IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**Martin Cowen**, et al.,

      Plaintiffs,

  vs.

**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,

      Defendant.

Case No. 1:17-cv-04660-LMM

**Brief in Support of the Plaintiffs' Motion for Summary Judgment**

Plaintiffs Martin Cowen, Allen Buckley, Aaron Gilmer, John Monds, and the Libertarian Party of Georgia, Inc., respectfully submit this brief in support of their motion for summary judgment.

## Background

This is a constitutional challenge to Georgia's ballot-access restrictions for third-party candidates for U.S. Representative. Among the laws at issue is O.C.G.A. § 21-2-170, which requires a candidate from a third party (or "political body," as third parties are known under

Georgia law) seeking the office of U.S. Representative to obtain signatures on a nomination petition from at least five percent of the registered voters eligible to vote in the last election for that office. No political-body candidate for U.S. Representative has ever been able to qualify for Georgia's general-election ballot since this provision was enacted in 1943.

The plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters. Together, they raise two claims. First, they allege that Georgia's ballot-access restrictions unconstitutionally burden their rights under the First and Fourteenth Amendments to the U.S. Constitution. Second, they allege that Georgia's ballot-access restrictions violate the Equal Protection Clause of the Fourteenth Amendment. They seek declaratory and injunctive relief prohibiting the State from enforcing those restrictions in future elections.

## I.   Georgia's Ballot-Access Restrictions

Georgia enacted its first ballot-access law in 1922. Act of Aug. 21, 1922, ch. 530, § 3, 1922 Ga. Laws 97, 100 (codified at 1933 Ga. Code § 34-1904). That law provided that an independent candidate, or the nominee

of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. (Ex. 33: Answer[1] (ECF 14) ¶15.) Before 1922, Georgia did not use government-printed ballots. Voters had to use their own ballots, and ballots were generally provided to voters by a political party. (Ex. 33: Answer ¶16.)

Georgia's current ballot-access restrictions date back to 1943, when the state added a five-percent petition requirement for access to the general-election ballot. Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292. That law allowed candidates of any political party that received at least five percent of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee. (Ex. 33: Answer ¶17.) The law required all other candidates to file a petition signed by at least five percent of the registered voters in the territory covered by the office. (Ex. 33: Answer ¶17.) The deadline for the petition was 30 days before the general election. See Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292. (Ex. 27: Def's Resp. Pls.' Corrected First Req. Admis.[2] ¶2 ("First Admissions").)

---

[1] For comparison with the defendant's answer, the plaintiffs' complaint (ECF 1) is attached as exhibit 32.
[2] For comparison with the defendant's responses, the plaintiffs' first set of requests for admissions is attached as exhibit 26.

The five-percent petition requirement came in the midst of a wave of anti-communist and nativist sentiment in Georgia and across the United States, and it was hailed at the time in the local media as a way to keep Communist candidates off of Georgia's ballots. (Ex. 17: Richardson decl. ¶¶10-13; Ex. 24: Richardson dep. 17:21-18:16; 20:4-7, 20:9-21:9, 23:5-11; Ex. 34: newspaper articles.)

Between 1943 and 1999, when the relevant ballot-access laws were last amended, the Georgia General Assembly adopted a series of incremental changes to the petition deadline, added a filing fee, and imposed a number of other restrictions that shape today's ballot-access rules for political-body candidates for U.S. Representative.[3]

Georgia's current ballot-access laws distinguish between three kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a political body; and (3) independent candidates. (Ex. 33: Answer ¶27.)

A "political party" is any political organization whose nominee received at least 20 percent of the vote in the last gubernatorial or

---

[3] A detailed history of those changes is set out in Part III of the plaintiffs' statement of material facts.

4

presidential election. O.C.G.A. § 21-2-2 (25). (Ex. 33: Answer ¶28.)[4]

Political parties choose nominees in partisan primaries, and the

candidate nominated by the party appears automatically on the general-

election ballot for any statewide or district office. O.C.G.A. § 21-2-130(1).

(Ex. 33: Answer ¶29.)

A "political body" is any political organization other than a political

party. O.C.G.A. § 21-2-2(25). (Ex. 33: Answer ¶31.) Political bodies must

nominate candidates for partisan offices by convention, and the

nominees' access to the general-election ballot may depend on whether

the nominee is seeking a statewide office, a non-statewide office, or the

office of President of the United States. O.C.G.A. § 21-2-170(g). (Ex. 33:

Answer ¶32.)

Georgia law permits a political body to become "qualified to

nominate candidates for statewide public office by convention." O.C.G.A.

§ 21-2-180. (Ex. 27: First Admissions ¶3.) A political body becomes

qualified to nominate candidates for statewide office by convention if: (a)

it submits a qualifying petition signed by at least one percent of the total

---

[4] The only political parties that meet the current definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party. (Ex. 33: Answer ¶30.)

number of registered voters at the last general election; or (b) it nominated a candidate for statewide office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶4.) Candidates for statewide offices, including the office of President of the United States, nominated by a political body that is qualified under Section 21-2-180 appear automatically on the general-election ballot without a nomination petition. O.C.G.A. § 21-2-132(e)(5). (Ex. 27: First Admissions ¶6.) The Libertarian Party of Georgia is a political body under Georgia law and has been qualified under Section 21-2-180 since 1988. (Ex. 33: Answer ¶128.)

Candidates for statewide offices nominated by political bodies that are not qualified under Section 21-2-180 do not appear automatically on the general-election ballot. Each such nominee for statewide office other than President must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Presidential candidates nominated by political bodies that are not qualified under

Section 21-2-180 must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by 7,500 registered voters eligible to vote for that office in the last general election. (Ex. 33: Answer ¶42.)

