# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | **Statement of Material Facts** |
| Defendant. | |

Pursuant to Local Rule 56.1 B.1., the plaintiffs respectfully submit this statement of material facts as to which there is no genuine issue to be tried.

# Table of Contents

I.        Jurisdiction and Venue .................................................4

II.       Parties ...........................................................................4

III.      The History of Georgia's Ballot-Access Restrictions .....................7

IV.       The Purpose of Georgia's Petition Requirement...........................10

V.        Georgia's Current Ballot-Access Restrictions ...............................13

VI.       The Pauper's Affidavit in Lieu of Filing Fee.................................19

VII.      The Number of Valid Signatures and Qualifying Fee Required
          for Political-Body Candidates ........................................20

VIII.     Other States' Signature Requirements ........................................22

IX.       Other States' Qualifying Fees.....................................................23

X.        The Impact of Georgia's Ballot-Access Restrictions ....................24

XI.       Signatures Requirements Met by Independent and Third-Party
          Candidates for U.S. Representative in Other States ..................26

XII.      Past Attempts to Qualify for the General-Election Ballot ..........28

XIII.     The Petition-Checking Process ....................................................43

XIV.      The Difficulty and Pace of Petitioning .........................................48

XV.       The Cost of Petitioning in Georgia ...............................................50

XVI.      The Impact of Federal Campaign-Finance Law ...........................51

XVII.     Lack of Access to Voters..............................................................53

XVIII.    Public Concern about Disclosing Confidential Information.........55

XIX.      Support for the Libertarian Party Nationwide and in Georgia ...57

XX.       The Libertarian Party's Platform and Policy Positions ..............62

XXI.      The National Impact of Georgia's Ballot-Access Restrictions......63

XXII.       Uncontested Congressional Elections in Georgia ..........................65

XXIII.      Special Elections for U.S. Representative in Georgia ..................67

XXIV.       Runoff Elections in Georgia ...........................................................69

## I.        Jurisdiction and Venue

1.     This Court has original jurisdiction over this case under Article III of the U.S. Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3). (Ex. 33: Answer[1] (ECF 14) ¶3.)

2.     This suit is authorized by 42 U.S.C. § 1983. (Ex. 33: Answer ¶4.)

3.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. (Ex. 33: Answer ¶5.)

4.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) and in the Atlanta Division under Local Rule 3.1. (Ex. 33: Answer ¶6.)

## II.       Parties

5.     Plaintiff Martin Cowen is a prospective political-body candidate in Georgia's Thirteenth Congressional District. (Ex. 33: Answer ¶7.) He meets all of the qualifications for the office of U.S. Representative and wants to appear on the general-election ballot as the nominee of the Libertarian Party of Georgia. He was the Libertarian Party's nominee for that seat in 2018, but he was unable to qualify for the general-election ballot. He intends to run again for that seat in 2020. (Ex. 5: Cowen decl. ¶¶1, 8, 10, 18, 20, 22-23.)

---

[1] For comparison with the defendant's answer, the plaintiffs' complaint (ECF 1) is attached as exhibit 32.

6.     Plaintiff Allen Buckley is a registered voter in Georgia's Thirteenth Congressional District. (Ex. 33: Answer ¶8.) He wants to vote for Martin Cowen as the Libertarian Party of Georgia's nominee for the office of U.S. Representative in his district. (Ex. 3: Buckley decl. ¶¶15-16.)

7.     Plaintiff Aaron Gilmer, whose full name is Robin Aaron Gilmer, is a prospective political-body candidate in Georgia's Ninth Congressional District. (Ex. 27: Def's Resp Pls.' Corrected First Req. Admis.[2] ¶1 ("First Admissions").) He meets all of the qualifications for the office of U.S. Representative. He was the Libertarian Party's nominee for that seat in 2018, but he was unable to qualify for the ballot. He is planning to run for office again as a Libertarian Party candidate in 2020 and would prefer to run for the office of U.S. Representative. (Ex. 8: Gilmer decl. ¶¶1, 9, 17, 21.)

8.     Plaintiff John Monds is a registered voter in Georgia's Second Congressional District. (Ex. 33: Answer ¶10.) He wants to vote for the Libertarian Party of Georgia's nominee for the office of U.S. Representative in his district. (Ex. 13: Monds decl. ¶¶10-11.)

9.     Plaintiff Libertarian Party of Georgia, Inc. is a Georgia nonprofit corporation and a political body within the meaning of O.C.G.A. § 21-2-170. (Ex. 33: Answer ¶11.)

---

[2] For comparison with the defendant's responses, the plaintiffs' first set of requests for admissions is attached as exhibit 26.

10.    The Libertarian Party of Georgia was founded in 1972 and is the official Georgia affiliate of the national Libertarian Party, which was founded in 1971. (Ex. 33: Answer ¶12.)

11.    Since its founding, the Libertarian Party of Georgia has run candidates for statewide public offices and for state legislative offices. (Ex. 33: Answer ¶13.) The party has never had any nominee for U.S. Representative appear on Georgia's general-election ballot. (Ex. 33: Answer ¶13.) The party wants to nominate a candidate for U.S. Representative in all of Georgia's congressional districts and to have those nominees appear on the general-election ballot. (Ex. 9: Graham decl. ¶19.)

12.    Defendant Brad Raffensperger is the Secretary of State of the State of Georgia (hereinafter, the "Secretary"). (ECF 48.) He is the chief election official of the State of Georgia. (Ex. 33: Answer ¶14.) He is charged by statute with enforcing Georgia's ballot-access restrictions for candidates for U.S. Representative. (Ex. 33: Answer ¶14.) At all relevant times, the Secretary exercised his authority under color of state law within the meaning of 42 U.S.C. § 1983. (Ex. 33: Answer ¶14.) He is sued in his official capacity only. (Ex. 33: Answer ¶14.)

III.        **The History of Georgia's Ballot-Access Restrictions**

13.     Georgia enacted its first ballot-access law in 1922. Act of Aug. 21, 1922, ch. 530, § 3, 1922 Ga. Laws 97, 100 (codified at 1933 Ga. Code § 34-1904). That law provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. (Ex. 33: Answer ¶15.)

14.     Before 1922, Georgia did not use government-printed ballots. Voters had to use their own ballots, and these were generally provided to voters by a political party. (Ex. 33: Answer ¶16.)

15.     In 1943, Georgia added a five-percent petition requirement for access to the general-election ballot. Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292. That law allowed candidates of any political party that received at least five percent of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee. (Ex. 33: Answer ¶17.) The law required all other candidates to file a petition signed by at least five percent of the registered voters in the territory covered by the office. (Ex. 33: Answer ¶17.)

16.     When Georgia first enacted its five-percent petition requirement in 1943, the petition deadline was 30 days before the general election. *See* Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292 (amending 1933 Ga. Code § 34-1904, which provided that "All candidates for National and State offices,

7

or the proper authorities of the political party nominating them, shall file notice of their candidacy, giving their names and the offices for which they are candidates, with the Secretary of State, at least thirty days prior to the regular election, except in cases where a second primary election is necessary."). (Ex. 27: First Admissions ¶2.)

17.     In 1964, the State added a time limit for gathering signatures on a nomination petition, providing that candidates could not begin circulating a nomination petition more than 180 days before the filing deadline. Georgia Election Code, ch. 26, § 1, 1964 Ga. Laws Ex. Sess. 26, 93 (codified at 1933 Ga. Code § 34-1010). That law also changed the petition filing deadline to 50 days before the general election. *Id.* at 87 (codified at 1933 Ga. Code § 34-1001). (Ex. 33: Answer ¶20.)

18.     In 1965, the General Assembly moved the petition deadline to 60 days before the general election. Act of March 22, 1965, Ch. 118, § 1, 1965 Ga. Laws 224, 225 (codified at 1933 Ga. Code § 34-1001). (Ex. 33: Answer ¶21.)

19.     In 1969, the petition deadline was moved to the second Wednesday in June. Act of April 9, 1969, ch. 89, § 8B, 1969 Ga Laws. 329, 336 (codified at 1933 Ga. Code § 34-1001). In 1977, the petition deadline was moved to the second Wednesday in July. Act of March 30, 1977, ch. 294, § 3(c), 1977 Ga. Laws 1053, 1056 (codified at 1933 Ga. Code § 34-1002). (Ex. 33: Answer ¶22.)

20.     In 1970, the General Assembly imposed a qualifying fee on candidates for U.S. Representative equal to five percent of the annual salary of the office. Act of March 20, 1970, ch. 1079, § 13, 1970 Ga. Laws 347, 367 (codified at 1933 Ga. Code § 34-1013). At the time, the annual salary of U.S. Representatives was $42,500. *See* Ida A. Brudnick, Cong. Research Serv., 97-1011, Salaries of Members of Congress: Recent Actions and Historical Tables 16 (2018), *available at* https://fas.org/sgp/crs/misc/97-1011.pdf. (Ex. 27: First Admissions ¶18.)

21.     In 1974, the General Assembly lowered the qualifying fee to three percent of the annual salary of the office, where it remains today. Act of January 29, 1974, ch. 757, § 2, 1974 Ga. Laws 4, 6. (Ex. 27: First Admissions ¶19.)

22.     In 1979, the General Assembly created a separate petition requirement for statewide offices. Act of April 12, 1979, ch. 436, 1979 Ga Laws 617 (codified at 1933 Ga. Code § 34-1010). Under that provision, an independent or political-body candidate seeking a statewide office needed to file a petition signed by at least two and a half percent of the registered voters eligible to vote in the last election for the office. Candidates for all other offices still had to meet the five-percent threshold. (Ex. 33: Answer ¶23.)

23.     In 1986, the General Assembly lowered the petition threshold for statewide candidates to one percent. Act of April 3, 1986, ch. 1517, § 3, 1986 Ga. Laws 890, 892-93 (codified at Ga. Code § 21-2-170). The threshold for all other independent and political-body candidates remained at five percent. (Ex. 33: Answer ¶24.)

