IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>Defendant. | Case No. 1:17-cv-04660-LMM<br><br>**Declaration of Jeff Anderson** |

1. My name is Jeff Anderson. I have been a registered voter in Georgia since 1990.

2. I am a former United States Naval Aviator and current captain for Delta Air Lines. I have been heavily involved in the Air Line Pilots Association (ALPA), where I participated in negotiating a multi-billion-dollar labor contract with Delta and subsequently served as chair of the Government Affairs Committee. I have also served on the steering committee of ALPA's national political action committee.

Plaintiff's SJ Exhibit 001

3. In early 2010, I declared my intention to qualify for the general election ballot as an independent candidate for U.S. Representative in Georgia's Eleventh Congressional District.

4. I proposed to run as an independent primarily because, from a public policy perspective, my views and overall platform did not strictly coincide with either the Republican or Democratic Party "brands." In a practical regard I also recognized that with a Republican incumbent and the Eleventh Congressional District's political performance history, even if I secured the Democratic Party nomination, having a "D" next to my name in the general election would greatly diminish my chance for victory. I determined that I could be more competitive as a true independent.

5. I made a genuine effort to gather enough signatures to qualify for the ballot.

6. By rule, I needed approximately 21,000 valid signatures in order to qualify for the general election ballot. Based on anecdotal evidence as to petition challenges and disqualifications, I estimated that I needed to gather at least 33,000 signatures to account for those that might be thrown out by the Secretary of State's office.

7. I considered using paid petition circulators, but, based on estimates for labor and expenses, I calculated the total cost of obtaining ballot-access at approximately $10 per signature; roughly $330,000 for our

2

target application. Considering that burden, plus the approximately $7500 in filing and administrative fees, I decided against spending hundreds of thousands of dollars simply to appear on the ballot. Even if such amounts could be collected, the time and distraction involved with raising that funding would certainly have fatally detracted from the necessary task of engaging voters and discussing relevant electoral issues.

8. In the alternative, I had a team of approximately 24 volunteers who went door-to-door through neighborhoods in the Eleventh Congressional District gathering signatures on my behalf. The spent hundreds, if not thousands, of person-hours on that effort.

9. In the strictly defined and limiting time frame allowed by law, my teams gathered somewhere between 11,000 and 12,000 raw signatures— well short of the number required. In the end, knowing how far that total was from the qualification minimum, I did not wastefully file the petitions to the Georgia Secretary of State.

10. I subsequently pursued the administrative and campaign pathway to qualify as a write-in candidate, an option that offers virtually no opportunity for success, and one which itself presents an unduly complex process challenge.

11. The incumbent in the Eleventh Congressional District, Representative Phil Gingrey, ultimately ran unopposed on the ballot in the 2010 general election.

12. During the course of my campaign and qualification effort, I found my interactions with the Secretary of State's office personnel to be polite and professional, but not altogether assistive, and the process to be quite frustrating. There was no comprehensive source of information for prospective independent candidates, and the technical requirements for petitioning were a potential minefield. Many of the rules, such as the requirement that candidates use the form specifically provided by the Secretary of State (not a copy, even if identical) and that each page of the petition (allowing for only a dozen or so signatures) be individually notarized, seemed to be designed to make it unjustifiably hard and remarkably expensive to qualify.

13. My team also found that many of the larger communities in the Eleventh Congressional District are private homeowners' associations posted as "no soliciting" zones. While I do not know whether that precluded our actual legal right to solicit for signatures in those communities, understandably my team immediately found that many residents of those communities are resistant to having strangers simply "cold call" them on

their own doorstep - an environment specifically counterproductive to eliciting support for election.

14. My experience in 2010 convinced me that it is virtually impossible to qualify for the general-election ballot in Georgia as an independent or third-party candidate for U.S. Representative. The number of signatures required is simply too great to gather in the allotted time and designated fashion without hundreds of thousands of dollars to spend on paid petition circulators.

15. Because running for U.S. Representative as an independent would be futile under current ballot-access law, regulation and practice, I have no plan to do so again. However, if those laws were more reasonable and the qualification pathway fairly and appropriately open, I would seriously consider running again as an independent candidate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May 28, 2019.

_____
Jeff Anderson