IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>Defendant. | Case No. 1:17-cv-04660-LMM<br><br>**Declaration of Derrick Lee** |

1. My name is Derrick Lee. I am a citizen and resident of Arizona. I am over the age of 18 and have the legal capacity to offer this declaration.

2. I am a member of Direct Contact Voter Services LLC., a professional petition circulating firm based in Arizona.

3. I have been in the petition-circulating industry since 1987. Since then, I have been involved in over 500 petition drives and have collected more than 30 million signatures.

4. I have been involved in two petition drives in Georgia. In 2002, I was hired by Helmut Forren, who was then the chair of the Libertarian Party of Georgia, to work on gathering signatures for Wayne Parker, who was the

Plaintiff's SJ Exhibit 010

Libertarian Party's nominee for U.S. Representative in Georgia's Eleventh Congressional District. And in 2016, I was hired by independent candidate Rocky De La Fuente to circulate his petitions nationwide, including in Georgia, for the office of President of the United States.

5.   I personally supervised De La Fuente's petitioning operation in Georgia in June 2016. I rented a headquarters office in Atlanta. I brought in experienced signature gatherers from others states to collect the signatures. I also hired and trained local signature-gatherers.

6.   The first thing I did when I got to Atlanta was to meet with officials in the Secretary of State's office and election officials in Fulton County to find out what constitutes a valid signature in Georgia. The Secretary of State's office told me that the only requirement was for the signature on the petition to match a signature of a registered voter. They said that the date of birth and address did not have to match as long as the signature on the petition matched the signature on a voter's registration affidavit. If they could find a voter using the information on the petition, and the signature matched, it would count.

7.   My signature-gatherers would go out and gather signatures during the day and bring them back to the office at the end of the day. My team would then check the signatures collected each day for validity. We did

2

this to ensure the validity of the signatures collected and to know when to stop collecting.

8. Neither the Secretary of State's office nor election officials in Fulton County would allow us to check our signatures against the signatures in their voter database.

9. In my experience, most or all states other than Georgia grant petition-circulators access to the records they need to check their petitions before they turn them in. Most often, they provide public-access terminals that allow us to see if we can find a voter and see if the signatures match. Georgia is the only state I've encountered in recent years that does not offer this kind of access. Instead, Georgia offers only one public access terminal with limited data and search capabilities. There are no instructions on how to use the software, and it does not give access to a voter's signature.

10. Because we had no access to signatures, we could only validate our petitions using Georgia's the online voter lookup tool. To check our signatures using the online tool, we input each signer's name, date of birth, and county to determine if the signer was a registered voter. Using this method, we were able to validate 45 to 50 percent of the signatures we gathered. That is, we could determine with a high degree of certainty that at least 45 to 50 percent of the signers were registered voters. However, since voters would not show up in the online lookup tool if they were registered to

3

vote in a different county than the one in which they currently reside or if they gave an inaccurate date of birth, we figured that a substantially higher percentage than that was actually registered to vote.

11. I personally submitted Mr. De La Fuente's petition containing approximately 15,000 signatures to the Secretary of State's office. The Secretary of State validated only 2,964 signatures—a validation rate of approximately 20 percent. This is well below industry norms and those of other states.

12. In my experience, a validation rate of 65 to 75% is the standard for candidacy petitions. This can vary somewhat based on a number of factors, including the quality of a state's voter records.

13. After the Secretary of State denied De La Fuente's petition, my firm also led the effort to check the validations. We were provided copies of the petitions as validated by county officials, and we had access to a secure website where we could search the state's voter list.

14. Because we did not have access to signature records, we could not actually check signatures. We could only try to find the signer in the state's list of registered voters.

15. Using just the information appearing on the face of the petitions, we were able to find unique voter registration numbers for over 1,200 voters after reviewing just a fraction of the petitions. In my experience, the

4

likelihood is very high that the signatures on file would have matched those on the petitions for these voters. Just these voters alone brought our validation rate above 50 percent for the petitions we reviewed.

16. Had we been granted access to the voters' signature, we would likely have validated these and many more signatures. It is important to remember that these 1,200 are only the ones for which we could find a *unique* voter registration record. With access to the signatures, however, we could have checked multiple records for each signer. It is not difficult, for example, to check 5 or 10 signatures of "Mary Smith" to find the one who signed a petition.

17. Based on my experience, I would estimate that we could validate another 15 to 20% very easily, bringing the overall validation rate to at least 70%.

18. My experience with Wayne Parker's petition was similar.

19. For that effort, I brought in experienced signature gatherers from others states to collect the signatures. I also hired and trained local signature-gatherers.

20. Because the 2002 redistricting process reduced the time available to petition, a federal judge reduced the signature requirement to 9,462 valid signatures. We submitted almost 20,000 raw signatures, and the Secretary

of State's office validated only 8,346 of them—a validation rate of approximately 40 percent.

21. Based on my experience in Georgia, I would say that Libertarian Party candidates would have to gather signatures far in excess of the number of valid signatures required in order to have any chance of ballot access. For one candidate for U.S. Representative, that might mean somewhere between 40,000 and 75,000 signatures. For a full slate of 14 candidates for U.S. Representative, that might be somewhere between 600,000 and 1,000,000 signatures.

22. I do not believe that number is reasonable or realistically achievable without an army of paid petition circulators.

23. Professional petition circulators typically charge $2-$5 per signature collected, plus expenses for travel, lodging and incidentals.

24. The cost of gathering the signatures necessary to qualify a full slate of candidates for the office of U.S. Representative would likely exceed $1,000,000 and could easily exceed $2,500,000.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on May 29, 2019.

*Derrick Lee*
Derrick Lee
Phoenix, Arizona