# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, an individual, **Allen Buckley**, an individual, **Aaron Gilmer**, an individual, **John Monds**, an individual, and the **Libertarian Party of Georgia, Inc.**, a Georgia nonprofit corporation, | Case No. _____ |
| Plaintiffs, | |
| vs. | **Complaint** |
| **Brian P. Kemp**, in his official capacity as Secretary of State of the State of Georgia, | |
| Defendant. | |

## Nature of the Case

1.      This case is a constitutional challenge to Georgia's ballot-access laws for third-party candidates for U.S. Representative.  Among the laws at issue is O.C.G.A. § 21-2-170, which requires a candidate from a third party (or "political body," as third parties are known under

Plaintiff's SJ Exhibit

032

Georgia law) seeking the office of U.S. Representative to obtain
signatures on a nomination petition from at least five percent of the
registered voters eligible to vote in the last election for that office. No
political-body candidate for U.S. Representative has ever been able to
qualify for Georgia's ballot since this provision was enacted in 1943.

2.      The plaintiffs are Georgia voters, prospective political-body
candidates for U.S. Representative, and the Libertarian Party of
Georgia.  They allege that Georgia's ballot-access restrictions
unconstitutionally burden their rights under the First and Fourteenth
Amendments to the U.S. Constitution, and they seek declaratory and
injunctive relief prohibiting the State from enforcing those restrictions
in future elections.

## Jurisdiction and Venue

3.      This Court has original jurisdiction over this case under
Article III of the U.S. Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

4.      This suit is authorized by 42 U.S.C. § 1983.

5.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and
2202.

6.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) and in the Atlanta Division under Local Rule 3.1.

## Parties

7.     Plaintiff Martin Cowen is a prospective political-body candidate in Georgia's Thirteenth Congressional District.  He meets all of the qualifications for the office of U.S. Representative and wants to appear on the general-election ballot as the nominee of the Libertarian Party of Georgia.

8.     Plaintiff Allen Buckley is a registered voter in Georgia's Thirteenth Congressional District.  He wants to vote for Martin Cowen as the Libertarian Party of Georgia's nominee for the office of U.S. Representative in his district.

9.     Plaintiff Aaron Gilmer is a prospective political-body candidate in Georgia's Ninth Congressional District.  He meets all of the qualifications for the office of U.S. Representative and wants to appear on the general-election ballot as the nominee of the Libertarian Party of Georgia.

10.     Plaintiff John Monds is a registered voter in Georgia's Second Congressional District.  He wants to vote for the Libertarian

Party of Georgia's nominee for the office of U.S. Representative in his district.

11.    Plaintiff Libertarian Party of Georgia, Inc. is a Georgia nonprofit corporation and a political body within the meaning of O.C.G.A. § 21-2-170.

12.    The Libertarian Party of Georgia was founded in 1972 and is the official Georgia affiliate of the national Libertarian Party, which was founded in 1971.

13.    Since its founding, the Libertarian Party of Georgia has run candidates for statewide public offices and for state legislative offices. The party has never had any nominee for U.S. Representative appear on Georgia's general-election ballot.  The party wants to nominate a candidate for U.S. Representative in all of Georgia's congressional districts and to have those nominees appear on the general-election ballot.

14.    Defendant Brian P. Kemp is the Secretary of State of the State of Georgia (hereinafter, the "Secretary").  He is the chief election official of the State of Georgia.  He is charged by statute with enforcing Georgia's ballot-access restrictions for candidates for U.S.

4

Representative.  At all relevant times, the Secretary exercised his authority under color of state law within the meaning of 42 U.S.C. § 1983.  He is sued in his official capacity only.

## Background

### I.    The History of Georgia's Ballot-Access Restrictions

15.    Georgia enacted its first ballot-access law in 1922.  Act of Aug. 21, 1922, ch. 530, §3, 1922 Ga. Laws 97, 100 (codified at 1933 Ga. Code § 34-1904).  That law provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee.

16.    Before 1922, Georgia did not use government-printed ballots.  Voters had to use their own ballots, and these were generally provided to voters by a political party.

