**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MARTIN COWEN, ALLEN BUCKLEY, AARON GILMER, JOHN MONDS, and the LIBERTARIAN PARTY OF GEORGIA, INC., a Georgia nonprofit  corporation, | * * * * * | |
| | * | CASE NO.: 1:17cv04660-LMM |
| Plaintiffs, | * * | |
| v. | * * | |
| BRAD RAFFENSPERGER, Georgia Secretary of State, | * * * | |
| Defendant. | * | |

**DEFENDANT BRAD RAFFENSPERGER'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs, the Libertarian Party of Georgia and four of its individual members, filed this action on November 21, 2017 asserting that O.C.G.A. § 21-2-170 constitutes an unconstitutional burden on Plaintiffs' associational rights under the First and Fourteenth Amendments, and further assert that this statute

1

violates Plaintiffs' equal protections rights.[1]    Plaintiffs wish to have their candidates on the general election ballot for Congress.  Doc. 1.

Because the undisputed facts establish that Georgia's ballot access statutes are constitutional, Defendant now moves for summary judgment.

## II.   BRIEF SUMMARY JUDGMENT FACTS AND BALLOT ACCESS STATUTES.[2]

Plaintiff, the Libertarian Party of Georgia is a political body as defined by O.C.G.A. § 21-2-2(23).   No Libertarian Party candidate has ever been on the general election ballot for Congress in Georgia.  The Libertarian Party of Georgia had 161 members as of 2016.  Libertarian Party Depo p. 33 lns. 6-25; p. 110 ln. 7 – p. 112 ln. 3, and Exhibit 2 of the deposition.

Under Georgia law, political organizations are divided between political bodies and political parties.  O.C.G.A. § 21-2-2(23) through (25).  A political organization that at the preceding general election nominated a candidate for Governor, and that candidate received at least 20% of the vote, is labeled a

---

[1]  Plaintiffs' complaint asserts claims against "Georgia's ballot access laws" generally.  Doc. 1 ¶¶ 138, 139.  However, the complaint's focus is on the petition requirement in O.C.G.A. § 21-2-170.  Doc. 1 ¶ 1.

[2]  Defendant has filed a Statement of Material Facts not in Dispute which more fully sets forth the material undisputed facts in the case.   Those facts are incorporated herein by reference.

political party.  O.C.G.A. § 21-2-2(25).  In Georgia, only the Republican and Democratic parties are political parties as defined by state law.[3]  Political parties nominate their candidates by primary election and the candidate that gets 50% or more of the primary vote is automatically included on the general election ballot. *See* O.C.G.A. § 21-2-130(1).

Political organizations that are not political parties are defined as political bodies in Georgia.  O.C.G.A. § 21-2-2(23).  Political body candidates do not have to garner support in a primary election or expend resources running a primary campaign.  Rather, political body candidates may be nominated at their parties' conventions, and included on the general election ballot by demonstrating significant voter support in other ways.[4]  An independent or political body candidate may petition to get on the ballot.  For elections that are not statewide, including elections for Congress, the petition must be signed by 5% of the district's

---

[3] Of course, political parties must continue to garner at least 20% of the vote at each general election to continue their status as a political party.  *See* O.C.G.A. § 21-2-2(25).

[4] As in *Storer v. Brown*, 415 U.S. 724, 725 (1974), in Georgia "[t]he [political body] candidate need not stand for primary election but must qualify for the ballot by demonstrating substantial public support in another way."

"active" registered voters, as of the prior general election.   O.C.G.A. § 21-2-170(b).[5]

Independent and political body candidates may also run as write-in candidates by providing notice of intent to run as a write-in candidate, publishing notice in a newspaper of general circulation, and providing a copy of that notice to the Secretary of State.  *See* O.C.G.A. § 21-2-133.  No petition is required to run as a write-in candidate.  Exhibit A, ¶ 37.

The fee to qualify as a candidate for Congress is $5,220.00.  Exhibit A ¶ 34. The fee is the same for all candidates regardless of party affiliation.   *Id.* Candidates do have the option of submitting a petition with signatures equal to 1% of the total registered voters in the relevant Congressional District at the prior general election, in lieu of the filing fee.  O.C.G.A. § 21-2-153(a)(1); Exhibit A ¶ 35.

The Libertarian Party of Georgia, like other political bodies and parties, received 75% of a Libertarian candidate's qualifying fee.   O.C.G.A. § 21-2-131(c)(2).   The Libertarian Party advances its candidates for statewide

---

[5]  Political body candidates submitting a petition pursuant to O.C.G.A. § 21-2-170(b) have six (6) months to collect petition signatures.   O.C.G.A. § 21-2-170(e).

office 75% of the filing fees.  Libertarian Party Depo, p. 44 ln. 14 – p. 46 ln. 8; p. 64 ln. 5 – p. 65 ln. 9.  In the case of candidates running for Congress, while the candidate may pay the initial filing fee the Libertarian Party returns 75% of the fee to the candidate upon request.  Libertarian Party Depo, p. 68 ln. 11 – p. 70 ln. 11.

