**Exhibit F**

Deposition Excerpts of Richard Winger Deposition (including Exhibits 1 less appendices)

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF GEORGIA

 3                    ATLANTA DIVISION

 4

 5     Martin Cowen, et al.,

 6              Plaintiffs,

 7     -vs-                              CASE NO.
                                         1:17-cv-04660-LMM
 8     Brian P. Kemp, in his official
 9     capacity as Secretary of State of
       the State of Georgia,
10
                Defendant.
11     _____/

12

13                                      CERTIFIED COPY

14

15           DEPOSITION OF RICHARD WINGER

16

17

18           Taken before JOAN GRIER
           Certified Shorthand Reporter
               State of California
19         C.S.R. License No. 8958

20

21

22

23

24           February 19, 2019

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    then it would be fine.  But they're not.  Most people

2    can't sign.

3          Q.  But you'd agree that not requiring that voters

4    commit to a particular candidate or will be of a

5    particular party, the fact that Georgia doesn't have any

6    such qualifications makes it easier to gather signatures

7    than something like Massachusetts?

8          A.  But all the states permit any registered voter

9    to sign for a general election candidate with just one

10   exception.  That's Texas, where registered voters who

11   voted in the primary can't sign.

12              But setting Texas aside, in all cases, any

13   registered voter can sign for a third party or

14   independent candidate to get on the general election

15   ballot.  Okay.

16              Except, I admit, if the person has already

17   signed for one candidate, there's about ten states where

18   they can't sign for another one.

19         Q.  Will you look at Paragraph 28 in your report.

20         A.  Okay.  I found it.

21         Q.  How are you defining "modicum of support" in

22   that paragraph?

23         A.  I'm not really defining it.  But if you look

24   at -- I'm sorry.  If you look in the dictionary,

25   "modicum" means a small amount.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

MARTIN COWEN, et al. vs. BRIAN P. KEMP
RICHARD WINGER on 02/19/2019

DEPOSITION OF
Page 30

1    Q.   How are you using it in that paragraph?

2    A.   To me, if a third-party candidate is seriously

3  running, speaking to as many audiences as is feasible,

4  answering questionnaires that the candidates receive in

5  the mail, then that person -- I'm not going to say has a

6  modicum of support, but I'm going to say the person

7  deserves to be on the ballot.

8    Q.   You use the term "modicum of support" in that

9  paragraph.

10    A.   Well, I'd rather not, but the courts use that

11  word over and over and over again.

12    Q.   When you used it in Paragraph 28, what are you

13  saying?

14    A.   What I'm really saying is I think this

15  candidate has a serious purpose, a public purpose, is

16  trying to improve society, and should be on the ballot.

17         I admit that's not the literal meaning of

18  "modicum."  If the courts didn't use that over and over

19  again, I probably wouldn't, either.

20    Q.   How does Appendix F demonstrate what modicum of

21  support is needed in any state?

22    A.   I'm looking for Appendix E right now.  The

23  pieces of paper have gotten disorderly.

24         You said F?

25    Q.   F.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.   Okay.  I found it.

 2             Well, I didn't really relate this chart to any

 3   discussion of modicum of support.

 4        Q.   You want to read that Paragraph 28 again?

 5        A.   Okay.  "As this appendix shows" -- and I'm

 6   talking about Appendix F -- "Georgia signature

 7   requirements are substantially higher than necessary to

 8   ensure that third-party candidates have a modicum of

 9   support."

10             So I take it back.  This chart does relate to

11   modicum of support.

12        Q.   How?

13        A.   Let me think about it.

14             Even though I said, "As this appendix shows,

15   Georgia signature requirement is substantially higher

16   than necessary to ensure that third-party candidates

17   have a modicum of support," I don't really think I

18   should have said that.

19             I think this chart is very interesting.  But I

20   don't really think it shows what I said it shows.

21        Q.   Okay.  In Paragraph 29, the next paragraph.

22        A.   Yes.

23        Q.   In that first sentence, did you intend to

24   provide a number there?

