IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**Martin Cowen**, et al.,

      Plaintiffs,

  vs.

**Brad Raffensperger**, in his
official capacity as Secretary of
State of the State of Georgia,

      Defendant.

Case No. 1:17-cv-04660-LMM

**Plaintiffs' Response in
Opposition to the
Defendant's Motion for
Summary Judgment**

This is a constitutional challenge to Georgia's ballot-access
restrictions on third-party candidates for U.S. Representative. Those
restrictions are by far the most stringent in the nation, and no third-
party candidate for U.S. Representative has appeared on the general-
election ballot since they were first enacted in 1943. In addition to being
virtually impossible to overcome, those restrictions also produce the
incongruous result that nominees of the Libertarian Party, whose
candidates for statewide offices have won the support of millions of
Georgia voters over the last ten years, must gather far more signatures

to appear on the ballot in any one of Georgia's fourteen congressional districts than are required of Libertarian candidates for Governor, U.S. Senator, or even President.

The plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters, and together they claim that those restrictions violate the First and Fourteenth Amendments and the Equal Protection Clause of the United States Constitution. The defendant, Georgia Secretary of State Brad Raffensperger, argues that Georgia's ballot-access restrictions are constitutional, and he moves now for summary judgment. But because he is not entitled to judgment as a matter of law on either of the plaintiffs' claims, this Court should deny his motion in its entirety.[1]

## Background

The plaintiffs included a lengthy statement of the facts in their brief in support of their motion for summary judgment. (Br. Supp. Pls.' Mot. Summ. J., ECF 69-1, at 1-25.) That factual background is

---

[1] Although the defendant's motion is styled as a "motion for summary judgment," it addresses only one of the plaintiffs' two claims: the First Amendment claim. The defendant's brief does not meet the substance of the plaintiffs' claim under the Equal Protection Clause. (*See, e.g.* Joint Prelim. Report and Discovery Plan, ECF 11, at 5 (describing the Equal-Protection claim).) The Court should therefore treat the defendant's motion as a motion for only partial summary judgment.

incorporated here by reference and will not be repeated. The plaintiffs do, however, wish to highlight several areas where they dispute facts asserted in the defendant's brief.

First, the defendant asserts that the filing fee is the same for all candidates regardless of party affiliation and is therefore nondiscriminatory. (Def.'s Br. Supp. Mot. Summ. J., ECF 73-2, at 4, 15 (hereinafter "Def.'s Br.").) Not so. Although the qualifying fee for all candidates for U.S. Representative is $5,220.00, Georgia law regarding qualifying fees discriminates explicitly on the basis of party affiliation. Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2). For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B). For political-body candidates, the Secretary of State retains 25 percent and sends 75 percent to the political body after the election is over. O.C.G.A. § 21-2-131(c)(4)(A). (Ex. 9: Graham decl., ECF 69-12, ¶¶15-16; Ex. 12: Metz decl., ECF 69-15,

¶13.) The effect of this discrimination is that independent candidates and political-bodies are deprived of resources during an election campaign while political parties are enriched. The defendant's assertion that the filing-fee statute is nondiscriminatory is based a single declaration which, quite frankly, misstates Georgia law and is therefore entitled to no weight.

Second, the defendant asserts that "candidates running as Democrats and Republicans have an equal or *greater* expense to ensure they are on the ballot." (Def.'s Br. at 15.) The defendant further asserts that "[t]hese candidates must expend considerable financial resources to secure a place on the general election ballot as a nominee of the Democratic and Republican parties." (*Id.* at 16.) Neither assertion is supported by the evidence.

Campaign-finance reports from the Federal Election Commission (FEC) show that, for the years 2012-2018, only ten non-incumbent Republican or Democratic nominees for U.S. Representative (out of 44 such nominees over that period) spent more than $55,000 to secure his or her party's nomination. (Ex. 43: FEC Reports at 1.)[2] Thirty-one of such

---

[2] Exhibits attached to the plaintiffs' summary-judgment motion were numbered 1 through 42. For the sake of clarity, exhibits attached to this brief begin at number 43.

nominees spent $20,000.00 or less. (*Id*.) Thirteen spent less than $1,000.00. (*Id.)* More than half of them spent less than did plaintiff Martin Cowen in his unsuccessful bid to petition onto the ballot. (*Id*.) In light of the $100,000 to $250,000 or more that it would cost for a single Libertarian candidate to hire a professional petition-circulating company (Ex. 21: Wilson decl., ECF 69-24, ¶ 6), it is simply not true that Democrats and Republicans have a harder and more expensive path to the general-election ballot.

