# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | **Plaintiffs' Response to the Defendant's Statement of Material Facts** |
| Defendant. | |

Pursuant to Local Rule 56.1(B)(2), the plaintiffs respectfully submit this response to the defendant's statement of material facts. (ECF 73-1.)

1.      The Libertarian Party of Georgia is a political body pursuant to O.C.G.A. § 21-2-2(23). Exh. A ¶ 11.

**Response:** Admitted.

2.      In determining the number of petition signatures needed by independent or political body candidates to get on a general election ballot, including candidates for Congress, the Secretary of State's Office uses only the total number of "active voters" in its calculation. However, both "active" and "inactive voters" may sign candidate or political body qualifying petitions. Exh. A ¶ 5.

**Response:** Admitted.

3.      In 1988, the Libertarian Party successfully petitioned, pursuant to O.C.G.A. § 21-2-180(1), to have their candidates for President, Vice President, and Public Service Commission, Seats 1, 2 and 3, on the general election ballot. Exh. A ¶ 12.

**Response:** Admitted.

4.      The Libertarian Party's 1988 petition would have required approximately 25,758 signatures. Exh. A ¶13; Exhibit A-5 and O.C.G.A. § 21-2-180(1).

**Response:** Admitted.

5.     In 1988, the New Alliance Party successfully petitioned, pursuant to O.C.G.A. § 21-2-180(1), to have their candidates for President, Vice President, and Public Service Commission, Seat 3, on the general election ballot. Exh. A ¶ 14.

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

6.     The New Alliance Party's 1988 petition would have required approximately 25,758 signatures. Exh. A ¶15; Exhibit A-5 and O.C.G.A. § 21-2-180(1).

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

7.     In 1992, Ross Perot and James Stockdale successfully jointly petitioned, pursuant to O.C.G.A. § 2-21-170(b), to be on the general election ballot as Independent candidates for President and Vice President. Exh. A. ¶ 16.

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

8.     Ross Perot and James Stockdale's 1992 petition would have required approximately 29,348 signatures. Exh. A ¶ 17; Exh. A-5 and O.C.G.A. § 21-2-170(b).

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

9.     In 1996, Ross Perot and Pat Choate successfully jointly petitioned, pursuant to O.C.G.A. § 2-21-170(b), to be on the general election ballot as Reform Party candidates for President and Vice President. Exh. A. ¶ 18.

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

10.     Ross Perot and Pat Choate's 1996 petition would have required approximately 31,770 signatures. Exh. A ¶ 19; Exh. A-5 and O.C.G.A. § 21-2-170(b).

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

11.     In 2000, Pat Buchanan successfully petitioned, pursuant to O.C.G.A. § 2- 21-170(b), to be on the general election ballot as an Independent candidate for President. Exh. A ¶ 20.

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

12.     Pat Buchanan's 2000 petition would have required approximately 38,112 signatures. Exh. A ¶ 21; Exh. A-5 and O.C.G.A. § 21-2-170(b).

**Response:** This fact is not material to the claims or defenses in this case because it involves a statewide petition for offices other than U.S. Representative.

13.     Pursuant to O.C.G.A. § 21-2-170(d), each page of a petition can include only voters from the same county. "[D]ifferent [petition] sheets must be used by signers residing in different counties." Exh. A ¶ 22.

**Response:** Admitted.

14.     County election officials are responsible for counting and verifying the signatures for voters from their counties. Exh. A ¶ 23.

**Response:** Disputed. Under Georgia law, it is the duty of the Secretary of State to check the validity of signatures on nomination petitions submitted by candidates for President, U.S. Senator, U.S. Representative, and all state offices. O.C.G.A. §§ 21-2-132(d), -171(a). (Ex. 36: Answer, ECF 69-36, ¶56.)

15.    It is typical at Libertarian Party Conventions for the Party to vote in favor of suspending the 365 day rule, i.e., allowing all members, including new members, to vote on matters at the convention. Gilmer Deposition p. 161 ln. 3 – p. 162 ln. 21.

**Response:** Admitted (except that the rule is known as the "367 day rule"). However, this fact is not material to the claims or defenses in this case because Georgia law does not require any minimum level of attendance at the Libertarian Party's annual convention in order for the party's candidates for U.S. Representative to appear on the ballot.

16.    At the Libertarian Party of Georgia's 2012 annual convention, only 32 credentialed delegates were present until the 367 day rule was suspended, and then only 38 delegates were present. Exhibit 9 to Gilmore Deposition.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum level of attendance at the Libertarian Party's annual convention in order for the party's candidates for U.S. Representative to appear on the ballot.

