## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARTIN COWEN, ALLEN   *
BUCKLEY, AARON GILMER, JOHN   *
MONDS, and the LIBERTARIAN   *
PARTY OF GEORGIA, INC., a   *
Georgia nonprofit  corporation,   *   CASE NO.: 1:17cv04660-LMM
  *
   Plaintiffs,   *
  *
v.   *
  *
BRAD RAFFENSPERGER, Georgia   *
Secretary of State,   *
  *
   Defendant.   *

## DEFENDANT SECRETARY BRAD RAFFENSPERGER'S
## RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT[1]

## I. Georgia's Ballot Access Structure Has Repeatedly Been Held Constitutional.

The current Georgia ballot access statute, O.C.G.A. § 21-2-170, has  repeatedly

been upheld by both the United States Court of Appeals for the Eleventh Circuit and

the Supreme Court of the United States.  *See Jenness v. Fortson*, 403 U.S. 431 (1971)

(challenge to 5% petition requirement, by candidates for congressional office and

---

[1] Defendant adopts and incorporates herein by reference the facts and arguments in Defendant's Motion for Summary Judgment, and all accompanying briefs, statement of undisputed facts, and evidence.

voters, as both a violation of First Amendment and Equal Protection); *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981) (challenge to 5% petition requirement as both a violation of First Amendment and Equal Protection); *Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002) (challenge, pursuant to the Qualifications Clause, U.S. Const. Art I, Sec. 2, cl. 2, to 5% petition requirement in O.C.G.A. § 21-2-170(b) for congressional elections); *Coffield v. Handel*, 599 F.3d 1276 (11th Cir. 2010) (challenge to 5% petition requirement for congressional elections).  As the Eleventh Circuit explained in *Coffield*, "[o]ur Court and the Supreme Court have upheld [O.C.G.A. 21-2-170(b)] before . . . [and] [t]he pertinent laws of Georgia have not changed materially since the decisions in *Jenness* and *Cartwright* were made." *Coffield*, 599 F.3d at 1277.  That statement is still true today.  The ballot access structure challenged here is the same structure upheld by the United States Supreme Court in *Jenness*.

## II. Georgia's Petition Requirement for Independent and Political Body Candidates Does Not Violate the Equal Protection Clause.

Plaintiffs' Equal Protection arguments are premised on the assumption that once a political body qualifies for a full slate of statewide candidacies on the general election ballot, by virtue of receiving sufficient votes in the general election, the State must automatically and without any petition requirement place *all local* candidates of

that political body on the general election ballot.  Neither the Supreme Court nor the Eleventh Circuit has ever held as much.

Plaintiffs advance three arguments in support of their contention that Georgia's ballot access laws for Independent and political body candidates for Congress violate the Equal Protection Clause.  First, Plaintiffs contend that the number of petition signatures for Libertarian Party candidates for Congress is greater than the number of petition signatures for Libertarian Party candidates for any statewide office.  Doc. 69-1 at 25-29.  Second, Plaintiffs contend that the number of petition signatures for all Independent and political body candidates for Congress is greater than the number of petition signatures Independent and political body candidates need to run for President of the United States.  Doc. 69-1 at 29-30.  Third, Plaintiffs contend that where a political body has garnered sufficient ballot support to nominate candidates by convention pursuant to O.C.G.A. § 21-2-180, Georgia law treats candidates for Congress differently than candidates for statewide office.  Doc. 69-1 at 41-44.  This third argument is simply a restatement of the first.  *Compare* Doc. 69-1 at 29 (comparing a petition requirement of zero – because the political body is qualified pursuant to O.C.G.A. § 21-2-180 – with the 5% petition requirement for Congress) and Doc. 69-1 at 41-44 (comparing the treatment of candidates for Congress with candidates for statewide office *where* the political body is qualified pursuant to

3

O.C.G.A. § 21-2-180).   Defendant agrees with Plaintiffs that the test for whether a ballot restriction violates the Equal Protection Clause is analogous to the *Anderson v. Celebrezze*, 460 U.S. 780 (1983) balancing test.   *See* pages 12-13 below.

