IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | **Plaintiffs' Reply to the Defendant's Response to the Plaintiffs' Statement of Material Facts** |
| Defendant. | |

The plaintiffs respectfully submit this reply to the defendant's response to the plaintiffs' statement of material facts. (ECF 97.)  The defendant has admitted most of the plaintiffs' facts.  This reply focuses on those facts that are not undisputed.

# Table of Contents

I.      Jurisdiction and Venue............................................................ 4

II.     Parties.................................................................................5

III.    The History of Georgia's Ballot-Access Restrictions..................8

IV.     The Purpose of Georgia's Petition Requirement......................13

V.      Georgia's Current Ballot-Access Restrictions.........................20

VI.     The Pauper's Affidavit in Lieu of Filing Fee............................28

VII.    The Number of Valid Signatures and Qualifying Fee Required
        for Political-Body Candidates...............................................30

VIII.   Other States' Signature Requirements...................................34

IX.     Other State's Qualifying Fees...............................................38

X.      The Impact of Georgia's Ballot-Access Restrictions..................41

XI.     Signature Requirements Met by Independent and Third-Party
        Candidates for U.S. Representative in Other States.................44

XII.    Past Attempts to Qualify for the General-Election Ballot...........49

XIII.   The Petition-Checking Process..............................................89

XIV.    The Difficulty and Pace of Petitioning...................................100

XV.     The Cost of Petitioning in Georgia........................................103

XVI.    The Impact of Federal Campaign-Finance Law.......................105

XVII.   Lack of Access to Voters.....................................................112

XVIII.  Public Concern about Disclosing Confidential Information.........118

XIX.    Support for the Libertarian Party Nationwide and in Georgia....120

XX.     The Libertarian Party's Platform and Policy Positions..............132

XXI.      The National Impact of Georgia's Ballot-Access Restrictions……..136

XXII.     Uncontested Congressional Elections in Georgia………………..…..139

XXIII.    Special Elections for U.S. Representative in Georgia……………....142

XXIV.    Runoff Elections in Georgia…………………………………………145

## I.     Jurisdiction and Venue

1.      This Court has original jurisdiction over this case under Article III of the U.S. Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3). (Ex. 33: Answer (ECF 14) ¶ 3.)

**Response:** Defendant objects to paragraph 1 as a statement of law and not fact. Subject to this objection, Defendant does not dispute the Court's jurisdiction over this case.

**Reply:** No reply necessary.

2.      This suit is authorized by 42 U.S.C. § 1983. (Ex. 33: Answer ¶ 4.)

**Response:** Defendant objects to paragraph 2 as a statement of law and not fact. Subject to this objection, Defendant does not dispute that this action is authorized by statute.

**Reply:** No reply necessary.

3.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. (Ex. 33: Answer ¶ 5.)

**Response:** Defendant objects to paragraph 3 as a statement of law and not fact. Defendant does not dispute that declaratory relief is authorized by statute but denies that Plaintiffs are entitled to the relief requested in this action.

**Reply:** No reply necessary.

4.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) and in the Atlanta Division under Local Rule 3.1. (Ex. 33: Answer ¶ 6.)

**Response:** Defendant objects to paragraph 4 as a statement of law and not fact. Subject to this objection, Defendant does not dispute that venue is proper in this Court.

**Reply:** No reply necessary.

## II.   Parties

5.     Plaintiff Martin Cowen is a prospective political-body candidate in Georgia's Thirteenth Congressional District. (Ex. 33: Answer ¶ 7.) He meets all of the qualifications for the office of U.S. Representative and wants to appear on the general-election ballot as the nominee of the Libertarian Party of Georgia. He was the Libertarian Party's nominee for that seat in 2018, but he was unable to qualify for the general-election ballot. He intends to run again for that seat in 2020. (Ex. 5: Cowen decl. ¶¶ 1, 8, 10, 18, 20, 22-23.)

**Response:** Admitted.

**Reply:** No reply necessary.

6.     Plaintiff Allen Buckley is a registered voter in Georgia's Thirteenth Congressional District. He wants to vote for Martin Cowen as the

Libertarian Party of Georgia's nominee for the office of U.S. Representative in his district. (Ex. 33: Buckley decl. ¶¶ 15-16).

**Response:** Admitted.

**Reply:** No reply necessary.

7.     Plaintiff Aaron Gilmer, whose full name is Robin Aaron Gilmer, is a prospective political-body candidate in Georgia's Ninth Congressional District. (Ex. 27: Def's Resp Pls.' Corrected First Req. Admis. ¶ 1 ("First Admissions").) He meets all of the qualifications for the office of U.S. Representative. He was the Libertarian Party's nominee for that seat in 2018, but he was unable to qualify for the ballot. He is planning to run for office again as a Libertarian Party candidate in 2020 and would prefer to run for the office of U.S. Representative.

**Response:** Admitted.

**Reply:** No reply necessary.

8.     Plaintiff John Monds is a registered voter in Georgia's Second Congressional District. (Ex. 33: Answer ¶10.) He wants to vote for the Libertarian Party of Georgia's nominee for the office of U.S. Representative in his district. (Ex. 13: Monds decl. ¶¶ 10-11.)

**Response:** Admitted.

**Reply:** No reply necessary.

9.     Plaintiff Libertarian Party of Georgia, Inc. is a Georgia nonprofit corporation and a political body within the meaning of O.C.G.A. § 21-2-170. (Ex. 33: Answer ¶ 11.)

**Response:** Admitted.

**Reply:** No reply necessary.

10.     The Libertarian Party of Georgia was founded in 1972 and is the official Georgia affiliate of the national Libertarian Party, which was founded in 1971. (Ex. 33: Answer ¶ 12.)

**Response:** Defendant objects to paragraph 10 because the facts stated are not material. Subject to this objection, Defendant does not dispute paragraph 10.

**Reply:** The Court can determine for itself whether the facts are material.

11.     Since its founding, the Libertarian Party of Georgia has run candidates for statewide public offices and for state legislative offices. (Ex. 33: Answer ¶ 13.) The party has never had any nominee for U.S. Representative appear on Georgia's general-election ballot. (Ex. 33: Answer ¶ 13.) The party wants to nominate a candidate for U.S. Representative in all of Georgia's congressional districts and to have those nominees appear on the general election ballot. (Ex. 9: Graham decl. ¶ 19.)

**Response:** Admitted.

**Reply:** No reply necessary.

12.    Defendant Brad Raffensperger is the Secretary of State of the State of Georgia (hereinafter, the "Secretary"). (ECF 48.) He is the chief election official of the State of Georgia. (Ex. 33: Answer ¶ 14.) He is charged by statute with enforcing Georgia's ballot-access restrictions for candidates for U.S. Representative. (Ex. 33: Answer ¶ 14.) At all relevant times, the Secretary exercised his authority under color of state law within the meaning of 42 U.S.C. §1983. (Ex. 33: Answer ¶ 14.) He is sued in his official capacity only. (Ex. 33: Answer ¶ 14.)

**Response:** Admitted.

**Reply:** No reply necessary.

## III.    The History of Georgia's Ballot-Access Restrictions

13.    Georgia enacted its first ballot-access law in 1922. Act of Aug. 21, 1922, ch. 530, § 3, 1922 Ga. Laws 97, 100 (codified at 1933 Ga. Code § 34-1904). That law provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. (Ex. 33: Answer ¶ 15.)

**Response:** Admitted.

**Reply:** No reply necessary.

14.     Before 1922, Georgia did not use government-printed ballots. Voters had to use their own ballots, and these were generally provided to voters by a political party. (Ex. 33: Answer ¶ 16.)

**Response:** Admitted.

**Reply:** No reply necessary.

15.     In 1943, Georgia added a five-percent petition requirement for access to the general-election ballot. Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292. That law allowed candidates of any political party that received at least five percent of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee. (Ex. 33: Answer ¶ 17.) The law required all other candidates to file a petition signed by at least five percent of the registered voters in the territory covered by the office. (Ex. 33: Answer ¶ 17.)

**Response:** Admitted.

**Reply:** No reply necessary.

16.     When Georgia first enacted its five-percent petition requirement in 1943, the petition deadline was 30 days before the general election. *See* Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292 (amending 1933 Ga. Code § 34-1904, which provided that "All candidates for National and State offices, or the proper authorities of the political party nominating them, shall file notice of their candidacy, giving their names and the offices for which they

are candidates, with the Secretary of State, at least thirty days prior to the regular election, except in cases where a second primary election is necessary."). (Ex. 27: First Admissions ¶ 2.)

**Response:** Admitted.

**Reply:** No reply necessary.

17.    In 1964, the State added a time limit for gathering signatures on a nomination petition, providing that candidates could not begin circulating a nomination petition more than 180 days before the filing deadline. Georgia Election Code, ch. 26, § 1, 1964 Ga. Laws Ex. Sess. 26, 93 (codified at 1933 Ga. Code § 34-1010). That law also changed the petition filing deadline to 50 days before the general election. Id. at 87 (codified at 1933 Ga. Code § 34-1001). (Ex. 33: Answer ¶ 20.)

**Response:** Admitted.

**Reply:** No reply necessary.

18.    In 1965, the General Assembly moved the petition deadline to 60 days before the general election. Act of March 22, 1965, Ch. 118, § 1, 1965 Ga. Laws 224, 225 (codified at 1933 Ga. Code § 34-1001). (Ex. 33: Answer ¶ 21.)

**Response:** Admitted.

**Reply:** No reply necessary.

19.    In 1969, the petition deadline was moved to the second Wednesday in June. Act of April 9, 1969, ch. 89, § 8B, 1969 Ga Laws. 329,

336 (codified at 1933 Ga. Code § 34-1001). In 1977, the petition deadline was moved to the second Wednesday in July. Act of March 30, 1977, ch. 294, § 3(c), 1977 Ga. Laws 1053, 1056 (codified at 1933 Ga. Code § 34-1002). (Ex. 33: Answer ¶ 22.)

**Response:** Admitted.

**Reply:** No reply necessary.

20.     In 1969, the petition deadline was moved to the second Wednesday in June. Act of April 9, 1969, ch. 89, § 8B, 1969 Ga Laws. 329, 336 (codified at 1933 Ga. Code § 34-1001). In 1977, the petition deadline was moved to the second Wednesday in July. Act of March 30, 1977, ch. 294, § 3(c), 1977 Ga. Laws 1053, 1056 (codified at 1933 Ga. Code § 34-1002). (Ex. 33: Answer ¶ 22.)

**Response:** Admitted.

**Reply:** No reply necessary.

21.     In 1974, the General Assembly lowered the qualifying fee to three percent of the annual salary of the office, where it remains today. Act of January 29, 1974, ch. 757, § 2, 1974 Ga. Laws 4, 6. (Ex. 27: First Admissions ¶ 19.)

**Response:** Admitted.

**Reply:** No reply necessary.

22.    In 1979, the General Assembly created a separate petition requirement for statewide offices. Act of April 12, 1979, ch. 436, 1979 Ga Laws 617 (codified at 1933 Ga. Code § 34-1010). Under that provision, an independent or political-body candidate seeking a statewide office needed to file a petition signed by at least two and a half percent of the registered voters eligible to vote in the last election for the office. Candidates for all other offices still had to meet the five- percent threshold. (Ex. 33: Answer ¶23.)

**Response:** Admitted.

**Reply:** No reply necessary.

23.    In 1986, the General Assembly lowered the petition threshold for statewide candidates to one percent. Act of April 3, 1986, ch. 1517, § 3, 1986 Ga. Laws 890, 892-93 (codified at Ga. Code § 21-2-170). The threshold for all other independent and political-body candidates remained at five percent. (Ex. 33: Answer ¶ 24.)

**Response:** Admitted.

**Reply:** No reply necessary.

24.    In 1986, the General Assembly also moved the petition deadline to the first Tuesday in August. Id. at 891-92 (codified at Ga. Code § 21-2-132). (Ex. 33: Answer ¶ 25.)

**Response:** Admitted.

**Reply:** No reply necessary.

25.     In 1989, the General Assembly moved the petition deadline to the second Tuesday in July, where it remains today. Act of April 4, 1989, ch. 492, § 2, 1989 Ga. Laws 643, 647 (codified at Ga. Code § 21-2-132). (Ex. 33: Answer ¶ 26.)

**Response:** Admitted.

**Reply:** No reply necessary.

26.     In 1999, the General Assembly added a further requirement that each sheet of a nomination petition be notarized. Act of April 1, 1999, ch. 23, § 2, 1999 Ga. Laws 23, 24-25 (codified at Ga. Code § 21-2-170). (Ex. 27: First Admissions ¶ 9.)

**Response:** Admitted.

**Reply:** No reply necessary.

## IV.   The Purpose of Georgia's Petition Requirement

27.     Georgia's five-percent petition requirement was enacted with the discriminatory purpose of preventing Communist Party candidates from appearing on Georgia's ballots. (Ex. 17: Richardson decl. ¶ 15.)

**Response**: Defendant objects to the cited testimony in the Richardson Declaration because the witness is not qualified to testify as an expert and his testimony is unreliable. Defendant will file a motion to exclude Richardson's testimony as inadmissible under *Daubert v. Merrell Dow*

13

*Pharms.*, 509 U.S. 579 (1993). Defendant also disputes this statement as contradicted by Richardson in his deposition, wherein he admitted that the basis for his claim was limited to newspaper archives from 1940 through 1943. See Doc. 77-1, Richardson Dep. at 18:18 – 19:4. Richardson also conceded that "there was never really a communist party in Georgia ever." *Id.* at 18:9-12. This statement is further disputed by the 1948 Attorney General Opinion (which Mr. Richardson did not review), which noted that the purpose of the 1943 statute "was to prevent persons with little or no following encumbering the official ballot." 1948 Ga. AG Op. at 158 (attached as Exhibit C to Defendant's Motion for Summary Judgment).

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, the deposition testimony cited by the defendant does not, in fact, contradict Mr. Richardson's declaration.  Nor does a single throwaway line in an attorney-general opinion from five years after the fact create a genuine issue of fact when that line is contradicted by the contemporaneous press accounts upon which Mr. Richardson relied as the basis for his opinion.  (*See* Ex. 34: newspaper articles (ECF 69-37).)

28.     Prior to its enactment in 1943, Georgia had never had a problem with crowded ballots. (Ex. 24: Richardson dep. 14:14-17:6.) Between 1922 and 1943 Georgia had never had more than 5 candidates on its presidential ballot, and there had never been more than 2 senatorial candidates in a general election. (Ex. 17: Richardson decl. ¶ 14.).)

**Response:** Defendant objects to the cited testimony in the Richardson Declaration because the witness is not qualified to testify as an expert and his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, the second sentence in paragraph 28, above, is not an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact.  *See* Fed. R. Evid. 702, 703.)

29.     In 1940, Georgia's Secretary of State, John B. Wilson, had unilaterally barred Earl Browder, the Communist Party's nominee for president, and other members of the party from appearing on the state's ballots in the 1940 election. Wilson justified his ruling on the grounds of public policy: "It would be against public policy to place on our ballot the names of candidates of a party which seeks to overthrow our democratic

constitutional form of government." Wilson also relied on advice from
Georgia's Attorney General, Ellis Arnall, a noted anti-communist politician
who had waged a campaign to keep communist candidates off of Georgia's
ballots. (Ex. 17: Richardson decl. ¶ 10; Ex. 34 at 1-2: newspaper articles.)

