IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>          Plaintiffs,<br><br>   vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>          Defendant. | Case No. 1:17-cv-04660-LMM<br><br><br><br>**Plaintiffs' Response in Opposition to the Defendant's Objections to the Plaintiffs' Evidence** |

     The plaintiffs respectfully submit this response in opposition to

the defendant's objections to the plaintiffs' evidence. (ECF 99.)

Table of Contents

Introduction…………………………………………………...4

Ex. 1      Declaration of Jeff Anderson (Doc. 69-4)…………………..........6

Ex. 2      Declaration of Victor Armendariz (Doc. 69-5)………………9

Ex. 3      Declaration of Allen Buckley (Doc. 69-6)……………………11

Ex. 4      Declaration of Faye Coffield (Doc. 69-7)…………………...14

Ex. 5      Declaration of Martin Cowen (Doc. 69-8)……………………15

Ex. 6      Declaration of Hugh Esco (Doc. 69-9)…………………………...16

Ex. 7      Declaration of Jay Fisher (Doc. 69-10)………………………21

Ex. 8      Declaration of Aaron Gilmer (Doc. 69-11)…………………24

Ex. 10     Declaration of Derrick Lee (Doc. 69-13)……………………27

Ex. 11     Declaration of Cynthia McKinney (Doc. 69-14)……………29

Ex. 12     Declaration of Ted Metz (Doc. 69-15)……………………31

Ex. 13     Declaration of John Monds (Doc. 69-16)…………………...34

Ex. 14     Declaration of Eugene Moon (Doc. 69-17)………………37

Ex. 15     Declaration of Hien Nguyen (Doc. 69-18)………………39

Ex. 16     Declaration of Wayne Parker (Doc. 69-19)………………...40

Ex. 18     Declaration of Nicholas Sarwark (Doc. 69-21)……………42

Ex. 19     Declaration of Luanne Taylor (Doc. 69-22)………………46

Ex. 20      Declaration of Don Webb (Doc. 69-23).............................49

Ex. 21      Declaration of Nathan Wilson (Doc. 69-24)......................52

            Conclusion.................................................................56

## Introduction

Citing a version of Rule 56 that no longer exists, the defendant takes the untenable position that former congressional candidates are not competent to testify about their own campaigns. More specifically, the defendant objects that the declarations made by these former congressional candidates, each one about his or her own unsuccessful campaign, are not based on personal knowledge, contain inadmissible hearsay, and contain inadmissible lay-witness opinion testimony. None of these objections are well founded, and this Court should overrule them all.

Relying on an Eleventh Circuit case from 2009, the defendant argues that inadmissible hearsay generally cannot be considered on a summary-judgment motion. (ECF 99 at 3.) But Congress amended Rule 56 in 2010 to reject that position. At the summary judgment stage "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). A court may consider such materials so long as the proffering party can "show that the material is admissible as presented or . . . explain the admissible form that is anticipated." *Id.*

4

advisory committee's note to 2010 amendment. "When a Rule 56(c)(2) objection is made, it is within the district court's discretion to determine if the material used to support a fact can be presented in a form that would be admissible at trial." *Jacoby v. Keers*, No. 17-13400 (11th Cir., July 22, 2019) (per curiam); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) ("a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form").

The defendant further argues that "any opinion testimony by witnesses not properly designated as experts is not admissible and should be disregarded by the Court." (ECF 99 at 4.) But that simply is not the law. Lay witnesses may offer opinion testimony as long as it is (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. The distinction between "specialized knowledge" and personal experience is not always clear, but "Rule 701 does not prohibit lay witnesses from testifying based on

particularized knowledge gained from their own personal experiences."
*United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011). The defendant
relies on a single case where a handyman-plaintiff with no engineering
background sought to offer opinion testimony about design defects in a
ladder. (ECF 99 at 4 (citing *Ojeda v. Louisville Ladder, Inc.*, 410 Fed.
Appx. 213, 215 (11th Cir. 2010)). We have nothing like that here.

The plaintiffs' responses to the defendant's specific objections
follow.

**Ex. 1: Declaration of Jeff Anderson (Doc. 69-4)**

The defendant objects to paragraphs 6, 7, 12, 13, 14 and 15 of
Anderson's declaration. Of these, only paragraphs 6, 7, 13, and 14 are
cited in support of the plaintiffs' motion for summary judgment. (ECF
69-1 at 16-18, 20; ECF 69-2 ¶¶ 101, 149, 158, 161, 175.)

First, the defendant objects to the second sentence of paragraph 6:
"Based on anecdotal evidence as to petition challenges and
disqualifications, I estimated that I needed to gather at least 33,000
signatures to account for those that might be thrown out by the
Secretary of State's Office." (ECF 69-4 at 2.) The defendant contends
that this sentence is speculative and lacking foundation as to the

witness's knowledge of the Secretary of State's practices. (ECF 99 at 5.) This objection is ill-founded because Anderson clearly has personal knowledge of his own estimate of the number of signatures he might need. Fed. R. Evid. 602.

Next, the defendant objects to the first sentence of paragraph 7: "I considered using paid petition circulators, but, based on estimates for labor and expenses, I calculated the total cost of obtaining ballot-access at approximately $10 per signature; roughly $330,000 for our target application." (ECF 69-4 at 2-3.) The defendant contends that Anderson lacks personal knowledge of using paid petition circulators. (ECF 99 at 5.) Not so. His testimony is that his total cost calculation was based on estimates that he obtained for labor costs and estimates for other expenses.

The defendant objects to paragraph 13:

13.    My team also found that many of the larger communities in the Eleventh Congressional District are private homeowners' associations posted as "no soliciting" zones. While I do not know whether that precluded our actual legal right to solicit for signatures in those communities, understandably my team immediately found that many residents of those communities are resistant to having strangers simply "cold call" them on their own doorstep - an environment specifically counterproductive to eliciting support for election.

7

(ECF 69-4 at 4-5.) The defendant contends that descriptions of what "my team" encountered while gathering signatures are inadmissible hearsay. (ECF 99 at 6.) It is certainly not clear whether Anderson encountered those things along with his volunteers, but that is of no consequence here. If, as the defendant contends, this paragraph is based only on what his volunteers told him at the time, it would fall under the hearsay exception for a present-sense impression. Fed. R. Evid. 803(1).

Lastly, the defendant objects to paragraphs 12, 14, and 15, all on the grounds that they contain conclusory statements not based on personal knowledge and improper lay-witness opinion testimony. (ECF 99-4 at 6.) These paragraphs provide as follows:

> 12.    During the course of my campaign and qualification effort, I found my interactions with the Secretary of State's office personnel to be polite and professional, but not altogether assistive, and the process to be quite frustrating. There was no comprehensive source of information for prospective independent candidates, and the technical requirements for petitioning were a potential minefield. Many of the rules, such as the requirement that candidates use the form specifically provided by the Secretary of State (not a copy, even if identical) and that each page of the petition (allowing for only a dozen or so signatures) be individually notarized, seemed to be designed to make it unjustifiably hard and remarkably expensive to qualify.
> 14.    My experience in 2010 convinced me that it is virtually impossible to qualify for the general-election ballot in

Georgia as an independent or third-party candidate for U.S. Representative. The number of signatures required is simply too great to gather in the allotted time and designated fashion without hundreds of thousands of dollars to spend on paid petition circulators.

15.     Because running for U.S. Representative as an independent would be futile under current ballot-access law, regulation and practice, I have no plan to do so again. However, if those laws were more reasonable and the qualification pathway fairly and appropriately open, I would seriously consider running again as an independent candidate.

(ECF 69-4 at 4-5.) All of these statements, however, are based on Anderson's personal experience of running his unsuccessful campaign. And, as already explained above, "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Hill*, 643 F.3d at 841.

**Ex. 2: Declaration of Victor Armendariz (Doc. 69-5)**

The defendant objects to paragraphs 8 and 10 of Armendariz's declaration. (ECF 99 at 7.) Of these, only paragraph 8 is cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 17; ECF 69-2 ¶¶ 103, 149.)

