# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

16-11689-H
_____

GREEN PARTY OF GEORGIA and
CONSTITUTION PARTY OF GEORGIA,

                      Plaintiffs/Appellees,

v.

BRIAN KEMP, GEORGIA SECRETARY
OF STATE,

                      Defendant/Appellant.

_____

## BRIEF OF APPELLANT
## SECRETARY OF STATE BRIAN KEMP
_____

On Appeal from the United States District Court
For the Northern District of Georgia

| | |
|---|---|
| | SAMUEL S. OLENS    551540 |
| | Attorney General |
| | |
| | DENNIS R. DUNN    234098 |
| | Deputy Attorney General |
| | |
| | RUSSELL D. WILLARD    760280 |
| | Senior Assistant Attorney General |
| | |
| State Law Department | JULIA B. ANDERSON    017560 |
| 40 Capitol Square, S.W. | Senior Assistant Attorney General |
| Atlanta, GA 30334-1300 | |
| PH: (404) 656-7063 | CRISTINA M. CORREIA    188620 |
| FAX: (404) 651-9325 | Assistant Attorney General |
| Email: ccorreia@law.ga.gov | |
| | JOSIAH B. HEIDT    104183 |
| | Assistant Attorney General |

Plaintiff's Exhibit 050

01

which was upheld. *See Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 997 (S.D.N.Y.), *aff'd mem.*, 400 U.S. 806 (1970)). Moreover, as the Supreme Court described in *Munro v. Socialist Workers Party*, in *American Party of Texas*, 415 U.S. at 782 n. 14, the Court upheld a petition requirement where:

> [v]oters signing [ ] supplemental petitions had to swear under oath that they had not participated in another party's primary election or nominating process. In rejecting a First Amendment challenge to the 1% requirement, [the Supreme Court] asserted that the State's interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot was compelling and reiterated the holding in *Jenness* that a State may require a preliminary showing of significant support before placing a candidate on the general election ballot.

*Munro,* 479 U.S. 189, 194 (1986). Georgia also has no limit on how many petition signatures a political body or candidate may submit, and there is no cost imposed to verify the petition signatures. R-75-3 ¶ 28-29. *See Libertarian Party of Florida*, 710 F.2d at 794 (holding that a cost of 10 cents per signature to verify the petition was not impermissibly burdensome). These measures result in the pool of available voters, to sign the qualifying petitions, being as large as possible.

### 2. The District Court Cannot Measure the Severity of the Burden by Comparing Georgia's Legislative Choices to Those of Other States.

As this Court has recognized, the test of whether a state election law violates the Constitution is not dependent on how other states choose to run their elections. *Libertarian Party of Florida,* 710 F.2d at 794 (explaining that "[a] court is no more

16

free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature."). Rather, a state election structure severely burdens the rights of a political body, or political body candidate where it "unfairly discriminate[s] against minor parties or absolutely or directly preclude[s] minor parties from gaining a place on the ballot." *Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 71 (3rd Cir. 1999) (internal quotation and citations omitted). As this Court has said:

> [A] court must determine whether the challenged laws 'freeze' the status quo by effectively barring all candidates other than those of the major parties, and provide a realistic means of ballot access. The focal point of this inquiry is whether a 'reasonably diligent [] candidate [can] be expected to satisfy the signature requirements.' Thus, the test is whether the legislative requirement is a rational way to meet [the State's] compelling state interest. The least drastic means test becomes one of reasonableness, i.e., whether the statute unreasonably encroaches on ballot access.

*Libertarian Party of Florida*, 710 F.2d at 793 (internal citations omitted). Here, the district court erred in measuring the burdensomeness of Georgia's ballot access statute by comparing it to other states, both as to the number of petition signatures needed and the number of Presidential candidates appearing on the ballot. R-92 at 11-12, 58-59, 65-67. Relying on the report of Plaintiffs' expert witness, Richard Winger, which provided *some* data about a select number of elections throughout the country and going back as far as 1892, the district court considered that "of the 401 instances in which a state required independent candidates or candidates of an

