IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARTIN COWEN, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, | CIVIL ACTION NO. 1:17-CV-04660-LMM |
| Defendant. | |

**ORDER**

This matter is before the Court on Plaintiffs' Motion for Summary Judgment [69] and Defendant's Motion for Summary Judgment [73] and Defendant's Motion to Exclude Expert Report of Darcy Richardson [109]. After due consideration, the Court enters the following Order:

**I. BACKGROUND[1]**

This matter arises from a constitutional challenge to Georgia's ballot-access restrictions for third-party candidates seeking election to the United States House of Representatives. Plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters. See Dkt. No. [97]

---

[1] Unless otherwise indicated, the facts relied upon in this section are taken from the statements of material facts provided by the parties. See Dkt. Nos. [69-2; 73-1; 96-2].

¶¶ 5-9. Plaintiffs seek injunctive relief and a declaration that Georgia's ballot-access restrictions (1) unconstitutionally burden Plaintiffs' rights under the First and Fourteenth Amendments; and, (2) violate the Equal Protection Clause of the Fourteenth Amendment. See Dkt. No. [1] ¶¶ 148-52.

### A. History of Georgia's Ballot Access Restrictions

Georgia enacted its first ballot-access law in 1922, which provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. Dkt. No. [97] ¶ 13. In 1943, Georgia adopted a 5% petition requirement for access to the general-election ballot. Id. ¶ 15. That law allowed candidates of any political party that received at least 5% of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee. Id. All other candidates were required by law to file a petition signed by at least 5% of the registered voters in the territory covered by the office. Id. The deadline for the petition was thirty days before the general election. Id. ¶ 16. Between 1943 and 1999, the Georgia General Assembly adopted a series of incremental changes to the petition deadline, added a filing fee, and imposed a number of other restrictions. Id. ¶¶ 17-26.

### B. Georgia's Current Ballot Access Restrictions

Under Georgia law, a "political party" is any political organization whose nominee received at least twenty percent of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25). A candidate may appear on Georgia's

election ballot for any statewide or district office if he or she is nominated in a primary conducted by a political party. O.C.G.A. § 21-2-130(1).

A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(23). Political bodies must nominate candidates for partisan offices by convention. O.C.G.A. § 21-2-170(g). Georgia law provides that a political body becomes qualified to nominate candidates for statewide public office by convention if: (1) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the last general election; or (2) it nominated a candidate for statewide public office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. Candidates for statewide offices, including the office of the President of the United States, nominated by a political body that is qualified under Section 21-2-180 appear automatically on the general election ballot without a nomination petition. O.C.G.A. § 21-2-132(e)(5). The Libertarian Party is a political body under Georgia law and has been qualified under Section 21-2-180 since 1988. Dkt. No. [14] ¶ 128.

Candidates for non-statewide offices, including the office of U.S. Representative, nominated by a political body that is qualified under Section 21-2-180 do not appear automatically on the general-election ballot; rather, such candidates must submit: (1) a notice of candidacy and qualifying fee[2], O.C.G.A.

---

[2] Pursuant to O.C.G.A. § 21-2-132(g), a candidate may file a pauper's affidavit in lieu of the qualifying fee.

§ 21-2-132(d); and, (2) a nomination petition signed by 5% of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).

### C. Qualifying Fee and Nomination Petition Requirements

The qualifying fee for most partisan public offices, including U.S. Representative, is three percent of the annual salary of the office. O.C.G.A. § 21-2-131(a)(1)(A). The current annual salary for U.S. Representatives is $174,000. Dkt. No. [97] ¶ 64. As such, the qualifying fee for each candidate for U.S. House of Representatives is $5,220. Id. Among states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation. Id. ¶ 72.

Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains seventy-five percent and sends twenty-five percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2). For political-body candidates, the Secretary retains twenty-five percent and sends seventy-five percent to the political body. O.C.G.A. § 21-2-131(c)(4)(A). While the statute requires the Secretary of State to distribute the funds "as soon as practicable," the Libertarian Party did not receive their share of the qualifying fees for the 2018 election until after the election was over, in mid-April 2019. O.C.G.A. § 21-2-131(c)(4); Dkt. No. [69-12] ¶¶ 15-16.

