[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 19-14065

———————————————

D.C. Docket No. 1:17-cv-04660-LMM

MARTIN COWEN,
ALLEN BUCKLEY, et al.,

Plaintiffs–Appellants,

versus

GEORGIA SECRETARY OF STATE,

Defendant–Appellee.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia

———————————————

(June 3, 2020)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

The Libertarian Party of Georgia, several prospective Libertarian candidates

for Congress, and several Libertarian voters—collectively, "the Libertarian Party"

or "the Party"—brought the instant case against the Secretary of State of Georgia. They alleged that Georgia's ballot-access requirements for third-party and independent candidates violated their associational rights under the First and Fourteenth Amendments and their Equal Protection rights under the Fourteenth Amendment.  The district court granted the Secretary of State summary judgment, concluding that it did not need to apply the Supreme Court's test for the constitutionality of ballot-access requirements, as articulated in *Anderson v. Celebreeze*, 460 U.S. 780 (1983), and the Party appeals from that determination.

After careful review, and with the benefit of oral argument, we vacate the district court's grant of summary judgment.  We conclude that the district court's failure to conduct the *Anderson* test constitutes reversible error; accordingly, we remand the case to the district court with instructions to conduct in the first instance the *Anderson* test and to consider the Party's Equal Protection claim.

## I. BACKGROUND

We note at the outset that the facts are not seriously disputed, but nonetheless set them out to better contextualize the parties' arguments.  The State of Georgia first established formal ballot access requirements in 1922, which required that an independent candidate, or the nominee of any party not conducting a primary election, could attain ballot access by simply "fil[ing] notice of their candidacy, giving their names and the offices for which they are candidates, with

the Secretary of State" for national and statewide elections, and with county

officials for district and county elections, with no petition or filing fee

requirements.  1922 Ga. Laws 100.  Over the next few decades, the State

subsequently tightened its ballot-access requirements.  In 1943, the State enacted

the predecessor of its current ballot-access requirement, which allowed third-party

candidates to gain access to the ballot in one of two ways: (1) if the political party

received 5 percent of the votes in the last general election for the office in question,

which guaranteed ballot access; or (2) by gathering petitions signed by 5 percent of

all of the registered voters in the state or district.  1943 Ga. Laws 292.

In 1986, the State substantially loosened its ballot-access requirements—but

only with respect to statewide candidates.  That year, the State amended its statutes

to allow ballot access for third-party candidates nominated for statewide office if

the third-party either: (1) submitted petitions "signed by voters equal in number to

1 percent of the registered voters who were registered and eligible to vote in the

preceding general election; or (2) "[a]t the preceding general election, the political

body nominated a candidate for state-wide office and such candidate received a

number of votes equal to 1 percent of the total number of registered voters who

were registered and eligible to vote in such general election."  1986 Ga. Laws 894.

However, the legislature left unchanged the 5 percent petition requirement for

3

third-party and independent candidates for non-statewide offices.  Since 1986,

Georgia's ballot-access requirements have remained largely unchanged.

In contrast to the 1986 requirement for statewide offices, Georgia has a two-

tiered system through which non-statewide candidates, like those for the U.S.

House of Representatives, can qualify for the ballot.  For candidates of "political

parties"—defined by state law as political organization whose nominees won at

least twenty percent of the vote at the last gubernatorial or presidential election,

O.C.G.A. § 21-2-2(25)—they are guaranteed ballot access so long as they win their

party's primary and pay the requisite filing fee.  But for candidates of "political

bodies"—political organizations other than formally recognized political parties,

O.C.G.A. § 21-2-2(23), which, as a practical matter, encompasses all third

parties—the candidates are guaranteed ballot access only if they are nominated by

their party at a convention, *id.* § 21-2-170(g), and if they submit nomination

petitions signed by 5 percent of the registered voters eligible to vote for that office

in the most recent general election, *id.* § 21-2-170(b).

