IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**Martin Cowen**, et al.,

      Plaintiffs,

 vs.

**Brad Raffensperger**, in his
official capacity as Secretary of
State of the State of Georgia,

      Defendant.

Case No. 1:17-cv-04660-LMM

**Brief in Support of the
Plaintiffs' Second Motion
for Summary Judgment**

# Table of Contents

Table of Authorities ........................................................................ 3

Background ..................................................................................... 7

    I.     Georgia's Ballot-Access Restrictions ........................................ 8

    II.    Practical Barriers to Petitioning ............................................ 16

    III.   The Impact of Georgia's Ballot-Access Restrictions ............ 22

    IV.   Support for the Libertarian Party Nationwide ..................... 23

Legal Standard .............................................................................. 26

Discussion ..................................................................................... 27

    I.     Georgia may not require more signatures from candidates for U.S. Representative than from candidates for statewide offices. .................................................................................. 27

    II.    Georgia's ballot-access restrictions violate the First and Fourteenth Amendments. ....................................................... 33

         A.    The Character and Magnitude of the Injury .............. 35

         B.    *Jenness* does not compel the conclusion that the burden here is not severe. ........................................... 41

         C.    Asserted State Interests .............................................. 48

    III.   Georgia's ballot-access restrictions violate the Equal Protection Clause. .................................................................. 53

Conclusion .................................................................................... 56

Certificate of Compliance ............................................................ 58

# Table of Authorities

## Cases

*Allen v. Tyson Foods, Inc.,*
121 F.3d 642 (11th Cir. 1997) ................................................................27

*American Party of Texas v. White,*
415 U.S. 767 (1974) ...............................................................35, 43

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ............................................................*passim*

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................27

*Angle v. Miller,*
673 F.3d 1122 (9th Cir. 2012) ...............................................49

*Bergland v. Harris,*
767 F.2d 1551 (11th Cir. 1985) ................................34, 35, 48

*Burdick v. Takushi,*
504 U.S. 428 (1992) ...........................................................34, 43

*Clements v. Fashing,*
457 U.S. 957 (1982) .................................................................49

*Clingman v. Beaver,*
544 U.S. 581 (2005) .................................................................45

*Cowen v. Georgia Secretary of State,*
960 F.3d 1339 (11th Cir. 2020) .............................................34

*Fulani v. Krivanek,*
973 F.2d 1539 (11th Cir. 1992) ........................................35, 54

*Graveline v. Johnson,*
747 F. App'x 408 (6th Cir. 2018).............................................46

*Green Party of Georgia v. Georgia*,
  551 F. App'x 982 (11th Cir. 2014) ....................................................34

*Green Party of Georgia v. Kemp*,
  171 F. Supp. 3d 1340 (N.D. Ga. 2016) ...........................................39, 40

*Green Party of Georgia v. Kemp*,
  674 F. App'x 974 (11th Cir. 2017) ....................................................39

*Illinois State Board of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) ..........................................................*passim*

*Jenness v. Fortson*,
  403 U.S. 431 (1971) ..........................................................*passim*

*Libertarian Party of Florida v. Florida*,
  710 F.2d 790 (11th Cir. 1983) ....................................................34, 35, 38

*Lubin v. Panish*,
  415 U.S. 709 (1974) ..........................................................36

*Mandel v. Bradley*,
  432 U.S. 173 (1977) ..........................................................37

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................27

*Munro v. Socialist Workers Party*,
  479 U.S. 189 (1986) ..........................................................37

*New Alliance Party v. Hand*,
  933 F.2d 1568 (11th Cir. 1991) ....................................................37, 43

*Norman v. Reed*,
  502 U.S. 279 (1992) ..........................................................*passim*

*Storer v. Brown*,
  415 U.S. 724 (1974) ..........................................................35, 37

*Swanson v. Worley*,
  490 F.3d 894 (11th Cir. 2007) ....................................................37

*United States v. Johnson*,
   921 F.3d 991 (11th Cir. 2019) ............................................................42

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ..........................................................*passim*


**Statutes**

O.C.G.A. § 21-2-2 .............................................................10, 11

O.C.G.A. § 21-2-130 ..............................................................10

O.C.G.A. § 21-2-131 ...........................................................13, 14

O.C.G.A. § 21-2-132 .......................................................11, 12, 13, 14

O.C.G.A. § 21-2-133 ..............................................................44

O.C.G.A. § 21-2-153 ..............................................................50

O.C.G.A. § 21-2-170 ........................................................11, 12, 13

O.C.G.A. § 21-2-180 .........................................................*passim*

O.C.G.A. § 21-2-225 ..............................................................21

O.C.G.A. § 21-2-414 ..............................................................20


**Other Authorities**

Act of April 3, 1986, ch. 284, 1986 Ga. Laws 890 ......................................9

Act of Aug. 21, 1922, ch. 530, 1922 Ga. Laws 97 ......................................8

Act of March 20, 1943, ch. 415, 1943 Ga. Laws 292 ..................................8

Appellee's Brief, *Cowen v. Georgia Secretary of State*,
   No. 19-14065 (11th Cir. Dec. 13, 2019) ............................................31

Bryan A. Garner et al., *The Law of Judicial Precedent* (2016) ..........41, 43

Federal Rule of Civil Procedure 56............................................................26

Ga. Comp. R. & Regs. 183-1-15-.02........................................................44

Ga. Election Code Amended, ch. 1031, 1978 Ga. Laws 1004 .................44

Henry Campbell Black,
    *Handbook on the Law of Judicial Precedents*
    *or the Science of Case Law* (1912)...........................................................42

Richard Winger, *The Supreme Court and the Burial of*
    *Ballot Access: A Critical Review of Jenness v. Fortson,*
    1 Election L.J. 235 (2002) ......................................................................42

## Background

This is a constitutional challenge to Georgia's ballot-access restrictions on third-party candidates for U.S. Representative. Those restrictions are by far the most stringent in the nation, and—despite many attempts—no such candidates have appeared on the general-election ballot since the restrictions were first enacted in 1943. Among other things, the laws at issue here require third-party candidates for U.S. Representative to gather thousands more signatures on a nominating petition than any such candidate has ever successfully gathered in the history of the United States. Georgia's ballot-access laws also produce the incongruous result that nominees of the Libertarian Party—whose candidates for statewide offices have won the support of millions of Georgia voters over the last ten years—must gather far more signatures to appear on the ballot in any one of Georgia's fourteen congressional districts than are required of Libertarian candidates for Governor, U.S. Senator, or even President.

The plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters. Together, they raise two claims. First, they allege that Georgia's ballot-access restrictions

unconstitutionally burden their rights under the First and Fourteenth Amendments to the U.S. Constitution. Second, they allege that Georgia's ballot-access restrictions violate the Equal Protection Clause of the Fourteenth Amendment. They seek declaratory and injunctive relief prohibiting the Secretary of State from enforcing those restrictions in future elections.

