## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARTIN COWEN, ALLEN       *
BUCKLEY, AARON GILMER, JOHN   *
MONDS, and the LIBERTARIAN    *
PARTY OF GEORGIA, INC., a     *
Georgia nonprofit corporation,    *    CASE NO.: 1:17cv04660-LMM
                      *
      Plaintiffs,           *
                      *
v.                         *
                      *
BRAD RAFFENSPERGER, Georgia   *
Secretary of State,        *
                      *
      Defendant.         *

## BRIEF IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

This case is before the Court on remand from the Eleventh Circuit, with instructions to consider Plaintiffs' First and Fourteenth Amendment claims challenging Georgia's ballot access laws under the *Anderson-Burdick* framework, and to separately consider Plaintiffs' Equal Protection claim. *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1340 (11th Cir. 2020).

The Eleventh Circuit's decision is *not* a mandate to find in favor of the Plaintiffs on the merits. To the contrary, the *Cowen* decision is very clear that the

1

Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431 (1971), which first upheld Georgia's petition requirements under a similar challenge, remains controlling authority. Accordingly, this Court's determination on remand must still be informed by *Jenness* and other Eleventh Circuit precedent upholding the constitutionality of Georgia's petition requirements. *See Cowen*, 960 F.3d at 1346. The *Cowen* decision merely instructs the Court to determine, based upon the factual record, whether "a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law." *Id.*

Plaintiffs cannot make this showing. It has long been established that the State has the "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n. 9 (1982). Therefore, in applying the *Anderson-Burdick* framework to the facts of this case, the Court is to defer to this important State interest unless Plaintiffs can show that the burdens imposed on them by Georgia's 5% petition requirement are "severe."

However, the factual record does not demonstrate that the State has imposed any more burdens on candidates than what has already been considered in prior

2

cases. Georgia's petition requirements have not materially changed since *Jenness*, and the Eleventh Circuit and other federal courts have continuously upheld Georgia's petition requirements and similar requirements in other states under a rational basis level of scrutiny.

In fact, a court in this judicial district recently held that, in typical election years, Georgia's petition requirements "constitute reasonable, nondiscriminatory burdens" that are justified by the State's "important interest in ensuring that a candidate makes a 'preliminary showing of substantial support in order to qualify for a place on the ballot.'" *Cooper v. Raffensperger*, No. 1:20-cv-01312, slip op. at 13-14 (N.D. Ga. July 9, 2020) (citing *Anderson*, 460 U.S. at 788 n. 9.).[1] And it was only due to the current COVID-19 pandemic that the court found the burdens rose to a "moderate" level, so that a 30% reduction of the signature requirement was appropriate for the 2020 election. *Id.* at 16.

Plaintiffs cannot point to a single case supporting their argument that Georgia's petition requirements have become so burdensome that they should be subjected to a higher level of scrutiny under the *Anderson-Burdick* framework. To find that Georgia's petition requirements present a severe burden now, after over 40

---

[1] The *Cooper* decision is attached as **Exhibit A**.

years of precedent to the contrary, would be a radical departure from prevailing authority. Accordingly, the Court should grant summary judgment in favor of the Secretary on Plaintiffs' First and Fourteenth Amendment claim.

Plaintiffs' Equal Protection claim also fails as a matter of law. This claim rests on the false premise that Georgia law requires more petition signatures for non-party candidates for Georgia's congressional districts than for statewide office, which it does not. While Plaintiffs complain that they must demonstrate support among the electorate for both statewide office and Georgia's congressional districts, the State's interest in ensuring that candidates have a substantial level of support among voters before placing them on the ballot applies at the state and local level. It is not "invidious discrimination" that runs afoul of the Equal Protection clause to require Libertarian candidates to demonstrate that they have voter support in the congressional district in which they seek to run.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Georgia's Ballot Access Laws

Georgia's election code provides for ballot access based primarily on a showing of support within the electorate. A "political party," for example, is defined under Georgia law as a political organization whose nominee received at least 20% of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25).

