# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES L. (JIMMY) COOPER III,        *
MARTIN COWEN, and GEORGIA           *
GREEN PARTY,                        *
                                    *
        Plaintiffs,                 *
                                    *
    v.                              *        1:20-CV-01312-ELR
                                    *
BRAD RAFFENSPERGER, *in his*        *
*official capacity as Secretary of State* *
*of the State of Georgia,*          *
                                    *
        Defendant.                  *
                                    *

---

**O R D E R**

---

Presently before the Court is Plaintiffs' Motion for Preliminary Injunction.
[Doc. 11]. For the reasons below, the Court grants in part and denies in part
Plaintiffs' motion.

**I.     Background**

This action arises from Plaintiffs' desire to be included on ballots for the
upcoming general election as third-party candidates. See generally Compl. [Doc. 1].
Plaintiffs James L. "Jimmy" Cooper III and Martin Cowen each seek to run as
candidates for United States Representative to serve Georgia's Eighth and Thirteenth
Congressional Districts, respectively. [Doc. 11 at 11]. Plaintiff Georgia Green Party

seeks to have a nominee for President of the United States appear on the ballot in November. [Id. at 21]. Defendant Brad Raffensperger is the Secretary of State for the State of Georgia ("Defendant" or "the Secretary") and oversees the state's election process. Compl. ¶ 10.

The crux of Plaintiffs' case is that Georgia's ballot access requirements for third-party candidates—specifically the requirements concerning the collection of signatures—combined with the circumstances presented by COVID-19, violate the First and Fourteenth Amendments to the Constitution. [Doc. 11 at 2]. As such, Plaintiffs seek a preliminary injunction from this Court prohibiting the Secretary "from enforcing Georgia's signature requirements for independent and third-party candidates in light of the current public health emergency caused by the novel coronavirus." [Id. at 1]. The Court first provides an overview of Georgia's ballot access laws and other relevant background information before addressing Plaintiffs' motion.

### A.   Georgia's Ballot Access Laws

In Georgia, the law distinguishes between three (3) kinds of candidates for partisan public offices: (1) candidates nominated by a political party; (2) candidates nominated by a political body; and (3) independent candidates. A "political party" is any political organization whose nominee received at least 20% of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25). Based on that

2

showing of support, political parties may obtain ballot access by nominating a candidate via primary election. O.C.G.A. § 21-2-130(1). Currently, only the Republican and Democratic parties meet this definition. [Docs. 11 at 9 n.7; 17 at 4].

A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(23). Political bodies must nominate candidates for partisan offices by convention. O.C.G.A. § 21-2-170(g). However, this process does not guarantee ballot access. Instead, political body candidates for non-statewide offices—such as the office of U.S. Representative (as is relevant here)—must submit: (1) a notice of candidacy and qualifying fee, O.C.G.A. § 21-2-132(d), and (2) a nomination petition signed by 5% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b). The notice of candidacy and qualifying fee for non-statewide candidates is due during the thirty-fifth week before the election (which in 2020, fell on March 6). O.C.G.A. § 21-2-132(d). The nomination petition for non-statewide candidates is due no later than noon on the second Tuesday in July (which in 2020, falls on July 14). O.C.G.A. § 21-2-132(e).

Political body candidates for President undergo a similar process. Pursuant to O.C.G.A. § 21-2-170(b), political-body candidates for President must submit: (1) a notice of candidacy and qualifying fee, and (2) a nominating petition signed by at least 1% of the total number of registered voters at the last general election.

3

However, the statutory 1% requirement was reduced to 7,500 signatures by court order in 2016, as the result of a prior challenge by the Green Party. See Green Party v. Kemp, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016), aff'd, 674 F. App'x 974 (11th Cir. 2017). The notice of candidacy and qualifying fee for presidential candidates are due in late June (which in 2020, fell on June 26). O.C.G.A. §21-2-132(d). The nomination petition for presidential candidates is due no later than noon on the second Tuesday in July (which in 2020, as mentioned previously, is July 14). O.C.G.A. §21-2-132(e).

