## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARTIN COWEN, ALLEN
BUCKLEY, AARON GILMER, JOHN
MONDS, and the LIBERTARIAN
PARTY OF GEORGIA, INC., a
Georgia nonprofit corporation,

      Plaintiffs,

v.

BRAD RAFFENSPERGER, Georgia
Secretary of State,

      Defendant.

\*
\*
\*
\*
\*  CASE NO.: 1:17cv04660-LMM
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

Defendant Brad Raffensperger submits the following Statement of Material

Facts for Which There is No Genuine Issue to be Tried in support of Defendant's

Second Motion for Summary Judgment, pursuant to LR 56.1(B)(1).

### I.    The Parties

1.

Defendant Brad Raffensperger is the Secretary of State of the State of Georgia

(the "Secretary"). Secretary Raffensperger has the statutory responsibility to enforce

Georgia's ballot access laws. ECF Docket No. ("Doc.") 14 ¶ 14.

2.

Plaintiff The Libertarian Party of Georgia is a nonprofit corporation and political organization, and is the Georgia affiliate of the national Libertarian Party. Doc. 14 ¶¶ 11-12.

3.

Plaintiff Martin Cowen is a prospective candidate for Georgia's Thirteenth Congressional District who wants to appear on the general election ballot as the nominee of the Libertarian Party of Georgia. Doc. 14 ¶ 7.

4.

Plaintiff Allen Buckley is a registered voter in Georgia's Thirteenth Congressional District. Doc. 14 ¶ 8.

5.

Plaintiff Aaron Gilmer is a prospective candidate for Georgia's Ninth Congressional District who wants to appear on the general election ballot as the nominee of the Libertarian Party of Georgia. Doc. 14 ¶ 9.

6.

Plaintiff John Monds is a registered voter in Georgia's Second Congressional District. Doc. 14 ¶ 10.

## II.   Georgia's Ballot Access Requirements

7.

Gaining ballot access in Georgia is obtained by showing meaningful support in the electorate. How much support, and from where, depends on the nature of the entity and the relevant locality. *See* O.C.G.A. § 21-2-2(25) (political parties defined by electoral support); O.C.G.A. § 21-2-130(1) (political parties obtain ballot access by nomination via primary election); O.C.G.A. § 21-2-2(23) (political bodies defined by electoral support); O.C.G.A. § 21-2-170(b) (political bodies obtain ballot access, depending on statewide/non-statewide office, via signature petitions showing support in the electorate); O.C.G.A. § 21-2-180 (political body candidates may nominate statewide candidates by convention depending on (1) signature petition or (2) prior election results).

8.

A "political party" is defined under Georgia law as a political organization whose nominee received at least 20% of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25).

9.

Based on that substantial showing of support, political parties may obtain ballot access by nominating a candidate via primary election. O.C.G.A. § 21-2-130(1).

10.

Currently, only the Republican and Democratic parties meet the definition of a political party. Doc. 14 at ¶ 30.

11.

A "political body" is any political organization that does not meet the definition of a "political party." O.C.G.A. § 21-2-2(23).

12.

Because political bodies are not political parties, their candidates do not have to win a majority of votes in a primary election or expend resources running a primary campaign to be nominated for the general election ballot. O.C.G.A. § 21-2-130(1); O.C.G.A. § 21-2-170(b); O.C.G.A. § 21-2-180.

13.

Rather, political body candidates may be nominated at their organization's convention, and included on the general election ballot by demonstrating voter support in other ways. O.C.G.A. § 21-2-180.

4

14.

For statewide offices, a political body can qualify to have its nominees appear on the general election ballot by submitting a qualifying petition signed by at least 1% of the total number of registered voters at the last general election; or (b) nominating a candidate for statewide office who received votes totaling at least 1% of the total number of registered voters at the last general election. O.C.G.A. §§ 21-2-170(b) and 21-2-180.

15.

For non-statewide offices, including Georgia's congressional districts, political body candidates may appear on the general election ballot if they submit a nominating petition signed by 5% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b).

16.

Candidates have 180 days (six months) to collect signatures, which are due by the second Tuesday in July, meaning aspiring candidates can gather signatures as early as mid-January. O.C.G.A. §§ 21-2-170(e) and 21-2-132(e). *See also* Second Harvey Declaration at ¶ 4, attached as **Exhibit 1**.

