IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | **Plaintiffs' Response in Opposition to the Defendant's Motion for Summary Judgment** |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | |
| Defendant. | |

This is a constitutional challenge to Georgia's ballot-access restrictions on third-party candidates for U.S. Representative. Those restrictions are by far the most stringent in the nation, and no third-party candidate for U.S. Representative has appeared on the general-election ballot since they were first enacted in 1943. In addition to being virtually impossible to overcome, those restrictions also produce the incongruous result that nominees of the Libertarian Party, whose candidates for statewide offices have won the support of millions of Georgia voters over the last ten years, must gather far more signatures

to appear on the ballot in any one of Georgia's fourteen congressional districts than are required of Libertarian candidates for Governor, U.S. Senator, or even President.

The plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters, and together they claim that those restrictions violate the First and Fourteenth Amendments and the Equal Protection Clause of the United States Constitution. The defendant, Georgia Secretary of State Brad Raffensperger, moves for summary judgment for a second time. But because he is not entitled to judgment as a matter of law on any of the plaintiffs' claims, this Court should deny his motion in its entirety.

## Background

The plaintiffs included a lengthy statement of the facts in their brief in support of their second motion for summary judgment. (ECF 134-1, at 7-25.) That factual background is incorporated here by reference and will not be repeated. The plaintiffs do, however, wish to highlight several areas where they dispute facts asserted in the Secretary of State's brief.

First, the Secretary of State asserts as a matter of fact that "Georgia requires *fewer* petition signatures for local offices than for statewide offices." (ECF 135-1 at 22.) Not so. The plaintiffs addressed this issue of fact in their second summary-judgment brief. (ECF 134-1 at 31-33.) The Secretary's assertion ignores the fact that Libertarian candidates need not submit any signatures at all to qualify for statewide offices. (Ex. 27: First Admissions ¶ 6, ECF 69-30 at 1; Ex. 33: Answer ¶ 128, ECF 69-35 at 22.) It also overlooks the fact that the office of President of the United States, which requires only 7,500 signatures, is considered a statewide office for purposes of ballot access. (Ex. 31: Def's Resp. Pls.' 2d Interrogs., ECF 69-34 at 8; Ex. 33: Answer ¶¶ 42-43, ECF 69-36 at 6-7.) Georgia law therefore requires more signatures for any political-body candidate to qualify in any one of its 14 congressional districts than it requires for any political-body candidate to qualify for the office of President and, in the case of the Libertarian Party, for all statewide offices. That result offends the Constitution.

Second, the Secretary of State asserts that "there are many third-party and independent candidates who have achieved successes [in obtaining ballot access] both statewide and at the local level." (ECF 135-

1 at 21.) The Secretary further asserts that "several independent candidates were able to meet the petition requirement for local offices for the 2020 election even during a pandemic." (*Id.*) Both statements, however, are false.

As documented in the 2016 *Green Party* case, no independent or third-party candidate had satisfied the one-percent petition requirement for statewide offices since 2000. *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d. 1340, 1347 (N.D. Ga. 2016), *aff'd* 674 F. App'x 974 (11th Cir. 2017) (per curiam) And none have satisfied the 7,500-signature requirement since then. (Ex. 53: Presidential Candidates 2016-2020.)

There is also no evidence in this record of local[1] candidates meeting the five-percent petition requirement other than in 2020, when Judge Ross reduced the number of signatures required due to COVID-19. *See Cooper v. Raffensperger*, ___ F. Supp. 3d ____, 2020 WL 3892454 (N.D. Ga. July 9, 2020). And, although the Secretary claims that "several" such candidates qualified this year, only one candidate—out of

---

[1] Counsel for the Secretary of State has conceded that the Secretary's reference to "local" candidates is misleading. The evidence upon which the Secretary of State relies includes only state candidates, like candidates for the office of State Representative, that are not elected statewide. It does not include candidates for local offices, like County Commissioner. Counsel for the plaintiffs asked counsel for the Secretary of State to produce evidence regarding local offices, and the Secretary of State refused on the ground that he has does not have the information requested. (Ex. 57: McGowan-Sells Emails.)

