# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | **Plaintiffs' Response to the Defendant's Statement of Material Facts** |
| Defendant. | |

Pursuant to Local Rule 56.1(B)(2), the plaintiffs respectfully submit this response to the defendant's statement of material facts. (ECF 135-3.)

1.      Defendant Brad Raffensperger is the Secretary of State of the State of Georgia (the "Secretary"). Secretary Raffensperger has the statutory responsibility to enforce Georgia's ballot access laws. ECF Docket No. ("Doc.") 14 ¶ 14.

**Response:** Admitted.

2.      Plaintiff The Libertarian Party of Georgia is a nonprofit corporation and political organization, and is the Georgia affiliate of the national Libertarian Party. Doc. 14 ¶¶ 11-12.

**Response:** Admitted.

3.      Plaintiff Martin Cowen is a prospective candidate for Georgia's Thirteenth Congressional District who wants to appear on the general election ballot as the nominee of the Libertarian Party of Georgia. Doc. 14 ¶ 7.

**Response:** Admitted.

4.      Plaintiff Allen Buckley is a registered voter in Georgia's Thirteenth Congressional District. Doc. 14 ¶ 8.

**Response:** Admitted.

5.      Plaintiff Aaron Gilmer is a prospective candidate for Georgia's Ninth Congressional District who wants to appear on the general election ballot as the nominee of the Libertarian Party of Georgia. Doc. 14 ¶ 9.

**Response:** Admitted.

6.     Plaintiff John Monds is a registered voter in Georgia's Second Congressional District. Doc. 14 ¶ 10.

**Response:** Admitted.

7.     Gaining ballot access in Georgia is obtained by showing meaningful support in the electorate. How much support, and from where, depends on the nature of the entity and the relevant locality. See O.C.G.A. § 21-2-2(25) (political parties defined by electoral support); O.C.G.A. § 21-2-130(1) (political parties obtain ballot access by nomination via primary election); O.C.G.A. § 21-2-2(23) (political bodies defined by electoral support); O.C.G.A. § 21-2-170(b) (political bodies obtain ballot access, depending on statewide/non-statewide office, via signature petitions showing support in the electorate); O.C.G.A. § 21-2-180 (political body candidates may nominate statewide candidates by convention depending on (1) signature petition or (2) prior election results).

> **Response:** Disputed. The first sentence does not comply with Local
>
> Rule 56.1(B)(1)(a) in that it lacks any citation to evidence and
>
> mischaracterizes Georgia law. The second sentence mischaracterizes
>
> the cited provisions of Georgia law, which do not make ballot access
>
> dependent on "support."

8.      A "political party" is defined under Georgia law as a political organization whose nominee received at least 20% of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25).

**Response:** Admitted.

9.      Based on that substantial showing of support, political parties may obtain ballot access by nominating a candidate via primary election. O.C.G.A. § 21-2-130(1).

> **Response:** Disputed. This statement mischaracterizes Georgia law, which does not make ballot access dependent on "substantial support" or even "support."

10.      Currently, only the Republican and Democratic parties meet the definition of a political party. Doc. 14 at ¶ 30.

**Response:** Admitted.

11.      A "political body" is any political organization that does not meet the definition of a "political party." O.C.G.A. § 21-2-2(23).

**Response:** Admitted.

12.      Because political bodies are not political parties, their candidates do not have to win a majority of votes in a primary election or expend resources running a primary campaign to be nominated for the general election ballot. O.C.G.A. § 21-2-130(1); O.C.G.A. § 21-2-170(b); O.C.G.A. § 21-2-180.

**Response:** Disputed. The statement is not supported by the cited provisions of Georgia law. In incorrectly suggests that candidates seeking the nomination of a political body do not spend resources to obtain their party's nomination. And it incorrectly suggests that candidates seeking the nomination of a political party must always win a majority of votes in a primary election (since 2010, more than 40 percent of political-party candidates for U.S. Representative in Georgia have had no opposition in their party's primary) and must spend resources to obtain that nomination (many candidates spend little or no money to obtain a party's nomination). (Ex. 54: Primary Election Results 2010-2020; ECF 96-4 at 1; ECF 106-1 at 2-5.)

13.    Rather, political body candidates may be nominated at their organization's convention, and included on the general election ballot by demonstrating voter support in other ways. O.C.G.A. § 21-2-180.

**Response:** Disputed. This statement mischaracterizes Georgia law, which does not make ballot access dependent on "support."

