## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| MARTIN COWEN, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *   CASE NO.: 1:17cv04660-LMM |
| | * |
| BRAD RAFFENSPERGER, Georgia | * |
| Secretary of State, | * |
| | * |
| Defendant. | * |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR SUMMARY JUDGMENT[1]

It is settled law that Georgia has the "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n. 9 (1982). Based on this strong interest, courts repeatedly uphold state ballot access requirements like Georgia's that "protect the integrity and reliability of the electoral process itself." *Id.* Despite Plaintiffs' complaint that the ballot access requirements for Georgia's

---

[1] In their second motion for summary judgment (Doc. 134), Plaintiffs incorporated by reference their Statement of Undisputed Material Facts filed in the prior round of summary judgment briefing (Doc. 69). In response, Defendant incorporates by reference his original response and objections to Plaintiffs' Statement of Undisputed Material Facts and supporting evidence (Doc. 97 and 99).

congressional districts are the most stringent in the nation, they repeatedly have been upheld as constitutional by the Supreme Court and the Eleventh Circuit.

There is no reason why the Court should hold any differently based upon the factual record in this case. Although the Eleventh Circuit remanded the case for further consideration under the *Anderson-Burdick* framework, the Court's determination must still be informed by the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431 (1971) and other Eleventh Circuit precedent upholding the constitutionality of Georgia's 5% petition requirement. To prevail on their claims, Plaintiffs must demonstrate that "a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law." *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020).

Plaintiffs' motion fails to make this showing. Georgia's legal framework has not materially changed since *Jenness*, and the relevant federal cases repeatedly have upheld state petition requirements under a far more deferential standard of review than what Plaintiffs propose. The factual record, though robust in volume, is thin on probative evidence establishing that Georgia's petition requirements have become so burdensome that they should be subjected to a higher level of scrutiny under the

*Anderson-Burdick* framework. Accordingly, the Court should grant summary judgment in favor of the Secretary on Plaintiffs' First and Fourteenth Amendment claim.

Plaintiffs' Equal Protection claim also fails as a matter of law. This claim rests on the false premise that Georgia law requires more petition signatures for non-party candidates for Georgia's congressional districts than for statewide office, when it does not. While Plaintiffs complain that they must demonstrate support among the electorate for both statewide office and Georgia's congressional districts, the State's interest in ensuring that candidates have a substantial level of support among voters before placing them on the ballot applies at the state and district level. It is not "invidious discrimination" that runs afoul of the Equal Protection clause to require Libertarian Party candidates to demonstrate that they have voter support within the districts they seek to represent.

## I.   GEORGIA'S PETITION REQUIREMENTS DO NOT VIOLATE THE FIRST AND FOURTEENTH AMENDMENT.

The parties agree that the *Anderson-Burdick* framework is the appropriate legal standard for Plaintiffs' First and Fourteenth Amendment claims. Under the *Anderson-Burdick* test, courts are to "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interest the State contends justify that burden, and consider the extent to which the State's concerns make that

burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). The rigorousness of the Court's inquiry "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. When "those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citations omitted). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358.

The State disagrees, however, with Plaintiffs' claim that the State "bears the burden on the second and third [step]" of the *Anderson-Burdick* framework. (Doc. 134-1 at 35.) To the contrary, courts have never imposed an evidentiary burden on the State. The State need only *identify* the interests that it seeks to further by its regulation; it "does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause of Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (noting that the Supreme Court has never "place[d] an evidentiary burden on the state when defending a voting regulation"); *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986) ("We have never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition

of reasonable restrictions on ballot access.") Accordingly, the burden remains with the Plaintiffs to prove that Georgia's petition requirements violate their First and Fourteenth Amendment rights under the *Anderson-Burdick* framework.

### A. Georgia's petition requirements do not present a severe burden based upon longstanding precedent.

A well-established line of Supreme Court and Eleventh Circuit precedent holds that petition requirements for ballot access, including Georgia's 5% requirement, are "reasonable, nondiscriminatory restrictions" that do not impose a severe burden on Plaintiffs' First and Fourteenth Amendment rights.

