IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>          Plaintiffs,<br><br>   vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>          Defendant. | Case No. 1:17-cv-04660-LMM<br><br><br><br>**Plaintiffs' Reply in Support of their Second Motion for Summary Judgment** |

The plaintiffs respectfully submit this reply to the Secretary of State's brief in opposition to the plaintiffs' second motion for summary judgment. (ECF 140.) The Secretary's opposition brief largely repeats the arguments he made in his brief in support of his second motion for summary judgment. (ECF 135-1.) The plaintiffs have already responded to those arguments in their own opposition brief, and they incorporate that response here. (ECF 139.) This brief will try to focus on what's new.

## I.     The Court should decline the Secretary's invitation to ignore the law of this circuit once again.

The Secretary of State begins his brief by disputing the legal standard that applies to the plaintiffs' claim under the First and Fourteenth Amendments. (ECF 140 at 3-23.) Although he now concedes that the Court must apply the three-step balancing test set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), the Secretary disputes that he bears the burden of proof on steps two and three of that test. (ECF 140 at 4.) This dispute is critical, because he has made no effort to satisfy that burden at even the lowest level of constitutional scrutiny.

The law of this circuit is clear on this issue: the plaintiff bears the burden of proof on the first step in the *Anderson* test, and the defendant bears the burden on the second and third. *Fulani v. Krivanek*, 973 F.2d 1539, 1544 (11th Cir. 1992); *Bergland*, 767 F.2d 1551, 1554 (11th Cir. 1985). "Once a plaintiff has identified the interference with the exercise of her First Amendment rights, the burden is on the state to 'put forward' the 'precise interests … [that are] justifications for the burden imposed by its rule,'" and to "explain the relationship between these interests" and the challenged provisions. *Fulani*, 973 F.2d at 1544 (quoting *Anderson*, 460 U.S. at 789). "The State must introduce evidence

to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." *Bergland,* 767 F.2d at 1554.

The Supreme Court and other circuits apply the same rule. *See Burson v. Freeman,* 504 U.S. 191, 199 (1992) ("To survive strict scrutiny, however, a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest."); *Fish v. Schwab,* 957 F.3d 1105, 1133 (10th Cir. 2020) ("we agree with the Secretary that Kansas's interest in counting only the votes of eligible voters is legitimate in the abstract, but, on this record, we do not see any evidence that such an interest made it necessary to burden voters' rights here"), *petition for cert. filed* (U.S. Aug. 3, 2020) (No. 20-109); *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Obama for Am. v. Husted,* 697 F.3d 423, 433-34 (6th Cir. 2012) (holding voting regulation was not justified by "vague interest[s]" when the state had submitted "no evidence" to justify its invocation of the interests); *Nader v. Brewer,* 531 F.3d 1028, 1039-40 (9th Cir. 2008)

("In light of the state's . . . failure adequately to demonstrate why the petition filing deadline must be so early, the state has on this record failed to show that the deadline is narrowly tailored to further compelling administrative needs."); *Lopez Torres v. New York State Bd. of Elections,* 462 F.3d 161, 203 (2d Cir. 2006) ("the burden of demonstrating that the current scheme reasonably serves the asserted interests falls on defendants"), *rev'd on other grounds* 552 U.S. 196 (2008); *Patriot Party v. Allegheny Cty. Dept. of Elections*, 95 F.3d 253, 267-68 (3d Cir. 1996) ("The Department bears the burden of demonstrating that the challenged election laws are narrowly tailored to protect a compelling state interest.").

The Secretary does not address any of these cases. Instead, he relies on *Common Cause of Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009), and *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986), for the proposition that courts have "never" imposed an evidentiary burden on a State under the *Anderson* test. (ECF 140 at 4.) That extreme assertion is obviously belied by the caselaw cited above, but it also confuses steps two and three of the *Anderson* test. The cited portions of *Billups* and *Munro* pertain to step two: identifying the State's

asserted interests. In order to assert a legitimate state interest in preventing voter fraud, for example, a defendant generally need not produce evidence that voter fraud exists. *See, e.g., Fish*, 957 F.3d at 1132-37; *Billups,* 554 F.3d at 1353. But the burden remains on the defendant under step three to demonstrate that the asserted interest makes it necessary to burden the plaintiff's rights. *Fulani*, 973 F.2d at 1544. And that is what is lacking here.