Political-body candidates for non-statewide offices, including the office of U.S. Representative, do not appear automatically on the general-election ballot. In order to appear on the general-election ballot, such candidates must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). (Ex. 27: First Admissions ¶8; Ex. 33: Answer ¶37.)

Independent candidates do not appear automatically on the general-election ballot for any office unless the candidate is an incumbent. Non-incumbent independent candidates must follow the same rules as candidates nominated by political bodies that are not qualified under Section 21-2-180. (Ex. 33: Answer ¶41.)

The deadline for political-body and independent candidates to file their notice of candidacy and qualifying fee[5] is noon on the Friday following the Monday of the thirty-fifth week before the general election—a date that falls in early March of an election year. O.C.G.A. § 21-2-132(d). (Ex. 23: Harvey dep. 169:15-170:3.)

The qualifying fee for most partisan offices, including U.S. Representative, is three percent of the annual salary of the office; however, the qualifying fee for candidates for the General Assembly is a flat $400. O.C.G.A. § 21-2-131. (Ex. 33: Answer ¶38.) Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2). For independent candidates, the Secretary of State retains the entire fee.

---

[5] Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g). (Ex. 29: Def's Resp. to Pls.' Second Req. Admis. ¶47 ("Second Admissions").) A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor the income to pay the filing fee, and it requires the candidate to submit a personal financial statement. O.C.G.A. § 21-2-132(g). (Ex. 29: Second Admissions ¶48.) In addition, a pauper's affidavit for a candidate for U.S. Representative must be accompanied by a petition signed by one percent of the number of registered voters eligible to vote for the office in the last election. O.C.G.A. § 21-2-132(h). (Ex. 23: Harvey dep. 170:4-13.)

O.C.G.A. § 21-2-131(c)(4)(B). For political-body candidates, the Secretary of State retains 25 percent and sends 75 percent to the political body after the election is over.[6] O.C.G.A. § 21-2-131(c)(4)(A). (Ex. 9: Graham decl. ¶¶15-16; Ex. 12: Metz decl. ¶13.)

The deadline for political-body and independent candidates to file their nomination petition is noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). The form of the petition is set out by statute. O.C.G.A. § 21-2-183. The petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d). Each sheet of the petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. *Id.* (Ex. 33: Answer ¶39.)

According to the Secretary of State, the number of active voters and petition signatures projected to be required for an independent or political-body candidate for U.S. Representative to appear on the 2020 general-election ballot in each of Georgia's 14 congressional districts is as follows:

---

[6] The Libertarian Party of Georgia did not receive its share of qualifying fees for the 2018 election from the Secretary of State until April 2019. (Ex. 9: Graham decl. ¶16.)

| District | Active Voters (11/06/18) | Valid Signatures Required 2020 |
|---|---|---|
| 1 | 447,321 | 22,367 |
| 2 | 397,565 | 19,879 |
| 3 | 474,044 | 23,703 |
| 4 | 485,112 | 24,256 |
| 5 | 530,774 | 26,539 |
| 6 | 479,056 | 23,953 |
| 7 | 469,959 | 23,498 |
| 8 | 414,387 | 20,720 |
| 9 | 459,485 | 22,975 |
| 10 | 472,606 | 23,631 |
| 11 | 499,459 | 24,973 |
| 12 | 418,996 | 20,950 |
| 13 | 490,064 | 24,504 |
| 14 | 395,560 | 19,778 |
| TOTAL | 6,434,388 | 321,726 |

(Ex. 31: Def's Resp. Pls.' Second Interrogs.) As a result, the Libertarian Party would need to gather at least 321,726 valid signatures in order to run a full slate of candidates for the office of U.S. Representative. (Ex. 31: Def's Resp. Pls.' Second Interrogs.)

The current annual salary for U.S. Representatives is $174,000. As a result, the qualifying fee for each candidate for U.S. Representative in 2020 is $5,220, and the Libertarian Party would need to pay $73,080 in qualifying fees in order to run a full slate of candidates for the office of U.S. Representative in 2020. (Ex. 33: Answer ¶55.)

## II.    Other States' Signature and Fee Requirements

Georgia requires more signatures for third-party candidates for
U.S. Representative to appear on the general-election ballot than any
other state in the nation, both as a percentage of votes cast and as an
absolute number of signatures. (Ex. 22: Winger decl. ¶¶8-9.) In 2018,
Georgia law required more than 272,000 valid signatures for a third
party to run a full slate of candidates for U.S. Representative. This
number represents more than 6.6 percent of all votes cast in Georgia for
president in 2016. (Ex. 22: Winger decl. ¶11.)

The state that required the next-highest number of signatures for
a third party to run a full slate of candidates for U.S. Representative was
Illinois, which required approximately 262,000 valid signatures in 2018.
This number represents approximately 4.7 percent of all votes cast in
Illinois for president in 2016, and it would have qualified 18 candidates.
(Ex. 22: Winger decl. ¶12.) The state that required the third-highest
number of signatures for a third party to run a full slate of candidates for
U.S. Representative in 2018 was New York, which required
approximately 94,500 valid signatures. This number represents
approximately 1.2 percent of all votes cast in New York for president in

2016, and it would have qualified 27 candidates. (Ex. 22: Winger decl. ¶13.)

Twenty-nine states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative in 2018. (Ex. 22: Winger decl. ¶14.) In some states, moreover, it is possible for third parties to qualify to nominate candidates for U.S. Representative without submitting any signatures. (Ex. 22: Winger decl. ¶15.)