24.     In 1986, the General Assembly also moved the petition deadline to the first Tuesday in August. *Id.* at 891-92 (codified at Ga. Code § 21-2-132). (Ex. 33: Answer ¶25.)

25.     In 1989, the General Assembly moved the petition deadline to the second Tuesday in July, where it remains today. Act of April 4, 1989, ch. 492, § 2, 1989 Ga. Laws 643, 647 (codified at Ga. Code § 21-2-132). (Ex. 33: Answer ¶26.)

26.     In 1999, the General Assembly added a further requirement that each sheet of a nomination petition be notarized. Act of April 1, 1999, ch. 23, § 2, 1999 Ga. Laws 23, 24-25 (codified at Ga. Code § 21-2-170). (Ex. 27: First Admissions ¶9.)

## IV.        The Purpose of Georgia's Petition Requirement

27.     Georgia's five-percent petition requirement was enacted with the discriminatory purpose of preventing Communist Party candidates from appearing on Georgia's ballots. (Ex. 17: Richardson decl. ¶15.)

28.     Prior to its enactment in 1943, Georgia had never had a problem with crowded ballots. (Ex. 24: Richardson dep. 14:14-17:6.) Between 1922 and 1943 Georgia had never had more than 5 candidates on its presidential ballot, and there had never been more than 2 senatorial candidates in a general election. (Ex. 17: Richardson decl. ¶14.)

29.     In 1940, Georgia's Secretary of State, John B. Wilson, had unilaterally barred Earl Browder, the Communist Party's nominee for president, and other members of the party from appearing on the state's ballots in the 1940 election. Wilson justified his ruling on the grounds of public policy: "It would be against public policy to place on our ballot the names of candidates of a party which seeks to overthrow our democratic constitutional form of government." Wilson also relied on advice from Georgia's Attorney General, Ellis Arnall, a noted anti-communist politician who had waged a campaign to keep communist candidates off of Georgia's ballots. (Ex. 17: Richardson decl. ¶10; Ex. 34 at 1-2: newspaper articles.)

30.     Wilson's action came in the midst of a wave of anti-communist and nativist sentiment in the United States. (Ex. 17: Richardson decl. ¶11.) Eleven states took similar action to arbitrarily keep the communist party off the ballot in 1940. (Ex. 24: Richardson dep. 20:4-7.)

31.     Shortly after the 1940 presidential election, Wilson was reported to be seeking legislation to keep the Communist party permanently off the

ballot. At the time, Wilson proposed to require all candidates for state and national office in Georgia to file with the secretary of state sufficient information to determine whether the party is designed to overthrow our constitutional form of government. Although the communist party would not be mentioned in the bill, Wilson said that it and any other similar party would be the primary target. (Ex. 17: Richardson decl. ¶12; Ex. 34 at 3: newspaper articles.)

32.     Although the General Assembly did not adopt Wilson's proposal in 1941 or 1942, it did adopt the five-percent petition requirement in 1943, when hostility to the Soviet Union and communism was still high. (Ex. 24: Richardson dep. 20:19-21:9, 23:5-11.) The bill was signed into law by Ellis Arnall, who had been elected governor of Georgia in 1942. (Ex. 24: Richardson dep. 25:3-7.)

33.     Even though the Communist Party was never a significant force in Georgia, Wilson and Arnall knew that the issue would be popular with the voters. (Ex. 24: Richardson dep. 17:21-18:16, 20:15-18.)

34.     A contemporaneous article in the Atlanta Constitution indicated that the five-percent petition requirement "sustained Secretary of State John B. Wilson in refusing a Communist candidate for president a place on the Georgia ballot in the 1940 election." (Ex. 34 at 4-5: newspaper articles.) The article offered no other justification for the bill, and no other justification for

the bill appears in the contemporaneous historical record. (Ex. 33: Answer ¶19; Ex. 17: Richardson decl. ¶13; Ex. 24: Richardson dep. 18:17-19:4, 28:6-29:21.)

## V.        Georgia's Current Ballot-Access Restrictions

35.     Georgia's current ballot-access laws distinguish between three kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a political body; and (3) independent candidates. (Ex. 33: Answer ¶27.)

36.     A "political party" is any political organization whose nominee received at least 20 percent of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2 (25). (Ex. 33: Answer ¶28.)

37.     Political parties choose nominees in partisan primaries, and the candidate nominated by the party appears automatically on the ballot for any statewide or district office. O.C.G.A. § 21-2-130(1). No nomination petition is required of a political party or any nominee of a political party. (Ex. 33: Answer ¶29.)

38.     The only political parties that meet the current definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party. (Ex. 33: Answer ¶30.)

39.    A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(25). (Ex. 33: Answer ¶31.)

40.    Political bodies must nominate candidates for partisan public offices by convention. O.C.G.A. § 21-2-170(g). (Ex. 33: Answer ¶32.)

41.    Georgia law permits a political body to become "qualified to nominate candidates for statewide public office by convention." O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶3.)

42.    A political body becomes qualified to nominate candidates for statewide public office by convention if: (a) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the last general election; or (b) it nominated a candidate for statewide public office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶4.)

43.    Petitions seeking to qualify a political body to nominate candidates for statewide public office by convention are due no later than the second Tuesday in July, O.C.G.A. § 21-2-185, and all signatures must be gathered within 15 months of the date on which the petition is submitted, O.C.G.A. § 21-2-182. (Ex. 27: First Admissions ¶5.)

44.    Candidates for statewide partisan public offices nominated by a political body that is qualified under Section 21-2-180 appear automatically

14

on the ballot without a nomination petition. O.C.G.A. § 21-2-132(e)(5). Each such nominee must submit a notice of candidacy and pay the applicable qualifying fee by the deadlines prescribed in O.C.G.A. § 21-2-132(d), but no nomination petition is required. (Ex. 27: First Admissions ¶6.)

45.     Candidates for all other partisan public offices, including the office of U.S. Representative, nominated by a political body that is qualified under Section 21-2-180 do not appear automatically on the ballot. In order to appear on the general-election ballot, such candidates must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). (Ex. 33: Answer ¶37.)

46.     The qualifying fee for most partisan public offices, including U.S. Representative, is three percent of the annual salary of the office; however, the qualifying fee for candidates for the General Assembly is a flat $400. O.C.G.A. § 21-2-131. (Ex. 33: Answer ¶38.)

47.     Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-

131(b)(2). For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B). For political-body candidates, the Secretary of State retains 25 percent and sends 75 percent to the political body after the election is over. O.C.G.A. § 21-2-131(c)(4)(A). (Ex. 9: Graham decl. ¶¶15-16; Ex. 12: Metz decl. ¶13.)

48.    A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d). Each sheet of the nomination petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. *Id.* The nomination petition is due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 33: Answer ¶39.)

49.    Candidates nominated by political bodies that are not qualified under Section 21-2-180 do not appear automatically on the ballot for any office. In order to appear on the general-election ballot, such candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Such candidates for all other partisan public offices must submit: (1) a notice of

candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Nomination petitions are due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 27: First Admissions ¶8.)

50.    Independent candidates do not appear automatically on the ballot for any office unless the candidate is an incumbent. In order to appear on the general-election ballot, independent candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). Such candidates for all other partisan public offices must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). Nomination petitions are due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 33: Answer ¶41.)

51.    Because of recent litigation, the signature requirements for independent presidential candidates and presidential candidates nominated by political bodies that are not qualified under Section 21-2-180 is currently

lower than prescribed by Georgia law. In 2016, U.S. District Judge Richard Story ruled that the one-percent signature requirement in O.C.G.A. § 21-2-170(b) is unconstitutional as applied to presidential candidates. *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam). As a remedy, he lowered the signature requirement for presidential candidates from one percent (about 50,000 signatures) to 7,500 signatures until the Georgia General Assembly enacts a different measure. *Id.* at 1374. To date, the General Assembly has not done so. (Ex. 33: Answer ¶42.)

52.     In light of Judge Story's order and the General Assembly's acquiescence in it, the number of signatures required for independent presidential candidates and presidential candidates nominated by political bodies that are not qualified to appear on the ballot statewide is now less than half the number of signatures required for an independent or political-body candidate for U.S. Representative to appear on the general-election ballot in any one of Georgia's fourteen congressional districts. (Ex. 33: Answer ¶43.)

## VI.         The Pauper's Affidavit in Lieu of Filing Fee

53.     Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g). (Ex. 29: Def's Resp. Pls.' Second Req. Admis.[3] ¶47 ("Second Admissions").)

54.     A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor the income to pay the filing fee, and it requires the candidate to submit a personal financial statement. O.C.G.A. § 21-2-132(g). (Ex. 29: Second Admissions ¶48.)

55.     In addition, a pauper's affidavit for a candidate for U.S. Representative must be accompanied by a petition signed by one percent of the number of registered voters eligible to vote for the office in the last election. O.C.G.A. § 21-2-132(h). (Ex. 23: Harvey dep. 170:4-13.)

56.     Each sheet of the petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. O.C.G.A. § 21-2-132(h). (Ex. 29: Second Admissions ¶50.)

57.     For a political-body candidate, the petition is due at the same time that a candidate's notice of candidacy is due—no later than noon on the Friday following the Monday of the thirty-fifth week before the general

---

[3] For comparison with the defendant's responses, the plaintiffs' second set of requests for admissions is attached as exhibit 28.

election—a date that falls in early March of an election year. O.C.G.A. § 21-2-132(d). (Ex. 23: Harvey dep. 169:15-170:3.)

## VII.      The Number of Valid Signatures and Qualifying Fee Required for Political-Body Candidates

58.      In determining the number of petition signatures needed by independent or political body candidates to appear on a general election ballot, the Secretary of State uses only the total number of "active" voters. (Ex. 33: Answer ¶49.)