17.    In 1943, Georgia added a five-percent petition requirement for access to the general-election ballot.  Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292.  That law allowed candidates of any political party that received at least five percent of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee.  The law required all other candidates to file a petition

5

signed by at least five percent of the registered voters in the territory covered by the office. The petition deadline was 30 days before the general election.

18. The five-percent petition requirement was enacted with the discriminatory purpose of preventing Communist Party candidates from appearing on Georgia's ballots.

19. A contemporaneous article in the *Atlanta Constitution* indicated that the five-percent petition requirement "sustained Secretary of State John B. Wilson in refusing a Communist candidate for president a place on the Georgia ballot in the 1940 election." *State Senate Receives New Election Bills*, Atlanta Const., Feb. 18, 1943.

20. In 1964, the State added a time limit for gathering signatures on a nomination petition, providing that candidates could not begin circulating a nomination petition more than 180 days before the filing deadline. Georgia Election Code, ch. 26, § 1, 1964 Ga. Laws Ex. Sess. 26, 93 (codified at 1933 Ga. Code § 34-1010). That law also changed the petition filing deadline to 50 days before the general election. *Id.* at 87 (codified at 1933 Ga. Code § 34-1001).

21.     In 1965, the General Assembly moved the petition deadline to 60 days before the general election.  Act of March 22, 1965, Ch. 118, § 1, 1965 Ga. Laws 224, 225 (codified at 1933 Ga. Code § 34-1001).

22.     In 1969, the petition deadline was moved to the second Wednesday in June.  Act of April 9, 1969, ch. 89, § 8B, 1969 Ga Laws. 329, 336 (codified at 1933 Ga. Code § 34-1001).  In 1977, the petition deadline was moved to the second Wednesday in July.  Act of March 30, 1977, ch. 294, § 3(c), 1977 Ga. Laws 1053, 1056 (codified at 1933 Ga. Code § 34-1002).

23.     In 1979, the General Assembly created a separate petition requirement for statewide offices.  Act of April 12, 1979, ch. 436, 1979 Ga Laws 617 (codified at 1933 Ga. Code § 34-1010).  Under that provision, an independent or political-body candidate seeking a statewide office needed to file a petition signed by at least two and a half percent of the registered voters eligible to vote in the last election for the office. Candidates for all other offices still had to meet the five-percent threshold.

24.     In 1986, the General Assembly lowered the petition threshold for statewide candidates to one percent.  Act of April 3, 1986,

7

ch. 1517, § 3, 1986 Ga Laws 890, 892-93 (codified at Ga. Code § 21-2-170).  The threshold for all other independent and political-body candidates remained at five percent.

25.    In 1986, the General Assembly also moved the petition deadline to the first Tuesday in August.  *Id.* at 891-92 (codified at Ga. Code § 21-2-132).

26.    In 1989, the General Assembly moved the petition deadline to the second Tuesday in July, where it remains today.  Act of April 4, 1989, ch. 492, § 2, 1989 Ga. Laws 643, 647 (codified at Ga. Code § 21-2-132).

## II.    Georgia's Current Ballot-Access Restrictions

27.    Georgia's current ballot-access laws distinguish between three kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a political body; and (3) independent candidates.

28.    A "political party" is any political organization whose nominee received at least 20 percent of the vote in the last gubernatorial or presidential election.  O.C.G.A. § 21-2-2 (25).

8

29.     Political parties choose nominees in partisan primaries, and the candidate nominated by the party appears automatically on the ballot for any statewide or district office.  O.C.G.A. § 21-2-130(1).  No nomination petition is required of a political party or any nominee of a political party.

30.     The only political parties that meet the current definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party.

31.     A "political body" is any political organization other than a political party.  O.C.G.A. § 21-2-2 (25).

32.     Political bodies must nominate candidates for partisan public offices by convention.  O.C.G.A. § 21-2-170(g).

33.     A political body can be qualified or not qualified.

34.     A political body is qualified if: (a) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the last general election; or (b) it nominated a candidate for statewide public office in the last election who received votes totaling at least one percent of the total number of registered voters in the election.  O.C.G.A. § 21-2-180.