The Libertarian Party of Georgia has a very small membership.  In 2016, the most recent year data is available, the Libertarian Party of Georgia had only 161 members.  These individuals all paid dues to the state party. Libertarian Party Depo p. 33 lns. 19-22; p. 107 lns. 18-25;  and Exhibit 2 of Deposition.  Annual Dues for the Libertarian Party are approximately $30.00.  Libertarian Party Depo p. 106 lns. 21-24.  It takes only three members - that must volunteer to be officers - to start an affiliate branch of the Libertarian Party.  Libertarian Party Depo p. 91 lns. 12-24. The Libertarian Party of Georgia has only seven active affiliates in this State. Libertarian Party Depo p. 94 ln. 24 through p. 95 ln. 4.

## III.   THE SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine dispute regarding any material fact and the defendant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c).   The moving party must show that there is an absence of evidence to support the non-movant's case; the moving party is not required to negate his opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325

(1986).  Once that showing is made, the burden shifts to the non-movant to demonstrate that there is a material issue of fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The mere existence of some factual dispute does not preclude summary judgment; rather, a plaintiff must establish a *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

On summary judgment, the court must construe the facts in the light most favorable to the non-moving party, but the court is not required to accept any interpretation "no matter how strained."  *Rowe v. Fort Lauderdale*, 279 F.3d 1271, 1277 and 1278 n.6 (11th Cir. 2002).  Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Thus, in *Scott*, the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him," and should not have been considered on summary judgment.  *Id.*

## IV. GEORGIA'S STATUTORY SCHEME REGULATING ACCESS TO THE GENERAL ELECTION BALLOT IS CONSTITUTIONAL.

### A. Prior Cases Have Found Georgia's Ballot Access Statute for Congressional Seats Constitutional.

The current Georgia ballot access statute, O.C.G.A. § 21-2-170, has been repeatedly upheld by both the United States Court of Appeals for the Eleventh Circuit and the Supreme Court of the United States. *See Jenness v. Fortson*, 403 U.S. 431 (1971) (challenging 5% petition requirement, by candidates for congressional office and voters, as both a violation of First Amendment and Equal Protection); *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981) (challenging 5% petition requirement as both a violation of First Amendment and Equal Protection); *Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002) (challenge, pursuant to the Qualifications Clause, U.S. Const. Art I, Sec. 2, cl. 2, to 5% petition requirement in O.C.G.A. § 21-2-170(b) for congressional elections); *Coffield v. Handel*, 599 F.3d 1276 (11th Cir. 2010) (challenge to 5% petition requirement for congressional elections).  As the Eleventh Circuit explained in *Coffield*, "[o]ur Court and the Supreme Court have upheld [O.C.G.A. 21-2-170(b)] before . . . [and] [t]he pertinent laws of Georgia have not changed materially since the decisions in *Jenness* and *Cartwright* were made." *Coffield*, 599 F.3d at 1277.  That statement is

still true today.  The ballot access structure challenged here is the same structure upheld by the United States Supreme Court in *Jenness*.

The *Jenness* Court, in upholding Georgia's ballot access structure, considered that Georgia's structure "freely provides for write-in votes."  403 U.S. at 438.  Georgia's current statutory scheme also provides for write-in votes.  O.C.G.A. § 21-2-133.  The *Jenness* Court noted that Georgia "does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies."  403 U.S. at 438.  Georgia's current structure allows independent candidates, like political body candidates, access to the general election ballot via petition.  *See* O.C.G.A. § 21-2-170(b).  The *Jenness* Court also considered that Georgia "does not fix an unreasonably early filing deadline for candidates not endorsed by established parties."  403 U.S. at 438.  At the time *Jenness* was decided, a political body candidate had to submit his nomination petition the second Wednesday in June.  403 U.S. at 433-434.  Currently, the petition deadline is the second Tuesday in July.  O.C.G.A. § 21-2-132(e).[6]  The

---

[6] A notice of candidacy must also be filed during the period "beginning at 9:00 A.M. on the Monday of the thirty-fifth week immediately prior to the election and ending at 12:00 Noon on the Friday immediately following such Monday." O.C.G.A. § 21-2-132(d)(2).  This deadline is the same as the deadline for political party candidates, although the deadline for political parties is calculated from the date of the primary election.  O.C.G.A. § 21-2-153(c)(1)(A).  The result is that the deadline is the same for all.

*Jenness* Court considered that Georgia did not "impose upon a small party or a new party the Procrustean requirement of establishing elaborate primary election machinery." 403 U.S. at 438. The same is true today. As recognized by the Supreme Court:

> So far as the Georgia election laws are concerned, independent candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions.

403 U.S. at 438. The Court went on to describe a number of features of the petition process that afford independent and political body candidates a greater opportunity to obtain signatures. Features such as allowing voters to sign as many different petitions as they wish,[7] and allowing voters that voted in a party primary to also sign a petition,[8] are still part of Georgia's ballot access structure today.