25        A.   Yeah.  That was a typographical error.  There
```



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>**Brian P. Kemp**, in his official<br>capacity as Secretary of State of<br>the State of Georgia,<br><br>    Defendant. | Case No. 1:17-cv-04660-LMM<br><br><br>**Declaration of<br>Richard Winger** |

## Introduction

1.    My name is Richard Winger, and I have been retained by the
plaintiffs to analyze Georgia's ballot-access laws for third-party candidates
for U.S. Representative.

2.    My analysis leads me to the following conclusions:

a.    Georgia requires more signatures for third-party candidates for
      U.S. Representative to appear on the general-election ballot than
      any other state in the nation, both as a percentage of votes cast
      and as an absolute number of signatures.





b.   Among the states that require third-party candidates for U.S.
Representative who qualify for the general-election ballot by
petition to pay a qualifying fee, Georgia's qualifying fees are
higher than any other state in the nation.

c.   Georgia's elections for U.S. Representative are among the most
uncompetitive in the nation.

d.   Georgia's ballot access scheme is not necessary to ensure that
third-party candidates have a modicum of support.

e.   Georgia's ballot access scheme is not necessary to reduce the
number of run-off elections.

### Professional Background and Experience

3.   I graduated from the University of California at Berkeley in 1966
with a B.A. degree in political science.

4.   Since 1985 I have published a newsletter, Ballot Access News (12
issues per year), which covers legal, legislative and political developments of
interest to third parties and independent candidates.

5.   For 53 years I have researched the ballot-access laws of all states,
for the period 1888 to the present (there were no ballot access laws in the
U.S. before 1888 because there were no government-printed ballots until that
year).

2

6.      Appendix A to this declaration contains a copy of my current Curriculum Vitae which includes a complete list of all publications that I have authored in the past 10 years and all other cases in which I have testified as an expert in the last four years.

7.      I am receiving no compensation for my work in this case.

## Analysis

### I.      Other States' Signature Requirements

8.      Appendices B and C to this declaration contain a summary of the signature requirements for a third party to obtain ballot access for a full slate of candidates for U.S. Representative in 2016 and 2018, respectively, in each of the 50 states.

9.      As those appendices show, Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures.

10.     In 2016, Georgia law required more than 259,500 valid signatures for a third party to run a full slate of candidates for U.S. Representative.  This number represents more than 6.3 percent of all votes cast in Georgia for president in 2016.

11.     In 2018, Georgia law requires more than 272,000 valid signatures for a third party to run a full slate of candidates for U.S. Representative.

3

This number represents more than 6.6 percent of all votes cast in Georgia for president in 2016.

12.     The state that required the next-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative was Illinois, which required approximately 178,400 valid signatures in 2016 and 262,000 valid signatures in 2018.  These numbers represent approximately 3.2 percent and 4.7 percent of all votes cast in Illinois for president in 2016, and they would have qualified 18 candidates.

13.     The state that required the third-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative in 2016 and 2018 was New York, which required approximately 94,500 valid signatures.  This number represents approximately 1.2 percent of all votes cast in New York for president in 2016, and it would have qualified 27 candidates.

14.     Thirty states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative in 2016. In 2018, that number was 29.

15.     In some states, moreover, it is possible for third parties to qualify to nominate candidates for U.S. Representative without submitting any signatures.

4

## II.    Other States' Qualifying Fees

16.    Appendix D to this declaration contains a summary of the qualifying-fee requirements for a third party to obtain ballot access for a full slate of candidates for U.S. Representative in each of the 50 states.

17.    As that appendix shows, most other states do not require third-party candidates for U.S. Representative who qualify for the general-election ballot by petition to pay a qualifying fee at all.  Among the states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation.

18.    Georgia law requires $5,220 for a single congressional candidate and $73,080 for a third party to run a full slate of candidates for U.S. Representative.

19.    The state that requires the second highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is North Carolina, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $22,620 for a third-party to run a full slate of thirteen candidates for U.S. Representative.

20.    The state that requires the third highest qualifying fees for third-party candidates for U.S. Representative who qualify for the general-election ballot by petition is West Virginia, which has a qualifying fee of $1,740 (one

5

percent of the annual salary of U.S. Representative) for a single candidate and $5,220 for a third-party to run a full slate of three candidates for U.S. Representative.

### III.   Uncontested Congressional Elections

21.   Appendix E to this declaration contains a compilation of the number of uncontested elections for U.S. Representative in each state over the last three election cycles.

22.   As this appendix shows, Georgia's elections for U.S. Representative are among the most uncompetitive in the nation.