The defendant's assertion to the contrary is based on only two FEC reports, and those two FEC reports reflect spending on the nominees' entire campaign—not just the campaign to secure the nomination and appear on the general-election ballot. The defendant asserts, for example, that the Democratic nominee in Congressional District 9 spent $90,000 to secure a place on the ballot in 2018. (Def.'s Br. at 16) That figure, while still less than it would have cost a single Libertarian candidate to fund a professional petition drive, includes all spending from April 2017 through December 2018. But that candidate's pre-primary report to the FEC, which reflects spending from April 2017 until just before the primary election, shows that he spent only $19,109.54 to

5

secure the nomination. (Ex. 43: FEC Reports at 58-61.) The defendant's evidence therefore does not support the facts asserted and certainly does not outweigh the broader picture painted by the 44 FEC reports described above.

Third, the defendant asserts—without citation to any evidence whatsoever—that "the Libertarian Party of Georgia has little voter support in Georgia." (Def.'s Br. at 16.) Election returns prove otherwise. (Ex. 37: election results, ECF 69-40.) In the last ten years, Libertarian Party candidates for statewide public offices have received more than five million votes from Georgia voters. (*Id.*)

In 1988, moreover, the Libertarian Party of Georgia qualified to nominate candidates for statewide public office by convention when it submitted a party-qualifying petition signed by at least one percent of the total number of registered voters at the preceding general election. *See* O.C.G.A. § 21-2-180(1). The party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least one percent of the total number of registered voters who were registered and eligible to vote in that election. *See* O.C.G.A. § 21-2-

180(2). (Ex. 33: Answer, ECF 69-36, ¶128.) In other words, *the Libertarian Party of Georgia has repeatedly demonstrated that it has at least as much actual voter support as the State of Georgia believes is necessary for the party to appear on the general-election ballot.*

It is because of that actual voter support, furthermore, that the Secretary of State's briefs in the *Green Party* litigation repeatedly described the Libertarian Party as having "substantial support" and "significant support." (Ex. 42: excerpts from appellants' briefs, ECF 69-46, at 3, 5-6, 11; *see also* Ex. 33: Answer, ECF 69-36, ¶135.) Those briefs were filed in mid-2016, and Libertarian candidates have received more than a million votes in the two election since then.

Fourth, the defendant asserts—again without citation to any evidence whatsoever—that several aspects of Georgia's ballot-access laws "lessen the burdens of collecting petition signatures." (Def.'s Br. at 21.) That bald assertion, however, simply does not square with the evidence in the record. The plaintiffs submitted numerous declarations attesting to the fact that satisfying Georgia's petition requirement is nigh impossible. (*See, e.g.,* Ex. 1: Anderson decl., ECF 69-4, ¶14; Ex. 2: Armendariz decl., ECF 69-5, ¶9; Ex. 4: Coffield decl., ECF 69-7, ¶14; Ex.

7

5: Cowen decl., ECF 69-8, ¶20; Ex. 7: Fisher decl., ECF 69-10, ¶11; Ex.

14: Moon decl., ECF 69-17, ¶9.) But there is not a shred of evidence that,

for example, the fact that "a voter may sign as many petitions as they

wish" (Def.'s Br. at 22), makes that requirement any less impossible.

This Court may not simply take the defendant's word for it.