17.    At the Libertarian Party of Georgia's 2014 annual convention, only 22 credentialed delegates were present until the 367 day rule was suspended, and then only 35 delegates were present. Exhibit 12 to Gilmore Deposition.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum level of attendance at the Libertarian Party's annual convention in order for the party's candidates for U.S. Representative to appear on the ballot.

18.     At the Libertarian Party of Georgia's 2016 annual convention, only 51 persons present had been dues paying members for an entire year. Libertarian Party Depo p. 100 ln. 14 through p. 101 ln. 3.

**Response:** Disputed insofar as 367 days is longer than a year, and this fact is not material to the claims or defenses in this case because Georgia law does not require any minimum level of attendance at the Libertarian Party's annual convention in order for the party's candidates for U.S. Representative to appear on the ballot.

19.     N/A

**Response:** No response is necessary.

20.     Neither the Secretary of State's Office, nor county election officials, charge candidates or political bodies to verify petition signatures. Exh. A ¶ 7.

**Response:** Admitted.

21.     The Libertarian Party of Georgia's Executive Committee consists of twenty five members. Libertarian Party Depo p. 103 ln. 2 through ln. 14.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum or maximum number of members on Libertarian Party's executive committee in order for the party's candidates for U.S. Representative to appear on the ballot.

22.    There is no requirement that candidates collect signatures from every county or any number of counties in their Congressional District, only that they collect the required 5% of petition signatures. Exh. A ¶ 8.

**Response:** Admitted.

23.    In 2016 the National Libertarian Party counted as members, including persons that paid no annual dues, 6,297 persons residing in Georgia. Libertarian Party Depo p. 7 lns. 20-23, p. 10 lns. 1-2, p. 30 ln. 18 through p. 31 ln. 12; and Exhibit 2 of Deposition.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

24.    In 2018 the National Libertarian Party counted as members, including persons that paid no annual dues, 5,851 persons residing in Georgia. Libertarian Party Depo p. 7 lns. 20-23, p. 10 lns. 1-2, p. 30 ln. 18 through p. 31 ln. 12; and Exhibit 2 of Deposition.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

25.     In 2016, the most recent year data is available, the Libertarian Party of Georgia had only 161 members. These individuals all paid dues to the state party. Libertarian Party Depo p. 33 lns. 19-22; p. 107 lns. 18-25; and Exhibit 2 of Deposition.

**Response:** Disputed, and this fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot. More recent membership data is available. (Libertarian Party dep., ECF 74-1, 34:19-35:5.)

26.     Annual Dues for the Libertarian Party are approximately $30.00. Libertarian Party Depo p. 106 lns. 21-24.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of dues-paying members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

27.     It takes only three members - that must volunteer to be officers - to start an affiliate branch of the Libertarian Party. Libertarian Party Depo p. 91 lns. 12-24.

**Response:** Disputed, and this fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of affiliate branches in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot. More is required to start an affiliate of the state party. (Libertarian Party dep., ECF 74-1, 18:17-19:11.)

28.     The Libertarian Party of Georgia has only seven active affiliates in this State. Libertarian Party Depo p. 94 ln. 24 through p. 25 ln. 4.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of affiliate branches in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

29.     In 2016, the National Libertarian Party received donations from only 653 persons residing in Georgia. Libertarian Party Depo p. 33 lns. 12-15 and Exhibit 2 of Deposition.

**Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of donors in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

30.    Georgia has 14 congressional districts, each with just under 700,000 persons, according to the 2010 U.S. Census. Exhibit A ¶ 4 and http://www.legis.ga.gov/Joint/reapportionment/Documents/SEPT%202012/Congress12-packet.pdf

**Response:** Admitted.

31.    In 2018, Aaron Gilmer sought to be a candidate on the general election ballot for Congressional District 9. Exhibit A ¶ 24.

**Response:** Admitted.

32.    In 2018, Gilmer submitted an untimely petition with a total of 304 signatures, for Congressional District 9. Exhibit A ¶ 24.

**Response:** Admitted.

33.    Aaron Gilmer did not qualify to appear as a write in candidate for Congressional District 9 in 2018. Exhibit A ¶ 26.

**Response:** Admitted.

34.    In 2018, a candidate for Congressional District 9 was required to submit a petition with 18,790 valid signatures to be placed on the general election ballot as an independent or political body candidate. Exhibit A ¶ 25.

**Response:** Admitted.

35.    In 2018, the Republican incumbent in Congressional District 9 received 224,661 votes. The Democratic candidate for office received 57,912 votes. Exhibit A ¶ 27.

**Response:** This fact is not material to the claims or defenses in this case.

36.     In 2018, two Democratic candidates ran in the Democratic Primary for Congressional District 9. The winner of the primary, Josh McCall, appeared on the general election ballot as the Democratic Party nominee. Exhibit A ¶ 28.