A. **The Number of Petition Signatures Required for Congress and for Statewide Office.**

The statutory petition requirement for statewide office is 1% of the voter registration at the previous general election for the office sought.   O.C.G.A. § 21-2-170(b) and § 21-2-180(1).   The statewide active voter registration for 2018 was approximately 6,434,388 and 1% of that number is 64,344, significantly more than 5% of the registered voters in any one congressional district.[2]  *See* Doc. 69-34 at 8.   State law also allows a political body to qualify a full slate of candidates for statewide office where, at the preceding general election, the political body nominated a candidate for any statewide office that garnered votes equal to 1% or more of the total number of registered voters statewide.   O.C.G.A. § 21-2-180(2).

---

[2] The petition requirement for candidates for President of the United States was reduced to 7,500 by court order.  *See Green Party v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016), *aff'd* 674 Fed. Appx. 974 (11th Cir. 2017).   The court's opinion stressed the nationwide nature of Presidential elections and that unique nature of that election led to both the court's assessment of the burden and the weight of the state interests.   171 F. Supp. 3d at 1362 (considering the impact on the rights of voters outside of the Georgia because of the national nature of the election); 171 F. Supp. 3d at 1367 (explaining that "Defendant's interest is outweighed by a national interest.").

Plaintiffs characterize this alternative method of qualifying – by votes rather than petition – as a petition requirement of zero.  Doc. 69-1 at 29.

Plaintiffs rely on *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) and *Norman v. Reed*, 502 U.S. 279 (1992) for their contention that Georgia's statutory scheme – allowing political bodies an alternative method of qualifying for statewide office through O.C.G.A. § 21-2-180(2) - violates Equal Protection.[3] Neither case supports Plaintiffs' arguments.

In *Illinois State Board of Elections v. Socialist Workers Party*, the challenged statute had a 5% petition requirement for all offices for "new parties," but the requirement was capped at 25,000 signatures for statewide offices.  Since there was no similar signature cap for non-statewide offices, a large political subdivision like Chicago actually required substantially more than the 25,000 signatures required for statewide office.[4]  440 U.S. at 176-77.  The Court simply held that a statutory scheme requiring more petition signatures for ballot access by a new local party in the state's political sub-divisions than for a new party seeking statewide office was unconstitutional.  440 U.S. at 187.  The comparison was the number of petition signatures required "between those independent candidates and new parties seeking

---

[3]  Of course, Plaintiffs do not challenge the constitutionality of O.C.G.A. § 21-2-180(2).  *See* Complaint.
[4]  There is *no* suggestion in the opinion that the 25,000 petition signature requirement itself was unconstitutionally burdensome.

access to the ballot in statewide elections and those *similarly situated* candidates and parties seeking access in city elections."  440 U.S. at 181 (emphasis added).  There was no suggestion at all in the case that the requirements for "new parties" within a political subdivision had to mirror the requirements for qualified parties for statewide offices.  This distinction becomes even clearer in *Norman v. Reed*.

Following *Illinois State Board of Elections*, the Illinois legislature amended the statute to cap all petition requirements at 25,000.  However, where county offices were subdivided into multiple districts, each district had a separate 25,000 petition signature requirement, *and* failure to collect 25,000 signatures from each sub-district meant *all* county offices were disqualified from appearing on the ballot.[5]  *Norman v. Reed*, 502 U.S. at 293.  "Thus, a prerequisite to establishing a new political party in such multidistrict subdivisions is some multiple of the number of signatures required of new statewide parties."  *Id*.  As a result, a new party seeking to run any candidates in Cook County was required "to accumulate 50,000 signatures (25,000 from the city district and another 25,000 from the suburbs)."  *Id.*

---

[5] The Illinois statute had a full slate requirement, that is, a new party was required to run candidates for each of the county's districts.  502 U.S. at 298.  "[T]he failure of a party's organizers to obtain 25,000 signatures for each district in which they run candidates disqualifies the party's candidates in all races within the subdivision." 502 U.S. at 293.