**Response:** Defendant objects to the cited testimony in the Richardson
Declaration because the witness is not qualified to testify as an expert and
his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the
reasons set out in the plaintiffs' response in opposition to the defendant's
motion for summary judgment, and there is no basis upon which to conclude
that his testimony is unreliable. (ECF 96 at 20-23.) In addition, nothing in
paragraph 29, above, is an opinion, and Mr. Richardson need not be qualified
as an expert to testify as to matters of fact.  *See* Fed. R. Evid. 702, 703.)

30.    Wilson's action came in the midst of a wave of anti-communist
and nativist sentiment in the United States. (Ex. 17: Richardson decl. ¶ 11.)
Eleven states took similar action to arbitrarily keep the communist party off
the ballot in 1940. (Ex. 24: Richardson dep. 20:4-7.)

**Response:** Defendant objects to the cited testimony because the
witness is not qualified to testify as an expert and his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the
reasons set out in the plaintiffs' response in opposition to the defendant's

motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, nothing in paragraph 30, above, is an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact. *See* Fed. R. Evid. 702, 703.)

31.    Shortly after the 1940 presidential election, Wilson was reported to be seeking legislation to keep the Communist party permanently off the ballot. At the time, Wilson proposed to require all candidates for state and national office in Georgia to file with the secretary of state sufficient information to determine whether the party is designed to overthrow our constitutional form of government. Although the communist party would not be mentioned in the bill, Wilson said that it and any other similar party would be the primary target. (Ex. 17: Richardson decl. ¶ 12; Ex. 34 at 3: newspaper articles.)

**Response:** Defendant objects to the cited testimony because the witness is not qualified to testify as an expert and his testimony is unreliable. Defendant also objects to the newspaper articles in Ex. 34 as inadmissible hearsay.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, nothing in

paragraph 31, above, is an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact. *See* Fed. R. Evid. 702, 703. The newspaper articles fall into the hearsay exception for ancient documents, Fed. R. Evid. 803(16), but Mr. Richardson can base his opinion on inadmissible facts or data in any event, Fed. R. Evid. 703.

32.     Although the General Assembly did not adopt Wilson's proposal in 1941 or 1942, it did adopt the five-percent petition requirement in 1943, when hostility to the Soviet Union and communism was still high. (Ex. 24: Richardson dep. 20:19-21:9, 23:5-11.) The bill was signed into law by Ellis Arnall, who had been elected governor of Georgia in 1942. (Ex. 24: Richardson dep. 25:3-7.)

**Response:** Defendant objects to the cited testimony because the witness is not qualified to testify as an expert and his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, nothing in paragraph 32, above, is an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact. *See* Fed. R. Evid. 702, 703.

33.     Even though the Communist Party was never a significant force in Georgia, Wilson and Arnall knew that the issue would be popular with the voters. (Ex. 24: Richardson dep. 17:21-18:16, 20:15-18.)

**Response:** Defendant objects to the cited testimony because the witness is not qualified to testify as an expert and his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, at least part of paragraph 33, above, is not an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact. *See* Fed. R. Evid. 702, 703.

34.     A contemporaneous article in the Atlanta Constitution indicated that the five-percent petition requirement "sustained Secretary of State John B. Wilson in refusing a Communist candidate for president a place on the Georgia ballot in the 1940 election." (Ex. 34 at 4-5: newspaper articles.) The article offered no other justification for the bill, and no other justification for the bill appears in the contemporaneous historical record. (Ex. 33: Answer ¶ 19; Ex. 17: Richardson decl. ¶13; Ex. 24: Richardson dep. 18:17-19:4, 28:6-29:21.)

**Response:** Defendant objects to the cited testimony because the witness is not qualified to testify as an expert and his testimony is unreliable.

**Reply:** Mr. Richardson is amply qualified to testify as an expert for the reasons set out in the plaintiffs' response in opposition to the defendant's motion for summary judgment, and there is no basis upon which to conclude that his testimony is unreliable. (ECF 96 at 20-23.) In addition, nothing in paragraph 34, above, is an opinion, and Mr. Richardson need not be qualified as an expert to testify as to matters of fact. *See* Fed. R. Evid. 702, 703. The defendant's answer and the newspaper articles independently support the facts asserted in the paragraph.

## V.   Georgia's Current Ballot-Access Restrictions

35.   Georgia's current ballot-access laws distinguish between three kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a political body; and (3) independent candidates. (Ex. 33: Answer ¶27.)

**Response:** Admitted.

**Reply:** No reply necessary.

36.   A "political party" is any political organization whose nominee received at least 20 percent of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2 (25). (Ex. 33: Answer ¶ 28.)

**Response:** Admitted.

**Reply:** No reply necessary.

37. Political parties choose nominees in partisan primaries, and the candidate nominated by the party appears automatically on the ballot for any statewide or district office. O.C.G.A. § 21-2-130(1). No nomination petition is required of a political party or any nominee of a political party. (Ex. 33: Answer ¶ 29.)

**Response:** Admitted.

**Reply:** No reply necessary.

38.    The only political parties that meet the current definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party. (Ex. 33: Answer ¶ 30.)

**Response:** Admitted, although any political organization can become a political party by nominating a candidate for Governor or President that receives at least 10 percent of the total votes cast for that office. See O.C.G.A. § 21-2-2(25).

**Reply:** Disputed. The defendant's response includes a likely typographical error ("10 percent" should be "20 percent").  The cited code provision provides in full as follows:

> (25)  "Political party" or "party" means any political organization which at the preceding:
> (A)  Gubernatorial election nominated a candidate for Governor and whose candidate for Governor at such election

polled at least *20 percent* of the total vote cast in the state for Governor; or

(B)  Presidential election nominated a candidate for President of the United States and whose candidates for presidential electors at such election polled at least *20 percent* of the total vote cast in the nation for that office.

O.C.G.A. § 21-2-2(25) (emphasis added).

39.     A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(25). (Ex. 33: Answer ¶ 31.)

**Response:** Admitted.

**Reply:** No reply necessary.

40.     Political bodies must nominate candidates for partisan public offices by convention. O.C.G.A. § 21-2-170(g). (Ex. 33: Answer ¶ 32.)

**Response:** Admitted.

**Reply:** No reply necessary.

41.     Georgia law permits a political body to become "qualified to nominate candidates for statewide public office by convention." O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶ 3.)

**Response:** Admitted.

**Reply:** No reply necessary.

42.     A political body becomes qualified to nominate candidates for statewide public office by convention if: (a) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the

last general election; or (b) it nominated a candidate for statewide public office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶ 4.)

**Response:** Admitted.

**Reply:** No reply necessary.

43.    Petitions seeking to qualify a political body to nominate candidates for statewide public office by convention are due no later than the second Tuesday in July, O.C.G.A. § 21-2-185, and all signatures must be gathered within 15 months of the date on which the petition is submitted, O.C.G.A. § 21-2-182. (Ex. 27: First Admissions ¶ 5.)

**Response:** Admitted.

**Reply:** No reply necessary.

44.    Candidates for statewide partisan public offices nominated by a political body that is qualified under Section 21-2-180 appear automatically on the ballot without a nomination petition. O.C.G.A. § 21-2-132(e)(5). Each such nominee must submit a notice of candidacy and pay the applicable qualifying fee by the deadlines prescribed in O.C.G.A. § 21-2-132(d), but no nomination petition is required. (Ex. 27: First Admissions ¶ 6.)

**Response:** Admitted.

**Reply:** No reply necessary.

45.     Candidates for all other partisan public offices, including the office of U.S. Representative, nominated by a political body that is qualified under Section 21-2-180 do not appear automatically on the ballot. In order to appear on the general-election ballot, such candidates must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). (Ex. 33: Answer ¶ 37.)

**Response:** Admitted.

**Reply:** No reply necessary.

46.     The qualifying fee for most partisan public offices, including U.S. Representative, is three percent of the annual salary of the office; however, the qualifying fee for candidates for the General Assembly is a flat $400. O.C.G.A. § 21-2-131. (Ex. 33: Answer ¶ 38.)

**Response:** Admitted.

**Reply:** No reply necessary.

47.     Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-

24

131(b)(2). For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B). For political-body candidates, the Secretary of State retains 25 percent and sends 75 percent to the political body after the election is over. O.C.G.A. § 21-2-131(c)(4)(A). (Ex. 9: Graham decl. ¶¶ 15-16; Ex. 12: Metz decl. ¶ 13.)

**Response:** Defendant disputes that the statute mandates distributing funds after the election. The statute requires only that the Secretary of State distribute the funds "as soon as practicable." O.C.G.A. 21-2-131(c)(4)(A).

**Reply:** Paragraph 47 does not assert that the statute mandates distributing funds after the election. The paragraph asserts only that "after the election is over" is when the Secretary disburses the funds. The cited code provision does not create a fact issue on that point.

48.    A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d). Each sheet of the nomination petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. Id. The nomination petition is due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 33: Answer ¶ 39.)

**Response:** Admitted.

**Reply:** No reply necessary.

49.   Candidates nominated by political bodies that are not qualified under Section 21-2-180 do not appear automatically on the ballot for any office. In order to appear on the general-election ballot, such candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Such candidates for all other partisan public offices must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2- 132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Nomination petitions are due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 27: First Admissions ¶ 8.)

**Response:** Admitted.

**Reply:** No reply necessary.

50.   Independent candidates do not appear automatically on the ballot for any office unless the candidate is an incumbent. In order to appear on the general- election ballot, independent candidates for statewide public offices (other than president) must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one

percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). Such candidates for all other partisan public offices must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). Nomination petitions are due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). (Ex. 33: Answer ¶ 41.)

> **Response:** Admitted.

> **Reply:** No reply necessary.

51.    Because of recent litigation, the signature requirements for independent presidential candidates and presidential candidates nominated by political bodies that are not qualified under Section 21-2-180 is currently lower than prescribed by Georgia law. In 2016, U.S. District Judge Richard Story ruled that the one-percent signature requirement in O.C.G.A. § 21-2-170(b) is unconstitutional as applied to presidential candidates. See Green Party of Georgia v. Kemp, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016), aff'd No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam). As a remedy, he lowered the signature requirement for presidential candidates from one percent (about 50,000 signatures) to 7,500 signatures until the Georgia General

Assembly enacts a different measure. Id. at 1374. To date, the General Assembly has not done so. (Ex. 33: Answer ¶ 42.)

**Response:** Admitted.

**Reply:** No reply necessary.

52.     In light of Judge Story's order and the General Assembly's acquiescence in it, the number of signatures required for independent presidential candidates and presidential candidates nominated by political bodies that are not qualified to appear on the ballot statewide is now less than half the number of signatures required for an independent or political-body candidate for U.S. Representative to appear on the general-election ballot in any one of Georgia's fourteen congressional districts. (Ex. 33: Answer ¶ 43.)

**Response:** Admitted.

**Reply:** No reply necessary.

## VI.   The Pauper's Affidavit in Lieu of Filing Fee

53.     Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g). (Ex. 29: Def's Resp. Pls.' Second Req. Admis. 3 ¶ 47 ("Second Admissions").)

**Response:** Defendant objects to paragraph 53 as a conclusion of law and not a statement of fact. Subject to this objection, Defendant admits this paragraph.

**Reply:** No reply necessary.

54.     A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor the income to pay the filing fee, and it requires the candidate to submit a personal financial statement. O.C.G.A. § 21-2- 132(g). (Ex. 29: Second Admissions ¶ 48.)

**Response:** Defendant objects to paragraph 54 as a conclusion of law and not a statement of fact. Subject to this objection, Defendant admits this paragraph.

**Reply:** No reply necessary.

55.     In addition, a pauper's affidavit for a candidate for U.S. Representative must be accompanied by a petition signed by one percent of the number of registered voters eligible to vote for the office in the last election. O.C.G.A. § 21-2-132(h). (Ex. 23: Harvey dep. 170:4-13.)

**Response:** Defendant objects to paragraph 55 as a conclusion of law and not a statement of fact. Subject to this objection, Defendant admits this paragraph.

**Reply:** No reply necessary.

56.     Each sheet of the petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. O.C.G.A. § 21-2-132(h). (Ex. 29: Second Admissions ¶ 50.)

**Response:** Defendant objects to paragraph 56 as a conclusion of law and not a statement of fact. Subject to this objection, Defendant admits this paragraph.

**Reply:** No reply necessary.

57.     For a political-body candidate, the petition is due at the same time that a candidate's notice of candidacy is due—no later than noon on the Friday following the Monday of the thirty-fifth week before the general election—a date that falls in early March of an election year. O.C.G.A. § 21-2-132(d). (Ex. 23: Harvey dep. 169:15-170:3.)

**Response:** Defendant objects to paragraph 57 as a conclusion of law and not a statement of fact. Subject to this objection, Defendant admits this paragraph.

**Reply:** No reply necessary.

## VII.  The Number of Valid Signatures and Qualifying Fee Required for Political-Body Candidates

58.     In determining the number of petition signatures needed by independent or political body candidates to appear on a general election ballot, the Secretary of State uses only the total number of "active" voters. (Ex. 33: Answer ¶ 49.)

**Response:** Admitted.

**Reply:** No reply necessary.

59.     According to figures provided by the Secretary of State's office, Georgia had 6,434,388 active registered voters as of the 2018 general election. (Ex. 31: Def's Resp. Pls.' Second Interrogs.)

**Response:** Admitted.

**Reply:** No reply necessary.

60.     Georgia currently has 14 members of the U.S. House of Representatives, each of which is elected from a single-member district. (Ex. 33: Answer ¶ 52.)

**Response:** Admitted.

**Reply:** No reply necessary.

61.     Because the actual number of registered voters in each congressional district varies from district to district, the actual number of valid signatures required for an independent or political-body candidate for the U.S. House of Representative to appear on the 2020 general election ballot also varies from district to district. (Ex. 33: Answer ¶ 53.)

**Response:** Admitted.

**Reply:** No reply necessary.

62.     According to the Secretary of State, the number of active voters and petition signatures projected to be required for an independent or political-body candidate to appear on the 2020 general election ballot in each of Georgia's 14 congressional districts is as follows:

| District | Active Voters (11/06/18) | Signatures Required 2020 |
|---|---|---|
| 1 | 447,321 | 22,367 |
| 2 | 397,565 | 19,879 |
| 3 | 474,044 | 23,703 |
| 4 | 485,112 | 24,256 |
| 5 | 530,774 | 26,539 |
| 6 | 479,056 | 23,953 |
| 7 | 469,959 | 23,498 |
| 8 | 414,387 | 20,720 |
| 9 | 459,485 | 22,975 |
| 10 | 472,606 | 23,631 |
| 11 | 499,459 | 24,973 |
| 12 | 418,996 | 20,950 |
| 13 | 490,064 | 24,504 |
| 14 | 395,560 | 19,778 |
| TOTAL | 6,434,388 | 321,726 |

(Ex. 31: Def's Resp. Pls.' Second Interrogs.)

**Response:** Defendant disputes this statement as inaccurate. The numbers listed in the "Signatures Required 2020" column in the chart above are not consistent with the numbers provided in Defendant's Responses to Plaintiffs' Second Interrogatories (Ex. 31). All numbers (except for District 14) in this column have been increased by one from the original document.