Paragraph 8 provides as follows:

8.     My team gathered quite a few signatures, but I realized before long that we would not be able to gather the required number despite our hard work. I also learned that

9

> the Secretary of State's office had a history of rejecting a
> high percentage of signatures, and I figured that I would
> need to gather almost double the number of signatures
> required. That struck me as an impossible task, and I
> therefore decided to drop my candidacy as an independent.
> I ran instead as a candidate for the Republican nomination.
> I appeared on the primary-election ballot, but I was not
> successful.

(ECF 69-5 at 2.) The defendant objects on the ground that the clause "I

also learned that the Secretary of State's office had a history of rejecting

a high percentage of signatures" contains conclusory allegations not

based on the witness's personal knowledge. (ECF 99 at 7.) While it is not

clear how Armendariz learned that the Secretary of State's office has a

history of rejecting a high percentage of signatures, that matter is beside

the point. His testimony here is an explanation of his own decision to

abandon his campaign, and that is a matter that is plainly within his

personal knowledge.

Paragraph 10 provides as follows: "Because running as an

independent would be futile under current law, I have no plans to do so

again. But if the ballot-access laws were more reasonable, I would

seriously consider running again as an independent candidate." (ECF

69-5 at 3.) The defendant argues that, like similar statements in

Anderson's declaration, this paragraph contains inadmissible lay-

witness opinion testimony. But, again, this paragraph is based on the witness's personal experience of running his unsuccessful campaign. And, as already explained above, "Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Hill*, 643 F.3d at 841. He is competent to testify as to his own beliefs, based on his own experiences, about the difficulty of qualifying for ballot access.

**Ex. 3: Declaration of Allen Buckley (Doc. 69-6)**

The defendant objects to paragraphs 5 through 10, 13, and 14 of Buckley's declaration. (ECF 99 at 7-8.) Of these, only paragraph 10 is cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 43.)

Paragraphs 5 through 10 provide as follows:

5.     I have run for statewide office in Georgia four times.

6.     In 2004, I ran as the Libertarian candidate for U.S. Senator. I received 69,051 votes, or 2.1 percent, in a three-way race.

7.     In 2006, I ran as the Libertarian candidate for lieutenant governor. I received 75,673 votes, or 3.6 percent, in a three-way race.

8.      In 2008, I ran again as the Libertarian candidate for
U.S. Senator. I received 127,923 votes, or 3.4 percent, in a
three-way race with two write-in candidates.

9.      Most recently, in 2016, I ran a third time as the
Libertarian candidate for U.S. Senator. I received 162,260
votes, or 4.16 percent, in a three-way race with one write-in
candidate.

10.     I did not have to gather signatures on a nominating
petition for any of those races, because the Libertarian
Party of Georgia is qualified to nominate candidates for
statewide office by convention.

(ECF 69-6 at 2.) The defendant contends that these paragraphs are

irrelevant and immaterial, but he does not explain the basis for that

contention. (ECF 99 at 7-8.) Paragraphs 5 through 9 provide the

foundation for paragraph 10, which the plaintiffs cite to undermine the

State's asserted interest in ensuring that Libertarian candidates have a

modicum of support among the electorate that they wish to represent.

(ECF 69-1 at 42-43.) Paragraph 10 shows that the state did not, in fact,

require Buckley to demonstrate any support before appearing on the

ballot. That is plainly relevant and material under the *Anderson* test.

Paragraphs 13 and 14 provide as follows:

13.     In 2007, when the total national debt was
approximately $9 trillion, David M. Walker, as Comptroller
General of the United States and head of the Government
Accountability Office (GAO), said: "GAO's long-term

12

simulations continue to show ever-larger deficits resulting
in a federal debt burden that ultimately spirals out of
control." Now, total debt exceeds $20 trillion, and the
Congressional Budget Office sees deficits averaging roughly
$1 trillion per year over the next decade. That is not
sustainable. Annually balanced federal budgets—supported
by the Libertarian Party but neither the Democratic Party
nor the Republican Party—would halt the growth of the
debt.

14.    I believe that the Libertarian Party's vastly different
approach to fiscal issues could attract a lot of voters in
Georgia, but Georgia's ballot-access rules make it
impossible for the party to get its candidates for the U.S.
House of Representatives—which is primarily responsible
for the budget—on the ballot. Voters for whom fiscal sanity
is an important issue have no good choices for U.S.
Representative. The Libertarian Party could provide that
choice.

(ECF 69-6 at 3-4.) The defendant contends that these paragraphs are

irrelevant and immaterial, but, again, he fails to explain the basis for

that contention. Although the plaintiffs have not cited either paragraph

in support of their motion, both are relevant and material because of the

important role that legitimate third parties play in the voter's exercise of

First and Fourteenth Amendment rights. *See, e.g. Anderson v.

Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of

"political figures outside the two major parties"); *Green Party of Georgia

v. Kemp*, 171 F. Supp. 3d 1340, 1352-53, 1363 (N.D. Ga. 2016) (same),

*aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam). Paragraph 13

provides context and foundation for paragraph 14, which shows that the Libertarian Party takes serious issues on matters of wide public concern that are distinct from those of other parties. The plaintiffs have cited similar testimony from other witnesses. (ECF 69-2 ¶ ¶210-214.)

**Ex. 4: Declaration of Faye Coffield (Doc. 69-7)**

The defendant objects to paragraphs 11 and 12 of Coffield's declaration. (ECF 99 at 8.) Both of these are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 21; ECF 69-2 ¶188.)

Paragraphs 11 and 12 provide as follows:

11.    During the course of my signature-gathering, I encountered many obstacles. Perhaps the biggest obstacle was fear of identity theft among potential signers. The petition form required the voter to provide a name, signature, date of birth, and address, which is more than enough information for a criminal to steal the signer's identity for nefarious purposes. Many of the potential signers that my team and I encountered were worried about identity theft and therefore extremely reluctant to sign.

12.    We also encountered many people who were reluctant to sign because they didn't want their name in the public record. They were fearful of public or private retribution for signing my petition.

(ECF 69-7 at 2-3.) The defendant contends that reasons offered by people who refused to sign Coffield's petition are inadmissible hearsay. They are not.

First, those reasons are not offered here for their truth, but rather to illustrate the problems that Coffield encountered. It does not matter whether the prospective signers were telling the truth. It is significant enough that those are the reasons they gave. Offered for that purpose, the statements are not hearsay. Fed. R. Evid. 801(c)(2).

Second, even if the statements are offered for their truth, they would fall under the exception to the hearsay rule for present-sense impressions. Fed. R. Evid. 803(1). They "explain[] an event," namely the person's refusal or reluctance to sign, "immediately after the declarant [the would-be signer] perceived it." *Id.*

### Ex. 5: Declaration of Martin Cowen (Doc. 69-8)

The defendant objects to paragraph 22 of Cowen's declaration. (ECF 99 at 8-9.) This paragraph is cited in support of the plaintiffs' motion for summary judgment. (ECF 69-2 ¶5.)

Paragraph 22 provides as follows: "The requirement to pay $5,220 to the Secretary of State of Georgia as a condition to appear on the ballot

is a sufficient barrier to ballot access for the purpose of excluding 'non-serious' candidates." (ECF 69-8 at 6.) The defendant contends that this paragraph is inadmissible lay-witness opinion testimony because it is not based on his personal knowledge, and he argues further that it is not admissible as expert testimony because Cowen was not designated by the plaintiffs as an expert witness. (ECF 99 at 9.) The defendant is simply mistaken that Cowen's opinion is not based on his personal knowledge. Paragraphs 8 through 18 of Cowen's declaration detail his candidacy for U.S. Representative in 2018. Paragraph 10, in particular, states that he paid the filing fee in 2018. Paragraph 17 notes that he loaned his campaign more than $15,000. Having thus felt the impact of the filing fee on his own finances, he is competent to offer the opinion testimony in paragraph 22 as a lay witness.