17

unqualified party to collect more than 5,000 signatures, no candidate was able to access the ballot 33% of the time."[4] R-92 at 11-12. However, Winger's report failed to produce evidence showing that any party *attempted* to get on the ballot when he claimed 33% of the time "no candidate was able to access the ballot." R-92 at 12. Winger failed to consider the number of times any candidate tried to get on the ballot by petition and therefore is not credible. *See Swanson v. Worley*, 490 F.3d 894, 910 (11th Cir. 2007) (explaining that fact that no candidate had obtained statewide ballot access, where no evidence was presented regarding attempts to obtain statewide ballot access, was insufficient evidence to show ballot access statute was a severe burden). The district court, also relying on Winger's report, considered that "[t]hirty-eight states plus the District of Columbia allow presidential ballot access with 10,000 or fewer signatures." R-92 at 66. Again, relying on Winger's report, the district court considered that "[n]o state had fewer candidates [than Georgia] on its ballot from 1968 to 1988," and "[o]nly Oklahoma had fewer candidates from 1992 to 2012." R-92 at 66-67. First, this candidate counting proves nothing about causation. If there were fewer candidates in Georgia than in other states, it is just as likely due to routine political reality – lack

---

[4] Richard Winger is an *advocate* for minor party access to the ballot. R-75-17 at p. 22 lns. 1-3. Secretary Kemp argued in the district court that Winger's opinion was due no weight under *Daubert*, 509 U.S. 579. *See* Section II.A below for a discussion of the district court's error in relying on Winger's report.

of support, lack of fund raising. Plaintiffs failed to attempt to prove it was the number of required signatures that limited their success. None of the considerations the district court recited are relevant to whether the burden on Plaintiffs' rights is severe. *Libertarian Party of Fla.*, 710 F.2d at 794. Second, this Court has previously rejected similar expert witness testimony, by Richard Winger, which does nothing but compare the legislative choices of one state against those of another. As this Court instructed:

> Plaintiffs also point to Winger's testimony that Alabama had the second toughest ballot access restrictions among all states in the 2002 election. This Court in *Libertarian Party* instructed that the legislative choices of other states are irrelevant, however, because a court is 'no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature.' *Libertarian Party*, 710 F.2d at 794. Furthermore, the Supreme Court has upheld a broad array of election schemes, and we confine our inquiry to whether Alabama's election scheme is constitutional, not whether Alabama's scheme is the best relative to other states.

*Swanson*, 490 F.3d at 910. This Court should similarly reject Winger's testimony in this case.

### 3. Because Ralph Nader Never Attempted to be on the Ballot In Georgia, His Absence From the Ballot is Meaningless.

Finally, the district court erred in its conclusion that Georgia's ballot access statute kept a candidate with widespread national support, Ralph Nader, from securing a place on Georgia's general election ballot. R-92 at 50-51. The undisputed testimony from Plaintiffs' own witnesses was that the Nader campaign

19

05

statements of material fact upon which the court relied. *See* Section II.B below. The district court failed to address *any* of Secretary Kemp's objections. *Compare* R-80-2, R-81 and R-92.

> **B.   The Cases Relied on by the District Court Require Strict Scrutiny Only Where the Election Structure Unfairly Discriminates Against Minor Parties or Freezes the Status Quo.**

The cases relied upon by the district court in holding that Georgia's ballot access statute imposed a severe burden on Plaintiffs' rights because they either unfairly discriminated against minor parties or operated to freeze the status quo for the two major parties. Here, Georgia's 1% petition requirement does neither.

The district court relied heavily on *Williams v. Rhodes*, 393 U.S. 23, 25 (1968) in its application of strict scrutiny. R-92 at 48-50. In *Williams* the Supreme Court struck down an Ohio statute that made it "virtually impossible" for a third party candidate to get on the ballot. The Ohio election structure in that case required that third party candidates submit a petition signed by voters equal in number to 15% of the votes cast in the prior gubernatorial election.[5] In addition, the only voters that could sign the petition were those that had "(1) voted for a majority of that party's candidates at the last election, or, (2) ha[d] never voted in *any* election before." 393 U.S. at 25 n. 1 (emphasis added). Additional burdens included that:

---

[5] Republican and Democratic Party candidates by contrast, needed only to have garnered 10% of the gubernatorial vote in the preceding election. 393 U.S. at 26.

21

> First, at the primary election, the new party, or any political party, is required to elect a state central committee consisting of two members from each congressional district and county central committees for each county in Ohio. [Ohio Rev. Code §§ 3517.02-3517.04.] Second, at the primary election the new party must elect delegates and alternates to a national convention. [Ohio Rev. Code § 3505.10.] Since Section 3513.19.1, Ohio Rev. Code, prohibits a candidate from seeking the office of delegate to the national convention or committeeman if he voted as a member of a different party at a primary election in the preceding four year period, the new party would be required to have over twelve hundred members who had not previously voted in another party's primary, and who would be willing to serve as committeemen and delegates.