The deadline for political-body candidates to file their notice of candidacy and qualifying fee is noon on the Friday following the Monday of the thirty-fifth week before the general election—a date that falls in early March of an election year. O.C.G.A. § 21-2-132(d)(2). The nomination petition is due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). The form of the petition is set out by statute. O.C.G.A. § 21-2-183. A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d). Each sheet must also contain a sworn and notarized affidavit of the circular attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. Id.

According to the Secretary of State, Georgia had 6,434,388 active registered voters as of the 2018 general election. Dkt. No. [97] ¶ 59. Georgia currently has fourteen members of the U.S. House of Representatives, each of which is elected from a single-member district. Id. ¶ 60. The Secretary of State estimates that the Libertarian Party would need to gather 321,713 signatures to run a full slate of candidates for the office of United States Representatives in 2020. Id. ¶ 63; see also Dkt. No. [69-34] at 8. Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. Dkt. No. [97] ¶ 65.

D. <u>Past Attempts to Qualify for the General-Election Ballot and Practical Barriers to Petitioning</u>

No political-body candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot since the 5% petition requirement was adopted in 1943. Id. ¶ 76. Plaintiffs have submitted evidence that since 2002, at least twenty independent[3] and political body candidates have unsuccessfully attempted to access the ballot. Id. ¶¶ 92-131. Plaintiffs also provide evidence of the various practical barriers to gathering enough signatures to satisfy the 5% petition requirement, including: (1) the Secretary of State's signature-checking process, which according to Plaintiffs is error prone; (2) the difficulty and pace of petitioning; (3) the cost of petitioning and the impact of federal campaign finance law; (4) petition-circulators' lack of access to voters; and; (5) public concern about disclosing the confidential information required by the form of a nomination petition. Id. ¶¶ 144, 149-154, 171, 173-74, 181-84.

E. <u>Support for the Libertarian Party Nationwide and in Georgia</u>

The Libertarian Party was founded in 1971 and is organized in all fifty states, plus the District of Columbia. Dkt. No. [97] ¶ 189. Nationwide, the

---

[3] Independent candidates do not appear automatically on the ballot for any office unless the candidate is an incumbent; to appear on the general-election ballot independent candidates for non-statewide partisan public offices must submit (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and, (2) a nomination petition signed by 5% of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b).

Libertarian Party is currently the third-largest political party in the United States by voter registration. Id. ¶ 190. In 2018, the National Libertarian Party counted as members, including persons that paid no annual dues, 5,851 persons residing in Georgia. Dkt. No. [96-1] ¶ 24. The most recent data from the parties shows that in 2016, the Libertarian Party of Georgia had 161 due-paying members. Id. ¶ 25.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477

U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts. S. Pilot Ins. Co. v. CECS, Inc., 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." Id. at 1243.

### III. DISCUSSION

In moving for summary judgment, Plaintiffs argue that Georgia's ballot-

access laws for political-body candidates for U.S. Representative—namely O.C.G.A. § 21-2-170—unconstitutionally burden their First and Fourteenth Amendment rights. Dkt. Nos. [1] ¶ 148; [69-1] at 1. Plaintiffs further challenge Georgia's ballot-access laws under the Equal Protection Clause, in that Georgia law creates a classification by treating Libertarian Party candidates for U.S. Representative differently than Libertarian Party candidates for statewide offices. Dkt. No. [1] ¶ 149; [69-1] at 41.

Defendants have moved for summary judgment on both[4] of Plaintiffs' claims, as well as on Plaintiffs' possible[5] claim that Georgia's petition requirement was enacted with a discriminatory intent. See Dkt. No. [73]. Defendants first argue that the very statutory scheme at issue has been repeatedly upheld by both the Eleventh Circuit and the Supreme Court. See Dkt. No. [73-2]

---

[4] Plaintiffs argue that Defendant's brief only addresses Plaintiffs' First Amendment claim and therefore urge the Court to treat Defendant's motion as one for partial summary judgment. See Dkt. No. [96] at 2 n.1. The Court, however, reads Defendant's motion as one for summary judgment on both of Plaintiffs' claims and will therefore treat it as such. See Dkt. No. [73-2] at 1-2 (discussing Plaintiffs' claims under the First and Fourteenth Amendment and the Equal Protection clause).