The Libertarian Party of Georgia, along with several of its prospective

congressional candidates and voters, brought the instant suit, challenging the

constitutionality of these ballot-access requirements for congressional candidates.

The Party noted that, if it wanted to run a full slate of congressional candidates in

Georgia, it would be required to gather a grand total of 321,713 valid signatures.  It

also introduced evidence that no third-party congressional candidate has *ever* managed to petition its way onto the ballot—despite the fact that, since 2002, at least twenty candidates had attempted to do so.  It also introduced evidence surrounding the practical difficulties of gathering petitions, which include the allegedly error-prone signature-checking process, the undue cost of petitioning (and the inability, under federal campaign finance law, of the national party to help defray these costs), the onerousness of the pace and schedule of petition gathering, the lack of access to voters, and alleged concerns from voters about disclosing confidential information on the nominating petition.

The district court characterized this evidence as part of a "robust record" and noted that the Party raised "some compelling arguments," but nonetheless concluded that the Secretary of State was entitled to summary judgment.  The court declined to apply the Supreme Court's test for the constitutionality of ballot-access requirements—as articulated in *Anderson*, 460 U.S. at 789—instead concluding that, in light of *Jenness v. Fortson*, 403 U.S. 431 (1971), which upheld Georgia's ballot-access requirements, it was not necessary to apply the *Anderson* test to ballot-access requirements outside of the presidential election context.  It also summarily rejected the Party's Equal Protection challenge.  The Party timely appealed to us.  We vacate and remand with instructions.

## II. ANALYSIS

We review *de novo* a grant of summary judgment. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). In reviewing the propriety of summary judgment, "we view the evidence in the light most favorable to the non-moving party." *Thomas*, 506 F.3d at 1363.

This case involves a challenge to Georgia's ballot-access requirements for third-party (or "political body") congressional candidates. The Libertarian Party in this case raises two different constitutional challenges to Georgia's ballot-access requirements—one based on its associational rights under the First and Fourteenth Amendments, and one based on its rights under the Equal Protection Clause. We address each in turn.

A.  *Associational Rights*

The Supreme Court has recognized the unique "impact of candidate eligibility requirements on voters," which implicates the "basic constitutional rights" of both voters and candidates under the First and Fourteenth Amendments. *Anderson*, 460 U.S. at 786. Specifically, ballot-access requirements implicate "the right of individuals to associate for the advancement of political beliefs, and the

right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Id.* at 787 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968)).

In *Anderson*, the Supreme Court laid out a multistep test for evaluating the constitutionality of ballot-access requirements under the First and Fourteenth Amendment.  First, the court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."  460 U.S. at 789.  Second, "[i]t then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*  Third, the court must "weigh[] all these factors" and "decide whether the challenged provision is unconstitutional." *Id.*

In laying out these steps, the Court emphasized the importance of context. "Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Id.* at 789.  In other words, the determination that a 1 percent petition

requirement by one state's election law in one context is constitutional, *vel non*, does not guarantee the same determination of a similar law in a different context.[1]

> [T]he rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made.  Decision in this context, as in others, is very much a "matter of degree," very much a matter of "considering the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.

*Storer v. Brown*, 415 U.S. 724, 730 (1974) (internal cites and punctuation omitted).

Georgia's ballot-access requirements have been repeatedly challenged, both before and after the Supreme Court's decision in *Anderson*, and have been upheld each time.  While we ultimately conclude that the district court erred in prematurely concluding—without applying the *Anderson* analysis—that the Party's challenge was foreclosed by Supreme Court and Eleventh Circuit precedent, we nonetheless find it prudent to lay out the underlying legal landscape.