## I.   Georgia's Ballot-Access Restrictions

The State of Georgia enacted its first ballot-access law in 1922. Act of Aug. 21, 1922, ch. 530, § 3, 1922 Ga. Laws 97, 100 (codified at 1933 Ga. Code § 34-1904). That law provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. (Ex. 33: Answer ¶ 15, ECF 69-36 at 4.)[1] In 1943, the State added a five-percent petition requirement for access to the general-election ballot. Act of March 20, 1943, ch. 415, § 1, 1943 Ga. Laws 292. That provision allowed candidates of any political party that received at least five percent of the votes in the last general election for the office to appear on the general-election ballot

---

[1] For comparison with the Secretary of State's answer, the plaintiffs' complaint (ECF 1) is included as exhibit 32. (ECF 69-35.)

without a petition or fee, but it required all other candidates to file a petition signed by at least five percent of the registered voters in the territory covered by the office. (Ex. 33: Answer ¶ 17, ECF 69-36 at 4.) Over the next few decades, the State tightened its ballot-access requirements through a series of incremental changes to the petition deadline, an added qualifying fee, and a number of other restrictions.[2]

In 1986, the State substantially loosened its ballot-access requirements—but only for statewide candidates. That year, the State dropped the petition requirement to one percent for statewide candidates and created a way for third parties to have their candidates for statewide offices appear on the ballot without the need to submit a petition. Act of April 3, 1986, ch. 284, §§ 3, 5, 1986 Ga. Laws 890, 892-93 (codified at O.C.G.A. §§ 21-2-170 and -180). Under the latter provision, referred to here as "Section 21-2-180," a third party could become qualified to nominate statewide candidates without a petition if the party either (a) submitted a petition signed by at least one percent of the total number of registered voters at the last general election; or (b) had one of its statewide candidates in the last general election receive votes totaling at

_____

[2] A detailed history of those changes is set out in Part III of the plaintiffs' statement of material facts. (ECF 69-2 at 7-10.)

9

least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. The State left the five-percent petition and requirement for third-party candidates for non-statewide offices, including U.S. Representative, unchanged.

Today, Georgia's ballot-access laws distinguish between three kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a "political body," as third-parties are known in Georgia; and (3) independent candidates. (Ex. 33: Answer ¶ 27, ECF 69-36 at 5.)

A "political party" is any political organization whose nominee received at least 20 percent of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2 (25). (Ex. 33: Answer ¶ 28, ECF 69-36 at 5.) Political parties choose nominees in partisan primaries, and the candidate nominated by the party appears automatically on the general-election ballot for any statewide or district office. O.C.G.A. § 21-2-130(1). (Ex. 33: Answer ¶ 29, ECF 69-36 at 5.) The only political parties that meet the current definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party. (Ex. 33: Answer ¶ 30, ECF 69-36 at 5.)

A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(23). (Ex. 33: Answer ¶ 31, ECF 69-36 at 5.) Political bodies must nominate candidates for partisan offices by convention, and the nominees' access to the general-election ballot depends on the office being sought (whether the office is a statewide office, a non-statewide office, or the office of President of the United States) and whether the political body has qualified to nominate statewide candidates without a petition under Section 21-2-180. O.C.G.A. § 21-2-170(g). (Ex. 33: Answer ¶ 32, ECF 69-36 at 5.)

A political body can qualify under Section 21-2-180 to have its nominees for *statewide* offices, including the office of President, appear automatically on the general-election ballot without the need to submit a nominating petition. O.C.G.A. § 21-2-132(e)(5). (Ex. 27: First Admissions ¶ 6, ECF 69-30 at 1.)[3] To do so, the political body must either: (a) submit a qualifying petition signed by at least one percent of the total number of registered voters at the last general election; or (b) have nominated a candidate for statewide office in the last general election who received votes totaling at least one percent of the total number of registered

---

[3] For comparison with the Secretary of State's responses, the plaintiffs' first set of requests for admissions is included as exhibit 26. (ECF 69-29.)

voters in the election. O.C.G.A. § 21-2-180. (Ex. 27: First Admissions ¶¶ 3-4, ECF 69-30 at 1.)

The Libertarian Party of Georgia is a political body under Georgia law and has been qualified under Section 21-2-180 since 1988. (Ex. 33: Answer ¶ 128, ECF 69-36 at 22.) As a result, it can nominate candidates for all *statewide* offices in Georgia without the need to submit any petition signatures.

Candidates for statewide offices nominated by political bodies that are not qualified under Section 21-2-180 do not appear automatically on the general-election ballot. Each such nominee for statewide offices *other than President* must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by one percent of the number of registered voters eligible to vote for that office in the last general election, O.C.G.A. § 21-2-170(b). Presidential candidates nominated by political bodies that are not qualified under Section 21-2-180 must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by 7,500 registered voters eligible to vote for that office in the last general election. (Ex. 33: Answer ¶ 42, ECF 69-36 at 6.)

Political-body candidates for *non-statewide offices*, including the office of U.S. Representative, do not appear automatically on the general-election ballot. In order to appear on the general-election ballot, such candidates must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d); and (2) a nomination petition signed by five percent of the number of registered voters eligible to vote for that office in the last election, O.C.G.A. § 21-2-170(b). (Ex. 27: First Admissions ¶ 8, ECF 69-30 at 2; Ex. 33: Answer ¶ 37, ECF 69-36 at 6.)

Independent candidates do not appear automatically on the general-election ballot for any office unless the candidate is an incumbent. Non-incumbent independent candidates must follow the same rules as candidates nominated by political bodies that are not qualified under Section 21-2-180. (Ex. 33: Answer ¶ 41, ECF 69-36 at 6.)

Qualifying fees for political-party candidates for U.S. Representative are paid directly to the state political party, which retains 75 percent and sends 25 percent to the Secretary of State. O.C.G.A. § 21-2-131(b)-(c). Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2). For political-body candidates, the

Secretary of State retains 25 percent and sends 75 percent to the political body. O.C.G.A. § 21-2-131(c)(4)(A). While the statute requires the Secretary of State to distribute the funds "as soon as practicable," the Libertarian Party did not receive its share of the qualifying fees for the 2018 election until after the election was over, in mid-April 2019. (Ex. 9: Graham decl.¶¶ 15-16, ECF 69-12 at 4; Ex. 12: Metz decl. ¶ 13, ECF 69-15 at 4.)

The qualifying fee for candidates for U.S. Representative is currently $5,220 (which is three percent of the annual salary of the office), and the Libertarian Party would therefore need to pay $73,080 in qualifying fees in order to run a full slate of candidates for the office of U.S. Representative in 2020.[4] (Ex. 33: Answer ¶ 55, ECF 69-36 at 9.) Among states with a mandatory nominating petition, Georgia's qualifying fees are higher than any other state in the nation. (Ex. 22: Winger decl. ¶¶ 16-17, ECF 69-25 at 5.)

---

[4] Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g). (Ex. 29: Second Admissions ¶ 47, ECF 69-32 at 11.) In addition, a pauper's affidavit for a candidate for U.S. Representative must be accompanied by a petition signed by one percent of the number of registered voters eligible to vote for the office in the last election. O.C.G.A. § 21-2-132(h). (Ex. 23: Harvey dep. 170:4-13, ECF 69-26 at 81.)

Based on the State's voter registration rolls in 2018, the Secretary of State estimated that a political body would need to submit at least 321,713 valid signatures in order to run a full-slate of fourteen candidates for the office of U.S. Representative in 2020. (Ex. 31; Def's Resp. Pls.' 2d Interrogs., ECF 69-34 at 8.) That is more signatures than required by any other state in the nation, both as a percentage of votes cast for President in 2016 (which is a common denominator for comparison among the states) and as an absolute number of signatures. (Ex. 21: Winger decl. ¶¶ 9-15, ECF 69-25 at 3-4.) Georgia's signature requirement is also higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever overcome in the history of the United States. (Ex. 21: Winger decl. ¶¶ 29-37, ECF 69-25 at 7-9.)