Based on that substantial showing of support, political parties obtain ballot access by nominating their candidates via primary election, and candidates must receive over 50% of the primary or primary runoff vote to be on the general election ballot. O.C.G.A. § 21-2-130(1). Currently, only the Republican and Democratic parties meet the definition of a political party. To maintain their status, political parties must continue to receive at least 20% of the vote in each general election. O.C.G.A. § 21-2-2(25).

The Libertarian Party of Georgia is a "political body" as defined by Georgia law, which includes any political organization that is not a political party. O.C.G.A. § 21-2-2(23). Political body candidates do not have to win a majority of votes in a primary election or expend resources running a primary campaign to be placed on the general election ballot. Rather, political body candidates may be nominated at their organization's convention, and placed on the general election ballot by demonstrating significant voter support in other ways.

For *statewide* offices, a political body can qualify to have its nominees appear on the general election ballot by submitting a nominating petition signed by 1% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b). Political bodies may also qualify to nominate candidates for statewide office by convention by (a) submitting a qualifying petition signed by

at least 1% of the total number of registered voters at the last general election; or (b) nominating a candidate for statewide office who received votes totaling at least 1% of the total number of registered voters at the last general election. O.C.G.A. § 21-2-180.

For *non-statewide* offices, including Georgia's congressional districts, political body candidates may appear on the general election ballot if they submit a nominating petition signed by 5% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b).

Georgia law places very few restrictions on the signature-gathering process. Candidates have 180 days (six months) to collect signatures. O.C.G.A. § 21-2-170(e). Candidates are not required to wait until after they receive their party's nomination to begin gathering signatures. Any registered voter may sign a petition; the only restriction is that no person may sign the same petition more than once. O.C.G.A. § 21-2-170(c).

In addition to showing support among the electorate, both political party and political body candidates must also file a notice of candidacy and qualifying fee. O.C.G.A. § 21-2-132(d). For the U.S. House of Representatives, the required qualifying fee is 3% of the annual salary for the office, or $5,220. O.C.G.A. § 21-2-131(a)(1)(A).  The fee is the same for all candidates regardless of party

6

affiliation. *Id.* Candidates who cannot pay the qualifying fee have the option to file a pauper's affidavit. O.C.G.A. § 21-2-132(g).

If a candidate does not qualify by nomination or petition, they may alternatively run as a write-in candidate for state or local office by filing notice of their intention of candidacy. O.C.G.A. § 21-2-133.

## B. The Libertarian Party's Access to the Ballot in Georgia

Although the national Libertarian Party is organized in all fifty states, the Libertarian Party of Georgia has a very small membership.  In 2016, the most recent year for which data is available, the Libertarian Party of Georgia had 5,861 Georgia residents as members, with 161 dues-paying members. (Defendant's Statement of Material Facts ("SMF") ¶ 39.) Annual membership dues for the Libertarian Party are approximately $30.00. (SMF ¶ 40.) Although it takes only three members (who must volunteer to be officers) to start an affiliate branch of the Libertarian Party, the Libertarian Party of Georgia has only seven active affiliates in the state. (SMF ¶ 41.)

Despite its low membership in Georgia, the Libertarian Party has successfully obtained ballot access for state and local office. In 1988, the Libertarian Party qualified under O.C.G.A. § 21-2-180 to nominate candidates for statewide offices when it submitted a qualifying petition signed by more than 1% of the total number of registered voters in the preceding general election. (SMF ¶ 37.) Since then, the

party has retained that qualification in each election cycle by nominating at least one candidate for statewide public office who received votes totaling at least 1% of the total number of registered voters in that election. (*Id.*)

While Libertarian Party candidates have some support among voters at the state level, no Libertarian Party candidate has yet met the petition requirement to qualify for the general election ballot for the U.S. House of Representatives in Georgia. (SMF ¶ 38.) However, the record shows that very few individuals have actually made a genuine effort to qualify.