**B.      The COVID-19 Pandemic**

As no doubt all are aware, COVID-19 has disrupted life as Americans have previously known it. In Georgia alone, there have been over 100,000 confirmed cases of the virus with nearly 3,000 deaths.[1] In response to the pandemic, and for good reason, Governor Brian Kemp issued several executive orders out of concern for public safety. Specifically, Governor Kemp has:

- declared a public health state of emergency for the State of Georgia due to the spread of COVID-19, effective March 14, 2020, and subsequently extended it through and until August 11, 2020;
- ordered, on March 23, 2020, that all bars and nightclubs close and banned gatherings of more than ten (10) people;
- issued a Shelter-in-Place Order effective April 3–30, 2020; and
- ordered "all residents and visitors in the State of Georgia" to practice social distancing and sanitation in accordance with the guidelines published by the

---

[1] COVID-19 Daily Status Report, GA. DEP'T OF PUB. HEALTH, https://dph.georgia.gov/COVID-19-daily-status-report. (last visited July 7, 2020).

Centers for Disease Control and Prevention and encouraged residents and visitors to wear masks in public to prevent the spread of COVID-19.

[See Docs. 11-1, 11-3, 11-6, 11-7, 11-8, 11-9]; see also 2020 Executive Orders, OFFICE OF THE GOVERNOR, https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders. (last visited July 1, 2020). These restrictions were imposed in an effort to mitigate the spread of the virus, which easily transfers from person-to person, spreading at an alarming rate.

Similarly, Defendant Raffensperger—in accordance with his duty to oversee Georgia's voting activities—has taken several measures to adjust the election process in light of COVID-19. Such measures include the postponement of the Georgia primary, encouraging voting by mail, and, as relevant here, extending the deadline for independent and third-party candidates to submit nomination petitions until August 14, 2020. [Docs. 11-10, 11-12, 11-13]. This extension increased the signature gathering period from 180 to 211 days. 2d. Decl. of Chris Harvey ¶ 4 [Doc. 26-1].

## C.    The Parties

The individual Plaintiffs in this case are third-party candidates for U.S. Representative in their respective districts. Compl. ¶¶ 2, 7–8. Both timely submitted a notice of candidacy and paid the $5,220 qualifying fee before the March 6 deadline. Id. At the time Plaintiffs filed their Complaint, Plaintiff Georgia Green Party had not yet paid the filing fee or filed a notice of candidacy for its presidential electors

because the applicable qualifying period did not begin until June 22.  Id. ¶ 9.
However, in the Complaint, Plaintiff Georgia Green Party represented that it was
poised to do so at the appropriate time.  Id.  Defendant Raffensperger, as Georgia's
Secretary of State, is charged by statute with enforcing Georgia's ballot-access
restrictions.  Id. ¶ 10.

   After filing the requisite notices of candidacy and paying the qualifying fees,
the only remaining requirement for Plaintiffs to appear on the general ballot is to
meet Georgia's signature requirements.  See O.C.G.A. § 21-2-170(b).  As noted
above, the individual Plaintiffs must submit a nomination petition signed by 5% of
the number of registered voters eligible to vote in the last election for the office that
they are seeking.  O.C.G.A. § 21-2-170(b).  Political body candidates for President
must submit a nominating petition containing at least 7,500 signatures.  See Green
Party v. Kemp, 171 F. Supp. 3d at 1372.  According to Plaintiffs, Georgia's response
to COVID-19 has made it virtually impossible to gather signatures because
"[g]athering signatures during the COVID-19 outbreak endangers public health and
the lives of petition-circulators and potential signers." [Doc. 11 at 16].

   **D.   Procedural History**

   On March 26, 2020, Plaintiffs filed the Complaint in this action.  Compl.
Plaintiffs bring a single claim pursuant to 42 U.S.C. § 1983, contending that "[u]nder
the present circumstances, Georgia's ballot-access laws for independent

political-body candidates for President of the United States and U.S. Representative violate rights guaranteed to these [P]laintiffs by the First and Fourteenth Amendments to the U.S. Constitution." Id. ¶ 63.  On May 8, 2020, Plaintiffs filed the instant Motion for Preliminary Injunction, seeking to enjoin the signature requirements for this election.  [Doc. 11 at 33–34].  This motion has been fully briefed and, with the benefit of oral argument,[2] is ripe for the Court's review.