17.

Candidates are not required to wait until after they receive their party's nomination to begin gathering signatures. O.C.G.A. § 21-2-170(e).

18.

Any registered voter, including an inactive voter, may sign a petition. The only statutory restriction on signing is that no person may sign the same petition more than once. There is no limit on how many different petitions a voter may sign. O.C.G.A. § 21-2-170(c); Doc. 73-3 ¶ 6.

19.

A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d).

20.

Each sheet of the nomination petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. O.C.G.A. § 21-2-170(d).

21.

There is no charge for verifying petition signatures, and there is no limit to the number of signatures a candidate may submit with their petition. Doc. 73-3 ¶ 7, 10.

22.

There is no geographic distribution requirement for petition signatures. A petition for Congress may be signed by voters from one large county within the District. Doc. 73-3 ¶ 8.

23.

All prospective candidates, both party and non-party, must pay a notice of candidacy and qualifying fee. O.C.G.A. § 21-2-132(d).

24.

The qualifying fee for most partisan public offices, including U.S. Representative, is 3% of the annual salary of the office. However, the qualifying fee for candidates for the General Assembly is a flat $400. O.C.G.A. § 21-2-131.

25.

Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2).

26.

For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B).

27.

For political-body candidates, the Secretary of State retains 25% and sends 75% to the political body.  O.C.G.A. § 21-2-131(c)(4)(A).

28.

The current annual salary for U.S. Representatives is $174,000. As a result, the qualifying fee for each candidate for U.S. Representative in 2020 is $5,220. Doc. 14 ¶ 55.

29.

Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g).

30.

A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor the income to pay the filing fee, and it requires the candidate to submit a personal financial statement. O.C.G.A. § 21-2-132(h).

31.

Along with the pauper's affidavit, the candidate must submit a petition signed by ¼ of 1% of registered voters for a statewide election, or 1% of registered voters eligible to vote in the last election for all other offices. The petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. O.C.G.A. § 21-2-132(h)(1); *see also* Doc. 69-26 at 170:4-13.

32.

A signature on a nomination petition is valid if it matches the signature on file of a duly qualified and registered voter who is eligible to vote for the office to be filled. O.C.G.A. § 21-2-170(d).

33.

While the signature requirement is calculated using total number of "active voters," both "active" and "inactive" voters may sign petitions. Doc. 73-3 ¶ 5.

34.

When a candidate submits a nomination petition, the Secretary conducts an initial review to determine if the petition contains at least the minimum required number of signatures. If so, the Secretary sends a duplicate of the petition to county election officials to verify voters' identity and signature, along with a one-page letter

asking them to use certain codes on the petition when verifying signatures to indicate why a particular signature was deemed invalid. Ex. 1 ¶ 6; Doc. 14 ¶ 60.

35.

If there is more than one county involved, the Secretary of State's office then adds up the total number of signatures validated by the counties and makes a determination as to whether or not the petition contains a sufficient number of valid signatures for the candidate to qualify for the ballot. Doc. 69-26 at 32:11-33:16, 38:4-39:2; 69-44.

36.

The Secretary of State's office provides training to county election workers on signature verification, and that the requirements for signature verification are set out in O.C.G.A. § 21-2-170 and § 21-2-171. Doc. 69-26 at 36:4-19; 47:17-25; 52:2-9.

## III.    The Plaintiffs' Past Ballot Access Efforts

37.

In 1988, the Libertarian Party successfully petitioned, pursuant to O.C.G.A. § 21-2-180(1) to have their candidates for President, Vice President, and Public Service Commission Districts 1, 2, and 3 on the general election ballot. Doc. 73-3 ¶ 12. The Libertarian Party's 1988 petition would have required approximately 25,758

signatures. *Id.* Since then, the Libertarian Party has qualified to nominate candidates for statewide office under O.C.G.A. § 21-2-180. Doc. 14 at ¶ 128.

38.

No Libertarian Party candidate has met the petition requirements to qualify for the general election ballot for the U.S. House of Representatives in Georgia. Doc. 14 ¶ 13.

39.

Although the National Libertarian Party is organized in all fifty states, the Libertarian Party of Georgia's membership is relatively small. In 2016, the most recent year for which data is available, the Libertarian Party of Georgia had 5,861 Georgia residents as members, with 161 dues-paying members. Doc. 73-11 at 7.