eight candidates who had filed a notice of candidacy and paid the qualifying fee—actually succeeded in gathering enough verified signatures to exceed the five-percent threshold. (Ex. 56: Sept. 14 Email at 1-2.) That candidate was Keith Higgins, who is running for district attorney against one of the prosecutors accused of misconduct in the investigation of Ahmaud Arbery's murder, and Higgins still did not gather even one-third the number of signatures required of candidates for U.S. Representative. (*Id.*) A second candidate, Joe Reed, qualified for the ballot under the lowered threshold by submitting 1,269 verified signatures, but that number would not have been enough to qualify under normal circumstances. (*Id.*) A third candidate, Andrew Bell, submitted almost twice the number of raw signatures required, but he did not qualify for the ballot even under the lowered threshold because the Secretary of State verified fewer than 40 percent of them.

## Discussion

### I.   The Secretary of State is not entitled to judgment as a matter of law under the *Anderson* test.

The Secretary first argues that this Court should grant summary judgment in his favor on the plaintiffs' First and Fourteenth Amendment

claims because Georgia's ballot-access restrictions can withstand the lowest level of scrutiny under the three-step balancing test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985) (paraphrasing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). (ECF 135-1 at 12-21.) But there are several problems with the Secretary's argument.

First, the Secretary misstates the *Anderson* test. Not only does he make no mention of the three steps in his brief, but the Secretary also claims, without citing any authority, that this Court must "defer" to the State's asserted interests "unless Plaintiffs can show that the burdens imposed on them by Georgia's 5% petition requirement are 'severe.'" (ECF 135-1 at 2.) But that is not the law. The Eleventh Circuit has made quite clear that a State must meet its burden of proof under the second and third steps of the *Anderson* test even when the constitutional

6

burdens of a challenged election law are not severe. "Once a plaintiff has identified the interference with the exercise of her First Amendment rights, the burden is on the state to 'put forward' the 'precise interests … [that are] justifications for the burden imposed by its rule,'" and to "explain the relationship between these interests" and the challenged provisions. *Fulani v. Krivanek,* 973 F.2d 1539, 1544 (11th Cir. 1992) (quoting *Anderson,* 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland,* 767 F.2d at 1554.

In *Fulani,* for example, the Eleventh Circuit found that the burden imposed by the Florida law at issue "was not so severe as to 'operate to freeze the status quo' by completely preventing minor-party access to the ballot." 973 F.2d at 1544 (quoting *Jenness v. Fortson,* 403 U.S. 431, 438 (1971)). Describing the burden instead as merely "significant," the court nonetheless struck down the law because the state had "failed to justify" that less-than-severe burden. 973 F.2d at 1547; *see also id.* at 1546 ("The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the [law] here at issue."). The court afforded no deference to the state's asserted interests.

Similarly, in *New Alliance Party of Alabama v. Hand*, 933 F.2d 1568 (11th Cir. 1991), the Eleventh Circuit affirmed a decision that struck down an Alabama law making it "moderately difficult" but "not insurmountable" for third parties to access the ballot. *Id.* at 1575-76. As in *Fulani*, the court found that the state had failed to show that the less-than-severe burdens were necessary to advance the state's legitimate interests. *Id.* at 1576. Neither the district court nor the court of appeals afforded any deference to the state's asserted interests.

This misstatement of the *Anderson* test is a problem for the Secretary here because, as in *Fulani*, his brief merely recites "boilerplate interests" taken from other cases without explaining how those interests justify the laws at issue in this case.[2] *Fulani*, 973 F.2d at 1547. He has not explained, for example, why any of those boilerplate interests make it necessary for Georgia to have both the highest signature requirement in the country *and* the highest qualifying fee. He has not met his burden,

---

[2] The boilerplate nature of the asserted interests is particularly evident from the fact that the Secretary has never asserted some of them before now. Despite being asked about the state's interests in written discovery (Ex. 30: Def's Resp. Pls.' 1st Interrogs., ECF 69-33 at 3-9) and during a Rule 30(b)(6) deposition (Harvey dep., ECF 72-1 at 175-76), the Secretary never previously asserted "a generalized interest in the orderly administration of elections," for example. (ECF 135-1 at 17.) Although he offers no evidence to support that interest, asserting it at such a late date, after the close of discovery, has deprived the plaintiffs of the opportunity to test that assertion through discovery and evidence of their own.

as explained in *Bergland*, of introducing evidence to justify "both the interests the State asserts and the burdens the State imposes." 767 F. 2d 1554. His argument is totally evidence-free. And that is not enough to establish his entitlement to summary judgment under the *Anderson* test even at the lowest level of scrutiny.