14.    For statewide offices, a political body can qualify to have its nominees appear on the general election ballot by submitting a qualifying petition signed by at least 1% of the total number of registered voters at the last general election; or (b) nominating a candidate for statewide office who

5

received votes totaling at least 1% of the total number of registered voters at the last general election. O.C.G.A. §§ 21-2-170(b) and 21-2-180.

**Response:** Admitted.

15. For non-statewide offices, including Georgia's congressional districts, political body candidates may appear on the general election ballot if they submit a nominating petition signed by 5% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b).

> **Response:** Disputed. The statement is an incomplete description of the ballot-access requirements for political-body candidates for non-statewide office in that it omits the requirement of filing a notice of candidacy and paying a qualifying fee. O.C.G.A. § 21-2-132(d). (Answer ¶ 37, ECF 14 at 6.)

16. Candidates have 180 days (six months) to collect signatures, which are due by the second Tuesday in July, meaning aspiring candidates can gather signatures as early as mid-January. O.C.G.A. §§ 21-2-170(e) and 21-2-132(e). See also Second Harvey Declaration at ¶ 4, attached as Exhibit 1.

> **Response:** Admitted.

17. Candidates are not required to wait until after they receive their party's nomination to begin gathering signatures. O.C.G.A. § 21-2-170(e).

**Response:** Disputed. The petition form requires the candidate to describe himself or herself as the nominee of a specified political body. (Ex. 52: Political-Body Nomination Petition at 1.) It would be a felony for a candidate to circulate a nomination petition that falsely describes him or her as the nominee. O.C.G.A. § 21-2-565(a). If the candidate were to leave that part of the petition blank until he or she obtains the nomination, he or she would also be guilty of a felony. O.C.G.A. § 21-2-563(6).

18.     Any registered voter, including an inactive voter, may sign a petition. The only statutory restriction on signing is that no person may sign the same petition more than once. There is no limit on how many different petitions a voter may sign. O.C.G.A. § 21-2-170(c); Doc. 73-3 ¶ 6.

**Response:** Disputed. The second sentence is not supported by the cited evidence or the cited provision of Georgia law. There is an additional restriction on signers in O.C.G.A. § 21-2-170(d).

19.     A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d).

**Response:** Admitted.

20.     Each sheet of the nomination petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that

each signature on the sheet was gathered within 180 days of the filing

deadline. O.C.G.A. § 21-2-170(d).

   **Response:** Admitted.

   21.    There is no charge for verifying petition signatures, and there is

no limit to the number of signatures a candidate may submit with their

petition. Doc. 73-3 ¶ 7, 10.

   **Response:** Admitted.

   22.    There is no geographic distribution requirement for petition

signatures. A petition for Congress may be signed by voters from one large

county within the District. Doc. 73-3 ¶ 8.

   **Response:** Admitted.

   23.    All prospective candidates, both party and non-party, must pay a

notice of candidacy and qualifying fee. O.C.G.A. § 21-2-132(d).

   **Response:** Disputed as written. A notice of candidacy must be filed

   and a qualifying fee must be paid.

   24.    The qualifying fee for most partisan public offices, including U.S.

Representative, is 3% of the annual salary of the office. However, the

qualifying fee for candidates for the General Assembly is a flat $400.

O.C.G.A. § 21-2-131.

   **Response:** Admitted.

25.     Qualifying fees for independent and political-body candidates for U.S. Representative are paid to the Secretary of State. O.C.G.A. § 21-2-131(b)(2).

**Response:** Admitted.

26.     For independent candidates, the Secretary of State retains the entire fee. O.C.G.A. § 21-2-131(c)(4)(B).

**Response:** Admitted.

27.     For political-body candidates, the Secretary of State retains 25% and sends 75% to the political body. O.C.G.A. § 21-2-131(c)(4)(A).

**Response:** Disputed. The record shows that the Secretary of State retains the entire fee paid by political-body candidates for months and sends it to the political body in mid-April of the year following the election. (Ex. 9: Graham decl. ¶¶ 15-16, ECF 69-12 at 4.)

28.     The current annual salary for U.S. Representatives is $174,000. As a result, the qualifying fee for each candidate for U.S. Representative in 2020 is $5,220. Doc. 14 ¶ 55.

**Response:** Admitted.

29.     Georgia law permits candidates to file a pauper's affidavit in lieu of paying an applicable qualifying fee. O.C.G.A. § 21-2-132(g).

**Response:** Admitted.

30.    A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor the income to pay the filing fee, and it requires the candidate to submit a personal financial statement. O.C.G.A. § 21-2-132(h).