The Supreme Court first found that Georgia's 5% signature requirement did not present a severe burden in *Jenness v. Fortson*, 403 U.S. 431 (1971). The Court looked at the burden imposed by the petition requirement and reasoned that, although it is "somewhat higher" than other states, Georgia imposes few restrictions on the signature collection process. *Id.* at 442. Specifically, voters may sign a petition for more than one candidate; voters are not required to state that they intend to vote for that candidate in the election; and voters who previously voted in a party primary are still eligible to sign a petition. *Id.* at 438-39. Additionally, Georgia law "does not fix an unreasonably early filing deadline for candidates" and allows them 6 months to conduct a signature-gathering campaign. *Id.* at 438. Georgia also "freely provides for write-in votes." *Id.* 438. In sum, the Court concluded that Georgia's

election laws do not "operate to freeze the political status quo" because they do not make it "virtually impossible" for third-party candidates to access the ballot. *Id.* at 438, 434-45.

Following *Jenness*, the Eleventh Circuit has upheld Georgia's petition requirements as reasonable, nondiscriminatory restrictions that are justified by the State's regulatory interests. *See McCrary v. Poythress*, 638 F.2d 1308, 1311-13 (11th Cir. 1981) (relying on *Jenness* to uphold the 5% petition requirement); *Coffield v. Handel*, 599 F.3d 1276, 1277 (11th Cir. 2010) ("Our Court and the Supreme Court have upheld Georgia's 5% rule before."); *Cartwright v. Barnes*, 304 F.3d 1138, 1141 (2002) (recognizing that the analysis in *Jenness* "still equally pertains today" and that Georgia's 5% petition requirement is not severely burdensome). The Eleventh Circuit has thus upheld Georgia's petition requirements in three separate challenges, holding each time that the associated burdens are not severe and have not materially changed since *Jenness*.

Furthermore, the Eleventh Circuit has held that similar petition requirements in Florida and Alabama do not present a severe burden under the *Anderson-Burdick* framework and should not be subject to heightened scrutiny. *See Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (upholding Florida's 3% petition requirement and declining to apply a heightened level of scrutiny); *Swanson*

*v Worley*, 490 F.3d 894, 903-904 (11th Cir. 2007) (holding that Alabama's 3%

petition requirement "does not impose a severe burden on plaintiffs' rights but is a

reasonable, nondiscriminatory restriction"); *Stein v. Ala. Sec'y of State*, 774 F.3d

689, 694-99 (11th Cir. 2014) (holding that Alabama's ballot access requirements for

presidential candidates did not demonstrate a burden that would subject them to strict

scrutiny).[2]

Based upon this long line of precedent, another court in this judicial district

declined to fully enjoin Georgia's petition requirement for the 2020 election cycle,

finding that Georgia's petition requirements impose only a "moderate" burden this

year due to the global COVID-19 outbreak. *Cooper v. Raffensperger*, No. 1:20-CV-

1312-ELR, 2020 U.S. Dist. LEXIS 122237, *17 (N.D. Ga. July 9, 2020). Judge Ross

---

[2] Other circuits have also declined to find that state petition requirements as high as 5% are so burdensome as to trigger heightened scrutiny under *Anderson-Burdick*, citing *Jenness* as establishing a constitutionally permissible limit. *See, e.g., Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1093 (9th Cir. 2019) (holding that a state can allow signature requirements of up to 5% without imposing a "severe burden" triggering heightened scrutiny); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016) ("Neither the Supreme Court nor any circuit court has struck down a statewide ballot-access regime on the grounds that a signature requirement of 5% (or less) is too much, or that 6 months (or more) is too little time within which to gather the signatures from a pool of substantially all voters."); *Rainbow Coalition of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 743 (10th Cir. 1988) (rejecting the argument that strict scrutiny should be applied in upholding Oklahoma's 5% petition requirement for party status).

recognized that during "normal circumstances," Georgia's petition requirements "constitute reasonable, nondiscriminatory burdens" and withstand scrutiny under the rational basis test. *Id.* at \*14. While the court concluded that the circumstances surrounding COVID-19 elevated the burden on candidates to a "moderate" level, it rejected the plaintiffs' argument that the burden associated with the petition requirements were severe because candidates are not "virtually excluded from the ballot." *Id.* at \*17 (citing *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)). If, as Judge Ross found, Georgia's petition requirements impose only a "moderate" burden during a global pandemic, then they certainly do not present a *severe* burden in normal election cycles as Plaintiffs contend.

### B. Plaintiffs have not shown that this case is materially distinguishable from *Jenness* and other controlling Eleventh Circuit precedent.