## II.    The Court should reject the Secretary of State's plea to apply precedent like a litmus test.

The first step in the *Anderson* test requires the Court to "evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments." *Bergland*, 767 F.2d at 1553. The Secretary urges the Court to find that "Georgia's petition requirements pose only a reasonable, nondiscriminatory burden" (ECF 140 at 20), and his main argument is that "controlling" precedent requires that conclusion (ECF 140 at 8). Because the Eleventh Circuit and other courts have found in other cases that a five-percent petition requirement does not impose severe constitutional burdens, the argument goes, so must this Court. (ECF 140 at 5-8, 20.)

The Secretary's argument, however, sounds almost as if he has not read the Eleventh Circuit's decision in *this* case. That decision expressly emphasizes the importance of context and eschews the very kind of litmus test that the Secretary advocates: "In other words, the determination that a 1 percent petition requirement by one state's election law in one context is constitutional, *vel non*, does not guarantee the same determination of a similar law in a different context." *Cowen v. Ga. Sec'y of State,* 960 F.3d 1339, 1342 (11th Cir. 2020).

The plaintiffs have already pointed out that the cases from other states upon which the Secretary relies are easily distinguishable because, unlike this case, the record in those cases contained recent successes by independent or third-party candidates under the challenged statutes. (ECF 139 at 9-11.) The plaintiffs incorporate that discussion here.

The Secretary also argues that *Jenness v. Fortson*, 403 U.S. 431, 438 (1971), and other Eleventh Circuit cases which previously upheld earlier versions of Georgia's ballot-access system are not "materially distinguishable" and therefore compel the conclusion that only the lowest level of scrutiny should apply here (ECF 140 at 8.) But his response brief

simply fails to address most of the distinctions that the plaintiffs' pointed out in their opening brief. (ECF 134-1 at 41-48.) For example, he does not address the fact that *Jenness* and the other cases did not involve a challenge to the *cumulative* impact of Georgia's ballot-access restrictions, including the qualifying fee. (ECF 134-1 at 45-46.) He does not address other differences between the thin record in *Jenness* and the robust record here, such as evidence about the cost of petitioning, lack of access to voters, and public concern over the disclosure of confidential information. (ECF 134-1 at 45.) And he does not address the major changes in Georgia's legal framework, including the one-percent statewide petition requirement adopted by the legislature in 1986 and the 7,500-signature presidential petition requirement imposed by the Court in 2016. (ECF 134-1 at 45-46.)

These are all distinctions that matter. They address the areas mentioned in the Eleventh Circuit's opinion, 960 F.3d at 1346, and they are among the many factors recited by Judge Anderson at oral argument before he concluded that "I think there's a whole lot that has changed." Oral Argument at 18:09-19:20, *Cowen* (No. 19-14065), *available at*

https://www.ca11.uscourts.gov/system/files_force/oral_argument_recordings/19-14065.mp3.

The Secretary's brief addresses only three of the distinctions between this case and *Jenness* that the plaintiffs pointed out in their opening brief, and none of the Secretary's counterarguments are persuasive.

First, the Secretary suggests that independent candidates' record of recent success in obtaining ballot access under the challenged provisions in Georgia did not matter to the Supreme Court's decision in *Jenness* because the Court was only "looking at whether Georgia's scheme allowed for the *possibility* that a third-party candidate could get on the ballot." (ECF 140 at 9-10.) But this reading of *Jenness* is not persuasive for the reasons pointed out in the plaintiffs' opposition brief. (ECF 139 at 12-13.) The plaintiffs incorporate that discussion here.

Second, the Secretary concedes that campaign-finance laws have changed substantially since the time of *Jenness*, but he argues that those changes do not matter because the plaintiffs have not cited any cases holding that the added burdens associated with campaign contribution limits "have any bearing whatsoever on the constitutionality of state

ballot-access requirements." (ECF 140 at 18.) This argument is unpersuasive because *Anderson* does not limit the factors on which a court may rely in evaluating the constitutional burden. *Anderson* requires an expansive, fact-based look at the context of a challenged election law, and there is no basis in that case or any other for suggesting that the added difficulty of meeting a petition requirement due to suffocating campaign-contribution limits is somehow off limits.