Unlike Georgia, most other states do not require third-party candidates for U.S. Representative who qualify for the general-election ballot by petition to pay a qualifying fee at all. Among the states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation. (Ex. 22: Winger decl. ¶¶16-17.)

The state that requires the second-highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is North Carolina, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $22,620 for a third-party to run a full slate of 13 candidates for U.S. Representative. (Ex. 22: Winger

decl. ¶19.) The state that requires the third highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is West Virginia, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $5,220 for a third-party to run a full slate of three candidates for U.S. Representative. (Ex. 22: Winger decl. ¶20.)

## III.   The Impact of Georgia's Ballot-Access Restrictions

No political-body candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot since the five-percent petition requirement was adopted in 1943. (Ex. 33: Answer ¶44.)

Only two independent candidates for U.S. Representative have ever appeared on Georgia's general-election ballot, but they both did so under special circumstances. In 1964, Milton Lent qualified to be an independent candidate in Georgia's First Congressional District. (Ex. 33: Answer ¶45.) At the time, however, voter registration rates were lower; congressional districts did not split county boundaries; there was no qualifying fee; there was no time limit for gathering signatures; and the

petition deadline was in October. (Ex. 27: First Admissions ¶¶2, 10-12, 18; Ex. 33: Answer ¶20.) In 1982, Democratic State Representative Billy McKinney qualified as an independent candidate in Georgia's Fifth Congressional District after a federal court temporarily lowered the requirement to just 4,037 signatures. (Ex. 33: Answer ¶47; Ex 35: Application for Writ of Mandamus, *Dixon v. Poythress*, Civ. A. No. C-92177, (Fulton Cnty. Sup. Ct. 1982); Ex. 36: Jerry Schwartz and Ron Taylor, *McKinney Petition OK'd for 5th District Election*, Atlanta Constitution, Oct 30, 1982, at 1-B.)

No independent candidate for U.S. Representative has ever satisfied Georgia's ballot-access restrictions as they exist today, including the signature requirement, the filing deadline, the qualifying fee, and the technical requirements as to the form of the petition. (Ex. 37: Election Results 2000-2018 (excerpts).) And Georgia's signature requirement is higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever overcome in the history of the United States. (Ex. 22: Winger decl. ¶¶29-37.)

## IV.    Past Attempts to Qualify for the General-Election Ballot

Numerous independent and political-body candidates for U.S. Representative have sought unsuccessfully in the past to qualify for the general-election ballot under Georgia's current ballot-access laws. (Ex. 33: Answer ¶86.) Since 2002 alone, at least 20 independent and political-body candidates for U.S. Representative have made a genuine effort to get on the ballot but were unable to qualify.

In 2002, for example, the Libertarian Party made a genuine effort to qualify three candidates for U.S. Representative: Wayne Parker in the Eleventh Congressional District, Carol Ann Rand in the Sixth Congressional District, and Chad Elwartowski in the Ninth Congressional District. Because the 2002 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement by about half. The party raised approximately $40,000 for the effort and used 35 professional, paid petition circulators. The party ultimately decided to focus on Parker's campaign, and Parker submitted more than 20,000 raw signatures. But the Secretary of State's office rejected more than half of them, leaving Parker about 1,100 valid

signatures shy of the court-adjusted requirement. (Ex. 16: Parker decl. ¶¶5-15; Ex. 33: Answer ¶111.)

In 2010, independent candidate Jeff Anderson tried to get on the ballot in the Eleventh Congressional District. Anderson assembled a team of 24 volunteers who spent hundreds, if not thousands, of hours gathering signatures door to door. Anderson gathered somewhere between 11,000 and 12,000 raw signatures—well short of the approximately 21,000 valid signatures he needed—and therefore did not turn them in. (Ex. 1: Anderson decl. ¶¶5-9.)

Details of more unsuccessful efforts to gather signatures are set out at length in Part XII of the plaintiffs' statement of material facts.

## V.   Practical Barriers to Petitioning

There are a number of additional factors that present practical barriers to gathering enough signatures to qualify for the ballot.

One is the Secretary of State's error-prone petition-checking process, which leads to signature validation rates that are well below those of other states. (Ex. 10: Lee decl. ¶¶4-20; Ex. 23: Harvey dep. 32:11-33:16, 36:4-19, 38:4-39:2, 45:21-49:1, 52:11-16, 60:22-61:9, 61:22-25, 70:5-71:3; 84:20-23, 86:24-87:3, 91:13-92:9; 113:20-25, 118:22-119:4,

140:24-141:1, 158:5-11; Ex. 41: De La Fuente petition sheets and ENET printouts.)[7] The Secretary of State's office has validated only two petitions for U.S. Representative since 2000, for example, and those have yielded validation rates of 40 percent (in 2002) and a shocking two percent (in 2016). (Ex. 10: Lee decl. ¶20; Ex. 23: Harvey dep. 100:6-18.) As a result, independent and political-body candidates for U.S. Representative must gather signatures far in excess of the number of valid signatures required to obtain ballot access under Georgia law. (Ex. 1: Anderson decl. ¶6; Ex. 2: Armendariz decl. ¶8; Ex. 6: Esco decl. ¶7; Ex. 7: Fisher decl. ¶7; Ex. 10: Lee decl. ¶21.) For one candidate for U.S. Representative, that might mean somewhere between 40,000 and 75,000 signatures. For a full slate of 14 candidates for U.S. Representative, that might be somewhere between 600,000 and 1,000,000 signatures. (Ex. 10: Lee decl. ¶21.)