59.      According to figures provided by the Secretary of State's office, Georgia had 6,434,388 active registered voters as of the 2018 general election. (Ex. 31: Def's Resp. Pls.' Second Interrogs.)

60.      Georgia currently has 14 members of the U.S. House of Representatives, each of which is elected from a single-member district. (Ex. 33: Answer ¶52.)

61.      Because the actual number of registered voters in each congressional district varies from district to district, the actual number of valid signatures required for an independent or political-body candidate for the U.S. House of Representative to appear on the 2020 general election ballot also varies from district to district. (Ex. 33: Answer ¶53.)

62.      According to the Secretary of State, the number of active voters and petition signatures projected to be required for an independent or

political-body candidate to appear on the 2020 general election ballot in each of Georgia's 14 congressional districts is as follows:

| District | Active Voters (11/06/18) | Signatures Required 2020 |
|---|---|---|
| 1 | 447,321 | 22,367 |
| 2 | 397,565 | 19,879 |
| 3 | 474,044 | 23,703 |
| 4 | 485,112 | 24,256 |
| 5 | 530,774 | 26,539 |
| 6 | 479,056 | 23,953 |
| 7 | 469,959 | 23,498 |
| 8 | 414,387 | 20,720 |
| 9 | 459,485 | 22,975 |
| 10 | 472,606 | 23,631 |
| 11 | 499,459 | 24,973 |
| 12 | 418,996 | 20,950 |
| 13 | 490,064 | 24,504 |
| 14 | 395,560 | 19,778 |
| TOTAL | 6,434,388 | 321,726 |

(Ex. 31: Def's Resp. Pls.' Second Interrogs.)

63.    As a result, the Libertarian Party would need to gather at least 321,726 valid signatures in order to run a full slate of candidates for the office of U.S. Representative. (Ex. 31: Def's Resp. Pls.' Second Interrogs.)

64.    The current annual salary for U.S. Representatives is $174,000. As a result, the qualifying fee for each candidate for U.S. Representative in 2020 is $5,220, and the Libertarian Party would need to pay $73,080 in qualifying fees in order to run a full slate of candidates for the office of U.S. Representative in 2020. (Ex. 33: Answer ¶55.)

# VIII.        Other States' Signature Requirements

65.    Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. (Ex. 22: Winger decl. ¶¶8-9.)

66.    In 2016, Georgia law required more than 259,500 valid signatures for a third party to run a full slate of candidates for U.S. Representative. This number represents more than 6.3 percent of all votes cast in Georgia for president in 2016. (Ex. 33: Answer ¶77.)

67.    In 2018, Georgia law required more than 272,000 valid signatures for a third party to run a full slate of candidates for U.S. Representative. This number represents more than 6.6 percent of all votes cast in Georgia for president in 2016. (Ex. 22: Winger decl. ¶11.)

68.    The state that required the next-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative was Illinois, which required approximately 178,400 valid signatures in 2016 and 262,000 valid signatures in 2018. These numbers represent approximately 3.2 percent and 4.7 percent of all votes cast in Illinois for president in 2016, and they would have qualified 18 candidates. (Ex. 22: Winger decl. ¶12.)

69.    The state that required the third-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative in

2016 and 2018 was New York, which required approximately 94,500 valid signatures. This number represents approximately 1.2 percent of all votes cast in New York for president in 2016, and it would have qualified 27 candidates. (Ex. 22: Winger decl. ¶13.)

70.    Thirty states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative in 2016. In 2018, that number was 29. (Ex. 22: Winger decl. ¶14.)

71.    In some states, moreover, it is possible for third parties to qualify to nominate candidates for U.S. Representative without submitting any signatures. (Ex. 22: Winger decl. ¶15.)

## IX.       Other States' Qualifying Fees

72.    Unlike Georgia, most other states do not require third-party candidates for U.S. Representative who qualify for the general-election ballot by petition to pay a qualifying fee at all. Among the states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation. (Ex. 22: Winger decl. ¶¶16-17.)

73.    In 2016, the last year for which complete data are available, Georgia law required $5,220 for a single congressional candidate and $73,080

for a third party to run a full slate of candidates for U.S. Representative. (Ex. 33: Answer ¶83.)

74.     The state that requires the second highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is North Carolina, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $22,620 for a third-party to run a full slate of thirteen candidates for U.S. Representative. (Ex. 22: Winger decl. ¶19.)

75.     The state that requires the third highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is West Virginia, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $5,220 for a third-party to run a full slate of three candidates for U.S. Representative. (Ex. 22: Winger decl. ¶20.)

X.      **The Impact of Georgia's Ballot-Access Restrictions**

76.     No candidate for U.S. Representative nominated by a political body has ever satisfied the five-percent signature requirement to appear on Georgia's general-election ballot. (Ex. 33: Answer ¶44.)

77.     No independent candidate for U.S. Representative has satisfied the five-percent signature requirement to appear on Georgia's general-

election ballot since 1964, when Milton Lent qualified to be an independent candidate in Georgia's First Congressional District. (Ex. 33: Answer ¶45.)

78.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general-election ballots, the congressional district in which the candidate qualified did not split any county boundaries. *See* Act of March 13, 1964, ch. 923, 1964 Ga. Laws 478. (Ex. 27: First Admissions ¶10.)

79.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general-election ballots, only 25 percent of Georgia's nonwhite voting-age population was registered to vote. *See* S. Rep. No. 89-162, at 44 (1965), reprinted in 1965 U.S.C.C.A.N. 2508. (Ex. 27: First Admissions ¶11.)

80.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general-election ballots, the overall registration rate was approximately 63 percent of voting-age population, which is below where it is today (approximately 86 percent). *See* S. Rep. No. 89-162, at 41 (1965), reprinted in 1965 U.S.C.C.A.N. 2508. (Ex. 27: First Admissions ¶12.)

81.     Only one independent candidate for U.S. Representative, Billy McKinney, has appeared on Georgia's general-election ballot since 1964. (Ex. 33: Answer ¶47.) However, when McKinney qualified for the ballot in 1982, a

federal court in *Busbee v. Smith,* civ. no. 82-0665 (D.D.C. 1982), had suspended the five-percent signature requirement due to preclearance litigation over the State's redistricting plan that delayed the adoption of new districts following the 1980 Census. McKinney, who was an African-American and Democratic state representative from Atlanta, needed only 4,037 signatures to have his name placed on the general-election ballot alongside the white Democratic incumbent, Wyche Fowler, in Georgia's Fifth Congressional District. (Ex 35: Application for Writ of Mandamus, *Dixon v. Poythress*, Civ. A. No. C-92177, (Fulton Cnty. Sup. Ct. 1982); Ex. 36: Jerry Schwartz and Ron Taylor, *McKinney Petition OK'd for 5th District Election*, Atlanta Constitution, Oct 30, 1982, at 1-B.)

82.     No independent candidate for U.S. Representative has ever satisfied Georgia's ballot-access laws as they exist today, including the signature requirement, the filing deadline, the qualifying fee, and the technical requirements as to the form of the petition. (Ex. 37: Election Results 2000-2018 (excerpts) ("election results").)

**XI.        Signatures Requirements Met by Independent and Third-Party Candidates for U.S. Representative in Other States**

83.     In the entire history of the United States, only six independent or third-party candidates for U.S. Representative have ever overcome a signature requirement as high as 10,000 signatures. Only one such candidate

26

has ever overcome a petition requirement higher than 15,000 signatures. (Ex. 22: Winger decl. ¶29.)

84.    The first was in Ohio in 1954, when the incumbent in the Ninth Congressional District in Toledo, Frazier Reams, met the requirement of 12,919 signatures. (Ex. 22: Winger decl. ¶30.)

85.    The second was in Montana in the regular at-large election in 1994, when Steve Kelly successfully met the requirement of 10,186 signatures. (Ex. 22: Winger decl. ¶31.)

86.    The third was in California in 1996, when Steven Wheeler in the Twenty-Second Congressional District met the requirement of 10,191 signatures. (Ex. 22: Winger decl. ¶32.)

87.    The fourth was in 1998, when the Reform Party nominee in the Fifth Congressional District in Florida, Jack Gargan, met the requirement of 12,141 signatures. (Ex. 22: Winger decl. ¶33.)

88.    The fifth was in 2008, when Cindy Sheehan in California's Eighth Congressional District in San Francisco met the requirement of 10,198 signatures. (Ex. 22: Winger decl. ¶34.)

89.    The last instance was in 2010, when the Service Employees International Union drafted independent candidate Wendall Fant and successfully collected the needed 16,292 signatures in the Eighth Congressional District in North Carolina. However, after the petition was

checked, Fant declined to run, so the petition success had no observable concrete consequence. (Ex. 22: Winger decl. ¶35.)

90.     In four of the six instances when an independent or minor-party candidate for U.S. Representative satisfied a signature requirement as high as 10,000 signatures, the time period to collect the signatures was unlimited. (Ex. 22: Winger decl. ¶36.)

91.     Illinois has never had a successful petition attempt for U.S. House if the petition requirement was 10,000 or greater and the petition was challenged. (Illinois has a unique system in which all petitions are deemed valid unless they are challenged. Petitions are not checked unless someone files a challenge, even if the petition has only a single signature.) (Ex. 22: Winger decl. ¶37.)

## XII.      Past Attempts to Qualify for the General-Election Ballot

92.      Independent and political-body candidates for U.S. Representative have sought unsuccessfully to qualify for the general-election ballot under Georgia's current ballot-access laws. (Ex. 33: Answer ¶86.)

93.     In 2018, plaintiff Martin Cowen made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Thirteenth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. With the help of volunteer circulators, he spent more

than 120 hours gathering signatures over 40 days. He timely submitted 620 signatures to the Secretary of State and did not qualify for the ballot. (Ex. 5: Cowen decl. ¶¶8-14, 17.)