35.     Party-qualifying petitions are due no later than the second Tuesday in July, O.C.G.A. § 21-2-185, and all signatures must be gathered within 15 months of the date on which the petition is submitted, O.C.G.A. § 21-2-182.

36.     Candidates nominated by a qualified political body for statewide partisan public offices appear automatically on the ballot without a nomination petition.  O.C.G.A. § 21-2-132(e)(5).  Each such nominee must submit a notice of candidacy and pay the applicable qualifying fee by the deadlines prescribed in O.C.G.A. § 21-2-132(d), but no nomination petition is required.

37.     Candidates nominated by a qualified political body for all other partisan public offices, including the office of U.S. Representative, do not appear automatically on the ballot. In order to appear on the general-election ballot, such candidates must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).

10

38.     The qualifying fee for most partisan public offices, including U.S. Representative, is three percent of the annual salary of the office; however, the qualifying fee for candidates for the General Assembly is a flat $400.  O.C.G.A. § 21-2-131.

39.     The nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities.  O.C.G.A. § 21-2-170(d).  Each sheet of the nomination petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline.  *Id.*  The nomination petition is due no later than noon on the second Tuesday in July.  O.C.G.A. § 21-2-132(e).

40.     Candidates nominated by political bodies that are not qualified do not appear automatically on the ballot for any office. In order to appear on the general-election ballot, such candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-

11

170(b).  Such candidates for all other partisan public offices must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).  Nomination petitions are due no later than noon on the second Tuesday in July.  O.C.G.A. § 21-2-132(e).

41.    Independent candidates do not appear automatically on the ballot for any office unless the candidate is an incumbent.  In order to appear on the general-election ballot, independent candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).  Such candidates for all other partisan public offices must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).  Nomination petitions are due no later than noon on the second Tuesday in July.  O.C.G.A. § 21-2-132(e).

12

42.     Because of recent litigation, the signature requirements for
independent presidential candidates and presidential candidates
nominated by political bodies that are not qualified is currently lower
than prescribed by Georgia law.  In 2016, U.S. District Judge Richard
Story ruled that the one-percent signature requirement in O.C.G.A. § 21-
2-170(b) is unconstitutional as applied to presidential candidates.  *See*
*Green Party v.* Kemp, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016), *aff'd*
No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam). As a remedy, he
lowered the signature requirement for presidential candidates from one
percent (about 50,000 signatures) to 7,500 signatures until the Georgia
General Assembly enacts a different measure.  *Id.* at 1374.  To date, the
General Assembly has not done so.

43.     In light of Judge Story's order and the General Assembly's
acquiescence in it, the number of signatures required for independent
presidential candidates and presidential candidates nominated by
political bodies that are not qualified to appear on the ballot statewide is
now less than half the number of signatures required for an independent
or political-body candidate for U.S. Representative to appear on the
ballot in any one of Georgia's fourteen congressional districts.

### III. The Exclusion of Independent and Political-Body Candidates

44. No candidate for U.S. Representative nominated by a political body has ever satisfied the five-percent signature requirement to appear on Georgia's general-election ballot.

45. No independent candidate for U.S. Representative has satisfied the five-percent signature requirement to appear on Georgia's general-election ballot since 1964, when Milton Lent qualified to be an independent candidate in Georgia's First Congressional District.

46. In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general-election ballot: (1) the State did not routinely check the validity of the signatures on a candidate's nomination petition; (2) the filing deadline was in October; (3) petitions were not required to be notarized; (4) no counties were split by a congressional district boundary; (5) fewer than 30 percent of African Americans of voting-age were registered to vote in Georgia; and (6) the overall registration rate was substantially below where it is in 2017.

47. Only one independent candidate for U.S. Representative, Billy McKinney, has appeared on Georgia's general-election ballot since

1964. When he qualified for the ballot in 1982, a federal court had suspended the five-percent signature requirement due to litigation over the State's redistricting plan that delayed the adoption of new districts following the 1980 Census.