---

[7] The Eleventh Circuit has also recognized that permitting voters to sign multiple petitions eases the burden of collecting petition signatures. *See Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (comparing Florida's requirement with the "New York law providing that a person may not sign a nominating petition if he or she has signed a petition of another candidate for same office," which was upheld. *See Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 997 (S.D.N.Y.), *aff'd mem.*, 400 U.S. 806 (1970).

[8] *See* discussion *infra* at pp. 22-23.

There is also no limit on how many petition signatures a political body or candidate may submit, and there is no cost imposed to verify the petition signatures, and as was true in *Jenness*, voters "not even registered at the time of the previous election" may sign a petition.[9]   403 U.S. at 439.   Exh. A ¶ 5, 7.   These measures result in the pool of available voters, to sign the qualifying petitions, being as large as possible.

### B. The Constitutional Standard for Challenges to Ballot Access Laws.

The standard for ballot access cases is a balancing test.  A court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Burdick v. Takushi*, 504 U.S. 428 (1992) and *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).   The Supreme Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be

---

[9] *See Libertarian Party of Florida*, 710 F.2d at 794.

fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer*, 415 U.S. at 730. "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). The Court has instructed further that "the mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Burdick*, 504 U.S. at 433 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

In *Burdick* the Supreme Court upheld a complete ban on write in candidates in the general election to a voter's challenge under the First and Fourteenth Amendments. The *Burdick* Court recognized that the function of elections is to choose candidates "not to provide a means of giving vent to 'short-range political forum for political goals, pique, or personal quarrels." 504 U.S. at 438 (quoting *Storer*, 415 U.S. at 735). *See also Stein v. Ala. Sec'y of State*, 774 F.3d 689, 695 (11th Cir. 2014) (explaining that "[b]allots serve primarily to elect candidates, not as forums for political expression.") (quoting *Timmons*, 520 U.S. at 363). "[T]o the extent Plaintiffs argue their associational rights [are] burdened because the

11

Party Plaintiffs and their candidates could not use the ballot as a vehicle to communicate with voters . . . the burden they shouldered was not severe." *Stein*, 774 F.3d at 695.

While *Jenness* predated the Supreme Court's decisions and standard set out in *Anderson* and *Burdick*, the Court has repeatedly reaffirmed the principle holdings in *Jenness*, that is, that the State may require candidates to show significant voter support before being required to place those candidates' names on the general election ballot. *See*, *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008) ("Just as States may require persons to demonstrate 'a significant modicum of support' before allowing them access to the general-election ballot, lest it become unmanageable, *Jenness v. Fortson*, 403 U.S. [at] 442, they may similarly demand a minimum degree of support for candidate access to a primary ballot.") (full citation and parallel cites omitted); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("[I]n order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot." citing *Jenness,* 403 U.S. 431); *Morse v. Republican Party*, 517 U.S. 186, 198 (1996) (explaining that *Jenness*, and other cited cases, "establish only that political parties with at least a modicum of public support must be

provided a reasonable method of ballot access. They do not establish that they are entitled to choose the method itself."); *Burdick*, 504 U.S. at 435 n. 3 ("We have previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Hawaii's one-percent requirement." citing *Jenness*, 403 U.S. 431).[10]

Other courts have also confirmed that the holdings of *Jenness* are still good law. As the Ninth Circuit Court of Appeals recently explained:

> It was long ago established that a state may condition ballot placement on a preliminary showing of a significant modicum of support. And there is no dispute that a state may require a candidate to demonstrate support from slightly, but not substantially, *more than 5% of voters* without imposing a severe burden triggering heightened scrutiny.

*Ariz. Libertarian Party v. Hobbs*, 2019 U.S. App. LEXIS 16201 * 8 (9th Cir. May 31, 2019) (emphasis added) (internal quotations and citations omitted).

The ballot access structure that the Supreme Court held was constitutional in *Jenness* is constitutional today. That structure operates in largely the same manner

---

[10] *Green Party v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016), *aff'd* 674 Fed. Appx. 974 (11th Cir. 2017), is not to the contrary. There, the court's review was necessarily restricted, in both its assessment of the burden and the interests of the state, by the nationwide nature of Presidential elections. 171 F. Supp. 3d at 1362 (considering the impact on the rights of voters outside of the Georgia because of the national nature of the election); 171 F. Supp. 3d at 1367 (explaining that "Defendant's interest is outweighed by a national interest."). Here, the Plaintiffs' challenge falls squarely within the parameters the Supreme Court has already held constitutional in *Jenness*. This court should "not adopt what the Supreme Court has expressly rejected." *Griffin v. Breckenridge*, 403 U.S. 88, 93 (1971).

today as it did in *Jenness*, *McCrary*, 638 F.2d 1308, *Cartwright*, 304 F.3d 1138 and *Coffield*, 599 F.3d 1276.