23.   In the three election cycles from 2012 through 2016, Georgia has had 15 unopposed races for U.S. Representative—more than any other state in the nation.  That number represents almost 36 percent of its races for U.S. Representative over that period, which is a greater share than any other state in the nation except Massachusetts.

24.   In 2016, the winning candidate ran unopposed in the general election in five (35.7%) of Georgia's 14 congressional districts: the First, Ninth, Tenth, Thirteenth, and Fourteenth.  No other state had more than four unopposed races for U.S. Representative in 2016, and only two states, Alabama (42.8%) and Massachusetts (44.4%), had a greater share of their races for U.S. Representative unopposed.

25.    In 2014, the winning candidate ran unopposed in the general election in seven (50.0%) of Georgia's 14 congressional districts: the Third, Fourth, Fifth, Eighth, Eleventh, Thirteenth, and Fourteenth.  No other state had more than six unopposed races for U.S. Representative in 2014, and only one state, Massachusetts (66.7%), had a greater share of its races for U.S. Representative unopposed.

26.    In 2012, the winning candidate ran unopposed in the general election in three (21.4%) of Georgia's 14 congressional districts: the Third, Eighth, and Tenth. No other state had more than two unopposed races for U.S. Representative in 2012, and only two states, Kansas (25%) and Massachusetts (22.2%), had a greater share of their races for U.S. Representative unopposed.

**IV.    Georgia's signature requirement is higher than necessary.**

27.    Appendix F to this declaration contains a table listing the highest signature requirement ever met by an independent or minor-party candidate for U.S. Representative in each state.

28.    As this appendix shows, Georgia's signature requirement is substantially higher than necessary, to ensure that third-party candidates have a modicum of support.

29.    In the entire history of the United States, only independent or minor-party candidates for U.S. Representative have ever overcome a

7

signature requirement as high as 10,000 signatures. Only one such candidate has ever overcome a petition requirement higher than 15,000 signatures.

30.     The first was in Ohio in 1954, when the incumbent in the Ninth Congressional District in Toledo, Frazier Reams, met the requirement of 12,919 signatures.

31.     The second was in Montana in the regular at-large election in 1994, when Steve Kelly successfully met the requirement of 10,186 signatures.

32.     The third was in California in 1996, when Steven Wheeler in the Twenty-Second Congressional District met the requirement of 10,191 signatures.

33.     The fourth was in 1998, when the Reform Party nominee in the Fifth Congressional District in Florida, Jack Gargan, met the requirement of 12,141 signatures.

34.     The fifth was in 2008, when Cindy Sheehan in California's Eighth Congressional District in San Francisco met the requirement of 10,198 signatures.

35.     The last instance was in 2010, when the Service Employees International Union drafted independent candidate Wendall Fant and successfully collected the needed 16,292 signatures in the Eighth Congressional District in North Carolina.  However, after the petition was

checked, Fant declined to run, so the petition success had no observable concrete consequence.

36.    In four the six instances when an independent or minor-party candidate for U.S. Representative satisfied a signature requirement as high as 10,000 signatures, the time period to collect the signatures was unlimited. In the Florida instance, the candidate had six and one-half months to collect signatures, and in the California instances, four and one-half months were allowed.

37.    Illinois has a unique system in which all petitions are deemed valid unless they are challenged.  Petitions are not checked unless someone files a challenge, even if the petition has only a single signature.  Concerning petitioning attempts in Illinois, only instances when a petition was challenged are included.  Illinois has never had a successful petition attempt for U.S. House if the petition requirement was 10,000 or greater and the petition was challenged.

V.    **General Runoffs**

38.    Georgia's ballot-access restrictions are not necessary to reduce the number of run-off elections, especially runoffs in a general election for federal offices.

39.    Georgia is one of only two states to use runoffs in general elections.  Louisiana is the other.

9

40.     Georgia has had only two general runoffs for the United States Senate since 1988, when the Libertarian Party became qualified to nominate candidates for U.S. Senator without a petition.

41.     Runoff elections can be avoided altogether by using ranked-choice voting.

42.     Maine uses ranked-choice voting in congressional primaries, several states use ranked-choice voting in congressional primaries for voters who are eligible to cast votes under the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. § 20301 et seq., and Louisiana uses ranked-choice voting in general elections for UOCAVA voters.

## Conclusion

43.     Based on the foregoing, it is my opinion that Georgia's ballot access scheme is not necessary to ensure that third-party candidates have a modicum of support or to reduce the number of run-off elections.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 20, 2018.

Richard Winger
San Francisco, California

10

**ERRATA SHEET**

Witness: Richard Winger
Case: Martin Cowen et al. v. Brad Raffensperger
Date: February 19, 2019

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 51 | 13 | "Hargot" to "Hargett" | correct name |
| 52 | 7 | "Klingman" to "Clingman" | correct name |
| 53 | 25 | "bid" to "big" | transcription error |
| 54 | 2 | "sir name" to "surname" | transcription error |
| 54 | 11 | "Faith Hofield" to "Faye Coffield" | correct name |

*Richard Winger*
_____
WITNESS NAME

*25 March 2019*
_____
DATE