## Discussion

## I.     The Eleventh Circuit has repeatedly rejected the defendant's "litmus-paper test" approach.

Without even citing the two most relevant Eleventh Circuit cases,

the defendant first argues that this Court should grant summary-

judgment here because other courts have upheld Georgia's five-percent

petition requirement in the past. (Def.'s Br. at 7-10.) It is the law of this

circuit, however, that "cases which have upheld the Georgia provisions

against constitutional attack by prospective candidates and minor

political parties do not foreclose the parties' right to present the evidence

necessary to undertake the balancing approach outlined in *Anderson v.*

*Celebrezze*." *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985);

*accord Green Party of Ga. v. Georgia*, 551 Fed. Appx. 982 (11th Cir. 2014)

(per curiam).

8

Indeed, the ink is barely dry on the Eleventh Circuit's opinion rejecting the defendant's last attempt to make this argument. In *Green Party*, the plaintiffs challenged Georgia's one-percent signature requirement for presidential ballot access. The Secretary of State referenced the same litany of cases that he cites here and argued that if a five-percent requirement was constitutional, the one-percent requirement must also be constitutional. *Green Party*, 551 Fed. Appx. at 982. The district court agreed with the defendant, but the Eleventh Circuit reversed. *Id.* In so doing, the circuit court reaffirmed its analysis from nearly thirty years ago in *Bergland* that ballot-access cases under the First and Fourteenth Amendments are particularly fact-dependent and cannot be decided with any "litmus-paper test." *Id.* Rather, a district court must follow the approach laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983):

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland*, 767 F.2d at 1553-54. Reversal was warranted, according to the Eleventh Circuit, because the district court had failed to apply the *Anderson* balancing approach. *Green Party*, 551 Fed. Appx. at 983. This Court should decline the defendant's invitation to make the same mistake.

In addition, the facts and the law now before the Court are distinguishable from those earlier cases. In *Jenness v. Fortson*, 403 U.S. 431 (1971), and *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981), for example, there was no plaintiff like the Libertarian Party which has been unable to secure ballot access for its candidates for U.S. Representative despite winning millions of votes in statewide elections over the last decade. There was no 76-year record of excluding all political-body candidates from the ballot. Federal campaign finance laws did not limit a party's ability to fund petition drives as it does now. Georgia law did not have a one-percent threshold for demonstrating sufficient voter support for a political body to remain on the statewide ballot. Judge Story had not yet struck down the one-percent signature requirement for presidential candidates as unduly burdensome and set it at only 7,500 signatures. Another one of the defendant's cases,

*Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002), did not even involve a claim under the First and Fourteenth Amendments. And the defendant's final case, *Coffield v. v. Handel,* 599 F.3d 1276, 1277 (11th Cir. 2010), upheld Georgia's ballot-access laws because the plaintiff did not "allege how many candidates have tried" unsuccessfully to qualify for the ballot.

This case is very different. The plaintiffs have produced a lot of "evidence necessary to undertake the balancing approach outlined in *Anderson v. Celebrezze*," *Bergland v. Harris*, 767 F.2d at 1554, including numerous declarations from would-be candidates who have tried unsuccessfully to qualify for the ballot. There is substantial evidence— never-before presented in the defendant's cases—about the impact of campaign-finance law and the Secretary of State's error-prone petition-checking process. And the record of completely excluding third-party candidates from the general-election ballot is now much longer.

This Court should therefore follow the Eleventh Circuit's command in *Bergland* and *Green Party* and resist the defendant's temptation to take a shortcut.

11

## II.    The defendant has not established that the burdens here are reasonable and nondiscriminatory.

The first step in the *Anderson* test requires a court to "evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments." *Bergland*, 767 F.2d at 1553-54. The defendant argues that the burdens here are reasonable and nondiscriminatory and therefore do not warrant strict scrutiny. (Def.'s Br. at 15-23.) But this argument is based entirely on factual assertions that turn out not to be true or lack support in the record.

First, the defendant suggests that the burdens here are reasonable and nondiscriminatory because, according to FEC reports, "candidates running as Democrats and Republicans have an equal or *greater* expense to ensure they are on the ballot." (Def.'s Br. at 15.) But, as already discussed above, the FEC reports cited by the defendant do not support that assertion because they include campaign expenses incurred for the general election (after the candidate has already secured a place on the ballot) and because a broader look at FEC reports show that Democratic and Republican candidates rarely spend as much to secure a place on the ballot as it would cost for a Libertarian candidate to fund a professional petition drive.