**Response:** This fact is not material to the claims or defenses in this case.

37.     In his 2018 campaign for Congressional District 9, candidate Josh McCall raised $101,015.51 and spent $94,468.60.

https://www.fec.gov/data/committee/C00647222/?cycle=2018

**Response:** Disputed, and this fact is not material to the claims or defenses in this case. The web page cited shows that Josh McCall *received* $101,015.51 during the 2018 election cycle, including a contribution from himself, but it does not indicate who raised that money. Similarly, the web page shows that Josh McCall *disbursed* $94,468.60 during the 2018 election cycle, but the disbursements included items that were not campaign expenditures.

38.     In 2018 Martin Cowen sought to be a candidate on the general election ballot for Congressional District 13. Exhibit A ¶ 29.

**Response:** Admitted.

39.     In 2018, Cowen submitted a timely petition with a total of 620 signatures, for Congressional District 13. Exhibit A ¶ 29.

**Response:** Admitted.

40.     In 2018, a candidate for Congressional District 13 was required to submit a petition with 20,188 valid signatures to be placed on the general election ballot as an independent or political body candidate. Exhibit A ¶ 30.

**Response:** Admitted.

41.     In 2018, Martin Cowen ran as a write in candidate for Congressional District 13 and received 93 votes. Exhibit A ¶ 31.

**Response:** Admitted.

42.     In 2018, the Democratic incumbent in Congressional District 13 received 223,157 votes. The Republican candidate for office received 69,760 votes. Exhibit A ¶ 32.

**Response:** This fact is not material to the claims or defenses in this case.

43.     In 2018, two Republican candidates ran in the Republican Primary for Congressional District 13. The winner of the primary, David Callahan, appeared on the general election ballot as the Republican Party nominee. Exhibit A ¶ 33.

**Response:** This fact is not material to the claims or defenses in this case.

44.    In his 2018 campaign for Congressional District 13, candidate David Callahan raised $17,832.00 and spent $18,513.00.

https://www.fec.gov/data/committee/C00673202/?tab=spending

**Response:** Disputed, and this fact is not material to the claims or defenses in this case. The web page cited shows that David Callahan *received* $17,832 during the 2018 election cycle, including a $10,000 loan from himself, but it does not indicate who raised that money. Similarly, the web page shows that David Callahan *disbursed* $18,513 during the 2018 election cycle, but the disbursements included items that were not campaign expenditures.

45.    In 2018 the qualifying fee for Congress was $5,220.00. The qualifying fee is the same for all candidates for Congress, irrespective of party affiliation. Exhibit A ¶ 34.

**Response:** Disputed. Although the qualifying fee for all candidates for U.S. Representative is $5,220.00, Georgia law regarding qualifying fees discriminates explicitly on the basis of party affiliation. Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2). For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B). For

political-body candidates, the Secretary of State retains 25 percent and sends 75 percent to the political body after the election is over. O.C.G.A. § 21-2-131(c)(4)(A). (ECF 69-12 - Ex. 9: Graham decl. ¶¶15-16; ECF 69-15 - Ex. 12: Metz decl. ¶13.)

46.     Pursuant to O.C.G.A. § 21-2-153(a)(1), a candidate for the U.S. House of Representatives may submit, in lieu of paying a filing fee, a petition with signatures equal to 1% of the total registered voters in the relevant Congressional District at the prior general election. O.C.G.A. § 21-2-153(a)(1); Exhibit A ¶ 35.

**Response:** Admitted.

47.     Due to the requirements of the Uniformed and Overseas Citizens Absentee Voting Act, general run-off elections for Congress are held nine (9) weeks after the general election. O.C.G.A. § 21-2-384(a)(2); Exhibit A ¶ 36.

**Response:** Disputed. Nothing in the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 *et seq*., requires Georgia or any other state to hold general runoffs nine weeks after a general election. Indeed, nothing in UOCAVA requires Georgia or any state to have runoffs of any kind *ever*. Louisiana, which is the only state other than Georgia to use runoffs in general elections for U.S. Representative, holds its runoff in early December of the election year and uses ranked-choice voting for UOCAVA voters. (Ex. 22: Winger decl., ECF 69-25, ¶¶39, 41; Ex. 29: Second

Admissions, ECF 69-32, ¶45.) *See*

https://www.sos.la.gov/ElectionsAndVoting/GetElectionInformation/SearchEl

ectionDates/Pages/default.aspx

48.   To qualify as a write-in candidate, one need only fill out a notice

of intent to run as a write-in candidate and publish said notice in a

newspaper of general circulation. See O.C.G.A. § 21-2-133; Exhibit A ¶ 37.

**Response:** This fact is not material to the claims or defenses in this

case because the plaintiffs are not challenging the requirements to run

as a write-in candidate.


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com