These cases stand for the proposition that a state election structure cannot require more petition signatures for "new" party candidates from a district or political sub-division of the state than it requires for "new" party candidates running for statewide office.  Plaintiffs here, however, attempt to conflate the requirements for a "qualified" statewide party with those for a "new" local party.  In *Reed*, the Court rejected a similar argument.  Plaintiffs there argued that since they had collected 25,000 signatures in the city of Chicago, and the state could require no more than 25,000 signatures for county election, their city petition should qualify the party for all county races.  502 U.S. at 295.

> Although [plaintiffs] suggest that their showing of support in the city district should qualify their candidates to represent the Party in all races within Cook County, in the absence of any claim that the division of Cook county into separate districts is itself unconstitutional, our precedents foreclose the argument. . . . *Just as the State may not cite the Party's failure in the suburbs as reason for disqualifying its candidates in urban Cook County, neither may the Party cite its success in the city district as sufficient condition for running candidates in the suburbs*.

502 U.S. at 295 (emphasis added).  Similarly here, Plaintiffs' success in statewide elections is not a "sufficient condition for running candidates" in a particular congressional district.  *Id.*  Certainly the election of congressional seats by district is not itself unconstitutional.  *See* 2 U.S.C. § 2c.

Plaintiffs also argue that because this Court has reduced the number of petition signatures required for President to 7,500, *Green Party, et al., v. Kemp*, 171 F. Supp.

3d 1340 (N.D. Ga. 2016), *aff'd* 674 Fed. Appx. 974 (11th Cir. 2017), the requirement that Plaintiffs collect over 20,000 signatures per congressional district violates the Equal Protection Clause.  Doc. 69-1 at 29-30.  Plaintiffs ignore both this Court's language in *Green Party* and the Supreme Court's language in *Anderson* that clearly distinguish ballot access measures in elections for President from other elections.  *See Green Party*, 171 F. Supp. 3d at 1363; *Anderson*, 460 U.S. at 795 (explaining that the filing deadline "places a significant state-imposed restriction on a nationwide electoral process."); 460 U.S. at 804 (explaining how the "State's interest in regulating a nationwide Presidential election is not nearly as strong.").[6]  It is not logical to argue that a statewide petition requirement that was judicially-created because of the unique nationwide nature of the election for President should now act as a ceiling for petition requirements for other offices.  Both *Illinois State Board of Elections* and *Norman* were limited to challenges involving a general petition requirement for all statewide offices being compared to the petition requirement for smaller geographic regions.  Nationwide elections for President are dissimilar to all

---

[6] The Eleventh Circuit has also addressed the unique nature of Presidential elections. *Bergland v. Harris*, 767 F. 2d 1551, 1554 (11th Cir. 1985) ("the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.") (quoting *Anderson*, 460 U.S. at 795).

other elections and therefore not a proper comparator for petition requirements for other offices, whether statewide, district, or political subdivision.

B. **The Different Treatment of Libertarian Candidates for Congress And Libertarian Candidates for Statewide Office, Including United States Senate, Does Not Violate the Equal Protection Clause.**

As noted above, Plaintiffs' argument, that Libertarian candidates for statewide office are treated differently from Libertarian candidates for Congress, is really a restatement of Plaintiffs' argument that since zero petition signatures are required for statewide office no more than zero can be required for offices elected by district. Plaintiffs contend that because the Libertarian Party qualified, pursuant to O.C.G.A. § 21-2-180(2), to nominate candidates for statewide office by convention, it must also be permitted to nominate candidates for non-statewide office by convention.  Doc. 69-1 at 41-43.   Again, while Plaintiffs here are challenging ballot access for congressional districts, their argument applies equally to *any* non-statewide office such as state house or senate district seats and county commission or county school board seats.   Ironically, it is the state's attempt to provide political bodies an *alternative* method for ballot access, for statewide office, that Plaintiffs contend leads to the violation of the equal protection rights of non-statewide candidates.  In other words, Plaintiffs believe the Equal Protection Clause requires that the Libertarian Party's 1988 statewide petition – or the success of any statewide Libertarian Party