**Reply:** This is a dispute only about rounding.  Under the relevant statute, a political-body candidate for U.S. Representative must submit a petition "signed by a number of voters equal to 5 percent of the total number of registered voters eligible to vote in the last election" for the office. O.C.G.A. § 21-2-170(b).  Here, there is no dispute as to the number of registered voters in each district. But the defendant has chosen to round

32

*down* to the nearest integer, and the plaintiffs have chosen to round *up* to the nearest integer.  So, to use District 1 as an example, five percent of 447,321 equals exactly 22,366.05.  The defendant contends that the number of signatures required under Georgia law is 22,366 (which equals 4.99998882 percent of the agreed-upon number of registered voters), and the plaintiffs contend that the number is 22,367 (which equals 5.00021238 percent of the agreed-upon number of registered voters).  The Court can decide for itself whether a petition signed by 4.99998882 percent of registered voters would satisfy Georgia's "five percent" requirement.

63.    As a result, the Libertarian Party would need to gather at least 321,726 valid signatures in order to run a full slate of candidates for the office of U.S. Representative. (Ex. 31: Def's Resp. Pls.' Second Interrogs.)

**Response:** Defendant disputes this statement as inaccurate. The cited number of valid signatures differs from the numbers provided in Defendant's Responses to Plaintiffs' Second Interrogatories (Ex. 31). The correct number is 321,713.

**Reply:** This dispute is also about rounding.  See the plaintiffs' reply to the defendant's response to the previous fact.

64.    The current annual salary for U.S. Representatives is $174,000. As a result, the qualifying fee for each candidate for U.S. Representative in 2020 is $5,220, and the Libertarian Party would need to pay $73,080 in

qualifying fees in order to run a full slate of candidates for the office of U.S. Representative in 2020. (Ex. 33: Answer ¶ 55.)

**Response:** Defendant admits that the qualifying fee for any candidate for U.S. House of Representatives is $5,220, regardless of party. Defendant disputes this statement to the extent it is not consistent with O.C.G.A. § 21-2-131, which governs qualification fees.

**Reply:** The second sentence of the defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because "to the extent that" does not directly refute the plaintiffs' fact.

## VIII. Other States' Signature Requirements

65. Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. (Ex. 22: Winger decl. ¶¶ 8-9.)

**Response:** Defendant objects to this statement as immaterial and irrelevant. Whether a state election law violates the Constitution is not dependent on how other states choose to run their elections. *Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (explaining that "[a] court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature.").

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

66.    In 2016, Georgia law required more than 259,500 valid signatures for a third party to run a full slate of candidates for U.S. Representative. This number represents more than 6.3 percent of all votes cast in Georgia for president in 2016. (Ex. 33: Answer ¶ 77.)

**Response:** Defendant admits this statement with the qualification that if fourteen candidates were qualifying by petition for U.S. House of Representatives in 2016, those fourteen candidates would have cumulatively required approximately 259,500 signatures.

**Reply:** No reply necessary.

67.    In 2018, Georgia law required more than 272,000 valid signatures for a third party to run a full slate of candidates for U.S. Representative. This number represents more than 6.6 percent of all votes cast in Georgia for president in 2016. (Ex. 22: Winger decl. ¶ 11.)

**Response:** Defendant admits this statement with the qualification that if fourteen candidates were qualifying by petition for U.S. House of

Representatives in 2018, the full slate of candidates would have cumulatively required more than 272,000 signatures.

**Reply:** No reply necessary.

68.   The state that required the next-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative was Illinois, which required approximately 178,400 valid signatures in 2016 and 262,000 valid signatures in 2018. These numbers represent approximately 3.2 percent and 4.7 percent of all votes cast in Illinois for president in 2016, and they would have qualified 18 candidates. (Ex. 22: Winger decl. ¶ 12.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

69.   The state that required the third-highest number of signatures for a third party to run a full slate of candidates for U.S. Representative in 2016 and 2018 was New York, which required approximately 94,500 valid signatures. This number represents approximately 1.2 percent of all votes

cast in New York for president in 2016, and it would have qualified 27 candidates. (Ex. 22: Winger decl. ¶ 13.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

70.    Thirty states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative in 2016. In 2018, that number was 29. (Ex. 22: Winger decl. ¶ 14.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

71.    In some states, moreover, it is possible for third parties to qualify to nominate candidates for U.S. Representative without submitting any signatures. (Ex. 22: Winger decl. ¶ 15.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

## IX.   Other State's Qualifying Fees

72.    Unlike Georgia, most other states do not require third-party candidates for U.S. Representative who qualify for the general-election ballot by petition to pay a qualifying fee at all. Among the states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation. (Ex. 22: Winger decl. ¶¶ 16-17.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature

38

requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

73.    In 2016, the last year for which complete data are available, Georgia law required $5,220 for a single congressional candidate and $73,080 for a third party to run a full slate of candidates for U.S. Representative. (Ex. 33: Answer ¶ 83.)

**Response:** Defendant admits that the filing fee in 2016 was $5,229 for every candidate seeking the office of U.S. House of Representative, regardless of party. Defendant disputes this statement to the extent it is not consistent with O.C.G.A. § 21-2-131, which governs qualification fees.

**Reply:**  The defendant's response contains a typographical error ("5,229" should be "$5,220").

74.    The state that requires the second highest qualifying fees for third- party candidates for U.S. Representative who qualify for the general election ballot by petition is North Carolina, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $22,620 for a third-party to run a full slate of thirteen candidates for U.S. Representative. (Ex. 22: Winger decl. ¶ 19.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

39

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

75.   The state that requires the third highest qualifying fees for third party candidates for U.S. Representative who qualify for the general-election ballot by petition is West Virginia, which has a qualifying fee of $1,740 (one percent of the annual salary of U.S. Representative) for a single candidate and $5,220 for a third-party to run a full slate of three candidates for U.S. Representative. (Ex. 22: Winger decl. ¶ 20.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

**X.     The Impact of Georgia's Ballot-Access Restrictions**

76.     No candidate for U.S. Representative nominated by a political body has ever satisfied the five-percent signature requirement to appear on Georgia's general-election ballot. (Ex. 33: Answer ¶44.)

**Response:** Admitted.

**Reply:** No reply necessary.

77.     No independent candidate for U.S. Representative has satisfied the five-percent signature requirement to appear on Georgia's general-election ballot since 1964, when Milton Lent qualified to be an independent candidate in Georgia's First Congressional District. (Ex. 33: Answer ¶45.)

**Response:** Admitted.

**Reply:** No reply necessary.

78.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general- election ballots, the congressional district in which the candidate qualified did not split any county boundaries. See Act of March 13, 1964, ch. 923, 1964 Ga. Laws 478. (Ex. 27: First Admissions ¶ 10.)

**Response:** Admitted.

**Reply:** No reply necessary.

79.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's

general- election ballots, only 25 percent of Georgia's nonwhite voting-age population was registered to vote. See S. Rep. No. 89-162, at 44 (1965), reprinted in 1965 U.S.C.C.A.N. 2508. (Ex. 27: First Admissions ¶ 11.)

**Response:** Admitted.

**Reply:** No reply necessary.

80.     In 1964, when an independent candidate for U.S. Representative last satisfied the five-percent signature requirement to appear on Georgia's general- election ballots, the overall registration rate was approximately 63 percent of voting-age population, which is below where it is today (approximately 86 percent). See S. Rep. No. 89-162, at 41 (1965), reprinted in 1965 U.S.C.C.A.N. 2508. (Ex. 27: First Admissions ¶ 12.)

**Response:** Admitted

**Reply:** No reply necessary.

81.     Only one independent candidate for U.S. Representative, Billy McKinney, has appeared on Georgia's general-election ballot since 1964. (Ex. 33: Answer ¶47.) However, when McKinney qualified for the ballot in 1982, a federal court in Busbee v. Smith, civ. no. 82-0665 (D.D.C. 1982), had suspended the five- percent signature requirement due to preclearance litigation over the State's redistricting plan that delayed the adoption of new districts following the 1980 Census. McKinney, who was an African-American and Democratic state representative from Atlanta, needed only 4,037

signatures to have his name placed on the general-election ballot alongside the white Democratic incumbent, Wyche Fowler, in Georgia's Fifth Congressional District. (Ex 35: Application for Writ of Mandamus, Dixon v. Poythress, Civ. A. No. C-92177, (Fulton Cnty. Sup. Ct. 1982); Ex. 36: Jerry Schwartz and Ron Taylor, McKinney Petition OK'd for 5th District Election, Atlanta Constitution, Oct 30, 1982, at 1-B.)

**Response:** Admitted.

**Reply:** No reply necessary.

82.     No independent candidate for U.S. Representative has ever satisfied Georgia's ballot-access laws as they exist today, including the signature requirement, the filing deadline, the qualifying fee, and the technical requirements as to the form of the petition. (Ex. 37: Election Results 2000-2018 (excerpts) ("election results").)

**Response:** Defendant objects to paragraph 82 as argumentative. Defendant does not dispute the authenticity of the election results shown in Exhibit 37.

**Reply:** The defendant does not dispute the core fact that no independent candidate for U.S. Representative has ever satisfied the *current* ballot-access requirements. The only two independent candidates for U.S. Representative who have appeared on Georgia's general-election ballot since 1943 did so under different versions of the laws at issue.

## XI.   Signature Requirements Met by Independent and Third-Party Candidates for U.S. Representative in Other States.

83.    In the entire history of the United States, only six independent or third-party candidates for U.S. Representative have ever overcome a signature requirement as high as 10,000 signatures. Only one such candidate has ever overcome a petition requirement higher than 15,000 signatures. (Ex. 22: Winger decl. ¶ 29.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

84.    The first was in Ohio in 1954, when the incumbent in the Ninth Congressional District in Toledo, Frazier Reams, met the requirement of 12,919 signatures. (Ex. 22: Winger decl. ¶ 30.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

85.    The second was in Montana in the regular at-large election in 1994, when Steve Kelly successfully met the requirement of 10,186 signatures. (Ex. 22: Winger decl. ¶ 31.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

86.     The third was in California in 1996, when Steven Wheeler in the Twenty-Second Congressional District met the requirement of 10,191 signatures. (Ex. 22: Winger decl. ¶ 32.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

87.     The fourth was in 1998, when the Reform Party nominee in the Fifth Congressional District in Florida, Jack Gargan, met the requirement of 12,141 signatures. (Ex. 22: Winger decl. ¶ 33.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v.*

46

*Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

88.    The fifth was in 2008, when Cindy Sheehan in California's Eighth Congressional District in San Francisco met the requirement of 10,198 signatures. (Ex. 22: Winger decl. ¶ 34.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

89.    The last instance was in 2010, when the Service Employees International Union drafted independent candidate Wendall Fant and successfully collected the needed 16,292 signatures in the Eighth Congressional District in North Carolina. However, after the petition was checked, Fant declined to run, so the petition success had no observable concrete consequence. (Ex. 22: Winger decl. ¶ 35.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

90.     In four of the six instances when an independent or minor-party candidate for U.S. Representative satisfied a signature requirement as high as 10,000 signatures, the time period to collect the signatures was unlimited. (Ex. 22: Winger decl. ¶ 36.)

**Response:** Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not

always unerring, guide" when assessing the burdens imposed by ballot access requirements).

91.     Illinois has never had a successful petition attempt for U.S. House if the petition requirement was 10,000 or greater and the petition was challenged. (Illinois has a unique system in which all petitions are deemed valid unless they are challenged. Petitions are not checked unless someone files a challenge, even if the petition has only a single signature.) (Ex. 22: Winger decl. ¶ 37.)

**Response**: Defendant objects to this statement as immaterial and irrelevant.

**Reply:** This fact is plainly relevant and material under the *Anderson* test. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements).

## XII.  Past Attempts to Qualify for the General-Election Ballot

92.     Independent and political-body candidates for U.S. Representative have sought unsuccessfully to qualify for the general-election ballot under Georgia's current ballot-access laws. (Ex. 33: Answer ¶ 86.)

**Response:** Admitted.

**Reply:** No reply necessary.

93.    In 2018, plaintiff Martin Cowen made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Thirteenth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. With the help of volunteer circulators, he spent more than 120 hours gathering signatures over 40 days. He timely submitted 620 signatures to the Secretary of State and did not qualify for the ballot. (Ex. 5: Cowen decl. ¶¶ 8-14, 17.)

**Response:** Defendant does not dispute that plaintiff Martin Cowen attempted to qualify for the general-election ballot in 2018 and failed to qualify. Defendant disputes that the collection of only 620 signatures over 180 days is a "genuine effort."

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it fails to cite any evidence that Cowen did not make a genuine effort to qualify for the ballot.  (The defendant could have, for example, had an expert testify as to what constitutes a genuine effort.)

94.    In 2018, plaintiff Aaron Gilmer made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Ninth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. With the help of volunteer and paid circulators, he and his

team spent approximately 150 hours gathering signatures over 60 days. He submitted 308 raw signatures to the Secretary of State and did not qualify for the ballot. (Ex. 8: Ex. 8: Gilmer decl. ¶¶ 10-17.)

**Response:** Defendant does not dispute that plaintiff Aaron Gilmer attempted to qualify for the general-election ballot in 2018 and failed to qualify. Defendant disputes that the collection of only 308 signatures over 180 days is a "genuine effort."

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it fails to cite any evidence that Gilmer did not make a genuine effort to qualify for the ballot. (The defendant could have, for example, had an expert testify as to what constitutes a genuine effort.)

95.    In 2018, Steve "Fred" Abrams made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourteenth Congressional District. In email correspondence with the Secretary of State's office, he declared his intention to run and inquired about the number of signatures required on both the pauper's affidavit and nomination petition. He subsequently set up a campaign website, produced campaign materials, and held events to gather signatures. He did not qualify for the ballot. (Ex. 37 at 6: election results; Ex. 38 at 1-24: candidate materials.)

**Response:** Defendant disputes this statement, which is unsupported by the cited record excerpts. There is no evidence that Abrams attempted to gather signatures and there is no evidence in the record that Abrams actually submitted a petition to the Secretary of State. Defendant also objects to the materials attached as Exhibit 38, which have not been authenticated and contain inadmissible hearsay.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph.  The defendant cites no evidence to refute any of the facts in this paragraph.  In addition, the defendant's objection to the admissibility of the material in Exhibit 38 is ill-founded. Under Rule 56, it is not enough to object simply that evidence offered in support of a motion for summary judgment is inadmissible. (A declaration, for example, is clearly hearsay that would not be admissible at trial.) Rather, "[a] party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*." (emphasis added). Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Civ. P. 56(c)(1)(A) (providing that facts may be supported by, among other things, "documents" and "electronically stored information"). Here, the defendant has made no such objection, nor could there be any serious contention that the fact in this paragraph or the material in Exhibit 38 cannot be presented in admissible form at trial.

96.    In 2018, Jimmy Cooper made a genuine effort to qualify for the general-election ballot as a Green candidate in Georgia's Eighth Congressional District. He submitted a statement of candidacy to the Federal Elections Commission and set up a campaign website. He sought volunteers for his petition drive and gathered 171 signatures in January and February of 2018 before abandoning his effort. He filed as a write-in candidate. (Ex. 6: Esco decl. ¶ 14; Ex. 37 at 8: election results; Ex. 38 at 25-36: candidate materials.)