**Ex. 6: Declaration of Hugh Esco (Doc. 69-9)**

The defendant objects to paragraphs 6, 7, 8, 10 through 14, 15, and 16 of Esco's declaration. Of these, only paragraphs 7, 8, 10, 12, 13, and 14 are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 17, 18, 20; ECF 69-2 ¶¶ 96, 110, 149, 158, 172, 174, 176, 188.)

Paragraphs 6 and 7 provide as follows:

6.     In my experience, Georgia's signature requirements for independent and political-body candidates for U.S. Representative are not realistically achievable.

7.     The number of signatures required is simply too high to collect in the time available. This is particularly true because the Secretary of State's office routinely rejects a high proportion of signatures. In 2016, for example, the Secretary of State rejected approximately half of the signatures collected for the Green Party's nominee for President, Dr. Jill Stein. As a result of the low validation rates, in my experience, a party or candidate needs to collect at least double the number of raw signatures as are required.

(ECF 69-9 at 2-3.) The defendant contends that these paragraphs are inadmissible because they are not based on Esco's personal knowledge. (ECF 99 at 9-10.) The defendant is plainly mistaken in that contention. Esco is a longtime officer of the Georgia Green Party and has personally coordinated or otherwise been involved with numerous petition drives for Green Party candidates in Georgia, including the Green Party's candidate for President of the United States. (ECF 96-9 ¶¶ 2, 5.) Paragraphs 6 and 7 are expressly based on that experience.

Paragraph 8 provides as follows:

8.     The sheer burden of collecting tens of thousands of signatures is compounded by at least four additional factors. First is that traditional public spaces where

17

petitioning used to take place, such as main streets and town squares, have become increasingly privatized into shopping malls and the like. Second is that the automobile has insulated voters from circulators. Potential signers drive right past our circulators as they go to park at strip malls and shopping centers. Third is that concerns about identity theft have made many potential signers wary about sharing their personally identifying information like birth dates and home addresses. And fourth is that petition circulators, even when canvassing legally on public property, are often harassed by police officers unaware or unconcerned about their right to petition. Green Party petitioners have been harassed repeatedly while gathering signatures in public parks, and this makes it very difficult to attract and maintain volunteer circulators.

(ECF 69-9 at 3.) The defendant contends that this is inadmissible lay-witness opinion testimony because it is based on hearsay. (ECF 99 at 10.) Not so. The statements in paragraph 8 are all things that a veteran petition-coordinator like Esco would know from personal experience. But even if Esco knows of them only because his petitioners told him so, those statements would fall under an exception to the hearsay rule for present-sense impressions, Fed. R. Evid. 803(1), and any lay-witness opinions based on those impressions would not be inadmissible.

Paragraphs 11 through 14 provide as follows:

11.    Several Green Party candidates for U.S. Representative have made a genuine effort to satisfy the ballot-access requirement.

12.    In 2002, Joyce Griggs declared her intention to qualify for the general-election ballot as the Green Party candidate in Georgia's First Congressional District. She made a genuine effort to gather enough signatures but was unsuccessful in doing so. It is worth noting that the signature requirement was lowered by court order that year because Georgia was late to redraw district lines, and Griggs was still unable to gather enough signatures despite her best efforts. With perhaps eight volunteers, Griggs gathered approximately 400 signatures over a period of six or eight weeks.

13.    Also in 2002, Al Herman declared his intention to qualify for the general-election ballot as the Green Party candidate in Georgia's Seventh Congressional District. He made a genuine effort to gather enough signatures but was unsuccessful in doing so. With ten or so volunteers, Herman collected more than 2,000 signatures over a five-month period.

14.    In 2018, Jimmy Cooper declared his intention to qualify for the general-election ballot as the Green Party candidate in Georgia's Eighth Congressional District. He made a genuine effort to gather enough signatures but was unsuccessful in doing so.

(ECF 69-9 at 4-6.) The defendant contends that these statements lack foundation and are not based on personal knowledge. (ECF 99 at 11.) But, again, the statements are all things that a veteran petition-coordinator would know. Esco's declaration makes clear that he has been involved with the Green Party since 1996 and has personally coordinated or otherwise been involved with numerous petition drives

for Green Party candidates in Georgia, including the Green Party's

candidate for U.S. Representative. (ECF 96-9 ¶¶ 2-3, 5.)

> Paragraphs 15 and 16 provide as follows:

> 15.    Georgia's ballot-access laws make it more difficult for
> the Green Party to recruit high-quality candidates for U.S.
> Representative.

> 16.    In 2012, we came close to recruiting former U.S.
> Representative and 2008 Green Party nominee for
> President, Cynthia McKinney, to run as the Green Party
> candidate for U.S. Representative in Georgia's Fourth
> Congressional District. She filed a notice of candidacy with
> the Federal Election Commission and began raising money
> for a possible bid, but she ultimately decided against
> running because she concluded that it would be difficult, if
> not impossible, for her to satisfy the ballot-access
> requirements. Had she been on the ballot in the general
> election, I believe that she would have been highly
> competitive.

(ECF 69-9 at 6.) The defendant contends that these paragraphs contain

inadmissible opinion testimony, but he does not explain what about

these paragraphs would make such testimony inadmissible. (ECF 99 at

10.) Any opinions in these paragraphs are well within the knowledge

and experience of a longtime officer of the Georgia Green Party, and

particularly one who has spearheaded the party's efforts to secure ballot

access for its candidates. The defendant further contends that Esco's

opinion on McKinney's electoral prospects in the final sentence of

paragraph 16 is speculative (ECF 99 at 10), but, again, that opinion has more than adequate foundation in Esco's extensive experience as a Green Party officer in Georgia.

**Ex. 7: Declaration of Jay Fisher (Doc. 69-10)**

The defendant objects to paragraphs 7, 8, 9, and 11 of Fisher's declaration. All of these paragraphs are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 17, 18; ECF 69-2 ¶¶ 106, 149, 150, 158, 188.)

Paragraph 7 provides as follows:

> 7.    I interviewed several professional petition circulators and considered hiring them to help me qualify for the ballot. Based on my conversations with them, I was convinced that I would need to collect at least 30,000 raw signatures in order to qualify for the ballot because the Secretary of State's office routinely rejects so many signatures.

(ECF 69-10 at 2.) The defendant contends that this paragraph contains inadmissible hearsay. (ECF 99 at 11.) Specifically, the defendant takes the position that it is inadmissible for Fisher to state that he had conversations with professional petition circulators, even though nothing in paragraph 7 conveys a statement by those circulators. That is simply not the law of hearsay. Fed. R. Evid. 801. The first sentence of

paragraph 7 is a simple declaration by Fisher himself: Fisher

interviewed circulators. The second sentence is also a declaration by

Fisher himself: Fisher became convinced. There is no declaration by an

out-of-court declarant (other than Fisher himself) and hence no hearsay.

*Id.*

> Paragraph 8 provides as follows:

> 8.    Gathering signatures was frustrating and difficult
> work. Rather than engaging with voters on the issues, I
> had to spend time educating voters on Georgia's ballot-
> access laws and explain why I needed their signature and
> personal information. Many voters I encountered were
> hesitant to give this information to a stranger and did not
> understand why I needed it.

(ECF 69-10 at 2.) The defendant contends that this paragraph contains

inadmissible hearsay because Fisher states that he spoke to voters.

(ECF 99 at 11.) But, here again, there is no statement by an out-of-court

declarant. Fisher is testifying as to his own experiences interacting with

Georgia voters. And even if Fisher's account of the voters' reactions could

be considered an out-of-court statement by someone other than Fisher, it

would fall within the present-sense impression of the hearsay rule. Fed.