393 U.S. at 25 n. 1. This structure effectively kept anyone other than the two major parties off the ballot. Here, Georgia law does not freeze the status quo.

Similarly, in *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008), the Ninth Circuit applied strict scrutiny to a ballot access measure which restricted persons who could circulate a petition to those persons who were qualified to register to vote in the state. 531 F.3d at 1031. In other words, even the candidate could not circulate his own petition. That burden, together with an early filing deadline, significantly increased the burden imposed by the petition requirement. The Ninth Circuit held that:

> the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so.

*Nader v. Brewer*, 531 F.3d at 1035 (citations omitted). Here, the repeated success of the Libertarian Party and other Independent candidates, clearly demonstrates

that "reasonably diligent" candidates can succeed in getting on the ballot.

The district court also relied on the application of strict scrutiny in *Anderson v. Celebrezze*, 460 U.S. 780. In *Anderson* the Court again addressed an Ohio election structure, this time the challenge was to an early filing deadline. The challenge in *Anderson* was brought by the candidate *and* three voters.[6] The Court therefore looked at "whether Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters." 460 U.S. at 782. Ohio law provided that independent candidates for office, including President, were required to file their "statement of candidacy and nominating petition" a full seventy five (75) days *before* the primaries and 229 days before the general election. 460 U.S. at 783 n. 1. As the Court recognized, by the time John Anderson had declared his candidacy, it was already too late to qualify as an independent candidate in Ohio. Therefore, the election structure completely shut out Anderson and any other independent candidate. It was the difference in how the State treated major parties and minor parties that warranted the application of strict scrutiny.

> [B]y requiring an independent to declare his candidacy in March without mandating comparable action by the nominee of a political party, the State violated the Equal Protection Clause of the Fourteenth Amendment.

---

[6] Here, only two political bodies appear as Plaintiffs.

*Anderson*, 460 U.S. at 783. Similarly, in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 594 (6th Cir. 2006), the application of strict scrutiny was warranted because, again, minor parties were required to qualify 120 days before party primaries and a full *twelve months* before the preceding general election for President.

In both *Bullock v. Carter*, 405 U.S. 134 (1972) and *Lubin v. Panish*, 415 U.S. 709 (1974), strict scrutiny was warranted because the statutes at issue imposed significant filing fees with no alternative means to qualify for office. As the Supreme Court noted, the filing fees have:

> a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper [v. Virginia Board of Elections*, 383 U.S. 663 (1966) (challenging poll tax)], that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster.

*Bullock*, 405 U.S. at 144. The Court in *Lubin* likewise rejected the idea that a filing fee is an appropriate measure of the seriousness of a candidate. 415 U.S. at 716.

Here, the different treatment of major and minor parties is not discriminatory because each must show significant support. Both this Court and the United States Supreme Court have recognized that States may provide alternate methods of

24

getting on the general election ballot for political parties, whose candidates must run in party primaries, and other political organizations.

> The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

*Cartwright v. Barnes*, 304 F.3d 1138, 1142 (11th Cir. 2002) (quoting *Jenness*, 403 U.S. at 440-441). In summary:

> Under the Supreme Court's election jurisprudence, a state burdens the 'availability of political opportunity' by enacting ballot access laws that unfairly discriminate against minor parties or 'absolutely' or 'directly preclude' minor parties from gaining a place on the ballot. *See Timmons*, 117 S. Ct. at 1371 (upholding statute because it did not 'exclude[] a particular group' from electoral participation, nor did it 'directly preclude[] minor political parties from developing and organizing'); *see also Williams*, 393 U.S. at 25 (invalidating statute that made it 'virtually impossible' for minor party candidates to gain access to the ballot).

*Council of Alternative Political Parties*, 179 F.3d at 71. Here, Georgia's petition requirement neither unfairly discriminates against minor parties, nor absolutely or directly precludes them from gaining a place on the ballot. Rather, Georgia's petition requirement provides that candidates must demonstrate significant support in Georgia before getting on the ballot. Similar petition requirements have been

25

10

repeatedly upheld by both this Court and the Supreme Court.[7] As another district court recognized:

> the analysis of ballot-access restrictions is not bound by any "'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789, based solely on percentage thresholds and time limits. But these cases, although not dispositive, provide a consistent and useful set of benchmarks . . . *See Norman*, 502 U.S. [279,] 295 [(1992)] (using *Jenness* five percent threshold as benchmark in evaluating Illinois ballot restriction); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193-94, 107 S. Ct. 533, 93 L. Ed. 2d 499 (1986) (citing *Jenness* and *American Party of Texas* as benchmarks in ballot-access cases).