[5] Plaintiffs point out that although their claims under the First and Fourteenth Amendment and the Equal Protection Clause could "conceivably encompass a claim of discriminatory intent or viewpoint discrimination," they have not sought summary judgment on this issue. See Dkt. No. [96] at 20 n.4. Moreover, Defendant has since filed a Motion to Exclude the Expert Report of Darcy Richardson [109], which is largely redundant of Defendant's argument in his motion for summary judgment on this point. As discussed *infra*, because both the Eleventh Circuit and the Supreme Court have held the challenged provisions constitutional, the issue of discriminatory intent is moot. Thus, both this portion of Defendant's motion for summary judgment and the Expert Report of Darcy Richardson [109] are **DENIED as MOOT.**

at 7-14. Because this Court is bound by such rulings, it is to this argument that the Court first turns.

### A. Prior Cases Upholding Georgia's Ballot-Access Restrictions

In <u>Jenness v. Fortson</u>, the Supreme Court rejected a constitutional challenge to essentially the same ballot-access restrictions that Plaintiffs challenge today—that is, the provisions of the Georgia Election Code requiring political body candidates to submit (1) a nominating petition signed by at least 5% of the number of registered voters in the last general election for the office in question; and (2) a filing fee equal to 5% of the annual salary of the office sought. 403 U.S. 431, 432 (1971). In upholding Georgia's statutory scheme, the Supreme Court explained that "[t]here is a surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." <u>Id.</u> at 442. The Supreme Court acknowledged that "[t]he 5% figure is, to be sure, apparently somewhat higher than the percentage of support required to be shown in many States," but determined that this was "balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." <u>Id.</u>

In the years following the <u>Jenness</u> decision, the Eleventh Circuit has repeatedly affirmed the constitutionality of Georgia's 5% signature requirement. See <u>Coffield v. Kemp</u>, 599 F.3d 1276, 1277 (11th Cir. 2010) (upholding Georgia's 5% petition requirement as not "too burdensome"); <u>Cartwright v. Barnes</u>, 304

F.3d 1138, 1139 (11th Cir. 2002) (upholding 5% petition requirement under Georgia law); McCrary v. Poythress, 638 F.2d 1308, 1313 (5th Cir. Mar. 1981) (provisions of Georgia Election Code did not place unconstitutional restrictions upon the plaintiffs' access to general election ballot). Nevertheless, Plaintiffs aver that such cases do not foreclose their claims for two primary reasons. See Dkt. No. [96] at 8-11.

First, Plaintiffs argue that the Eleventh Circuit has "repeatedly rejected" such a "litmus-paper test" approach and instead require district courts to follow the three-step process for analyzing constitutional challenges to state statutes restricting ballot access set forth by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983). See id. at 8-9. By way of background, in Anderson, the Supreme Court laid out the following approach for determining whether a ballot access law violates the First and Fourteenth Amendments:

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

460 U.S at 789. Relying on Bergland v. Harris, Plaintiffs urge the Court that "cases which have upheld the Georgia provisions against constitutional attack by prospective candidates and minor political parties do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach

outlined in Anderson v. Celebrezze." Id. at 8 (citing 767 F.2d 1551, 1554 (11th Cir. 1985)). In Bergland, the district court dismissed the plaintiffs' constitutional challenges to provisions of the Georgia Election Code, including the signature requirements for nominating petitions, for failure to state a claim. 767 F.2d at 1552. On appeal, the Eleventh Circuit reversed and remanded, finding "an insufficient factual record to carry out the Anderson requirements." Id. at 1554. In holding that Jenness and McCrary did not bar the plaintiffs' claims, however, the court emphasized the uniqueness of a constitutional challenge by a prospective presidential candidate. See id. at 1554-55.

As further support for their argument that prior cases upholding Georgia's 5% requirement are not controlling, Plaintiffs cite to Green Party of Georgia v. Georgia, an unpublished decision from the Eleventh Circuit. Dkt. No. [96] at 8-9 (citing 551 F. App'x 982, 983 (11th Cir. 2014)). In Green Party, the Eleventh Circuit determined that the district court had erred in dismissing the plaintiffs' constitutional challenges to Georgia's petition-signature requirement for presidential candidates not affiliated with any recognized political party based on Jenness and subsequent cases. 551 F. App'x at 982-83. The court remanded the matter to the district court with instructions to apply the Anderson balancing approach, explaining that "we previously addressed whether our past decisions upholding a 5% petition-signature requirement preclude a challenge to a lower petition-signature requirement for a presidential candidate and we concluded that our past decisions are distinguishable." Id. at 983.