First, in *Jenness v. Fortson*—a decision predating *Anderson* by more than a decade—the Supreme Court upheld Georgia's ballot-access requirements against constitutional challenges.  Significantly, the 1986 amendment to the Georgia law

---

[1] We note below that our decision in *Bergland v. Harris*, 767 F.2d 1551, 1554 (11th Cir. 1985), held that, in a challenge to the constitutionality of a ballot-access requirement, the *Anderson* analysis must be undertaken even if the very same requirement had been previously upheld as constitutional, if there are at least some non-frivolous arguments that, since the decision upholding the requirement, circumstances have changed the context of the analysis.

had not come into effect at this point, and as a result, the only way that a third-party or independent candidate could be placed on the ballot for *any* race in Georgia was to file "a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question."  403 U.S. at 432.  Several prospective candidates challenged the constitutionality of the law, both as a violation of their rights under the First and Fourteenth Amendments and as a violation of the Equal Protection Clause.  The Court concluded that the law did "nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments."  *Id.* at 440.  As we will address later in our discussion of the Equal Protection challenge, the Court also rejected the plaintiffs' Equal Protection arguments.  *Id.*

We, in turn, rejected a subsequent challenge in *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981),[2] where our predecessor court upheld the Georgia ballot-access requirements from similar constitutional challenges.  We "extensively quote[d]" from the Supreme Court's opinion in *Jenness*, and ultimately concluded that, given the similar nature of the challenges to the law, the plaintiffs' challenge to the law was due to be rejected.  *Id.* at 1310–13.

---

[2] In *Bonner v. City of Prichard*, we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.  661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

In *Bergland v. Harris*, a decision issued two years after the Supreme Court's decision in *Anderson*, we considered a similar challenge.  There, a coalition of plaintiffs—including several third parties, third-party presidential candidates, and a third-party congressional candidate—challenged the Georgia law once again.  767 F.2d 1551, 1552–53, 1553 n.1 (11th Cir. 1985).  We reiterated the three-part *Anderson* test but ultimately concluded that there was "an insufficient factual record to carry out the *Anderson* requirements" because the evidentiary materials "filed by the State in this case are simply inadequate to allow a court to conduct" the "weighing of interests" required by the *Anderson* analysis.  *Id.* at 1554.  We further held that the "two cases which have upheld the Georgia provisions against constitutional attack by prospective candidates and minor political parties"—that is, *Jenness* and *McCrary*—"do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in *Anderson v. Celebreeze*."  *Id.* (citations omitted).

Finally, in *Cartwright v. Barnes*, 304 F.3d 1138, 1142–44 (11th Cir. 2002), and *Coffield v. Handel*, 599 F.3d 1276, 1277 (11th Cir. 2010), we upheld Georgia's ballot-access requirements in different contexts, as discussed more fully below.

In the instant case, the district court granted summary judgment to the Secretary of State.  In upholding Georgia's ballot-access requirements, however, the district court did not apply the *Anderson* test at all.  It concluded that our

opinion in *Bergland*—along with our unpublished opinion in *Green Party of Ga. v. Georgia*, 551 F. App'x 982 (11th Cir. 2014)—"emphasized the uniqueness of presidential elections," and that our opinions in *Cartwright* and *Coffield* demonstrate that we

> ha[ve] continued to reject challenges to Georgia's 5% rule brought by prospective candidates for the United States House of Representatives *without* engaging in the analysis set forth in *Anderson*. Thus, the case law in this circuit simply does not support Plaintiff's argument that this Court must analyze Plaintiffs' claims under *Anderson*, notwithstanding the clear ruling in *Jenness*.

Dist. Ct. Op. at 13 (emphasis in original).

In our view, this is a reversible error of law. We cannot agree with the assertion that our *Bergland* decision—and thus the applicability of the *Anderson* test—is limited to ballot-access requirements as applied to presidential candidates for several reasons. First, by its own text, the Supreme Court's opinion in *Anderson* does not restrict its holding to presidential candidates. Though it certainly emphasizes the "uniquely important national interest" when ballot-access restrictions are applied to presidential candidates, 460 U.S. at 794–95, we do not read that as an implied limitation on *Anderson*'s applicability. Such a limitation would make little sense in context. The Supreme Court in *Anderson* laid out the test for evaluating the constitutionality of ballot-access restrictions, which requires, *inter alia*, the "identif[ication] and evaluat[ion] [of] the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at

11

789.  Then, in a subsequent section, it explained that "the State has a less important interest in regulating Presidential elections than statewide or local elections," *id.* at 795; in other words, the unique nature of a presidential election altered the weighing of interests.  Our reading of *Anderson* makes clear that its requirements apply in all elections—but with a thumb on the scale in favor of ballot access when the candidates challenging the requirements are presidential candidates.