In a nutshell, the upshot of Georgia's current ballot-access regime for the plaintiffs is this. The Libertarian Party, which is qualified under Section 21-2-180, can have its nominees for a full slate of *statewide* offices—which include President, U.S. Senator, Governor, Lieutenant Governor, Secretary of State, Attorney General, Commissioner of Agriculture, Commissioner of Insurance, and all five members of the

15

Public Service Commission—appear on the general-election ballot without submitting any petition signatures. All the party has to do is to pay the applicable qualifying fees. But to have a full-slate of nominees for the office of U.S. Representative appear on the general-election ballot, the party would have to pay $73,080 in qualifying fees and submit nominating petitions containing at least 321,713 valid signatures.

## II.   Practical Barriers to Petitioning

There are a number of additional factors that present practical barriers to gathering enough signatures to qualify for the ballot.

One is the Secretary of State's error-prone petition-checking process, which leads to signature validation rates that are well below those of other states. (Ex. 10: Lee decl. ¶¶ 4-20, ECF 69-13 at 1-5; Ex. 23: Harvey dep. 32:11-33:16, 36:4-19, 38:4-39:2, 45:21-49:1, 52:11-16, 60:22-61:9, 61:22-25, 70:5-71:3; 84:20-23, 86:24-87:3, 91:13-92:9; 113:20-25, 118:22-119:4, 140:24-141:1, 158:5-11, ECF 69-26; Ex. 41: De La Fuente petition sheets and ENET printouts, ECF 69-45.)[5] Between 2000 and 2016, the Secretary of State's office validated two petitions for U.S.

_____

[5] For more details about the petition-checking process, see Part XIII of the plaintiffs' statement of material facts. (ECF 69-2 at 43-48.)

16

Representative, and those yielded validation rates of 40 percent (in 2002) and a shocking two percent (in 2016). (Ex. 10: Lee decl. ¶ 20, ECF 69-13 at 5-6; Ex. 23: Harvey dep. 100:6-18, ECF 69-26 at 26.) As a result, independent and political-body candidates for U.S. Representative must gather signatures far in excess of the number of valid signatures required to obtain ballot access under Georgia law. (Ex. 1: Anderson decl. ¶ 6, ECF 69-4 at 2; Ex. 2: Armendariz decl. ¶ 8, ECF 69-5 at 2; Ex. 6: Esco decl. ¶ 7, ECF 69-9 at 2-3; Ex. 7: Fisher decl. ¶ 7, ECF 69-10 at 2; Ex. 10: Lee decl. ¶ 21, ECF 69-13 at 6.) For one candidate for U.S. Representative, that might mean somewhere between 40,000 and 75,000 signatures. For a full slate of 14 candidates for U.S. Representative, that might be somewhere between 600,000 and 1,000,000 signatures. (Ex. 10: Lee decl. ¶ 21, ECF 69-13 at 6.)

Another barrier is simply the difficulty and pace of petitioning. Gathering signatures is difficult, labor-intensive work. (Ex. 5: Cowen decl. ¶ 12, ECF 69-8 at 3; Ex. 7: Fisher decl. ¶ 8, ECF 69-10 at 2; Ex. 20: Webb decl. ¶ 7, ECF 69-23 at 2.) Don Webb, an experienced paid petition circulator, gathers an average of less than five signatures per hour over the course of a week—a pace that would yield fewer than 5,000 raw

signatures working nine-hour days seven days a week over the 180-day petitioning window. (Ex. 20: Webb decl. ¶¶ 7, 11, ECF 69-23 at 2, 3.) Volunteer signature-gatherers tend to be difficult to recruit and less effective than paid signature-gatherers, and they are rarely willing or able to work for more than a few hours at a time. (Ex. 6: Esco decl. ¶ 9, ECF 69-9 at 4; Ex. 12: Metz decl. ¶ 12, ECF 69-15 at 3; Ex. 20: Webb decl. ¶¶ 9-10, ECF 69-23 at 2.) As a practical matter, therefore, it would be impossible for the Libertarian Party to qualify a full slate of candidates for the office of U.S. Representative without using dozens, if not hundreds, of professional petition circulators. (Ex. 1: Anderson decl. ¶ 14, ECF 69-4 at 5; Ex. 6: Esco decl. ¶ 10, ECF 69-9 at 4; Ex. 7: Fisher decl. ¶ 11, ECF 69-10 at 3; Ex. 10: Lee decl. ¶ 22, ECF 69-13 at 6; Ex. 13: Monds decl. ¶ 8, ECF 69-16 at 2; Ex. 20: Webb decl. ¶ 12, ECF 69-23 at 3.)

Another is the combined effect of the cost of petitioning and the impact of federal campaign-finance law. Experienced petition-circulators estimate that the cost of gathering enough signatures to qualify a full slate of candidates for the office of U.S. Representative would likely exceed $1,000,000 and could exceed $2,500,000. (Ex. 1: Anderson decl.

¶ 7, ECF 69-4 at 2; Ex. 10: Lee decl. ¶ 24, ECF 69-13 at 6; Ex. 16: Parker decl. ¶ 17, ECF 69-19 at 4; Ex. 20: Webb decl. ¶ 12, ECF 69-23 at 3; Ex. 21: Wilson decl. ¶¶ 6-8, ECF 69-24 at 2-3.) But federal campaign-finance law limits the amount that donors, including a state or national party, can contribute to a candidate. (Ex. 21: Wilson decl. ¶ 5, ECF 69-24 at 2; Ex. 29: Second Admissions ¶¶ 36-43, ECF 69-32 at 7-10.)[6] Except in the event of a runoff, the maximum amount that a state or national party may contribute to one candidate for U.S. Representative—in cash or via in-kind contributions—is $10,000 per election cycle. (Ex. 29: Second Admissions ¶¶ 40-43, ECF 69-32 at 8-10.) Federal law thus prohibits the Libertarian Party or any other large donor from contributing enough money to cover a substantial number of signatures. (Ex. 9: Graham decl. ¶ 17, ECF 69-12 at 4-5; Ex. 18: Sarwark decl. ¶ 32, ECF 69-21 at 7-8; Ex. 21: Wilson decl. ¶¶ 5, 17, ECF 69-24 at 2, 6.) Donors, moreover, generally do not want to give money for signature-gathering on a ballot-access petition when success is far from assured. (Ex. 6: Esco decl. ¶ 10, ECF 69-9 at 4; Ex. 9: Graham decl. ¶ 18, ECF 69-12 at 5; Ex. 11: McKinney decl. ¶¶ 10-12, ECF 69-14 at 3; Ex. 12: Metz decl. ¶ 11, ECF 69-15 at 3;

---

[6] For comparison with the Secretary of State's responses, the plaintiffs' second set of requests for admissions is included as exhibit 28. (ECF 69-31.)

Ex. 21: Wilson decl. ¶ 4, ECF 69-24 at 2.). They want to promote ideas and policies, and they recognize that candidates who are not on the ballot are not taken seriously by the media or by the voters. (Ex. 21: Wilson decl. ¶ 4, ECF 69-24 at 2.)

Another barrier is a lack of access to voters. In Georgia, petition-circulators may not lawfully solicit signatures on private property without the permission of the property owner. (Ex. 29: Second Admissions ¶ 46, ECF 69-32 at 10-11.) Virtually all of the places where large numbers of people congregate, like grocery stores and shopping malls, are on private property. Petition-circulators are relegated to gathering signatures on public sidewalks, which are often far away from where voters park to enter the stores. (Ex. 4: Coffield decl. ¶ 13, ECF 69-7 at 3; Ex. 6: Esco decl. ¶ 8 , ECF 69-9 at 3; Ex. 19: Taylor decl. ¶ 11, ECF 69-22 at 2.) This also means that common-interest communities, like homeowners' associations (which have exploded in popularity in recent decades), are often off limits. (Ex. 1: Anderson decl. ¶ 13, ECF 69-4 at 5; Ex. 5: Cowen decl. ¶ 15, ECF 69-8 at 4.) Georgia law also prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place. O.C.G.A. § 21-2-414(a). This often means that signature-

gatherers never have the chance to interact with voters. (Ex. 21: Wilson decl. ¶ 15, ECF 69-24 at 5.) Even when canvassing legally on public property, petition-circulators are often confronted by police officers or business owners unaware of their right to do so. (Ex. 6: Esco decl. ¶ 8, ECF 69-9 at 3; Ex. 16: Parker decl. ¶ 8, ECF 69-19 at 2; Ex. 19: Taylor decl. ¶ 12, ECF 69-22 at 2.)