In support of their previous motion for summary judgment, Plaintiffs submitted statements from 11 individuals who unsuccessfully attempted to meet the 5% petition requirement as third-party of independent candidates in a handful of congressional elections since 2002.[2] Only one candidate—Wayne Parker—even came close to meeting the petition requirement. (SMF ¶ 55.) The Libertarian Party raised $40,000 for his campaign in 2002, and paid for 35 professional petition circulators. (*Id.*) While he gathered over 20,000 raw signatures, after they were

---

[2] There are additional individuals whom Plaintiffs claim attempted to qualify as candidates, who are identified in Plaintiffs' Statement of Undisputed Material Facts in Support of the Their Motion for Summary Judgment. [*See* Doc. 69-2 ¶¶ 92-120]. However, Plaintiffs did not obtain sworn declarations from any of these purported candidates. Rather, they are identified in unauthenticated documents or hearsay statements from other witnesses. This evidence is of little probative value, and should not be considered by the Court on summary judgment.

validated by county officials, he was "just shy" of the requirement. (SMF ¶ 56.) According to Mr. Parker, the 2002 election cycle was the Libertarian Party's "most substantial effort to obtain ballot-access for U.S. Representative," before or after. (SMF ¶ 55.)

The record further shows that four candidates were able to collect a significant number of signatures with some effort, but fell short:

- Eugene Moon collected 13,000 signatures in 2010 when he attempted to qualify for the Ninth Congressional District (SMF ¶ 48);

- Jeff Anderson collected an estimated 11,000-12,000 of raw signatures in 2010 when he attempted to qualify for the Eleventh Congressional District (SMF ¶ 47);

- Faye Coffield attempted to qualify as an independent candidate for the Fourth Congressional District in 2008, Faye Coffield testified that she collected "approximately 2,000 raw signatures" over two months (SMF ¶ 50); and

- Hien Dai Nguyen collected approximately 25,000 raw signatures when she attempted to qualify for the Fourth Congressional District in 2016, but only 528 of these signatures could be validated by the county elections boards (SMF ¶ 46).

9

The remaining aspiring candidates either collected only a few signatures or did not even attempt a petition campaign:

- Martin Cowen collected approximately 620 signatures over a period of 40 days when he attempted to qualify for the Thirteenth Congressional District in 2018 (SMF ¶ 42);

- Aaron Gilmer collected 308 raw signatures over a 60-day period when he attempted to qualify for the Ninth Congressional District in 2018 (SMF ¶ 43);

- Jay Fisher, the Libertarian Party's nominee for the Sixth Congressional District in 2006, stated that he "abandoned [his] effort to qualify for the ballot and did not submit the signatures that my team had gathered" (SMF ¶ 51);

- Cynthia McKinney considered running in 2012 as the Green Party's candidate for the Fourth Congressional District, but she never attempted a petition campaign and "withdrew from the race without ever having publicly announced [her] intention to enter it" (SMF ¶ 54);

- Luanne Taylor inquired with the Secretary of State's office about the number of required signatures for the Sixth Congressional District in 2018, but immediately decided not to run (SMF ¶ 57); and

10

- Victor Armendariz attempted to run as an independent candidate in the Fourth Congressional District in 2010 but only gathered "quite a few" signatures until he decided to withdraw his candidacy (SMF ¶ 49).

No Libertarian Party candidate qualified for Georgia's congressional districts in 2020, even with the reduced signature requirement and extended period of time. (SMF ¶ 58.) While Plaintiff Cowen was the only Libertarian Party candidate to file a notice of candidacy and qualifying fee in March, he turned in a nomination petition with only *six* signatures, and therefore did not qualify. (SMF ¶ 64.) However, there were several independent candidates who were able to gather more than enough signatures to qualify for local races, even during the COVID-19 outbreak. (SMF ¶¶ 60-62.)