## II.    Discussion

A temporary restraining order or preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four" elements.  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal marks and citations omitted).  A plaintiff seeking a preliminary injunction must demonstrate that: (1) there is a substantial likelihood of success on the merits; (2) it will suffer irreparable injury if relief is not granted; (3) the threatened injury outweighs any harm the requested relief would inflict on the non-moving party; and (4) entry of relief would serve the public interest. See, e.g., KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006).  The decision as to whether a plaintiff carries this burden "is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion."  Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc., 303 F.3d

---

[2] The undersigned held oral argument regarding Plaintiffs' motion on June 30, 2020.  [Doc. 27].

1242, 1246 (11th Cir. 2002) (quoting Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002)) (internal quotation marks omitted).

Before addressing the merits of this case, the Court finds it necessary to define the nature of Plaintiffs' challenge. A litigant may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both. See Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009). While a facial challenge asserts that the challenged statute "always operates unconstitutionally," an "as-applied challenge, by contrast, addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" Id. (citations omitted). In this case, Plaintiffs do not assert that the ballot access laws "always operate unconstitutionally"; instead, Plaintiffs contest the constitutionality of the laws as they are applied during this election cycle in light of COVID-19. As such, they bring an as-applied challenge.[3] With this context in mind, the Court turns to the four (4) preliminary injunction factors.

## A.    Substantial Likelihood of Success on the Merits

To meet the first element for an injunction, Plaintiffs must demonstrate that they are likely to succeed on the merits of their § 1983 claim. Section 1983 provides

---

[3] A facial challenge to these laws is currently pending in this Court before a fellow district judge. See Cowen v. Ga. Sec'y of State, No. 1:17-CV-4660-LMM (N.D. Ga. filed Nov. 21, 2017).

a cause of action for constitutional violations committed under color of state law.[4]

To prevail, Plaintiffs must show (1) that Defendant deprived them of a right secured under the Constitution or federal law and (2) that the deprivation occurred under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir.1998). The Court discusses the requirements in reverse.

      i.    Color of State Law

"To satisfy section 1983's 'under color of [state law]' requirement, a plaintiff must demonstrate that 'the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State.'" Gene Thompson Lumber Co. v. Davis Parmer Lumber Co., 984 F.2d 401, 403 (11th Cir. 1993) (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)). For a defendant's actions to be fairly attributable to the State, "[f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar, 457 U.S. at 937.

---

[4] Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

Here, Plaintiffs contend that the ballot access laws, and the Secretary's enforcement of those laws, sufficiently satisfy the state action requirement. [Doc. 22 at 7–8]. The Court agrees. The ballot-access laws are a "rule of conduct" imposed by the State of Georgia and enforced by the Secretary. See Lugar, 457 U.S. at 937. Indeed, an analogous case found state action under the same circumstances. See Esshaki v. Whitmer, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020) (noting that "the State's actions in the form of enforcing . . . the statutory ballot-access requirements" combined with circumstances presented by COVID-19 to violate the plaintiff's First and Fourteenth Amendment rights).[5] Thus, the Court finds sufficient state action here.

ii.   Constitutional Deprivation

The Court turns next to an assessment of the alleged constitutional deprivation. The Supreme Court has long recognized that ballot access laws "place burdens on two different, although overlapping, kinds of rights—the right of

---

[5] The Secretary's argument on this issue is unavailing. In his brief, the Secretary argues that COVID-19 is the real source of Plaintiffs' woes, not a "statute, regulation, or policy" that the Secretary enforces. To support this position, the Secretary cites a footnote in a recent Order by this Court. See Coalition for Good Governance, et al. v. Raffensperger, et al., No. 1:20-CV-01677-TCB, slip op. at *10 n. 2 (N.D. Ga. May 14, 2020). However, the context of this footnote did not concern state action, but instead was used as separate justification for the Judge in that case to apply the political question doctrine. Id. But it is well-settled that this sort of case—one involving ballot access laws—is not precluded by the political question doctrine. See Williams v. Rhodes, 393 U.S. 23, 28 (1968) ("Ohio's claim that the political-question doctrine precludes judicial consideration of [ballot access] cases requires very little discussion. That claim has been rejected in cases of this kind numerous times."). Thus, the Court finds the Secretary's reliance on the aforementioned case to be misplaced.

individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30–31 (1968). Ballot access restrictions affect candidates and individual voters alike because usually "voters can assert their preferences only through candidates or parties or both." Lubin v. Panish, 415 U.S. 709, 716 (1974). "By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences." Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979). As the Supreme Court explained in Anderson v. Celebrezze, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters." 460 U.S. 780, 786 (1983) (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972)).

When considering the constitutionality of ballot access laws, the Court applies the framework set out in Anderson, 460 U.S. at 780, as later refined in Burdick v. Takushi, 504 U.S. 428 (1992). Pursuant to the Anderson-Burdick test,

> [w]hen deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.

Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (internal quotation marks omitted).

Stated differently, the Court:

> must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." [Anderson v. Celebrezze,] 460 U.S. 780, 789, 103 S. Ct. 1564 (1983). Then the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. Finally, the court must "determine the legitimacy and strength of each of those interests," while also considering "the extent to which those interests make it necessary to burden the Plaintiff's rights." Id.
>
> . . . .
>
> [I]f the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Id. (quotations omitted). In short, the level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights—"Lesser burdens trigger less exacting review." Id.

Stein v. Alabama Sec'y of State, 774 F.3d 689, 694 (11th Cir. 2014).

"For [the] intermediate cases, where the burden on the right to vote is moderate," a court must "weigh that burden against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the

plaintiff's rights."[6] Mays v. LaRose, 951 F.3d 775, 784 (6th Cir. 2020) (citing

Burdick, 504 U.S. at 434) (internal quotation marks omitted); see also People First

of Alabama v. Sec'y of State for Alabama, No. 20-12184, 2020 WL 3478093, at *6

(11th Cir. June 25, 2020) (Rosenbaum & Pryor, JJ., concurring) ("But whatever the

burden, no matter how slight, 'it must be justified by relevant and legitimate state

interests sufficiently weighty to justify the limitation.'" (internal citations omitted)).

In sum, the "Supreme Court has rejected a litmus-paper test for constitutional

challenges to specific provisions of a State's election laws and instead has applied a

flexible standard." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1352

(11th Cir. 2009) (quotation omitted). The Court turns now to the analysis of the test.

a.    *Severity of the Burden*

During normal circumstances, Georgia's signature collection requirements for

an individual to gain a place on the ballot as a third-party candidate constitute

reasonable, nondiscriminatory burdens. See Anderson, 460 U.S. at 788 (citing

Jenness v. Fortson, 403 U.S. 431 (1971), which examined the laws at issue here, as

an example where the state's important regulatory interests were sufficient to justify

reasonable, nondiscriminatory burdens imposed by the laws); see also Coffield v.

---

[6] Put another way, "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden—require a flexible analysis, weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it.'" Esshaki, 2020 WL 1910154, at *4 (citing Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016) (internal marks omitted)).

Handel, 599 F.3d 1276, 1277 (11th Cir. 2010) (upholding Georgia's 5% rule and noting that the state's pertinent laws had not changed materially since Jenness). As such, courts apply the rational basis test, which would be met in normal circumstances because the State has an important interest in ensuring that a candidate makes a "preliminary showing of substantial support in order to qualify for a place on the ballot." Anderson, 460 U.S. at 788 n. 9.