40.

Annual membership dues for the Libertarian Party are approximately $30.00. Doc. 73-11 at 24.

41.

Although it takes only three members (who must volunteer to be officers) to start an affiliate branch of the Libertarian Party, the Libertarian Party of Georgia has only seven active affiliates in the state. Doc. 73-11 at 91-94.

42.

When Plaintiff Martin Cowen attempted to qualify for the ballot in 2018, even with the help of volunteer circulators, he gathered only 620 signatures over 40 days and did not qualify for the ballot. Doc. 69-8 ¶ 10. He still ran as a write-in candidate that year and received 93 votes. *Id.* ¶ 18.

43.

When Plaintiff Aaron Gilmer attempted to qualify for Georgia's Ninth Congressional District in 2018, even with the help of volunteer circulators, he gathered only 308 raw signatures over a 60 day period and did not qualify for the ballot. Doc. 69-11¶ 17.

44.

Plaintiff John Monds has run for statewide office in Georgia three times. In 2008, he ran as the Libertarian candidate for Public Service Commission District 1. He received 1,076,726 votes, or 33.4 % of the total vote. In 2010, he ran as the Libertarian candidate for Governor and received 103,194 votes, or 4%. In 2014, he ran as the Libertarian candidate for Public Service Commission District 1 a second time, and received 710,408 votes, or 31.7%. Despite his support at the state level, he has not attempted to qualify to run for the U.S. House of Representatives. Doc. 69-16 ¶¶ 4-10.

45.

In the 2018, the Libertarian candidate for Georgia's Secretary of State received 86,696 out of 3,883,594 votes cast, or 2.23%, in a three-way race. Doc. 73-3 ¶ 38.

## IV.   Other Declarants' Past Ballot Access Efforts

46.

When Hien Dai Nguyen attempted to qualify for Georgia's Fourth Congressional District in 2016, she collected approximately 25,000 raw signatures using both volunteers and paid circulators. When Nguyen submitted the petitions, only 528 of the signatures could be validated by the county elections boards. Ngyuen has not attempted to run again. Doc. 69-18 ¶¶ 6-10, 12.

47.

Jeff Anderson intended to run for Congress in 2010 as an independent in Georgia's Eleventh Congressional District. While Anderson claims to have made a "genuine effort" to gather enough signatures, his testimony reflects only that he solicited the help of 24 volunteers to knock on doors to gather signatures and "gathered somewhere between 11,000 and 12,000 raw signatures"—out of the required "approximately 21,000." Anderson has not attempted to run since. Doc. 69-4 ¶ 3, 6, 8-9, 15.

13

48.

Eugene Moon intended to run for Congress in 2010 in Georgia's Ninth Congressional District. While Moon claims to have made a "genuine effort to gather enough signatures" with a team of volunteers, he collected 13,000 signatures before abandoning his efforts. Moon eventually obtained ballot access because Nathan Deal resigned from the office to run for Governor, triggering a special election in which a signature petition was not required. Doc. 69-17 ¶ 4-8.

49.

Victor Armendariz intended to run for Congress in 2010 as an Independent in Georgia's Fourth Congressional District. While Armendariz claims he and volunteers "gathered quite a few signatures," his testimony does not explain how many signatures he gathered or how much time, effort, or money his campaign spent in that effort. Armendariz has not attempted to run since. Mr. Armendariz attempted to run as an independent candidate in the Fourth Congressional District in 2010. Doc. 69-5 ¶¶ 3-4, 7-8, 10.

50.

Faye Coffield intended to run for Congress in 2008 in Georgia's Fourth Congressional district. While Coffield claims she and a group of volunteers made a "genuine effort" to gather enough signatures, and spent "hundreds" of hours

gathering signatures, she gathered only approximately 2,000 of the required 15,000 signatures over two months. Doc. 69-7 ¶¶ 6-8.

51.

Jay Fisher was the Libertarian Party's nominee for Congress in Georgia's Sixth Congressional District in 2006. While Fisher claims he made a "genuine effort" to gather the approximately 19,000 required signatures, he assembled a team of just five volunteers (plus himself), and does not specify how many signatures he was able to gather. Fisher eventually "abandoned [his] effort to qualify for the ballot and did not submit the signatures [his] team had gathered." Doc. 69-10 ¶¶ 3, 5-6, 10.