A second problem with the Secretary's argument is that he relies exclusively on easily-distinguishable cases to support his assertion that the lowest level of scrutiny should apply here. (ECF 135 at 14-16.) The Eleventh Circuit made clear in this very case that context matters when it comes to the *Anderson* test, *Cowen v. Ga. Sec'y of State,* 960 F.3d 1339, 1342 (11th Cir. 2020), and yet the Secretary leans on the cases like a litmus test without a shred of context. For example, the Secretary observes that the Eleventh Circuit did not apply strict scrutiny in *Libertarian Party of Florida v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983), *Swanson v. Worley*, 490 F.3d 894, 903-04 (11th Cir. 2007), and *Stein v. Alabama Secretary of State*, 774 F.3d 689, 694-99 (11th Cir. 2014), but he ignores the fact that, unlike this case, all three of those cases came with a record of recent successes by independent or third-party candidates. *See Stein*, 774 F.3d at 693, 698 (observing that

candidates Stein and Johnson had appeared on the ballot in 2012); *Swanson*, 490 F.3d at 905 (observing that the Libertarian Party's successes in the 2000 and 2002 election cycles demonstrated the openness of Alabama's ballot-access scheme); *Libertarian Party*, 710 F.2d at 794 (tallying the number of independent and third-party candidates that had recently qualified for the ballot under the challenged provision). The Secretary makes no attempt to explain how the context of those cases is similar to, or different from, the record here.

The Secretary cites three out-of-circuit cases to the same effect. (ECF 135-1 at 15 n.3.) All of those cases arose in very different contexts and, unlike this case, had a record of recent success by independent or third-party candidates. *See Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1089 (9th Cir. 2019); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 22-23 (1st Cir. 2016); *Rainbow Coalition of Okla. v. Okla. St. Election Bd.*, 844 F.2d 740, 742 (10th Cir. 1988). The Secretary makes no attempt to explain how the record in those cases is relevant here.

The Secretary also relies on Judge Ross' recent decision granting a preliminary injunction in *Cooper*, which involved the application of Georgia's ballot-access laws during the current global pandemic.

Although Judge Ross found that the laws imposed only a "moderate" burden under the circumstances, she nonetheless found them likely to be unconstitutional as applied. 2020 WL 3892454 at *6, *8. But because Judge Ross did not have an extensive record at the preliminary-injunction stage and did not conduct the searching fact-intensive analysis that the Eleventh Circuit's *Cowen* decision requires, *Cooper* sheds no light on how to weigh the burden here.

The Secretary's reliance on these cases to measure the burden in this case is thus a problem because the record here is very different in ways that he fails to address. Indeed, the Secretary's analysis of the burden lacks any mention of the actual record in this case. As a result, he cannot establish as a matter of law that the Court should apply the lowest level of scrutiny under the *Anderson* test.

A third problem with the Secretary's argument is his continued reliance on *Jenness* as "controlling authority." (ECF 135-1 at 18.) The Eleventh Circuit's decision in this case establishes that *Jenness* is *not* controlling authority. If it were, the Secretary of State would have prevailed on appeal. The plaintiffs have addressed *Jenness* at length in their second summary-judgment brief, and they incorporate that

discussion here. (ECF 134-1 at 41-48.) But the Secretary's brief offers
two new arguments about *Jenness*.