**Response:** Admitted.

31.    Along with the pauper's affidavit, the candidate must submit a petition signed by ¼ of 1% of registered voters for a statewide election, or 1% of registered voters eligible to vote in the last election for all other offices. The petition must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. O.C.G.A. § 21-2-132(h)(1); see also Doc. 69-26 at 170:4-13.

**Response:** Admitted.

32.    A signature on a nomination petition is valid if it matches the signature on file of a duly qualified and registered voter who is eligible to vote for the office to be filled. O.C.G.A. § 21-2-170(d).

**Response:** Admitted.

33.    While the signature requirement is calculated using total number of "active voters," both "active" and "inactive" voters may sign petitions. Doc. 73-3 ¶ 5.

**Response:** Admitted.

34.     When a candidate submits a nomination petition, the Secretary
conducts an initial review to determine if the petition contains at least the
minimum required number of signatures. If so, the Secretary sends a
duplicate of the petition to county election officials to verify voters' identity
and signature, along with a one-page letter asking them to use certain codes
on the petition when verifying signatures to indicate why a particular
signature was deemed invalid. Ex. 1 ¶ 6; Doc. 14 ¶ 60.

**Response:** Admitted.

35.     If there is more than one county involved, the Secretary of State's
office then adds up the total number of signatures validated by the counties
and makes a determination as to whether or not the petition contains a
sufficient number of valid signatures for the candidate to qualify for the
ballot. Doc. 69-26 at 32:11-33:16, 38:4-39:2; 69-44.

**Response:** Admitted.

36.     The Secretary of State's office provides training to county election
workers on signature verification, and that the requirements for signature
verification are set out in O.C.G.A. § 21-2-170 and § 21-2-171. Doc. 69-26 at
36:4-19; 47:17-25; 52:2-9.

**Response:** Disputed. The Secretary of State's office provides no
instructions other than the one-page letter when transmitting petitions
to county election officials, and it provides no guidance on what

11

constitutes a valid signature unless county election officials affirmatively ask for specific guidance. (Ex. 23: Harvey dep., ECF 69-26 at 36:4-19, 47:12-49:1.) The Secretary of State's office does nothing to ensure that the workers who verify petitions in the county election offices have undertaken any form of training. (Ex. 23: Harvey dep., ECF 69-26 at 52:11-16.) The Secretary of State's office provides no training on handwriting analysis. (Ex. 23: Harvey dep., ECF 69-26 at 60:22-61:9.)

37.    In 1988, the Libertarian Party successfully petitioned, pursuant to O.C.G.A. § 21-2-180(1) to have their candidates for President, Vice President, and Public Service Commission Districts 1, 2, and 3 on the general election ballot. Doc. 73-3 ¶ 12. The Libertarian Party's 1988 petition would have required approximately 25,758 signatures. Id. Since then, the Libertarian Party has qualified to nominate candidates for statewide office under O.C.G.A. § 21-2-180. Doc. 14 at ¶ 128.

**Response:** Admitted.

38.    No Libertarian Party candidate has met the petition requirements to qualify for the general election ballot for the U.S. House of Representatives in Georgia. Doc. 14 ¶ 13.

**Response:** Admitted.

39.     Although the National Libertarian Party is organized in all fifty states, the Libertarian Party of Georgia's membership is relatively small. In 2016, the most recent year for which data is available, the Libertarian Party of Georgia had 5,861 Georgia residents as members, with 161 dues-paying members. Doc. 73-11 at 7.

> **Response:** Disputed. This statement is not supported by the cited evidence. The Libertarian Party of Georgia has more dues-paying members than the Democratic Party of Georgia and the Georgia Republican Party combined. Plus, membership data more recent than those cited are available. (Ex. 55: Graham 2d decl. ¶¶ 6-12.) Finally, this alleged fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

40.     Annual membership dues for the Libertarian Party are approximately $30.00. Doc. 73-11 at 24.

> **Response:** This fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of dues-paying members in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

13

41.     Although it takes only three members (who must volunteer to be officers) to start an affiliate branch of the Libertarian Party, the Libertarian Party of Georgia has only seven active affiliates in the state. Doc. 73-11 at 91-94.

> **Response:** Disputed. The Libertarian Party of Georgia has 17 affiliates covering 55 of Georgia's 159 counties. (Ex. 55: Graham 2d decl. ¶ 5.) In addition, this fact is not material to the claims or defenses in this case because Georgia law does not require any minimum number of affiliate branches in order for the Libertarian Party's candidates for U.S. Representative to appear on the ballot.

42.     When Plaintiff Martin Cowen attempted to qualify for the ballot in 2018, even with the help of volunteer circulators, he gathered only 620 signatures over 40 days and did not qualify for the ballot. Doc. 69-8 ¶ 10. He still ran as a write-in candidate that year and received 93 votes. Id. ¶ 18.