The Eleventh Circuit instructed in its remand order that, in order to prevail, Plaintiffs must "satisfactorily distinguish its claims from those rejected in *Jenness*," and "demonstrate why a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law." *Cowen*, 960 F.3d at 1346. Plaintiffs cannot meaningfully distinguish *Jenness* in any of these ways. Although Plaintiffs assert a laundry list of arguments

why the Court should find that Georgia's petition requirements impose a severe burden on political body candidates, none of these arguments withstand scrutiny.

> 1. *Plaintiffs' evidence does not establish that it is virtually impossible for reasonably diligent candidates to satisfy the petition requirements.*

First, Plaintiffs point to the fact that no political body candidate has ever satisfied the signature requirement for U.S. Representative. (Doc. 134-1 at 37.) While Plaintiffs argue that this fact shows that Georgia's petition requirements "operate to freeze the political status quo" in violation of *Jenness*, 403 U.S. at 438, they mischaracterize what the Supreme Court was saying in that case. The Supreme Court was comparing Georgia's requirements to the ballot access laws of Ohio struck down in *Williams v. Rhodes*, 393 U.S. 23 (1968). Ohio's requirements were much more restrictive, and made it "virtually impossible" for new political parties to access the ballot. *Jenness*, 403 U.S. at 435 (citing *Williams*, 393 U.S. at 24).[3] When it observed that Georgia's election laws did not "operate to freeze the political status quo," the Court was looking at whether Georgia's scheme allowed for the

---

[3] The Ohio scheme struck down in *Williams* required new political parties to submit a petition signed by a number of qualified electors equal to 15% of the number of voters in the last gubernatorial election, file the petition by February of an election year, and hold a primary election "conforming to detailed and rigorous standards." *Jenness*, 403 U.S. at 435. In comparison, the *Jenness* court found Georgia's 5% petition requirement far less restrictive.

*possibility* that a third party candidate could get on the ballot—not whether some had tried and failed.[4]

The evidence adduced by Plaintiffs falls far short of proving that it is "virtually impossible" for a candidate to meet the 5% petition requirement for U.S. Representative. The appropriate standard is whether "a reasonably diligent [ ] candidate [can] be expected to satisfy the signature requirements." *Libertarian Party of Florida v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (quoting *Storer v. Brown*, 415 U.S. 724, 742 (1974)). However, almost all of the candidates that Plaintiffs identify as having made a "genuine effort" to meet the petition requirements actually did very little work during the 6-month period they are allowed to gather signatures. Plaintiffs cannot just assert the conclusion that these candidates made a genuine effort—they must present evidence of such an effort. *See id.* at 794 ("Conclusory allegations cannot prevail.").

---

[4] The plaintiffs in *Cartwright* and *Coffield* also raised the argument that no third-party candidate has ever succeeded in meeting the 5% petition requirement for U.S. Representative. The Eleventh Circuit rejected that argument in both cases, finding that the holding of *Jenness* still controlled and that Georgia's petition requirement was not severely burdensome. *See Cartwright*, 304 F.3d at 1141; *Coffield*, 599 F.3d at 1277.

Plaintiffs' purported evidence may be robust in volume, but it is thin in substance. Although Plaintiff Martin Cowen claims to have made a "genuine effort" to meet the petition requirement in 2018, he utilized only 40 out of the 180 allotted days and collected 620 signatures. (Defendant's Statement of Material Facts [Doc. 135-3] ¶ 42.) In 2020, Mr. Cowen submitted a petition with *six* signatures. (*Id.* ¶ 64.)

Other would-be candidates gathered only a few hundred signatures, or did not even try. (*See* Doc. 135-3 ¶¶ 42-57.) One stated that he "abandoned [his] effort to qualify for the ballot and did not submit the signatures that [his] team had gathered." (*Id.* ¶ 51.) Another "withdrew from the race without ever having publicly announced [her] intention to enter it." (*Id.* ¶ 54.) Still another inquired with the Secretary of State's office about the number of required signatures, but immediately decided not to run. (*Id.* ¶ 57.)