Third, the Secretary argues that Georgia law still "freely provides for write-in votes" as the Supreme Court observed in *Jenness*. (ECF 140 at 19-20 (quoting *Jenness*, 403 U.S. at 438).) But this argument is unpersuasive because the Secretary concedes that Georgia's laws on write-in voting have indeed become more restrictive since the time of *Jenness*. While Georgia previously had "no limitation" on write-in voting, *Jenness*, 403 U.S. at 434, it now clearly does. Voters are no longer free to write-in the candidates of their choice and to have those votes counted. Write-ins are now counted only if a candidate has met the pre-registration requirements. Ga. Comp. R. & Regs. 183-1-15-.02(5). This limitation impinges upon a voter's right to associate and to cast her vote effectively in a way that Georgia's system previously did not.

For all of these reasons, this Court should reject the Secretary's argument that caselaw compels a certain conclusion under the first step of the *Anderson* test. That judgment should instead account for the full record before the Court, and the full record shows a heavy burden.

### III. The undisputed facts establish that Georgia's ballot-access restrictions impose a heavy burden.

As the Eleventh Circuit observed in its opinion in this case, the facts here "are not seriously disputed." 960 F.3d at 1340. There is a mountain of uncontroverted and undisputed evidence that Georgia's ballot-access restrictions on independent and third-party candidates for U.S. Representative impose a heavy burden on the rights of political parties, candidates, and Georgia voters. In his response brief, the Secretary of State tries to chip away at that mountain with picayune legal arguments, but those arguments have no merit and do not undermine the plaintiffs' evidence.

For example, the Secretary argues that the undisputed fact that Georgia's signature requirement is the highest in the nation is irrelevant because the Court may not compare Georgia's laws to those of any other state. (ECF 140 at 15-16.) Of course, Judge Story relied heavily and explicitly on a comparison to other states in *Green Party*. 171 F. Supp. 3d

at 1363. On appeal, the Secretary of State vigorously argued the same point that he raises here, and the Eleventh Circuit nonetheless affirmed. (Ex. 50: add'l excerpts from appellant's briefs, ECF 105-7 at 2-4, 14-15.) Thus, while the Court may not be free to impose the legislative judgments of other states on the State of Georgia, that does not necessarily mean that the Court must blind itself to the probative evidence in the record. Again, *Anderson* is an expansive, fact-based test, and no evidence is necessarily off limits.

The Secretary also argues that the undisputed factual similarities between this case and the record in *Green Party* are irrelevant because that case involved petition requirements for independent and third-party presidential candidates. (ECF 140 at 13-15.) The Secretary claims that Judge Story only applied strict scrutiny in that case because he found that the burden on the voters—not candidates—was severe due to the nature of a presidential election. (ECF 140 at 13.) The Secretary also claims that Judge Story's decision was "based entirely" on the presidential nature of the case. But this misreads the case. Judge Story actually found that "[t]he burdens to Plaintiffs' constitutional rights are severe." 171 F. Supp. 3d at 1365. And, of course, the plaintiffs were the

Green Party and the Constitution Party. *Id.* at 1344. While Judge Story did consider the impact of the challenged law on Georgia's voters, he also considered the impact on the parties and candidates. *Id.* at 1360-62; *see also id.* at 1362 ("[T]he Court emphasizes that ballot access restrictions have a substantial impact on both candidates *and* voters."). Moreover, as the Eleventh Circuit explained in its opinion in this case, a case involving presidential candidates alters "the weighing of interests" under the *Anderson* test. *Cowen*, 960 F.3d at 1344. It does not make the court's analysis of the burden irrelevant. Judge Story's analysis of the burden was *not* based entirely on factors unique to a presidential election but on factors that apply with equal or greater force here, such as a comparison of Georgia's signature requirements to other states and the absence of successful petitioning candidates in recent years. 171 F. Supp. 3d at 1363. Those factors should weigh heavily here.

Although he claims that presidential ballot-access is irrelevant, the Secretary argues that recent success in obtaining ballot access by one independent candidate for state representative and one independent candidate for district attorney not only is relevant but also precludes any finding that Georgia's ballot-access restrictions for independent and

third-party candidates for U.S. Representative impose a severe burden.
Not so. The plaintiffs have already explained why these recent successes
shed little light, and they incorporate that discussion here. (ECF 139 at
4-5, 15-17.)