Another barrier is simply the difficulty and pace of petitioning. Gathering signatures is difficult, labor-intensive work. (Ex. 5: Cowen decl. ¶12; Ex. 7: Fisher decl. ¶8; Ex. 20: Webb decl. ¶7.) Don Webb, an experienced paid petition circulator, gathers an average of less than five

---

[7] For more details about the petition-checking process, see Part XIII of the plaintiffs' statement of material facts.

signatures per hour over the course of a week—a pace that would yield fewer than 5,000 raw signatures working nine-hour days seven days a week over the 180-day petitioning window. (Ex. 20: Webb decl. ¶¶7, 11.) Volunteer signature-gatherers tend to be difficult to recruit and less effective than paid signature-gatherers, and they are rarely willing or able to work for more than a few hours at a time. (Ex. 6: Esco decl. ¶9; Ex. 12: Metz decl. ¶12; Ex. 20: Webb decl. ¶¶9-10.) As a practical matter, therefore, it would be impossible for the Libertarian Party to qualify a full slate of candidates for the office of U.S. Representative without using multiple professional petition circulators. (Ex. 1: Anderson decl. ¶14; Ex. 6: Esco decl. ¶10; Ex. 7: Fisher decl. ¶11; Ex. 10: Lee decl. ¶22; Ex. 20: Webb decl. ¶12; Ex. 13: Monds decl. ¶8.)

Another is the combined effect of the cost of petitioning and the impact of federal campaign-finance law. Experienced petition-circulators estimate that the cost of gathering enough signatures to qualify a full slate of candidates for the office of U.S. Representative would likely exceed $1,000,000 and could exceed $2,500,000. (Ex. 1: Anderson decl. ¶7; Ex. 10: Lee decl. ¶24; ; Ex. 16: Parker decl. ¶17; Ex. 20: Webb decl. ¶12; Ex. 21: Wilson decl. ¶¶6-8.) But federal campaign-finance law limits

the amount that donors, including a state or national party, can contribute to a candidate. (Ex. 21: Wilson decl. ¶5; Ex. 29: Def's Resp. Pls.' Second Req. Admis.[8] ¶¶36-43 ("Second Admissions").) Except in the event of a runoff, the maximum amount that a state or national party may contribute to one candidate for U.S. Representative—in cash or via in-kind contributions—is $10,000 per election cycle. (Ex. 29: Second Admissions ¶¶40-43.) Federal law thus prohibits the Libertarian Party or any other large donor from contributing enough money to cover a substantial number of signatures. (Ex. 9: Graham decl. ¶17; Ex. 18: Sarwark decl. ¶32; Ex. 21: Wilson decl. ¶¶5, 17.) Donors, moreover, generally do not want to give money for signature-gathering on a ballot-access petition when success is far from assured. (Ex. 6: Esco decl. ¶10; Ex. 9: Graham decl. ¶18; Ex. 11: McKinney decl. ¶¶10-12; Ex. 12: Metz decl. ¶11; Ex. 21: Wilson decl. ¶4.). They want to promote ideas and policies, and they recognize that candidates who are not on the ballot are not taken seriously by the media or by the voters. (Ex. 21: Wilson decl. ¶4.)

---

[8] For comparison with the defendant's responses, the plaintiffs' second set of requests for admissions is attached as exhibit 28.

Another barrier is a lack of access to voters. In Georgia, petition-circulators may not lawfully solicit signatures on private property without the permission of the property owner. (Ex. 29: Second Admissions ¶46.) Virtually all of the places where large numbers of people congregate, like grocery stores and shopping malls, are on private property. Petition-circulators are relegated to gathering signatures on public sidewalks, which are often far away from where voters park to enter the stores. (Ex. 4: Coffield decl. ¶13; Ex. 6: Esco decl. ¶8; Ex. 19: Taylor decl. ¶11.) This also means that common-interest communities, like homeowners' associations (which have exploded in popularity in recent decades), are often off limits. (Ex. 1: Anderson decl. ¶13; Ex. 5: Cowen decl. ¶15.) Georgia law also prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place. O.C.G.A. § 21-2-414(a). This often means that signature-gatherers never have the chance to interact with voters. (Ex. 21: Wilson decl. ¶15.) Even when canvassing legally on public property, petition-circulators are often confronted by police officers or business owners unaware of their right to do so. (Ex. 6: Esco decl. ¶8; Ex. 16: Parker decl. ¶8; Ex. 19: Taylor decl. ¶12.)

Yet another barrier is widespread public concern about disclosing confidential information to petitioners. The form of a nomination petition calls for a voter to provide a date of birth and residential address, both of which are considered confidential, personally identifying information. O.C.G.A. § 21-2-225(b). (Ex. 41: De La Fuente petition sheets.) Many potential petition-signers express reluctance to sign, or refuse to sign altogether, because of the confidential information called-for by the form and the possibility that it could be used for identity theft or other nefarious purposes. (Ex. 4: Coffield decl. ¶11; Ex. 6: Esco decl. ¶8; Ex. 8: Gilmer decl. ¶13; Ex. 9: Graham decl. ¶13.) But without this information, or with partial or incomplete information, county officials are less likely to be able to verify the voter's signature. (Ex. 23: Harvey dep. 107:25-108:9.) And the Secretary of State's office recognizes that requiring candidates to ask strangers for legally-protected confidential information in order to appear on the ballot is "a concern." (Ex. 23: Harvey dep. 108:17-24.)