94.    In 2018, plaintiff Aaron Gilmer made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Ninth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. With the help of volunteer and paid circulators, he and his team spent approximately 150 hours gathering signatures over 60 days. He submitted 308 raw signatures to the Secretary of State and did not qualify for the ballot. (Ex. 8: Ex. 8: Gilmer decl. ¶¶10-17.)

95.    In 2018, Steve "Fred" Abrams made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourteenth Congressional District. In email correspondence with the Secretary of State's office, he declared his intention to run and inquired about the number of signatures required on both the pauper's affidavit and nomination petition. He subsequently set up a campaign website, produced campaign materials, and held events to gather signatures. He did not qualify for the ballot. (Ex. 37 at 6: election results; Ex. 38 at 1-24: candidate materials.)

96.    In 2018, Jimmy Cooper made a genuine effort to qualify for the general-election ballot as a Green candidate in Georgia's Eighth

Congressional District. He submitted a statement of candidacy to the Federal Elections Commission and set up a campaign website. He sought volunteers for his petition drive and gathered 171 signatures in January and February of 2018 before abandoning his effort. He filed as a write-in candidate. (Ex. 6: Esco decl. ¶14; Ex. 37 at 8: election results; Ex. 38 at 25-36: candidate materials.)

97.    In 2016, Hien Dai Nguyen made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. He had a team of mostly volunteer petition circulators who gathered approximately 25,000 raw signatures in the predominantly minority communities of Dekalb, Gwinnett, and Rockdale counties. But the Secretary of State's office invalidated almost 98 percent of them, and he therefore did not qualify for the ballot. (Ex. 15: Nguyen decl. ¶¶6-10.)

98.    In 2016, Lincoln Nunnally made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He submitted a statement of candidacy to the Federal Elections Commission and set up a campaign website. He reported having at least 50 volunteer petition circulators, and he promoted his signature-gathering efforts on social media. He did not submit any signatures and did

not qualify for the ballot. (Ex. 37 at 13: election results; Ex. 38 at 37-53: candidate materials.)

99.    In 2016, Leonard Ware made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. He filed a statement of candidacy with the Federal Elections Commission, set up a campaign website and Facebook page, and sought out volunteers to gather signatures. He did not gather enough signatures to qualify for the ballot but did qualify as a write-in candidate. The incumbent in that district ultimately ran unopposed on the general-election ballot. (Ex. 37 at 14: election results; Ex. 38 at 54-88: candidate materials.)

100.   In 2012, Cynthia McKinney made a genuine effort to qualify for the general-election ballot as the Green candidate in Georgia's Fourth Congressional District. She submitted a statement of candidacy form with the Federal Elections Commission declaring her intention to run and then began trying to raise the money necessary to mount a successful petition drive. McKinney found that raising money for a petition drive proved to be difficult and time consuming. In her experience, donors do not like to spend their money on gathering signatures for ballot access when success is far from assured. McKinney soon determined that she would not be able to raise the resources necessary to mount a successful ballot-access campaign *and* a

31

competitive campaign in the general election once ballot access had been secured, and she therefore withdrew from the race. (Ex. 11: McKinney decl. ¶¶7-13.)

101.   In 2010, Jeff Anderson made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Eleventh Congressional District. He had a team of approximately 24 volunteer petition circulators who spent hundreds, if not thousands of hours on the effort and gathered somewhere between 11,000 and 12,000 signatures. Because that number was far short of what he needed, he did not file the signatures with the Secretary of State. The incumbent in his district ultimately ran unopposed in the 2010 general election. (Ex. 1: Anderson decl. ¶¶5-9, 11.)

102.   In 2010, Eugene Moon made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Ninth Congressional District. He had a team of volunteers in each of the counties covered by his district. His teams gathered approximately 13,000 raw signatures, but he did not turn them in because he knew that he would not qualify for the ballot. The Republican nominee ultimately ran unopposed on the ballot in the 2010 general election. (Ex. 14: Moon decl. ¶¶4-8.)

103.   In 2010, Victor Amendariz made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He used volunteers to gather signatures door to door.

32

Although his team gathered quite a few signatures, he quickly realized that he would not be able to gather enough, and he decided to run instead for the Republican nomination. (Ex. 2: Armendariz decl. ¶¶4-8; Ex. 29: Second Admissions ¶29.)

104.   In 2008, Faye Coffield made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. She assembled a team of volunteers and spent hundreds of hours trying to gather signatures over approximately two months. She gathered approximately 2,000 raw signatures—well short of the approximately 15,000 she needed—and therefore did not qualify for the ballot. The incumbent in her district ultimately ran unopposed in the 2008 general election. (Ex. 4: Coffield decl. ¶¶3-10.)

105.   In 2008, James P. Mason made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. He filed a statement of candidacy with the Federal Elections Commission, informed the Secretary of State's office of his intention to run, set up a campaign website, and kicked off "PROJECT: PETITION" with a two-day tour of the district. He did not qualify for the ballot. (Ex. 37 at 33: election results; Ex. 38 at 89-95: candidate materials.)

106.   In 2006, Jay Fisher made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Sixth

Congressional District. He announced his candidacy in the media and in correspondence with the Secretary of State's office. He ran on a platform of opposition to the Iraq War and to the Patriot Act, both of which were supported by the then-incumbent Republican representative, Dr. Tom Price. He assembled a team of approximately five volunteers and went door to door. After a while, he realized that he would not be able to qualify for the ballot with volunteer petitions, and the option of using paid petitioners was too expensive. He therefore abandoned his effort to qualify for the ballot and did not submit any signatures. (Ex. 7: Fisher decl. ¶¶4-10; Ex. 33: Answer ¶93)

107. In 2004, Philip Bradley made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Thirteenth Congressional District. He announced intention to run correspondence with the Secretary of State's office, and it was reported in the media that he had gathered 500 signatures as of March of that year. He did not qualify for the ballot. The Democratic nominee ultimately ran unopposed on the general-election ballot. (Ex. 33: Answer ¶103; Ex. 37 at 40: election results; Ex. 38 at 96-99: candidate materials.)

108. In 2002, the Libertarian Party made a genuine effort to qualify three candidates for U.S. Representative: Wayne Parker in Georgia's Eleventh Congressional District, Carol Ann Rand in Georgia's Sixth Congressional District, and Chad Elwartowski in Georgia's Ninth

34

Congressional District. Because the 2002 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement by about half. The party raised approximately $40,000 for the effort and used 35 professional, paid petition circulators. The party ultimately decided to focus on Parker's campaign, and Parker submitted more than 20,000 raw signatures. But the Secretary of State's office rejected more than half of them, leaving Parker about 1,100 valid signatures shy of the court-adjusted requirement. (Ex. 16: Parker decl. ¶¶5-15; Ex. 33: Answer ¶111.)

109.   In 2002, Joyce Griggs made a genuine effort to qualify for the general-election ballot as the Green candidate in Georgia's First Congressional District. With approximately eight volunteers, Griggs gathered approximately 400 signatures over a period of six to eight weeks. (Ex. 6: Esco decl. ¶12.)

110.   In 2002, Al Herman made a genuine effort to qualify for the general-election ballot as the Green candidate in Georgia's Seventh Congressional District. With approximately ten volunteers, Herman collected more than 2,000 signatures over a five-month period. (Ex. 6: Esco decl. ¶13.)

111.   In 1982, Maceo Dixon made a genuine effort to qualify for the general-election ballot as the Socialist Workers Party's candidate in Georgia's Fifth Congressional District. Because the 1982 redistricting process had

reduced the time available for petitioning, a federal judge reduced the

signature requirement to approximately 4,037. Dixon submitted 7,821 raw

signatures, but the Secretary of State's Office rejected more than 3,000 of

them. As a result, Dixon did not qualify for the general-election ballot. (Ex 35:

Application for Writ of Mandamus, *Dixon v. Poythress*, Civ. A. No. C-92177,

(Fulton Cnty. Sup. Ct. 1982; Ex. 36: Jerry Schwartz and Ron Taylor,

*McKinney Petition OK'd for 5th District Election*, Atlanta Constitution, Oct

30, 1982, at 1-B; Ex. 39: Sara Jean Johnston, *Atlanta Socialist Worker Fights*

*for Ballot Status*, The Militant, Nov. 26, 1982, at 4.)

112. John Monds, who has run three times as a Libertarian candidate

for statewide office in Georgia and has cumulatively received millions of

votes, would have run for U.S. Representative but was deterred from doing so

by the ballot-access restrictions. (Ex. 13: Monds decl. ¶9-10.)

113. In 2018, Luanne Taylor wanted to qualify for the general-election

ballot as an independent candidate for U.S. Representative in Georgia's Sixth

Congressional District. She called the Secretary of State's office to inquire

about the number of signatures required on her nomination petition. When

the Secretary of State's office responded by email that she would need 20,918

valid signatures, she was shocked at how high the number was. She was

immediately deterred from running for Congress and decided instead to try to

run for state representative. (Ex. 19: Taylor decl. ¶¶2-4.)

36

114.   In 2016, David Moreland inquired to the Secretary of State's office about qualifying for the general-election ballot as an independent candidate in Georgia's First Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Moreland did not qualify for the ballot. The incumbent in that district ultimately ran unopposed on the ballot in the 2016 general election. (Ex. 29: Second Admissions ¶30; Ex. 37 at 12: election results; Ex. 38 at 100-101: candidate materials.)

115.   In 2016, Raymond Beckwith declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's First Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Beckwith did not qualify for the ballot. The incumbent in that district ultimately ran unopposed on the ballot in the 2016 general election. (Ex. 29: Second Admissions ¶31; Ex. 37 at 12: election results; Ex. 38 at 102-103: candidate materials.)

116.   In 2010, Charles Perry declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Thirteenth Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Perry did not qualify for the ballot. (Ex. 29: Second

37

Admissions ¶28; Ex. 37 at 29: election results; Ex. 38 at 104-105: candidate materials.)