48.     No independent candidate for U.S. Representative has ever qualified for the general-election ballot under Georgia's current ballot-access laws.

## IV.   The Number of Signatures and Qualifying Fee Required for Political-Body Candidates

49.     In determining the number of petition signatures needed by independent or political body candidates to appear on a general election ballot, the Secretary of State uses only the total number of "active" voters.

50.     According to election results posted on the Secretary of State's website, Georgia had 5,452,197 active registered voters as of the 2016 general election.

51.     As a result, the Libertarian Party would need to gather at least 272,610 valid signatures in order to run a full slate of candidates for the office of U.S. Representative.

52.     Georgia currently has 14 members of the U.S. House of Representatives, each of which is elected from a single-member district, so the average number of valid signatures required for an independent or political-body candidate for the U.S. House of Representative to appear on the 2018 general election ballot is 19,473.

53.     Because the actual number of registered voters in each congressional district varies from district to district, the actual number of valid signatures required for an independent or political-body candidate for the U.S. House of Representative to appear on the 2018 general election ballot also varies from district to district.

54.     According to election results posted on the Secretary of State's website, the following are the number of active voters as of the 2016 general election and the number of valid signatures required for an independent or political-body candidate to appear on the 2018 general election ballot in each congressional district.

| District | Active Voters (11/08/16) | Signatures Required 2018 |
|---|---|---|
| 1 | 370,379 | 18,519 |
| 2 | 351,380 | 17,569 |
| 3 | 405,201 | 20,261 |
| 4 | 407,264 | 20,364 |
| 5 | 441,833 | 22,092 |
| 6 | 420,301 | 21,016 |

16

| | | |
|---|---|---|
| 7 | 388,396 | 19,420 |
| 8 | 355,083 | 17,755 |
| 9 | 377,556 | 18,878 |
| 10 | 404,371 | 20,219 |
| 11 | 426,707 | 21,336 |
| 12 | 360,149 | 18,008 |
| 13 | 406,215 | 20,311 |
| 14 | 337,362 | 16,869 |
| TOTAL | 5,452,197 | 272,617 |

55.     The current annual salary for U.S. Representatives is

$174,000.  As a result, the qualifying fee for each candidate for U.S.

Representative in 2018 is $5,220, and the Libertarian Party would need

to pay $73,080 in qualifying fees in order to run a full slate of candidates

for the office of U.S. Representative in 2018.

## V.     The Petition-Checking Process

56.     Under Georgia law, it is the duty of the Secretary of State to

check the validity of signatures on nomination petitions submitted by

candidates for President, U.S. Senator, U.S. Representative, and all

state offices.  O.C.G.A. §§ 21-2-132(d), -171(a).

57.     A signature on a nomination petition is valid and must be

counted if it matches the signature on file of a duly qualified and

registered voter who is eligible to vote for the office to be filled.

17

58.   Georgia law does not prescribe any particular method for checking signatures, but the Georgia Supreme Court has indicated that Secretary of State must choose a method which "can reasonably be expected to operate in a thorough and professional way so as to produce accurate results." *Anderson v. Poythress*, 246 Ga. 435, 271 S.E.2d 834 (1980).

59.   The Secretary of State has chosen to delegate the task of validating signatures to county election officials.

60.   When a candidate submits a nomination petition, the Secretary sends a duplicate of the petition to county election officials along with a one-page letter asking them to use certain codes on the petition when verifying signatures to indicate why a particular signature was deemed invalid.

61.   The Secretary provides no instructions on how to go about the verification process, nor any guidance on what the law requires for a signature to be considered valid.

62.   The absence of instruction from the Secretary has led to inconsistent approaches throughout the counties.

63.     For instance, some county election officials do not count the signatures of inactive voters as valid.

64.     Some county election officials do not use the voter's date of birth appearing on the petition to identify the voter and to validate the voter's signature.

65.     The Secretary has no procedures in place to ensure that county election officials have examined the petition signatures in accordance with the law and to the extent necessary to determine their validity under both federal and Georgia law.