Georgia requires all candidates, including political body candidates, to have significant support *before* they are placed on the general election ballot.[11]  "While there is no 'litmus-paper test' for deciding a case like this, [*Storer*, 415 U.S. at 730], it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office."  *Munro*, 479 U.S. at 193.  In other words, a State may "reserve the general election ballot 'for major struggles.'"  *Id.* at 196 (quoting *Storer*, 415 U.S. 724).

---

[11] Plaintiffs' expert, Richard Winger, opined in his report that "Georgia's signature requirement is substantially higher than necessary to ensure that third-party candidates have a modicum of support."  Winger Depo, Exh. 1 ¶ 28.  However, on examination he admitted that the data he cited in his report did not really show what he had claimed.  Winger Depo, p. 31 lns. 4-20 ("I don't really think I should have said that.  I think this chart is very interesting.  But I don't really think it shows what I said it shows.").  Winger also conceded that he uses the term "modicum" to mean "a small amount," and that in his view "if a third-party candidate is seriously running, speaking to as many audiences as is feasible, answering questionnaires that the candidate receive[d] in the mail, then that person - - I'm not going to say has a modicum of support, but I'm going to say the person deserves to be on the ballot."  Winger Depo, p. 29 ln. 21 – p. 30 ln. 7.  The Supreme Court however, has held that "States have an 'undoubted right to require candidates to make a preliminary showing of *substantial support* in order to qualify for a place on the ballot. . . .'"  *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (emphasis added) (quoting *Anderson*, 460 U.S. at 788-789 n. 9).

**C. The Burdens Imposed by Georgia's Ballot Access Laws Are Reasonable and Non Discriminatory and Meet the Applicable Standard of Review.**

Both the Eleventh Circuit and the United States Supreme Court have recognized that States may provide alternate methods of getting on the general election ballot for political parties, whose candidates must run in party primaries, and other political organizations.

> The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

*Cartwright*, 304 F.3d at 1142 (quoting *Jenness*, 403 U.S. at 440-441).

Plaintiffs assert a host of complaints regarding the costs associated with running as a Libertarian candidate for Congress but fail to acknowledge that candidates running as Democrats and Republicans have an equal or *greater* expense to ensure they are on the ballot.[12]  Candidates of Georgia's two political

---

[12] As noted above, the Libertarian Party receives 75% of a Libertarian candidate's qualifying fee.  O.C.G.A. § 21-2-131(c)(2).  As a result, the Party advances candidates 75% of the filing fees to the candidates.  Libertarian Party Depo, p. 44

parties must garner votes equal to 50% +1 in a party primary election, sometimes requiring a run-off.   These candidates must expend considerable financial resources to secure a place on the general election ballot as a nominee of the Democratic and Republican parties.   FEC filings for the 2018 Democratic candidate on the ballot for Congressional District 9 show that he spent over $90,000 on this campaign.[13]   SMF 37.[14]   FEC filings for the 2018 Republican candidate on the ballot for Congressional District 13 show that he spent over $18,000 on this campaign.  SMF 44.[15]

The reality is that the Libertarian Party of Georgia has little voter support in Georgia.[16]   That reality does make it difficult for them to collect the requisite

---

ln. 14 – p. 46 ln. 8; p. 64 ln. 5 – p. 65 ln. 9; Libertarian Party Depo, p. 68 ln. 11 – p. 70 ln. 11.

[13] This Court may take judicial notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Selbst v. Coca Cola Company*, 262 Fed. Appx. 177, 179 (11th Cir. 2008) (recognizing that a district court could properly take judicial notice of SEC filings "for the purpose of determining what statements the documents contain." quoting *Bryant v. Avado Brands, Inc.*, 187 F. 3d 1271, 1278 (11th Cir. 1999)).

[14] https://www.fec.gov/data/committee/C00647222/?cycle=2018

[15] https://www.fec.gov/data/committee/C00673202/?tab=spending

[16] Defendant's expert, Dr. Robert Stein, concluded that a review of the scholarly literature "shows no evidence that ballot access requirements have a direct causal

number of petition signatures needed.  That does not however, make the petition requirement severe.   It is when the state imposes restrictions that limit a candidate's or party's access to petition signers, or imposes restrictions that are more burdensome for independent and political body candidates than the two major parties, that the restrictions become severe.  *Ariz. Libertarian Party*, 2019 U.S. App. LEXIS 16201 *11-12 (explaining that where the signature requirement was less than 5% of the eligible pool of voters the burden was not severe).

In *Williams v. Rhodes*, 393 U.S. 23, 25 (1968) the Supreme Court struck down an Ohio statute that made it "virtually impossible" for a third party candidate to get on the ballot.  The Ohio election structure in that case required that third party candidates submit a petition signed by voters equal in number to 15% of the votes cast in the prior gubernatorial election.[17]   In addition, the only voters that could sign the petition were those that had "(1) voted for a majority of that party's candidates at the last election, or, (2) ha[d] never voted in *any* election before." 393 U.S. at 25 n. 1 (emphasis added).  Additional burdens included that:

_____

relationship with either ballot access or the electoral success of third party and independent candidates."  Report of Dr. Stein, Exhibit H ¶ 22.