Second, the defendant suggests that the burdens here are reasonable because the Libertarian Party "has little voter support in Georgia." (Def.'s Br. at 16.) This assertion, even if true, would not establish the reasonableness of Georgia's ballot-access requirements, but it is obviously belied by election results. Libertarian candidates have won millions of votes from actual Georgia voters and have repeatedly met the threshold for demonstrating that the Libertarian Party has at least as much actual voter support as the State of Georgia believes is necessary for the party to appear on the general-election ballot. It is also belied by the defendant's own position in the *Green Party* litigation, where he repeatedly described the Libertarian Party as having "substantial" and "significant" support in Georgia.[3] (Ex. 42: excerpts from appellants' briefs, ECF 69-46, at 3, 5-6, 11.)

Third, the defendant suggests that the burdens here are not severe because several aspects of Georgia's ballot-access laws "lessen the

---

[3] Because the Secretary of State has taken inconsistent positions in similar litigation, this Court should apply the doctrine of judicial estoppel to bar the defendant's argument here. The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Judicial estoppel applies where: (1) the party's position is "clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage . . . if not estopped." *New Hampshire*, 532 U.S. at 750–51 (internal quotation marks omitted). All three factors plainly apply here.

burdens of collecting petition signatures." (Def.'s Br. at 21.) But, as already discussed above, there is no evidence in the record that those aspects make any practical difference in the magnitude of the burdens here. It is simply a bald assertion.

Missing from the defendant's brief is any discussion of the undisputed fact that no political-body candidate for U.S. Representative has ever satisfied the five-percent signature requirement since it was enacted in 1943. (Ex. 33: Answer, ECF 69-37, ¶44.) Also missing is any discussion of the undisputed fact that Georgia's signature requirement is higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever met in the history of the United States. (Ex. 22: Winger decl., ECF 69-25, ¶29.) The defendant avoids all mention of the *Green Party* case and fails to explain how his assessment of the burden here can be reconciled with Judge Story's findings—affirmed by the Eleventh Circuit—in that case.

The defendant's brief thus fails to establish that the burdens here are either reasonable or nondiscriminatory. For the reasons set out in the plaintiffs' summary-judgment brief (ECF 69-1 at 31-36), Georgia's ballot-access restrictions for independent and political-body candidates

for U.S. Representative impose severe constitutional burdens and therefore merit strict scrutiny.

### III.   The State's asserted interests are insufficient to justify the burdens here.

The second and third steps in the *Anderson* test focus on the State's interests: "Second, [the court] must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights." *Bergland*, 767 F.2d at 1553-54. The defendant offers two such interests in his brief: (1) "an important state interest in ensuring that political-body candidates for U.S. Representative can demonstrate that they have significant support within the congressional districts that they wish to represent" (Def.'s Br. at 23); and (2) "preventing run-off elections—except where candidates demonstrate *significant* support" (*id.* at 27).

Even assuming that the first asserted State interest is legitimate (and no court has ever so held), the Supreme Court has twice made clear that a desire to screen out frivolous candidacies cannot justify a higher petition requirement for offices in a district or political subdivision than

15

for statewide offices. *See Norman v. Reed*, 502 U.S. 279, 291-94 (1992); *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 185-86 (1979). The plaintiffs discussed these cases at length in their summary-judgment brief (ECF 69-1 at 25-30, 43-44), and they incorporate that discussion here. Georgia's asserted interest is indistinguishable from the interest that the Supreme Court found lacking in *Norman*, 502 U.S. at 293-94. It therefore cannot satisfy the tailoring requirement in step three of the *Anderson* test.

The second asserted State interest—preventing runoffs—is undoubtedly legitimate. But this interest also fails step three of the *Anderson* test because it is weak in this instance and because advancing it does not require the State of Georgia to adopt draconian ballot-access requirements.

Preventing runoffs has been described by the Supreme Court as "important," but not compelling. *Clements v. Fashing*, 457 U.S. 957, 965 (1982). It therefore cannot justify a heavy constitutional burden as there is in this case. The circumstances here indicate, moreover, that Georgia isn't really serious about preventing runoffs.