9

candidate to capture votes equal to 1% of the statewide voter registration - also *qualify* non-statewide candidates of the Libertarian Party.  Of course, the state has an interest in making sure that the Libertarian Party has support within the political subdivision or district that its candidates seek election.  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("[A] State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on the ballot." (citing *Jenness*, 403 U.S. 431)).  Plaintiffs contend that "Georgia could have served any such interest by imposing a geographic distribution requirement on the Libertarian Party's 1988 statewide qualifying petition or the one-percent retention threshold under Section 21-2-180."  Doc. 69-1 at 43.  Plaintiffs also suggest that this state interest is "indistinguishable from the interest that the Supreme Court found lacking in *Norman*, 502 U.S. at 293-294."  Doc. 69-1 at 43.  Again, Plaintiffs misunderstand the import of *Norman*.

In *Norman*, Illinois required a new party to submit 25,000 petition signatures from every district within Cook County in order to have the names of *any* district's candidates on the ballot.  502 U.S. at 293.  Illinois justified the requirement by stating that the state was "ensuring that the electoral support for new parties in a multidistrict political subdivision extends to every district."  *Id.*  The Court *rejected* the state's position because it resulted in requiring more petition signatures for Cook County,

10

25,000 from each district within the county, than from the petition requirement for new parties fielding statewide candidates. *Id.*

Here, the State is not requiring the Libertarian Party to submit a petition from *every* congressional district in order to qualify *any* congressional district candidate. That is precisely the situation that the *Norman* Court rejected. Here, the State is simply requiring the Libertarian Party to demonstrate a modicum of support within a congressional district in which it wants to field candidates. Having a modicum of support statewide does not ensure that the Libertarian Party has *any* support at all within any one congressional district. Unlike the Illinois statute in *Norman*, here, Defendant is only requiring that the Libertarian Party have support within the individual district for which it seeks ballot access. The structure in *Norman* required support in *both* district A and B in order to be on the ballot from *either* district A or B. That is not at all what Georgia law requires.

Finally, Plaintiffs' suggestion that the state should impose a geographic distribution requirement for statewide petitions, rather than impose any petition requirement for congressional races, ignores the reality that such a distribution requirement would likely be unconstitutional. In *Moore v. Ogilvie*, 394 U.S. 814 (1969), the Supreme Court struck down such a requirement. In an Equal Protection challenge to an Illinois statute that required a nominating petition for statewide office

11

to contain at least 200 signatures from each of 50 counties, regardless of the disparity in population among rural and urban counties.[7]  As the Supreme Court noted, 93.4% of the state's voters resided in the 49 most populous counties with the 53 remaining counties containing only 6.6% of the state's voters.  394 U.S. at 816.  It was this inequality in voting strength that offended the Fourteenth Amendment.  "Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot.  Yet 25,000 of the remaining 6.6% of the registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office."  394 U.S. at 819.  A geographic distribution requirement would also add to the burden of statewide candidates petitioning to get on the ballot.  *See Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (recognizing that a lack of geographic distribution requirement eases the burden on the party).  The State's interest in making sure that political body candidates for Congress have a modicum of support, before their names are placed on the general election ballot, is served by the petition requirement.  Additionally, the State's interest in avoiding federal general election run-offs is also served by the petition requirement.  *See* Discussion pp. 24-25.

---

[7] Illinois required that the petition be signed by a total of 25,000 registered voters. 394 U.S. at 815.  The challenge stemmed only from the distribution requirement, not the requirement that the candidates first demonstrate significant support.

III.   **Georgia's 5% Petition Requirement Does Not Violate the First and Fourteenth Amendments.**

The standard for ballot access cases is a balancing test.  A court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights."  *Anderson*, 460 U.S. at 789; *see also Burdick v. Takushi*, 504 U.S. 428 (1992); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).  The Supreme Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).  "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434).  "[T]he mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might

13

choose . . . does not of itself compel close scrutiny." *Burdick*, 504 U.S. at 433 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

### A. The Burden on Plaintiffs' Rights is Not Severe.

Plaintiffs contend that one way to measure the burden to Plaintiffs is by comparison to other cases, Doc. 69-1 at 33, Defendant agrees. Plaintiffs argue that this Court should apply strict scrutiny, relying primarily on *Williams v. Rhodes*, 393 U.S. 23 (1968), *Lubin v. Panish*, 415 U.S. 709 (1974), and *Green Party*, 171 F. Supp. 3d at 1362-1365, Doc. 69-1 at 33-34, but the structures challenged in each of those cases were much more burdensome than the 5% petition requirement challenged here.