**Response:** Defendant disputes this statement of fact as unsupported by the record citations. Defendant also objects to this statement of fact as based upon inadmissible hearsay in the Esco Declaration (Ex. 6) and Exhibit 38. See Defendant's Objections to Plaintiffs' Evidence, submitted contemporaneously herewith.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph.  The defendant cites no evidence to refute any of the facts in this paragraph. In addition, paragraph 14 of the Esco declaration is not inadmissible hearsay but is instead based on his personal knowledge as a longtime official with the Green Party whose responsibilities have included ballot access for Green-Party candidates.  (*See* Ex. 6: Esco decl. ¶¶ 2, 5.) The material in Exhibit 38 include an FEC form, which is a public record, and his website (which includes a volunteer sign-up form), which are

offered here for the fact of publication.  The defendant's objection to the material in Exhibit 38 is also ill founded for the reasons discussed above regarding paragraph 95.

97.    In 2016, Hien Dai Nguyen made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He submitted a notice of candidacy and paid the qualifying fee. He had a team of mostly volunteer petition circulators who gathered approximately 25,000 raw signatures in the predominantly minority communities of Dekalb, Gwinnett, and Rockdale counties. But the Secretary of State's office invalidated almost 98 percent of them, and he therefore did not qualify for the ballot. (Ex. 15: Nguyen decl. ¶¶ 6-10.)

**Response:** Defendant objects to the statement that the "Secretary of State's office invalidated almost 98 percent" of the signatures in the petition as based upon inadmissible hearsay. See Defendant's Objections to Plaintiffs' Evidence. Defendant does not dispute the remaining statements in this paragraph.

**Reply:** The defendant (who is the Secretary of State) objects to the statement that the "Secretary of State's office invalidated almost 98 percent" of Mr. Nguyen's signatures on the ground that this statement is inadmissible hearsay.  In his objections to the plaintiffs' evidence, the defendant further explains that this is hearsay only because Nguyen's declaration does not

attach the letter that he received from the Secretary of State invalidating the signatures. For the reasons discussed above with regard to paragraph 95, evidence offered in support of a motion for summary judgment need not be admissible at trial, so the defendant's objection is ill founded. In this instance, moreover, it would not be inadmissible hearsay at trial for Mr. Nguyen to testify about receiving the letter from the Secretary of State or about its contents.

98.    In 2016, Lincoln Nunnally made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He submitted a statement of candidacy to the Federal Elections Commission and set up a campaign website. He reported having at least 50 volunteer petition circulators, and he promoted his signature gathering efforts on social media. He did not submit any signatures and did not qualify for the ballot. (Ex. 37 at 13: election results; Ex. 38 at 37-53: candidate materials.)

**Response:** Defendant disputes this statement, which is unsupported by the record citations. Defendant also objects to the materials in Exhibit 38, which have not been authenticated and contain inadmissible hearsay.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph. The defendant cites no evidence to refute any of the facts in this paragraph. In addition, the defendant's objection to

the material in Exhibit 38 is also ill founded for the reasons discussed above regarding paragraph 95.

99.    In 2016, Leonard Ware made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. He filed a statement of candidacy with the Federal Elections Commission, set up a campaign website and Facebook page, and sought out volunteers to gather signatures. He did not gather enough signatures to qualify for the ballot but did qualify as a write-in candidate. The incumbent in that district ultimately ran unopposed on the general-election ballot. (Ex. 37 at 14: election results; Ex. 38 at 54-88: candidate materials.)

**Response:** Defendant disputes this statement, which is unsupported by the record citations. Defendant also objects to the materials in Exhibit 38, which have not been authenticated and contain inadmissible hearsay.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph. The defendant cites no evidence to refute any of the facts in this paragraph. In addition, the defendant's objection to the material in Exhibit 38 is also ill founded for the reasons discussed above regarding paragraph 95.

100.   In 2012, Cynthia McKinney made a genuine effort to qualify for the general-election ballot as the Green candidate in Georgia's Fourth

Congressional District. She submitted a statement of candidacy form with the Federal Elections Commission declaring her intention to run and then began trying to raise the money necessary to mount a successful petition drive. McKinney found that raising money for a petition drive proved to be difficult and time consuming. In her experience, donors do not like to spend their money on gathering signatures for ballot access when success is far from assured. McKinney soon determined that she would not be able to raise the resources necessary to mount a successful ballot- access campaign and a competitive campaign in the general election once ballot access had been secured, and she therefore withdrew from the race. (Ex. 11: McKinney decl. ¶¶ 7-13.)

**Response:** Defendant disputes this statement and objects to the admissibility of the McKinney Declaration. See Defendant's Objections to Plaintiffs' Evidence. By her own admission, McKinney never attempted a signature gathering campaign, and her testimony is neither competent nor based upon personal knowledge. The cited testimony is also based upon inadmissible hearsay.

**Reply:** The defendant's objections are unfounded. Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

101. In 2010, Jeff Anderson made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Eleventh

57

Congressional District. He had a team of approximately 24 volunteer petition circulators who spent hundreds, if not thousands of hours on the effort and gathered somewhere between 11,000 and 12,000 signatures. Because that number was far short of what he needed, he did not file the signatures with the Secretary of State. The incumbent in his district ultimately ran unopposed in the 2010 general election. (Ex. 1: Anderson decl. ¶¶ 5-9, 11.)

**Response:** Defendant does not dispute that Jeff Anderson attempted to qualify for the general-election ballot in 2010 and failed to qualify. However, Defendant disputes and objects to Anderson's testimony that volunteers spent "hundreds if not thousands of hours" gathering signatures. This testimony is speculative and not based upon the witness's personal knowledge. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

102.   In 2010, Eugene Moon made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Ninth Congressional District. He had a team of volunteers in each of the counties covered by his district. His teams gathered approximately 13,000 raw signatures, but he did not turn them in because he knew that he would not qualify for the ballot. The Republican nominee ultimately ran unopposed on the ballot in the 2010 general election. (Ex. 14: Moon decl. ¶¶ 4-8.)

58

**Response:** Defendant does not dispute that Eugene Moon attempted to qualify for the general-election ballot in 2010 and failed to qualify.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

103.   In 2010, Victor Armendariz made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. He used volunteers to gather signatures door to door. Although his team gathered quite a few signatures, he quickly realized that he would not be able to gather enough, and he decided to run instead for the Republican nomination. (Ex. 2: Armendariz decl. ¶¶ 4-8; Ex. 29: Second Admissions ¶ 29.)

**Response:** Defendant disputes this statement and objects to the Armendariz Declaration because it consists entirely of conclusory statements and inadmissible opinion testimony. See Defendant's Objections to Plaintiffs' Evidence. The allegation that Armendariz made a "genuine effort" is not supported by the record evidence. By his own admission, Armendariz stopped gathering signatures shortly after beginning his signature gathering campaign. Subject to these objections, Defendant does not dispute that Armendariz ran as a Republican candidate in 2010.

**Reply:** The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence. Armendariz's declaration supports the facts in this paragraph.

104.   In 2008, Faye Coffield made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. She assembled a team of volunteers and spent hundreds of hours trying to gather signatures over approximately two months. She gathered approximately 2,000 raw signatures—well short of the approximately 15,000 she needed—and therefore did not qualify for the ballot. The incumbent in her district ultimately ran unopposed in the 2008 general election. (Ex. 4: Coffield decl. ¶¶ 3- 10.)

**Response:** Defendant does not dispute that Faye Coffield attempted to qualify for the general-election ballot in 2008 and failed to qualify.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

105.   In 2008, James P. Mason made a genuine effort to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. He filed a statement of candidacy with the Federal Elections Commission, informed the Secretary of State's office of his intention to run, set up a campaign website, and kicked off "PROJECT: PETITION"

60

with a two-day tour of the district. He did not qualify for the ballot. (Ex. 37 at

33: election results; Ex. 38 at 89-95: candidate materials.)

**Response:** Defendant disputes this statement, which is unsupported

by the record citations. Defendant furthermore objects to the materials in

Exhibit 38, which have not been authenticated and contain inadmissible

hearsay.

**Reply:** The cited evidence supports the facts in this paragraph.  The

authenticity of the materials in Exhibit 38 can be easily established at trial.

Any hearsay in exhibit 38 can be presented in admissible form at trial by

subpoenaing the witness to appear in person.

106.   In 2006, Jay Fisher made a genuine effort to qualify for the

general- election ballot as the Libertarian candidate in Georgia's Sixth

Congressional District. He announced his candidacy in the media and in

correspondence with the Secretary of State's office. He ran on a platform of

opposition to the Iraq War and to the Patriot Act, both of which were

supported by the then-incumbent Republican representative, Dr. Tom Price.

He assembled a team of approximately five volunteers and went door to door.

After a while, he realized that he would not be able to qualify for the ballot

with volunteer petitions, and the option of using paid petitioners was too

expensive. He therefore abandoned his effort to qualify for the ballot and did

not submit any signatures. (Ex. 7: Fisher decl. ¶¶ 4-10; Ex. 33: Answer ¶93.)

**Response:** Defendant does not dispute that Jay Fisher announced his candidacy as a Libertarian candidate in the 2006 election and attempted but failed to qualify for the general-election ballot.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

107. In 2004, Philip Bradley made a genuine effort to qualify for the general-election ballot as the Libertarian candidate in Georgia's Thirteenth Congressional District. He announced intention to run correspondence with the Secretary of State's office, and it was reported in the media that he had gathered 500 signatures as of March of that year. He did not qualify for the ballot. The Democratic nominee ultimately ran unopposed on the general-election ballot. (Ex. 33: Answer ¶ 103; Ex. 37 at 40: election results; Ex. 38 at 96-99: candidate materials.)

**Response:** Defendant disputes this statement, which is unsupported by the record citations. Defendant furthermore objects to the materials in Exhibit 38, which have not been authenticated and contain inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The authenticity of the materials in Exhibit 38 can be easily established at trial.

Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

108.  In 2002, the Libertarian Party made a genuine effort to qualify three candidates for U.S. Representative: Wayne Parker in Georgia's Eleventh Congressional District, Carol Ann Rand in Georgia's Sixth Congressional District, and Chad Elwartowski in Georgia's Ninth Congressional District. Because the 2002 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement by about half. The party raised approximately $40,000 for the effort and used 35 professional, paid petition circulators. The party ultimately decided to focus on Parker's campaign, and Parker submitted more than 20,000 raw signatures. But the Secretary of State's office rejected more than half of them, leaving Parker about 1,100 valid signatures shy of the court-adjusted requirement. (Ex. 16: Parker decl. ¶¶ 5-15; Ex. 33: Answer ¶ 111.)

**Response:** Defendant disputes this statement, which is unsupported by the record citations. This statement relies on the Parker Declaration, which provides no foundation for the basis of Parker's knowledge of the campaigns of other candidates or the Libertarian Party's campaign strategies in 2002. Defendant also objects to the Parker Declaration as including

conclusory statements, testimony beyond Parker's personal knowledge, and inadmissible hearsay. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The cited evidence supports the facts in this paragraph. The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

109.  In 2002, Joyce Griggs made a genuine effort to qualify for the general-election ballot as the Green candidate in Georgia's First Congressional District. With approximately eight volunteers, Griggs gathered approximately 400 signatures over a period of six to eight weeks. (Ex. 6: Esco decl. ¶ 12.)

**Response:** Defendant disputes this statement of fact as unsupported by the record citations. Defendant also objects to this statement of fact as based upon inadmissible hearsay in the Esco Declaration (Ex. 6). See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The cited evidence supports the facts in this paragraph. The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

110.  In 2002, Al Herman made a genuine effort to qualify for the general- election ballot as the Green candidate in Georgia's Seventh Congressional District. With approximately ten volunteers, Herman collected more than 2,000 signatures over a five-month period. (Ex. 6: Esco decl. ¶ 13.)

**Response:** Defendant disputes this statement of fact as unsupported by the record citations. Defendant also objects to this statement of fact as based upon inadmissible hearsay in the Esco Declaration (Ex. 6). See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The cited evidence supports the facts in this paragraph. The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

111.  In 1982, Maceo Dixon made a genuine effort to qualify for the general-election ballot as the Socialist Workers Party's candidate in Georgia's Fifth Congressional District. Because the 1982 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement to approximately 4,037. Dixon submitted 7,821 raw signatures, but the Secretary of State's Office rejected more than 3,000 of them. As a result, Dixon did not qualify for the general-election ballot. (Ex 35: Application for Writ of Mandamus, Dixon v. Poythress, Civ. A. No. C-92177, (Fulton Cnty. Sup. Ct. 1982; Ex. 36: Jerry Schwartz and Ron Taylor, McKinney Petition OK'd for 5th District Election, Atlanta Constitution, Oct 30, 1982, at 1-B; Ex. 39: Sara Jean Johnston, Atlanta Socialist Worker Fights for Ballot Status, The Militant, Nov. 26, 1982, at 4.)

**Response:** Defendant admits only that Dixon did not qualify for the general election ballot, that Dixon submitted about 7,281 signatures to the

Secretary of State, that over 3,000 signatures were rejected, and that the signature requirement was reduced in 1982.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

112.  John Monds, who has run three times as a Libertarian candidate for statewide office in Georgia and has cumulatively received millions of votes, would have run for U.S. Representative but was deterred from doing so by the ballot- access restrictions. (Ex. 13: Monds decl. ¶ 9-10.)

**Response:** Defendant admits only that John Monds has run for statewide office three times and that he cumulatively received millions of votes. Defendant objects to the Monds Declaration as irrelevant and not based upon the witness's personal knowledge. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.  The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

113.  In 2018, Luanne Taylor wanted to qualify for the general-election ballot as an independent candidate for U.S. Representative in Georgia's Sixth Congressional District. She called the Secretary of State's office to inquire about the number of signatures required on her nomination petition. When the Secretary of State's office responded by email that she would need 20,918 valid signatures, she was shocked at how high the number was. She was immediately deterred from running for Congress and decided instead to try to run for state representative. (Ex. 19: Taylor decl. ¶¶ 2-4.)

**Response:** Defendant admits that Luanne Taylor contacted the Secretary of State's office, and the Secretary of State responded with the number of valid signatures she would be required to submit. Defendant objects to the Taylor Declaration because the witness is lacks personal knowledge and is not competent to testify regarding the subject matter. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

114.  In 2016, David Moreland inquired to the Secretary of State's office about qualifying for the general-election ballot as an independent candidate in Georgia's First Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Moreland did not qualify for

the ballot. The incumbent in that district ultimately ran unopposed on the ballot in the 2016 general election. (Ex. 29: Second Admissions ¶ 30; Ex. 37 at 12: election results; Ex. 38 at 100-101: candidate materials.)