R. Evid. 803(1).

Paragraph 9 provides as follows: "I also found that my ideas could not get any traction in the media because I was not yet on the ballot." (ECF 69-10 at 2.) The defendant contends that this statement is inadmissible because it is speculative, lacks foundation, and constitutes hearsay. (ECF 99 at 11.) The defendant's objections here are utterly frivolous. There is no basis for concluding that Fisher's testimony in paragraph 9 is based on speculation. As a candidate for Congress, he would know whether his ideas were getting traction in the media. The paragraph has ample foundation in paragraphs 3 and 4 of his declaration, which establish that he ran for Congress in 2006 on a platform of opposition to the Iraq War and the Patriot Act. (ECF 69-10 at 1.) And there is no statement from an out-of-court declarant and therefore no hearsay. Fed. R. Evid. 801(c)(1).

Paragraph 11 provides as follows: "My experience in 2006 convinced me that Georgia's signature requirement for third-party candidates for U.S. Representative are not realistically achievable—at least not without a lot of money for professional petition-circulators." (ECF 69-10 at 3.) The defendant contends that this paragraph is inadmissible because it is conclusory and not based on any facts. (ECF

99 at 11.) Not so. Fisher's opinion in Paragraph 11 is expressly based on his experience with his 2006 campaign, which is recounted in paragraphs 3 through 10 of his declaration. The defendant takes the absurd position that candidates who have tried unsuccessfully to satisfy Georgia's ballot-access requirements are not allowed to have any opinions about it. There is no basis in law whatsoever for that position.

**Ex. 8: Declaration of Aaron Gilmer (Doc. 69-11)**

The defendant objects to paragraphs 13, 19, and 21 of Gilmer's declaration. All of these paragraphs are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 21; ECF 69-2 ¶¶7, 94, 188, 214.)

Paragraph 13 provides as follows:

13.     I quickly discovered that collecting signatures at public events did not prove fruitful. Many events in my district would not allow petitioning or political activities. Where I was allowed, I was only able to collect a handful of signatures at each event. The number of signatures would depend somewhat on the size of the event, and many of the events where I was allowed to gather signatures were quite small. But I also found that potential signers were often put-off by the prospect of giving personally-identifying information, such as a birthdate and home address, to a stranger because of the possibility of identity theft. I had many people refuse to sign my petition, even after a long conversation about my candidacy, because of their wariness about information required by the form.

(ECF 69-11 at 3.) The defendant contends that this paragraph contains inadmissible hearsay because Gilmer mentions the reactions he faced while petitioning last year. (ECF 99 at 12.) As already discussed above, this is not hearsay. This is Gilmer's declaration, not the declaration of any voter. Fed. R. Evid. 801(c)(1). It need not be admitted for the truth of the matter asserted because what is important is that would-be signers cited privacy as an excuse (even if the excuse was a lie). Fed. R. Evid. 801(c)(2). And those excuses would fall within the present-sense impression exception to the hearsay rule in any event. Fed. R. Evid. 803(1).

> Paragraph 19 provides as follows:

> 19.    Had I been able to get on the ballot, I believe that I would have been competitive against the incumbent, Republican Doug Collins. Libertarian views on the economy, privacy, and government intrusion are popular in rural north Georgia, where the district is located, and I believe that I would have gotten a lot of votes if I had been able to run a general-election campaign from the start. I would have broadened the discussion of the issues beyond the old left-right dichotomy.

(ECF 69-11 at 5.) The defendant contends that this paragraph is conclusory and not within his personal knowledge. (ECF 99 at 12.) The first sentence of the paragraph is a statement of Gilmer's belief that he

would have been competitive if he had been on the ballot. One wonders

who, if not Gilmer himself, would have personal knowledge of what

Gilmer believed about his own prospects for election. Because Gilmer

clearly has personal knowledge of his own beliefs, the defendant's

objection here is unfounded. The remainder of the paragraph explains

*why* he held that belief. As a Libertarian and politically-active resident

of north Georgia, he has a foundation for his opinions about what

Libertarian issues would resonate with his neighbors.

> Paragraph 21 provides as follows:

> 21.    I am planning to run for office in 2020 as a
> Libertarian Party candidate, but I have not yet decided
> which office. I would most prefer to run for U.S.
> Representative, but my experience in 2018 convinced me
> that it is virtually impossible to qualify for the general-
> election ballot as a Libertarian candidate for U.S.
> Representative. The number of signatures required is just
> too high.

(ECF 69-11 at 5-6.) The defendant contends that this paragraph is

conclusory and lacks foundation. (ECF 99 at 12-13.) The plaintiffs

disagree. The foundation for Gilmer's statement that "my experience in

2018 convinced me that it is virtually impossible to qualify for the

general-election ballot as a Libertarian candidate for U.S.

Representative. The number of signatures required is just too high" is

his experience as a Libertarian candidate for U.S. Representative in 2018. That experience is set out in paragraphs 9 through 20 of Gilmer's declaration. Here again, the defendant takes the untenable position that candidates who have tried unsuccessfully to satisfy Georgia's ballot-access requirements are not allowed to have any opinions about it. There is no basis in law whatsoever for that position.

**Ex. 10: Declaration of Derrick Lee (Doc. 69-13)**

The defendant objects to Lee's entire declaration on the ground that it includes inadmissible lay-witness opinion testimony. The defendant contends that Lee, who is a professional petition circulator, may not testify about "industry norms" in his industry without being designated as an expert. (ECF 99 at 13.)

The Eleventh Circuit disagrees. In *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co. Ltd.*, 320 F.3d 1213 (11th Cir. 2003), the Eleventh Circuit addressed whether Rule 701 permits an officer or employee of a corporation to offer lay opinion testimony about industry norms and pricing. The court concluded that the district court had not abused its discretion in permitting officers and employees to testify as lay witnesses about the reasonableness of their corporation's pricing in

light of industry norms. *Id.* at 1223. The court reasoned that the lay

witnesses' testimony was "based upon their particularized knowledge

garnered from years of experience within the field." *Id.* The court also

noted that the Advisory Committee notes to the 2000 amendments

specifically carve out the lay opinion testimony of business owners or

officers from subsection (c)'s exclusion, and explain that:

> most courts have permitted [owners and officers] to testify
> ... without the necessity of qualifying the witness as an ...
> expert. Such opinion testimony is admitted not because of
> experience, training or specialized knowledge within the
> realm of an expert, but because of the particularized
> knowledge that the witness has by virtue of his or her
> position in the business. The amendment does not purport
> to change this analysis.

*Tampa Bay*, 320 F.3d at 1222 (quoting Fed. R. Evid. 701 Advisory

Comm. Notes). *See also United States v. Hill*, 643 F.3d 807, 840-42 (11th

Cir. 2011) (explaining and relying on *Tampa Bay*).

Much of Lee's declaration, including some of the specific passages

mentioned in the defendant's brief, are not even opinions. Paragraphs 4

through 8, 10, 11, 13 through 16, and 18 through 20 recount Lee's

experience working on two petition drives in Georgia. (ECF 69-13 at 1-

3.) There are no opinions there. Paragraph 9 contains some factual

comparison of Lee's experience in Georgia versus other states and some

strictly factual information about his experience in Georgia. Paragraph 17, 21, and 22 contain estimates or opinions based solely on Lee's personal experience in Georgia. Only paragraphs 12 and 23 contain any reference to industry norms or standards. Paragraph 12 notes the industry standard for signature-validation rates, and paragraph 23 provides industry norms on pricing.

Lee's declaration establishes that he is a member of a limited-liability corporation engaged in the business of circulating petitions and that he has 32 years of experience in the industry. (ECF 69-13 at 1.) Under Rule 701 and *Tampa Bay*, that is more than sufficient foundation for his lay-witness testimony regarding industry-standard validation rates and pricing.

## Ex. 11: Declaration of Cynthia McKinney (Doc. 69-14)

The defendant objects to paragraphs 12 and 15 of McKinney's declaration. Of these, only paragraph 12 is cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 19; ECF 69-2 ¶100, 172.)