*Libertarian Party of N.H. v. Gardner*, 126 F. Supp. 3d 194, 201 (D. N.H. 2015). Here, the district court erred by failing to use both this Court's and the Supreme Court's prior petition cases as benchmarks. Instead, the district court reduced the petition requirement for political and independent candidates running for President

---

[7] *Jenness*, 403 U.S. 431 (challenging 5% petition requirement under former Georgia Code § 24-1010 (1970)); *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981) (same); *Cartwright*, 304 F.3d 1138 (challenge, pursuant to the Qualifications Clause, U.S. Const. Art I, Sec. 2, cl. 2, to 5% petition requirement in O.C.G.A. § 21-2-170(b) for congressional elections); *Coffield v. Handel*, 599 F.3d 1276 (11th Cir. 2010) (challenge to 5% petition requirement for congressional elections); *Libertarian Party of Florida*, 710 F.2d at 794 (noting that a 188 day period to collect 144,492 petitions compared favorably to shorter periods found to be constitutional); *Storer*, 415 U.S. at 740 ("Standing alone, gathering 325,000 signatures in 24 days would not appear to be an impossible burden. Signatures at the rate of 13,542 per day would be required, but 1,000 canvassers could perform the task if each gathered 14 signers a day. On its face, the statute would not appear to require an impractical undertaking for one who desires to be a candidate for President.")

of the United States from 1% of active registered voters to 7,500 or roughly .15% of active registered voters.

### C. The District Court Erred in its Consideration of the Associational Rights at Issue.

The district court found that the right of Plaintiffs' to "select their own candidates" was "*not* implicated in this case." R-92 at 44-45 (emphasis added). The court then went on to consider the implications on the rights of *both* candidates *and* voters. R-92 at 47. This led the district court to increase the level of constitutional scrutiny.

Plaintiffs, two political bodies, filed this lawsuit on their own behalf. They did not file on behalf of their members or voters at large. R-1¶¶ 3-4, 18; R-92 at 3 (describing Plaintiffs' claim that the petition requirement "infringe[s] upon the constitutional rights of the Plaintiffs [the political bodies] to participate in the electoral process."). Therefore, the interests at issue here are those of the Plaintiff political bodies and not those of voters. *See N.Y. State Bd. of Elections [v. Torres]*, 552 U.S. [196], 203[(2008)] (explaining that Plaintiffs, prospective candidates, were in no position to assert the associational rights of the parties but rather only their "own claimed associational right[s].").

Even where a voter's rights are implicated however, the Supreme Court has held that "the mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself

27

**12**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____
## 16-11689-H
_____

GREEN PARTY OF GEORGIA and
CONSTITUTION PARTY OF GEORGIA,

                Plaintiffs/Appellees,

v.

BRIAN KEMP, GEORGIA SECRETARY
OF STATE,

                Defendant/Appellant.

_____
## PETITION FOR REHEARING EN BANC
## ON BEHALF OF APPELLANT
## SECRETARY OF STATE BRIAN KEMP
_____

On Appeal from the United States District Court
For the Northern District of Georgia

| | |
|---|---|
| CHRISTOPHER M. CARR | 112505 |
| Attorney General | |
| | |
| ANNETTE M. COWART | 191199 |
| Deputy Attorney General | |
| | |
| RUSSELL D. WILLARD | 760280 |
| Senior Assistant Attorney General | |
| | |
| JULIA B. ANDERSON | 017560 |
| Senior Assistant Attorney General | |
| | |
| CRISTINA M. CORREIA | 188620 |
| Assistant Attorney General | |
| | |
| JOSIAH B. HEIDT | 104183 |
| Assistant Attorney General | |

State Law Department
40 Capitol Square, S.W.
Atlanta, GA 30334-1300
PH: (404) 656-7063
FAX: (404) 651-9325
Email: ccorreia@law.ga.gov

## II. States Are Not Required to Provide Evidence That Their Ballot Access Measures Are Necessary or the Least Drastic Measure to Accomplish Their Stated Goals.

Importantly, States are not required, prior to regulation, to make a showing "of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194-195. As the Supreme Court has explained,

> [t]o require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

*Id*. at 195-196. Here, the district court held that the State was required to provide evidence of voter confusion to justify its regulatory scheme. R-92 at 64.

The district court, like Winger, considered the State's interest in the particular number of petition signatures required, not whether the State had a legitimate interest in having *some* number of petitions required for ballot access. R-92 at 66-67; R-75-17 at 55 ln. 4-7; p. 99 ln. 15 – p. 100 ln. 4. This Court has already rejected that position.