12

Plaintiffs' reliance on Bergland and Green Party is misplaced. As set forth above, both cases emphasized the uniqueness of presidential elections, citing Anderson for the proposition that the State has "a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will largely be determined by voters beyond the State's boundaries." Bergland, 767 F.2d at 1554 (citing Anderson, 460 U.S. at 795); Green Party, 551 F. App'x at 984 (same). Plaintiffs argue that the State "has even less interest in regulating elections for U.S. Representative than it does in regulating elections for president" because the Constitution establishes federal law as the "ultimate authority over elections for U.S. Representative." Dkt. No. [105] at 18 (citing U.S. Const. art. I, §§ 1, 4-5). But following Bergland, the Eleventh Circuit has continued to reject challenges to Georgia's 5% rule brought by prospective candidates for the United States House of Representatives *without* engaging in the analysis set forth in Anderson. See Coffield, 599 F.3d at 1277; Cartwright, 304 F.3d at 1139. Thus, the case law in this circuit simply does not support Plaintiff's argument that this Court must analyze Plaintiffs' claims under Anderson, notwithstanding the clear ruling in Jenness. See Dkt. No. [96] at 9.

Second, Plaintiffs contend that "the facts and the law before the Court are distinguishable from those earlier cases." Dkt. No. [96] at 10. Plaintiffs stress that no Libertarian Party candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot since the 5% petition requirement was adopted in 1943. See id. While the Court is sympathetic to

Plaintiffs' plights, the Eleventh Circuit squarely rejected this argument in Cartwright, on the basis that "Jenness directly addressed the 5% figure . . . ." 304 F.3d at 1141. In a similar vein, the current federal campaign finance laws that Plaintiffs claim limit their ability to fund petition drives is not sufficient to establish that Jenness no longer applies. See Dkt No. [96] at 10; cf. Cartwright, 304 F.3d at 1141 (refusing to find that the plaintiffs' evidence with respect to reapportionment imposed "suffocating restrictions" sufficient to render Jenness inapplicable).

Plaintiffs' attempts to distinguish their claims from prior cases likewise fall short. See Dkt. No. [96] at 10-11. Although Cartwright primarily involved a claim under the Qualifications Clause, the Eleventh Circuit explicitly stated that the "analysis in Jenness still equally pertains today" with respect to the Supreme Court's holdings under the First and Fourteenth Amendments and the Equal Protection Clause. 304 F.3d at 1141. In Coffield, the Eleventh Circuit noted that Plaintiff failed to "allege how many candidates have tried" to qualify for the ballot. Dkt. No. [96] at 11 (citing 599 F.3d at 1277). However, contrary to Plaintiffs' argument, the Court does not find that this language provides a sufficient foothold for distinguishing Coffield from the instant case because the Coffield court ultimately emphasized that "[t]he pertinent laws of Georgia have not changed materially since the decisions in Jenness and Cartwright were made." 599 F.3d at 1277.

Thus, while Plaintiffs present a robust record and some compelling arguments, the Court cannot ignore the fact that similar challenges to the Georgia Election Code have been rejected by higher courts. The Court is bound by the clear rulings of both the Eleventh Circuit and the Supreme Court. Therefore, Plaintiffs' Motion for Summary Judgment [69] is **DENIED** and Defendant's Motion for Summary Judgment [73] is **GRANTED** as to Plaintiff's claims under the First and Fourteenth Amendments and the Equal Protection Clause.

### IV.   CONCLUSION

Plaintiffs' Motion for Summary Judgment [69] is **DENIED.** Defendant's Motion for Summary Judgment [73] is **GRANTED in PART and DENIED IN PART AS MOOT.** Defendant's Motion to Exclude Expert Report of Darcy Richardson [109] is **DENIED AS MOOT.**

The Clerk is **DIRECTED** to **CLOSE** this case.

**IT IS SO ORDERED** this 23rd day of September, 2019.

_____
**Leigh Martin May**
**United States District Judge**