Second, our precedent makes clear that it is the law in this circuit to apply *Anderson* to ballot-access requirements for all candidates.  *See, e.g.*, *Grizzle v. Kemp*, 634 F.3d 1314, 1316, 1321–22 (11th Cir. 2011) (school board candidates); *Swanson v. Worley*, 490 F.3d 894, 896, 902–03 (11th Cir. 2007) (state senate, state house, and sheriff candidates); *Green v. Mortham*, 155 F.3d 1332, 1333, 1335–36 (11th Cir. 1998) (congressional candidate); *New Alliance Party v. Hand*, 933 F.2d 1568, 1570, 1574 (11th Cir. 1991) (congressional candidate and county commission candidate); *Bergland*, 767 F.2d at 1552–53, 1553 n.1 (presidential candidates and a congressional candidate); *Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 792–93 (11th Cir. 1983) (state legislative, statewide office, and presidential candidates).

Third, and most significantly, we conclude that the district court erred when it limited the precedential force of *Bergland* to presidential candidates and declined to apply the *Anderson* analysis, relying upon its belief that the Supreme Court's

12

decision in *Jenness* foreclosed the Party's challenge to Georgia's ballot-access requirements.  Contrary to the district court's ruling, our prior, binding decision in *Bergland* expressly held that *Jenness* did not foreclose a challenge to Georgia's "signature requirements for nominating petitions," *see Bergland*, 767 F.2d at 1553, including the 5 percent rule challenged in this case, *id.* at 1553, 1553 n.3.  Rather, *Bergland* held that the challenge must be evaluated pursuant to the "balancing approach outlined in *Anderson v. Celebreeze*."  *Id.* at 1554.  *Bergland* held that, "[c]ontrary to the State's argument, the two cases"—referring expressly to *Jenness* and *McCrary*, both of which preceded the Supreme Court's opinion in *Anderson*— "which have upheld the Georgia provisions against constitutional attack by prospective candidates and minor political parties do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in *Anderson v. Celebrezze*."  *Id.*

The district court erred in concluding that the precedential force of *Bergland* was limited to candidates for President.  Although the *Bergland* plaintiffs did include candidates for President, the case also included a candidate for Congress, whose claim was also vacated and remanded to the district court for analysis pursuant to the *Anderson* balancing approach.  *Id.* at 1553 n.1, 1554–55.  Moreover, while *Bergland* did note that, in applying the *Anderson* analysis, "the State has a less important interest in regulating Presidential elections than

statewide or local elections," *id.* at 1554 (quoting *Anderson*, 460 U.S. at 795), it also noted that the "difference between state and local offices and federal offices . . . requires a different balance than that used in weighing the state interests against the burdens placed on candidates for statewide and local offices," *id.* at 1554–55.

Moreover, the district court misapplied our holdings in *Cartwright* and *Coffield*. In *Cartwright*, the primary challenge was that Georgia's 5 percent requirement for ballot access violated the Qualifications Clause of the U.S. Constitution. 304 F.3d at 1139. It is true that the decision also mentioned that "this 5% signature requirement does not violate any other constitutional provision," *id.*; and it did note that the *Jenness* analysis "still equally pertains today," at least with respect to its Equal Protection analysis, *id.* at 1441–42. However, the plaintiffs in *Cartwright* pointed to only two differences in the relevant context to distinguish their case from *Jenness*, both of which the panel rejected summarily as wholly without merit. *Id.* at 1141. Similarly, our decision in *Coffield* appears to have rejected an attempt to distinguish *Jenness*, thus affirming the district court's dismissal, because the plaintiff's allegations were wholly insufficient to plausibly distinguish *Jenness*. *See Coffield*, 599 F.3d at 1277. Although both the *Cartwright* and *Coffield* panels rejected challenges to Georgia's ballot-access requirements without explicitly engaging in the analysis set