Yet another barrier is widespread public concern about disclosing confidential information to petitioners. Until 2020, the form of a nomination petition called for a voter to provide a date of birth and residential address, both of which are considered confidential, personally identifying information.[7] O.C.G.A. § 21-2-225(b). (Ex. 41: De La Fuente petition sheets, ECF 69-45.) Many potential petition-signers express reluctance to sign, or refuse to sign altogether, because of the confidential information called-for by the form and the possibility that it could be used for identity theft or other nefarious purposes. (Ex. 4: Coffield decl. ¶ 11, ECF 69-7 at 3; Ex. 6: Esco decl. ¶ 8, ECF 69-9 at 3; Ex. 8: Gilmer decl. ¶ 13, ECF 69-11 at 3; Ex. 9: Graham decl. ¶ 13, ECF

---

[7] Now, the petition form only requires a birth year. This change could make it more difficult for election officials to validate signatures because there are likely to be many Georgia voters with identical names and birth years. (Ex. 23: Harvey dep. 107:25-108:9, ECF 69-26 at 28-29.)

69-12 at 3.) But without this information, or with partial or incomplete information, county officials are less likely to be able to verify the voter's signature. (Ex. 23: Harvey dep. 107:25-108:9, ECF 69-26 at 28-29.)

## III.   The Impact of Georgia's Ballot-Access Restrictions

Despite many attempts, no political-body candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot since the five-percent petition requirement was adopted in 1943. (Ex. 33: Answer ¶¶ 44, 86, ECF 69-36 at 7, 12.) Since 2002 alone, at least 20 independent and political-body candidates for U.S. Representative have made a genuine effort to get on the ballot but were unable to qualify.

In 2002, for example, the Libertarian Party made a genuine effort to qualify three candidates for U.S. Representative: Wayne Parker in the Eleventh Congressional District, Carol Ann Rand in the Sixth Congressional District, and Chad Elwartowski in the Ninth Congressional District. Because the 2002 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement by about half. The party raised approximately $40,000 for the effort and used 35 professional, paid petition circulators.

The party ultimately decided to focus on Parker's campaign, and Parker submitted more than 20,000 raw signatures. But the Secretary of State's office rejected more than half of them, leaving Parker about 1,100 valid signatures shy of the court-adjusted requirement. (Ex. 16: Parker decl. ¶¶ 5-15, ECF 69-19 at 2-4; Ex. 33: Answer ¶ 111, ECF 69-36 at 19.)

In 2010, independent candidate Jeff Anderson tried to get on the ballot in the Eleventh Congressional District. Anderson assembled a team of 24 volunteers who spent hundreds, if not thousands, of hours gathering signatures door to door. Anderson gathered somewhere between 11,000 and 12,000 raw signatures—well short of the approximately 21,000 valid signatures he needed—and therefore did not turn them in. (Ex. 1: Anderson decl. ¶¶ 5-9, ECF 69-4 at 2-3.)[8]

## IV.   Support for the Libertarian Party Nationwide and in Georgia

The Libertarian Party was founded in 1971 and is organized in all 50 states plus the District of Columbia. (Ex. 18: Sarwark decl. ¶¶ 5-6, ECF 69-21 at 2.) It is currently the third-largest political party in the United States. (Ex. 18: Sarwark decl. ¶ 14, ECF 69-21 at 3-4.) The

---

[8] Details of more unsuccessful efforts to gather signatures are set out at length in Part XII of the plaintiffs' statement of material facts. (ECF 69-2 at 28-43.)

party's platform and positions on contemporary issues emphasize individual liberty and reflect policy preferences that are distinct from those of the Democratic and Republican parties. (Ex. 18: Sarwark decl. ¶¶ 8-13, ECF 69-21 at 2-3.) Researchers estimate that up to 27 percent of Americans have libertarian-leaning views. (Ex. 18: Sarwark decl. ¶¶ 15-16, ECF 69-21 at 4.)

The Libertarian Party runs hundreds of candidates in every election cycle. These candidates seek positions ranging from city council to President. The Libertarian Party had 833 candidates on ballots in 2018. (Ex. 18: Sarwark decl. ¶ 18, ECF 69-21 at 5.) The party runs numerous candidates for U.S. Representative and has had those candidates on the ballot in every state in the nation except Georgia. (Ex. 18: Sarwark decl. ¶¶ 20-21, ECF 69-21 at 5.)

In the last ten years, Libertarian candidates have received tens of millions of votes. (Ex. 18: Sarwark decl. ¶ 24, ECF 69-21 at 6.) The party's 2016 nominee for President, Gary Johnson, received 4,489,341 votes, which represented 3.28 percent of the popular vote and the third-highest vote total among the candidates. (Ex. 18: Sarwark decl. ¶ 25, ECF 69-21 at 6.) There are currently more than 180 elected officials

affiliated with the party nationwide. (Ex. 18: Sarwark decl. ¶ 22, ECF 69-21 at 5.)

The Libertarian Party of Georgia was founded in 1972 and currently has members in each of Georgia's 14 congressional districts. (Ex. 9: Graham decl. ¶ 20, ECF 69-12 at 5; Ex. 33: Answer ¶ 12, ECF 69-36 at 3.) The party wants to nominate a full slate of candidates for U.S. Representative and to have those nominees appear on the general-election ballot. (Ex. 9: Graham decl. ¶ 19, ECF 69-12 at 5.)

In 1988, the party qualified to nominate candidates for statewide office by convention when it submitted a party-qualifying petition signed by at least one percent of the total number of registered voters at the preceding general election. *See* O.C.G.A. § 21-2-180(1). The party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least one percent of the total number of registered voters who were registered and eligible to vote in that election. *See* O.C.G.A. § 21-2-180(2). (Ex. 33: Answer ¶ 128, ECF 69-36 at 22.)

25

In the last ten years, Libertarian candidates for statewide offices in Georgia have received more than five million votes. (Ex. 33: Answer ¶ 131, ECF 69-36 at 22; Ex. 37: Election Results 2000-2018 (excerpts), ECF 69-40.) In 2016, for example, the Libertarian candidate for the Public Service Commission, Eric Hoskins, received 1,200,076 votes, which represents 33.4 percent of all votes cast in that contest and 22.0 percent of the total number of registered voters who were registered and eligible to vote in that election. Hoskins carried Clayton and DeKalb counties. (Ex. 33: Answer ¶ 132, ECF 69-36 at 22.)

In *Green Party of Georgia v. Kemp*, the Secretary of State repeatedly described the Libertarian Party as a political body "with significant support" in Georgia. (Ex. 33: Answer ¶ 135, ECF 69-36 at 22; Ex. 42: excerpts from appellant's briefs, ECF 69-46.)

## Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is "a legal element of the claim under the applicable substantive law

which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute about a material fact is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether to grant or deny summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Id.* at 249. In doing so, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Discussion

## I.   Georgia may not require more signatures from candidates for U.S. Representative than from candidates for statewide offices.