## III.   ARGUMENT

### A. Summary Judgment Standard

Summary judgment is proper if there is no genuine dispute regarding any material fact and the defendant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The moving party must show that there is an absence of evidence to support the non-movant's case; the moving party is not required to negate his opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986).  Once that showing is made, the burden shifts to the non-movant to demonstrate that there

is a material issue of fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The mere existence of some factual dispute does not preclude summary judgment; rather, a plaintiff must establish a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On summary judgment, the court must construe the facts in the light most favorable to the non-moving party, but the court is not required to accept any interpretation "no matter how strained." *Rowe v. Fort Lauderdale*, 279 F.3d 1271, 1277 and 1278 n. 6 (11th Cir. 2002).

## B. Georgia's Ballot Access Requirements do not Violate the First and Fourteenth Amendments under the *Anderson-Burdick* Standard.

In its order, the Eleventh Circuit instructed the Court on remand to apply the framework for evaluating the constitutionality of ballot-access requirements under the First and Fourteenth Amendment laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1982), and as later refined in *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under the *Anderson-Burdick* test, courts are to "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interest the State contends justify that burden, and consider the extent to which the State's concerns make that burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). The rigorousness of the Court's inquiry "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. When "those rights are subjected to 'severe'

12

restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citations omitted). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358.

### 1. Georgia's ballot access requirements are "reasonable, nondiscriminatory restrictions" subject to rational basis review.

In assessing the severity of the burden imposed by Georgia's petition requirements under the *Anderson-Burdick* framework, the Court's analysis must start with the recognition that under long-standing Supreme Court and Eleventh Circuit precedent, petition signature requirements such as Georgia's do not present a severe burden on Plaintiffs' First and Fourteenth Amendment rights.

The Supreme Court first found that Georgia's 5% petition signature requirement did not present an unconstitutional burden in *Jenness v. Fortson*, 403 U.S. 431 (1971). The Court looked at the burden imposed by the petition requirement and reasoned that, although it is "somewhat higher" than other states, Georgia imposes few restrictions on the signature collection process. *Id.* at 442. Specifically, voters may sign a petition for more than one candidate; voters are not required to state that they intend to vote for that candidate in the election; and voters who previously voted in a party primary are still eligible to sign a petition. *Id.* at 438-39.

13

Additionally, Georgia law "does not fix an unreasonably early filing deadline for candidates" and allows them 6 months to conduct a signature-gathering campaign. *Id.* at 438. Georgia also "freely provides for write-in votes." *Id.* 438. In sum, the Court concluded that Georgia's election laws do not "operate to freeze the political status quo" because they do not make it "virtually impossible" for third-party candidates to access the ballot. *Id.* at 438, 434-45.

Following *Jenness*, the Eleventh Circuit consistently has declined to apply strict scrutiny in upholding Georgia's petition requirements. *See McCrary v. Poythress*, 638 F.2d 1308, 1311-13 (11th Cir. 1981) (relying on *Jenness* to uphold the 5% petition requirement); *Coffield v. Handel*, 599 F.3d 1276, 1277 (11th Cir. 2010) ("Our Court and the Supreme Court have upheld Georgia's 5% rule before."); *Cartwright v. Barnes*, 304 F.3d 1138, 1141 (11th Cir. 2002) (recognizing that the analysis in *Jenness* "still equally pertains today" and that Georgia's 5% petition requirement is not severely burdensome). These cases still support the unchanged reality that the burdens associated with meeting Georgia's ballot access requirements are not severe and have not materially changed since *Jenness*.

Consistent with this line of authority, the Eleventh Circuit has also declined to apply strict scrutiny to similar petition requirements in other states. *See Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (upholding

Florida's 3% petition requirement and declining to apply a heightened level of scrutiny); *Swanson v Worley*, 490 F.3d 894, 903-904 (11th Cir. 2007) (holding that Alabama's 3% petition requirement "does not impose a severe burden on plaintiffs' rights but is a reasonable, nondiscriminatory restriction"); *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694-99 (11th Cir. 2014) (holding that Alabama's ballot access requirements for presidential candidates did not demonstrate a burden that would subject them to strict scrutiny).[3]

Another court in this district recently held that Georgia's petition requirements only present a "moderate" burden even during the current global pandemic. *See Cooper*, slip op. at 16. The Court recognized that during "normal circumstances," Georgia's petition requirements "constitute reasonable,