However, no one can debate that conditions throughout the state, country, and world are anything but normal. As briefly detailed above, in response to the spread and threat of COVID-19, Governor Kemp declared a public health state of emergency for Georgia (which is still ongoing), mandated social distancing, recommended mask wearing, and, at one point, issued shelter-in-place orders for all Georgians. Other measures to mitigate the spread of COVID-19 include the closing of schools, bars, and nightclubs as well as prohibiting non-essential gatherings of more than ten (10) people in any one location at any time. Because of the ongoing pandemic and the subsequent restrictions on social interactions, Plaintiffs could not, and in many ways still cannot, gather signatures in the same safe and reasonable manner as they could during more typical times. For example, where Plaintiffs may have once been able to visit locations, such as a mall, where large numbers of registered voters were likely gathered, the combined effect of the Governor's Orders and the pandemic virtually eliminated such possibilities.

Under these circumstances, and as applied to Plaintiffs, the signature constraints certainly place an increased burden on Plaintiffs' constitutional rights. Indeed, Defendant concedes that Georgia's petition requirements "may be more burdensome under the present circumstances." [Doc. 17 at 22]. Nevertheless, the Secretary argues that the increased burden is not severe, as Plaintiffs contend.

To support this position, the Secretary highlights several facts. First, it is undisputed that the petitioning period for these candidates opened nearly two (2) months prior to the onset of any of the Governor's Orders stemming from COVID-19. Second, while the entirety of the State of Georgia was under a shelter-in-place Order during the month of April, the Order was lifted for most Georgians by May. Third, the State of Georgia has been reopening in stages during the recent months. Fourth, the Secretary has already extended the petitioning period by thirty-one (31) days to ameliorate the increased burden he concedes the public health emergency has imposed on Plaintiffs. [See generally Doc. 17].

In response, Plaintiffs argue that many of these facts bear no consequence on the burden imposed on their constitutional rights. For example, Plaintiffs maintain that many Georgians, including Plaintiff Cowen, remain under a shelter-in-place order of unlimited duration. [Doc. 22 at 13]. Plaintiffs also contend that social distancing remains the law even as the state reopens, and voters may remain wary of

close physical contact for some time.  Thus, Plaintiffs argue that the burden remains severe.

Upon consideration of the Parties' arguments and circumstances as they exist in Georgia, the Court finds that the burden as applied here is not severe, but moderate.  "The hallmark of a severe burden is exclusion or virtual exclusion from the ballot."  Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016) (comparing Lubin, 415 U.S. at 719 (striking $701.60 filing fee for ballot-access petition because it excluded indigent candidates from running for office with no reasonable alternative means of access), and Rhodes, 393 U.S. at 24 (striking election laws that "made it virtually impossible" for independent parties to gain ballot access), with Jenness, 403 U.S. at 438 (upholding petition signature requirement of 5% of all registered Georgia voters and noting that such a requirement does not "freeze the political status quo")).  Here, Plaintiffs are not "virtually excluded from the ballot."  Plaintiffs had nearly two (2) months prior to the onset of the COVID-19 pandemic to collect signatures and are afforded the benefit of an extended deadline of thirty-one (31) days.  Moreover, while the combined effect of COVID-19 with the Governor's Orders certainly brought the state to a halt for a significant period of time, it is undisputed that the state is reopening in many ways.

"In the end, 'there is no hard-and-fast rule as to when a restriction on ballot

eligibility becomes an unconstitutional burden.'" Garbett v. Herbert, No. 2:20-CV-

245-RJS, 2020 WL 2064101, at *12 (D. Utah Apr. 29, 2020).

> Rather, the court must consider the "character and magnitude" of the
> injury in view of the statutory framework as a whole, the practical effect
> of the election laws, and the available avenues to the ballot. And
> because [Plaintiffs] bring[] an as-applied challenge, the court must
> consider [their] injury under the unique circumstances related to the
> COVID-19 pandemic.

Id.   In sum, after considering the hardships of the COVID-19 pandemic, the

Governor's responses thereto, Georgia's current ballot access laws, the Secretary's

responsive measures thus far, and recent conditions in Georgia, the Court finds that

the State's signature requirements pose a moderate burden on Plaintiffs.[7]

### b.   Identification and Evaluation of the State's Interest

The second and third steps in the Anderson-Burdick test require the Court to

"identify the interests advanced by the State as justifications for the burdens" and

"evaluate the legitimacy and strength of each asserted state interest and determine

the extent to which those interests necessitate the burdening of the plaintiffs' rights."