52.

Ryan Graham ran as the Libertarian Candidate for the Public Service Commission, District 3, receiving 102,878 votes. Graham "would have run" for state representative, but did not attempt to gather any signatures—instead running for statewide office where ballot access was assured. Doc. 69-12 ¶ 6, 8.

53.

Graham also helped gather signatures for two libertarian candidates in 2018, but neither qualified for the ballot. Graham does not specify how many signatures either candidate was able to gather. Doc. 69-12 ¶¶ 10, 12-13.

15

54.

Cynthia McKinney considered running in 2012 as the Green Party's candidate for the Fourth Congressional District, but after determining she would not be able to raise the resources necessary to mount a successful ballot access campaign and election campaign she "withdrew from the race without ever having publicly announced [her] intention to enter it." Doc. 69-14 ¶ 13.

55.

Wayne Parker was the Libertarian Nominee for the Public Service Commission in Georgia's Fifth District in 2000, in which he received 135,888 votes. When Parker ran for Congress in Georgia's Eleventh Congressional District in 2002, the Libertarian Party raised $40,000 for his campaign to pay 35 professional petition circulators. According to Mr. Parker, this was the party's "most substantial effort to obtain ballot-access for U.S. Representative," before or after. Doc. 69-19 ¶¶ 3, 7, 10, 11.

56.

While Parker gathered over 20,000 raw signatures, after they were validated by county officials, he was "just shy" of the requirement (which had been reduced

that year because re-districting efforts shortened the time frame to gather signatures).

Doc. 69-19 ¶¶ 8, 13, 14.

57.

Luanne Taylor intended to run for Congress as an independent in Georgia's Sixth Congressional District, but when she inquired with the Secretary of State's office about the number of required signatures for that district in 2018, she immediately decided not to run and made no efforts to collect signatures. Doc. 69-22 ¶¶ 2-4.

## V.   2020 Ballot Access Efforts

58.

This year, due to the outbreak of COVID-19, the Secretary of State exercised his authority to extend the deadline to submit nomination petitions an additional 31 days, from July 14 to August 14, 2020. The number of valid petition signatures required was also reduced by 30% by federal court order. Ex. 1 ¶ 5.

59.

There were 3 independent candidates who submitted petitions bearing the requisite signatures for local races for the 2020 general election, even during the pandemic. Ex. 1 ¶ 8.

60.

Joe Reed, who qualified as an independent candidate for State House District 129, obtained 1,526 verified signatures out of the required 1,197. Ex. 1 ¶ 8.

61.

Andrew Bell, an independent candidate for State House District 85, submitted a petition with 2,220 raw signatures out of the required 1,255. Mr. Bell's petition is currently being verified by the county. Ex. 1 ¶ 8.

62.

Keith Higgins, an independent candidate for the Brunswick District Attorney, obtained 8,832 raw signatures out of the required 3,526. His petition is currently being verified by the county. Ex. 1 ¶ 8.

63.

Two candidates for Georgia's congressional districts filed a notice of candidacy and filing fee in March, but did not submit a nomination petition by the August 14 deadline. These include Jimmy Cooper, a Green Party candidate for the Eighth District, and Donald Keller, an independent candidate for the Twelfth District. Ex. 1 ¶ 9.

64.

Plaintiff Martin Cowen submitted a nomination petition on August 14, 2020, as the Libertarian Party's nominee for the Thirteenth Congressional District, after having filed a notice of candidacy and qualifying fee in March. Mr. Cowen's petition contained 6 out of the required 17,152 signatures, and he did not qualify for the general election ballot. Ex. 1 ¶ 7.

65.

Other than Cowen, who did not qualify, none of the named Plaintiffs submitted a nomination petition to qualify as a candidate for any of Georgia's congressional districts for the 2020 general election ballot. Ex. 1 ¶ 9.

Respectfully submitted, this 28th day of August, 2020.

CHRISTOPHER M. CARR
Attorney General                   112505
BRYAN K. WEBB                      743580
Deputy Attorney General
RUSSELL D. WILLARD                 760280
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
CHARLENE S. MCGOWAN 697316
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
Tel: 404-656-3389

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

*/s/Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel for Plaintiffs via electronic notification:

Bryan L. Sells
bryan@bryansellslaw.com

Dated: August 28, 2020.

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General