First, the Secretary argues in a footnote that when the Supreme
Court concluded in *Jenness* that the Georgia laws at issue did not
"operate to freeze the political status quo," 403 U.S. at 438, it was doing
so without regard to independent candidates' record of recent success in
obtaining ballot access under the challenged provisions. (ECF 135-1 at
19 n.4.) Rather, according to the Secretary, the Court was only "looking
at whether Georgia's scheme allowed for the *possibility* that a third-
party candidate could get on the ballot." (*Id.*)

This reading of *Jenness* is not persuasive. The word "operate"
denotes a focus on the how Georgia's laws function in the real world. The
text of the opinion also indicates that the Court relied on the recent
candidate successes to show that "[t]he open quality of the Georgia
system is far from merely theoretical." 403 U.S. at 439. The structure of
the opinion also undermines the Secretary's argument: the Court's
conclusion that "Georgia in no way freezes the status quo" comes in the
sentence that immediately follows the Court's discussion of recent
candidate successes. *Id*. And subsequent decisions of the Supreme Court

and the Eleventh Circuit have recognized the centrality of the real-world impact of Georgia's laws to the outcome in *Jenness*. *See, e.g., Burdick*, 504 U.S. at 435 n.4 (1992) (observing that *Jenness* found Georgia's system to be constitutional "because it did not operate to freeze the political status quo"); *American Party*, 415 U.S. at 783; *id.* at 787; *New Alliance Party*, 933 F.2d at 1572-73. *Jenness* thus does not support the Secretary's suggestion that this Court can apply the *Anderson* test without regard to the real-world impact of Georgia's scheme over the last 77 years.

The Secretary's second new argument is that *Jenness* controls because of recent successes by independent and third-party candidates in obtaining ballot access at the statewide and local levels. (ECF 135-1 at 18-21.) He argues that these successes demonstrate, as in *Jenness*, that Georgia's ballot-access scheme for independent and third-party candidates for U.S. Representative does not operate to freeze the status quo despite the total absence of such candidates from Georgia's ballots over the last three-quarters of a century.

Even if there were evidence in the record to support the Secretary's assertion that "many" independent and third-party candidates have

obtained ballot access at the statewide and local levels (ECF 135-1 at 21), that evidence would be of little or no probative value here. Statewide candidates for offices other than President have a much lower signature requirement, in percentage terms, than candidates for U.S. Representative, and they can gather signatures without regard to whether a potential signer is registered to vote in any particular district—which can be difficult to determine in many areas because of boundary-line meanderings. Statewide candidates for President need only gather 7,500 signatures, approximately one-third the number of signatures required of a candidate for U.S. Representative in the average congressional district. Recent success of candidates in satisfying those different and lower requirements would say little about the difficulty of meeting the more stringent requirements for U.S. Representative.

But there are no such successes. As discussed above, the district court in the 2016 *Green Party* case found that no independent or third-party candidates for statewide offices had recently qualified for office under the one-percent petition requirement, 171 F. Supp. 3d at 1347, and none have satisfied the one-percent petition requirement since then. No Presidential candidate has even satisfied the 7,500-signature

requirement that the court ordered as the remedy in that case. As support for his assertion, the Secretary points to Libertarian candidates for statewide offices who have appeared on the ballot in recent years, but, as this Court well knows, those candidates did not have to submit any signatures. Georgia's actual record on statewide candidates shows anything but openness.

The same is true for local candidates. While most candidates for local offices have to meet a five-percent signature threshold, the actual number of signatures involved can be quite small. Because Georgia's House of Representatives has 180 members, for example, the number of signatures required of independent and third-party candidates for State Representative in the average district is less than one-tenth the number required of candidates for U.S. Representative. Recent success of candidates in gathering a small number of signatures would therefore say little about the difficulty of gathering the much larger number of signatures required for U.S. Representative—a number that is higher than any independent or third-party candidate for U.S. Representative has ever gathered in the history of the United States.

But, again, there are no such successes. Only one of eight candidates for non-statewide state offices satisfied the five-percent threshold this year, and his campaign for district attorney against one of the prosecutors accused of misconduct in the investigation of Ahmaud Arbery's murder received widespread media attention.[3] The Secretary's evidence from 2020 thus shows that ballot-access in these races is exceedingly rare and may only be possible if a candidate receives an unusual amount of media attention.