> **Response:** Disputed. The statement is not supported by the cited evidence.

43.     When Plaintiff Aaron Gilmer attempted to qualify for Georgia's Ninth Congressional District in 2018, even with the help of volunteer circulators, he gathered only 308 raw signatures over a 60 day period and did not qualify for the ballot. Doc. 69-11¶ 17.

**Response:** Disputed. The statement is not supported by the cited evidence.

44.    Plaintiff John Monds has run for statewide office in Georgia three times. In 2008, he ran as the Libertarian candidate for Public Service Commission District 1. He received 1,076,726 votes, or 33.4 % of the total vote. In 2010, he ran as the Libertarian candidate for Governor and received 103,194 votes, or 4%. In 2014, he ran as the Libertarian candidate for Public Service Commission District 1 a second time, and received 710,408 votes, or 31.7%. Despite his support at the state level, he has not attempted to qualify to run for the U.S. House of Representatives. Doc. 69- 16 ¶¶ 4-10.

**Response:** Admitted.

45.    In the 2018, the Libertarian candidate for Georgia's Secretary of State received 86,696 out of 3,883,594 votes cast, or 2.23%, in a three-way race. Doc. 73- 3 ¶ 38.

**Response:** Admitted.

46.    When Hien Dai Nguyen attempted to qualify for Georgia's Fourth Congressional District in 2016, she collected approximately 25,000 raw signatures using both volunteers and paid circulators. When Nguyen submitted the petitions, only 528 of the signatures could be validated by the county elections boards. Ngyuen has not attempted to run again. Doc. 69-18 ¶¶ 6-10, 12.

**Response:** Admitted.

47.    Jeff Anderson intended to run for Congress in 2010 as an independent in Georgia's Eleventh Congressional District. While Anderson claims to have made a "genuine effort" to gather enough signatures, his testimony reflects only that he solicited the help of 24 volunteers to knock on doors to gather signatures and "gathered somewhere between 11,000 and 12,000 raw signatures"—out of the required "approximately 21,000." Anderson has not attempted to run since. Doc. 69- 4 ¶ 3, 6, 8-9, 15.

**Response:** Disputed. The statement is not supported by the cited evidence.

48.    Eugene Moon intended to run for Congress in 2010 in Georgia's Ninth Congressional District. While Moon claims to have made a "genuine effort to gather enough signatures" with a team of volunteers, he collected 13,000 signatures before abandoning his efforts. Moon eventually obtained ballot access because Nathan Deal resigned from the office to run for Governor, triggering a special election in which a signature petition was not required. Doc. 69-17 ¶ 4-8.

**Response:** Disputed. The statement is not supported by the cited evidence.

49.    Victor Armendariz intended to run for Congress in 2010 as an Independent in Georgia's Fourth Congressional District. While Armendariz

claims he and volunteers "gathered quite a few signatures," his testimony does not explain how many signatures he gathered or how much time, effort, or money his campaign spent in that effort. Armendariz has not attempted to run since. Mr. Armendariz attempted to run as an independent candidate in the Fourth Congressional District in 2010. Doc. 69-5 ¶¶ 3-4, 7-8, 10.

>   **Response:** Disputed. The statement is not supported by the cited
>   evidence. And Mr. Armendariz has attempted to run for office since
>   2010. (Ex. 2: Armendariz decl. ¶ 3, ECF 69-5 at 1.)

50.     Faye Coffield intended to run for Congress in 2008 in Georgia's Fourth Congressional district. While Coffield claims she and a group of volunteers made a "genuine effort" to gather enough signatures, and spent "hundreds" of hours gathering signatures, she gathered only approximately 2,000 of the required 15,000 signatures over two months. Doc. 69-7 ¶¶ 6-8.

>   **Response:** Disputed. The statement is not supported by the cited
>   evidence.

51.     Jay Fisher was the Libertarian Party's nominee for Congress in Georgia's Sixth Congressional District in 2006. While Fisher claims he made a "genuine effort" to gather the approximately 19,000 required signatures, he assembled a team of just five volunteers (plus himself), and does not specify how many signatures he was able to gather. Fisher eventually "abandoned

[his] effort to qualify for the ballot and did not submit the signatures [his] team had gathered." Doc. 69-10 ¶¶ 3, 5-6, 10. 52.

**Response:** Disputed. The statement is not supported by the cited evidence.

52.    Ryan Graham ran as the Libertarian Candidate for the Public Service Commission, District 3, receiving 102,878 votes. Graham "would have run" for state representative, but did not attempt to gather any signatures—instead running for statewide office where ballot access was assured. Doc. 69-12 ¶ 6, 8.