Of the 11 unsuccessful candidates who submitted declarations in support of Plaintiffs' summary judgment motion,[5] only one candidate (Wayne Parker) can be

---

[5] There are additional individuals whom Plaintiffs claim attempted to qualify as candidates, who are identified in Plaintiffs' Statement of Undisputed Material Facts. [*See* Doc. 69-2 ¶¶ 92-120.] However, Plaintiffs did not obtain sworn declarations from any of these purported candidates. Rather, they are identified in unauthenticated documents or hearsay statements from other witnesses. There is no evidence regarding the efforts these candidates made to qualify, or if they even tried to meet the petition requirements. This evidence is of little probative value, and should not be considered by the Court on summary judgment.

said to have acted with reasonable diligence, and he came very close to meeting the petition requirement. (*Id.* ¶ 55.) The Libertarian Party raised $40,000 for Mr. Parker's campaign in 2002, and paid for 35 professional petition circulators. (*Id.*) While he gathered over 20,000 raw signatures, after they were validated by county officials, he was "just shy" of the requirement. (*Id.* ¶ 56.) According to Mr. Parker, the 2002 election cycle was the Libertarian Party's "most substantial effort to obtain ballot-access for U.S. Representative," before or after. (*Id.* ¶ 55.) Mr. Parker's testimony is evidence that, with the investment of time and financial resources, it is possible to collect the necessary signatures.

And while no third-party or independent candidates have yet obtained ballot access for Georgia's congressional districts, non-party candidates have achieved successes both statewide and at the district level. (*Id.* ¶¶ 44, 45.) Indeed, several independent candidates were able to meet the petition requirement for local offices for the 2020 election even during a pandemic. (*Id.* ¶¶ 60-62.) In this respect, Georgia's petition requirements have not operated to exclude non-party candidates from the ballot.

Running for Congress undoubtedly requires significant time and resources for party and non-party candidates alike. The failure of a candidate to get on the ballot can be an indication that they simply do not have the support of the voters in

Georgia's current political landscape. But as the Supreme Court has made clear, the State is "not burdened with a constitutional imperative to reduce voter apathy or to 'handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot." *Munro*, 479 U.S. at 198.

   *2. Georgia's petition requirements for president are not relevant here.*

Next, Plaintiffs argue that *Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016) supports a finding that Georgia's petition requirements are severely burdensome. (Doc. 134-1 at 39.) However, that case is inapposite because it involved Georgia's petition requirements for political body candidates for *president*. The issue before the Court was whether Georgia's petition requirement of 50,000 signatures for ballot access in the presidential general election was unconstitutionally burdensome. *See id.* at 1359-60. Although the Court first analyzed the petition requirement under a strict scrutiny standard of review, it did so because it found the burden on the *right to vote* was severe—not because the burden on *candidates* in meeting the petition requirement was severe. *Id.* at 1363. The Court reasoned that, due to the national nature of a presidential election, the petition requirement limited the choice of Georgia voters and the rights of voters outside of Georgia. *Id.* at 1362.

After reaching this conclusion, however, the Court expressed uncertainty about whether a strict scrutiny level of review was even appropriate under the *Anderson-Burdick* framework. *Id.* at 1367 ("*Anderson* and its progeny dictate that the Court apply more of a sliding scale than the tiered levels of review.") The Court therefore proceeded "under a standard more deferential than strict scrutiny," and still concluded that the petition requirement could not withstand any level of scrutiny because "the State's regulatory interest is not sufficiently important to justify the restrictions" on the rights of Georgia voters *and* voters in other states. *Id.* at 1367. The Court concluded that the State's regulatory interest was outweighed by important national interests, and ordered that the petition requirement for presidential candidates be reduced from 50,000 to 7,500. *Id.* at 1373. The Court was careful to note in its order that "all other facets of Georgia's election scheme will remain in place." *Id.*

The *Green Party* decision does not support Plaintiffs' argument that strict scrutiny should be applied here, because the Court in that case ultimately applied a more deferential standard of review. More importantly, the Court's decision was based entirely upon the unique national interests implicated in a presidential election, which are not at issue here. Although the Eleventh Circuit affirmed the *Green Party*

decision without an opinion, it has never extended that case's reasoning to state petition requirements for *non-presidential* offices.

In sum, there is nothing in the *Green Party* decision that supports a finding in this case that Georgia's 5% petition requirement for U.S. Representative are severely burdensome, particularly in light of the Supreme Court and Eleventh Circuit precedent upholding the requirement, as well as precedent upholding similar requirements in other states under a more deferential standard of review.

### 3. *Comparison to other states is not the standard for constitutionality.*

Plaintiffs also argue that Georgia's signature requirement is the highest in the nation. (Doc. 134-1 at 40.) However, the Eleventh Circuit repeatedly has rejected this type of state-by-state comparison as a means of determining whether a ballot access restriction is constitutional, and the Court should decline to do so here.