The Secretary also suggests that undisputed facts about the
impact of campaign-finance law on petitioning efforts are irrelevant
because contribution limits "are not a burden unique to political body
and independent candidates." (ECF 140 at 16.) This suggestion is doubly
wrong. First, it is not true, as a matter of fact, that the burden of
campaign contribution limits falls equally on all candidates. Independent
and third-party candidates need to raise and spend a gigantic sum of
money just to get on the ballot, and political-party candidates don't.
Second, there is no basis in any event for concluding that evidence of the
burden is irrelevant here.  The Secretary cites no authority to support
his suggestion, and the plaintiffs are aware of none. Again, nothing in
*Anderson* or later cases suggests that this evidence is off limits.

Lastly, the Secretary tries to undermine this Court's prior finding
that since 2002 alone, at least 20 independent and third-party
candidates for U.S. Representative "have unsuccessfully attempted to

access the ballot." (ECF 113 at 6.) The Secretary discounts this evidence entirely by asserting that only one of the unsuccessful candidates—Wayne Parker in 2002—was reasonably diligent in their efforts (ECF 140 at 10-11), but this assertion does not square with the record or even with the Secretary's own admissions. (*See, e.g.,* ECF 97 at 37, 40, 41, 42, 47 ¶¶ 97, 101, 102, 104, 111.) Parker, moreover, was not successful in meeting a petition requirement that was lowered by half. His testimony does not, as the Secretary claims, support an inference "that it is possible to collect the necessary signatures." (ECF 140 at 12.) And nothing in the Secretary's brief disputes the single-most important fact in this case: no third-party candidate for U.S. Representative has ever satisfied the five-percent signature requirement since it was first enacted in 1943. (ECF 97 at 30 ¶ 76.)

## IV. The Secretary of State flunks step three of the *Anderson* test.

The third step in the *Anderson* test requires the Court to "evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights." *Bergland*, 767 F.2d at 1553-54. The Secretary argues, however, that step three of the *Anderson* test does not apply

when a court finds in step one that the lowest level of scrutiny should
apply (as the Secretary urges here). (ECF 140 at 21-22.) And he therefore
makes no attempt to demonstrate why Georgia's ballot-access
restrictions are necessary to serve any state interest. (*Id.* at 22.)

The Secretary's argument is contrary to law for the reasons
discussed at length in the plaintiffs' response brief, and the plaintiffs
incorporate that discussion here. (ECF 139 at 6-9.) Under controlling
law, the Secretary has the burden of justifying even minimal burdens:
"However slight that burden may appear . . . it must be justified by
relevant and legitimate state interests 'sufficiently weighty to justify the
limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191
(2008) (controlling op.) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89
(1992)); *accord*, *Democratic Exec. Cmte. of Fla. v. Lee*, 915 F.3d 1312,
1318-19 (11th Cir. 2019); *Common Cause/Ga. v. Billups*, 554 F.3d 1340,
1352 (11th Cir. 2009). The Secretary would thus flunk step three even if
the Court were to find that low-level scrutiny applies.

The Secretary's argument essentially concedes that Georgia's
ballot-access restrictions are not necessary to achieve any state interests,
and it's easy to see why. The State of Georgia has a less restrictive

method that it already uses to ensure that Libertarian candidates have a modicum of support. That method is the one-percent vote threshold for retaining the ability to nominate candidates for statewide office by convention. *See* O.C.G.A. § 21-2-180(2). If a Libertarian candidate for statewide office receives votes totaling at least one percent of the voters registered in that election, the party retains its ability to nominate statewide candidates without a petition in the next election. In other words, the Georgia General Assembly has decided that the Libertarian Party can demonstrate support by earning votes.  In addition, as explained in earlier briefing, the Secretary could easily use earned votes to measure the support of Libertarian candidates in any congressional district. (ECF 105 at 13-14.) In 2016, for example, the Libertarian candidate for the Public Service Commission received no fewer than 45,337 votes (or 16.5 percent of the votes) in any of Georgia's congressional districts. (ECF 105-6.) This more than adequately demonstrates substantial support for the Libertarian Party in all of Georgia's congressional districts.