## VI.   Support for the Libertarian Party Nationwide and in Georgia

The Libertarian Party was founded in 1971 and is organized in all 50 states plus the District of Columbia. (Ex. 18: Sarwark decl. ¶¶5-6.) It is currently the third-largest political party in the United States. (Ex. 18: Sarwark decl. ¶14.) The party's platform and positions on contemporary issues emphasize individual liberty and reflect policy preferences that are distinct from those of the Democratic and Republican parties. (Ex. 18: Sarwark decl. ¶¶8-13.) Researchers estimate that up to 27 percent of Americans have libertarian-leaning views. (Ex. 18: Sarwark decl. ¶¶15-16.)

The Libertarian Party runs hundreds of candidates in every election cycle. These candidates seek positions ranging from city council to President. The Libertarian Party had 833 candidates on ballots in 2018. (Ex. 18: Sarwark decl. ¶18.) The party runs numerous candidates for U.S. Representative and has had those candidates on the ballot in every state in the nation except Georgia. (Ex. 18: Sarwark decl. ¶¶20-21.)

In the last ten years, Libertarian candidates have received tens of millions of votes. (Ex. 18: Sarwark decl. ¶24.) The party's 2016 nominee for President, Gary Johnson, received 4,489,341 votes—the highest-ever

vote total for a Libertarian candidate—which represented 3.28 percent of the popular vote and the third-highest vote total among the candidates. (Ex. 18: Sarwark decl. ¶25.) There are currently more than 180 elected officials affiliated with the party nationwide. (Ex. 18: Sarwark decl. ¶22.)

The Libertarian Party of Georgia was founded in 1972 and currently has members in each of Georgia's 14 congressional districts. (Ex. 9: Graham decl. ¶20; Ex. 33: Answer ¶12.) In 1988, the party qualified to nominate candidates for statewide office by convention when it submitted a party-qualifying petition signed by at least one percent of the number of total number of registered voters at the preceding general election. *See* O.C.G.A. § 21-2-180(1). The party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least one percent of the total number of registered voters who were registered and eligible to vote in that election. *See* O.C.G.A. § 21-2-180(2). (Ex. 33: Answer ¶128.)

In the last ten years, Libertarian candidates for statewide offices in Georgia have received more than five million votes. (Ex. 33: Answer ¶131; Ex. 37: Election Results 2000-2018 (excerpts).) In 2016, for

example, the Libertarian candidate for the Public Service Commission, Eric Hoskins, received 1,200,076 votes, which represents 33.4 percent of all votes cast in that contest and 22.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Hoskins carried Clayton and DeKalb counties. (Ex. 33: Answer ¶132.)

In *Green Party of Georgia v. Kemp*, the Secretary of State repeatedly described the Libertarian Party as a political body "with significant support" in Georgia. (Ex. 33: Answer ¶135; Ex. 42: excerpts from appellant's briefs.)

## Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute about a material fact is genuine if the evidence would allow a reasonable

jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether to grant or deny summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Id.* at 249. In doing so, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Discussion

### I.   Georgia may not require more signatures from candidates for U.S. Representative than from candidates for statewide office.

This case is controlled by the Supreme Court's decisions in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), and *Norman v. Reed*, 502 U.S. 279 (1992), both of which plainly forbid a state from requiring third-party candidates to gather more signatures to get on the ballot for an office in a district or political-subdivision than for a statewide office.

In *Socialist Workers*, the issue was a provision of Illinois law that required independent candidates and candidates from new political parties[9] seeking to run for office in a congressional district, other district, or political subdivision of the state to gather signatures equaling five percent of the number of persons who voted in the last election in the district or political subdivision. 440 U.S. at 175-76. But Illinois law required only 25,000 signatures for an independent or new-party candidate to appear on the ballot in a statewide election. *Id.* at 175. In the City of Chicago, this had the "incongruous result" that the Socialist Workers Party's candidate needed 63,373 signatures to appear on the ballot in a special mayoral election—substantially more signatures than the party or its candidate would have needed for a statewide office. *Id.* at 176-77. The Supreme Court held that, although the State had a legitimate interest in ensuring that a party or independent candidate had a "'significant modicum of support,'" there was "no reason, much less

---

[9] Illinois law distinguished between "established" political parties and "new" political parties. *Socialist Workers,* 440 U.S. at 175-76 n.1. An established political party was any party whose candidate for Governor or for any office in a district or political subdivision received at least five percent of the votes in the last election. *Id.* A new political party was any party that had not met that requirement. *Id.*

a compelling one" justifying a requirement of greater support for Chicago

elections than for statewide elections. *Id.* at 185-86.

    In reaching that conclusion, the Supreme Court recognized the

important role that third parties play in our political system:

> The States' interest in screening out frivolous candidates
> must be considered in light of the significant role that third
> parties have played in the political development of the
> Nation. Abolitionists, Progressives, and Populists have
> undeniably had influence, if not always electoral success.
> As the records of such parties demonstrate, an election
> campaign is a means of disseminating ideas as well as
> attaining political office.

*Id.*; *see also Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing

the importance of "political figures outside the two major parties").

    The Supreme Court reaffirmed the core holding of *Socialist*

*Workers* and reached the same result two decades later in *Norman*. 502

U.S. at 291-94. In that case, the issue was another provision of Illinois

law, enacted in direct response to *Socialist Workers,* that capped the

signature requirement for "any district or political subdivision" at 25,000

signatures. *Id.* at 292. Under that replacement provision, a candidate for

Mayor of Chicago would have needed only 25,000 signatures—the same

number still required for statewide office. But the plaintiffs in *Norman*

sought to run new-party candidates for the Cook County Board of

Commissioners, which consisted of two districts, and the State Supreme Court construed the new law to require them to submit 50,000 signatures—25,000 for each district—in order to do so. *Id.* at 283-84, 293.