117.   In 2008, Timothy J. Payne declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fifth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Payne did not qualify for the ballot. (Ex. 29: Second Admissions ¶26; Ex. 37 at 32: election results; Ex. 38 at 106-107: candidate materials.)

118.   In 2006, Loren Collins declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Collins did not qualify for the ballot. (Ex. 33: Answer ¶92; Ex. 37 at 37: election results; Ex. 38 at 108: candidate materials.)

119.   In 2006, Chip Shirley declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Shirley did not qualify for the ballot. (Ex. 33: Answer ¶94; Ex. 37 at 38: election results; Ex. 38 at 109-110: candidate materials.)

120.   In 2006, Richard Clarke declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Twelfth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Clarke did not qualify for the ballot. (Ex. 33: Answer ¶95; Ex. 37 at 38: election results; Ex. 38 at 111-112: candidate materials.)

121.   In 2005, the Veterans Party of America declared its intention to qualify a candidate as a political-body candidate in Georgia's Second Congressional District. The Secretary of State's office then informed the party of the signature requirement and other legal requirements for qualifying for the ballot. The party did not qualify a candidate for the ballot. (Ex. 33: Answer ¶91; Ex. 37 at 37: election results; Ex. 38 at 113-115: candidate materials.)

122.   In 2004, the Veterans Party of America declared its intention to qualify a candidate a political-body candidate in Georgia's Second Congressional District. The Secretary of State's office then informed the party of the signature requirements and other legal requirements for qualifying for the ballot. The party did not qualify a candidate for the ballot. (Ex. 33: Answer ¶96; Ex. 37 at 39: election results; Ex. 38 at 116-117: candidate materials.)

123.   In 2004, Steven Muhammad declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fifth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Muhammad did not qualify for the ballot. The incumbent in that district ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶97; Ex. 37 at 40: election results; Ex. 38 at 118: candidate materials.)

124.   In 2004, Andy Altizer declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Sixth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Altizer did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶98; Ex. 37 at 40: election results; Ex. 38 at 119-120: candidate materials.)

125.   In 2004, Chris Borcik declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Eighth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the

ballot. Borcik did not qualify for the ballot. (Ex. 33: Answer ¶99; Ex. 37 at 40: election results; Ex. 38 at 121: candidate materials.)

126.   In 2004, Malcom Rogers declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Thirteenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Rogers did not qualify for the ballot. The Democratic nominee in that district ultimately ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶102; Ex. 37 at 40: election results; Ex. 38 at 122-123: candidate materials.)

127.   In 2002, Ryan Anthony Cancio declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Sixth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Cancio did not qualify for the ballot. (Ex. 33: Answer ¶105; Ex. 37 at 43: election results; Ex. 38 at 124-126: candidate materials.)

128.   In 2002, Daniel Kozarich declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Kozarich did not qualify for the ballot. The Republican nominee in

41

that district ultimately ran unopposed on the ballot in the 2002 general

election. (Ex. 33: Answer ¶109; Ex. 37 at 44: election results; Ex. 38 at 127-

129: candidate materials.)

129.   In 2002, Brian Brown declared his intention to qualify for the

general-election ballot as an independent candidate in Georgia's Tenth

Congressional District. The Secretary of State's office then informed him of

the signature requirement and other legal requirements for qualifying for the

ballot. Brown did not qualify for the ballot. The Republican nominee in that

district ultimately ran unopposed on the ballot in the 2002 general election.

(Ex. 33: Answer ¶110; Ex. 37 at 44: election results; Ex. 38 at 130: candidate

materials.)

130.   In 2002, Ron Smith declared his intention to qualify for the

general-election ballot as an independent candidate in Georgia's Thirteenth

Congressional District. The Secretary of State's office then informed him of

the signature requirement and other legal requirements for qualifying for the

ballot. Smith did not qualify for the ballot. (Ex. 33: Answer ¶111; Ex. 37 at

44: election results; Ex. 38 at 131-134: candidate materials.)

131.   In 2000, Gail Debra Allen-Cartwright declared her intention to

qualify for the general-election ballot as an independent candidate in

Georgia's Eleventh Congressional District. She filed a statement of candidacy

with the federal elections commission. She also filed a notice of candidacy

42

with the Secretary of State's office and paid the filing fee. Allen-Cartwright did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2000 general election. (Ex. 29: Second Admissions ¶35; Ex. 37 at 46: election results; Ex. 38 at 135-139: candidate materials.)

## XIII.    The Petition-Checking Process

132.   Under Georgia law, it is the duty of the Secretary of State to check the validity of signatures on nomination petitions submitted by candidates for President, U.S. Senator, U.S. Representative, and all state offices. O.C.G.A. §§ 21-2-132(d), -171(a). (Ex. 33: Answer ¶56.)

133.   A signature on a nomination petition is valid and must be counted if it matches the signature on file of a duly qualified and registered voter who is eligible to vote for the office to be filled. (Ex. 33: Answer ¶57.)

134.   Georgia law does not prescribe any particular method for checking signatures, but the Georgia Supreme Court has indicated that Secretary of State must choose a method which "can reasonably be expected to operate in a thorough and professional way so as to produce accurate results." *Anderson v. Poythress*, 246 Ga. 435, 271 S.E.2d 834 (1980). (Ex. 33: Answer ¶58.)

135.   The current petition-checking process is as follows. When a candidate submits a nomination petition, the Secretary sends a duplicate of the petition to county election officials along with a one-page letter asking them to use certain codes on the petition when verifying signatures to indicate why a particular signature was deemed invalid. (Ex. 33: Answer ¶60.) The counties send back their results. And, if there is more than one county involved, the Secretary of State's office then adds up the total number of signatures validated by the counties and makes a determination as to whether or not the petition contains a sufficient number of valid signatures for the candidate to qualify for the ballot. (Ex. 23: Harvey dep. 32:11-33:16, 38:4-39:2; Ex. 40: petition-verification instruction letters.)

136.   The Secretary of State's office provides no instructions other than the one-page letter when transmitting petitions to county election officials, and it provides no guidance on what constitutes a valid signature unless county election officials affirmatively ask for specific guidance. (Ex. 23: Harvey dep. 36:4-19, 47:12-49:1.)

137.   The Secretary of State's office does nothing to ensure that county election officials follow the instructions set out in the one-page letter that accompanies each petition. (Ex. 23: Harvey dep. 45:21-46:2). The Secretary of State's office conducts no audit of the verifications returned from the counties to determine whether the county election officials have complied with the

instructions. (Ex. 23: Harvey dep. 46:3-8, 70:5-71:3.) There are no possible repercussions from the Secretary of State's office for a county election official who fails to follow the Secretary's instructions, and county election officials are not required to attest to the results. (Ex. 23: Harvey dep. 46:9-47:11.)

138.   The Secretary of State's office takes no action, audit, or review even when it is apparent on the face of a petition returned by county election officials that they did not comply with the Secretary's one-page instruction letter. (Ex. 23: Harvey dep. 91:13-92:9.) The office could conduct an audit or review if it wished to do so; it has the necessary tools (access to the petitions and the state's voter-registration database). (Ex. 23: Harvey dep. 84:20-23, 86:24-87:3.)

139.   The Secretary of State's office does nothing to ensure that the workers who verify petitions in the county election offices have undertaken any form of training. (Ex. 23: Harvey dep. 52:11-16.)

140.   The Secretary of State's office provides no training on handwriting analysis even though it admits that a voter's signature can change over time and based on the conditions under which the voter signs. (Ex. 23: Harvey dep. 60:22-61:9.) And the office conducts no review of a county's determination that a signature does not match. (Ex. 23: Harvey dep. 61:22-25.)

141.   In fact, the Secretary of State's office keeps no records as to the basis on which counties have rejected signatures. (Ex. 23: Harvey dep. 62:1-10.)

142.   The Secretary of State's signature validation process results in valid signatures being improperly rejected. (Ex. 23: Harvey dep. 113:20-25, 118:22-119:4, 140:24-141:1, 158:5-11.)

143.   In addition, unlike most other states, Georgia does not grant petition-circulators access to the records they need in order to check their petitions before they turn them in. Most states provide public-access terminals that allow petition-circulators to see if they can find a person who signed their petition and to check whether the signature matches. Georgia does not offer this kind of access. It offers only one public access terminal with limited data and search capabilities. There are no instructions for the public on how to use the software, and it does not give access to a voter's signature. (Ex. 10: Lee decl. ¶9.)

144.   The Secretary's signature-verification process leads to signature-validation rates that are well below industry norms and those of other states. (Ex. 10: Lee decl. ¶11.) A validation rate of 65 to 75 percent is the standard for candidacy petitions. (Ex. 10: Lee decl. ¶12.)

145.   In 2016, for example, Rocky De La Fuente submitted approximately 15,000 signatures on a nomination petition in an attempt to

46

qualify for the general-election ballot as an independent candidate for President. He used professional, experienced petition circulators to gather his signatures. (Ex. 10: Lee decl. ¶¶5-17.) The Secretary verified only 2,964 signatures—a validation rate of approximately 20 percent. (Ex. 33: Answer ¶68.)

146.   De La Fuente's petition contains numerous signatures that were improperly rejected. (Ex. 23: Harvey dep. 110:19-158:11; Ex. 41: De La Fuente petition sheets and ENET printouts.) After reviewing only a small number of signatures from De La Fuente's petition that were rejected by county election officials, the Secretary of State's office admitted that there were "more than a handful of errors from Cobb, Dekalb, Fulton, and Clayton counties." (Ex. 23: Harvey dep. 158:5-11.)