66.     The Secretary's signature validation process results in many valid signatures being improperly rejected.

67.     In 2016, for example, Rocky De La Fuente submitted approximately 15,000 signatures on a nomination petition in an attempt to qualify for the general-election ballot as an independent candidate for President. He used professional, experienced petition circulators to gather his signatures.

68.     The Secretary verified only 2,964 signatures—a validation rate of approximately 20 percent.

69.     Further investigation or discovery is likely to identify other instances where the Secretary's signature-verification process yielded similar signature-validation rates.

70.     The Secretary's signature-verification process leads to signature-validation rates that are well below industry norms and those of other states.

71.     Because of the Secretary's inconsistent and error-prone signature-verification process, independent and political-body candidates for U.S. Representative must gather signatures far in excess of the number of valid signatures required to obtain ballot access under Georgia law.

## VI.     The Cost of Petitioning in Georgia

72.     As a practical matter, it would be impossible for the Libertarian Party to qualify a full slate of candidates for the office of U.S. Representative in 2018 without making extensive use of paid, professional petition circulators.

73.     Professional petition circulators typically charge $2-$5 per signature collected, plus expenses for travel, lodging and incidentals.

74.     In order to be assured of gathering a sufficient number of valid signatures to qualify a full slate of candidates for the office of U.S. Representative, the Libertarian Party would need to gather in excess of 500,000 total signatures.

75.     The cost of gathering the signatures necessary to qualify a full slate of candidates for the office of U.S. Representative would likely exceed $1,000,000 and could exceed $2,500,000.

## VII.  Other States' Signature Requirements

76.     Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures.

77.     In 2016, the last year for which complete data are available, Georgia law required more than 259,500 valid signatures for a third party to run a full slate of candidates for U.S. Representative.  This number represents more than 6.3 percent of all votes cast in Georgia for president in 2016.

78.     The state that required the next-highest number of signatures for a third party to run a full slate of candidates for U.S.

Representative was Illinois, which required approximately 178,400 valid signatures. This number represents approximately 3.2 percent of all votes cast in Illinois for president in 2016, and it would have qualified 18 candidates.

79. The state that required the third-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative was New York, which required approximately 94,500 valid signatures. This number represents approximately 1.2 percent of all votes cast in New York for president in 2016, and it would have qualified 27 candidates.

80. Thirty states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative.

81. In many other states, moreover, it is possible for third parties to qualify to nominate candidates for U.S. Representative without submitting any signatures.

## VIII. Other States' Qualifying Fees

82. Unlike Georgia, most other states do not require third-party candidates for U.S. Representative who qualify for the general-election

22

ballot by petition to pay a qualifying fee at all. Among the states that do, Georgia's qualifying fees are higher than any other state in the nation.

83. In 2016, the last year for which complete data are available, Georgia law required $5,220 for a single congressional candidate and $73,080 for a third party to run a full slate of candidates for U.S. Representative.

84. The state that required the second highest qualifying fees in 2016 for third-party candidates for U.S. Representative who qualified for the general-election ballot by petition was North Carolina, which had a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $22,620 for a third-party to run a full slate of thirteen candidates for U.S. Representative.

85. The state that required the third highest qualifying fees in 2016 for third-party candidates for U.S. Representative who qualified for the general-election ballot by petition was West Virginia, which had a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $5,220 for a third-party to run a full slate of three candidates for U.S. Representative.

## IX.    Past Petition Efforts

86.    Independent and political-body candidates for U.S. Representative have sought unsuccessfully to qualify for the general-election ballot under Georgia's current ballot-access laws.

87.    In 2012, former congresswoman Cynthia McKinney declared her intention to qualify for the general-election ballot the Green Party candidate in Georgia's Fourth Congressional District and was unsuccessful in doing so.

88.    In 2010, Eugene Moon declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Ninth Congressional District and was unsuccessful in doing so.

89.    In 2008, Faye Coffield declared her intention to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District and was unsuccessful in doing so.