[17] Republican and Democratic Party candidates by contrast, needed only to have garnered 10% of the gubernatorial vote in the preceding election.  393 U.S. at 26.

>First, at the primary election, the new party, or any political party, is required to elect a state central committee consisting of two members from each congressional district and county central committees for each county in Ohio. [Ohio Rev. Code §§ 3517.02-3517.04.] Second, at the primary election the new party must elect delegates and alternates to a national convention. [Ohio Rev. Code § 3505.10.] Since Section 3513.19.1, Ohio Rev. Code, prohibits a candidate from seeking the office of delegate to the national convention or committeeman if he voted as a member of a different party at a primary election in the preceding four year period, the new party would be required to have over twelve hundred members who had not previously voted in another party's primary, and who would be willing to serve as committeemen and delegates.

393 U.S. at 25 n. 1.  This structure effectively kept anyone other than the two major parties off the ballot.  Here, Georgia law does not freeze the status quo.

Similarly, in *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008), the Ninth Circuit applied strict scrutiny to a ballot access measure which restricted persons who could circulate a petition to those persons who were qualified to register to vote in the state.  531 F.3d at 1031.  In other words, even the candidate could not circulate his own petition.[18]  That burden, together with an early filing deadline, significantly increased the burden imposed by the petition requirement.

---

[18] Like *Green Party*, 171 F. Supp. 3d 1340, the *Nader* case was an election for President, where the state arguably has less of an interest in the election because the results of the election are determined by a nationwide vote.

18

In another case involving a Presidential election, *Anderson* addressed an early filing deadline.  Ohio law provided that independent candidates for office, including President, were required to file their "statement of candidacy and nominating petition" a full seventy five (75) days *before* the primaries and 229 days before the general election.  460 U.S. at 783 n. 1.  As the Court recognized, by the time John Anderson had declared his candidacy, it was already too late to qualify as an independent candidate in Ohio.  Therefore, the election structure completely shut out Anderson and any other independent candidate very early in the election season.  It was the difference in how the State treated major parties and minor parties that warranted the application of strict scrutiny.

> [B]y requiring an independent to declare his candidacy in March without mandating comparable action by the nominee of a political party, the State violated the Equal Protection Clause of the Fourteenth Amendment.

*Anderson*, 460 U.S. at 783.  Similarly, in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 594 (6th Cir. 2006), the application of strict scrutiny was warranted because, again, minor parties were required to qualify 120 days before party primaries and a full *twelve months* before the preceding general election for President.

In both *Bullock* and *Lubin v. Panish*, 415 U.S. 709 (1974), strict scrutiny was warranted because the statutes at issue imposed significant filing fees with no

alternative means to qualify for office.  As the Supreme Court noted, the filing fees have:

> a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper [v. Virginia Board of Elections*, 383 U.S. 663 (1966) (challenging poll tax)], that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster.

*Bullock*, 405 U.S. at 144.  The Court in *Lubin* likewise rejected the idea that a filing fee is an appropriate measure of the seriousness of a candidate.  415 U.S. at 716.

Here, Georgia does not treat independent and political body candidates in a manner that imposes *more* burdens on those candidates than on the Democratic and Republican candidates.  The structure is obviously different for political parties and political bodies, but that is perfectly constitutional.

> The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

*Cartwright*, 304 F.3d at 1142 (quoting *Jenness*, 403 U.S. at 440-441).    In summary:

> Under the Supreme Court's election jurisprudence, a state burdens the 'availability of political opportunity' by enacting ballot access laws that unfairly discriminate against minor parties or 'absolutely' or 'directly preclude' minor parties from gaining a place on the ballot. *See Timmons*, 117 S. Ct. at 1371 (upholding statute because it did not 'exclude[] a particular group' from electoral participation, nor did it 'directly preclude[] minor political parties from developing and organizing'); *see also Williams*, 393 U.S. at 25 (invalidating statute that made it 'virtually impossible' for minor party candidates to gain access to the ballot).

*Council of Alternative Political Parties*, 179 F.3d at 71.   Here, Georgia's petition requirement neither unfairly discriminates against minor parties, nor absolutely or directly precludes them from gaining a place on the ballot.   Rather, Georgia's petition requirement provides that candidates must demonstrate significant support in Georgia before getting on the ballot.

Several characteristics of Georgia's ballot access laws lessen the burden of collecting petition signatures.   First, candidates have one hundred and eighty days to collect petition signatures. O.C.G.A. § 21-2-170(e); *see Libertarian Party of Florida*, 710 F.2d at 794 (noting that a 188 day period to collect 144,492 petitions compared favorably to shorter periods found to be constitutional); *Storer*, 415 U.S. at 740 ("Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be

required, but 1,000 canvassers could perform the task if each gathered 14 signers a day.").[19]

Second, there is no geographic distribution requirement for petition signatures that is imposed by the State. Candidates can collect all of their signatures in one county, if the county is sufficiently large.[20] *See generally* O.C.G.A. § 21-2-170.