16

Most runoff elections in Georgia occur in party primaries, and primary runoffs are more expensive than general runoffs. (Ex. 23: Harvey dep. (excerpts), ECF 69-26, 175:19-176:13, 179:13-180:4.) In 2018, for example, there were primary runoffs in four contests for statewide offices, eight contests for state legislative offices, and two contests for U.S. Representative. (Ex. 44: primary runoff election results 2000-2018 at 1-4.) In 2016, there were primary runoffs in 13 contests for state legislative offices and one contest for U.S. Representative. (*Id.* at 5-7.) In 2014, there were primary runoffs in three contests for statewide office, ten contests for state legislative offices, and four contests for U.S. Representative. (*Id.* at 8-10.) If the State truly wanted to avoid the cost of run-off elections, as the defendant argues, primary runoffs would clearly be a place to focus. And yet the state does nothing to ensure that any of the candidates in these primary contests have any support whatsoever. The candidates need only pay a fee and fill out routine paperwork to appear on the primary-election ballot. O.C.G.A. § 21-2-153.

If Georgia had a serious state interest in preventing runoffs to keep costs down, statewide elections would also be a focus because they are more costly than runoffs for U.S. Representative would be. (Ex. 45:

Harvey dep. (excerpts) 178:16-179:6.) Whereas a runoff in a contest for U.S. Representative might involve as few as two counties (in Georgia's Seventh Congressional District), runoffs for statewide offices obviously involve all of Georgia's 159 counties. And yet Georgia law allows the Libertarian Party's candidates for any and all statewide offices, including U.S. Senator, to appear on the ballot without further petitioning. From the perspective of avoiding the cost of runoff elections, that is upside down.

And none of the cost is actually necessary. As discussed in the plaintiffs' summary-judgment brief, Georgia's ballot-access restrictions are not remotely necessary to advance an interest in avoiding runoffs. (ECF 69-1 at 37-39.) Georgia could serve that interest better, in fact, with other means.

Eliminating runoff elections altogether would be the simplest solution, but the cost, timing and participation issues of runoff elections are all problems that are easily solved with ranked-choice voting (also known as instant runoff voting). Instead of voting for only one candidate, voters in a ranked-choice election can rank candidates in order of preference. Ballots are initially counted for each voter's first choice. If no

candidate receives more than 50 percent of the vote, the candidate with the fewest votes is eliminated, and ballots listing that candidate as the first choice are reallocated to the voter's next choice. This elimination process continues until one candidate has more than half of the votes. The State of Maine uses ranked-choice voting in general elections to elect U.S. Senators and U.S. Representatives, and five states use ranked-choice voting for overseas voters in runoff elections for federal offices. (Ex. 29: Second Admissions, ECF 69-32, ¶¶44-45.) If Georgia were to adopt ranked-choice voting, there would be no need for runoff elections, and all general-election voters would participate in choosing the eventual winner.

The defendant's brief does not actually argue that there is any need to burden the plaintiffs' rights in order to avoid runoffs. The brief offers no tailoring argument whatsoever. Although the brief identifies the asserted interests and makes some attempt to convince this Court to weigh them heavily, it does not even attempt to suggest "the extent to which those interests necessitate the burdening of the plaintiffs' rights." *Bergland*, 767 F.2d at 1554. The defendant therefore cannot pass step

three of the *Anderson* test and has not established that he is entitled to summary judgment in this case.

## IV.    Darcy Richardson is qualified to testify as an expert.

Lastly, the defendant seeks summary judgment on the plaintiffs' claim that Georgia's petition requirement was enacted with a discriminatory intent.[4] (Def.'s Br. at 28-32.) The defendant argues that the plaintiffs' witness who testified about the origins of the requirement, Mr. Darcy Richardson, is not qualified to offer opinion testimony as an expert under Rule 702 of the Federal Rules of Evidence and that there is no other evidence in the record to support an intent claim. Neither argument is well founded.