In *Williams* the Supreme Court struck down an Ohio statute that made it "virtually impossible" for a third party candidate to get on the ballot. The Ohio election structure in that case required that third party candidates submit a petition signed by voters equal in number to 15% of the votes cast in the prior gubernatorial election.[8] In addition, the only voters that could sign the petition were those that had "(1) voted for a majority of that party's candidates at the last election, or, (2) ha[d] never voted in *any* election before." 393 U.S. at 25 n. 1 (emphasis added).[9] This election structure effectively kept anyone other than the two major parties off the

---

[8] Republican and Democratic Party candidates by contrast, needed only to have garnered 10% of the gubernatorial vote in the preceding election. 393 U.S. at 26.

[9] The Ohio statute also imposed burdens on the party's structure. *See* 393 U.S. at 25 n. 1.

ballot.  Here, Georgia law does not freeze the status quo.  *See Jenness*, 403 U.S. at 438 (explaining that "the *Williams* case, it is clear, presented a statutory scheme vastly different from the [Georgia statute] before us here.").

In *Lubin v. Panish*, 415 U.S. 709 (1974), strict scrutiny was warranted because the statute at issue imposed a significant filing fee with no alternative means to qualify for office.  415 U.S. at 716.  As in *Bullock*, 405 U.S. at 143, the *Lubin* Court rejected the idea that a filing fee is an appropriate measure of the seriousness of a candidate.  415 U.S. at 716.

Finally, Plaintiffs contend that the "closest case" is *Green Party v. Kemp*, a challenge to ballot access for *President*.  As addressed above, the Supreme Court, the Eleventh Circuit, and this court, have all recognized the unique nature of Presidential elections both as to the burdens on voters and candidates, and as to the more limited interests of the State.  *See* Discussion at 8.  Defendant submits that the "closest case" is *Jenness v. Fortson*, the case that actually considered the constitutionality of the 5% petition requirement for Congress at issue here.[10]  The Supreme Court has held that

---

[10] Although no less than four cases have held that the statute Plaintiffs challenge is constitutional, Plaintiffs fail to even acknowledge these holdings.  *See Jenness*, *supra*; *McCrary*, *supra*; *Cartwright*, *supra*; *Coffield*, *supra*.  Here, the Plaintiffs' challenge falls squarely within the parameters the Supreme Court has already held constitutional in *Jenness*.  This court should "not adopt what the Supreme Court has expressly rejected."  *Griffin v. Breckenridge*, 403 U.S. 88, 93 (1971).

the ballot access statute that Plaintiffs challenge in this action is constitutional. *Jenness*, 403 U.S. at 440.

The *Jenness* Court, in upholding Georgia's ballot access structure, considered that Georgia's structure "freely provides for write-in votes."   403 U.S. at 438. Georgia's current statutory scheme also provides for write-in votes.   O.C.G.A. § 21-2-133.   The *Jenness* Court noted that Georgia "does not require every candidate to be the nominee of a political party, but fully recognizes independent candidacies." 403 U.S. at 438.   Georgia's current structure allows independent candidates, like political body candidates, access to the general election ballot via petition.   *See* O.C.G.A. § 21-2-170(b).   The *Jenness* Court also considered that Georgia "does not fix an unreasonably early filing deadline for candidates not endorsed by established parties."   403 U.S. at 438.   At the time *Jenness* was decided, a political body candidate had to submit his nomination petition the second Wednesday in June.   403 U.S. at 433-434.   Currently, the petition deadline is the second Tuesday in July. O.C.G.A. § 21-2-132(e).   The *Jenness* Court considered that Georgia did not "impose upon a small party or a new party the Procrustean requirement of establishing elaborate primary election machinery."   403 U.S. at 438.   The same is true today.   As recognized by the Supreme Court:

> So far as the Georgia election laws are concerned, independent candidates and members of small or newly formed political

16

organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions.