**Response:** Defendant objects to this statement of fact as not relevant. The mere fact that Moreland received information from the Secretary of State about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant also objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial. Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

115. In 2016, Raymond Beckwith declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's First Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Beckwith did not qualify for the ballot. The

68

incumbent in that district ultimately ran unopposed on the ballot in the 2016 general election. (Ex. 29: Second Admissions ¶ 31; Ex. 37 at 12: election results; Ex. 38 at 102-103: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Raymond Beckwith received a letter from the Secretary of State's office containing information about qualifying for the general election ballot. See Ex. 38 at 102-103. There is no evidence that Beckwith "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

116.  In 2010, Charles Perry declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Thirteenth Congressional District. The Secretary of State's office then informed him of the filing fee, signature requirement and other legal requirements for qualifying for the ballot. Perry did not qualify for the ballot. (Ex. 29: Second Admissions ¶ 28; Ex. 37 at 29: election results; Ex. 38 at 104-105: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Charles Perry merely wrote a letter to the Secretary of State's office requesting information about qualifying for the general election ballot. See Ex. 38 at 104-105. There is no evidence that Perry "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the

70

plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

117.  In 2008, Timothy J. Payne declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fifth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Payne did not qualify for the ballot. (Ex. 29: Second Admissions ¶ 26; Ex. 37 at 32: election results; Ex. 38 at 106-107: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Timothy J. Payne merely wrote a letter to the Secretary of State's office requesting information about qualifying for the general election ballot. See Ex. 38 at 106-107. There is no evidence that Payne "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

118.  In 2006, Loren Collins declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Collins did not qualify for the ballot. (Ex. 33: Answer ¶ 92; Ex. 37 at 37: election results; Ex. 38 at 108: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Loren Collins received a letter from the Secretary of State's office containing information about qualifying for the general election ballot. See Ex. 38 at 108. There is no evidence that Collins "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general

election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

119.  In 2006, Chip Shirley declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Shirley did not qualify for the ballot. (Ex. 33: Answer ¶ 94; Ex. 37 at 38: election results; Ex. 38 at 109-110: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Chip Shirley received a letter from the Secretary of State's office containing information about qualifying for the general election ballot. See Ex. 38 at 109-110. There is no evidence

that Shirley "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

120.  In 2006, Richard Clarke declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Twelfth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Clarke did not qualify for the ballot. (Ex. 33: Answer ¶ 95; Ex. 37 at 38: election results; Ex. 38 at 111-112: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Richard Clarke requested and received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 111-12. There is no evidence that Clarke "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

121.   In 2005, the Veterans Party of America declared its intention to qualify a candidate as a political-body candidate in Georgia's Second Congressional District. The Secretary of State's office then informed the

party of the signature requirement and other legal requirements for qualifying for the ballot. The party did not qualify a candidate for the ballot. (Ex. 33: Answer ¶ 91; Ex. 37 at 37: election results; Ex. 38 at 113-115: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that a representative of the Veterans Party of America contacted the Secretary of State's office requesting information about qualifying a candidate for the general election ballot and received information in response. See Ex. 38 at 113-15. There is no evidence of a "declaration" of intent to qualify a candidate. Defendant also objects to this statement of fact as not relevant; the fact that a party inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can

76

be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

122.  In 2004, the Veterans Party of America declared its intention to qualify a candidate a political-body candidate in Georgia's Second Congressional District. The Secretary of State's office then informed the party of the signature requirements and other legal requirements for qualifying for the ballot. The party did not qualify a candidate for the ballot. (Ex. 33: Answer ¶ 96; Ex. 37 at 39: election results; Ex. 38 at 116-117: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that a representative of the Veterans Party of America contacted the Secretary of State's office requesting information about qualifying a candidate for the general election ballot and received information in response. See Ex. 38 at 116-17. There is no evidence of a "declaration" of intent to qualify a candidate. Defendant also objects to this statement of fact as not relevant; the fact that a party inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that

the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial. Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

123. In 2004, Steven Muhammad declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Fifth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Muhammad did not qualify for the ballot. The incumbent in that district ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶ 97; Ex. 37 at 40: election results; Ex. 38 at 118: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Steven Muhammad received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 118. There is no evidence that Muhammad "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general

election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

124.  In 2004, Andy Altizer declared his intention to qualify for the general- election ballot as an independent candidate in Georgia's Sixth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Altizer did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶ 98; Ex. 37 at 40: election results; Ex. 38 at 119-120: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Andy Altizer requested and

received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 119-20. There is no evidence that Altizer "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

125.  In 2004, Chris Borcik declared his intention to qualify for the general- election ballot as an independent candidate in Georgia's Eighth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the

ballot. Borcik did not qualify for the ballot. (Ex. 33: Answer ¶ 99; Ex. 37 at

40: election results; Ex. 38 at 121: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported

by the record citations. The record shows that Chris Borcik received

information from the Secretary of State's office regarding qualifying for the

general election ballot. See Ex. 38 at 121. There is no evidence that Borcik

"declared his intention to qualify for the general election ballot." Defendant

also objects to this statement of fact as not relevant; the fact that a person

inquired about the requirements for qualifying for the general election is not

probative of the issues in this case. Defendant further objects to the materials

attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The

facts in this paragraph are relevant because they support an inference that

the witness was deterred from running by the signature requirement. *Cf.*

*Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the

plaintiff had not allege how many candidates had tried to meet Georgia's

signature requirement). The authenticity of the materials in Exhibit 38 can

be easily established at trial.  Any hearsay in exhibit 38 can be presented in

admissible form at trial by subpoenaing the witness to appear in person.

126.  In 2004, Malcolm Rogers declared his intention to qualify for the

general-election ballot as an independent candidate in Georgia's Thirteenth

Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Rogers did not qualify for the ballot. The Democratic nominee in that district ultimately ran unopposed on the ballot in the 2004 general election. (Ex. 33: Answer ¶ 102; Ex. 37 at 40: election results; Ex. 38 at 122-123: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Malcolm received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 122-23. There is no evidence that Malcolm "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can

be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

127. In 2002, Ryan Anthony Cancio declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Sixth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Cancio did not qualify for the ballot. (Ex. 33: Answer ¶ 105; Ex. 37 at 43: election results; Ex. 38 at 124-126: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Ryan Anthony Cancio received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 124-26. There is no evidence that Cancio "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the

plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

128.  In 2002, Daniel Kozarich declared his intention to qualify for the general-election ballot as an independent candidate in Georgia's Tenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Kozarich did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2002 general election. (Ex. 33: Answer ¶ 109; Ex. 37 at 44: election results; Ex. 38 at 127-129: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Daniel Kozarich received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 127-29. There is no evidence that Kozarich "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects

84

to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial. Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

129. In 2002, Brian Brown declared his intention to qualify for the general- election ballot as an independent candidate in Georgia's Tenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Brown did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2002 general election. (Ex. 33: Answer ¶ 110; Ex. 37 at 44: election results; Ex. 38 at 130: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Brian Brown received information from the Secretary of State's office regarding qualifying for the

general election ballot. See Ex. 38 at 130. There is no evidence that Brown "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

130.  In 2002, Ron Smith declared his intention to qualify for the general- election ballot as an independent candidate in Georgia's Thirteenth Congressional District. The Secretary of State's office then informed him of the signature requirement and other legal requirements for qualifying for the ballot. Smith did not qualify for the ballot. (Ex. 33: Answer ¶ 111; Ex. 37 at 44: election results; Ex. 38 at 131-134: candidate materials.)

**Response:** Defendant disputes this statement, which is not supported by the record citations. The record shows that Ron Smith received information from the Secretary of State's office regarding qualifying for the general election ballot. See Ex. 38 at 124-26. There is no evidence that Smith "declared his intention to qualify for the general election ballot." Defendant also objects to this statement of fact as not relevant; the fact that a person inquired about the requirements for qualifying for the general election is not probative of the issues in this case. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

131.  In 2000, Gail Debra Allen-Cartwright declared her intention to qualify for the general-election ballot as an independent candidate in Georgia's Eleventh Congressional District. She filed a statement of candidacy with the federal elections commission. She also filed a notice of candidacy

with the Secretary of State's office and paid the filing fee. Allen-Cartwright did not qualify for the ballot. The Republican nominee in that district ultimately ran unopposed on the ballot in the 2000 general election. (Ex. 29: Second Admissions ¶ 35; Ex. 37 at 46: election results; Ex. 38 at 135-139: candidate materials.)

**Response:** Defendant does not dispute that Gail Allen-Cartwright filed a notice of candidacy and paid the filing fee. However, Defendant objects to this statement of fact as not relevant; the fact that a person paid a filing fee but did not appear on the ballot is not probative of the issues in this case. There are no additional facts regarding Allen-Cartwright's efforts to qualify. Defendant further objects to the materials attached as Exhibit 38 as unauthenticated and inadmissible hearsay.

**Reply:** The cited evidence supports the facts in this paragraph. The facts in this paragraph are relevant because they support an inference that the witness was deterred from running by the signature requirement. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement). The authenticity of the materials in Exhibit 38 can be easily established at trial.  Any hearsay in exhibit 38 can be presented in admissible form at trial by subpoenaing the witness to appear in person.

## XIII. The Petition-Checking Process

132. Under Georgia law, it is the duty of the Secretary of State to check the validity of signatures on nomination petitions submitted by candidates for President, U.S. Senator, U.S. Representative, and all state offices. O.C.G.A. §§ 21- 2-132(d), -171(a). (Ex. 33: Answer ¶ 56.)

**Response:** Admitted.

**Reply:** No reply necessary.

133.   A signature on a nomination petition is valid and must be counted if it matches the signature on file of a duly qualified and registered voter who is eligible to vote for the office to be filled. (Ex. 33: Answer ¶ 57.)

**Response:** Admitted.

**Reply:** No reply necessary.

134.   Georgia law does not prescribe any particular method for checking signatures, but the Georgia Supreme Court has indicated that Secretary of State must choose a method which "can reasonably be expected to operate in a thorough and professional way so as to produce accurate results." Anderson v. Poythress, 246 Ga. 435, 271 S.E.2d 834 (1980). (Ex. 33: Answer ¶ 58.)

**Response:** Admitted.

**Reply:** No reply necessary.

135.   The current petition-checking process is as follows. When a candidate submits a nomination petition, the Secretary sends a duplicate of the petition to county election officials along with a one-page letter asking them to use certain codes on the petition when verifying signatures to indicate why a particular signature was deemed invalid. (Ex. 33: Answer ¶ 60.) The counties send back their results. And, if there is more than one county involved, the Secretary of State's office then adds up the total number of signatures validated by the counties and makes a determination as to whether or not the petition contains a sufficient number of valid signatures for the candidate to qualify for the ballot. (Ex. 23: Harvey dep. 32:11-33:16, 38:4-39:2; Ex. 40: petition-verification instruction letters.)

**Response:** Admitted.

**Reply:** No reply necessary.

136.   The Secretary of State's office provides no instructions other than the one-page letter when transmitting petitions to county election officials, and it provides no guidance on what constitutes a valid signature unless county election officials affirmatively ask for specific guidance. (Ex. 23: Harvey dep. 36:4-19, 47:12-49:1.)

**Response:** Defendant disputes this statement because it misstates the cited testimony of Chris Harvey. Mr. Harvey testified that the Secretary of State's office provides training to county election workers on signature

verification, and that the requirements for signature verification are set out in O.C.G.A. § 21-2-170 and § 21-2-171. *See* Harvey dep. 36:4-19; 47:17-25; 52:2-9.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the page cited by the defendant create a genuine issue of material fact.

137.   The Secretary of State's office does nothing to ensure that county election officials follow the instructions set out in the one-page letter that accompanies each petition. (Ex. 23: Harvey dep. 45:21-46:2). The Secretary of State's office conducts no audit of the verifications returned from the counties to determine whether the county election officials have complied with the instructions. (Ex. 23: Harvey dep. 46:3-8, 70:5-71:3.) There are no possible repercussions from the Secretary of State's office for a county election official who fails to follow the Secretary's instructions, and county election officials are not required to attest to the results. (Ex. 23: Harvey dep. 46:9-47:11.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations. Defendant admits that county election officials and offices determine the process by which the Secretary of State's guidance is implemented.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

138.  The Secretary of State's office takes no action, audit, or review even when it is apparent on the face of a petition returned by county election officials that they did not comply with the Secretary's one-page instruction letter. (Ex. 23: Harvey dep. 91:13-92:9.) The office could conduct an audit or review if it wished to do so; it has the necessary tools (access to the petitions and the state's voter- registration database). (Ex. 23: Harvey dep. 84:20-23, 86:24-87:3.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

139.  The Secretary of State's office does nothing to ensure that the workers who verify petitions in the county election offices have undertaken any form of training. (Ex. 23: Harvey dep. 52:11-16.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

140.  The Secretary of State's office provides no training on handwriting analysis even though it admits that a voter's signature can change over time and based on the conditions under which the voter signs. (Ex. 23: Harvey dep. 60:22- 61:9.) And the office conducts no review of a county's determination that a signature does not match. (Ex. 23: Harvey dep. 61:22-25.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

141. In fact, the Secretary of State's office keeps no records as to the basis on which counties have rejected signatures. (Ex. 23: Harvey dep. 62:1-10.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

142.  The Secretary of State's signature validation process results in valid signatures being improperly rejected. (Ex. 23: Harvey dep. 113:20-25, 118:22- 119:4, 140:24-141:1, 158:5-11.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

143.  In addition, unlike most other states, Georgia does not grant petition-circulators access to the records they need in order to check their petitions before they turn them in. Most states provide public-access terminals that allow petition- circulators to see if they can find a person who signed their petition and to check whether the signature matches. Georgia does not offer this kind of access. It offers only one public access terminal with limited data and search capabilities. There are no instructions for the public on how to use the software, and it does not give access to a voter's signature. (Ex. 10: Lee decl. ¶ 9.)

**Response:** Defendant objects to a comparison with other states' requirements as irrelevant and not material. Defendant further objects to the admissibility of the Lee Declaration because it contains improper opinion testimony from a lay witness who has not been designated as an expert.

**Reply:** Nothing in paragraph 9 of Mr. Lee's declaration is an opinion. And a comparison to other states is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

144. The Secretary's signature-verification process leads to signature-validation rates that are well below industry norms and those of other states. (Ex. 10: Lee decl. ¶ 11.) A validation rate of 65 to 75 percent is the standard for candidacy petitions. (Ex. 10: Lee decl. ¶ 12.)

**Response:** Defendant objects to a comparison with other states without specification of those states' requirements as irrelevant and not material. Defendant further objects to the admissibility of the Lee Declaration because it contains improper opinion testimony from a lay witness who has not been designated as an expert.

**Reply:** Most of the testimony in paragraphs 11 and 12 of Mr. Lee's declaration is not an opinion. To the extent that those paragraphs do contain

opinion testimony, that testimony is based on his personal experience and is not "of the type traditionally considered within the purview of Rule 702." Fed. R. Evid. 701 (advisory committee notes). And a comparison to other states is plainly relevant and material under the *Anderson* test. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement was higher than "most other states"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

145.  In 2016, for example, Rocky De La Fuente submitted approximately 15,000 signatures on a nomination petition in an attempt to qualify for the general- election ballot as an independent candidate for President. He used professional, experienced petition circulators to gather his signatures. (Ex. 10: Lee decl. ¶¶ 5- 17.) The Secretary verified only 2,964 signatures—a validation rate of approximately 20 percent. (Ex. 33: Answer ¶ 68.)

**Response:** Defendant objects to the admissibility of the Lee Declaration because it is improper opinion testimony from a lay witness who has not been designated by Plaintiffs as an expert. Subject to this objection, Defendant admits that De La Fuente submitted 15,000 signatures; that the Secretary of State verified 2,964 of those signatures; and that De La Fuente employed at least one paid professional petition circulator.

**Reply:** Most of the testimony in paragraphs 5 through 17 of Mr. Lee's declaration is not an opinion. To the extent that those paragraphs do contain opinion testimony, that testimony is based on his personal experience and is not "of the type traditionally considered within the purview of Rule 702." Fed. R. Evid. 701 (advisory committee notes).

146. De La Fuente's petition contains numerous signatures that were improperly rejected. (Ex. 23: Harvey dep. 110:19-158:11; Ex. 41: De La Fuente petition sheets and ENET printouts.) After reviewing only a small number of signatures from De La Fuente's petition that were rejected by county election officials, the Secretary of State's office admitted that there were "more than a handful of errors from Cobb, Dekalb, Fulton, and Clayton counties." (Ex. 23: Harvey dep. 158:5-11.)