Paragraph 12 provides as follows:

12.    In fact, at a potential donors roundtable event, I was specifically told that it only takes one person in the

29

> Secretary of State's office to deny your petition for candidacy after we've donated thousands of dollars toward the effort. For them, the risk of an unnamed, unknown bureaucrat keeping me off the ballot by objecting to the collected signatures was too high.

(ECF 69-14 at 3.) The defendant contends that this is inadmissible hearsay. (ECF 99 at 14.) This paragraph need not be admitted for the truth of the matter asserted because what is important is that potential donors cited the Secretary of State's office reputation for rejecting signatures as an excuse for refusing to donate (even if the excuse was inaccurate or a lie). Fed. R. Evid. 801(c)(2). And the excuses would fall within the present-sense impression exception to the hearsay rule in any event. Fed. R. Evid. 803(1).

Paragraph 15 provides as follows: "Based on my experience in 2012, I believe that Georgia's signature requirement for ballot access is not realistically achievable." (ECF 69-14 at 4.) The defendant contends that McKinney is not competent to testify on this point and that her opinion lacks foundation because she did not actually attempt to gather signatures. (ECF 99 at 14.) But this takes a too-narrow view of McKinney's testimony. McKinney indicates that she did attempt to raise the money that she believed to be necessary to fund a successful petition

drive and subsequent campaign, but she was unsuccessful in doing so. (ECF 69-14 at 3-4.) The difficulty that she experienced in trying to raise that money provides ample foundation for her opinion that Georgia's signature requirement is not reasonably achievable.

**Ex. 12: Declaration of Ted Metz (Doc. 69-15)**

The defendant objects to paragraphs 10, 11, 12, and 14 of Metz's declaration. Of these, only paragraphs 11 and 12 are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 18, 19; ECF 69-2 ¶¶ 153, 172.)

Paragraph 10 provides as follows:

10.    As chair, I received dozens of inquiries from potential Libertarian candidates. Among other things, I would explain the ballot-access requirements to these potential candidates. It is hard to know for sure why some of the potential candidates declined to run, but my sense is that the signature requirement was a significant deterrent for potential candidates for U.S. Representative and the state legislature. The filing fee was also a deterrent for candidates for U.S. Representative. Two potential candidates that I know were deterred by the ballot-access requirements are Beth Pollak, who inquired about running for state representative, and Travis Klavohn, who inquired about running for U.S. Representative. I believe that both of them would have run as Libertarian candidates if the ballot-access requirements had been reasonably achievable.

(ECF 69-15 at 2-3.) The defendant contends that this paragraph is inadmissible because it is speculative. (ECF 99 at 15.) It is not. As the first and second sentences of the paragraph indicate, Metz himself spoke to dozens of potential Libertarian candidates. Those conversations provide sufficient foundation for Metz to form an opinion as to why some of those potential candidates declined to run. The defendant also objects to the two specific examples that Metz cites in the paragraph, Pollak and Klavohn. But again, the declaration indicates that Metz actually spoke to both people, and those conversations provide sufficient basis for Metz's opinion.

Paragraph 11 provides as follows:

11.    As chair, I was also involved in fundraising, and I have heard donors refuse to give to candidates because the candidates were not assured of a place on the ballot. Donating to a candidate who may not even make it onto the ballot strikes these donors as a risky proposition at best and makes fundraising exceedingly difficult.

(ECF 69-15 at 3.) The defendant contends that this paragraph is inadmissible hearsay. This paragraph need not be admitted for the truth of the matter asserted because what is important is that potential donors cited the issue of ballot access for rejecting signatures as an excuse for refusing to donate (even if the excuse was a lie). Fed. R. Evid.

32

801(c)(2). And the excuses would fall within the present-sense

impression exception to the hearsay rule in any event. Fed. R. Evid.

803(1). Those sentences also provide foundation for Metz's opinion that

fundraising is difficult.

Paragraph 12 provides as follows:

12.    The same is true of volunteer recruitment. Just as
donors are hesitant to give their money to support a
candidate who may not make it on the ballot, so too are
volunteers hesitant to donate their time to the same cause.
As chair, I often tried to recruit volunteers for signature-
gathering over social media, and I found it to be very
difficult to get people excited about that activity. Not only
is the task of canvassing door-to-door itself off-putting to
some people, but also the Secretary of State's track record
of rejecting so many signatures submitted in the past by
Libertarian candidates makes our supporters believe that
gathering signatures would be a wasted effort.

(ECF 69-15 at 3-4.) The defendant contends that this paragraph is

inadmissible because it is speculative. (ECF 99 at 15.) As with

paragraph 10, Metz's opinions in this paragraph have sufficient

foundation in his volunteer-recruitment efforts as chair of the

Libertarian Party.

Paragraph 14 provides as follows:

14.    In general, I believe that Georgia's ballot-access
requirements hurt the Libertarian Party's ability to
compete in the marketplace of ideas. We have no shortage

> of interesting and popular policy positions, but the ballot-
> access restrictions keep most of our candidates off the
> ballot and deter many other candidates from even entering
> the fray. And without Libertarian candidates on the ballot,
> many voters don't get exposed to our ideas. Those who
> would otherwise support us have no feasible way to do so
> when they enter the voting booth.

(ECF 69-15 at 4.) The defendant contends that Metz's opinions in this

paragraph lack foundation, are not based on personal knowledge, and

are conclusory. (ECF 99 at 16.) The defendant further argues that the

chair of the Libertarian Party is not allowed to offer any opinions about

whether Georgia law hurts his party or his party's relationship with

Georgia's voters. (*Id*.) That cannot be the rule. Metz's tenure as chair of

the party—and particularly his activities in fundraising and candidate-

recruitment—provides sufficient foundation for his opinions about

whether and how Georgia's ballot-access laws hurt his party. Metz's

involvement with the party—as a member, candidate and officer—

provides sufficient foundation for his opinions that the Libertarian Party

has interesting ideas and that Georgia voters don't get exposed to them.

**Ex. 13: Declaration of John Monds (Doc. 69-16)**

The defendant objects to paragraph 8 of Monds' declaration. This paragraph is cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 18; ECF 69-2 ¶158.)

Paragraph 8 provides as follows:

> 8.     I do not believe that Georgia's ballot-access requirements for Libertarian candidates for U.S. Representative are reasonably achievable. In fact, I think they're impossible. It would take an army of volunteers or hundreds of thousands of dollars for paid petition circulators, and neither pathway is truly feasible when the prospect of actually achieving ballot access is so far from certain.

(ECF 69-16 at 2.) The defendant contends that this paragraph is irrelevant and not based upon the witnesses' personal knowledge. (ECF 99 at 16.) The defendant asserts, in particular, that Monds cannot testify about signature-gathering because Monds "has never run for office where he was required to conduct a signature gathering campaign." (*Id.*)

The defendant's assertion is untrue, however, and the defendant's attorneys knew (or should have known) that it is untrue at the time they filed the defendant's objections. One of the defendant's attorneys deposed Monds in January and asked him about his prior campaigns. In addition to the statewide campaigns mentioned in Monds' declaration,

the defendant's attorney questioned Monds about his 2006 campaign for

the school board in Grady County:

> Q      I mean, I'm saying in your personal experience. · Is
> there anyone else?
>
> A      Well, I had to petition myself for a race.
>
> Q      Oh, which race did you have to petition for?
>
> A      The school board race back in 2006.
>
> Q      Okay. · And what was the requirements for that?
>
> A      The percentage of signatures, the guidelines that the
> state set out, was like 5 percent of the registered voters in
> that district. · It was -- to my knowledge, it was around 160
> signatures that were required to qualify for that office.
>
> Q      And just to make sure I'm understanding -- this is
> Grady County School Board; is that right?
>
> A      That is correct.

(Ex. 51: Monds dep. at 28:11-23; *see also id.* at 28:24-30:22.) In addition,

the defendant's attorney questioned Monds extensively about his

experience gathering signatures for another Libertarian candidate. (*Id.*

at 20:10-25:5.) So, contrary to the defendant's false assertion, Monds

does have personal knowledge of signature-gathering sufficient to form

the opinions in paragraph 8.