> [T]his argument misapprehends the proper test for reasonable, nondiscriminatory regulations. Because any percentage requirement or filing deadline is 'necessarily arbitrary' and 'impossible to defend

12

**14**

> . . . as either compelled or least drastic,' the test is not whether the regulations are necessary but whether they rationally serve important state interests. *Libertarian Party*, 710 F.2d at 793 (quotation marks omitted); *see also Timmons*, 520 U.S. at 358, 117 S. Ct. at 1370 (noting that a state [a]dditionally does not need to establish that ballot access restrictions are narrowly tailored and necessary to promote its interests unless the restrictions severely burden rights).

*Swanson v. Worley*, 490 F.3d 894, 912 (11th Cir. 2007). Georgia has chosen to make the petition requirement a percentage of the active registered voters, and it has already dropped the percentage requirement to 1%.[3] Prior to 1986, Georgia had a 2.5% petition requirement. *See Bergland v. Harris*, 767 F.2d 1551, 1553 n. 3 (11th Cir. 1985); *Libertarian Party of Georgia v. Harris*, 644 F. Supp. 602 (N.D. Ga. 1986). Moreover, as this Court has recognized:

> [T]he Supreme Court has 'never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access.' *Munro*, 479 U.S. at 194-95, 107 S. Ct. at 537. Because state legislatures 'should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively.'

*Swanson*, 490 F.3d at 912. The panel's summary affirmance leaves in place a district court order contrary to this Court's holding in *Swanson* and the Supreme Court's holding in *Munro*.

---

[3] In reality, the petition requirement is less than 1% as only "active" registered voters are counted for purposes of determining the number of petition signatures required, while the pool of available potential petition signatories includes *both* active and inactive voters. O.C.G.A. § 21-2-235(a); R-75-3 ¶ 5.

13

## III. The Constitutionality of Georgia's Ballot Access Measures Does Not Depend on the Legislative Choices of Other States.

As this Court has recognized, the test of whether a state election law violates the Constitution is not dependent on how other states choose to run their elections. *Libertarian Party of Florida,* 710 F.2d at 794 (explaining that "[a] court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature."). Rather:

> [A] court must determine whether the challenged laws 'freeze' the status quo by effectively barring all candidates other than those of the major parties, and provide a realistic means of ballot access. The focal point of this inquiry is whether a 'reasonably diligent [] candidate [can] be expected to satisfy the signature requirements.' Thus, the test is whether the legislative requirement is a rational way to meet [the State's] compelling state interest. The least drastic means test becomes one of reasonableness, i.e., whether the statute unreasonably encroaches on ballot access.

*Libertarian Party of Florida*, 710 F.2d at 793 (internal citations omitted). Here, the district court erred in measuring the burdensomeness of Georgia's ballot access statute by comparing it to other states, both as to the number of petition signatures needed and the number of Presidential candidates appearing on the ballot. R-92 at 11-12, 58-59, 65-67. Relying on Winger's report, the district court considered that "[t]hirty-eight states plus the District of Columbia allow presidential ballot access with 10,000 or fewer signatures." R-92 at 66. Again relying on Winger's report, the district court considered that "[n]o state had fewer candidates [than Georgia] on its ballot from 1968 to 1988," and "[o]nly Oklahoma had fewer candidates from

14

1992 to 2012." R-92 at 66-67. First, this candidate counting proves nothing about causation. If there were fewer candidates in Georgia than in other states, the causation for that reality may be just as likely due to routine political realities, such as lack of support for the political body both in lack of volunteers and fund raising capacity. None of the considerations the district court recited are relevant to whether the burden on Plaintiffs' rights is severe. *Libertarian Party of Fla.*, 710 F.2d at 794. Second, this Court has previously rejected similar expert witness testimony from Richard Winger which does nothing but compare the legislative choices of one state against those of another. *Swanson*, 490 F.3d at 910 (confining its inquiry to "whether Alabama's election scheme is constitutional, not whether Alabama's scheme is the best relative to other states."). The panel's summary affirmance of the district court is thus contrary to this Court's opinions in *Libertarian Party of Florida* and *Swanson*.

## CONCLUSION

For the reasons set forth above, Secretary Kemp respectfully requests rehearing *en banc*.

Respectfully submitted,

CHRISTOPHER M. CARR
Attorney General         112505

ANNETTE M. COWART  191199
Deputy Attorney General

15