14

forth in *Anderson*, we do not read those cases as refusing to engage in the *Anderson* analysis.  Rather, harmonizing those decisions with our binding precedent in *Bergland*, we read them as recognizing no significant differences from *Jenness* with respect to the relevant considerations.  To the extent that those cases could be read to hold that *Jenness* is dispositive and forecloses all challenges to Georgia's ballot-access requirements, such a holding would be inconsistent with our clear holding in *Bergland*.  As we recently recognized, "[o]ur adherence to the prior-panel rule is strict, but when there are conflicting prior panel decisions, the oldest one controls."  *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) (citing *Cohen v. Office Depot, Inc.*, 204 F.3d 1069, 1072 (11th Cir. 2000)).

For these reasons, we conclude that the district court erred by failing to apply the analysis articulated in *Anderson v. Celebreeze*.  We decline the Party's invitation that we address the merits of its claim; we would prefer that the district court address that question in the first instance.  As we have explained, the *Anderson* test emphasizes the relevance of context and specific circumstances to each challenge to ballot-access requirements.  While this is not a pure question of fact, we nonetheless believe that it is a question that the district court is better equipped to address with testimony and other direct evidence.

But though *Bergland* made clear that the Supreme Court's opinion in *Jenness* does not automatically preclude any subsequent challenges to Georgia's ballot-access requirements, the Party will, on remand, have to satisfactorily distinguish its claims from those rejected in *Jenness*. The Party will have to demonstrate why a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law.

On appeal, the Party has pointed to numerous differences in the instant case with respect to factors relevant in the *Anderson* balancing analysis, which it argues are different from the relevant considerations that were before the *Jenness* court. We decline to address those asserted differences from *Jenness* because the district court should address those issues in the first instance on remand. Accordingly, we vacate the district court's grant of summary judgment and remand to the district court with instructions to apply the *Anderson* analysis in the first instance.

B.    *Equal Protection Clause*

The plaintiffs in this case also raise a challenge to Georgia's ballot-access requirements as running afoul of the Equal Protection Clause. As the Supreme Court has recognized, to the extent that ballot-access requirements draw a distinction, the "State must establish that its classification is necessary to serve a

16

compelling interest." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (citations omitted).

In *Jenness*, the Supreme Court rejected an Equal Protection challenge to Georgia's requirements. But we note that the Equal Protection challenge in *Jenness* differs from the Party's Equal Protection challenge in the instant case. In *Jenness*, the challenge was as to the distinction between third-party (or "political body") candidates and major-party (or "political party") candidates: the claim was "necessarily bottomed upon the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it is to win the votes of a majority in a party primary." *Jenness*, 403 U.S. at 440. The Supreme Court rejected this assumption, noting that Georgia has provided two "alternative routes" to a candidate for getting his name on the ballot. *Id.* "He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization." *Id.* The Court noted that neither of these two alternative paths "can be assumed to be inherently more burdensome than the other." *Id.* at 441.

The Equal Protection challenge presented by the Party in this case is substantially different from that presented in *Jenness*. The challenge here is not between political party and political body candidates for the same offices, but between political body candidates for *different* offices. Under Georgia law, a

17

Libertarian Party candidate for statewide office is automatically entitled to ballot

access in 2020; this is because, in the 2018 general election, it "nominated a

candidate for state-wide office and such candidate received a number of votes

equal to 1 percent of the total number of registered voters who were registered and

eligible to vote in such general election."[3]  O.C.G.A. § 21-2-180(2).  However,

pursuant to the different Georgia requirement for non-statewide offices, Libertarian

congressional candidates are required to individually qualify for the ballot by

submitting a nominating petition "signed by a number of voters equal to 5 percent

of the total number of registered voters eligible to vote in the last election for the

filling of the office the candidate is seeking."  *Id.* § 21-2-170(b).  Therefore, the

Party argues, its statewide candidates need to gather zero signatures while a full

slate of congressional candidates would need to gather 321,713 valid signatures.