This case is controlled by the Supreme Court's decisions in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), and *Norman v. Reed*, 502 U.S. 279 (1992), both of which prohibit a state from requiring third-party candidates to gather more signatures to get

27

on the ballot for an office in a district or political-subdivision than for a statewide office.

In *Socialist Workers*, the issue was a provision of Illinois law that required independent candidates and candidates from new political parties[9] seeking to run for office in a congressional district, other district, or political subdivision of the state to gather signatures equaling five percent of the number of persons who voted in the last election in the district or political subdivision. 440 U.S. at 175-76. But Illinois law required only 25,000 signatures for an independent or new-party candidate to appear on the ballot in a statewide election. *Id.* at 175. In the City of Chicago, this had the "incongruous result" that the Socialist Workers Party's candidate needed 63,373 signatures to appear on the ballot in a special mayoral election—substantially more signatures than the party or its candidate would have needed for a statewide office. *Id.* at 176-77. The Supreme Court held that, although the State had a legitimate interest in ensuring that a party or independent candidate

---

[9] Illinois law distinguished between "established" political parties and "new" political parties. *Socialist Workers,* 440 U.S. at 175-76 n.1. An established political party was any party whose candidate for Governor or for any office in a district or political subdivision received at least five percent of the votes in the last election. *Id.* A new political party was any party that had not met that requirement. *Id.*

28

had a "'significant modicum of support,'" there was "no reason, much less a compelling one" justifying a requirement of greater support for Chicago elections than for statewide elections. *Id.* at 185-86.

In reaching that conclusion, the Supreme Court recognized the important role that third parties play in our political system:

> The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office.

*Id.*; *see also Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (discussing the importance of "political figures outside the two major parties").

The Supreme Court reaffirmed the core holding of *Socialist Workers* and reached the same result two decades later in *Norman.* 502 U.S. at 291-94. In that case, the issue was another provision of Illinois law, enacted in direct response to *Socialist Workers,* that capped the signature requirement for "any district or political subdivision" at 25,000 signatures. *Id.* at 292. Under that replacement provision, a candidate for Mayor of Chicago would have needed only 25,000 signatures—the same number still required for statewide office. But the plaintiffs in *Norman*

sought to run new-party candidates for the Cook County Board of Commissioners, which consisted of two districts, and the State Supreme Court construed the new law to require them to submit 50,000 signatures—25,000 for each district—in order to do so. *Id.* at 283-84, 293.

The Supreme Court held that the outcome in *Norman* was controlled by the earlier case: "The State may not do this in light of *Socialist Workers*, which forbids it to require petitioners to gather twice as many signatures to field candidates in Cook County as they would need statewide." *Id.* The Court did so even though the election officials defending the law advanced what they claimed to be a state interest, not addressed in the prior case, in ensuring that a new party has a modicum of support in *each* of Cook County's districts. *Id.* The Court observed that the State could have served that interest by requiring that some minimum number of signatures come from each district as long as the total would not exceed 25,000. And it noted that, because the State did not require any particular distribution of support for new statewide parties, "it requires elusive logic to demonstrate a serious state interest in demanding such a distribution for new local parties." *Id.* at 294. The Supreme Court closed that portion of its opinion by again reaffirming the

rule laid down by its earlier decision: "Thus, as in *Socialist Workers*, the State's requirements for access to the statewide ballot become criteria in the first instance for judging whether rules of access to local ballots are narrow enough to pass constitutional muster." *Id.* Finding "no justification for the disparity," the Court struck down the law once again. *Id.*

On appeal in this case, the Secretary of State conceded that, according to *Socialist Workers* and *Norman*, "a state cannot require a greater signature petition requirement for a political subdivision than for statewide office." Appellee's Br. 23, *Cowen v. Ga. Sec'y of State*, No. 19-14065 (11th Cir. Dec. 13, 2019). So the only question is whether Georgia does, in fact, require more signatures for a political subdivision than for a statewide office.

It does. A Libertarian candidate for U.S. Representative in 2020 needed between 19,777 and 26,539 valid signatures, depending on the congressional district at issue, in order to appear on the general-election ballot. (Ex. 31: Def's Resp. Pls.' 2d Interrogs., ECF 69-34 at 8.) But a Libertarian candidate for statewide office in 2020—which included the offices of President, U.S. Senator, and two members of Georgia's Public

Service Commission—did not need to gather any signatures in order to appear on the general-election ballot. (Ex. 27: First Admissions ¶ 6, ECF 69-30 at 1; Ex. 33: Answer ¶ 128, ECF 69-35 at 22.) This is because the Libertarian Party has repeatedly demonstrated that it has significant support in Georgia, first by satisfying the party-qualifying petition requirement in 1988, and then by satisfying the one-percent vote requirement in every statewide general election since then. (Ex. 33: Answer ¶ 128, ECF 69-35 at 22.) It is thus apparent that Georgia law, like the Illinois laws at issue in *Socialist Workers* and *Norman*, creates the incongruous result that Libertarian candidates in a political subdivision must gather more signatures than Libertarian candidates for statewide offices.

This incongruous result would still be present, moreover, even if the Libertarian Party were not qualified to nominate candidates for statewide office without a petition. A candidate of the Green Party, which is not so qualified, needed the same 19,777 to 26,539 valid signatures to run for U.S. Representative but needed only 7,500 valid signatures to run statewide for President. (Ex. 31: Def's Resp. Pls.' 2d Interrogs., ECF 69-34 at 8; (Ex. 33: Answer ¶¶ 42-43, ECF 69-36 at 6-7.)

The following table summarizes, by way of example, Georgia's 2020 signature requirements for Libertarian, Green, Democratic, and Republican candidates for U.S. Representative and President.

|  | U.S. Representative (Cong. Dist. 5) | President |
|---|---|---|
| **Libertarian** | 26,539 | 0 |
| **Green** | 26,539 | 7,500 |
| **Republican** | 0 | 0 |
| **Democrat** | 0 | 0 |

This result is precisely what *Socialist Workers* and *Norman* forbid.

## II.   Georgia's ballot-access restrictions violate the First and Fourteenth Amendments.

To determine whether Georgia's ballot-access restrictions otherwise violate the First and Fourteenth Amendments, this Court must apply the balancing test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985)

(paraphrasing *Anderson*, 460 U.S. at 789*)*; *accord Cowen v. Ga. Sec'y of State,* 960 F.3d 1339, 1342 (11th Cir. 2020); *Green Party of Ga. v. Georgia*, 551 F. App'x 982, 983 (11th Cir. 2014).

Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of the scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are general sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places "severe" burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id*. at 434 (quoting *Norman*, 502 U.S. at 289).

The Eleventh Circuit has observed that a ballot-access law imposes a severe burden if it "'freeze[s] the status quo' by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." *Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (quoting *Jenness v. Fortson*,

439 (1971), and *American Party of Tex. v. White*, 415 U.S. 767, 783 (1974)). "The focal point of this inquiry is whether a 'reasonably diligent [ ] candidate [can] be expected to satisfy'" the ballot-access requirements. *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 742 (1974)).

The plaintiff bears the burden of proof on the first step in the *Anderson* test, and the defendant bears the burden on the second and third. *Fulani v. Krivanek*, 973 F.2d 1539, 1544 (11th Cir. 1992); *Bergland*, 767 F.2d at 1554. In this analysis, "the burden is on the state to 'put forward' the 'precise interests . . . [that are] justifications for the burden imposed by its rules,'" and to "explain the relationship between theses interests" and the challenged provisions. *Fulani*, 973 F.2d at 1544 (quoting *Anderson*, 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland,* 767 F.2d at 1554.

## A.    The Character and Magnitude of the Injury

Georgia's ballot-access restrictions burden "two different, although overlapping kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."

35

*Williams v. Rhodes,* 393 U.S. 23, 30 (1968). "Both of these rights, of course, rank among our most precious freedoms." *Id.*

As the Supreme Court has recognized, "voters can assert their preferences only through candidates or parties or both." *Anderson*, 460 U.S. at 787. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). As a result, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Anderson*, 460 U.S. at 787 (quoting *Lubin*, 415 U.S. at 716). Ballot-access restrictions also implicate the freedom of association "because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." *Id.* at 787-88.

A political-body candidate for U.S. Representative who cannot access Georgia's ballot through the petition process must choose to run as a write-in candidate or not to run at all. Either choice burdens the fundamental rights of the candidate, the party, and the voters

36

themselves. The magnitude of the injury to these rights here is undoubtedly severe.

One important factor—perhaps the most important factor—in assessing the magnitude of the burdens under the *Anderson* test is history. "Past experience will be a helpful, if not always unerring guide: it will be one thing if independent candidates have qualified with regularity and quite a different matter if they have not." *Storer*, 415 U.S. at 742; *accord Mandel v. Bradley,* 432 U.S. 173, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed). *See, e.g., Munro v. Socialist Workers Party*, 479 U.S. 189, 197 n.11 (1986) (noting that 36 out of 40 minor-party candidates had qualified for the ballot under the challenged provisions in the preceding nine years); *Jenness*, 403 U.S. at 439 (relying heavily on the stipulated fact that two statewide candidates had petitioned onto the ballot in the preceding five years); *Swanson v. Worley*, 490 F.3d 894, 905 (11th Cir. 2007) (observing that the Libertarian Party's successes in the 2000 and 2002 election cycles demonstrated the openness of Alabama's ballot-access scheme); *New Alliance Party v. Hand*, 933 F.2d 1568, 1575-76 (11th Cir. 1991)

(tallying the number of independent and minor-party candidates that had recently qualified for the ballot under the challenged provision); *Libertarian Party*, 710 F.2d at 794 (same).

In this case, the undisputed record shows that (1) no political-body candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot since the five-percent petition requirement was adopted in 1943; (2) more than 20 independent and political-body candidates for U.S. Representative have unsuccessfully attempted to qualify for the general-election ballot since 2002; and (3) Georgia's signature requirement is higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever overcome in the history of the United States. These facts alone all but compel the conclusion that Georgia's current ballot-access laws impose a "severe" burden under the *Anderson* test. Georgia laws have frozen the status quo by "effectively barring all candidates other than those of the major parties" for more than three-quarters of a century. *Libertarian Party*, 710 F.2d at 793. If past experience is any guide, then, strict scrutiny should clearly apply.

Another way to measure the magnitude of the injury is by reference to other cases. Here, the closest case is *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1362-65 (N.D. Ga. 2016), *aff'd* 674 F. App'x 974 (11th Cir. 2017) (per curiam), which struck down Georgia's ballot-access restrictions for independent and political-body candidates for President. In that case, the signature requirement was one percent of registered voters, and political-body presidential candidates had been absent from Georgia's ballots for just over 15 years. The court also relied heavily on the fact that Georgia's signature requirement was higher than "most other states" and that the restrictions had excluded a presidential candidate in 2000 (Ralph Nader) who received 2.74 percent of the popular vote, which the court described as "widespread national support." *Id.* at 1362-63. The court found that the burden of the signature requirement was "severe," and it therefore applied strict scrutiny to the measure. *Id.* The Eleventh Circuit affirmed in an unpublished decision "based on the district court's well-reasoned opinion." *Green Party of Ga. v. Kemp*, 674 F. App'x 974, 975 (11th Cir. 2017).

By comparison, Georgia's signature requirement for independent and political-body candidates for U.S. Representative is higher in

percentage terms. It has excluded political-body candidates for more than half a century longer. It is the highest such requirement in the nation. It has excluded candidates of the Libertarian Party, which is the third-largest party in the United States and enjoys widespread support nationwide *and* in Georgia. Strict scrutiny should therefore apply in this case as well.

Another way to measure the burden is by comparison to other states. *See, e.g., Jenness*, 403 U.S. at 438 (comparing Georgia's nonparty candidate nominating petitions to Ohio's); *Williams*, 393 U.S. at 33, n.9 (comparing Ohio's signature requirement for ballot access with those of 42 other states); *Green Party*, 171 F. Supp. 3d at 1362. It is undisputed that Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. It is also undisputed that Georgia's qualifying fees are higher than any other state in the nation with a mandatory petition requirement.

Other key factors that point to a severe burden here include: (1) the Secretary of State's petition-checking process, which leads to lower

signature-validation rates than in other states; (2) the impact of federal campaign-finance law, which limits the amount that a party or other donor can contribute toward the cost of gathering signatures for a candidate; and (3) the other practical difficulties of gathering signatures outlined above. These factors plainly add weight to the burden imposed by Georgia's restrictions and support the conclusion that the burden here is severe.

**B.** *Jenness* **does not compel the conclusion that the burden here is not severe.**

The Supreme Court's decision in *Jenness*, which applied a low level of scrutiny to a previous version of Georgia's ballot-access laws, does not compel the conclusion that the burden here is not severe. In addition to the fact that *Jenness* did not apply the *Anderson* test, which was developed later, there are several material differences between that case and this one. It is blackletter law that "[f]or one decision to be precedent for another, the facts in the two cases need not be identical. But they must be substantially similar, without material difference." Bryan A. Garner et al., *The Law of Judicial Precedent*, § 7, at 92 (2016). A "material difference" exists if the first case "contained facts or

circumstances, essentially a part of the issue and directly influencing the judgment, not present in the second case, or if the second case contains facts or circumstances … which were not present in the first case but which, if present, would have modified or changed the judgment therein." Henry Campbell Black, *Handbook on the Law of Judicial Precedents or the Science of Case Law* § 15, at 60 (1912). "As binding authority, a judicial decision is inherently limited to the facts of the case then before the court and the questions presented to the court in the light of those facts." *United States v. Johnson*, 921 F.3d 991, 1003 (11th Cir. 2019) (en banc) (cleaned up).

In *Jenness*, the Supreme Court stated as a matter of fact that Georgia's ballot-access laws "do not operate to freeze the political status quo." 403 U.S. at 438. As support for that conclusion, the Court observed that two statewide candidates had petitioned onto the ballot in the preceding five years: "a candidate for Governor in 1966 and a candidate for President in 1968." *Id.* at 439.[10]

---

[10] Neither such candidate was the nominee of a third party. The gubernatorial candidate was the Republican nominee, Bo Callaway, who had completed an *optional* petition because the Republican Party preferred not to hold a primary election. *See* Richard Winger, *The Supreme Court and the Burial of Ballot Access: A Critical Review of Jenness v. Fortson*, 1 Election L.J. 235, 241 n.19 (2002). The presidential candidate was a former Democrat, George Wallace.

In fairly determining which facts were essential to the judgment in *Jenness,* the Supreme Court's own language must be the "starting point," Garner et al., *supra*, § 4 at 73, and the text of the decision emphasizes this particular fact more than any other. This fact was also critical because it distinguished *Jenness* from the Court's earlier ruling in *Williams*, 393 U.S. at 25, which had found that Ohio's ballot-access laws made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties." *See Jenness*, 403 U.S. at 434-40 (distinguishing *Williams*). Not surprisingly, subsequent decisions of the Supreme Court and the Eleventh Circuit have recognized the centrality of this particular fact to the outcome in *Jenness. See, e.g., Burdick*, 504 U.S. at 435 n.4 (1992) (observing that *Jenness* found Georgia's system to be constitutional "because it did not operate to freeze the political status quo"); *American Party*, 415 U.S. at 783; *id.* at 787; *New Alliance Party*, 933 F.2d at 1572-73.

Unlike *Jenness*, the undisputed record here shows no comparable record of recent success. No political-body candidate for U.S. Representative has *ever* satisfied the requirements to appear on Georgia's general-election ballot since the five-percent petition

requirement was adopted in 1943. As a matter of fact, therefore, it cannot be said that Georgia's laws do not freeze the status quo.

The Supreme Court also relied heavily on the fact that Georgia had "no limitation whatever … on the right of a voter to write-in on the ballot the name of a candidate of his choice and to have that write-in counted." 403 U.S. at 434; *see also id.* at 438 (distinguishing Ohio and Georgia law). That is also no longer true. Georgia law now requires write-in candidates to file and publish a notice of candidacy in advance of the election, O.C.G.A. § 21-2-133(a), and votes cast for a person who has not so qualified are not counted, Ga. Comp. R. & Regs. 183-1-15-.02(5). Georgia's restrictions on write-in voting were first adopted in 1978, *see* Ga. Election Code Amended, ch. 1031, § 17, 1978 Ga. Laws 1004, 1013 (codified at 1933 Ga. Code Ann. § 34-1017), and have been amended several times since then.

*Jenness* also did not involve a challenge to Georgia's candidate qualifying fee,[11] but this case does. This case is about the "*cumulative* burdens*" of Georgia's ballot-access laws, which include not only a

---

[11] The district court in *Jenness* had enjoined as unconstitutional the qualifying-fee statute that was in effect at the time, and "[n]o appeal was taken from that injunctive order." 403 U.S. at 433. As a result, the qualifying fee was not at issue when *Jenness* reached the Supreme Court.

burdensome petition requirement but also the highest candidate

qualifying fee in the nation. *Clingman v. Beaver*, 544 U.S. 581, 607

(2005) (O'Connor, J., concurring); *accord Williams*, 393 U.S. at 34

(measuring the burden of Ohio laws "taken as a whole").

There are many other differences between the rather thin record in

*Jenness* and the robust record here. This record, for example, contains

evidence about the petition-checking process and the practical difficulty

of gathering signatures that was missing in *Jenness*. This record

contains evidence about the cost of petitioning and the lack of access to

voters in contemporary society. This record contains evidence about

public concern over disclosing confidential information and its potential

for misuse. In short, the factual context for assessing the burden imposed

by Georgia's ballot-access restrictions is richer and materially different

from the record before the court in *Jenness*.

Georgia's legal framework has also changed in significant ways

since *Jenness*. The State adopted a qualifying-fee provision in 1974 and

has amended it several times since then. (Ex. 27: First Admissions ¶ 19,

ECF 69-30 at 4.) That provision now expressly discriminates between

political-party candidates, political-body candidates, and independent

candidates in a way that gives the political parties a clear advantage. The State also revamped its ballot-access laws substantially in 1986, dropping the petition requirement for statewide candidates to one percent and creating a way for third parties to have their candidates for statewide offices appear on the ballot without the need to submit a petition. In 2016, Judge Story struck down Georgia's one-percent signature requirement for presidential candidates as unduly burdensome and set the requirement at only 7,500 signatures. These changes are also part of the context, not present at the time of *Jenness*, in which this Court must evaluate the burden here.

Finally, the relevant federal law has evolved as well. The most important change, of course, is the emergence of the *Anderson* test. By allowing for the possibility of heightened constitutional scrutiny, the *Anderson* test represented a significant departure from the less-stringent analytical framework applied in some earlier ballot-access cases. *See Anderson*, 460 U.S. at 817 (Rehnquist, J., dissenting) (distinguishing the standard used in *Jenness* from the "narrowly tailored" standard applied in *Anderson*); *Graveline v. Johnson*, 747 F. App'x 408, 414 (6th Cir. 2018) (recognizing that *Anderson* superseded *Jenness*). The *Jenness* court

applied a low level of scrutiny without determining, as this Court must, the magnitude of the burden on the plaintiffs' rights. *Jenness* thus provides very limited guidance on how to apply the *Anderson* test here.

A second important area where federal law has changed is in the law of campaign finance. At the time of *Jenness*, federal campaign-finance laws did not limit donors' ability to fund petition drives as they do now. Today, those laws prohibit the Libertarian Party and major Libertarian donors from contributing enough money to get the party's candidates on the ballot. A party or donor's maximum allowable contribution is so small, in fact, that it would not even fund one-tenth of the cost of paying professional petition circulators to gather the necessary signatures. This limitation burdens the party's rights, as well as those of the candidates and voters, in ways that would have been inconceivable at the time of *Jenness*.

For all of these reasons, the Supreme Court's application of low-level scrutiny in *Jenness* does not require this Court to conclude under the *Anderson* test that the constitutional burden here is not severe. The *Anderson* test depends on context, and the context here is very different than the context faced by the Supreme Court almost fifty years ago.

Based on the record *in this case*, the Court should conclude that Georgia's ballot-access restrictions for independent and political-body candidates for U.S. Representative impose a severe constitutional burden and merit strict scrutiny.

### C.  Asserted State Interests

The second and third steps in the *Anderson* test focus on the State's asserted interests. *Bergland*, 767 F.2d at 1553-54. The Secretary of State has offered two such interests: (1) "an important state interest in ensuring that political-body candidates for U.S. Representative can demonstrate that they have significant support within the congressional districts that they wish to represent" (Def's Br. Supp. Mot. Summ. J. at 23, ECF 73-2 at 23); and (2) "preventing run-off elections—except where candidates demonstrate *significant* support" (*id.* at 27).

Even assuming that the first asserted state interest is legitimate (and no court has ever so held), the Supreme Court has twice made clear that a desire to screen out frivolous candidacies cannot justify a higher petition requirement for offices in a district or political subdivision than for statewide offices. *See Norman,* 502 U.S. at 291-94; *Socialist Workers*, 440 U.S. at 185-86. This asserted interest is indistinguishable from the

interest that the Supreme Court found lacking in *Norman*. 502 U.S. at 293-94. As in that case, Georgia could have served any such interest by imposing a geographic distribution requirement on the Libertarian Party's 1988 statewide qualifying petition or the one-percent retention threshold under Section 21-2-180.[12] But the State has chosen not to do so, and the Libertarian Party could therefore secure all the votes it needs to demonstrate "statewide" support from any one of the state's most-populous counties. That speaks volumes about the strength and tailoring of this asserted interest. It therefore cannot satisfy step three of the *Anderson* test.

The second asserted interest—preventing runoffs—has been described by the Supreme Court as "important," but not compelling. *Clements v. Fashing*, 457 U.S. 957, 965 (1982). It therefore cannot justify a heavy constitutional burden as there is in this case. The circumstances

---

[12] A distribution requirement would be constitutional if it were based on equipopulous congressional districts. *See, e.g., Angle v. Miller*, 673 F.3d 1122, 1129 (9th Cir. 2012). Using statewide election data that his office already compiles, the Secretary of State could determine whether the Libertarian Party has support in a particular congressional district by examining the votes that Libertarian candidates for statewide office received in the district. (Ex. 47: Hallman dep. 302:23-311:12, ECF 105-5 at 3-9.) The data would show, for example, that, in 2016, the Libertarian candidate for the Public Service Commission, Eric Hoskins, received approximately 159,260 votes, or 63.7 percent of votes cast, in Georgia's Fifth Congressional District. (Ex. 49: PSC election results by congressional district, ECF 105-6 at 1.)

here indicate, moreover, that Georgia isn't really serious about preventing runoffs.

Most runoff elections in Georgia occur in party primaries, and primary runoffs are more expensive than general runoffs. (Ex. 23: Harvey dep. (excerpts) 175:19-176:13, 179:13-180:4, ECF 69-26 at 84-85, 87-88.) In 2018, for example, there were primary runoffs in four contests for statewide offices, eight contests for state legislative offices, and two contests for U.S. Representative. (Ex. 44: primary runoff election results 2000-2018 at 1-4, ECF 96-5 at 1-4.) In 2016, there were primary runoffs in 13 contests for state legislative offices and one contest for U.S. Representative. (*Id.* at 5-7.) In 2014, there were primary runoffs in three contests for statewide office, ten contests for state legislative offices, and four contests for U.S. Representative. (*Id.* at 8-10.) If the State truly wanted to avoid the cost of run-off elections, as the Secretary of State argues, primary runoffs would clearly be a place to focus. And yet the State does nothing to ensure that any of the candidates in these primary contests have any support whatsoever. The candidates need only pay a fee and fill out routine paperwork to appear on the primary-election ballot. O.C.G.A. § 21-2-153.

If Georgia had a serious state interest in preventing runoffs to keep costs down, statewide offices would also be a focus because they are more costly than runoffs for U.S. Representative would be. (Ex. 45: Harvey dep. (excerpts) 178:16-179:6, ECF 96-6 at 4-5.) Whereas a runoff in a contest for U.S. Representative might involve as few as two counties (in Georgia's Seventh Congressional District), runoffs for statewide offices obviously involve all of Georgia's 159 counties. And yet Georgia law allows the Libertarian Party's candidates for any and all statewide offices to appear on the ballot without further petitioning. From the perspective of avoiding the cost of runoff elections, that is upside down.

And none of the cost is actually necessary. If the State truly wanted to avoid runoff elections, it could simply eliminate them. (Ex. 25: Winger dep. 38:10, ECF 69-28 at 6.) Georgia is one of only two states to use runoffs in any general elections. (Ex. 22: Winger decl. ¶ 39, ECF 69-25 at 9.) The cost, timing, and participation issues of runoff elections can also be avoided by using ranked-choice voting (also known as instant runoff voting). (Ex. 22: Winger decl. ¶ 41, ECF 69-25 at 10.) Instead of voting for only one candidate, voters in a ranked-choice election can rank candidates in order of preference. Ballots are initially counted for each

voter's first choice. If no candidate receives more than 50 percent of the votes, the candidate with the fewest votes is eliminated, and ballots listing that candidate as the first choice are reallocated to the voters' next choice. This elimination process continues until one candidate has more than half of the votes. The State of Maine uses ranked-choice voting in general elections to elect U.S. Senators and U.S. Representatives, and five states use ranked-choice voting for overseas voters in runoff elections for federal offices. (Ex. 29: Second Admissions ¶¶ 44-45, ECF 69-32 at 10.) If Georgia were to adopt ranked-choice voting, there would be no need for runoff elections, and all general-election voters would participate in choosing the eventual winner.

In any event, it is exceedingly rare for a winning congressional candidate to receive less than 50 percent of the vote. Among the 370 contests for U.S. Representative in 2016 where there were more than two candidates on the ballot, there were only eight general elections (2.2 percent) where the winner received less than 50 percent of the vote. (Ex. 25: Winger dep. 40:15-41:7, ECF 69-28 at 7.) There is simply no evidence to support a conclusion that easing Georgia's ballot-access restrictions for U.S. Representative would overburden the State with runoff

elections. (Ex. 23: Harvey dep. 176:21-177:10, 178:12-15, ECF 69-26 at 85-86.) The Secretary of State's office even concedes that there is no significant marginal cost for having a congressional runoff in addition to a runoff for a statewide office. (Ex. 23: Harvey dep. 179:7-12, ECF 69-26 at 87.)

For these reasons, the Secretary of State cannot show that Georgia's ballot-access restrictions are necessary to advance either of the asserted state interests. This Court should therefore conclude that those restrictions violate the First and Fourteenth Amendments.

## III.  Georgia's ballot-access restrictions violate the Equal Protection Clause.

To determine whether a ballot-access restriction violates the Equal Protection Clause of the Fourteenth Amendment, this Court "must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification." *Socialist Workers*, 440 U.S. at 183. This test is functionally almost identical to the *Anderson* test, and the Supreme Court has noted that the analysis is interchangeable. *Norman,*

502 U.S. at 288 n.8; *Anderson,* 460 U.S. at 786-87 n.7; *see also Fulani,*
973 F.2d at 1542-43.

Here, it is undisputed that Georgia law creates a classification by
treating Libertarian Party candidates for U.S. Representative differently
from Libertarian Party candidates for statewide offices. The latter have
automatic ballot access. The former must petition.

The individual interests at stake here are the same fundamental
rights involved in the plaintiffs' First Amendment claim: "the right of
individuals to associate for the advancement of political beliefs, and the
right of qualified voters, regardless of their political persuasion, to cast
their votes effectively.'" *Socialist Workers*, 440 U.S. at 184 (quoting
*Williams*, 393 U.S. at 30). And the burden on those rights is the same as
well.

The Secretary of State has asserted only one state interest to
justify this unequal treatment: "making sure that the Libertarian Party
has support within the political subdivision or district that its candidates
seek election." (Def's Resp. Opp. Summ. J. at 10, ECF 98 at 10.) But as
already discussed in the preceding section, this interest is
indistinguishable from the interest that the Supreme Court found

lacking in *Norman*, 502 U.S. at 293-94. The State could have imposed a distribution requirement on the Libertarian Party's qualifying petition under Section 21-2-180, or it could have imposed a distribution requirement on the vote-threshold for retaining that qualification. But because the Libertarian Party has repeatedly demonstrated that it has at least as much actual voter support as the State of Georgia believes is necessary for the party's statewide candidates to appear on the general-election ballot, this asserted state interest cannot justify the heavy burden that results from treating Libertarian candidates for U.S. Representative differently from candidates for statewide offices.

There are no facts in dispute on this claim. The State has failed to justify a frankly absurd classification that impinges upon the fundamental rights of parties, candidates and voters. This Court should therefore conclude that Georgia's ballot-access restrictions violate the Equal Protection Clause to the extent that they treat Libertarian Party candidates for U.S. Representative differently from Libertarian Party candidates for statewide offices.

## Conclusion

The undisputed facts in this case are overwhelming. Georgia's ballot-access restrictions are by far the most stringent in the nation, and no third-party candidate for U.S. Representative has appeared on the general-election ballot since they were enacted in 1943. They require Libertarian candidates for U.S. Representative to gather far more signatures than Libertarian candidates for U.S. Senator or even President. They make it virtually impossible for Libertarian Party candidates for U.S. Representative to qualify for the ballot despite widespread support nationwide and in Georgia. And it is clear that Georgia's restrictions are not remotely necessary for the State to advance its legitimate interests.

These circumstances permit the trier of fact to reach only one conclusion, and this Court should therefore grant summary judgment in the plaintiffs' favor.

Respectfully submitted this 28th day of August, 2020.


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing BRIEF IN SUPPORT OF THE

PLAINTIFFS' SECOND MOTION FOR SUMMARY JUDGMENT was

prepared in 13-point Century Schoolbook in compliance with Local Rules

5.1(C) and 7.1(D).


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com