---

[3] Other circuits have also declined to find that state petition requirements as high as 5% are so burdensome as to trigger heightened scrutiny. *See, e.g., Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1093 (9th Cir. 2019) (holding that a state can allow signature requirements of up to 5% without imposing a "severe burden" triggering heightened scrutiny); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016) ("Neither the Supreme Court nor any circuit court has struck down a statewide ballot-access regime on the grounds that a signature requirement of 5% (or less) is too much, or that 6 months (or more) is too little time within which to gather the signatures from a pool of substantially all voters."); *Rainbow Coalition of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 743 (10th Cir. 1988) (rejecting the argument that strict scrutiny should be applied in upholding Oklahoma's 5% petition requirement for party status).

nondiscriminatory burdens" and withstand scrutiny under the rational basis test. *Id.* at 13-14. While the Court concluded that the circumstances surrounding COVID-19 elevated the burden on candidates to a "moderate" level, the Court rejected the Plaintiffs' argument that the burden associated with the petition requirements were severe because candidates are not "virtually excluded from the ballot." *Id.* at 16 (citing *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)).

In sum, there is simply no authority for concluding that Georgia's petition requirements are "severe" and subject to heightened scrutiny. As the Supreme Court noted in *Burdick*, "[e]lection laws will invariably impose some burden upon individual voters." 504 U.S. at 433. The mere fact that Georgia's "system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Id.* Such a result "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* Accordingly, this Court should find that Georgia's petition requirements impose only a reasonable, nondiscriminatory burdens and apply a rational basis level of scrutiny.

### 2. The State has an important interest in regulating ballot access.

Georgia's petition requirements easily survive scrutiny under the rational basis test, as the State has "an important state interest in requiring some preliminary

showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." *Jenness*, 403 U.S. at 442. *See also Anderson*, 460 U.S. at 788 n. 9 (the State has the "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot"); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("in order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot.").

The State also has a generalized interest in the orderly administration of elections, and ballot access laws advance the State's interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. *See also Storer v. Brown*, 415 U.S. 724, 730 (1974) ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process"); *Timmons*, 520 U.S. at 366 ("States also have a strong interest in the stability of their political systems."). While this interest "does not permit a [s]tate to completely insulate the two-party system from minor parties' or independent candidates competition and influence," a state "need not remove all of

17

the many hurdles third parties face in the American political arena today." *Timmons*, 520 U.S. at 367.

The rational basis test is clearly met here, as Georgia's "reasonable, nondiscriminatory" petition requirements are justified by the State's "important regulatory interests" in regulating ballot access. *See Anderson*, 460 U.S. at 788.

### 3.  Plaintiffs cannot distinguish *Jenness* and other controlling authority.

As the Eleventh Circuit noted in *Cowen*, in order to survive summary judgment, Plaintiffs must "satisfactorily distinguish its claims from those rejected in *Jenness*," and "demonstrate why a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law." *Cowen*, 960 F.3d at 1346. Plaintiffs cannot meaningfully distinguish *Jenness* in any of these ways.

As already discussed, the "evolution of the relevant federal law" since *Jenness* has been to repeatedly affirm Georgia's petition requirements as constitutional. Plaintiffs cannot point to a single case that calls Georgia's petition requirements, or similar requirements in other states, into question.

There also have been no changes to Georgia's statutory scheme since *Jenness*, as the Eleventh Circuit has already recognized. *See Coffield v. Handel*, 599 F.3d

1276, 1277 (11th Cir. 2010) ("The pertinent laws of Georgia have not changed materially since the decisions in *Jenness* and *Cartwright* were made."). Georgia still imposes few restrictions on the signature collection process. *Jenness*, 403 U.S. at 442. Voters may still sign a petition for more than one candidate, are not required to state that they intend to vote for that candidate in the election, and are still eligible to sign a petition even if they previously voted in a party primary. *Id.* at 438-39. Additionally, Georgia's filing deadline is not unreasonably early, and the 6-month period to conduct a signature-gathering campaign remains the same. *Id.* at 438.

Because they cannot argue that Georgia law has changed since *Jenness*, Plaintiffs point to the fact that no third-party or independent candidates has yet to meet the petition requirements for Georgia's congressional districts.[4] However, this is not *per se* evidence that the requirements are severely burdensome. Rather, in considering Plaintiffs' evidence, it is more likely explained as a lack of diligence by

---

[4] Plaintiffs have argued that this fact shows that Georgia's petition requirements "operate to freeze the political status quo." *Jenness*, 403 U.S. at 438. But in *Jenness*, the Court was comparing Georgia's requirements to the ballot access laws of Ohio struck down in *Williams v. Rhodes*, 393 U.S. 23 (1968), which were much more restrictive and made it "virtually impossible" for new political parties to access the ballot. *Jenness*, 403 U.S. at 435. Thus, when it observed that Georgia's election laws did not "operate to freeze the political status quo," the Court was looking at whether Georgia's scheme allowed for the *possibility* that a third party candidate could get on the ballot—not how many had tried and failed.

the would-be candidates, an absence of support among voters, or both. Indeed, the vast majority of the candidates that Plaintiffs point to as having made a "genuine effort" to meet the petition requirements actually did very little work during the 6-month period they are provided to gather signatures. (SMF ¶¶ 42-57.) For the 2020 general election, even with lessened petition requirements in place, no Libertarian Party candidate was able to show any voter support in order to gain ballot access for Georgia's congressional districts. The idea that Plaintiff Cowen should be waived onto the ballot with consecutive apathetic submissions of 620 signatures in 2018 and *6* signatures in 2020 (in a congressional district of over 700,000) is a policy decision that the State has not found persuasive, and that policy decision is a reasonable and constitutionally-sound one under the *Anderson-Burdick* framework.

Running for Congress is undoubtedly time-consuming and expensive for party and non-party candidates alike. But the State is "not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 198 (1986). The law requires candidates to be "reasonably diligent," *see Libertarian Party of Fla.*, 710 F.2d at 793, and Plaintiffs' evidence fails to show any candidate who has met this standard in their efforts to be elected to a congressional district.

By contrast, there are many third-party and independent candidates who have achieved successes both statewide and at the local level. (SMF ¶¶ 44, 45.) For example, several independent candidates were able to meet the petition requirement for local offices for the 2020 election even during a pandemic. (SMF ¶¶ 60-62.) In this respect, Georgia's petition requirements have not operated to exclude non-party candidates from the ballot.

### C. Georgia may Require Political Body Candidates to Demonstrate a Significant Modicum of Voter Support for both State and Local Offices.

As an alternative argument to their *Anderson-Burdick* argument, Plaintiffs contend that Georgia's petition requirements run afoul of the Supreme Court's decisions in *Norman v. Reed*, 502 U.S. 279 (1992) and *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), which stand for the proposition that a State may not require a greater petition requirement for local office than it does for statewide office. However, those cases are inapposite because they involved a unique feature of Illinois's petition requirements not present in Georgia's election laws.

Under Illinois law, political organizations seeking to form a "new party" and field candidates for the ballot had to collect 25,000 signatures for statewide office or

for local office. *Norman*, 502 U.S. at 282.[5] If a political subdivision had multiple districts, a new party had to collect 25,000 signatures from each district. *Id.* The effect of the Illinois law required a new party seeking to run candidates in a particular district to collect far more signatures than the 25,000 required to run for state office. *Id.* The Supreme Court held that while Illinois had a valid interest in requiring new parties to show support among the electorate through a petition requirement, it had not chosen the most narrowly tailored means of advancing that interest. *Id.* at 294. If 25,000 signatures was sufficient to qualify for the ballot for statewide office, there was no compelling reason why candidates should have to meet that requirement for multiple political subdivisions when running for local office. *Id.*

Georgia's petition requirements do not run afoul of the holding in *Norman*, because Georgia requires *fewer* petition signatures for local offices than for statewide offices. The petition signature requirement for statewide office is 1% of the total number of registered voters in the state in the last general election. This is significantly more than the signature petition requirement for any single congressional district.[6]

---

[5] The *Socialist Workers Party* decision struck down an earlier version of the Illinois petition requirement.

[6] For 2020, a candidate for statewide office would have been required to collect 51,686 signatures (reduced by 30% to 36,180), whereas the signatures

Even though Georgia's petition requirements are plainly constitutional on their face, Plaintiffs complain that because the Libertarian Party has qualified under O.C.G.A. § 21-2-180 to nominate candidates by convention for statewide office without having to meet the statewide petition requirement every election cycle, they should not have to meet the petition requirements for ballot access at the local level. In this respect, they argue that Georgia law requires them to gather more signatures for congressional office than for statewide office. However, this misstates the holding of *Norman*, which rejected that very argument. *See Norman*, 502 U.S. at 295 (stating that candidates still had to meet the petition requirements for local office in the suburban districts even if they already had demonstrated support in the city of Chicago). In the same way, it is constitutionally permissible for Georgia to require that Libertarian candidates demonstrate support in their respective congressional districts, even if the party has already qualified to run statewide candidates.

**D. Georgia's Ballot Access Requirements do not Violate Equal Protection.**

Plaintiffs' claim that Georgia's petition requirement violates the Equal Protection Clause of the Fourteenth Amendment also fails as a matter of law. Their claim—that the petition requirement treats Libertarian Party candidates for statewide

---

required for Georgia's congressional districts ranged from 19,778 (reduced to 13,845) to 24,972 (reduced to 17,480).

office differently than Libertarian Party candidates for the U.S. House of Representatives—is not one that has ever been recognized by law.

To succeed on their equal protection claim, Plaintiffs must "demonstrate in the first instance a discrimination against them of some substance." *Am. Party of Texas v. White*, 415 U.S. 767, 781 (1974). State election statutes "create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." *Id.* (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 732 (1963)). *See also Jenness*, 403 U.S. at 441 (rejecting equal protection claim).

Plaintiffs fail to show shown that Libertarian congressional candidates face any sort of "invidious discrimination" or are subjected to a greater burden than statewide candidates. As discussed above, it is not discrimination for the State to require Libertarian candidates to demonstrate voter support in their respective congressional districts, even though the party may nominate candidates by convention for statewide office without having to meet the statewide petition requirement. Merely because Georgia has provided multiple alternative means to achieving ballot access does not compel the conclusion that Georgia has violated equal protection. *See Jenness*, 403 U.S. at 441-42 ("Georgia has not been guilty of invidious discrimination" by "providing different routes to the printed ballot.").

24

It would not advance the State's interest in ensuring that candidates have "a significant modicum of support" among the electorate before placing them on the ballot if Libertarian candidates could rely on their support at the state level as a means to achieving wholly unrestricted access to the ballot for each of Georgia's congressional districts. As shown in Plaintiffs' own evidence, many of the Libertarian Party candidates who aspire to run for Congress have demonstrated little to no support among the voters of their district in prior election cycles. It does not serve equal protection to entirely waive the ballot access requirements for Libertarian candidates at the expense of other candidates (both party and non-party), who would still be required to invest the necessary time and resources to earn ballot access. The Constitution does not compel this result, and the Court should find that Plaintiffs' equal protection claim fails as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that his Motion for Summary Judgment be granted.

Respectfully submitted, this 28th day of August, 2020.

CHRISTOPHER M. CARR
Attorney General          112505
BRYAN K. WEBB        743580
Deputy Attorney General
RUSSELL D. WILLARD     760280
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
CHARLENE S. MCGOWAN 697316
Assistant Attorney General


Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
Tel: 404-656-3389

*Counsel for Defendant*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

*/s/Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel for Plaintiffs via electronic notification:

Bryan L. Sells
bryan@bryansellslaw.com

Dated: August 28, 2020.

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General