---

[7] Plaintiffs point to several cases where other courts, facing similar challenges, characterized the increased burden as severe. See, e.g., Garbett, 2020 WL 2064101, at *6–12; Esshaki, 2020 WL 1910154, at *6, aff'd in part and reversed in part, No. 20-136, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) ("The district court correctly determined that the [ballot-access restrictions] imposed a severe burden on the plaintiffs' ballot access, so strict scrutiny applied."). The Court need not distinguish these cases because requests for preliminary injunctions, by their very nature, necessitate a fact-intensive, individual analysis. See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 394 (2006) (requiring case-by-case assessment of preliminary injunction factors).

Bergland v. Harris, 767 F.2d 1551, 1553–54 (11th Cir. 1985).  Defendant identifies two (2) interests for Georgia's ballot access laws: (1) the State's interest in not burdening the general election ballot with frivolous candidacies (or stated differently, the State's interest in ensuring a candidate demonstrates significant support before appearing on the ballot); and (2) the State's generalized interest in the orderly administration of elections.   [Doc. 17 at 23].   Because the Court categorizes Plaintiffs' burden as moderate, the undersigned must weigh Plaintiffs' "burden . . . against the State's asserted interest and chosen means of pursuing it." Esshaki, 2020 WL 1910154, at *4.

The Supreme Court has recognized that states have "an important interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness, 403 U.S. at 442.  Additionally, in Storer v. Brown, the Supreme Court held that a state has a "compelling" interest in "the stability of its political system," which certainly speaks to the State's interest in the orderly administration of elections.  415 U.S. 724, 736 (1974).  To achieve these interests, the State has chosen to adhere to its ballot access laws with one amendment—an increase in the petitioning period of thirty-one (31) days.

During this present exigency, the Court finds that the State's interests do not comport with its chosen means of pursuing them. In other words, while the Court recognizes the important state interest of ensuring a candidate has a significant modicum of support before appearing on the ballot, and its interest in administering orderly elections, the Secretary's thirty-one-day accommodation does not go far enough to alleviate Plaintiffs' increased burden in light of the constraints presented by the COVID-19 pandemic. There is no doubt that Plaintiffs have been deprived of significant time and typical means of collecting signatures. Despite this, the Secretary only increased the deadline by thirty-one (31) days. The Secretary could have, for example, reduced the number of signatures required while satisfying the State's asserted interests. In short, while the Governor's responses to COVID-19 were undoubtedly necessary, the Secretary failed to institute sufficient complementary measures to account for the increased burden on Plaintiffs' constitutionally protected ballot access rights.

For these reasons, as applied to Plaintiffs during the 2020 election cycle, the Court concludes that the moderate burden on Plaintiffs is not justified by the State's asserted interests and its chosen means of preserving them. As such, Plaintiffs have shown a substantial likelihood of success on their § 1983 claim for Defendant's alleged violation of the First and Fourteenth Amendments of the United States

Constitution, satisfying the first of the preliminary injunction factors.  See KH

Outdoor, 458 F.3d at 1268.

### B.   Irreparable Injury

The Court turns next to its assessment of irreparable harm, the second element

of a preliminary injunction.  Id.  It is well-settled that the "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion).  Thus, when

a plaintiff alleges her First Amendment rights have been infringed, irreparable injury

is generally presumed.  See id.  Further, the Supreme Court has confirmed that the

possibility that being unjustifiably shut out from an election constitutes irreparable

injury.  See Brown v. Chote, 411 U.S. 452, 456, (1973) (affirming district court's

finding of irreparable injury where "appellee's opportunity to be a candidate would

have been foreclosed, absent some relief"); see also League of Women Voters v.

North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem

restrictions on fundamental voting rights irreparable injury" because "once the

election occurs, there can be no do-over and no redress.").

Accordingly, due to the rights at stake and the Court's determination

regarding Plaintiffs' likelihood of success on the merits, the undersigned finds that

Plaintiffs will suffer irreparable harm absent an injunction.  Thus, the Court finds

Plaintiffs demonstrate the second element necessary to obtain a preliminary injunction.

### C.    Balance of the Harms and Public Interest

The remaining two (2) factors of the four-part preliminary injunction test, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Usually, the Court would consider each factor in view of Plaintiffs' proposed relief. Here, however, acting in equity, the Court grants Plaintiffs a remedy narrower than the one they seek.[8] Specifically, for the reasons outlined below, the Court will order the Secretary, in addition to his self-imposed extension, to reduce the signature requirements by 30%.    The Court therefore reviews these remaining two (2) injunction factors in light of the specific relief to be granted.

The Court finds both factors to be satisfied.    First, the balance of the harms tips in favor of Plaintiffs.    Plaintiffs will be forever harmed if they are unconstitutionally forbidden from the ballot.    The Secretary, on the other hand, will not be harmed by a 30% reduction in the number of necessary signatures.    Not only does the reduction require little action on the part of the Secretary, but also, as

---

[8] "[A] court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." See Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)) (internal quotation marks omitted).

discussed above, it satisfies the State's interest of ensuring that the candidate has a significant modicum of support before appearing on the ballot.[9]

Second, the public will be served by this injunction. Voters have an interest in choosing the candidate of their choice and should not be unconstitutionally prevented from doing so. See Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (recognizing the public has a "strong interest in exercising the fundamental political right to vote"); Illinois State Bd. of Elections, 440 U.S. at 184 ("By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."). Additionally, "it is always in the public interest to prevent the violation of a party's constitutional rights." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc).

Accordingly, Plaintiffs have carried their burden as to each of the four (4) preliminary injunction factors. See KH Outdoor, 458 F.3d at 1283. Thus, the Court turns now to its remedy.[10]

---

[9] The Court also notes that Defendant does not oppose this reduction. [Doc. 17 at 28].

[10] Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). While Plaintiffs do mention the bond requirement, the Court, in its discretion, waives it. See BellSouth Telecoms., Inc. v. MCIMetro Access Transmission Serv., LLC, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all." (internal citation and punctuation omitted)).

### III.   Remedy

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (per curiam).  In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Id. (citation omitted).  Here, Plaintiffs request that the Court suspend, in totality, the signature requirements for this election.  However, the Court declines Plaintiffs' request and instead directs the Secretary to reduce the signature requirements for third-party candidates by 30%.

In crafting this remedy, the Court by no means discounts the challenges Plaintiffs have faced in their signature collection efforts amid the COVID-19 pandemic.  However, the Court must balance these difficulties with the need to honor the State's legitimate interest in ensuring that only candidates with a measurable modicum of public support will gain access to the 2020 general election ballot. See Jenness, 403 U.S. at 442.  Suspending the signature requirement entirely, without requiring candidates to otherwise demonstrate support, would wrongfully disregard the State's interest. See Munro v. Socialist Workers Party, 479 U.S. 189, 197 (1986) (noting that states need not provide automatic ballot access). Accordingly, the Court finds a 30% reduction in the signature collection

requirement, combined with the State's previous extension of the signature collection deadline, balances the interests of all Parties. The Court emphasizes that the equitable relief it provides is limited to the 2020 election in these extraordinary times, which is the sole subject of the case before us.[11]

## IV.   Conclusion

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Preliminary Injunction. [Doc. 11]. Specifically, the Court grants Plaintiffs' request for preliminary injunctive relief but declines to impose their invited remedy. The Court **ORDERS** the Secretary to reduce the relevant signature requirements by 30% for the 2020 general election.

**SO ORDERED**, this ___9th___ day of July, 2020.

_Eleanor L. Ross_
Eleanor L. Ross
United States District Judge
Northern District of Georgia

---

[11] Although not requested by Plaintiffs, the Court declines to further extend the petitioning deadline. For any election in which a federal office is at issue, federal law mandates that ballots must be transmitted to military and overseas voters no later than forty-five (45) days in advance of the election. See 52 U.S.C. § 20302(a)(8)(A). Defendant represents that the current deadline of August 14, 2020, is the furthest date it may set to ensure validation of signatures and transmission to military and overseas voters. [Doc. 17 at 9–10].