While the record contains scant evidence of success for independent and third-party candidates for statewide and non-statewide state offices, there is plenty of unrebutted evidence that, since 2002 alone, at least 20 independent and third-party candidates for U.S. Representative "have unsuccessfully attempted to access the ballot." (ECF 113 at 6.) This evidence is more probative of the actual operation of Georgia's ballot-access scheme for independent and third-party candidates for U.S. Representative than anything else, and it is one of several factors that distinguish this case from *Jenness*. (ECF 134-1 at 43-

---

[3] *See, e.g.,* Jim Galloway, Greg Bluestein, and Tia Mitchell, *The Jolt: A Trio of District Attorney Contests that are Worth Your Attention*, Atlanta Journal-Constitution, May 19, 2020, *available at* *https://www.ajc.com/blog/politics/the-jolt-trio-district-attorney-contests-that-are-worth-your-attention/PeEmSzsJKVm7zZoKnWHxcM/*.

44.) The Secretary discounts this evidence entirely by asserting that none of the more-than 20 unsuccessful candidates were reasonably diligent in their efforts, but this assertion does not square with the record or even with the Secretary's own admissions. (*See, e.g.,* ECF 97 at 37, 40, 41, 42, 47 ¶¶ 97, 101, 102, 104, 111.)

This Court should therefore reject the Secretary's renewed invitation to find that *Jenness* controls.

*     *     *

In sum, the Secretary of State has failed to establish that he is entitled to summary judgment on the plaintiffs' First and Fourteenth Amendment claim. The evidence and cases on which he relies do not establish that the Court should apply only the lowest level of scrutiny under the *Anderson* test. And even if they did, the Secretary has still failed to meet his burden under steps two and three of the *Anderson* test to show why the asserted state interests make it necessary to harm the plaintiffs' rights.

## II. The Secretary of State cannot distinguish *Norman* and *Socialist Workers*.

The Secretary next argues that this case is distinguishable from *Norman v. Reed*, 502 U.S. 279 (1992), and *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). (ECF 135-1 at 21-23.) The Secretary does not argue that he is therefore entitled to summary judgment on any of the plaintiffs' claims, but his distinctions fail nonetheless.

The Secretary first tries to distinguish *Norman* and *Socialist Workers* by asserting that, unlike the Illinois laws at issue in those cases, "Georgia requires *fewer* petition signatures for local offices than for statewide offices." (ECF 135-1 at 22.) As discussed above, this assertion is not true as a matter of undisputed fact. Georgia requires Libertarian candidates for U.S. Representative to submit more signatures than Libertarian candidates for all statewide offices, and it requires independent and third-party candidates (other than Libertarian candidates) to submit more signatures for U.S. Representative than for presidential elector, which is also a statewide office. Both results violate the constitution for the reasons explained in *Norman* and *Socialist Workers*.

18

In a footnote, the Secretary compares the number of signatures required of independent and third-party candidates (other than Libertarian candidates) to run for statewide offices *other than presidential elector*—which is approximately 51,000—to the number required of independent and third-party candidates for U.S. Representative—which ranges from about 19,000 to 25,000. (ECF 135-1 at 22-23 n.6.) But this is the wrong comparison.

Because this case involves Libertarian candidates, the most appropriate comparison is between the number of signatures required for Libertarian candidates for statewide offices—zero—and the number of signatures required for Libertarian candidates for U.S. Representative— 19,000 to 25,000. It is thus clear that Georgia law requires fewer signatures for statewide offices than for a congressional district for Libertarian candidates—a result prohibited by *Norman* and *Socialist Workers*.

Georgia law also offends the constitution if one compares the signatures required of non-Libertarian third-party candidates. Green Party candidates for presidential elector must gather 7,500 signatures while Green Party candidates for U.S. Representative must gather

between 19,000 and 25,000. That result is also prohibited. As the Supreme Court explained in *Norman*, Georgia could constitutionally require Green Party candidates for U.S. Representative to gather some number of signatures in each congressional district as long as the total number required does not exceed the number required for statewide office—which, in this case, is 7,500 signatures. 502 U.S. at 293-94.

The Secretary also argues that the Supreme Court in *Norman* already rejected the argument advanced by the plaintiffs here. (ECF 135-1 at 23.) But this is a misreading of *Norman* and of the plaintiffs' argument.

The Secretary correctly observes that the Supreme Court in *Norman* rejected one of the arguments made by the plaintiffs in that case. Specifically, the Court rejected the third-party's argument that its success in gathering more than the required 25,000 signatures in one of Cook County's two districts should qualify the party for ballot access in the other district, where the party had gathered only 7,800 signatures 502 U.S. at 295; *see also id.* at 282-87. While the Court held that the total number of signatures required for the two districts in Cook County (50,000) was unconstitutional because it exceeded the number required

for statewide offices (25,000), it rejected the party's suggestion that the number of signatures gathered in one district, which exceeded 25,000, should have qualified the party for the ballot in the other district as well. *Id.* at 295.

That is not what the plaintiffs are arguing here. The plaintiffs do not argue that the Libertarian party's success in qualifying to run candidates in one political subdivision should qualify the party to run candidates in another political subdivision. The do not even argue, as the Secretary suggests, that the Libertarian Party's success in qualifying to run statewide candidates should necessarily qualify them to run candidates in a political subdivision. Rather, they are arguing that the state may not require of them more signatures to run for office in a political subdivision than it requires for them to run for statewide offices. That is what Georgia law does, and that is precisely what *Norman* and *Socialist Workers* forbid.

### III. The Secretary of State is not entitled to summary judgment on the plaintiffs' Equal Protection claim.

Finally, the Secretary of State argues that the plaintiffs' Equal Protection claim should fail as a matter of law because it "is not one that

has ever been recognized by law." (ECF 135-1 at 24.) The Secretary's brief, however, fails to address the principal case on which the plaintiffs rely, *Socialist Workers*, in which the Supreme Court recognized that a state's election law violates the Equal Protection Clause when, without sufficient justification, it creates a classification that impinges upon the right to vote. 440 U.S. at 183. The Secretary also fails to reckon with the Eleventh Circuit's decision in this case, which rejected his argument that "the Libertarian Party's novel equal protection argument has no basis in law." Appellee's Br. 16, *Cowen v. Ga. Sec'y of State*, No. 19-14065 (11th Cir. Dec. 13, 2019).

The Secretary also argues that Georgia law does not discriminate at all, asserting without discussion that the plaintiffs have failed to show "that Libertarian congressional candidates … are subjected to a greater burden than statewide candidates." (ECF 135-1 at 24.) But this is plainly not true. Libertarian candidates for statewide office do not have to submit any signatures, while Libertarian candidates for U.S. Representative do, and the record is chock-full of evidence that gathering the required number of signatures is a heavy burden.

Lastly, the Secretary suggests that the classification at issue here is justified by the State's interest in ensuring that Libertarian candidates have a significant modicum of support in their district. (ECF 135-1 at 25.) The plaintiffs have addressed this asserted justification, which the Supreme Court has expressly rejected, in other briefing, and they incorporate that discussion here. (ECF 134-1 at 48-49.) Despite now having had several attempts to justify the classification at issue, the Secretary has yet to explain how it serves the state's interests to require Libertarian candidates for U.S. Representative to gather tens of thousands of signatures when it allows Libertarian candidates for statewide office to appear on Georgia's ballots simply by virtue of their nomination by the Libertarian Party.

Because he has not justified a frankly absurd classification, the Secretary is not entitled to summary judgment on the plaintiffs' Equal Protection Claim.

## Conclusion

This Court should deny the defendant's motion for summary judgment because he has failed to establish that he is entitled to judgment as a matter of law on any of the plaintiffs' claims.

Respectfully submitted this 25th day of September, 2020.

**/s/ Bryan L. Sells**

Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2020, I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Charlene McGowan: cmcgowan@law.ga.gov

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

25

## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT was prepared in 13-point Century Schoolbook in compliance with Local Rules 5.1(C) and 7.1(D).


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com