**Response:** Admitted.

53.    Graham also helped gather signatures for two libertarian candidates in 2018, but neither qualified for the ballot. Graham does not specify how many signatures either candidate was able to gather. Doc. 69-12 ¶¶ 10, 12-13.

**Response:** Admitted.

54.    Cynthia McKinney considered running in 2012 as the Green Party's candidate for the Fourth Congressional District, but after determining she would not be able to raise the resources necessary to mount a successful ballot access campaign and election campaign she "withdrew from the race without ever having publicly announced [her] intention to enter it." Doc. 69-14 ¶ 13.

**Response:** Admitted.

55.    Wayne Parker was the Libertarian Nominee for the Public Service Commission in Georgia's Fifth District in 2000, in which he received 135,888 votes. When Parker ran for Congress in Georgia's Eleventh Congressional District in 2002, the Libertarian Party raised $40,000 for his campaign to pay 35 professional petition circulators. According to Mr. Parker, this was the party's "most substantial effort to obtain ballot-access for U.S. Representative," before or after. Doc. 69-19 ¶¶ 3, 7, 10, 11.

> **Response:** Disputed. The statement is not supported by the cited evidence. The defendant misquotes the testimony.

56.    While Parker gathered over 20,000 raw signatures, after they were validated by county officials, he was "just shy" of the requirement (which had been reduced that year because re-districting efforts shortened the time frame to gather signatures). Doc. 69-19 ¶¶ 8, 13, 14.

> **Response:** Disputed. The statement is not supported by the cited evidence.

57.    Luanne Taylor intended to run for Congress as an independent in Georgia's Sixth Congressional District, but when she inquired with the Secretary of State's office about the number of required signatures for that district in 2018, she immediately decided not to run and made no efforts to collect signatures. Doc. 69- 22 ¶¶ 2-4.

**Response:** Disputed. The statement is not supported by the cited evidence.

58.    This year, due to the outbreak of COVID-19, the Secretary of State exercised his authority to extend the deadline to submit nomination petitions an additional 31 days, from July 14 to August 14, 2020. The number of valid petition signatures required was also reduced by 30% by federal court order. Ex. 1 ¶ 5.

**Response:** Admitted.

59.    There were 3 independent candidates who submitted petitions bearing the requisite signatures for local races for the 2020 general election, even during the pandemic. Ex. 1 ¶ 8.

**Response:** Disputed. This statement is not supported by the cited evidence because (a) the candidates shown on the cited evidence are not local candidates, and (2) one of the three candidates shown on the cited evidence did not qualify for the ballot. (Ex. 56: Sept. 14 Email at 1-2; Ex. 57: McGowan-Sells Emails at 1-3.)

60.    Joe Reed, who qualified as an independent candidate for State House District 129, obtained 1,526 verified signatures out of the required 1,197. Ex. 1 ¶ 8. 61.

**Response:** Admitted.

61.     Andrew Bell, an independent candidate for State House District 85, submitted a petition with 2,220 raw signatures out of the required 1,255. Mr. Bell's petition is currently being verified by the county. Ex. 1 ¶ 8.

**Response:** Disputed. Bell did not qualify. (Ex. 56: Sept. 14 Email at 1.)

62.     Keith Higgins, an independent candidate for the Brunswick District Attorney, obtained 8,832 raw signatures out of the required 3,526. His petition is currently being verified by the county. Ex. 1 ¶ 8.

**Response:** Admitted

63.     Two candidates for Georgia's congressional districts filed a notice of candidacy and filing fee in March, but did not submit a nomination petition by the August 14 deadline. These include Jimmy Cooper, a Green Party candidate for the Eighth District, and Donald Keller, an independent candidate for the Twelfth District. Ex. 1 ¶ 9.

**Response:** Admitted.

64.     Plaintiff Martin Cowen submitted a nomination petition on August 14, 2020, as the Libertarian Party's nominee for the Thirteenth Congressional District, after having filed a notice of candidacy and qualifying fee in March. Mr. Cowen's petition contained 6 out of the required 17,152 signatures, and he did not qualify for the general election ballot. Ex. 1 ¶ 7.

**Response:** Admitted.

65.     Other than Cowen, who did not qualify, none of the named

Plaintiffs submitted a nomination petition to qualify as a candidate for any of

Georgia's congressional districts for the 2020 general election ballot. Ex. 1 ¶

9.

**Response:** This fact is not material to the claims or defenses in this

case.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com