In *Libertarian Party of Florida*, the Eleventh Circuit dismissed a similar argument that "Florida's 3% requirement must be stricken as unconstitutionally burdensome because a majority of states protects interests similar to Florida's by imposing a lesser requirement." 710 F.2d at 793-94. The court noted that petition requirements are a policy judgment to be made by each state, and a "court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." *Id.* at 794. *See also*

*Swanson*, 490 F.3d at 910 ("[T]he Supreme Court has upheld a broad array of election schemes, and we confine our inquiry to whether Alabama's election scheme is constitutional, not whether Alabama's scheme is the best relative to other states."); *Green v. Mortham*, 155 F.3d 1332, 1339 (11th Cir. 1998) ("There is a range of fees and signature requirements that are constitutional, and the Florida legislature is free to choose its ballot access requirements from that constitutional spectrum. The fact that Florida may be at the high end of that range does not make its ballot access restrictions unconstitutional.").

Accordingly, the Court must confine its inquiry to whether Georgia's petition requirements are constitutional, not whether they are more rigorous than other states. Since *Jenness*, the Eleventh Circuit and other circuit courts continue to cite Georgia's 5% petition requirement as constitutionally permissible, even if it is on the high end of the permissible range.

> ### 4. Federal campaign contribution limits apply to all candidates, and are not a burden unique to political body and independent candidates.

Plaintiffs also assert a number of complaints about the costs associated with meeting ballot access requirements, including the qualifying fee, and federal campaign finance laws, which they contend inhibit their ability to raise sufficient resources to meet the petition requirements. (Doc. 134-1 at 45-48.) However, all candidates for office—both party and non-party alike—face these challenges.

All candidates must pay a qualifying fee in Georgia, and this requirement has actually become *less* restrictive since *Jenness* because the law now allows candidates to submit a pauper's affidavit if they cannot meet the fee requirement. O.C.G.A. § 21-2-132(g). Although the pauper's affidavit must also be accompanied by a conforming petition, the Supreme Court has upheld this type of scheme. *See Lubin v. Panish*, 415 U.S. 709, 718 (1973) ("[A] candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the seriousness of his candidacy by persuading a substantial number of voters to sign a petition in his behalf.").

It is expected that non-party candidates "must incur some expenses in accumulating the necessary signatures to qualify for the ballot," but this does not render petition requirements unconstitutionally burdensome. *Libertarian Party of Florida*, 710 F.2d at 794-795; *see also American Party of Texas v. White*, 415 U.S. 767, 794 (1974) (recognizing that minor parties "must undergo expense, to be sure, in holding their conventions and accumulating the necessary signatures to qualify for the ballot"). Major party candidates must raise funds to successfully run in a primary election, which can be significantly more than a petition drive in a congressional race.

Restrictions on fundraising imposed by federal campaign finance laws also equally apply to all candidates, and are not a discriminatory burden imposed by the State. Although Plaintiffs are correct that the federal limits on individual donor base contributions were imposed in 1971 and were not in place at the time *Jenness* was decided,[6] those limits did exist at the time that the Eleventh Circuit upheld Georgia's petition requirements in *McCrary*, *Cartwright*, and *Coffield*. The federal limits on individual base contributions have been upheld as constitutional by the Supreme Court, and Plaintiffs fail to cite to any authority holding that federal campaign finance laws have any bearing whatsoever on the constitutionality of state ballot access requirements.

   5. *Georgia's petition requirements have not materially changed since Jenness.*

Finally, Plaintiffs argue that "Georgia's legal framework has also changed in significant ways since *Jenness*." (Doc. 134-1 at 45.) However, this is directly contradicted by the Eleventh Circuit's holding in *Coffield* that the "pertinent laws of Georgia have not changed materially since the decisions in *Jenness* and *Cartwright* were made." 599 F.3d at 1277. Indeed, Georgia still imposes few restrictions on the

---

[6] In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court addressed the constitutionality of certain provisions of the Federal Election Campaign Act of 1971 and upheld the individual contribution limits established by the act.

signature collection process, as noted in *Jenness*. 403 U.S. at 442. Voters may still sign a petition for more than one candidate, are still not required to state that they intend to vote for that candidate in the election, and are still eligible to sign a petition even if they previously voted in a party primary. *Id.* at 438-39. Additionally, Georgia's filing deadline is not unreasonably early, and the 6-month period to conduct a signature-gathering campaign remains the same. *Id.* at 438.

Although Plaintiffs complain that the Secretary's review of petition signatures has become more rigorous, there is no evidence in the record of a candidate having been wrongfully denied a place on the ballot because the Secretary improperly rejected valid signatures. There is a statutory procedure for the review of petitions set forth in O.C.G.A. § 21-2-171. Signatures are reviewed by both the Secretary's office and by the appropriate county elections superintendent(s) to determine whether the signatures are from registered voters who reside within the district. If a candidate believes that a petition has been wrongfully rejected, state law provides a process for judicial review of the Secretary's decision as to the sufficiency of the petition. *See* O.C.G.A. § 21-2-171(c).

Plaintiffs' complaint about the qualification process for write-in candidates is also without merit. Georgia law still "freely provides for write-in votes," as the Supreme Court found in *Jenness*. 403 U.S. at 438. Contrary to Plaintiffs' claim that

the process has become more restrictive, the only change in the law is that a write-in candidate must file a declaration of candidacy with the Secretary of State before votes for that candidate will be counted. *See* O.C.G.A. § 21-2-133. An aspiring candidate is still free to run as a write-in candidate, and voters can write in the name of that candidate and have those votes counted. Indeed, Mr. Cowen declared his intent to run as a write-in candidate in the last congressional election and again in 2020.

In sum, Plaintiffs have not met their burden to show why the Court should turn precedent on its head and find that Georgia's petition requirements are "severe" and subject to heightened scrutiny. As the Supreme Court noted in *Burdick*, "[e]lection laws will invariably impose some burden upon individual voters." 504 U.S. at 433. The mere fact that Georgia's "system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny." *Id.* Such a result "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* Accordingly, the Court should find that Georgia's petition requirements pose only a reasonable, nondiscriminatory burden and apply a more deferential level of scrutiny.

**C. The State has an important interest in regulating ballot access.**

If "the relevant federal law has evolved" since *Jenness* as Plaintiffs contend (*see* Doc. 134-1 at 46), it has evolved toward affording *more* deference to a state's interest in "ensuring that only bona fide independent candidates with a measure of support gain ballot access, preventing frivolous candidates from clogging the ballot and confusing voters." *Swanson*, 490 F.3d at 911.

It has become axiomatic since *Jenness* that the State has "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." 403 U.S. at 442; *see Anderson*, 460 U.S. at 788 n. 9 (the State has the "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot"); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("in order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot."); *Swanson*, 490 F.3d at 911 ("This Court previously has recognized that signature requirements promote the important state interest of ensuring that only bona fide independent candidates with a measure of support gain ballot access, preventing frivolous candidates from clogging the ballot and confusing voters.").

The State also has a generalized interest in the orderly administration of elections, and ballot access laws advance the State's interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442. *See also Storer v. Brown*, 415 U.S. 724, 730 (1974) ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process"); *Timmons*, 520 U.S. at 366 ("States also have a strong interest in the stability of their political systems."). While this interest "does not permit a [s]tate to completely insulate the two-party system from minor parties' or independent candidates competition and influence," a state "need not remove all of the many hurdles third parties face in the American political arena today." *Timmons*, 520 U.S. at 367.

Plaintiffs do not dispute that the State's interests are legitimate. Rather, they argue that Georgia can advanced these interests through less restrictive means. But under the deferential review that is appropriate here, the Court need only conclude that these important state interests provide sufficient justification for Georgia's reasonable, nondiscriminatory petition requirements. *See Anderson*, 460 U.S. at 788; *Swanson*, 490 F.3d at 910.  Accordingly, the Court should deny Plaintiffs' motion for

summary judgment on their First and Fourteenth Amendment claim, and enter judgment as a matter of law in favor of the Secretary.

## II. GEORGIA'S PETITION REQUIREMENTS DO NOT VIOLATE THE EQUAL PROTECTION CLAUSE.

In addition to their First and Fourteenth Amendment claim, Plaintiffs advance two separate but related claims based upon the false premise that Georgia requires more signatures from candidates for U.S. Representative than for statewide office. *First*, Plaintiffs argue that Georgia's petition requirements are impermissible under the Supreme Court's decisions in *Norman v. Reed*, 502 U.S. 279 (1992) and *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). *Second*, Plaintiffs argue that Georgia's petition requirements discriminate between Libertarian Party candidates for statewide office and Libertarian Party candidates for U.S. Representative in violation of the equal protection clause. Both of these arguments are based on Plaintiffs' mischaracterization of Georgia's statutory requirements, and fail as a matter of law.

### A. Georgia does not require more signatures for U.S. Representative than it does for statewide office.

Plaintiffs continue to repeat the false refrain that Georgia law requires more signatures for local office than for a statewide office. (Doc. 134-1 at 31.) This is simply not true. The signature requirement for statewide office under Georgia law is

1% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b). For 2020, a non-party candidate seeking to qualify for statewide office (such as U.S. Senate) was required to submit a petition with **51,686** valid signatures. (Doc. 135-4 ¶ 3 & Ex. A.) On the other hand, the signature requirement for U.S. Representative is 5% of the number of registered voters eligible to vote for that office in the last election. For 2020, a non-party candidate seeking to qualify for one of Georgia's congressional districts was required to submit a petition with **19,778** to **24,972** valid signatures depending on the size of the district—far less than for statewide office.

Georgia's petition requirements are simple and straightforward: there is a 1% requirement for statewide office and a 5% requirement for non-statewide office. Plaintiffs confuse the analysis by arguing that Libertarian Party candidates for statewide office "have automatic ballot access" and do not have to satisfy the 1% petition requirement, whereas its candidates for U.S. Representative must meet the 5% petition requirement. (Doc. 134-1 at 54.) But the Libertarian Party does not have "automatic ballot access" for statewide office. Rather, they obtain statewide ballot access by meeting the alternative requirements of O.C.G.A. § 21-2-180, which allow them to nominate statewide candidates by convention by (1) initially submitting a petition meeting the 1% signature requirement; and (2) continuing thereafter to have

a candidate receive 1% of the vote in a statewide race every election cycle. Because the Libertarian Party previously met the 1% petition requirement in 1988, it continues maintains its statewide ballot access by demonstrating significant support among the electorate through *votes*, rather than by *petition*.

Thus, while Georgia provides the Libertarian Party with an alternative process to access the ballot for statewide office., there is nothing about Georgia's statutory scheme that runs afoul of the Supreme Court's decisions in *Norman v. Reed*, 502 U.S. 279 (1992) and *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). These related cases invalidated a unique process by which a political organization could become a new political party under Illinois law. Georgia's ballot access scheme shares none of the same features as the Illinois law struck down in those cases.

Under Illinois law, citizens seeking to establish a "new party" and field candidates for the ballot had to collect 25,000 signatures for statewide office. *Norman*, 502 U.S. at 282.[7] New party organizers seeking to field candidates for

---

[7] The *Socialist Workers Party* decision struck down an earlier version of the Illinois petition requirement. While that case relied upon the equal protection clause to invalidate the law, *Norman* based its conclusion on the First and Fourteenth Amendment but relied "on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment." 502 U.S. at 288 n. 8.

offices in a non-statewide "political subdivision" had to collect the signatures of 25,000 subdivision voters. *Id.* If the large political subdivision had multiple districts from which some of its officers were elected, new party organizers seeking to fill such offices had to collect 25,000 signatures from each district. *Id.* A new political party became an "established political party" if it received 5% of the vote in the next election, but a party that had not engaged in a statewide election could become "established" only in a subdivision where it had fielded candidates. *Id.* at 283.

The plaintiffs in *Norman* sought to expand the Harold Washington Party, an established party in the city of Chicago, to all of Cook County, a subdivision comprising two electoral districts: a city district and a suburban district. *Id.* at 283-84. Before the 1990 election, the party presented the county board of elections with a petition containing 44,000 signatures from the city district and 7,800 signatures from the suburban district, as well as a slate of candidates for both at-large and district-specific seats. *Id.* at 284. The Illinois Supreme Court found that the Harold Washington Party's failure to obtain 25,000 signatures from the suburban district (in addition to the city district) disqualified their entire slate of candidates. *Id.* at 286.

The Supreme Court held that while Illinois had a valid interest in requiring new parties to show support among the electorate through a petition requirement, it had not chosen the most narrowly tailored means of advancing that interest. *Id.* at

294. If 25,000 signatures were sufficient to qualify for the ballot for statewide office, there was no compelling reason why candidates should have to gather a multiple of that requirement for each district within a political subdivision. *Id.* at 293. The Supreme Court furthermore criticized the Illinois law because it had the effect of disqualifying an entire slate of candidates because of the party's failure to meet the signature requirement for every district. *Id.*

Georgia's petition requirements do not have anything in common with the Illinois law struck down in *Norman*. Georgia does not require candidates for U.S. Representative to meet the 5% signature requirement for every political subdivision within the district; nor does it require political bodies to nominate and qualify an entire slate of candidates for every congressional district.[8] The holding of *Norman* simply has no applicability here.

If anything, *Norman* cuts against Plaintiffs' argument that because they qualify to nominate candidates by convention for statewide office without having to meet the statewide petition requirement every election cycle, they should automatically qualify for U.S. Representative as well. The *Norman* plaintiffs

---

[8] Plaintiffs repeatedly mention in their brief that the Libertarian Party would have to gather 321,713 valid signatures to run a full slate of 14 candidates for Georgia's congressional districts. Of course, they are not required under Georgia law to run a full slate of candidates, and may pick and choose individual districts.

similarly cited their electoral success in the city of Chicago as the reason why their candidates should automatically qualify to run in the suburbs. 502 U.S. at 295. But the Supreme Court rejected that argument, reasoning that the party candidates still had to meet the petition requirements for local office and demonstrate support in those districts. *Id*. In the same way, it is constitutionally permissible for Georgia to require that Libertarian candidates demonstrate support in their respective congressional districts, even if the party has already qualified another way to run statewide candidates.

## B. Georgia does not "Invidiously Discriminate" between Libertarian candidates for statewide and Congressional office.

Plaintiffs' claim that Georgia's petition requirement violates the Equal Protection Clause of the Fourteenth Amendment also fails as a matter of law. Their claim—that the petition requirement treats Libertarian Party candidates for statewide office differently than Libertarian Party candidates for the U.S. House of Representatives—is not one that has ever been recognized by any court.

To succeed on their equal protection claim, Plaintiffs must "demonstrate in the first instance a discrimination against them of some substance." *Am. Party of Texas v. White*, 415 U.S. 767, 781 (1974). State election statutes "create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." *Id.* (quoting *Ferguson v. Skrupa*,

372 U.S. 726, 732 (1963)).[9] *See also Jenness*, 403 U.S. at 441 (rejecting equal protection claim).

Plaintiffs fail to show shown that Libertarian congressional candidates face any sort of "invidious discrimination" or are subjected to a greater burden than statewide candidates. As discussed above, it is not discrimination for the State to require Libertarian candidates to demonstrate voter support in the congressional district in which they seek to run, even though the party may nominate candidates by convention for statewide office without having to meet the statewide petition requirement. Merely because Georgia has provided multiple alternative means to achieving ballot access does not compel the conclusion that Georgia has violated equal protection. *See Jenness*, 403 U.S. at 441-42 ("Georgia has not been guilty of invidious discrimination" by "providing different routes to the printed ballot.").

It is the State's policy choice to require candidates to demonstrate support among voters at the state *and* district level, and no court has ever held that this policy judgment is unconstitutional. It would not advance the State's interest in ensuring that candidates have "a significant modicum of support" among the electorate if

---

[9] In support of their equal protection claim, Plaintiffs rely on the outdated legal standard set forth in *Socialist Workers Party*, 440 U.S. at 183. That case applied a strict scrutiny level of review that has been walked back in subsequent cases and replaced by the *Anderson-Burdick* test for challenges to state ballot access laws. *See Norman*, 502 U.S. at 288 n. 8.

Libertarian candidates could rely on their support at the state level to achieve wholly unrestricted ballot access for each of Georgia's congressional districts. This is not an "absurd" or unjustified classification as Plaintiffs contend, because the Libertarian Party could be popular in one part of the state, but not another. As shown in Plaintiffs' own evidence, many of the Libertarian candidates who aspire to run for Congress have demonstrated little to no support among the voters of their district. It does not serve equal protection to entirely waive the ballot access requirements for these Libertarian Party candidates at the expense of the independent, third-party, and major party candidates who would still be required to invest the time and resources to earn ballot access. The Constitution does not compel this result, and the Court should find that Plaintiffs' equal protection claim fails as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' second motion for summary judgment should be denied and the Secretary's motion for summary judgment should be granted.

Respectfully submitted, this 25th day of September, 2020.

CHRISTOPHER M. CARR
Attorney General         112505

BRYAN K. WEBB      743580
Deputy Attorney General

RUSSELL D. WILLARD   760280
Senior Assistant Attorney General

*/s/ Charlene S. McGowan*
CHARLENE S. MCGOWAN 697316
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
Tel: 404-656-3389

*Counsel for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

<u>*/s/Charlene S. McGowan*</u>
Charlene S. McGowan
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel for Plaintiffs via electronic notification:

Bryan L. Sells
bryan@bryansellslaw.com

Dated: September 25, 2020.

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General