Or the State could use a less-restrictive signature requirement. The signature requirement for presidential candidates, which amounts

to approximately one-tenth of one percent of Georgia's registered voters, has proven to be high enough to exclude all independent and third-party candidates (other than the Libertarian candidates) over two election cycles. There is no evidence in the record to suggest that a similar signature requirement for independent and third-party candidates for U.S. Representative would not have a similar result.

The Court should therefore conclude that, under any level of scrutiny, the restrictions at issue here cannot pass the *Anderson* test.

## V.   The Secretary of State fails to distinguish *Norman*.

The Secretary spends almost five pages of his brief trying once again to distinguish this case from the Supreme Court's decision in *Norman*. (ECF 140 at 23-28.) The plaintiffs have addressed his arguments at length elsewhere, and they incorporate that discussion here. (ECF 105 at 2-6; ECF 139 at 18-21.) The only thing that's new in the Secretary's brief is his argument that *Norman* is distinguishable because (1) "Georgia does not require [independent and third party] candidates for U.S. Representative to meet the 5% signature requirement for every political subdivision within the district," and (2) Georgia does not "require political bodies to nominate and qualify an

entire slate of candidates for every congressional district." (ECF 140 at 27.) But this argument misreads *Norman*.

The "constitutional flaw" in the Illinois law at issue in *Norman* was not that it had a distribution requirement for signatures nor that it had a complete-slate requirement. 502 U.S. at 293. Indeed, the Supreme Court suggested that a distribution requirement might be permissible, *id.* at 293-94, and it expressly declined to address the constitutionality of the complete-slate requirement, *id.* at 295-96. Rather, the flaw was that Illinois law required the Harold Washington Party "to gather twice as many signatures to field candidates in Cook County [50,000] as they would need statewide [25,000]." *Id.* at 293. Here, of course, the disparity is even worse.

Though he denies that a disparity exists at all and tries unsuccessfully to distinguish *Norman*, the Secretary does not make a serious attempt to justify the disparity created by Georgia law. Accordingly, the Court should conclude that *Norman* controls and compels the conclusion that Georgia's ballot-access scheme is constitutionally flawed.

## VI.   The Secretary of State's Equal Protection argument offers nothing new.

The Secretary of State's response brief makes no new arguments in opposition to the plaintiffs' Equal Protection claim. The response argument is copied almost verbatim from his initial brief. (*Compare* ECF 135-1 at 23-25 *with* ECF 140 at 28-30.) He simply denies that Georgia law does, in fact, treat Libertarian candidates for U.S. Representative differently from Libertarian candidates for statewide office, and he argues, without mentioning the principal case on which the plaintiffs rely, that the plaintiffs' claim "is not one that has ever been recognized by any court." (ECF 140 at 28.) The plaintiffs have already responded to the Secretary's argument, and they incorporate that discussion here. (ECF 139 at 21-23.)

The only substantial difference in his response brief is the addition of two sentences: "It is the State's policy choice to require candidates to demonstrate support among the voters at the state *and* district level, and no court has ever held that this policy judgment is unconstitutional. … This is not an 'absurd' or unjustified classification as Plaintiffs contend, because the Libertarian Party could be popular in one part of the state, but not another." (ECF 140 at 29-30.) But this, too, is nothing

new. The Secretary made this very argument during briefing on the first round of summary-judgment motions, and the plaintiffs pointed out that the Supreme Court squarely rejected it in *Norman*. (ECF 69-1 at 28-29, 42-44; ECF 96 at 15-16; ECF 105 at 6-8; ECF 134-1 at 30.) The plaintiffs incorporate that discussion here.

## VII.  Conclusion

The undisputed facts in this fact-intensive case are overwhelming. It is *particularly* clear that Georgia's ballot-access restrictions offend the constitution for the reasons set out in *Norman* and *Socialist Workers*, but the robust record here permits the trier of fact to reach only one conclusion on each of the plaintiffs' claims. This Court should therefore grant summary judgment in the plaintiffs' favor.

Respectfully submitted this 16th day of October, 2020.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## Certificate of Compliance

I hereby certify that the forgoing PLAINTIFFS' REPLY IN

SUPPORT OF THEIR SECOND MOTION FOR SUMMARY

JUDGMENT was prepared in 13-point Century Schoolbook in

compliance with Local Rules 5.1(C) and 7.1(D).


**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com