The Supreme Court held that the outcome in *Norman* was controlled by the earlier case: "The State may not do this in light of *Socialist Workers*, which forbids it to require petitioners to gather twice as many signatures to field candidates in Cook County as they would need statewide." *Id.* The Court did so even though the election officials defending the law advanced what they claimed to be a state interest, not addressed in the prior case, in ensuring that a new party has a modicum of support in *each* of Cook County's districts. *Id.* The Court observed that the State could have served that interest by requiring that some minimum number of signatures come from each district as long as the total would not exceed 25,000. And it noted that, because the State did not require any particular distribution of support for new statewide parties, "it requires elusive logic to demonstrate a serious state interest in demanding such a distribution for new local parties." *Id* at 294. The Supreme Court closed that portion of its opinion by again reaffirming the rule laid down by its earlier decision: "Thus, as in *Socialist Workers*, the

State's requirements for access to the statewide ballot become criteria in the first instance for judging whether rules of access to local ballots are narrow enough to pass constitutional muster." *Id.* Finding "no justification for the disparity," the Court struck down the law once again. *Id.*

Georgia law, like the Illinois laws at issue in *Socialist Workers* and *Norman*, creates the incongruous result that Libertarian candidates must gather more signatures to run for U.S. Representative in any one of Georgia's fourteen congressional districts than they would need to run for President, U.S. Senator, Governor, or any one of Georgia's other statewide offices. Indeed, Libertarian candidates need not submit *any* signatures to run for statewide office because the party has repeatedly demonstrated that it has significant support, first by satisfying the party-qualifying petition requirement in 1988, and then by satisfying the one-percent vote requirement in every statewide general election since then. And, even if the Libertarian Party had not demonstrated such support, a Libertarian candidate for President of the United States would need only 7,500 signatures in order to qualify for the statewide ballot. Either number—zero or 7,500—is substantially smaller than the

approximately 23,000 valid signatures required for a Libertarian

candidate to run for U.S. Representative. This is precisely what *Socialist*

*Workers* and *Norman* forbid.

## II. Georgia's ballot-access restrictions violate the First and Fourteenth Amendments.

To determine whether Georgia's ballot-access restrictions

otherwise violate the First and Fourteenth Amendments, this Court

must apply the balancing test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985)

(paraphrasing *Anderson*, 460 U.S. at 789*); accord Green Party of Georgia*

*v. Georgia*, 551 Fed. Appx 982, 983 (11th Cir. 2014).

Under this test, the level of scrutiny varies on a sliding scale with

the extent of the asserted injury. When, at the low end of the scale, the

law "imposes only 'reasonable, nondiscriminatory restrictions' upon First

and Fourteenth Amendment rights of voters, 'the State's important

regulatory interests are general sufficient to justify' the restrictions."
*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460
U.S. at 788, 788-89 n.9). But when the law places "severe" burdens on
the rights of political parties, candidates, or voters, "the regulation must
be 'narrowly drawn to advance a state interest of compelling
importance.'" *Id*. at 434 (quoting *Norman*, 502 U.S. at 289).

The plaintiff bears the burden of proof on the first step in the
*Anderson* test, and the defendant bears the burden on the second and
third. *Burson v. Freeman*, 504 U.S. 191, 199 (1992); *Nader v. Brewer,* 531
F.3d 1028, 1039-40 (9th Cir. 2008); *Lopez Torres v. New York State Bd. of
Elections,* 462 F.3d 161, 203 (2d Cir. 2006), *rev'd on other grounds* 552
U.S. 196 (2008); *Patriot Party v. Allegheny Cnty. Dept. of Elections*, 95
F.3d 253, 267-68 (3d Cir. 1996*).

A.    **The Character and Magnitude of the Injury**

Georgia's ballot-access restrictions burden "two different, although
overlapping kinds of rights—the right of individuals to associate for the
advancement of political beliefs, and the right of qualified voters,
regardless of their political persuasion, to cast their votes effectively."

*Williams v. Rhodes,* 393 U.S. 23, 30 (1968). "Both of these rights, of course, rank among our most precious freedoms." *Id.*

The right to associate, which includes the "right of citizens to create and develop new political parties," is obviously diminished if a party can be kept off the ballot. *Norman*, 502 U.S. at 288; *see also Socialist Workers*, 440 U.S. at 184. Ballot-access restrictions also implicate the right to vote because, except for initiatives and referenda, "voters can assert their preferences only through candidates or parties or both." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Id.* An election campaign is a platform for the expression of views on the issues of the day, and a candidate "serves as a rallying point for like-minded citizens." *Anderson*, 460 U.S. at 787-88.

Generally, a ballot-access law imposes a severe burden if it "'freeze[s] the status quo' by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." *Libertarian Party v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (quoting *Jenness v. Fortson*, 403 U.S. 431, 439 (1971)). Thus, the

Supreme Court applied strict scrutiny to several provisions of Ohio's restrictive election code which together made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties." *Williams v. Rhodes*, 393 U.S. at 24.

The magnitude of the injury to these rights here is undoubtedly severe: Georgia's ballot-access restrictions make it virtually impossible for independent and political-body candidates for U.S. Representative to qualify for the ballot. As the Supreme Court has recognized, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Anderson*, 460 U.S. at 787 (quoting *Lubin*, 415 U.S. at 716).

One way to measure the magnitude of the injury is by reference to other cases. Here, the closest case is *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1362-65 (N.D. Ga. 2016), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam), which struck down Georgia's ballot-access restrictions for independent and political-body candidates for President. In that case, the signature requirement was one percent of registered voters, and political-body presidential candidates had been absent from

33

Georgia's ballots for just over 15 years. The court also relied heavily on the fact that Georgia's signature requirement was higher than "most other states" and that the restrictions had excluded a presidential candidate in 2000 (Ralph Nader) who had enjoyed "widespread national support."[10] *Id.* at 1363. The district court found that the burden of the signature requirement was "severe," and it therefore applied strict scrutiny to the measure. *Id.* The Eleventh Circuit affirmed in an unpublished decision "based on the district court's well-reasoned opinion." *Green Party of Georgia v. Kemp*, No. 16-11689 (11th Cir. Feb 1, 2017) (per curiam).

By comparison, Georgia's signature requirement for independent and political-body candidates for U.S. Representative is higher in percentage terms. It has excluded political-body candidates for more than half a century longer. It is the highest such requirement in the nation, and it has excluded candidates of the Libertarian Party, which is the third-largest party in the United States and enjoys widespread support nationwide *and* in Georgia. Strict scrutiny should therefore apply in this case as well.

---

[10] Nader received nearly three percent (2.74 percent) of the popular vote in 2000. *Green Party*, 171 F. Supp. 3d at 1362.

Another way to measure the magnitude of the injury is by looking to past experience. If candidates for U.S. Representative have been unable to meet the requirements, then the burden is probably severe. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements). Here, it is undisputed that no political-body candidate for U.S. Representative has ever satisfied the five-percent signature requirement since it was enacted in 1943. And that is despite more than a dozen genuine attempts to qualify for the ballot since 2002 alone. It is also undisputed that Georgia's signature requirement is higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever met in the history of the United States. If past experience is any guide, then, strict scrutiny should clearly apply.

Yet another way to measure the burden is by comparison to other states. It is undisputed that Georgia requires more signatures for third-

party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. It is also undisputed that Georgia's qualifying fees are higher than any other state in the nation with a mandatory petition requirement.

Other key factors that point to a severe burden here include: (1) the Secretary of State's petition-checking process, which leads to lower signature-validation rates than in other states; (2) the impact of federal campaign-finance law, which limits the amount that a party or other donor can contribute toward the cost of gathering signatures for a candidate; and (3) the other practical difficulties of gathering signatures outlined above. These factors plainly add weight to the burden imposed by Georgia's restrictions.

This Court should therefore conclude that Georgia's ballot-access restrictions for independent and political-body candidates for U.S. Representative impose a severe constitutional burden and merit strict scrutiny.

## B.   Asserted State Interests

In a deposition conducted under Rule 30(b)(6) of the Federal Rules of Civil Procedure just before the close of discovery, the Secretary of State's office asserted two state interests as justification for Georgia's ballot-access restrictions: (1) "eliminating or avoiding [as] many runoffs as possible;" and (2) "limiting ballot confusion among voters." (Ex. 23: Harvey dep. 173:21-174:3.)

## C.   Legitimacy, Strength, and Tailoring

The is no question that the State's interests in avoiding runoffs and limiting voter confusion are legitimate. The Supreme Court has described the former as "important," *Clements v. Flashing*, 457 U.S. 957, 965 (1982), and the latter as "compelling," *American Party of Texas v. White*, 415 U.S. 767, 799 (1974), though the Eleventh Circuit has recognized that state interests generally weigh less in the context of elections for "federal offices" than they do in the context of elections for state and local offices. *Bergland*, 767 F.2d at 1554. But, in this case, it does not matter whether the State's two asserted interests are "compelling," merely "important," or even less weighty because of the

37

federal context. Georgia's ballot-access restrictions are not remotely necessary to advance either one of its interests.

If the State truly wanted to avoid runoff elections, it could simply eliminate them. (Ex. 25: Winger dep. 38:10.) Georgia is one of only two states to use runoffs in any general elections. (Ex. 22: Winger decl. ¶39.) Runoff elections can also be avoided by using ranked-choice voting. (Ex. 22: Winger decl. ¶41.) The State of Maine uses ranked-choice voting in general elections to elect U.S. Senators and U.S. Representatives, and five states use ranked-choice voting for overseas voters in runoff elections for federal offices. (Ex. 29: Second Admissions ¶¶44-45.)

In any event, it is exceedingly rare for a winning congressional candidate to receive less than 50 percent of the vote. Among the 370 contests for U.S. Representative in 2016 where there were more than two candidates on the ballot, there were only eight general elections (2.2 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 40:15-41:7.) There is simply no evidence to support a conclusion that easing Georgia's ballot-access restrictions for U.S. Representative would overburden the State with runoff elections. (Ex. 23: Harvey dep. 176:21-177:10, 178:12-15.) Moreover, it requires "elusive

logic," *Norman*, 502 U.S. at 294, to demonstrate a serious state interest in avoiding runoffs when Georgia law allows the Libertarian Party's candidates for any and all statewide offices, including U.S. Senator, to appear on the ballot without further petitioning. The Secretary of State's office even concedes that there is no significant marginal cost for having a congressional runoff in addition to a runoff for a statewide race. (Ex. 23: Harvey dep. 179:7-12.)

And, as for voter confusion, the Secretary of State's office concedes that there is none. (Ex. 23: Harvey dep. 183:16-19.) There were 18 candidates on the ballot (most of them Democrats or Republicans) in the most recent special congressional election, held in 2017, and the Secretary of State's office is not aware of any widespread reports of voter confusion even in that race. (Ex. 23: Harvey dep. 182:13-183:15.) *See also Green Party*, 171 F. Supp. 3d at 1366 (observing that there was no evidence of voter confusion in Georgia's Republican presidential preference primaries in 2012 and 2016, which had 13 and nine candidates, respectively).

Special congressional elections are also instructive here because the ballot-access rules are different: no nomination petition is required.

Every candidate who submits a notice of candidacy and qualifying fee, and who otherwise meets the qualifications for the office, appears automatically on the special-election ballot. (Ex. 27: First Admissions ¶22.) And yet, even in the absence of a signature requirement, Georgia's special-election ballots have not been overcrowded with independent or political-body candidates. (Ex. 27: First Admissions ¶23-24.) In the three special congressional elections held in Georgia since 2007—with only the qualifying fee (or pauper's affidavit) as a hurdle for ballot access—there have never been more than two independent or political-body candidates to qualify for the ballot. (Ex. 37 at 11, 30, 37: Election Results 2000-2018 (excerpts).) This demonstrates quite clearly that Georgia's signature requirement is not necessary to keep the number of such candidates down.

Lastly, it strains credulity even to suggest that Georgia has a problem with overcrowded congressional ballots when they are among the least crowded in the nation. In the three election cycles from 2012 through 2016, Georgia had 15 unopposed races for U.S. Representative—more than any other state in the nation. That number represents almost 36 percent of its races for U.S. Representative over that period, which is

a greater share than any other state in the nation except Massachusetts. (Ex. 22: Winger decl. ¶¶21-26; Ex. 33: Answer ¶¶118-121.)

For these reasons, the Secretary of State cannot show that Georgia's ballot-access restrictions are necessary to advance either of the asserted state interests. This Court should therefore conclude that those restrictions violate the First and Fourteenth Amendments.

## III.   Georgia's ballot-access restrictions violate the Equal Protection Clause.

To determine whether a ballot-access restriction violates the Equal Protection Clause of the Fourteenth Amendment, this Court "must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification." *Socialist Workers*, 440 U.S. at 183. This test is functionally almost identical to the *Anderson* test, and the Supreme Court has noted that the analysis is interchangeable. *Norman,* 502 U.S. at 288 n.8; *Anderson,* 460 U.S. at 786-87 n.7.

Here, Georgia law creates a classification by treating Libertarian Party candidates for U.S. Representative differently from Libertarian Party candidates for statewide offices including U.S. Senator. Or, more

41

broadly speaking: among candidates nominated by a political body that is qualified under Section 21-2-180 of the Georgia Code, Georgia's ballot-access laws treat candidates for U.S. Representative differently than candidates for statewide offices. The latter have automatic ballot access. The former, of course, must petition.

The individual interests at stake here are the same fundamental rights described above: "'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Socialist Workers*, 440 U.S. at 184 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

The Secretary of State has asserted two state interests to support this classification. (Ex. 30 at 7-9: Def's Resp. Pls.' First Interrogs.) One of them, avoiding runoffs, was addressed above. The other is an asserted interest in "ensuring that Libertarian Party candidates for both U.S. Representative and statewide partisan office can demonstrate that they have a modicum of support among the electorate that they wish to represent." (*Id.* at 8.)

This assertion, however, rests on a faulty premise. The State does not, in fact, require Libertarian candidates to demonstrate any support before appearing automatically on the ballot in a statewide race. Allen Buckley, for example, did not have to gather signatures before he appeared on the ballot at the Libertarian candidate for U.S. Senator in 2016 or 2004. (Ex. 3: Buckley decl. ¶10.) He appeared automatically on the ballot simply because he was the nominee of the Libertarian Party and because the party itself had demonstrated support in the preceding election by having *a different candidate or candidates* meet the one-percent vote threshold. *See* O.C.G.A. § 21-2-180(2).

This asserted interest, moreover, is indistinguishable from the interest that the Supreme Court found lacking in *Norman*. 502 U.S. at 293-94. As in that case, Georgia could have served any such interest by imposing a geographic distribution requirement on the Libertarian Party's 1988 statewide qualifying petition or the one-percent retention threshold under Section 21-2-180. But the State has chosen not to do so, and the Libertarian party could therefore secure all the votes it needs to demonstrate "statewide" support from any one of the state's most-

populous counties. That speaks volumes about the strength and tailoring of this asserted interest.

The State has thus failed to justify a frankly absurd classification that impinges upon the fundamental rights of parties, candidates and voters. This Court should therefore conclude that Georgia's ballot-access restrictions violate the Equal Protection Clause to the extent that they treat Libertarian Party candidates for U.S. Representative differently from Libertarian Party candidates for statewide offices.

## Conclusion

The undisputed facts in this case are overwhelming. Georgia's ballot-access restrictions are by far the most stringent in the nation, and no third-party candidate for U.S. Representative has appeared on the general-election ballot since they were enacted in 1943. They require Libertarian candidates for U.S. Representative to gather far more signatures than Libertarian candidates for U.S. Senator or even President. They make it virtually impossible for Libertarian Party candidates for U.S. Representative to qualify for the ballot despite widespread support nationwide and in Georgia. And it is clear that they

are not remotely necessary for the State to advance its legitimate interests.

These circumstances permit the trier of fact to reach only one conclusion, and this Court should therefore grant summary judgment in the plaintiffs' favor.

Respectfully submitted this 5th day of June, 2019.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing BRIEF IN SUPPORT OF THE

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT was prepared in

13-point Century Schoolbook in compliance with Local Rules 5.1(C) and

7.1(D).


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com