147.   Since 2014, the Secretary of State's office has validated only one petition for an independent or political-body candidate for U.S. Representative. In 2016, Hien Dai Nguyen submitted a nomination petition containing approximately 25,000 raw signatures. (Ex. 15: Nguyen decl. ¶8.) Election officials in Dekalb, Gwinnett, Newton and Rockdale counties validated only 556 of them—a validation rate of approximately two percent. (Ex. 23: Harvey dep. 100:6-18.)

148.   The Secretary of State's office has validated only one other nomination petition for an independent or political-body candidate for U.S.

Representative since 2000. In 2002, Wayne Parker submitted almost 20,000 raw signatures, and the Secretary of State's office validated only 8,346 of them—a validation rate of approximately 40 percent. (Ex. 10: Lee decl. ¶20; Ex. 16: Parker decl. ¶¶13-14.)

149.   Because of the Secretary's error-prone signature-verification process, independent and political-body candidates for U.S. Representative must gather signatures far in excess of the number of valid signatures required to obtain ballot access under Georgia law. (Ex. 1: Anderson decl. ¶6; Ex. 2: Armendariz decl. ¶8; Ex. 6: Esco decl. ¶7; Ex. 7: Fisher decl. ¶7; Ex. 10: Lee decl. ¶21.) For one candidate for U.S. Representative, that might mean somewhere between 40,000 and 75,000 signatures. For a full slate of 14 candidates for U.S. Representative, that might be somewhere between 600,000 and 1,000,000 signatures. (Ex. 10: Lee decl. ¶21.)

## XIV.      The Difficulty and Pace of Petitioning

150.   Gathering signatures is difficult, labor-intensive work. (Ex. 5: Cowen decl. ¶12; Ex. 7: Fisher decl. ¶8; Ex. 20: Webb decl. ¶7.)

151.   Don Webb, an experienced paid petition circulator, is only able to gather 30 to 40 raw signatures in an eight- or nine-hour day on a Saturday. He is able to collect 15 to 25 raw signatures on other days. That averages out

to less than five signatures per hour over the course of a week. (Ex. 20: Webb decl. ¶7.)

152.   Even if he spent eight hours per day, seven days per week, going door to door over the course of the 180-day petitioning window (a total of 1,440 hours), he would be able to gather fewer than 4,800 raw signatures, which is well short of the number required for a single political-body candidate for U.S. Representative. (Ex. 20: Webb decl. ¶11.)

153.   It is hard to convince people to volunteer to gather signatures for ballot access. (Ex. 12: Metz decl. ¶12; Ex. 20: Webb decl. ¶10.)

154.   Volunteer signature-gatherers tend to be slower and less effective than paid signature-gatherers, and they are rarely willing or able to work for more than a few hours at a time. (Ex. 6: Esco decl. ¶9; Ex. 20: Webb decl. ¶9.)

155.   Luanne Taylor, who attempted to qualify for the ballot as an independent candidate in 2018, was only able to gather about one signature per hour. (Ex. 19: Taylor decl. ¶9.)

156.   Aaron Gilmer, who attempted to qualify for the ballot as a Libertarian candidate for U.S. Representative in 2018, was only able to gather about two signature per hour using a mixture of professional and volunteer circulators. (Ex. 8: Gilmer decl. ¶¶16-17.)

157.   Martin Cowen, who attempted to qualify for the ballot as a Libertarian candidate for U.S. Representative in 2018, was able to gather

less than three signatures per hour circulating his own petition. (Ex. 5:

Cowen decl. ¶¶10, 14.)

## XV.        The Cost of Petitioning in Georgia

158.    As a practical matter, it would be impossible for the Libertarian

Party to qualify a full slate of candidates for the office of U.S. Representative

in 2020 without making extensive use of paid, professional petition

circulators. (Ex. 1: Anderson decl. ¶14; Ex. 6: Esco decl. ¶10; Ex. 7: Fisher

decl. ¶11; Ex. 10: Lee decl. ¶22; Ex. 13: Monds decl. ¶8; Ex. 20: Webb decl.

¶12.)

159.    Professional petition circulators typically charge $2-$5 per

signature collected, plus expenses for travel, lodging and incidentals. (Ex. 10:

Lee decl. ¶23.)

160.    In order to be assured of gathering a sufficient number of valid

signatures to qualify a full slate of candidates for the office of U.S.

Representative, the Libertarian Party would need to gather somewhere

between 600,000 and $1,000,000 signatures. (Ex. 10: Lee decl. ¶21.)

161.    The cost of gathering the signatures necessary to qualify a full

slate of candidates for the office of U.S. Representative would likely exceed

$1,000,000 and could exceed $2,500,000. (Ex. 1: Anderson decl. ¶7; Ex. 10:

Lee decl. ¶24; Ex. 16: Parker decl. ¶17; Ex. 20: Webb decl. ¶12; Ex. 21: Wilson

decl. ¶¶6-8.)

## XVI.        The Impact of Federal Campaign-Finance Law

162.    Federal campaign-finance laws set certain limits on campaign

contributions to candidates for federal offices, including political-body

candidates for U.S. Representative. Federal Elections Campaign Act of 1971,

Pub L. 92-225, 86 Stat. 3, 52 U.S.C. § 30101 *et seq.* (Ex. 29: Second

Admissions ¶36.)

163.    Under these laws, the maximum amount that a state or national

party may contribute to one candidate for U.S. Representative is $5,000 per

election. 52 U.S.C. § 30116(a)(2)(A); 11 C.F.R. § 110.2(b)(1). *See*

https://www.fec.gov/help-candidates-and-committees/candidate-taking-

receipts/contribution-limits/. (Ex. 29: Second Admissions ¶37.)

164.    The limits on contributions to candidates apply separately to

each federal election in which the candidate participates. A primary election,

general election, runoff election and special election are each considered a

separate election with a separate limit. (Ex. 29: Second Admissions ¶38.)

165.    Even when candidates are not involved in an actual primary,

they are entitled to a primary limit. They may choose one of the following

dates to be their "primary" date, and, until that date, they may collect

contributions that count towards the contributor's primary limits: (1) the last day on which, under state law, a candidate may qualify for a position on the general election ballot; or (2) the date of the last major primary election, caucus or convention in that state. Political-body candidates may also choose the date of the nomination by their party as their primary date. (Ex. 29: Second Admissions ¶39.)

166.   As a result, the maximum amount that a state or national party may contribute to one candidate for U.S. Representative (except in the event of a runoff election) is $10,000 per election cycle. (Ex. 9: Graham decl. ¶17; Ex. 18: Sarwark decl. ¶32; Ex. 21: Wilson decl. ¶¶5, 17; Ex. 29: Second Admissions ¶40.)

167.   The maximum that an individual donor can give to a candidate is $5,600 per election cycle. (Ex. 21: Wilson decl. ¶5.)

168.   The value of an in-kind contribution counts against the contribution limits just as a contribution of money does. 11 C.F.R. § 100.51. (Ex. 29: Second Admissions ¶41.)

169.   Any amount paid by a state or national party for petition circulators or other petitioning efforts in support of a candidate for U.S. Representative must be reported to federal authorities as an in-kind contribution and is subject to campaign contribution limits. 11 C.F.R. §§ 100.52(d)(1), 100.54. (Ex. 29: Second Admissions ¶42.)

170.   Any amount paid by a state or national party for qualifying fees in support of a candidate for U.S. Representative must be reported to federal authorities as an in-kind contribution and is subject to campaign contribution limits. 11 C.F.R. § 100.52. (Ex. 29: Second Admissions ¶43.)

171.   Federal law thus prohibits the Libertarian Party or any other large donor from contributing enough money to cover a substantial number of signatures. (Ex. 9: Graham decl. ¶17; Ex. 18: Sarwark decl. ¶32; Ex. 21: Wilson decl. ¶¶5, 17.)

172.   Donors, moreover, generally do not want to give money for signature-gathering on a ballot-access petition when success is far from assured. (Ex. 6: Esco decl. ¶10; Ex. 9: Graham decl. ¶18; Ex. 11: McKinney decl. ¶¶10-12; Ex. 12: Metz decl. ¶11; Ex. 21: Wilson decl. ¶4.). They want to promote ideas and policies, and they recognize that candidates who are not on the ballot are not taken seriously by the media or by the voters. (Ex. 21: Wilson decl. ¶4.)

## XVII.    Lack of Access to Voters

173.   Petition-circulators in Georgia may not lawfully solicit signatures on private property without the permission of the property owner. *See Cahill v. Cobb Place Associates*, 271 Ga. 322 (1999); *Citizens for Ethical Gov't v. Gwinnett Place Associates*, 260 Ga. 245 (1990). That includes places of public

accommodation, such as shopping malls, as well as property owned by common-interest community associations, such as homeowners' associations. (Ex. 29: Second Admissions ¶46.)

174.   Virtually all of the places where large numbers of people congregate, like grocery stores and shopping malls, are on private property. Petition-circulators are consequently relegated to gathering signatures on public sidewalks, which are often far away from where voters park to enter the stores. (Ex. 4: Coffield decl. ¶13; Ex. 6: Esco decl. ¶8; Ex. 19: Taylor decl. ¶11.)

175.   Entire subdivisions are often off-limits to petition-circulators because private homeowners' associations own the streets and sidewalks and have signs that bar all forms of soliciting. (Ex. 1: Anderson decl. ¶13; Ex. 5: Cowen decl. ¶15.)

176.   Even when canvassing legally on public property, petition-circulators are often confronted by police officers or business owners unaware of their right to do so. (Ex. 6: Esco decl. ¶8; Ex. 16: Parker decl. ¶8; Ex. 19: Taylor decl. ¶12.)

177.   Primary elections are generally not a good time to gather signatures. (Ex. 21: Wilson decl. ¶13.)

178.   Many counties consolidate polling places in primary elections, with voters from more than one congressional district voting at the same

location. This makes it difficult to figure out whether the voter lives in the right district to sign a petition. (Ex. 21: Wilson decl. ¶14).

179.   Turnout in primaries tends to be lower than in general elections, and many of those who do turn out are ardent partisans who refuse to sign petitions for candidates who do not belong to their favored party. (Ex. 21: Wilson decl. ¶16.)

180.   Georgia law prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place. O.C.G.A. § 21-2-414(a). This often means that signature-gatherers never have the chance to interact with voters at a polling place. In many areas, the parking lot for a polling place is within the 150-foot radius. In others, the polling place is so close to the street that -petition circulators can only stand across the street. In rural areas, the 150-foot radius sometimes puts signature gatherers in the middle of the woods because there is no sidewalk or other place to stand. (Ex. 21: Wilson decl. ¶15.)

## XVIII.    Public Concern about Disclosing Confidential Information

181.   The form of a nomination petition calls for a voter to provide a name, signature, date of birth, residential address, county of residence, and date of signing. (Ex. 41: De La Fuente petition sheets and ENET printouts.)

182.   Georgia law considers a voter's date of birth and address to be confidential information. O.C.G.A. § 21-2-225(b).

183.   In order to decrease the risk of identity theft, the Consumer Protection Division of the Georgia Department of Law advises individuals not to disclose their date of birth or residential address to members of the public. *See, e.g.,* http://www.consumer.ga.gov/consumer-topics/identity-theft-social-networking; http://www.consumer.ga.gov/consumer-topics/identity-theft-child-identity-theft .

184.   "A lot of people are terribly concerned about addresses being public." (Ex. 23: Harvey dep. 109:14-24.) This was a significant issue in 2015 when the Secretary of State's office inadvertently distributed copies of the state's voter list with dates of birth and residential addresses exposed. The Secretary of State issued a statement warning affected voters to be vigilant for the possibility of identity theft as a result of the disclosure. *See* http://sos.ga.gov/index.php/general/important_notice_from_the_secretary_of_s tate__regarding_the_security_of_the_state_voter_file.

185.   The designee of the Secretary of State's office admits that he would not disclose his date of birth to a stranger knocking on his door "without a very compelling reason." (Ex. 23: Harvey dep. 107:20-24.) The designee concedes that requiring candidates to ask strangers for legally-

protected confidential information in order to appear on the ballot is "a concern." (Ex. 23: Harvey dep. 108-17-24.)

186.   Although a voter's date of birth and residential address are not required on a nomination petition, providing that information increases the chance that county election officials will be able to identify the signature. (Ex. 23: Harvey dep. 107:25-108:9.)

187.   In many cases, petition-signers do not supply their full date of birth or residential address. (Ex. 23: Harvey dep. 108:25-109:13.)

188.   Many potential petition-signers express reluctance to sign, or refuse to sign altogether, because of the confidential information called-for by the form and the possibility that it could be used for identity theft or other nefarious purposes. (Ex. 4: Coffield decl. ¶11-12; Ex. 6: Esco decl. ¶8; Ex. 7: Fisher decl. ¶8; Ex. 8: Gilmer decl. ¶13; Ex. 9: Graham decl. ¶13.)

## XIX.   Support for the Libertarian Party Nationwide and in Georgia

189.   The Libertarian Party was founded in 1971 and is organized in all 50 states plus the District of Columbia. (Ex. 18: Sarwark decl. ¶¶5-6.)

190.   The Libertarian Party is currently the third largest political party in the United States by voter registration. Among the 50 states plus the District of Columbia, there are 31 jurisdictions where a voter can register as a Libertarian. (Georgia does not register voters by party.) According to the

most recent data collected by the party, there were 567,157 active voters registered as Libertarians in the fall of 2018—a 92 percent increase over the last 10 years. (Ex. 18: Sarwark decl. ¶14.)

191.   A 2010 study by David Boaz and David Kirby found that at least 14 percent of American voters have libertarian-leaning views. (Ex. 18: Sarwark decl. ¶15.)

192.   The Gallup Poll found in its 2015 Governance survey that 27 percent of respondents could be characterized as libertarians—the highest number that poll has ever found. And, in 2018, the same Gallup poll found that 57 percent of Americans say that a third major political party is needed, marking the fifth straight year in which the poll found a majority support for a new third party. (Ex. 18: Sarwark decl. ¶16.)

193.   The Libertarian Party currently has automatic ballot access in 33 states plus the District of Columbia. Georgia is the only state in the nation that considers the Libertarian Party ballot-qualified for statewide offices but not for district offices. (Ex. 18: Sarwark decl. ¶17.)

194.   The Libertarian Party runs hundreds of candidates in every election cycle. These candidates seek positions ranging from city council to President of the United States. The Libertarian Party had 833 candidates on ballots in 2018. (Ex. 18: Sarwark decl. ¶18.)

195.   The Libertarian Party has placed a presidential candidate on the ballot in all 50 states and the District of Columbia on five separate occasions, most recently in 2016. (Ex. 18: Sarwark decl. ¶19.)

196.   Nationwide, the Libertarian Party runs numerous candidates for U.S. Representative. It is only the third political party since 1916 to have had a candidate for U.S. Representative on the ballot in a majority of congressional districts across the country. (Ex. 18: Sarwark decl. ¶20.)

197.   The Libertarian Party has had candidates for U.S. Representative appear on the ballot in every state in the nation except Georgia. (Ex. 18: Sarwark decl. ¶21.)

198.   There are currently more than 180 elected officials affiliated with the Libertarian Party nationwide. There has been one statewide elected official and members of five state legislatures affiliated with the Libertarian Party. (Ex. 18: Sarwark decl. ¶22.)

199.   Fifty-four Libertarians were elected to office in 2018—a 59 percent increase over 2016. This includes the election of Jeff Hewitt as county supervisor in Riverside County, California. Hewitt's district has a population larger than 15 different states and an annual budget of more than $5 billion. (Ex. 18: Sarwark decl. ¶23.)

200.   In the last ten years, Libertarian Party candidates have received tens of millions of votes. (Ex. 18: Sarwark decl. ¶24.)

201.   The Libertarian Party's nominee for President of the United

States in the 2016 election, Gary Johnson, received 4,489,341 votes—the

highest-ever vote total for a Libertarian candidate—which represented 3.28

percent of the popular vote and the third highest vote total among the

candidates in the race. (Ex. 18: Sarwark decl. ¶25.)

202.   Nine different Libertarian candidates have received more than

one million votes in statewide races since 2008. The first to do so was John

Monds, the Libertarian Party's 2008 candidate of the Public Service

Commission District 1 in Georgia. Three of the nine million-vote candidates

were in Georgia. (Ex. 18: Sarwark decl. ¶26.)

203.   The Libertarian Party has demonstrated that it has substantial

support among Georgia's electorate. (Ex. 33: Answer ¶127; Ex. 37: election

results.)

204.   In 1988, the Libertarian Party of Georgia qualified to nominate

candidates for statewide public office by convention when it submitted a

party-qualifying petition signed by at least one percent of the number of total

number of registered voters at the preceding general election. *See* O.C.G.A. §

21-2-180(1). The party has retained that qualification under Georgia law in

each election cycle since 1988 by nominating at least one candidate for

statewide public office who received votes totaling at least one percent of the

total number of registered voters who were registered and eligible to vote in that election. *See* O.C.G.A. § 21-2-180(2). (Ex. 33: Answer ¶128.)

205.   In the last ten years, Libertarian Party candidates for statewide public offices in Georgia have received more than five million votes. (Ex. 33: Answer ¶131; Ex. 37: election results.)

206.   In 2016, the Libertarian Party of Georgia's nominee for the Public Service Commission, Eric Hoskins, received 1,200,076 votes, which represents 33.4 percent of all votes cast in that contest and 22.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Hoskins carried Clayton and DeKalb counties in that election. (Ex. 33: Answer ¶132.)

207.   In 2014, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, John H. Monds, received 710,408 votes, which represents 31.7 percent of all votes cast in that contest and 11.7 percent of the total number of registered voters who were registered and eligible to vote in that election. Monds carried Clayton, DeKalb, and Hancock counties. (Ex. 33: Answer ¶133.)

208.   In 2012, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, David Staples, received 1,095,115 votes, which represents 34.2 percent of all votes cast in that contest and 18.0 percent of the total number of registered voters who were registered and

eligible to vote in that election. Staples carried Clayton, DeKalb, and Hancock counties. (Ex. 33: Answer ¶134.)

209.   In *Green Party of Georgia v. Kemp*, the Secretary of State repeatedly described the Libertarian Party as a political body "with significant support" in Georgia. (Ex. 33: Answer ¶135; Ex. 42: excerpts from appellant's briefs.)

## XX.        The Libertarian Party's Platform and Policy Positions

210.   The Libertarian Party's platform and positions on contemporary issues reflect policy preferences that are distinct from those of the Democratic and Republican parties. (Ex. 18: Sarwark decl. ¶11.)

211.   The Libertarian Party has adopted a national platform emphasizing personal liberty, economic liberty, balanced budgets, and national defense. The party has also taken policy positions on a number of contemporary issues. (Ex. 18: Sarwark decl. ¶¶9-10.)

212.   On some contemporary issues, the Libertarian Party takes policy positions that are different from those offered by either the Democratic or the Republican party. For example, the Libertarian Party platform favors the repeal of laws creating victimless crimes, such as gambling, the use of drugs for medicinal or recreational purposes, and consensual transactions for

sexual services. The Party supports abolishing the Internal Revenue Service and phasing out the Social Security system. (Ex. 18: Sarwark decl. ¶12.)

213.   On other contemporary issues, the Libertarian Party takes policy positions that align with those offered by the Democratic or Republican parties. For example, the Libertarian Party supports abolishing the death penalty, a position that the Democratic Party shares. The Libertarian Party also supports the individual right to keep and bear arms under the Second Amendment, a position that the Republican Party shares. (Ex. 18: Sarwark decl. ¶13.)

214.   Candidates nominated by the Libertarian Party of Georgia have run on the party's national platform in addition to emphasizing unique or local campaign issues. (Ex. 3: Buckley decl. ¶11; Ex. 5: Cowen decl. ¶9; Ex. 8: Gilmer decl. ¶¶19-20.)

## XXI.   The National Impact of Georgia's Ballot-Access Restrictions

215.   The national Libertarian Party has identified a set of Libertarian policy issues that a plurality of Americans supports, which the Republican and Democratic parties are not addressing. The national Libertarian Party would like to run a coordinated nationwide electoral campaign, pursuant to which Libertarian candidates for U.S. House in all 50 states and the District

of Columbia will focus on promoting those policy issues. (Ex. 18: Sarwark decl. ¶27.)

216.   In 1994, the Republican Party ran a coordinated nationwide campaign based on the "Contract with America." Rather than campaign independently within each district, Republican candidates rallied behind the national message crafted by then-congressman Newt Gingrich. As part of that campaign strategy, the Republican Party attempted to run candidates in every congressional district in America, including districts in which they were almost certain to lose. The party succeeded in fielding candidates for more than 90 percent of the available seats and went on to win control of both houses of Congress in the 1994 election. (Ex. 18: Sarwark decl. ¶28; Ex. 33: Answer ¶137.)

217.   Leading up to the 1994 campaign, the Georgia Republican Party waged a similar party-building campaign in Georgia. It ran a full slate of candidates for U.S. Representative in Georgia in 1990, 1992, and 1994. (Ex. 33: Answer ¶138.)

218.   Similarly, with coordination and support from the national Libertarian Party, Libertarian candidates for the U.S. House can run in all 50 states and the District of Columbia on a unified platform that presents the Libertarian Party as a viable alternative to the Republican and Democratic parties. That coordinated strategy and messaging will support Libertarian

candidates for U.S. Representative and promote the party as a whole. (Ex. 9: Graham decl. ¶22; Ex. 18: Sarwark decl. ¶29.)

219.   The exclusion of Libertarian candidates for U.S. Representative from the ballot in Georgia harms our coordinated national electoral strategy and prevents us from presenting the Libertarian Party as a viable alternative for all voters nationwide. (Ex. 9: Graham decl. ¶23; Ex. 18: Sarwark decl. ¶30.)

220.   Georgia's ballot-access restrictions thereby have a ripple-effect across the nation. (Ex. 18: Sarwark decl. ¶31.)

## XXII.      Uncontested Congressional Elections in Georgia

221.   Georgia's elections for U.S. Representative are among the most uncompetitive in the nation. (Ex. 22: Winger decl. ¶¶21-22.)

222.   In the three election cycles from 2012 through 2016, Georgia has had 15 unopposed races for U.S. Representative—more than any other state in the nation. That number represents almost 36 percent of its races for U.S. Representative over that period, which is a greater share than any other state in the nation except Massachusetts. (Ex. 22: Winger decl. ¶23.; Ex. 33: Answer ¶118) *See* Federal Election Commission, *Federal Elections 2016* at 89-184 (2017); Federal Election Commission, *Federal Elections 2014* at 33-

125 (2015); Federal Election Commission, *Federal Elections 2012* at 77-177 (2013).[4]

223.   In 2016, the winning candidate ran unopposed in the general election in five (35.7%) of Georgia's 14 congressional districts: the First, Ninth, Tenth, Thirteenth, and Fourteenth. No other state had more than four unopposed races for U.S. Representative in 2016, and only two states, Alabama (42.8%) and Massachusetts (44.4%), had a greater share of their races for U.S. Representative unopposed. (Ex. 22: Winger decl. ¶24; Ex. 33: Answer ¶119.) *See* Federal Election Commission, *Federal Elections 2016* at 89-184 (2017).

224.   In 2014, the winning candidate ran unopposed in the general election in seven (50.0%) of Georgia's 14 congressional districts: the Third, Fourth, Fifth, Eighth, Eleventh, Thirteenth, and Fourteenth. No other state had more than six unopposed races for U.S. Representative in 2014, and only one state, Massachusetts (66.7%), had a greater share of its races for U.S. Representative unopposed. (Ex. 22: Winger decl. ¶25; Ex. 33: Answer ¶120.) *See* Federal Election Commission, *Federal Elections 2014* at 33-125 (2015).

225.   In 2012, the winning candidate ran unopposed in the general election in three (21.4%) of Georgia's 14 congressional districts: the Third,

---

[4] The Federal Election Commission publishes a compilation of official election results for federal offices. Those publications are available at https://transition.fec.gov/pubrec/electionresults.shtml.

Eighth, and Tenth. No other state had more than two unopposed races for

U.S. Representative in 2012, and only two states, Kansas (25%) and

Massachusetts (22.2%), had a greater share of their races for U.S.

Representative unopposed. (Ex. 22: Winger decl. ¶26; Ex. 33: Answer ¶121.)

*See* Federal Election Commission, *Federal Elections 2012* at 77-177 (2013).

## XXIII.        Special Elections for U.S. Representative in Georgia

226.   Georgia uses a different set of ballot-access rules in special

elections to fill vacancies in the office of U.S. Representative. (Ex. 27: First

Admissions ¶20.)

227.   Those rules do not distinguish between candidates affiliated with

a political party, candidates affiliated with a political body, and independent

candidates. (Ex. 27: First Admissions ¶21.)

228.   In order to appear on the ballot in a special election for U.S.

Representative, each candidate must submit a notice of candidacy and the

qualifying fee by the date specified for that election. No nomination petition

is required. Every candidate who submits a notice of candidacy and

qualifying fee, and who otherwise meets the qualifications for the office,

appears automatically on the special-election ballot. (Ex. 27: First Admissions

¶22.)

229.   In the last 50 years, Georgia has held six special elections to fill a vacancy in the office of U.S. Representative. In 2017, Georgia held a special election in the Sixth Congressional District. In 2010, Georgia held a special election in the Ninth Congressional District. In 2007, Georgia held a special election in the Tenth Congressional District. In 1999, Georgia held a special election in the Sixth Congressional District. In 1983, Georgia held a special election in the Seventh Congressional District. And, in 1977, Georgia held a special election in the Fifth Congressional District. (Ex. 27: First Admissions ¶23.)

230.   In each special election for U.S. Representative in Georgia in the last 50 years, at least one independent candidate or candidate affiliated with a political body appeared on the special-election ballot. (Ex. 27: First Admissions ¶24.)

231.   There were two independent candidates on the ballot in the special congressional election held in 2017. (Ex. 37 at 11: election results.)

232.   There was one independent candidate on the ballot in the special congressional election held in 2010. (Ex. 37 at 30: election results.)

233.   There was one political-body candidate on the ballot in the special congressional election held in 2007. (Ex. 37 at 35: election results.)

234.   There were "a lot of candidates on the ballot" in the most recent special congressional election, held in 2017, and the Secretary of State's office

is not aware of any widespread reports of voter confusion in that race. (Ex. 23: Harvey dep. 182:13-183:15.)

235.   The Secretary of State's office is not aware of any elections where voters have reported significant amounts of confusion based on the number of candidates on the ballot. (Ex. 23: Harvey dep. 183:16-19.)

## XXIV.        Runoff Elections in Georgia

236.   Georgia's ballot-access restrictions are not necessary to reduce the number of run-off elections, especially runoffs in a general election for federal offices. (Ex. 22: Winger decl. ¶38.)

237.   Run-off elections in contests for U.S. Representative are not required by federal law: Georgia could simply eliminate them. (Ex. 25: Winger dep. 38:10.)

238.   Georgia is one of only two states to use runoffs in any general elections. Louisiana is the other. (Ex. 22: Winger decl. ¶39.)

239.   Runoff elections can be avoided altogether by using ranked-choice voting. (Ex. 22: Winger decl. ¶41.)

240.   The State of Maine uses ranked-choice voting in general elections to elect U.S. Senators and U.S. Representatives. In 2018, a federal district court upheld the state's ranked-choice system against a constitutional challenge brought by a losing congressional candidate. The court of appeals

denied the candidate's motion for an emergency injunction against the system, and the candidate later dropped his appeal. (Ex. 29: Second Admissions ¶44.)

241.   Five states (Arkansas, Alabama, Louisiana, Mississippi and South Carolina) use ranked-choice voting for overseas voters in runoff elections for federal offices. (Ex. 29: Second Admissions ¶45.)

242.   The Secretary of State's office is not aware of any voter confusion in the states where instant runoff voting has been used. (Ex. 23: Harvey dep. 182:4-7.)

243.   Runoffs in general elections for federal office are rare. Georgia has had only two general runoffs for the United States Senate since 1988, when the Libertarian Party became qualified to nominate candidates for U.S. Senator without a petition. (Ex. 22: Winger decl. ¶40.)

244.   The Secretary of State's office has not quantified the expense to the State of holding a runoff election. (Ex. 23: Harvey dep. 178:12-15.)

245.   There is no significant marginal cost for having a congressional runoff in addition to a runoff for a statewide race. (Ex. 23: Harvey dep. 179:7-12.)

246.   In the 2016 election cycle across the country, there were only nine general elections for U.S. Representative out of 435 (2.1 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 38:13-

22.) Among the 370 contests for U.S. Representative where there were more than two candidates on the ballot, there were only eight general elections (2.2 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 40:15-41:7.)

247.   The Secretary of State's office has done no analysis to determine how many additional runoffs would result if the Libertarian Party had ballot-access and has no factual support for its claim that allowing the Libertarian Party to have ballot access could conceivably result in more runoffs. (Ex. 23: Harvey dep. 176:21-177:10.)

248.   Georgia has runoff elections in virtually every election cycle because of contested primary elections for political-party candidates. (Ex. 23: Harvey dep. 175:24-175:13, 180:1-4.) Primary runoffs are slightly more expensive than general runoffs. (Ex. 23: Harvey dep. 179:13-25.)


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com