90.    In 2008, Dr. Jim Sendelbach declared his intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Tenth Congressional District and was unsuccessful in doing so.

91.    In 2006, the Veterans Party of America declared its intention to qualify a candidate as a political-body candidate in Georgia's Second Congressional District and was unsuccessful in doing so.

92.    In 2006, Loren Collins declared an intention to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District and was unsuccessful in doing so.

93.    In 2006, Jay Fisher declared his intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Sixth Congressional District and was unsuccessful in doing so.

94.    In 2006, Chip Shirley declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District and was unsuccessful in doing so.

95.    In 2006, Richard Clarke declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Twelfth Congressional District and was unsuccessful in doing so.

96.    In 2004, the Veterans Party of America declared its intention to qualify a candidate as a political-body candidate in Georgia's Second Congressional District and was unsuccessful in doing so.

97.     In 2004, Steven Muhammad declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fifth Congressional District and was unsuccessful in doing so.

98.     In 2004, Andy Altizer declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Sixth Congressional District and was unsuccessful in doing so.

99.     In 2004, Chris Borcik declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Eighth Congressional District and was unsuccessful in doing so.

100.   In 2004, Silvia Delamar declared her intention to qualify for the general-election ballot as an independent candidate in Georgia's Eighth Congressional District and was unsuccessful in doing so.

101.   In 2004, Caine Cortellino declared an intention to qualify for the general-election ballot as an independent candidate in Georgia's Twelfth Congressional District and was unsuccessful in doing so.

102.   In 2004, Malcom Rogers declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Thirteenth Congressional District and was unsuccessful in doing so.

103. In 2004, Philip Bradley declared his intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Thirteenth Congressional District and was unsuccessful in doing so.

104. In 2002, Joyce Griggs declared her intention to qualify for the general-election ballot as the Green Party candidate in Georgia's First Congressional District and was unsuccessful in doing so.

105. In 2002, Ryan Anthony Cancio declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Sixth Congressional District and was unsuccessful in doing so.

106. In 2002, Carol Ann Rand declared her intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Seventh Congressional District and was unsuccessful in doing so.

107. In 2002, Al Herman declared his intention to qualify for the general-election ballot as the Green Party candidate in Georgia's Seventh Congressional District and was unsuccessful in doing so.

108.  In 2002, Chad Elwartowski declared his intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Ninth Congressional District and was unsuccessful in doing so.

109.  In 2002, Daniel Kozarich declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District and was unsuccessful in doing so.

110.  In 2002, Brian Brown declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District and was unsuccessful in doing so.

111.  In 2002, Wayne Parker declared his intention to qualify for the general-election ballot as the Libertarian Party candidate in Georgia's Eleventh Congressional District and was unsuccessful in doing so.

112.  In 2002, Ron Smith declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Thirteenth Congressional District and was unsuccessful in doing so.

113.  In 1982, Maceo D. Dixon declared his intention to qualify for the general-election ballot as the Socialist Workers Party candidate in Georgia's Fifth Congressional District and was unsuccessful in doing so.

114.  Georgia's ballot-access laws have contributed, at least in part, to the failure of these independent and political-body candidates for U.S. Representative to qualify for the general-election ballot.

115.  Further investigation or discovery is likely to establish that other individuals have sought unsuccessfully to qualify for the general-election ballot as an independent candidate or political-body candidate for U.S. Representative under Georgia's current ballot-access laws.

116.  Georgia's current ballot-access laws have deterred other potential independent and political-body candidates from even attempting to qualify for the general-election ballot.

## X.  Uncontested Congressional Elections in Georgia

117.  Georgia's elections for U.S. Representative are among the most uncompetitive in the nation.

118.  In the three election cycles from 2012 through 2016, Georgia has had 15 unopposed races for U.S. Representative—more than any other state in the nation.  That number represents almost 36 percent of its races for U.S. Representative over that period, which is a greater share than any other state in the nation except Massachusetts.

119. In 2016, the winning candidate ran unopposed in the general election in five (35.7%) of Georgia's 14 congressional districts: the First, Ninth, Tenth, Thirteenth, and Fourteenth. No other state had more than four unopposed races for U.S. Representative in 2016, and only two states, Alabama (42.8%) and Massachusetts (44.4%), had a greater share of their races for U.S. Representative unopposed.

120. In 2014, the winning candidate ran unopposed in the general election in seven (50.0%) of Georgia's 14 congressional districts: the Third, Fourth, Fifth, Eighth, Eleventh, Thirteenth, and Fourteenth. No other state had more than six unopposed races for U.S. Representative in 2014, and only one state, Massachusetts (66.7%), had a greater share of its races for U.S. Representative unopposed.

121. In 2012, the winning candidate ran unopposed in the general election in three (21.4%) of Georgia's 14 congressional districts: the Third, Eighth, and Tenth. No other state had more than two unopposed races for U.S. Representative in 2012, and only two states, Kansas (25%) and Massachusetts (22.2%), had a greater share of their races for U.S. Representative unopposed.

## XI. The Libertarian Party Offers a Unique Mix of Policy Preferences

122.   The Libertarian Party has adopted a national platform emphasizing personal liberty, economic liberty, balanced budgets, and national defense.  The party has also taken detailed policy positions on a number of contemporary issues.

123.   The Libertarian Party's platform and policies on contemporary issues reflects a mix of policy preferences that differs from those of the Democratic and Republican parties.

124.   On some contemporary issues, the Libertarian Party takes policy positions that are different from those offered by either the Democratic or the Republican party.

125.   Concerning balanced budgets, in 2007, when the total nation debt was approximately $9 trillion, David M. Walker, as Comptroller General of the United States and head of the Government Accountability Office (GAO), said: "GAO's long-term simulations continue to show ever-larger deficits resulting in a federal debt burden that ultimately spirals out of control." Now, total debt exceeds $20 trillion, and the Congressional Budget Office sees deficits averaging roughly $1 trillion per year over the next decade.  Annually balanced budgets—supported

by the Libertarian Party but neither the Democratic Party nor the Republican Party—would halt the growth of the debt.

126.  Candidates nominated by the Libertarian Party of Georgia have run on the party's national platform in addition to emphasizing unique or local campaign issues.

## XII.  The Libertarian Party has Significant Support in Georgia

127.  The Libertarian Party has demonstrated that it has substantial support among Georgia's electorate.

128.  In 1988, the Libertarian Party of Georgia qualified to nominate candidates for statewide public office by convention when it submitted a party-qualifying petition signed by at least 1 percent of the number of total number of registered voters at the preceding general election.  *See* O.C.G.A. § 21-2-180(1).  The party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least 1 percent of the total number of registered voters who were registered and eligible to vote in that election. *See* O.C.G.A. § 21-2-180(2).

32

129. Georgia is the only state in the nation that considers the Libertarian Party ballot-qualified for state offices but not for district offices.

130. The Libertarian Party has had candidates for U.S. Representative appear on the ballot in every state in the nation except Georgia.

131. In the last three election cycles, Libertarian Party candidates for statewide public offices in Georgia have received millions of votes.

132. In 2016, the Libertarian Party of Georgia's nominee for the Public Service Commission, Eric Hoskins, received 1,200,076 votes, which represents 33.4 percent of all votes cast in that contest and 22.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Hoskins carried Clayton and DeKalb counties in that election.

133. In 2014, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, John H. Monds, received 710,408 votes, which represents 31.7 percent of all votes cast in that contest and 11.7 percent of the total number of registered voters who were registered

and eligible to vote in that election. Monds carried Clayton, DeKalb, and Hancock counties.

134.  In 2012, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, David Staples, received 1,095,115 votes, which represents 34.2 percent of all votes cast in that contest and 18.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Staples carried Clayton, DeKalb, and Hancock counties.

135.  In *Green Party of Georgia v. Kemp*, the Secretary of State repeatedly described the Libertarian Party as a political body "with significant support" in Georgia.

## XIII. The National Impact of Georgia's Ballot-Access Restrictions

136.  Georgia's ballot-access restrictions make it more difficult for the national Libertarian Party to wage a coordinated nationwide campaign.

137.  In 1994, the Republican Party ran a coordinated nationwide campaign based on the "Contract with America." Rather than campaign independently within each district, Republican candidates rallied behind the national message crafted by then-congressman Newt Gingrich. As

34

part of that campaign strategy, the Republican Party attempted to run candidates in every congressional district in America, including districts in which they were almost certain to lose. The party succeeded in fielding candidates for more than 90 percent of the available seats and went on to win control of both houses of Congress in the 1994 election.

138. Leading up to the 1994 campaign, the Georgia Republican Party waged a similar party-building campaign in Georgia. It ran a full slate of candidates for U.S. Representative in Georgia in 1990, 1992, and 1994. Those campaigns were highly successful in attracting Georgia voters to the national Republican Party.

139. The national Libertarian Party wants to wage a similar coordinated campaign across the nation but is hindered in doing so by Georgia's ballot-access restrictions. Without a realistic opportunity to get candidates on the ballot in Georgia, the party cannot wage a truly national campaign.

140. Georgia's ballot-access laws for political-body candidates for U.S. Representative thereby have a ripple effect that touches the electoral process across the nation.

### XIV. Georgia's Ballot-Access Restrictions Harm Voters, Candidates, and Political Bodies

141. Georgia's ballot-access laws put the Libertarian Party at a financial disadvantage compared to the two recognized political parties in Georgia.

142. Georgia's ballot-access laws make it more difficult for the Libertarian Party to recruit high-quality candidates for U.S. Representative.

143. Georgia's ballot-access laws make it more difficult for the Libertarian Party to raise money.

144. Georgia's ballot-access laws make it more difficult for the Libertarian Party to attract members.

145. Georgia's ballot-access laws make it more difficult for the Libertarian Party to educate potential voters about its policy positions and platform.

146. Georgia's ballot-access laws make it more difficult for the Libertarian Party candidates to connect with voters.

147. Georgia's ballot-access laws make it more difficult for the Georgia's voters to identify candidates who reflect their policy preferences on contemporary issues.

## Claim One

148.   Georgia's ballot-access laws for political-body candidates for U.S. Representative violate rights guaranteed to the plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983.

## Claim Two

149.   Georgia's ballot-access laws for political-body candidates for U.S. Representative violate rights guaranteed to the plaintiffs by the Equal Protection Clause of the U.S. Constitution, as enforced by 42 U.S.C. § 1983.

## Relief

150.   A real and actual controversy exists between the parties.

151.   The plaintiffs have no adequate remedy at law other than this action for declaratory and equitable relief.

152.   The plaintiffs are suffering irreparable harm as a result of the violations complained of herein, and that harm will continue unless declared unlawful and enjoined by this Court.

WHEREFORE, the plaintiffs respectfully pray that this Court:

(1) assume original jurisdiction over this case;

(2) enter a declaratory judgment that Georgia's ballot-access laws for political-body candidates for U.S. Representatives violate rights guaranteed to the plaintiffs by the First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983;

(3) enter a declaratory judgment that Georgia's ballot-access laws for political-body candidates for U.S. Representatives violate rights guaranteed to the plaintiffs by the Equal Protection Clause of the U.S. Constitution, as enforced by 42 U.S.C. § 1983;

(4) enjoin the Secretary of State from enforcing Georgia's ballot-access laws for political-body candidates for U.S. Representatives in future elections;

(5) enjoin the Secretary of State from failing to print the Libertarian Party's nominees for U.S. Representative on the ballot in future elections;

(6) award the plaintiffs nominal damages;

(7) award the plaintiffs the costs of this action together with their reasonable attorneys' fees under 42 U.S.C. § 1988; and

(8) retain jurisdiction of this action and grant the plaintiffs any

further relief which may in the discretion of the Court be

necessary and proper.

Respectfully submitted this 21st day of November, 2017.

**/s/ Bryan L. Sells**_____

Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com