Third, a voter may sign as many different petitions as they wish. The Eleventh Circuit has recognized that permitting voters to sign multiple petitions eases the burden of collecting petition signatures. *See Libertarian Party of Florida*, 710 F.2d at 794 (comparing Florida's requirement with the "New York law providing that a person may not sign a nominating petition if he or she has signed a petition of another candidate for same office," which was upheld in *Socialist Workers Party v. Rockefeller*). Voters that voted in a party primary may still sign the petition. *Id.* In *American Party of Texas v. White*, 415 U.S. 767, 782 n. 14 (1974), the Supreme Court upheld a petition requirement where:

---

[19] Notably, the Libertarian Party representative testified that going door to door to collect signatures it takes one person roughly a six (6) hour day to collect fifteen (15) signatures, and Plaintiffs here have 180 days not 24. Libertarian Party Depo p. 48 lns. 15-20.

[20] *See Libertarian Party of Florida*, 710 F.2d at 794 (recognizing that a lack of geographic distribution requirement eases the burden on the party).

> [v]oters signing [ ] supplemental petitions had to swear under oath
> that they had not participated in another party's primary election or
> nominating process. In rejecting a First Amendment challenge to the
> 1% requirement, [the Supreme Court] asserted that the State's interest
> in preserving the integrity of the electoral process and in regulating
> the number of candidates on the ballot was compelling and reiterated
> the holding in *Jenness* that a State may require a preliminary showing
> of significant support before placing a candidate on the general
> election ballot.

*Munro*, 479 U.S. at 194.

Finally, there is no limit on how many petition signatures a political body or candidate may submit, and there is no cost imposed to verify the petition signatures.[21]   Exh. A ¶ 7.  These measures result in the pool of available voters, to sign the qualifying petitions, being as large as possible.  *See Ariz. Libertarian Party*, 2019 U.S. App. LEXIS 16201 * 10 (explaining that the relevant question in ballot access cases is "whether the required signatures represented a reasonable share of the 'available pool' of signers." quoting  *Storer*, 415 U.S. at 739-40).

### D. Georgia has a Legitimate Interest in Limiting the General Election Ballot to Political Bodies and Parties That Have Demonstrated Significant Voter Support.

The State of Georgia has an important state interest in ensuring that political-body candidates for U.S. Representative can demonstrate that they have significant support within the congressional districts that they wish to represent.

---

[21] *See Libertarian Party of Florida*, 710 F.2d at 794.

Georgia's ballot access laws serve that state interest. Plaintiffs Cowen and Gilmer collected less than 650 signatures each, despite residing in Congressional Districts with hundreds of thousands of registered voters.    Exhibit A ¶¶ 4, 24, 29 and Exhibit A-1. The Party representative testified that the Party assists candidates by supplying "walking lists" made up of name of registered voters and put out a call for volunteers to help the candidate. Libertarian Party Depo p. 47 ln. 13 – 23. The Party representative testified further that going door to door to collect signatures it takes one person roughly six (6) hours to collect fifteen (15) signatures.[22] *Id.* p. 48 lns. 15-20. At the rate of 15 signatures per day, 100 volunteers working 30 days would collect 42,000 signatures. The real problem is that the Libertarian Party of Georgia has only 161 members statewide.[23]  SMF 25; Libertarian Party Depo p. 33 lns. 19-22; p. 107 lns. 18-25 and Exhibit 2 of Deposition. The small size of the Party is also reflected in the relatively few names that appear among the list of officers since 1989. *See* Exhibit B, Plaintiffs' Responses to Defendant's First Set

---

[22] Plaintiffs do not explain how Martin Cowen's campaign was only able to collect 620 signatures in 180 days with approximately 38 volunteers. *See* Exhibit B, Plaintiffs' Responses to Defendant's First Set of Interrogatories, p. 4 no. 1. While only collecting 304 signatures, Aaron Gilmer did so in 60 days and with only 5 volunteers. *Id.* no. 2.

[23] While the National Libertarian Party may have additional members residing in Georgia, the Party representatives testified that the members involved in the Libertarian Party of Georgia numbered 161. Libertarian Party Depo p. 33 lns. 19-22; p. 107 lns. 18-25 and Exhibit 2 of Deposition.

of Interrogatories, p. 6 no. 3 and exhibit attached thereto.  Plaintiffs do not have significant support among Georgia voters to require the State to add their names to the general election ballot for Congress.  Instead, Plaintiffs seek the ballot for political expression and to serve their goals of growing their party, but that is not the function of elections.  "[T]he function of the election process is to winnow out and finally reject all but the chosen candidates. Not to provide a means of giving vent to short-range political goals, pique, or personal quarrels. Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently."  *Burdick*, 504 U.S. at 438 (internal quotations and citation omitted).

As noted above, the Supreme Court has repeatedly held that "in order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot." *Cal. Democratic Party*, 530 U.S. at 572 (quoting *Jenness*, 403 U.S. at 442); *Am. Party of Tex.*, 415 U.S. at 789 ("requiring independent candidates to evidence a *significant* modicum of support is not unconstitutional.") (internal quotation omitted); *Munro*, 479 U.S. at 194 ("*Jenness* and *American Party* establish with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of

25

substantial support in order to qualify for a place on the ballot. . . .'"

quoting *Anderson*, 460 U.S. at 788-789 n. 9); *see also Stein*, 774 F.3d at 700 (the

Eleventh Circuit adopted the opinion of the Middle District of Alabama as its own)

(explaining that "it is settled law that [a State] can demand 45,000 signatures on a

petition before it lets a minor party on the ballot.").

    Importantly, States are not required, prior to regulation, to make a showing

"of the existence of voter confusion, ballot overcrowding, or the presence of

"frivolous candidacies prior to the imposition of reasonable restrictions on ballot

access." *Munro*, 479 U.S. at 194-195.  As the Supreme Court has explained,

> [t]o require States to prove actual voter confusion, ballot
> overcrowding, or the presence of frivolous candidacies as a predicate
> to the imposition of reasonable ballot access restrictions would
> invariably lead to endless court battles over the sufficiency of the
> 'evidence' marshaled by a State to prove the predicate. Such a
> requirement would necessitate that a State's political system sustain
> some level of damage before the legislature could take corrective
> action. Legislatures, we think, should be permitted to respond to
> potential deficiencies in the electoral process with foresight rather
> than reactively, provided that the response is reasonable and does not
> significantly impinge on constitutionally protected rights.

*Id.* at 195-196.

    Here, Georgia's interests in limiting the general election ballot to candidates

with substantial support is heightened for Congressional races due to a federal law

requirement that, for elections to federal office, state election officials transmit to

uniformed and overseas voters an absentee ballot forty-five days prior to the election. 52 U.S.C. § 20302(a)(8); *see also United States v. Georgia*, 778 F.3d 1202, 1203 (11th Cir. 2015); § 21-2-384(a)(2). The State has adopted an election schedule to allow sufficient time to transmit absentee ballots for federal general run-off elections, setting the run-off nine (9) weeks *after* the general election.[24] O.C.G.A. § 21-2-501(a)(3). The general run-off election for Congressional races is *after* members of Congress take office. 2 U.S.C. § 7 (members take office on the third day of January). "The addition of third party and independent candidates on the ballot increases the likelihood of a run-off election." Report of Dr. Robert M. Stein, Doc. 24-1 at 6 ¶ 23, attached hereto as Exhibit H. Thus, in addition to ballot confusion and overcrowding, preventing run-off elections – except where candidates demonstrate *significant* support – is a compelling justification for Georgia's ballot access laws. General election run-offs cost money for counties to administer and for candidates to continue campaigning, they result in run-offs for federal office *after* members of Congress take office, and they result in *fewer voters determining the outcome of the election*. For instance, in the 2018 general election, nearly four million voters (3,883,594) voted in the race for Secretary of

---

[24] General election run-offs for state offices, where the requirements of UOCAVA do not apply, are held twenty-eight (28) days after the general election. O.C.G.A. § 21-2-501(a)(4).

27

State.[25]   Exhibit A ¶ 38.   The Libertarian candidate received 2.23% of the vote, resulting in the need for a run-off.   *Id.*   In the general election run-off only 1,473,904 votes were cast.[26]   Exhibit A ¶ 39.   Georgia has a compelling interest in preventing all but those candidates with *significant* voter support from being placed on the general election ballot.

### E. Plaintiffs' Suggestion That 1943 Statute Initially Adopting A Petition Requirement Was Enacted With The Intent to Discriminate Against Members of the Communist Party Is Not Entitled to Any Weight.

Plaintiffs' complaint asserts that in 1943 the Georgia Legislature adopted the petition requirement for access to the general election ballot to prevent members of the Communist Party from appearing on the ballot.[27]   Doc. 1 ¶¶ 18-19.   Plaintiffs' expert, Mr. Darcy Richardson, also opines that the 1943 measure was enacted to keep Communist Party candidates off of the ballot.   Richardson Deposition, Exhibit 1.   This is no credible evidence to support Plaintiffs' contention.

Darcy Richardson, a former third party candidate, is not qualified to testify as an historian.   Mr. Richardson does not have a college degree.   Richardson Deposition, p. 6 lns. 13-14.   Prior to becoming a self-published author, Mr.

---

[25] https://results.enr.clarityelections.com/GA/91639/Web02-state.221451/#/

[26] https://results.enr.clarityelections.com/GA/93711/Web02-state.222648/#/

[27] Plaintiffs are the Libertarian Party and members of the Libertarian Party.  Doc. 1 ¶¶ 7-11.

Richardson was employed as a financial analyst. *Id.* p. 6 lns.1-7; p. 11 ln. 3.  Mr. Richardson belongs to no professional organizations.  *Id.* p. 12 lns. 3-6.  Mr. Richardson has never authored an article for an academic journal.  *Id.* p. 11 ln. 24 – p. 12 ln. 2.  Not surprisingly, Mr. Richardson has never testified as an expert witness.  *Id*. p. 12 ln. 24 – p. 13 ln. 1.  Richardson's research consisted of nothing more than reviewing newspaper archives from 1940 through 1943.  *Id.* p. 18 ln. 18 – p. 19 ln. 4.  Richardson did not review Attorney General Opinions from the 1940's or any legislative documents other than the statute itself.  *Id.* p. 27 ln. 18 – p. 28 ln. 12.  Richardson conceded that "there was never really a communist party in Georgia ever." *Id.* p. 18 lns. 9-12.  He also conceded that in 1940 the Georgia Secretary of State, on the advice of the Georgia Attorney General, kept the communist candidate for President off the ballot and the communist party made no attempt to challenge that action and made "almost no attempt to get on the ballot in Georgia." *Id.* p. 17 ln. 16 – p. 18 ln 16; p. 19 ln. 19 – p. 20 ln. 3.  Richardson conceded that in 1941 and 1942, the secretary of state spearheaded legislation sought to keep any party seeking the overthrow of the government off the ballot. *Id.* p. 20 ln. 19 – p. 21 ln. 19.  These proposed measures did *not* apply a petition requirement and applied to no other party other than those attempting to overthrow the U.S. government.  *Id.* These proposed measures, which would have been

perfectly constitutional, failed. *Id.* p. 21 lns. 7-8. *See Scales v. United States*, 367 U.S. 203 (1961) (holding that the membership clause of the Smith Act - which made it a crime to knowingly be a member of an organization advocating for the overthrow of the U.S. government by force or violence - did not violate the U.S. Constitution). Nonetheless, Richardson opines that when a non-discriminatory ballot measure was enacted in 1943, legislators were really just trying to keep the non-existent communist party off the Georgia general election ballot.

In a 1948 Attorney General Opinion, which Mr. Richardson did not review, the Georgia Attorney General described that the purpose of the 1943 statute "was to prevent persons with little or no following encumbering the official ballot." 1948 Ga. AG Op. at 158. Exhibit C attached hereto. Because there is no credible evidence that the 1943 petition measure, which has since been recodified, was enacted with any discriminatory intent, Defendant is entitled to summary judgment on this claim. *Celotex Corp.,* 477 U.S. at 323, 325 (The moving party must show that there is an absence of evidence to support the non-movant's case; the moving party is not required to negate his opponent's claims).

Richardson's testimony is due no weight. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). The Supreme Court established a two-pronged analysis when reviewing expert testimony that requires the testimony: 1) be

30

reliable, such that it is grounded in methods and procedures of science, and 2) constitute something more than subjective belief or unsupported assumptions. *Daubert* 509 U.S. at 590.

The Eleventh Circuit has developed a framework to determine if expert testimony meets these *Daubert* standards that includes: 1) whether the expert is qualified to testify competently regarding the matters he intends to address; 2) whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and 3) whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Cook v. Sheriff of Monroe Cnty, Fl.*, 402 F.3d 1092, 1107 (11th Cir. 2005). While there is some overlap among these requirements, they are distinct concepts that should not be conflated. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*).

Under this framework, the trial court must first answer the question of whether the expert is qualified to render an opinion. *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004). If so, then the court should screen the testimony under Rule 702 to determine if the testimony is admissible. *Id.* The burden of laying the proper foundation for the admission of expert testimony is on the party

31

offering the expert.   *Id.* at 1300.   Here, Richardson's report fails the first prong. Richardson is not a historian or political scientist.   He is not qualified to testify concerning Georgia's legislative intent.

## CONCLUSION

Here, the Libertarian Party has not been successful in accessing the general election ballot because it does not enjoy substantial support in Georgia.   "States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot. . . .'"   *Munro*, 479 U.S. at 194 (quoting *Anderson*, 460 U.S. at 788-789 n. 9).   Defendant Secretary Raffensperger prays that the Court GRANTS Defendant's motion for summary judgment.

Respectfully submitted,

Christopher M. Carr 112505
Attorney General

Annette M. Cowart 191199
Deputy Attorney General

Russell D. Willard 760280
Senior Assistant Attorney General

40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
Fax:  404-651-9325

/s/Cristina M. Correia
Cristina M. Correia 188620
Senior Assistant Attorney General

Attorneys for Defendant

32

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Opposition to Plaintiffs' Motion for Attorneys' Fees was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## Certificate of Service

I hereby certify that I have electronically filed **Defendant Brad Raffensperger's Brief in Support of Motion for Summary Judgment** using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  NONE

This 5th day of June, 2019.

/s/Cristina Correia
Cristina Correia          188620
Senior Assistant Attorney General