First, Mr. Richardson is indeed qualified as an expert on the history of third parties in the United States, a topic which encompasses his testimony here. He has written more than a dozen books on American political history, including five well-regarded books on the history of third-party politics in the United States. One of those books earned an Outstanding Academic Title award from Choice Magazine (a

---

[4] Although the plaintiffs' claims under the First and Fourteenth Amendment or the Equal Protection Clause could conceivably encompass a claim of discriminatory intent or viewpoint discrimination, the plaintiffs have not sought summary judgment on those bases.

publication of the American Library Association) in 2005. His work has
been cited in Newsweek's "What To Read" section, and he has been
quoted as an expert on third-party politics in major publications such as
the Wall Street Journal, the Washington Times, and the Philadelphia
Inquirer. (Ex. 24: Richardson decl., ECF 69-27, ¶4.)

The defendant bases his attack on Mr. Richardson's qualification
on four things: (1) Mr. Richardson does not have a college degree; (2) Mr.
Richardson worked as a financial analyst before becoming an author; (3)
Mr. Richardson belongs to no professional organizations; and (4) Mr.
Richardson has never authored an article in an academic journal. (Def.'s
Br. at 28-29.) But those four things do not add up to an unqualified
witness.

Under Rule 702, a witness can be qualified to testify as an expert
"by knowledge, skill, experience, training, or education." Fed. R. Evid.
702. Mr. Richardson obviously does not have the educational credentials
that might alone qualify him as an expert, and he lacks certain academic
credentials, such as publication in a peer-reviewed journal, that might
signal a degree of knowledge, skill, experience, or training. But the lack
of those academic credentials does not mean that Mr. Richardson lacks

21

knowledge, skill, experience or training. A witness can be an expert without being an academic. *See, e.g., Hammond v. International Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982).

And that is certainly the case here. It is evident from Mr. Richardson's work that he is qualified as an expert by his knowledge, skill, and experience. According to recently-retired professor J. David Gillespie, who is himself widely regarded as an expert in third parties and independent candidates in the United States, Mr. Richardson's books on the history of third parties are of "excellent quality" and "a significant contribution to the field." (Ex. 46: Gillespie decl. ¶8.) "It is apparent from that work that Mr. Richardson has extensive knowledge about the history of third-party politics in the United States and great skill and experience in conducting original historical research despite the fact that he lacks academic credentials as a political scientist or historian." (*Id.* ¶9.) Professor Gillespie concludes: "Mr. Richardson is undoubtedly qualified as an expert to offer his opinion about the original purpose or purposes of Georgia's ballot-access laws." (*Id.* ¶10.) The defendant's attack on Mr. Richardson is thus ill founded.

Second, there is additional evidence in the record to support a finding of discriminatory intent even beyond Mr. Richardson's opinion testimony. Exhibit 34 to the plaintiffs' motion for summary judgment contains copies of the newspaper articled cited by Mr. Richardson in forming his opinion. (Ex. 34: newspaper articles, ECF 69-37.) Those articles are independently admissible, and they are sufficient to defeat summary judgment on the plaintiffs' intent claim.

The Court should therefore deny the defendant's motion for summary judgment as to the plaintiffs' possible claims based on discriminatory intent.

## Conclusion

This Court should deny the defendant's motion for summary judgment because he has failed to establish that he is entitled to judgment as a matter of law. His brief fails to cite the two most relevant cases. It fails to fully reckon with the fact that no third-party candidate for U.S. Representative has appeared on the general-election ballot since they were enacted in 1943. It does not address the fact that Georgia's ballot-access restrictions are by far the most stringent in the nation. It offers not a word of justification for requiring Libertarian candidates for

U.S. Representative to gather far more signatures than Libertarian

candidates for U.S. Senator or even President. And it does not even

attempt to argue that those restrictions are truly necessary for the State

to advance its legitimate interests. *Bergland* and *Green Party* thus

require this Court to deny his motion.

Respectfully submitted this 7th day of August, 2019.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2019, I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Cristina Correia: ccorreia@law.ga.gov

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the forgoing PLAINTIFFS' RESPONSE IN

OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY

JUDGMENT was prepared in 13-point Century Schoolbook in

compliance with Local Rules 5.1(C) and 7.1(D).


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com