403 U.S. at 438.

The Court went on to describe a number of features of the petition process that afford independent and political body candidates a greater opportunity to obtain signatures. Features such as allowing voters to sign as many different petitions as they wish, and allowing voters who voted in a party primary to also sign a petition, are still part of Georgia's ballot access structure today. There is also no limit on how many petition signatures a political body or candidate may submit, and there is no cost imposed to verify the petition signatures, and as was true in *Jenness*, voters "not even registered at the time of the previous election" may sign a petition. 403 U.S. at 439. Doc. 73-3 ¶ 5, 7. These measures result in the pool of voters available to sign the qualifying petitions being as large as possible. "[I]t is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). In other

words, a State may "reserve the general election ballot 'for major struggles.'"   *Id.* at 196 (quoting *Storer*, 415 U.S. 724).

Plaintiffs' suggestion that *Green Party v. Kemp*, is the "closest case" to Georgia's current structure for congressional candidates is simply not accurate.  First, the petition requirement in *Green Party* was over 60,000 petition signatures, here, the 5% requirement within the congressional district averages below 25,000.[11]  *See* Doc. 69-34 at 8.   Second, the court was very clear in *Green Party* that it was the nationwide nature of Presidential elections that led to both the court's assessment of the burden and the weight of the state interests.  171 F. Supp. 3d at 1362 (considering the impact on the rights of voters outside of the Georgia because of the national nature of the election); 171 F. Supp. 3d at 1367 (explaining that "Defendant's interest is outweighed by a national interest.").   Again, the most analogous cases are those challenging the identical structure for the identical office and pursuant to identical claims.  *Jenness*, 403 U.S. 431 (challenge to 5% petition requirement, by candidates

---

[11] There is some suggestion by Plaintiffs that the comparison for congressional districts is the total number of petition signatures needed for the Libertarian Party to field candidates for all 14 congressional districts.  *See* Doc. 69-1 at 10 (describing petition requirement as 321,726).  Nothing in *Norman* and *Socialist Workers Party* supports such a comparison.  The constitutional defect in the Illinois statute was not that it required 25,000 petition signatures for each district in Cook County, but that the new party was *required* to field a full slate of candidates and therefore the requirement for *each* district was twice the requirement statewide.  *Norman*, 502 U.S. at 293.  Georgia imposes no full slate requirement.

for congressional office and voters, as both a violation of First Amendment and Equal Protection).

Plaintiffs also suggest measuring the burden imposed by the petition requirement by comparing Georgia's legislative choices to those of other states. Doc. 69-1 at 35. The test of whether a state election law violates the Constitution is not dependent on how other states choose to run their elections. *Libertarian Party of Florida*, 710 F.2d at 794 (explaining that "[a] court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature."); *accord Swanson v. Worley*, 490 F.3d 894, 910 (11th Cir. 2007). Rather, a state election structure severely burdens the rights of a political body or political body candidate where it "unfairly discriminate[s] against minor parties or absolutely or directly preclude[s] minor parties from gaining a place on the ballot." *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 71 (3rd Cir. 1999) (internal quotation and citations omitted). Georgia's petition requirement, providing political bodies and Independent candidates ballot access by petition – and requiring the major political parties to run in primary elections – does not unfairly discriminate against minor parties.

> The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an

independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

*Cartwright*, 304 F.3d at 1142 (quoting *Jenness*, 403 U.S. at 440-441).

Next, Plaintiffs suggest that this court measure the severity of the burden on Plaintiffs' rights by looking at the lack of Independent and political body candidacies for Congress.[12]   Doc. 69-1 at 35.   However, lack of candidacies by itself is insufficient to determine the severity of the burden.   Instead, the test is whether "a reasonably diligent [ ] candidate [can] be expected to satisfy the signature requirements."   *Storer*, 415 U.S. at 742.   Again, the number of petition signatures required must be viewed in light of the number of voters available to sign petitions and the amount of time that candidates have to gather petitions.

---

[12]   Plaintiffs cite *Mandel v. Bradley*, 432 U.S. 173, 178 (1977) in support of their argument that "past experience" is a proper measure of the severity of the burden. Doc. 69-1 at 35.   However, the *Mandel* Court simply reversed and remanded a district court order striking down a filing deadline as unconstitutional because it was premised entirely on the Supreme Court's summary affirmance in another case interpreting a different statutory framework.   432 U.S. at 176.   The Court explained the limited precedential value of its summary affirmance in the earlier case, but also reiterated that "[s]ummary affirmances . . . do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.   . . . other courts were not free to conclude that the [statutory] provision invalidated [in the earlier summary affirmance] was nevertheless constitutional."   432 U.S. at 176.   Here, Plaintiffs seek to have this Court invalidate the very statutory scheme that was approved by the Supreme Court in *Jenness*.

> Standing alone, gathering 325,000 signatures in *24 days* would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. . . . Before the claim is finally dismissed, it should be determined whether the available pool is so diminished in size by the disqualification of those who voted in the primary that the 325,000-signature requirement, to be satisfied in 24 days, is too great a burden.

*Storer*, 415 U.S. at 740 (emphasis added).  Georgia allows registered voters to sign as many petitions as they want without restriction, all of Georgia's congressional district would require far fewer than 325,000 petition signatures to meet the 5% threshold, and candidates have *180* days to collect signatures.  O.C.G.A. § 21-2-170(e).

Finally, Plaintiffs contend that 1) the petition-checking process; 2) campaign finance laws; and 3) "practical difficulties of gathering signatures," Doc. 69-1 at 36, are all additional factors the court should consider.  With regard to the petition checking process, state law provides an avenue for judicial review of the Secretary's decision on petition signatures.  *See* O.C.G.A. § 21-2-171(c).  Douglas Craig, one of the Libertarian Party of Georgia's designees for a 30(b)(6) deposition, testified that in the past when collecting petition signatures he has been given permission by a local grocery store to collect signatures on their property.  Doc. 74-1 p. 16 (Depo p. 58 lns. 2-18).  Craig does offer that "for people that are a little shyer, it's a little rougher" to ask the property owner for permission.  *Id.* at lns. 17-18.  Craig also testified that volunteer party members have a higher rate of validity on petition signatures than

21

paid petition circulators.  Doc. 74-1 p. 17 (Depo p. 61 lns. 2-4).  Craig testified that paid circulators are just trying to get more signatures, whether or not the individuals are voters, but party volunteers are trying to get a candidate on the ballot.  Doc. 74-1 at 17 (Depo p. 61 lns. 5-10).  Some petitions have high rates of valid signatures and some do not.[13]  Doc. 72-8.  Chris Harvey testified that the 2016 petition for Congress from Mr. Nguyen, which had a very low rate of validity, had "very difficult to decipher handwriting, printed names, signatures, a lack of address information . . . making it difficult to identify the voter."  Doc. 72-1 p. 105 (Depo p. 103 ln. 20 – p. 104 ln. 2).

Finally, campaign finance laws apply equally to political bodies *and* the Democratic and Republican Parties.  Similarly, the costs of filing fees are the same for all candidates.  *See Council of Alternative Political Parties*, 179 F.3d at 71 (3rd Cir. 1999) (explaining that it is when the state "unfairly discriminate[s] against minor parties" that the state burdens the "availability of political opportunity.").  "That minor parties must incur some expenses in accumulating the necessary signatures to qualify for the ballot does not constitute an equal protection violation."  *Libertarian Party of Florida*, 710 F.2d at 794-795 (citing *American Party of Texas v. White*, 415

---

[13] Exhibit 6 to the Deposition of Chris Harvey includes a list of candidate petitions submitted to the Secretary of State between 2014 and 2018, the number of signatures needed by the candidate, the number of signatures submitted, and the rates of validity where known.  *See* Doc. 72-8.

U.S. 767, 793-794 (1974).  In summary, the burdens imposed on Independent and political body candidates seeking to run for Congress are not severe.

### B. The State's Interests in the Petition Requirement for Congressional Elections are Compelling.

The State's interests in the petition requirement for candidates running for U.S. House of Representatives are two-fold.  First, the State has an interest in making sure political body candidates have a modicum of support in the districts they wish to represent.  Plaintiffs take issue with Defendant's asserted interest because they claim the State does not have any indication of the "support" for the Libertarian Party's statewide candidates.  Doc. 69-1 at 43.  Plaintiffs ignore the fact that the Libertarian Party has demonstrated a modicum of support on the *statewide* level.  However, that does not eliminate the State's interest in making sure that Libertarian candidates, running from districts and *not* statewide, also enjoy a modicum of support *within the district* they choose to represent.  Moreover, "states defending ballot-access requirements are 'not required to present evidence in support of [their] professed interests."  *Stein v. Ala. Sec. of State*, 774 F.3d 689, 700 n. 17 (11th Cir. 2014) (quoting *Swanson*, 490 F.3d at 912).  "Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not

23

significantly impinge on constitutionally protected rights." *Munro*, 479 U.S. at 195-196.

Second, the State has an interest in limiting run-off elections, particularly federal general run-off elections, because of a requirement related to the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). Because of UOCAVA, federal law requires that, for elections to federal office, state election officials must transmit absentee ballots to uniformed and overseas voters forty-five days prior to the election. 52 U.S.C. § 20302(a)(8); *see also United States v. Georgia*, 778 F.3d 1202, 1203 (11th Cir. 2015); O.C.G.A. § 21-2-384(a)(2). As noted in Defendant's brief in support of Defendant's Motion for Summary Judgment, the State has adopted an election schedule to allow sufficient time to transmit absentee ballots for federal general run-off elections, setting the run-off nine (9) weeks *after* the general election.[14] O.C.G.A. § 21-2-501(a)(3). The general run-off election for Congressional races is *after* members of Congress take office. 2 U.S.C. § 7 (members take office on the third day of January). "The addition of third party and independent candidates on the ballot increases the likelihood of a run-off election." Doc. 73-15 at 7 ¶ 23.

---

[14] General election run-offs for state offices, where the requirements of UOCAVA do not apply, are held twenty-eight (28) days after the general election. O.C.G.A. § 21-2-501(a)(4).

Plaintiffs contend that the State could address its interests by other means. Doc. 69-1 at 43.  However, "the test is whether the legislative requirement is a rational way to meet this compelling state interest.  The least drastic means test becomes one of reasonableness, *i.e.*, whether the statute unreasonably encroaches on ballot access."  *Libertarian Party of Florida*, 710 F.2d at 793 (citing *Anderson*, 460 U.S. at 788 n. 9).  Here, Georgia's statute is a rational way to satisfy its interest in avoiding runoff elections.

## CONCLUSION

For all of the foregoing reasons, Defendant prays that the Court denies Plaintiffs' Motion for Summary.

Respectfully submitted,

Christopher M. Carr 112505
Attorney General

Annette M. Cowart 191199
Deputy Attorney General

Russell D. Willard 760280
Senior Assistant Attorney General

/s/Cristina M. Correia
Cristina M. Correia 188620
Senior Assistant Attorney General

40 Capitol Square SW
Atlanta, GA  30334
ccorreia@law.ga.gov
404-656-7063
Fax:  404-651-9325

/s/ Charlene S. McGowan
Charlene S. McGowan 697316
Assistant Attorney General

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment was prepared in 14-point Times New Roman in compliance with Local Rules 5.1(C) and 7.1(D).

## **Certificate of Service**

I hereby certify that I have electronically filed **Defendant Brad Raffensperger's Brief in Opposition to Plaintiffs' Motion for Summary Judgment** using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  NONE

This 7th day of August, 2019.

/s/Cristina Correia
Cristina Correia          188620
Senior Assistant Attorney General