**Response:** Defendant admits that some signatures from De La Fuente's petition were improperly rejected.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

147. Since 2014, the Secretary of State's office has validated only one petition for an independent or political-body candidate for U.S. Representative. In 2016, Hien Dai Nguyen submitted a nomination petition containing approximately 25,000 raw signatures. (Ex. 15: Nguyen decl. ¶ 8.)

Election officials in Dekalb, Gwinnett, Newton and Rockdale counties validated only 556 of them—a validation rate of approximately two percent. (Ex. 23: Harvey dep. 100:6-18.)

**Response:** Defendant objects to the first sentence of this paragraph as lacking any citation to the record. Defendant admits that Nguyen submitted a nomination petition and that approximately 2% of those signatures were validated. *See* Harvey dep. 100:6-18.

**Reply:** The first sentence of this paragraph is fully supported by exhibit 6 to the Harvey deposition (ECF 72-8), which is a spreadsheet created by the Secretary of State's office showing that he has validated only one petition for an independent or political-body candidate for U.S. Representative since 2014. But it is also supported by the cited page of the Harvey deposition which is discussing exhibit 6.

148.  The Secretary of State's office has validated only one other nomination petition for an independent or political-body candidate for U.S. Representative since 2000. In 2002, Wayne Parker submitted almost 20,000 raw signatures, and the Secretary of State's office validated only 8,346 of them—a validation rate of approximately 40 percent. (Ex. 10: Lee decl. ¶ 20; Ex. 16: Parker decl. ¶¶ 13-14.)

**Response:** Defendant objects to the first sentence of this paragraph as lacking any citation to the record. Defendant admits that Parker submitted a

nomination petition and that approximately 40% of those signatures were validated.

**Reply:** The first sentence of this paragraph is supported by the defendant's responses to the plaintiffs' interrogatories. (Ex. 30 at 10-13: Def's Resp. Pls.' First Interrogs.)

149.  Because of the Secretary's error-prone signature-verification process, independent and political-body candidates for U.S. Representative must gather signatures far in excess of the number of valid signatures required to obtain ballot access under Georgia law. (Ex. 1: Anderson decl. ¶ 6; Ex. 2: Armendariz decl. ¶ 8; Ex. 6: Esco decl. ¶ 7; Ex. 7: Fisher decl. ¶ 7; Ex. 10: Lee decl. ¶ 21.) For one candidate for U.S. Representative, that might mean somewhere between 40,000 and 75,000 signatures. For a full slate of 14 candidates for U.S. Representative, that might be somewhere between 600,000 and 1,000,000 signatures. (Ex. 10: Lee decl. ¶21.)

**Response:** Defendant objects to this statement as argumentative and disputes the statement as not supported by the record citations. None of the cited testimony provides evidence that the Secretary of State's verification process is "error-prone." Defendant also objects to the testimony in the cited declarations as mere conclusory allegations not supported by specific facts. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.  The error-prone nature of the Secretary's process is supported by paragraphs 135 through 148.

## XIV.  The Difficulty and Pace of Petitioning

150.   Gathering signatures is difficult, labor-intensive work. (Ex. 5: Cowen decl. ¶ 12; Ex. 7: Fisher decl. ¶ 8; Ex. 20: Webb decl. ¶ 7.)

**Response:** Defendant objects to this statement as a conclusory allegation not supported by specific facts. Subject to this objection, Defendant does not dispute that gathering voter signatures is difficult.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

151.   Don Webb, an experienced paid petition circulator, is only able to gather 30 to 40 raw signatures in an eight- or nine-hour day on a Saturday. He is able to collect 15 to 25 raw signatures on other days. That averages out to less than five signatures per hour over the course of a week. (Ex. 20: Webb decl. ¶ 7.)

**Response:** Defendant does not dispute Webb's testimony regarding the specifics of his personal experience but does not concede that his limited experience is generally applicable.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

152.   Even if he spent eight hours per day, seven days per week, going door to door over the course of the 180-day petitioning window (a total of 1,440 hours), he would be able to gather fewer than 4,800 raw signatures, which is well short of the number required for a single political-body candidate for U.S. Representative. (Ex. 20: Webb decl. ¶ 11.)

**Response:** Defendant objects to this statement as a conclusory allegation not supported by specific facts.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

153.   It is hard to convince people to volunteer to gather signatures for ballot access. (Ex. 12: Metz decl. ¶ 12; Ex. 20: Webb decl. ¶ 10.)

**Response:** Defendant objects to this statement as a conclusory allegation not supported by specific facts. Defendant further objects to the cited testimony in the Metz and Webb declarations as based upon inadmissible hearsay. See Defendant's Objections to Plaintiffs' Evidence.

**Reply:** The cited evidence supports the fact in this paragraph. The defendant's objections are unfounded. Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

154. Volunteer signature-gatherers tend to be slower and less effective than paid signature-gatherers, and they are rarely willing or able to work for more than a few hours at a time. (Ex. 6: Esco decl. ¶ 9; Ex. 20: Webb decl. ¶ 9.)

**Response:** Defendant objects to this statement as a conclusory allegation not supported by specific facts.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

155. Luanne Taylor, who attempted to qualify for the ballot as an independent candidate in 2018, was only able to gather about one signature per hour. (Ex. 19: Taylor decl. ¶ 9.)

**Response:** Admitted.

**Reply:** No reply necessary.

156. Aaron Gilmer, who attempted to qualify for the ballot as a Libertarian candidate for U.S. Representative in 2018, was only able to gather about two signatures per hour using a mixture of professional and volunteer circulators. (Ex. 8: Gilmer decl. ¶¶16-17.)

**Response:** Admitted.

**Reply:** No reply necessary.

157.   Martin Cowen, who attempted to qualify for the ballot as a Libertarian candidate for U.S. Representative in 2018, was able to gather less than three signatures per hour circulating his own petition. (Ex. 5: Cowen decl. ¶¶ 10, 14.)

**Response:** Defendant objects to this statement of fact as not supported by the cited testimony in the Cowen Declaration.

**Reply:** The Court can decide for itself whether the cited pages support the facts alleged in this paragraph and whether the defendant has stated a valid objection.

## XV.   The Cost of Petitioning in Georgia

158.   As a practical matter, it would be impossible for the Libertarian Party to qualify a full slate of candidates for the office of U.S. Representative in 2020 without making extensive use of paid, professional petition circulators. (Ex. 1: Anderson decl. ¶ 4; Ex. 6: Esco decl. ¶ 10; Ex. 7: Fisher decl. ¶ 11; Ex. 10: Lee decl. ¶ 22; Ex. 13: Monds decl. ¶ 8; Ex. 20: Webb decl. ¶ 12.)

**Response:** Defendant objects to this statement as a conclusory allegation not supported by admissible evidence. Defendant objects to the testimony in the cited declarations as inadmissible opinion testimony from

lay witnesses not designated as experts. Furthermore, this statement is inconsistent with the testimony of the 30(b)(6) representative of the Libertarian Party, who testified that the party prefers to use volunteer circulators, rather than professional, because they collect signatures with a higher validity rate. See Wilson Dep. at 59:24 to 61:10.

**Reply:** The defendant's objections are unfounded. Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence. The facts in this paragraph are not inconsistent with the deposition cited by the defendant.

159.   Professional petition circulators typically charge $2-$5 per signature collected, plus expenses for travel, lodging and incidentals. (Ex. 10: Lee decl. ¶ 23.)

**Response:** Defendant objects to this statement of fact as not supported by admissible evidence and based upon inadmissible hearsay and improper opinion testimony from a lay witness.

**Reply:** Nothing in paragraph 23 of Mr. Lee's declaration is an opinion. It is fact testimony based on Mr. Lee's personal knowledge.

160.   In order to be assured of gathering a sufficient number of valid signatures to qualify a full slate of candidates for the office of U.S. Representative, the Libertarian Party would need to gather somewhere between 600,000 and $1,000,000 signatures. (Ex. 10: Lee decl. ¶ 21.)

**Response:** Defendant objects to this statement of fact as not supported by admissible evidence and based upon inadmissible hearsay and improper opinion testimony from a lay witness.

**Reply:** Paragraph 21 of Mr. Lee's declaration is his opinion as a lay witness based on his personal knowledge and experience with petition drives in Georgia.

161.   The cost of gathering the signatures necessary to qualify a full slate of candidates for the office of U.S. Representative would likely exceed $1,000,000 and could exceed $2,500,000. (Ex. 1: Anderson decl. ¶ 7; Ex. 10: Lee decl. ¶ 24; Ex. 16: Parker decl. ¶ 17; Ex. 20: Webb decl. ¶ 12; Ex. 21: Wilson decl. ¶¶ 6-8.)

**Response:** Defendant objects to this statement of fact as not supported by admissible evidence and based upon inadmissible hearsay and improper opinion testimony from a lay witness.

**Reply:** This paragraph is supported by fact and opinion testimony of numerous lay witness based on their personal experience with petitioning in Georgia.

## XVI.  The Impact of Federal Campaign-Finance Law

162.   Federal campaign-finance laws set certain limits on campaign contributions to candidates for federal offices, including political-body candidates for U.S. Representative. Federal Elections Campaign Act of 1971,

Pub L. 92-225, 86 Stat. 3, 52 U.S.C. § 30101 et seq. (Ex. 29: Second

Admissions ¶ 36.)

**Response:** Defendant objects to this statement as irrelevant and not

material. Federal campaign finance laws are not at issue in this action.

Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and

material here because they make Georgia's signature requirement harder to

meet for all candidates who are not self-funded and because they limit the

party's ability to secure ballot access for its candidates.

163.   Under these laws, the maximum amount that a state or national

party may contribute to one candidate for U.S. Representative is $5,000 per

election. 52 U.S.C. § 30116(a)(2)(A); 11 C.F.R. § 110.2(b)(1). See

https://www.fec.gov/help-candidates-and-committees/candidate-

takingreceipts/contribution-limits/. (Ex. 29: Second Admissions ¶ 37.)

**Response:** Defendant objects to this statement as irrelevant and not

material. Federal campaign finance laws are not at issue in this action.

Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and

material here because they make Georgia's signature requirement harder to

meet for all candidates who are not self-funded and because they limit the

party's ability to secure ballot access for its candidates.

164.   The limits on contributions to candidates apply separately to each federal election in which the candidate participates. A primary election, general election, runoff election and special election are each considered a separate election with a separate limit. (Ex. 29: Second Admissions ¶ 38.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

165.   Even when candidates are not involved in an actual primary, they are entitled to a primary limit. They may choose one of the following dates to be their "primary" date, and, until that date, they may collect contributions that count towards the contributor's primary limits: (1) the last day on which, under state law, a candidate may qualify for a position on the general election ballot; or (2) the date of the last major primary election, caucus or convention in that state. Political-body candidates may also choose the date of the nomination by their party as their primary date. (Ex. 29: Second Admissions ¶ 39.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

166.   As a result, the maximum amount that a state or national party may contribute to one candidate for U.S. Representative (except in the event of a runoff election) is $10,000 per election cycle. (Ex. 9: Graham decl. ¶17; Ex. 18: Sarwark decl. ¶ 32; Ex. 21: Wilson decl. ¶¶ 5, 17; Ex. 29: Second Admissions ¶ 40.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

167.   The maximum that an individual donor can give to a candidate is $5,600 per election cycle. (Ex. 21: Wilson decl. ¶ 5.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

168.   The value of an in-kind contribution counts against the contribution limits just as a contribution of money does. 11 C.F.R. § 100.51. (Ex. 29: Second Admissions ¶ 41.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

169.   Any amount paid by a state or national party for petition circulators or other petitioning efforts in support of a candidate for U.S. Representative must be reported to federal authorities as an in-kind

contribution and is subject to campaign contribution limits. 11 C.F.R. §§ 100.52(d)(1), 100.54. (Ex. 29: Second Admissions ¶ 42.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

170.   Any amount paid by a state or national party for qualifying fees in support of a candidate for U.S. Representative must be reported to federal authorities as an in-kind contribution and is subject to campaign contribution limits. 11 C.F.R. § 100.52. (Ex. 29: Second Admissions ¶ 43.)

**Response:** Defendant objects to this statement as irrelevant and not material. Federal campaign finance laws are not at issue in this action. Subject to this objection, Defendant admits this statement.

**Reply:** Federal campaign-finance laws are highly relevant and material here because they make Georgia's signature requirement harder to meet for all candidates who are not self-funded and because they limit the party's ability to secure ballot access for its candidates.

171.   Federal law thus prohibits the Libertarian Party or any other large donor from contributing enough money to cover a substantial number of signatures. (Ex. 9: Graham decl. ¶ 17; Ex. 18: Sarwark decl. ¶ 32; Ex. 21: Wilson decl. ¶¶ 5, 17.)

**Response:** Defendant objects to this statement as argumentative and a conclusory allegation not supported by specific facts. There is nothing in federal law that specifically prohibits a candidate from raising sufficient funds to cover a signature gathering campaign.

**Reply:** The fact in this paragraph is supported by the evidence cited.

172. Donors, moreover, generally do not want to give money for signature-gathering on a ballot-access petition when success is far from assured. (Ex. 6: Esco decl. ¶ 10; Ex. 9: Graham decl. ¶ 18; Ex. 11: McKinney decl. ¶¶ 10-12; Ex. 12: Metz decl. ¶ 11; Ex. 21: Wilson decl. ¶ 4.). They want to promote ideas and policies, and they recognize that candidates who are not on the ballot are not taken seriously by the media or by the voters. (Ex. 21: Wilson decl. ¶ 4.)

**Response:** Defendant objects to this statement as argumentative. Defendant further objects to the testimony in the cited declarations as containing conclusory allegations not supported by specific facts and inadmissible hearsay statements.

**Reply:** The Court can decide for itself whether the defendants first objection is valid. With respect to the defendant's second objection, please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

## XVII.    Lack of Access to Voters

173.   Petition-circulators in Georgia may not lawfully solicit signatures on private property without the permission of the property owner. See Cahill v. Cobb Place Associates, 271 Ga. 322 (1999); Citizens for Ethical Gov't v. Gwinnett Place Associates, 260 Ga. 245 (1990). That includes places of public accommodation, such as shopping malls, as well as property owned by common-interest community associations, such as homeowners' associations. (Ex. 29: Second Admissions ¶ 46.)

**Response:** Defendant does not dispute this statement as an accurate statement of law. However, the Libertarian Party's 30(b)(6) representative conceded that he has known of circulators who have asked permission from property owners and the owners have said yes. See Craig Dep. at 58:2-11.

**Reply:** No reply necessary.

174.   Virtually all of the places where large numbers of people congregate, like grocery stores and shopping malls, are on private property. Petition-circulators are consequently relegated to gathering signatures on public sidewalks, which are often far away from where voters park to enter

the stores. (Ex. 4: Coffield decl. ¶ 13; Ex. 6: Esco decl. ¶ 8; Ex. 19: Taylor decl. ¶ 11.)

**Response:** Defendant objects to the statement as argumentative. The allegations that "virtually all" places where there are large numbers of people are on private property or that sidewalks are "often far away from" stores are not supported by admissible evidence. Defendant further objects to the testimony in the cited declarations to the extent that it is based upon inadmissible hearsay statements.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection.  The cited evidence supports the facts in this paragraph.

175.   Entire subdivisions are often off-limits to petition-circulators because private homeowners' associations own the streets and sidewalks and have signs that bar all forms of soliciting. (Ex. 1: Anderson decl. ¶ 13; Ex. 5: Cowen decl. ¶ 15.)

**Response:** Defendant objects to this statement as an incorrect statement of law. No-solicitation signs do not render these environments off limits. *See Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002). Second, the statement is not supported by the cited testimony.

**Reply:** The Court can decide for itself whether this fact is supported by the cited evidence. The plaintiffs do not concede that this fact is an inaccurate statement of law, but that is beside the point if petition-circulators and others believe that no-soliciting signs are enforceable.

176. Even when canvassing legally on public property, petition circulators are often confronted by police officers or business owners unaware of their right to do so. (Ex. 6: Esco decl. ¶ 8; Ex. 16: Parker decl. ¶ 8; Ex. 19: Taylor decl. ¶ 12.)

**Response:** Defendants objects to this statement as not supported by admissible evidence. The testimony in the cited declarations is not based upon the witnesses' personal knowledge and contains inadmissible hearsay statements.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection. The cited evidence supports the facts in this paragraph.

177. Primary elections are generally not a good time to gather signatures. (Ex. 21: Wilson decl. ¶ 13.)

**Response:** Defendant objects to this statement as argumentative and disputes that the statement is supported by the cited testimony in the Wilson Declaration.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection.  The cited evidence supports the fact in this paragraph.

178.   Many counties consolidate polling places in primary elections, with voters from more than one congressional district voting at the same location. This makes it difficult to figure out whether the voter lives in the right district to sign a petition. (Ex. 21: Wilson decl. ¶ 14).

**Response:** Defendant objects to this statement as argumentative and disputes that the statement is supported by the cited testimony in the Wilson Declaration.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection.  The cited evidence supports the fact in this paragraph.

179. Turnout in primaries tends to be lower than in general elections, and many of those who do turn out are ardent partisans who refuse to sign petitions for candidates who do not belong to their favored party. (Ex. 21: Wilson decl. ¶ 16.)

**Response:** Defendant objects to this statement of fact as not supported by admissible evidence. The cited testimony in the Wilson Declaration offers no support for the claim that primary elections have lower turnout and the voters present on primary day are "ardent partisans." Furthermore, Wilson

was not designated an expert witness by Plaintiffs, and his opinions on voter turnout trends and the political demographics of primary electorates are not admissible.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection.  The cited evidence supports the fact in this paragraph. Paragraph 16 of Mr. Wilson's declaration is based on his personal knowledge.

180.  Georgia law prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place. O.C.G.A. § 21-2-414(a). This often means that signature-gatherers never have the chance to interact with voters at a polling place. In many areas, the parking lot for a polling place is within the 150- foot radius. In others, the polling place is so close to the street that -petition circulators can only stand across the street. In rural areas, the 150-foot radius sometimes puts signature gatherers in the middle of the woods because there is no sidewalk or other place to stand. (Ex. 21: Wilson decl. ¶ 15.)

**Response:** Defendant objects to this statement as argumentative, irrelevant, and not material. Subject to these objections, Defendant admits that Georgia law prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place.

116

**Reply:** This fact is relevant and material because the practical limitations on gathering signatures at polling places on primary-election days increases the burden of Georgia's ballot-access restrictions.  The Court can decide for itself whether the defendant has state a valid objection.

## XVIII. Public Concern about Disclosing Confidential Information

181.   The form of a nomination petition calls for a voter to provide a name, signature, date of birth, residential address, county of residence, and date of signing. (Ex. 41: De La Fuente petition sheets and ENET printouts.)

**Response:** Admitted.

**Reply:** No reply necessary.

182.   Georgia law considers a voter's date of birth and address to be confidential information. O.C.G.A. § 21-2-225(b).

**Response:** Defendant objects to this statement as an incorrect statement of law. The statute prevents the Secretary of State from disclosing this information; it does not prevent individuals from revealing this information to anyone.

**Reply:** The cited evidence supports the fact in this paragraph.

183.   In order to decrease the risk of identity theft, the Consumer Protection Division of the Georgia Department of Law advises individuals not to disclose their date of birth or residential address to members of the public. *See, e.g.*, http://www.consumer.ga.gov/consumer-topics/identity-theft-

socialnetworking; http://www.consumer.ga.gov/consumer-topics/identity-theftchild-identity-theft.

**Response:** Defendant objects to this statement of fact as not material and not supported by the cited evidence. The referenced websites include information on not sharing personal information, such as date of birth and address, on social media or on the internet.

**Reply:** The fact in this paragraph is relevant and material because it helps to explain why signature-gathering today is so difficult. The cited evidence supports the fact in this paragraph.

184.   "A lot of people are terribly concerned about addresses being public." (Ex. 23: Harvey dep. 109:14-24.) This was a significant issue in 2015 when the Secretary of State's office inadvertently distributed copies of the state's voter list with dates of birth and residential addresses exposed. The Secretary of State issued a statement warning affected voters to be vigilant for the possibility of identity theft as a result of the disclosure.

**Response:** Defendant disputes this statement as not supported by the cited transcript. The correct quote from Harvey says, "I don't know that a lot of people are terribly concerned about addresses being public." (Ex. 23: Harvey dep. 109:14- 24).

**Reply:** The defendant does not address the facts contained in the second and third sentences of this paragraph, which are supported by the

defendant's own public statements.  *See*

https://sos.ga.gov/index.php/general/important_notice_from_the_secretary_of_

state__regarding_the_security_of_the_state_voter_file and

https://sos.ga.gov/index.php/elections/statement_on_voter_data_security.

185.   The designee of the Secretary of State's office admits that he

would not disclose his date of birth to a stranger knocking on his door

"without a very compelling reason." (Ex. 23: Harvey dep. 107:20-24.) The

designee concedes that requiring candidates to ask strangers for legally-

protected confidential information in order to appear on the ballot is "a

concern." (Ex. 23: Harvey dep. 108-17-24.)

**Response:** Defendant disputes this statement as not supported by the

cited transcript. There is nothing in the Harvey testimony that supports the

claim that requiring candidates to ask for protected confidential information

in order on the ballot is "a concern."

**Reply:** The cited evidence supports the fact in this paragraph.

188.   Many potential petition-signers express reluctance to sign, or

refuse to sign altogether, because of the confidential information called-for by

the form and the possibility that it could be used for identity theft or other

nefarious purposes. (Ex. 4: Coffield decl. ¶ 11-12; Ex. 6: Esco decl. ¶ 8; Ex. 7:

Fisher decl. ¶ 8; Ex. 8: Gilmer decl. ¶ 13; Ex. 9: Graham decl. ¶ 13.)

**Response:** Defendant objects to this statement of fact as not supported by admissible evidence. The testimony in the cited witness declarations includes inadmissible hearsay statements.

**Reply:** The Court can decide for itself whether the defendant has stated valid objections.

## XIX.  Support for the Libertarian Party Nationwide and in Georgia

189.   The Libertarian Party was founded in 1971 and is organized in all 50 states plus the District of Columbia. (Ex. 18: Sarwark decl. ¶¶ 5-6.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

190.   The Libertarian Party is currently the third largest political party in the United States by voter registration. Among the 50 states plus the District of Columbia, there are 31 jurisdictions where a voter can register as

a Libertarian. (Georgia does not register voters by party.) According to the most recent data collected by the party, there were 567,157 active voters registered as Libertarians in the fall of 2018—a 92 percent increase over the last 10 years. (Ex. 18: Sarwark decl. ¶ 14.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

191.   A 2010 study by David Boaz and David Kirby found that at least 14 percent of American voters have libertarian-leaning views. (Ex. 18: Sarwark decl. ¶ 15.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp.

3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

192.   The Gallup Poll found in its 2015 Governance survey that 27 percent of respondents could be characterized as libertarians—the highest number that poll has ever found. And, in 2018, the same Gallup poll found that 57 percent of Americans say that a third major political party is needed, marking the fifth straight year in which the poll found a majority support for a new third party. (Ex. 18: Sarwark decl. ¶ 16.)

**Response:** Defendant objects to this statement of fact as based upon inadmissible hearsay in the Sarwark Declaration. See Defendant's Objections to Plaintiffs' Evidence. A copy of the poll was not submitted or authenticated.

**Reply:** The defendant's objections are unfounded.  Please see the plaintiffs' response to the defendant's objections to the plaintiffs' evidence.

193.   The Libertarian Party currently has automatic ballot access in 33 states plus the District of Columbia. Georgia is the only state in the nation that considers the Libertarian Party ballot-qualified for statewide offices but not for district offices. (Ex. 18: Sarwark decl. ¶ 17.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

194.   The Libertarian Party runs hundreds of candidates in every election cycle. These candidates seek positions ranging from city council to President of the United States. The Libertarian Party had 833 candidates on ballots in 2018. (Ex. 18: Sarwark decl. ¶ 18.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's

signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

195.   The Libertarian Party has placed a presidential candidate on the ballot in all 50 states and the District of Columbia on five separate occasions, most recently in 2016. (Ex. 18: Sarwark decl. ¶ 19.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

196.   Nationwide, the Libertarian Party runs numerous candidates for U.S. Representative. It is only the third political party since 1916 to have had a candidate for U.S. Representative on the ballot in a majority of congressional districts across the country. (Ex. 18: Sarwark decl. ¶ 20.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

197.   The Libertarian Party has had candidates for U.S. Representative appear on the ballot in every state in the nation except Georgia. (Ex. 18: Sarwark decl. ¶ 21.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had

enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

198.   There are currently more than 180 elected officials affiliated with the Libertarian Party nationwide. There has been one statewide elected official and members of five state legislatures affiliated with the Libertarian Party. (Ex. 18: Sarwark decl. ¶ 22.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

199.   Fifty-four Libertarians were elected to office in 2018—a 59 percent increase over 2016. This includes the election of Jeff Hewitt as county supervisor in Riverside County, California. Hewitt's district has a population larger than 15 different states and an annual budget of more than $5 billion. (Ex. 18: Sarwark decl. ¶ 23.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

200.   In the last ten years, Libertarian Party candidates have received tens of millions of votes. (Ex. 18: Sarwark decl. ¶ 24.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had

enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

201.   The Libertarian Party's nominee for President of the United States in the 2016 election, Gary Johnson, received 4,489,341 votes—the highest-ever vote total for a Libertarian candidate—which represented 3.28 percent of the popular vote and the third highest vote total among the candidates in the race. (Ex. 18: Sarwark decl. ¶ 25.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

202.   Nine different Libertarian candidates have received more than one million votes in statewide races since 2008. The first to do so was John Monds, the Libertarian Party's 2008 candidate of the Public Service

128

Commission District 1 in Georgia. Three of the nine million-vote candidates were in Georgia. (Ex. 18: Sarwark decl. ¶ 26.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to these objections, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because it shows that Georgia's ballot-access restrictions exclude a party with widespread nationwide support. *See, e.g., Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) (relying heavily on the fact that Georgia's signature requirement had excluded a presidential candidate who had enjoyed "widespread national support"), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

203.   The Libertarian Party has demonstrated that it has substantial support among Georgia's electorate. (Ex. 33: Answer ¶ 127; Ex. 37: election results.)

**Response:** Defendant objects to the statement that the Libertarian Party has "substantial support" as argumentative and not supported by admissible evidence. Subject to this objection, Defendant does not dispute the election results shown in Exhibit 37.

**Reply:** The Court can decide for itself whether the defendant has cited a valid objection and whether the cited evidence supports the fact in this paragraph.

204.   In 1988, the Libertarian Party of Georgia qualified to nominate candidates for statewide public office by convention when it submitted a party-qualifying petition signed by at least one percent of the number of total number of registered voters at the preceding general election. See O.C.G.A. § 21-2-180(1). The party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least one percent of the total number of registered voters who were registered and eligible to vote in that election. See O.C.G.A. § 21-2- 180(2). (Ex. 33: Answer ¶ 128.)

**Response:** Admitted.

**Reply:** No reply necessary.

205.   In the last ten years, Libertarian Party candidates for statewide public offices in Georgia have received more than five million votes. (Ex. 33: Answer ¶ 131; Ex. 37: election results.)

**Response:** Admitted.

**Reply:** No reply necessary.

206.   In 2016, the Libertarian Party of Georgia's nominee for the Public Service Commission, Eric Hoskins, received 1,200,076 votes, which

represents 33.4 percent of all votes cast in that contest and 22.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Hoskins carried Clayton and DeKalb counties in that election. (Ex. 33: Answer ¶ 132.)

Response: Admitted.

**Reply:** No reply necessary.

207.   In 2014, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, John H. Monds, received 710,408 votes, which represents 31.7 percent of all votes cast in that contest and 11.7 percent of the total number of registered voters who were registered and eligible to vote in that election. Monds carried Clayton, DeKalb, and Hancock counties. (Ex. 33: Answer ¶ 133.)

**Response:** Admitted.

**Reply:** No reply necessary.

208.   In 2012, one of the Libertarian Party of Georgia's nominees for the Public Service Commission, David Staples, received 1,095,115 votes, which represents 34.2 percent of all votes cast in that contest and 18.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Staples carried Clayton, DeKalb, and Hancock counties. (Ex. 33: Answer ¶ 134.)

**Response:** Admitted.

**Reply:** No reply necessary.

209.   In *Green Party of Georgia v. Kemp*, the Secretary of State repeatedly described the Libertarian Party as a political body "with significant support" in Georgia. (Ex. 33: Answer ¶ 135; Ex. 42: excerpts from appellant's briefs.)

**Response:** Defendant admits that with respect to statewide elections, as was the case in *Green Party of Georgia v. Kemp*, candidates in the Libertarian Party of Georgia have at times received support from voters.

**Reply:** The defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the fact in this paragraph and is not supported by any evidence.

## XX.   The Libertarian Party's Platform and Policy Positions

210.   The Libertarian Party's platform and position on contemporary issues reflect policy preferences that are distinct from those of the Democratic and Republican parties. (Ex. 18: Sarwark decl. ¶ 11.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because of the important role that legitimate third parties play in the voter's exercise of First and Fourteenth Amendment rights.  *See, e.g. Anderson v. Celebrezze*, 460 U.S.

132

780, 794 (1983) (discussing the importance of "political figures outside the two major parties"); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

211.   The Libertarian Party has adopted a national platform emphasizing personal liberty, economic liberty, balanced budgets, and national defense. The party has also taken policy positions on a number of contemporary issues. (Ex. 18: Sarwark decl. ¶¶9-10.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because of the important role that legitimate third parties play in the voter's exercise of First and Fourteenth Amendment rights.  *See, e.g. Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of "political figures outside the two major parties"); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

212.   On some contemporary issues, the Libertarian Party takes policy positions that are different from those offered by either the Democratic or the Republican party. For example, the Libertarian Party platform favors the

repeal of laws creating victimless crimes, such as gambling, the use of drugs for medicinal or recreational purposes, and consensual transactions for sexual services. The Party supports abolishing the Internal Revenue Service and phasing out the Social Security system. (Ex. 18: Sarwark decl. ¶ 12.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because of the important role that legitimate third parties play in the voter's exercise of First and Fourteenth Amendment rights. *See, e.g. Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of "political figures outside the two major parties"); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

213.   On other contemporary issues, the Libertarian Party takes policy positions that align with those offered by the Democratic or Republican parties. For example, the Libertarian Party supports abolishing the death penalty, a position that the Democratic Party shares. The Libertarian Party also supports the individual right to keep and bear arms under the Second Amendment, a position that the Republican Party shares. (Ex. 18: Sarwark decl. ¶ 13.)

134

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because of the important role that legitimate third parties play in the voter's exercise of First and Fourteenth Amendment rights. *See, e.g. Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of "political figures outside the two major parties"); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

214.   Candidates nominated by the Libertarian Party of Georgia have run on the party's national platform in addition to emphasizing unique or local campaign issues. (Ex. 3: Buckley decl. ¶ 11; Ex. 5: Cowen decl. ¶ 9; Ex. 8: Gilmer decl. ¶¶ 19-20.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because of the important role that legitimate third parties play in the voter's exercise of First and Fourteenth Amendment rights. *See, e.g. Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of "political figures outside the

two major parties"); *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

## XXI. The National Impact of Georgia's Ballot-Access Restrictions

215.   The national Libertarian Party has identified a set of Libertarian policy issues that a plurality of Americans supports, which the Republican and Democratic parties are not addressing. The national Libertarian Party would like to run a coordinated nationwide electoral campaign, pursuant to which Libertarian candidates for U.S. House in all 50 states and the District of Columbia will focus on promoting those policy issues. (Ex. 18: Sarwark decl. ¶ 27.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because Georgia has a less important interest in regulating elections that have a national impact. *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1367-68 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

216.   In 1994, the Republican Party ran a coordinated nationwide campaign based on the "Contract with America." Rather than campaign independently within each district, Republican candidates rallied behind the

national message crafted by then-congressman Newt Gingrich. As part of that campaign strategy, the Republican Party attempted to run candidates in every congressional district in America, including districts in which they were almost certain to lose. The party succeeded in fielding candidates for more than 90 percent of the available seats and went on to win control of both houses of Congress in the 1994 election. (Ex. 18: Sarwark decl. ¶ 28; Ex. 33: Answer ¶ 137.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because Georgia has a less important interest in regulating elections that have a national impact. *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1367-68 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

217.   Leading up to the 1994 campaign, the Georgia Republican Party waged a similar party-building campaign in Georgia. It ran a full slate of candidates for U.S. Representative in Georgia in 1990, 1992, and 1994. (Ex. 33: Answer ¶ 138.)

**Response:** Admitted.

**Reply:** This fact is material and relevant because Georgia has a less important interest in regulating elections that have a national impact. *See*

137

*Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1367-68 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

218.   Similarly, with coordination and support from the national Libertarian Party, Libertarian candidates for the U.S. House can run in all 50 states and the District of Columbia on a unified platform that presents the Libertarian Party as a viable alternative to the Republican and Democratic parties. That coordinated strategy and messaging will support Libertarian candidates for U.S. Representative and promote the party as a whole. (Ex. 9: Graham decl. ¶ 22; Ex. 18: Sarwark decl. ¶ 29.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is material and relevant because Georgia has a less important interest in regulating elections that have a national impact. *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1367-68 (N.D. Ga. 2016) (same), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam).

219.   The exclusion of Libertarian candidates for U.S. Representative from the ballot in Georgia harms our coordinated national electoral strategy and prevents us from presenting the Libertarian Party as a viable alternative for all voters nationwide. (Ex. 9: Graham decl. ¶ 23; Ex. 18: Sarwark decl. ¶ 30.)

**Response:** Defendant objects to this statement as argumentative and not supported by admissible evidence. Defendant further objects to the cited testimony as inadmissible opinion testimony by lay witnesses.

**Reply:** The cited evidence, which consists of admissible lay-witness opinion testimony, supports the fact in this paragraph. Fed. R. Evid. 701.

220.   Georgia's ballot-access restrictions thereby have a ripple-effect across the nation. (Ex. 18: Sarwark decl. ¶ 31.)

**Response:** Defendant objects to this statement as argumentative and not supported by admissible evidence. Defendant further objects to the cited testimony as inadmissible opinion testimony by a lay witness.

**Reply:** The cited evidence, which consists of admissible lay-witness opinion testimony, supports the fact in this paragraph. Fed. R. Evid. 701.

## XXII. Uncontested Congressional Elections in Georgia

221.   Georgia's elections for U.S. Representative are among the most uncompetitive in the nation. (Ex. 22: Winger decl. ¶¶ 21-22.)

**Response:** Defendant objects to this statement as argumentative and a conclusory allegation not supported by admissible evidence. Defendant admits only that the evidence shows Georgia often has several uncontested general elections.

**Reply:** The Court can decide for itself whether the defendant has stated a valid objection.  The remainder of the defendant's response does not

comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

222.   In the three election cycles from 2012 through 2016, Georgia has had 15 unopposed races for U.S. Representative—more than any other state in the nation. That number represents almost 36 percent of its races for U.S. Representative over that period, which is a greater share than any other state in the nation except Massachusetts. (Ex. 22: Winger decl. ¶ 23; Ex. 33: Answer ¶ 118) See Federal Election Commission, Federal Elections 2016 at 89-184 (2017); Federal Election Commission, Federal Elections 2014 at 33-125 (2015); Federal Election Commission, Federal Elections 2012 at 77-177(2013).

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute the cited reports from the Federal Election Commission.

**Reply:** The facts in this paragraph are relevant and material because they undermine the State's asserted interests in avoiding runoffs and overcrowded ballots.

223.   In 2016, the winning candidate ran unopposed in the general election in five (35.7%) of Georgia's 14 congressional districts: the First, Ninth, Tenth, Thirteenth, and Fourteenth. No other state had more than four unopposed races for U.S. Representative in 2016, and only two states,

Alabama (42.8%) and Massachusetts (44.4%), had a greater share of their races for U.S. Representative unopposed. (Ex. 22: Winger decl. ¶ 24; Ex. 33: Answer ¶ 119.) See Federal Election Commission, Federal Elections 2016 at 89-184 (2017).

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** The facts in this paragraph are relevant and material because they undermine the State's asserted interests in avoiding runoffs and overcrowded ballots.

224. In 2014, the winning candidate ran unopposed in the general election in seven (50.0%) of Georgia's 14 congressional districts: the Third, Fourth, Fifth, Eighth, Eleventh, Thirteenth, and Fourteenth. No other state had more than six unopposed races for U.S. Representative in 2014, and only one state, Massachusetts (66.7%), had a greater share of its races for U.S. Representative unopposed. (Ex. 22: Winger decl. ¶ 25; Ex. 33: Answer ¶ 120.) See Federal Election Commission, Federal Elections 2014 at 33-125 (2015).

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** The facts in this paragraph are relevant and material because they undermine the State's asserted interests in avoiding runoffs and overcrowded ballots.

225.   In 2012, the winning candidate ran unopposed in the general election in three (21.4%) of Georgia's 14 congressional districts: the Third, Eighth, and Tenth. No other state had more than two unopposed races for U.S. Representative in 2012, and only two states, Kansas (25%) and Massachusetts (22.2%), had a greater share of their races for U.S. Representative unopposed. (Ex. 22: Winger decl. ¶ 26; Ex. 33: Answer ¶ 121.) See Federal Election Commission, Federal Elections 2012 at 77-177 (2013).

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** The facts in this paragraph are relevant and material because they undermine the State's asserted interests in avoiding runoffs and overcrowded ballots.

## XXIII. Special Elections for U.S. Representative in Georgia

226.   Georgia uses a different set of ballot-access rules in special elections to fill vacancies in the office of U.S. Representative. (Ex. 27: First Admissions ¶ 20.)

**Response:** Admitted.

142

**Reply:** No reply necessary.

227.   Those rules do not distinguish between candidates affiliated with a political party, candidates affiliated with a political body, and independent candidates. (Ex. 27: First Admissions ¶ 21.)

**Response:** Admitted.

**Reply:** No reply necessary.

228.   In order to appear on the ballot in a special election for U.S. Representative, each candidate must submit a notice of candidacy and the qualifying fee by the date specified for that election. No nomination petition is required. Every candidate who submits a notice of candidacy and qualifying fee, and who otherwise meets the qualifications for the office, appears automatically on the special-election ballot. (Ex. 27: First Admissions ¶ 22.)

**Response:** Admitted.

**Reply:** No reply necessary.

229.   In the last 50 years, Georgia has held six special elections to fill a vacancy in the office of U.S. Representative. In 2017, Georgia held a special election in the Sixth Congressional District. In 2010, Georgia held a special election in the Ninth Congressional District. In 2007, Georgia held a special election in the Tenth Congressional District. In 1999, Georgia held a special election in the Sixth Congressional District. In 1983, Georgia held a special

election in the Seventh Congressional District. And, in 1977, Georgia held a special election in the Fifth Congressional District. (Ex. 27: First Admissions ¶ 23.)

**Response:** Admitted.

**Reply:** No reply necessary.

230.   In each special election for U.S. Representative in Georgia in the last 50 years, at least one independent candidate or candidate affiliated with a political body appeared on the special-election ballot. (Ex. 27: First Admissions ¶ 24.)

**Response:** Admitted.

**Reply:** No reply necessary.

231.   There were two independent candidates on the ballot in the special congressional election held in 2017. (Ex. 37 at 11: election results.)

**Response:** Admitted.

**Reply:** No reply necessary.

232.   There was one independent candidate on the ballot in the special congressional election held in 2010. (Ex. 37 at 30: election results.)

**Response:** Admitted.

**Reply:** No reply necessary.

233.   There was one political-body candidate on the ballot in the special congressional election held in 2007. (Ex. 37 at 35: election results.)

**Response:** Admitted.

**Reply:** No reply necessary.

234.   There were "a lot of candidates on the ballot" in the most recent special congressional election, held in 2017, and the Secretary of State's office is not aware of any widespread reports of voter confusion in that race. (Ex. 23: Harvey dep. 182:13-183:15.)

**Response:** Admitted.

**Reply:** No reply necessary.

235.   The Secretary of State's office is not aware of any elections where voters have reported significant amounts of confusion based on the number of candidates on the ballot. (Ex. 23: Harvey dep. 183:16-19.)

**Response:** Admitted.

**Reply:** No reply necessary.

## XXIV. Runoff Elections in Georgia

236.   Georgia's ballot-access restrictions are not necessary to reduce the number of run-off elections, especially runoffs in a general election for federal offices. (Ex. 22: Winger decl. ¶ 38.)

**Response:** Disputed. Dr. Stein testified that addition of third party and Independent candidates on the ballot increases the likelihood of a runoff election. Doc. 73-15 at 7 ¶ 23.

**Reply:** The Court may consider Dr. Stein's testimony, but that testimony does not put the plaintiffs' fact in dispute.

237.   Run-off elections in contests for U.S. Representative are not required by federal law: Georgia could simply eliminate them. (Ex. 25: Winger dep. 38:10.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant admits that the United States Constitution allocates the power of state election regulation to the states and not the federal government.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections.  The remainder of the defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

238.   Georgia is one of only two states to use runoffs in any general elections. Louisiana is the other. (Ex. 22: Winger decl. ¶ 39.)

**Response:** Admitted.

**Reply:** No reply necessary.

239.   Runoff elections can be avoided altogether by using ranked-choice voting. (Ex. 22: Winger decl. ¶ 41.)

**Response:** Defendant objects to this statement of fact as not material. Defendant objects further to Winger's testimony on this subject as he is not qualified to testify as a political scientist.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections. Winger's testimony in paragraph 41 of his declaration is not an opinion, but it would not be inadmissible even if it were. The subject of run-off elections and ranked-choice voting is highly germane to Winger's unquestionable expertise in ballot-access laws.

240. The State of Maine uses ranked-choice voting in general elections to elect U.S. Senators and U.S. Representatives. In 2018, a federal district court upheld the state's ranked-choice system against a constitutional challenge brought by a losing congressional candidate. The court of appeals denied the candidate's motion for an emergency injunction against the system, and the candidate later dropped his appeal. (Ex. 29: Second Admissions ¶ 44.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections.

241.   Five states (Arkansas, Alabama, Louisiana, Mississippi and South Carolina) use ranked-choice voting for overseas voters in runoff elections for federal offices. (Ex. 29: Second Admissions ¶ 45.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections.

242.   The Secretary of State's office is not aware of any voter confusion in the states where instant runoff voting has been used. (Ex. 23: Harvey dep. 182:4-7.)

**Response:** Defendant objects to this statement of fact as it misstates the cited testimony. Harvey testified that instant runoff voting "can be very confusing to voters and that it could cause voters to spoil their ballot or mis-vote their ballot or not get their choices in a run-off done properly." *See* Ex. 23: Harvey Dep. at 181:15-24.

**Reply:** The plaintiffs object to the cited testimony on the ground that it is speculative and not based on Harvey's personal knowledge (because he also testified that he was not personally aware of any voter confusion).  In addition, Harvey's cited testimony does not put the plaintiffs' fact in dispute.

243.   Runoffs in general elections for federal office are rare. Georgia has had only two general runoffs for the United States Senate since 1988, when the Libertarian Party became qualified to nominate candidates for U.S. Senator without a petition. (Ex. 22: Winger decl. ¶ 40.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections.

244.   The Secretary of State's office has not quantified the expense to the State of holding a runoff election. (Ex. 23: Harvey dep. 178:12-15.)

**Response:** Defendant objects to this statement of fact as it misstates the cited testimony. Defendant admits only that the Secretary of State's office has not quantified the expense of run-off elections that have occurred in statewide races featuring a Libertarian Party candidate.

**Reply:** The Court can decide for itself whether the cited testimony supports the plaintiffs' fact.  The remainder of the defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

245.   There is no significant marginal cost for having a congressional runoff in addition to a runoff for a statewide race. (Ex. 23: Harvey dep. 179:7-12.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement so long as both run-off elections were held on the same day. Georgia law provides for separate run-offs. See O.C.G.A. § 21-2-501(a)(3) (general election run-off for federal office) and § 21-2-501(a)(4) (general election run-off for state office).

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections. The remainder of the defendant's response does not comply with Local Rule 56.1(B)(2)(a)(2) because it does not directly refute the plaintiffs' fact with citations to evidence.

246.   In the 2016 election cycle across the country, there were only nine general elections for U.S. Representative out of 435 (2.1 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 38:13-22.) Among the 370 contests for U.S. Representative where there were more than two candidates on the ballot, there were only eight general elections (2.2 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 40:15-41:7.)

**Response:** Defendant objects to this statement of fact as not material and irrelevant. Subject to this objection, Defendant does not dispute this statement.

**Reply:** This fact is relevant and material because it undermines the State's asserted interest in avoiding runoff elections.

247.   The Secretary of State's office has done no analysis to determine how many additional runoffs would result if the Libertarian Party had ballot access and has no factual support for its claim that allowing the Libertarian Party to have ballot access could conceivably result in more runoffs. (Ex. 23: Harvey dep. 176:21-177:10.)

**Response:** Defendant objects to this statement of fact as it misstates the cited testimony. Harvey testified that the Secretary of State's office had not done an analysis to determine whether it would increase the number of run-offs if the Libertarian Party were included in non-statewide races.

**Reply:** The Court can decide for itself whether the cited testimony supports the plaintiffs' fact.

248.   Georgia has runoff elections in virtually every election cycle because of contested primary elections for political-party candidates. (Ex. 23: Harvey dep. 175:24-175:13, 180:1-4.) Primary runoffs are slightly more expensive than general runoffs. (Ex. 23: Harvey dep. 179:13-25.)

**Response:** Admitted.

**Reply:** No reply necessary.

Respectfully submitted this 28th day of August, 2019.

**/s/ Bryan L. Sells**

Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com