Monds also has the extensive political experience reflected in his

declaration. He has been involved with the Libertarian Party since 2004

36

and has served several terms on its executive committee. (ECF 69-16 at 1.) He has run for statewide office three times, earning almost two million votes. (*Id.* at 1-2.) And he has considered running for U.S. Representative but was deterred from doing so by Georgia's ballot-access requirements. (*Id.* at 2.) That experience independently provides sufficient foundation for the opinions in paragraph 8.

Paragraph 8 is also clearly relevant. If nothing else, it shows what a seasoned and accomplished politician thinks of the feasibility of Georgia's ballot-access requirements.

## Ex. 14: Declaration of Eugene Moon (Doc. 69-17)

The defendant objects to paragraphs 9 and 12 of Moon's declaration. Neither one of these paragraphs is cited in support of the plaintiffs' motion for summary judgment.

Paragraph 9 provides as follows:

9.      My experience in 2010 convinced me that it is virtually impossible to qualify for the general-election ballot as an independent or third-party candidate for U.S. Representative. The number of signatures required is just too many to gather in the course of the 180 days allowed – even with teams of good volunteers as I had. I also learned that there is a minefield of legal technicalities that can lead to hundreds or thousands of signatures being thrown out. I feel like the deck is stacked against independent and third-party candidates.

37

(ECF 69-17 at 3.) The defendant contends that "Moon's allegations about the difficulties faced by independent and political body candidates are purely speculative, are not based upon the witness's personal knowledge, and are not admissible." (ECF 99 at 17.) However, as Moon's declaration makes clear, Moon himself tried to qualify for the ballot as an independent candidate in Georgia's Ninth Congressional District in 2010. (ECF 69-17 at 1-2.) That attempt provides sufficient foundation for the facts and opinions in this paragraph.

Paragraph 12 provides as follows:

12.    Because running for U.S. Representative as an independent would be futile under current law, I have no plans to do so again. But if the ballot-access laws were more reasonable, I would seriously consider running again as an independent candidate if the right opportunity presented itself.

(ECF 69-12 at 3.) The defendant makes the same objection to this paragraph (and particularly to Moon's opinion that running again as an independent candidate would be "futile"). (ECF 99 at 17.) Here again, Moon's previous attempt to qualify for the ballot as an independent candidate in Georgia's Ninth Congressional District provides sufficient foundation for the facts and opinions in this paragraph.

**Ex. 15: Declaration of Hien Nguyen (Doc. 69-18)**

The defendant objects to paragraphs 9, 10, 11, and 12 of Nguyen's declaration. Of these, only paragraphs 9 and 10 are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-2 ¶97.)

Paragraphs 9 and 10 provide as follows:

9.      I turned in my signatures to the Secretary of State's office on time. Approximately one month later, I received a letter from the Secretary of State's office informing me that only 528 of my signatures were valid. As a result, I did not qualify for the general-election ballot.

10.     The State's office invalidated almost 98 percent of my signatures due to incomplete residential addresses, which is not clearly required from the signature's page.

(ECF 69-18 at 9.) The defendant contends that these paragraphs are inadmissible hearsay. (ECF 99 at 17-18.) Not so.

As the defendant's attorneys knew (or should have known) when they filed the defendant's objections, the defendant produced the aforementioned letter to the plaintiffs in discovery along with Nguyen's petition. If called upon to do so at trial, the plaintiffs could offer those documents into the record. They would plainly be admissible in that form, and the defendant does not suggest otherwise. But even in their present form, these paragraphs are not hearsay because they contain the

statement of an opposing party—namely, the Secretary of State himself—which by definition is not hearsay. Fed. R. Evid. 801(d)(2)(A).

Paragraphs 11 and 12 provide as follows:

11.    My experience in 2016 convinced me that the signature requirement is not realistically achievable, particularly when the Secretary of State's office can invalidate so many. The number of signatures required is just too high.

12.    I would consider running again as an independent for U.S. Representative if the ballot-access requirements were more reasonable, but running again under the current ballot-access requirements would be futile.

(ECF 69-18 at 3.) The defendant contends that these paragraphs are speculative, conclusory, and not within the witness's personal knowledge. (ECF 99 at 18.) But, as his declaration makes clear, Nguyen tried unsuccessfully to qualify for the ballot as an independent candidate for U.S. Representative in Georgia's Fourth Congressional District in 2016. (ECF 69-18 at 1-2.) That experience provides sufficient foundation for the facts and opinions in these paragraphs.

**Ex. 16: Declaration of Wayne Parker (Doc. 69-19)**

The defendant objects to paragraphs 12 and 17 of Parker's declaration. Both of these paragraphs are cited in support of the

plaintiffs' motion for summary judgment. (ECF 69-1 at 16, 18; ECF 69-2
¶ ¶ 108, 161.)

Paragraph 12 provides as follows:

12.    Our petition circulators were repeatedly harassed by
the police for attempting to petition in public places. One
group of petitions was prevented by police from petitioning
at the Fourth of July fireworks display in Rome, Georgia.
Another group was prevented from petition at public events
in Columbus and Lagrange because of local anti-solicitation
ordinances.

(ECF 69-19 at 3.) The defendant contends that this paragraph is

inadmissible hearsay to the extent that it is beyond Parker's personal

knowledge. (ECF 99 at 18.) The statements in paragraph 12 are all

things that a candidate would likely know about his campaign from

personal experience. But even if Parker knows of them only because his

petitioners told him so, those statements would fall under an exception

to the hearsay rule for present-sense impressions. Fed. R. Evid. 803(1).

Paragraph 17 provides as follows:

17.    My experience in 2002 convinced me that it is
virtually impossible to qualify for the general-election
ballot as a third-party candidate for U.S. Representative
without a lot of money for paid petition circulators. Under
normal circumstances, i.e. when the signature requirement
is not lowered by court order, a single candidate would
probably need more than $100,000. And even then, ballot
access would be far from assured because the Secretary of

41

> State's office routinely rejects a large fraction of the
> signatures submitted with literally no oversight or
> meaningful opportunity for review.

(ECF 69-19 at 4.) The defendant contends that this paragraph consists of

inadmissible opinion testimony unsupported by any facts. (ECF 99 at 18-

19.) This paragraph does contain lay-witness opinion testimony, but that

does not make it inadmissible. *See* Fed. R. Evid. 701. Parker's

declaration makes clear that he was a Libertarian candidate for U.S.

Representative Georgia's Eleventh Congressional District in 2002. (ECF

69-19 at 2-4.) That experience provides more than sufficient foundation

in personal experience for Parker's opinions as a lay witness in

paragraph 17.

**Ex. 18: Declaration of Nicholas Sarwark (Doc. 69-21)**

The defendant objects to paragraphs 15, 16, 30, 31, and 33 of

Sarwark's declaration. Of these, only paragraphs 15, 16 , 30, and 31 are

cited in support of the plaintiffs' motion for summary judgment. (ECF

69-1 at 22; ECF 69-2 ¶¶ 191, 192, 219, 220.)

Paragraphs 15 and 16 provide as follows:

15.    A 2010 study by David Boaz and David Kirby found
that at least 14 percent of American voters have
libertarian-leaning views.

42

> 16.   More recently, the Gallup Poll found in its 2015
> Governance survey that 27 percent of respondents could be
> characterized as libertarians – the highest number that
> poll has ever found. And, in 2018, the same Gallup poll
> found that 57 percent of Americans say that a third major
> political party is needed, marking the fifth straight year in
> which the poll found a majority support for a new third
> party.

(ECF 69-21 at 4.) The defendant contends that these studies are

inadmissible hearsay. (ECF 99 at 19-20.)

Historically, the admissibility of public opinion surveys has been a

matter of some debate, particularly when the survey was conducted for

litigation purposes only, but the modern trend among the courts is to

admit the evidence under one of the exceptions to the hearsay rule. *See,*

*e.g., Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224-38 (2d Cir. 1998)

(Sotomayor, J., discussing the cases). And courts often cite to Gallup Poll

results without conducting any sort of admissibility analysis. *See, e.g.,*

*Kolbe v. Hogan*, 849 F.3d 114, 155 n.3 (4th Cir. 2017) (en banc) (Traxler,

J., dissenting); *United States v. McQuiller*, 178 F. Supp. 3d 75, 82 n.5

(W.D.N.Y. 2016).

Here, paragraphs 15 and 16 are offered for the ultimate purpose of

showing that the Libertarian Party has "widespread national support."

*Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1363 (N.D. Ga.

2016) (describing Ralph Nader's 2000 presidential campaign, which received 2.74 percent of the nationwide poplar vote), *aff'd* No. 16-11689 (11th Cir. Feb. 1, 2017) (per curiam). They are not offered for the precise numbers asserted. The Court could therefore conclude that paragraphs 15 and 16 do not constitute hearsay at all. Fed. R. Evid. 801(c)(2).

But even if paragraphs 15 and 16 were offered for the truth of the matters asserted, the studies mentioned in those paragraphs would be admissible under the exception to the hearsay rule for market reports and similar commercial publications, Fed. R. Evid. 803(17), and under the residual exception, Fed. R. Evid. 807. The former exception applies to "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." *Id.* The Gallup Poll's annual Governance survey is just such a publication. The residual exception, which is frequently used to admit public opinion surveys, *see Schering*, 189 F.3d at 227, permits a court to admit a hearsay statement where:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered
than any other evidence that the proponent can obtain
through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules
and the interests of justice.

Fed. R. Evid. 807(a). The Gallup Poll, on which the studies in

paragraphs 15 and 16 are based, undoubtedly carries circumstantial

guarantees of trustworthiness, particularly because it is an annually-

recurring survey not conducted for this or any other kind of litigation.

The studies are offered here in support of a material fact (demonstrating

nationwide support for the Libertarian Party). There is no other

evidence available to show public support for Libertarian ideas. And

admitting the evidence here would serve the interests of justice,

particularly in light of the fact that the Secretary of State repeatedly

described the Libertarian Party as a political body "with significant

support" in previous litigation. (Ex. 42: excerpts from appellant's briefs,

ECF 69-46.)

Paragraphs 30, 31, and 33 provide as follows:

30.     The exclusion of Libertarian candidates for U.S.
Representative from the ballot in Georgia harms our
coordinated national electoral strategy and prevents us
from presenting the Libertarian Party as a viable
alternative for all voters nationwide.

31.    Georgia's ballot-access restrictions thereby have a ripple-effect across the nation.

33.    The exclusion of Libertarian candidates for U.S. Representative from Georgia's ballot in election cycle after election cycle perpetuates the false impression that the Libertarian Party is only interested in running candidates for president. On the contrary, the Libertarian Party runs candidates for U.S. Representative in all 50 states and the District of Columbia, except Georgia. Moreover, in Georgia, Libertarians are numerous, enthusiastic, and turn out to support Libertarian candidates on election day, as demonstrated by the 162,260 votes that Alan Buckley, our candidate for U.S. Senate, received in 2016. But for Georgia's overly restrictive and burdensome ballot-access requirements for U.S. House, we would run congressional candidates in that state too.

(ECF 69-21 at 7-8.) The defendant contends that these paragraphs

contain inadmissible lay-witness opinions because they lack any factual

basis. (ECF 99 at 19.) However, as Sarwark's declaration makes clear,

he has been the chair of the Libertarian National Committee since 2014

and an active member of the Libertarian Party since 1999. (ECF 69-21

at 1-2.) His experience in those roles provide sufficient foundation for the

facts and opinions in these paragraphs. Indeed, if any lay witness could

reasonably hold opinions about how Georgia's ballot-access restrictions

hurt the national Libertarian Party, it would be the national party chair.

**Ex. 19: Declaration of Luanne Taylor (Doc. 69-22)**

46

The defendant objects to paragraphs 6, 7, and 15 of Taylor's declaration. None of these paragraphs are cited in support of the plaintiffs' motion for summary judgment.

Paragraphs 6 and 7 provide as follows: "6.   I was told that I would 1,635 signatures to run for House District 49, where I live.  7.   I made a genuine effort to collect the necessary signatures." (ECF 69-22 at 2.) The defendant contends that these paragraphs are irrelevant because they concern a signature-gathering campaign for State Representative rather than U.S. Representative. (ECF 99 at 20.) This contention, however, takes a too-narrow view of Taylor's testimony.

Taylor's full testimony shows that she *wanted* to run for U.S. Representative but was deterred from doing so by the number of signatures required. (ECF 69-22 at 1.) It was only then that she decided to run for State Representative. (ECF 69-22 at 2.) The plaintiffs cite the fact of her deterrence in support of their motion (ECF 69-2 ¶113), and that is plainly relevant under the *Anderson* test. *Cf. Coffield v. Kemp*, 599 F.3d 1276, 1277 (11th Cir. 2010) (noting that the plaintiff had not allege how many candidates had tried to meet Georgia's signature requirement).

47

Taylor's full testimony also describes some of the problems she faced while trying to gather signatures to qualify for the ballot as an independent candidate for State Representative. (ECF 69-22 at 2-3.) The plaintiffs cite her testimony, among the testimony of many other witnesses, to illustrate the difficulty of gathering signatures (ECF 69-2 ¶¶ 155, 174, 176), an issue which lies at the very core of the *Anderson* test. The defendant is free to argue that the difficulties she faced are unique to a campaign for State Representative rather than U.S. Representative, but that would go to the weight of Taylor's testimony rather than its admissibility. And because nothing about Taylor's testimony on this issue suggests that the difficulties she faced are in any way confined to a campaign for State Representative, such an argument would fail the smell test in any event.

Paragraph 15 provides as follows:

15.     My experience in 2018 convinced me that it is virtually impossible to qualify for the general-election ballot as an independent or third-party candidate for U.S. Representative, and it is not much easier to qualify as a candidate for State Representative. I have since become an advocate for improving our ballot access laws. I advocated in support of reform during the 2019 legislative session, but, unfortunately, those bills got little interest from state legislators.

48

(ECF 69-22 at 3.) The defendant contends that Taylor is not competent to form an opinion about the difficulty of qualifying for the ballot as an independent candidate for U.S. Representative because she did not actually attempt to do so. (ECF 99 at 20.) But, as her declaration makes clear, Taylor did try to gather signatures as a candidate for State Representative, and she knows how many signatures would be required to qualify as a candidate for U.S. Representative. (ECF 69-22 at 1-3.) That experience provides sufficient foundation for the facts and opinions in paragraph 15.

**Ex. 20: Declaration of Don Webb (Doc. 69-23)**

The defendant objects to paragraphs 10, 11, and 12 of Webb's declaration. All of these paragraphs are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 18; ECF 69-2 ¶¶ 152, 153, 158, 161.

Paragraphs 10, 11, and 12 provide as follows:

10.    I find that it is hard to convince people to volunteer to gather signatures for ballot access. Many Libertarian Party supporters and potential volunteers are discouraged by the Secretary of State's history of rejecting so many signatures to keep candidates off the ballot. They do not want to spend time on what they reasonably believe to be a futile effort.
11.    Based on my experience gathering signatures for six campaigns in the last five years, I do not believe that

49

> Georgia's signature requirement for Libertarian candidates
> for U.S. Representative are reasonably achievable. Even if I
> spent eight hours per day, seven days per week, going door-
> to-door over the 180-day petitioning window (a total of
> 1,440 hours), I believe that I could only gather about 4,800
> raw signatures. That is well short of the number required
> for a single candidate, particularly when the Secretary of
> State's office routinely rejects a high proportion of
> signatures. And my work, even at my heavily discounted
> rate, would cost a candidate almost $15,000.
>
> 12.    In order to have even a chance of gaining ballot
> access, a Libertarian candidate for U.S. Representative
> would have to bring in an army of paid petition circulators.
> Those circulators, collectively, would have to put in tens of
> thousands of person-hours gathering signatures door to
> door. And the costs for such an effort would likely run into
> the hundreds of thousands of dollars for each candidate.

(ECF 69-23 at 2-3.) The defendant contends that these paragraphs are

inadmissible hearsay and lacking in factual support. (ECF 99 at 20-21.)

The defendant also contends that Webb's opinions in paragraphs 11 and

12 are inadmissible because he was not designated as an expert witness.

(*Id.* at 21.)

As to paragraph 10, the defendant simply mischaracterizes Webb's

testimony: "Webb's allegation that the Secretary of State rejects

signatures to keep candidates off the ballot is purely speculative with no

basis in the factual record." (*Id.* at 21.) The defendant's phrasing

suggests that Webb is making a claim of nefarious intent, but that is not

Webb's testimony. Webb's testimony is better understood in light of the undisputed history of the Secretary of State's office repeatedly rejecting enough signatures on qualifying petitions to disqualify a candidate. For instance, presidential candidate Rocky De La Fuente and congressional candidates Hien Nguyen and Wayne Parker all submitted petitions containing enough signatures to qualify for the ballot but did not ultimately qualify because the Secretary of State rejected enough signatures to disqualify each candidate. (ECF 69-2 ¶¶ 145-148.) Webb's testimony refers to that history, as to which there is ample factual support, rather than to any allegation of intent.

The defendant's claim that paragraph 10 contains inadmissible hearsay should fail for the reasons discussed repeatedly above. This paragraph need not be admitted for the truth of the matter asserted because what is important is that potential campaign volunteers cited the Secretary of State's office reputation for rejecting signatures as an excuse for refusing to volunteer (even if the excuse was inaccurate or a lie). Fed. R. Evid. 801(c)(2). And the excuse would fall within the present-sense impression exception to the hearsay rule in any event. Fed. R. Evid. 803(1).

51

As to paragraphs 11 and 12, there is no basis for the defendant's claim that Webb's opinions are speculative and lack foundation in personal experience. As his declaration makes clear, Webb has worked as a petition circulator for Libertarian candidates in Georgia since 2014. (ECF 69-23 at 1-2.) He has worked on six campaigns gathering signatures door to door. (*Id.*) Under Rule 701, that experience provides sufficient foundations for the facts and opinions contained in paragraphs 11 and 12.

**Ex. 21: Declaration of Nathan Wilson (Doc. 69-24)**

The defendant objects to paragraphs 4, 12,[1] and 17 of Wilson's declaration. Of these, only paragraphs 4 and 17 are cited in support of the plaintiffs' motion for summary judgment. (ECF 69-1 at 19; ECF 69-2 ¶¶ 166, 171, 172.)

Paragraph 4 provides as follows:

> 4. As Executive Director, I found that raising money to support a ballot-access petition drive was exceedingly difficult. Major political donors do not want to give money to support candidates who, history suggests, have little chance of appearing on the general-election ballot. They want to give money to promote the Libertarian Party's ideas, and they recognize that candidates who are not on

---

[1] The defendant's objection refers to paragraph 13, but the quotation to which the defendant specifically objects is in paragraph 12, not paragraph 13.

> the ballot are not taken seriously by the media or the
> voters. The difficulty—some would say impossibility—of
> obtaining ballot access for House candidates in Georgia is
> well-known in the donor community, and that knowledge
> makes it nearly impossible for the party to raise money for
> petition drives.

(ECF 69-24 at 1-2.) The defendant contends that this paragraph is

inadmissible hearsay. (ECF 99 at 21-22.) But this paragraph need not be

admitted for the truth of the matter asserted because what is important

is that potential donors cited the difficulty of obtaining ballot-access as

an excuse for refusing to donate (even if the excuse was inaccurate or a

lie). Fed. R. Evid. 801(c)(2). And the excuse would fall within the

present-sense impression exception to the hearsay rule in any event.

Fed. R. Evid. 803(1). Wilson's declaration makes clear that he was

executive director of the Libertarian Party of Georgia and was

responsible for fundraising. (ECF 69-24 at 1.) Under Rule 701, that

experience provides sufficient foundation for the facts and opinions in

paragraph 4.

Paragraph 12 provides as follows:

> 12.    Another obstacle that I have encountered is bad data
> in the voter registration list. The Libertarian Party of
> Georgia purchases a list from the Secretary of State before
> every election cycle. We use that list to prepare "walk lists"
> to guide candidates and their supporters to the doors of
> registered voters when they're out canvassing door to door.

> But we have found that 20 percent or more of the data
> obtained from the Secretary of State is inaccurate. This
> leads to a lot of wasted time, effort, and money.

(ECF 69-24 at 4.) The defendant contends that Wilson's statement that

"we have found that 20 percent or more of the data obtained from the

Secretary of State is inaccurate" has no basis in fact. (ECF 99 at 22.) Not

so. The foundation for the penultimate sentence of paragraph 12 is what

comes before it. Wilson indicates that bad data from the Secretary of

State is a problem that he has personally encountered. (ECF 69-24 at 4.)

He encountered it when the Libertarian Party has purchased a voter list

from the state to prepare walk-lists for the party's candidates and their

supporters. (*Id.*) That provides ample foundation for the sentence to

which the defendant objects.

Paragraph 17 provides as follows:

> 17.    Based on my experience, I do not believe that
> Georgia's signature requirement for political-body
> candidates for U.S. Representative are realistically
> achievable. The number of signatures is just too high. And,
> while it might be possible to gather the required number
> with professional petition circulators, there is no realistic
> way under current campaign-finance laws for the party or a
> candidate to raise the money that would be required to pay
> them. It could only be done by a candidate wealthy enough
> to fund the hundreds of thousands of dollars necessary for
> such a drive out of his or her own pocket.

(ECF 69-24 at 6.) The defendant contends that Wilson's opinions in this paragraph lack foundation because "Wilson has not run for non-statewide office and he does not indicate ever being involved in a nomination petition campaign for non-statewide office." (ECF 99 at 22). The defendant also contends that this testimony is inadmissible because it is inconsistent with the testimony of another witness. (*Id.*)

As a factual matter, the defendant's assertion that Wilson has never been involved in a petition campaign for non-statewide office is false, and the defendant's attorneys knew (or should have known) that it is false when they filed the defendant's objections. Paragraphs 10 through 16 of Wilson's declaration describe in detail his experience with petitioning on behalf of the party in Georgia. (ECF 69-24 at 3-5.) These petition drives could only have been for non-statewide offices because the Libertarian Party does not need to gather signatures to nominate candidates for statewide office. Wilson's experience with petition-drives was also the subject of his deposition in this case taken by one of the defendant's attorneys. (Wilson dep., ECF 74-1, 75:24-83:13, 140:24-141:25.) That experience provides sufficient foundation for the facts and opinions in paragraph 17.

Lastly, the defendant's assertion that Wilson's testimony is inconsistent with the testimony of another witness is also incorrect as a factual matter, but that would be no basis for the Court to exclude it in any event. Inconsistency does not make testimony inadmissible, and the defendant's suggestion that it does is frivolous.

## Conclusion

Taken as a whole, the defendant's objections are not well founded. Some of them approach bad faith.  The Court should overrule them all.

The Eleventh Circuit has repeatedly indicated that ballot-access cases are fact-intensive, and that plaintiffs have a right to present their evidence. *See, e.g., Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985*); accord Green Party of Ga. v. Georgia*, 551 Fed. Appx. 982 (11th Cir. 2014) (per curiam). Lacking evidence of his own, the defendant has apparently chosen to turn this case instead into a dispute over the Federal Rules of Evidence.  This Court should not abide such dilatory tactics.

Respectfully submitted this 28th day of August, 2019.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com