The district court did not separately address the Party's Equal Protection

challenge, instead considering it in tandem with the associational-rights challenge,

thus in effect holding that *Jenness* foreclosed the Party's Equal Protection

challenge as well as its First and Fourteenth Amendment challenge.  We hold only

---

[3] In 2018, there were 6,935,816 voters eligible to vote in the general election.  To automatically
qualify for ballot access in future statewide elections, the Libertarian Party was required to
receive at least 69,359 votes.  Given that 3,939,328 votes were cast in the gubernatorial election,
this means that the Libertarian Party nominee for some statewide office would have been
required to get 1.76% of the vote.  They qualified by getting 2.23% for Secretary of State; 2.65%
for Commissioner of Insurance; and 2.67% and 2.52% for the Public Service Commission,
Districts 3 and 5, respectively.

that *Jenness* does not control the Equal Protection issue presented by the Party in this case, because the Equal Protection claim presented here is sufficiently different from that presented in *Jenness*.  However, we again decline the Party's invitation that we address the merits of its Equal Protection claim, believing that this question is best resolved by the district court in the first instance on remand, as is the case with the First and Fourteenth Amendment challenge.[4]

### III. CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary judgment to the Secretary of State and remand the case for further proceedings consistent with this opinion.  On remand, the district court is instructed to conduct in the first instance the *Anderson* test with respect to Georgia's ballot-access requirements and consider the Libertarian Party's Equal Protection challenge.

**VACATED AND REMANDED.**

---

[4] We note that the plaintiffs in *Bergland* included an Equal Protection challenge to Georgia's ballot-access requirements, in addition to their First and Fourteenth Amendment challenge.  767 F.2d at 1552.  Although our opinion in *Bergland* did not explicitly address the Equal Protection claim separately from the First and Fourteenth Amendment challenge, the decision did vacate and remand the Equal Protection challenge as well, notwithstanding *Jenness*.  *See id.*

JORDAN, Circuit Judge, concurring.

I join Judge Anderson's opinion for the court. Although I can understand why the district court believed that *Jenness v. Fortson*, 403 U.S. 431 (1971), was controlling, I offer some additional reasons why it is not.

First, the plaintiffs have challenged not only Georgia's 5% petition requirement, *see* O.C.G.A. § 21-1-170(b), but also the qualifying fee for the office of U.S. Representative, *see* O.C.G.A. § 21-2-132(d), and this latter claim was not at issue in *Jenness*. As the Supreme Court explained in *Jenness*, the qualifying fee had been declared unconstitutional and enjoined by the district court, and that ruling was not challenged on appeal. *See* 403 U.S. at 432. So, whatever effect *Jenness* may have had on the plaintiffs' First and Fourteenth Amendment claims, it did not foreclose or control the plaintiffs' challenge to the qualifying fee.

Second, as Judge Anderson points out, the Supreme Court changed the applicable constitutional standard in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). And "when the Supreme Court overturns the standard that it had previously used to resolve a particular class of cases," federal and state courts "must apply the new standard and reach the result dictated under that new standard." Bryan Garner et al., The Law of Judicial Precedent § 2, at 31 (2016). So *Jenness*, though not obsolete, does not control the outcome here.

20

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 03, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-14065-HH
Case Style:  Martin Cowen, et al v. Georgia Secretary of State
District Court Docket No:  1:17-cv-04660-LMM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Christopher Bergquist, HH at 404-335-6169.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs