IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARTIN COWEN, *et al.*,        :
                               :
                               :
        Plaintiffs,            :
                               :
v.                             :
                               :
BRAD RAFFENSPERGER, in his     :        CIVIL ACTION NO.
official capacity as Secretary of State :   1:17-CV-04660-LMM
of Georgia,                    :
                               :
                               :
        Defendant.             :

## **ORDER**

This case comes before the Court on Plaintiffs' Second Motion for Summary Judgment [134], Defendant's Second Motion for Summary Judgment [135], and Defendant's Motion to Exclude Expert Witness [137]. The Court previously granted Defendant's first motion for summary judgment. See Dkt. No. [113]. On appeal, the Eleventh Circuit vacated that decision and remanded to this Court. See Cowen v. Ga. Sec'y of State, 960 F.3d 1339, 1340 (11th Cir. 2020). The parties then filed the present Motions. After considering the Eleventh Circuit's decision, the parties' briefs, and the evidence in the record, the Court enters the following Order:

## I.    FACTUAL BACKGROUND

This case is a constitutional challenge to Georgia's ballot-access restrictions for third-party and independent candidates seeking election to the United States House of Representatives. Plaintiffs are the Libertarian Party of Georgia, prospective Libertarian candidates, and Libertarian voters. Plaintiffs seek injunctive relief and a declaration that Georgia's ballot-access restrictions (1) unconstitutionally burden Plaintiffs' rights under the First and Fourteenth Amendments and (2) violate the Equal Protection Clause of the Fourteenth Amendment. See Dkt. No. [1] ¶¶ 148–52.

### A. History of Georgia's Ballot-Access Restrictions

Georgia enacted its first ballot-access law in 1922, which provided that an independent candidate, or the nominee of any party, could appear on the general-election ballot as a candidate for any office with no petition and no fee. Dkt. No. [97] ¶ 13. In 1943, Georgia adopted a 5% petition requirement for access to the general-election ballot. Id. ¶ 15. That law allowed candidates of any political party that received at least 5% of the votes in the last general election for the office to appear on the general-election ballot without a petition or fee. Id. All other candidates were required to file a petition signed by at least 5% of the registered voters in the territory covered by the office. Id. The deadline for the petition was thirty days before the general election. Id. ¶ 16. Between 1943 and 1999, the Georgia General Assembly adopted a series of incremental changes to the petition deadline and imposed various other restrictions. Id. ¶¶ 17–26.

## B. Georgia's Current Ballot-Access Laws

Georgia's current ballot-access laws distinguish between (1) candidates nominated by a political party; (2) candidates nominated by a political body; and, (3) independent candidates. Under Georgia law, a "political party" is any political organization whose nominee received at least twenty percent of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25). Political parties choose nominees in partisan primaries, and the candidate nominated by the party automatically appears on the general election ballot for any statewide or district office. O.C.G.A. § 21-2-130(1). Presently, the only entities that meet the definition of "political party" under Georgia law are the Democratic Party of Georgia and the Georgia Republican Party. Dkt. No. [97] ¶ 38.

A "political body" is any political organization other than a political party. O.C.G.A. § 21-2-2(23). The Libertarian Party is a political body under Georgia law. Dkt. No. [97] at 9. Political bodies must nominate candidates for partisan offices by convention, O.C.G.A. § 21-2-170(g), and the nominees' access to the general-election ballot may depend on whether the nominee seeks a statewide office, a non-statewide office, or the office of the President of the United States.

Under Georgia law, a political body may become "qualified to nominate candidates for statewide public office by convention." O.C.G.A. § 21-2-180. A political body becomes qualified to nominate candidates for *statewide* public office by convention if: (1) it submits a qualifying petition signed by at least one percent of the total number of registered voters at the last general election; or (2)

3

it nominated a candidate for statewide public office in the last general election who received votes totaling at least one percent of the total number of registered voters in the election. O.C.G.A. § 21-2-180. The Libertarian Party has been qualified for statewide offices under § 21-2-180 since 1988. Dkt. No. [97] ¶ 204. Candidates for statewide offices nominated by a political body that are qualified under § 21-2-180 appear automatically on the general election ballot without a nomination petition. O.C.G.A. § 21-2-132(e)(5).

However, candidates for *non-statewide* offices (including the office of U.S. Representative) nominated by a § 21-2-180-qualified political body do not appear automatically on the general-election ballot. Instead, such candidates must submit (1) a notice of candidacy and qualifying fee,[1] see O.C.G.A. § 21-2-132(d), and (2) a nomination petition signed by 5% of the number of registered voters eligible to vote for that office in the last election, see O.C.G.A. § 21-2-170(b). Thus, in order for the Libertarian Party to have run a full a slate of candidates for U.S. Representative in 2020, it would have had to pay the necessary qualifying fees pursuant to § 21-2-132(d) and submit the necessary 5% nomination petitions pursuant to O.C.G.A. § 21-2-170(b). This ballot-access scheme for *non-statewide*

---

[1] Pursuant to O.C.G.A. § 21-2-132(g), a candidate may file a pauper's affidavit in lieu of paying the qualifying fee. A pauper's affidavit requires the candidate to swear under oath that the candidate has neither the assets nor income to pay the filing fee, and it requires the candidate to submit a personal financial statement. Id.

political-body and independent candidates is the target of Plaintiffs'
constitutional challenge.

The qualifying fee for most partisan public offices, including U.S.
Representative, is 3% of the annual salary of the office. O.C.G.A. § 21-2-
131(a)(1)(A). The current annual salary for U.S. Representatives is $174,000. Dkt.
No. [97] ¶ 64. As such, the qualifying fee for each candidate for U.S.
Representative is $5,220. Because Georgia currently has fourteen members of the
U.S. House of Representatives, each of whom is elected from a single-member
district, the Libertarian Party would have needed to pay $73,080 in qualifying
fees in order to run a full slate of U.S. Representative candidates in 2020. Id. ¶¶
60, 64. The Secretary of State estimates that the Libertarian Party would also
have also needed 321,713 signatures to run a full slate of U.S. Representative
candidates in 2020. Id. ¶ 63; see also Dkt. No. [69-34] at 8.

Qualifying fees for political-party candidates for U.S. Representative are
paid directly to the state political party, which retains 75% and sends 25% to the
Secretary of State. O.C.G.A. § 21-2-131(b)–(c). Qualifying fees for independent
and political-body candidates for U.S. Representative are paid to the Secretary of
State. O.C.G.A. § 21-2-131(b)(2). For political body candidates, the Secretary
retains twenty-five percent and sends seventy-five percent to the political body.
O.C.G.A. § 21-2-131(c)(4)(A). While the statute requires the Secretary of State to
distribute the funds "as soon as practicable," the Libertarian Party did not receive

its share of the qualifying fees for the 2018 election until after the election was over, in mid-April 2019. O.C.G.A. § 21-2-131(c)(4); Dkt. No. [69-12] ¶¶ 15–16.

The deadline for political-body candidates to file their notice of candidacy and qualifying fee is noon on the Friday following the Monday of the thirty-fifth week before the general election—a date that falls in early March of an election year. O.C.G.A. § 21-2-132(d)(2). The nomination petition is due no later than noon on the second Tuesday in July. O.C.G.A. § 21-2-132(e). The form of the petition is set out by statute. O.C.G.A. § 21-2-183. A nomination petition must be on sheets of uniform size and different sheets must be used by signers residing in different counties or municipalities. O.C.G.A. § 21-2-170(d). Each sheet must also contain a sworn and notarized affidavit of the circulator attesting, among other things, that each signature on the sheet was gathered within 180 days of the filing deadline. Id.

No political-body candidate for U.S. Representative has *ever* satisfied the requirements to appear on Georgia's general-election ballot since the 5% petition requirement was adopted in 1943. Dkt. No. [97] ¶ 76. Plaintiffs have submitted evidence that since 2002, at least twenty independent and political body candidates have unsuccessfully attempted to access the ballot. Id. ¶¶ 92-131. Plaintiffs also provide evidence of the various practical barriers to gathering enough signatures to satisfy the 5% petition requirement, including: (1) the Secretary of State's signature-checking process, which according to Plaintiffs is error prone; (2) the difficulty and pace of petitioning; (3) the cost of petitioning

and the impact of federal campaign finance law; (4) petition-circulators' lack of access to voters; and; (5) public concern about disclosing the confidential information required by the form of a nomination petition. Id. ¶¶ 144, 149-154, 171, 173-74, 181-84. The Court discusses this evidence in further detail in its analysis of the burden imposed on Plaintiffs' rights.

### C. Support for the Libertarian Party

The Libertarian Party was founded in 1971 and is organized in all fifty states, plus the District of Columbia. Id. ¶ 189. Nationwide, the Libertarian Party is currently the third-largest political party in the United States by voter registration. Id. ¶ 190. In 2018, the National Libertarian Party counted as members, including persons that paid no annual dues, 5,851 persons residing in Georgia. Dkt. No. [96-1] ¶ 24. The most recent data from the parties shows that in 2016, the Libertarian Party of Georgia had 161 dues-paying members. Id. ¶ 25.

The Libertarian Party runs hundreds of candidates in every election cycle who seek positions ranging from city council to President. Dkt. No. [97] ¶ 194. The Libertarian Party runs numerous candidates for U.S. Representative and has had those candidates on the ballot in every state in the nation *except Georgia*. Id. ¶ 197. There are currently 180 elected officials affiliated with the Libertarian Party nationwide. Id. ¶ 198.

In 1988, the Libertarian Party of Georgia qualified to nominate candidates for statewide public office by convention when it submitted a qualifying petition signed by at least one percent of the number of total registered voters at the

preceding general election. Id. ¶ 204. The Party has retained that qualification under Georgia law in each election cycle since 1988 by nominating at least one candidate for statewide public office who received votes totaling at least one percent of the total number of registered voters who were registered and eligible to vote in that election. Id. In the last ten years, Libertarian candidates for statewide offices in Georgia have received more than five million votes. Id. ¶ 205.

## II.    PROCEDURAL BACKGROUND

Plaintiffs first sued in this Court on November 21, 2017, alleging that Georgia's ballot-access laws violate their First and Fourteenth Amendment associational and voting rights and their Fourteenth Amendment equal-protection rights. Dkt. No. [1] ¶¶ 148–149. On September 23, 2019, the Court held that Defendant was entitled to summary judgment. Dkt. No. [113]. The Court reached this conclusion based on the Supreme Court's decision in Jenness v. Forston, 403 U.S. 431 (1971), which upheld as constitutional Georgia's law requiring a third-party or independent candidate for any race to file a nominating petition signed by at least 5% of the number of registered voters in the last general election for the office in question. Plaintiffs then appealed to the Eleventh Circuit. Dkt. No. [115]. The Eleventh Circuit reversed and remanded, holding that this Court erred in its conclusion that Plaintiffs' challenge was foreclosed by Supreme Court and Eleventh Circuit precedent without conducting the balancing test articulated in Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). See Cowen, 960 F.3d at 1343. On remand, the Eleventh Circuit has instructed the Court to

8

apply the Anderson test and to consider Plaintiffs' Equal Protection challenge. See id. at 1347.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most

favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

The same standard of review applies to cross-motions for summary judgment, but the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts. S. Pilot Ins. Co. v. CECS, Inc., 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)). Each motion must be considered "on its own merits, [with] all reasonable inferences [resolved] against the party whose motion is under consideration." Id. at 1243.

## IV.   DISCUSSION

Plaintiffs argue that they are entitled to summary judgment because Georgia's ballot-access restrictions for political body candidates for U.S. Representative unconstitutionally burden their First and Fourteenth Amendment rights. Dkt. Nos. [1] ¶ 148; [134-1] at 7–8. Plaintiffs challenge Georgia's 5%

petition-signature requirement, see O.C.G.A. § 21-1-170(b), as well as the qualifying fee requirement for the office of U.S. Representative, see O.C.G.A. § 21-2-132(d). Plaintiffs argue that "[t]his case is about the '*cumulative* burdens' of Georgia's ballot-access, which include not only a burdensome petition requirement but also the highest candidate qualifying fee in the nation." Dkt. No. [134-1] at 45 (emphasis in original). Plaintiffs also challenge Georgia's ballot-access laws under the Equal Protection Clause, arguing that the ballot-access restrictions create a classification that treats Libertarian Party candidates for U.S. Representative differently from Libertarian Party candidates for statewide offices.[2] Dkt. No. [1] ¶ 149; [134-1] at 8, 54−56. Defendant moves for summary judgment on both of Plaintiffs' claims. See Dkt. No. [135]. In accordance with the Eleventh Circuit's instructions, the Court considers Plaintiffs' claims and the parties' respective arguments in turn.

### A. Plaintiffs' First and Fourteenth Amendment Claim and the Anderson Test

Plaintiffs contend that Georgia's ballot-access laws unconstitutionally burden their First and Fourteenth Amendment rights to vote and to associate with their preferred political party. Dkt. No. [134-1] at 8, 35−36. In remanding the case to this Court, the Eleventh Circuit instructed the Court to apply the balancing test set forth in Anderson to determine whether the challenged ballot-

---

[2] Plaintiffs have not moved for summary judgment on their Equal-Protection Claim that the laws were adopted with a discriminatory purpose.

access laws violate these First and Fourteenth Amendment rights. See Cowen, 960 F.3d at 1346. Under the balancing test established in Anderson, the Court must (1) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate[]"; (2) "identify and evaluate the precise interests put forward by the State as justification for the burden imposed by its rule"; and (3) "weigh all these factors and decide whether the challenged provision is unconstitutional." Id. at 1342 (alterations and quotation marks omitted) (quoting Anderson, 460 U.S. at 789).

"Under this framework, the level of scrutiny . . . appl[ied] to a ballot-access law depends on the severity of the burdens it imposes." Indep. Party of Fla. v. Sec'y, State of Fla., 967 F.3d 1277, 1281 (11th Cir. 2020); see also Stein v. Ala. Sec'y of State, 774 F.3d 689, 694 (11th Cir. 2014) ("[T]he level of scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights."). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997). "Lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." Id. (quotation marks and citation omitted). Still, "[h]owever severe the burden, [a court] must ensure it is warranted 'by relevant and legitimate state interests sufficiently weighty to justify the limitation.'" Indep.

Party of Fla., 967 F.3d at 1281 (quoting Common Cause/Ga. v. Billups, 554 F.3d 1340, 1352 (11th Cir. 2009)).

The Eleventh Circuit has also explained that contextual, circumstance-specific analysis is central to the test articulated in Anderson, noting that the Supreme Court has rejected the use of a "litmus-paper test" to differentiate between valid and invalid restrictions. See Cowen, 960 F.3d at 1342 (quoting Anderson, 460 U.S. at 789); see also Storer v. Brown, 415 U.S. 724, 730 (1974) ("The rule is not self-executing and is no substitute for the hard judgments that must be made."). To this end, "the *Anderson* analysis must be undertaken even if the very same requirement had been previously upheld as constitutional, if there are at least some non-frivolous arguments that, since the decision upholding the requirement, circumstances have changed the context of the analysis." Cowen, 960 F.3d at 1342 n.1. With this in mind, the Court turns to the parties' arguments regarding the severity of the burden that Georgia's ballot-access laws impose on Plaintiffs' First and Fourteenth Amendment rights.

### 1. The Character and Magnitude of the Injury

The Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment that the plaintiff seeks to vindicate[]". Anderson, 460 U.S. at 789. As to the character of the injury, Plaintiffs assert two related rights: "the right of individuals to associate for the advancement of political beliefs[] and the right of qualified voters, regardless of political persuasion, to cast their votes effectively." Dkt. No.

[134-1] at 35–36 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)). These rights "rank among our most precious freedoms." Williams, 393 U.S. at 30. "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" Anderson, 460 U.S. at 787 (quoting Lubin v. Panish, 415 U.S. 709, 716 (1974)). And "[t]he exclusion of candidates also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens." Id.; Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 186 (1979) ("[A]n election campaign is a means of disseminating ideas as well as attaining political office. . . . Overbroad restrictions on ballot access jeopardize this form of political expression.").

As to the magnitude of the injury, Plaintiffs argue that their right to vote and right to associate have been severely burdened. Dkt. No. [134-1] at 37. Defendant disagrees. He cites a series of cases in which the Supreme Court and Eleventh Circuit have upheld Georgia's 5% signature requirement in part because the requirement did not severely burden plaintiffs in those cases. Dkt. No. [140] at 5–8. Defendant has moved for summary judgment on this basis. Dkt. No. [135]. The Court first addresses the magnitude of the injury to Plaintiffs' rights based on the facts in the current record, and then the Court addresses the relevant precedents that Defendant cites.

14

### i. Severity of Burden

The Court agrees with Plaintiffs that Georgia law imposes a severe burden on their First and Fourteenth Amendment rights. The cumulative effect of Georgia's requirements on independent and political-body candidates has frozen the political status quo in Georgia as to congressional races. Libertarian Party of Fla. v. Florida, 710 F.2d 790, 793 (11th Cir. 1983) ("[A] court must determine whether the challenged laws 'freeze' the status quo by effectively barring all candidates other than those of major parties . . . ."). Georgia's laws "ha[ve] effectively foreclosed [Georgia's] [federal congressional] ballot to all but Republicans and Democrats." Williams, 393 U.S. at 35 (Douglas, J., concurring).

The robust record in this case supports this conclusion, and the Court highlights several key facts from it. First, the historical record shows that third-party and independent candidates have largely been excluded from Georgia's congressional ballots. Since 1943, the year the 5% requirement was adopted, no political-body candidate for U.S. Representative has appeared on a general election ballot in Georgia. Dkt. No. [97] ¶ 76. In fact, Plaintiffs note that "Georgia's signature requirement is higher, in absolute terms, than any signature requirement that an independent or third-party candidate for U.S. Representative has ever overcome in the history of the United States." Dkt. No. [134-1] at 38.

As a result, no Georgia voter hoping to support a third-party candidate for U.S. Representative has been able to vote their preference. No such Georgia voter

has been able to associate with others who share their views—to express their beliefs by supporting an alternative candidate to those chosen by the Republican and Democratic parties. Only two independent candidates have ever appeared on Georgia's general election ballot for non-statewide office, though neither accessed the ballot under the restrictions as they exist today. Dkt. No. [97] ¶¶ 77–81. In 1964, Milton Lent qualified as an independent candidate in Georgia's First Congressional District. Id. ¶ 77. At that time, voter registration rates were lower; the congressional districts did not split county boundaries; there was no qualifying fee; there was no time limit for gathering signatures; and the petition deadline was October. Id. ¶¶ 78–80. In 1982, Billy McKinney qualified as an independent candidate for U.S. Representative in Georgia's Fifth Congressional District after a federal court temporarily lowered the requirement to 4,037 signatures. Id. ¶ 81.

This long absence of political-body candidates from Georgia's congressional ballots is not for lack of effort on their part. Plaintiffs have produced evidence in this case from 20 third-party and independent candidates who have tried and failed to appear on the ballot since 2002. This evidence strongly supports the conclusion that Georgia's ballot-access laws impose a severe burden based upon the Supreme Court's formulation in Storer: "[C]ould a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" Storer, 415 U.S. at 742; see also Libertarian Party of

16

Fla., 710 F.2d at 793 (citing Storer). The record indicates that it is exceedingly difficult for even reasonably diligent candidates to access Georgia's ballots.

Plaintiffs have submitted evidence that, since 2002, several independent and political-body candidates for U.S. Representative have unsuccessfully attempted to access the ballot.[3] The Court details a few examples here. In 2002, the Libertarian party sought to qualify Wayne Parker for U.S. Representative in Georgia's Eleventh Congressional District. Dkt. No. [69-19] ¶ 5. Because the 2002 redistricting process had reduced the time available for petitioning, a federal judge reduced the signature requirement to 9,462 signatures. Id. ¶ 8. The Party raised approximately $40,000 and used thirty-five professional, paid petition circulators (after beginning with volunteers) to focus on Parker's petition campaign. Id. ¶¶ 9–11. Parker submitted more than 20,000 raw signatures. Id. ¶ 13. The Secretary of State's office rejected more than half of the signatures, leaving Parker with 8,346. Id. ¶ 14.

In 2008, Faye Coffield attempted to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. Dkt. No.

---

[3] The parties dispute how many aspiring candidates are properly before the Court. Plaintiffs claim 20 candidates, but Defendant argues that nine of these candidates should not be considered. Dkt. No. [140] at 11 n.5 Defendant argues that these nine candidates appear only in unauthenticated documents or hearsay statements from other witnesses. Id. Plaintiffs do not directly counter this argument in their summary-judgment briefing, and so the Court will not consider the additional nine candidates. In any event, the Court finds that the difference between 11 and 20 candidates does not change its finding regarding the burden faced by Plaintiffs.

[97] ¶ 104. She needed approximately 15,000 signatures to qualify for the ballot. Dkt. Nos. [97] ¶ 104; [69-7] ¶ 7. With a team of volunteers, and over the course of approximately two months during which she estimates they spent hundreds of hours gathering signatures, she gathered roughly 2,000 signatures. Dkt. Nos. [97] ¶ 104; [69-7] ¶¶ 6, 8. The Secretary of State did not accept her petitions "because they did not contain the required number of signatures on their face," and she did not qualify for the ballot. Dkt. No. [69-7] ¶ 8; see also Dkt. No. [97] ¶ 104.

In 2010, Jeff Anderson sought to qualify for the general-election ballot as an independent candidate in Georgia's Eleventh Congressional District. Id. ¶ 101. He had a team of approximately twenty-four volunteer petition circulators who ultimately gathered between 11,000 and 12,000 signatures. Id. Anderson did not file the signatures with the Secretary of State because this number was far short of what he needed. Id. Likewise in 2010, Eugene Moon attempted to qualify for the general-election ballot as an independent candidate in Georgia's Ninth Congressional District. Dkt. No. [97] ¶ 102. His team of volunteers gathered roughly 13,000 signatures, but he also did not file any of these signatures with the Secretary of State because this number was below what was needed to qualify for the ballot. See id.; see also Dkt. No. [69-17] ¶ 6.

In 2016, Hien Dai Nguyen attempted to qualify for the general-election ballot as an independent candidate in Georgia's Fourth Congressional District. Dkt. No. [97] ¶ 97. His team of volunteer petition circulators gathered

approximately 25,000 signatures across Dekalb, Gwinnett, and Rockdale counties, but only 528 of these signatures were accepted as valid by the Secretary of State's office. Dkt. No. [69-18] ¶¶ 8–9.[4] As a result, Nguyen did not qualify for the general-election ballot. Dkt. Nos. [97] ¶ 97; [69-18] ¶ 9.

Defendant attacks Plaintiffs' evidence of failed candidacies. He argues that some of Plaintiffs' "would-be candidates gathered only a few hundred signatures, or did not even try." Dkt. No. [140] at 11. But this fact may help Plaintiffs as much as it harms them. Defendant highlights these candidates to argue that not all of Plaintiffs' candidates who tried to access the ballot made genuine efforts. But the Court notes that several of these candidates gave up for the simple reason that Georgia's ballot access requirements were too high to be worth their effort. See, e.g., Dkt. No. [69-2] ¶ 100 ("McKinney soon determined that she would not be able to raise the resources necessary to mount a successful ballot-access campaign *and* a competitive campaign in the general election once ballot access

---

[4] Defendant objects to paragraph 9 of Nguyen's declaration, in which he testifies that he received a letter from the Secretary of State's office "informing [him] that only 528 of [his] signatures were valid." Dkt. No. [69-18] ¶ 9. Defendant argues that this paragraph makes reference to the letter without including a copy of it and that it is therefore inadmissible hearsay. Dkt. No. [99] at 17–18. Plaintiffs state that they produced the letter to Defendant during discovery and that it could be introduced at trial and would be plainly admissible in that form. Dkt. No. [105-2] at 39. Plaintiffs also argue that this paragraph refers to statements by the Secretary of State's office, which, as opposing party statements, are not hearsay. Fed. R. Evid. 801(d)(2)(A); see Dkt. No. [105-2] at 39. The Court agrees that this is admissible as an opposing party statement and therefore overrules Defendant's objection to this paragraph of Nguyen's declaration. See Fed. R. Evid. 801(d)(2)(A).

had been secured, and she therefore withdrew from the race."); id. ¶ 102 ("His teams gathered approximately 13,000 raw signatures, but he did not turn them in because he knew that he would not qualify for the ballot."); id. ¶ 106 ("After a while, he realized that he would not be able to qualify for the ballot with volunteer petitions, and the option of using paid petitioners was too expensive. He therefore abandoned his effort to qualify for the ballot and did not submit any signatures."). Undoubtedly some of these candidates were genuine candidates who hoped to appear on the Georgia's general election ballot. Plaintiffs have shown that Georgia's ballot-access scheme disserved each of these candidates and their would-be voters.

Defendant also argues that several independent candidates met the 5% petition requirement—two candidates for State House and one for Brunswick District Attorney. Dkt. No. [140] at 12 (citing Dkt. No. [135-3] at 60–61). Plaintiffs contest that these facts diminish their claim. Dkt. No. [139] at 4–5. They argue that only the Brunswick District Attorney candidate gathered enough signatures to meet the 5% threshold and that he did so under the unusually high-profile circumstances of the Ahmaud Arbery murder and its political fallout. Of the other two candidates, one failed to meet the threshold because the Secretary verified too few of his submitted signatures, Dkt. No. [139-8], and the other only met the threshold after it was lowered by a judge in this District due to the coronavirus pandemic. See Cooper v. Raffensperger, 472 F. Supp. 3d 1282, 2020 WL 3892454 (N.D. Ga. July 9, 2020). The Court agrees with Plaintiffs on this

issue. The success of one local official does not significantly undermine the otherwise categorical exclusion of political-body candidates from congressional ballots in Georgia.

Apart from the history of ballot exclusion in Georgia, the record also indicates that Georgia holds third-party and independent candidates to a higher bar than does any other state. While the Eleventh Circuit has emphasized that states are free "to adopt differing means of regulating ballot access," Libertarian Party of Fla., 710 F.2d at 793, the comparison to other states underscores the severity of the burden in Georgia. Williams, 393 U.S. at 33 n.9 (comparing Ohio's restriction to those of forty-two other states and noting that "no significant problem has arisen in these States which have relatively lenient requirements for obtaining ballot position"); Green Party of Ga. v. Kemp, 171 F. Supp. 3d 1340, 1363 (N.D. Ga. 2016) ("Plaintiffs have put forth evidence showing that Georgia's ballot access signature requirements are substantially higher than those in most other states.").

In support of their motion for summary judgment, Plaintiffs submit an affidavit by Richard Winger, a political scientist and ballot-access scholar.[5] Mr. Winger discusses Georgia's ballot-access requirements for third-party candidates in the context of other states' restrictions. Dkt. No. [69-25]. He also submits an

---

[5] Another judge in the Northern District of Georgia recently relied on Mr. Winger's testimony, finding that "[c]ourts have considered Mr. Winger's expert testimony in many other cases and . . . that he is a reliable witness." Green Party of Ga., 171 F. Supp. 3d at 1348 n.8. This Court agrees.

appendix of data regarding other states' signature requirements and qualifying fees in support of his assertions. See id. at 16–25. According to Mr. Winger, Georgia requires more signatures for third-party candidates for U.S. Representative to appear on the general-election ballot than any other state in the nation, both as a percentage of votes cast and as an absolute number of signatures. Id. ¶ 2a. In 2018, Georgia law required more than 272,00 valid signatures for a third party to run a full slate of candidates for U.S. Representative. Id. ¶ 10. This number represents more than 6.3 percent of all votes cast in Georgia for president in 2016. Id.

Illinois required the next highest number of signatures for a third party to run a full slate of candidates for U.S. Representative; requiring approximately 178,400 valid signatures in 2016 and 262,000 valid signatures in 2018. Id. ¶ 12. These numbers represent approximately 3.2 percent and 4.7 percent of all votes cast in Illinois for president in 2016. Id. New York required the third highest number of signatures for a third party to run a full slate of candidates in 2016 and 2018, requiring approximately 94,500 valid signatures. Id. ¶ 13. This number represents approximately 1.2 percent of all votes cast in New York for president in 2016. Id. Twenty-nine states required 10,000 or fewer signatures for an unqualified third party to run a full slate of candidates for U.S. Representative in 2018. Id. ¶ 14. In some states, third parties may qualify to nominate candidates without submitting any signatures. Id. ¶ 15.

Mr. Winger further testifies that, in the entire history of the United States, only six independent or third-party candidates for U.S. Representative have ever overcome a signature requirement as high as 10,000 signatures, and only one such candidate has overcome a petition requirement higher than 15,000 signatures. Id. ¶¶ 29–37. This leaves political-body candidates in Georgia in an especially difficult position. In 2020, they needed between 19,777 and 26,539 valid signatures, depending on their district, to appear on the general-election ballot for a congressional race. Dkt. No. [134-1] at 31.

Mr. Winger also provides information regarding Georgia's qualifying fees. He states that most states do not require third-party candidates for U.S. Representative who qualify for the general election ballot by petition to pay any qualifying fee. Dkt. No. [69-25] ¶ 17. Among states with a mandatory petition, Georgia's qualifying fees are higher than any other state in the nation. Id. Georgia's qualifying fee for U.S. Representative is $5,220, which amounts to $73,080 for a full slate of candidates. The state that requires the second highest qualifying fee for third-party candidates is North Carolina, which has a qualifying fee of $1,740 (one percent of the annual salary of a U.S. Representative) for a single candidate and $22,620 for a third party to run a full slate of thirteen candidates for U.S. Representative. Id. ¶ 19.

In addition to demonstrating candidates' historical exclusion from ballots and Georgia's restrictiveness compared to other states, Plaintiffs have introduced evidence showing the practical difficulties of obtaining petition signatures to

appear on a ballot. This evidence is key in the context of the <u>Anderson</u> analysis because, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." <u>Anderson</u>, 460 U.S. at 786 (quoting <u>Bullock v. Carter</u>, 405 U.S. 134, 143 (1972)); <u>see also</u> <u>Green Party of Ga.</u>, 171 F. Supp. 3d at 1350 (addressing the practical difficulties of gathering petition signatures in reaching the conclusion that presidential candidates faced a severe burden).

First, Plaintiffs offer evidence that the Secretary of State's petition-checking process yields validation rates of between two percent and forty percent.[6] <u>Id.</u> ¶¶ 145, 147, 148. As a practical matter, then, independent and political body candidates for U.S. Representative must gather signatures in excess of the required figures. Derrick Lee, a member of a professional petition-circulating firm and an experienced petition circulator, estimates based on his experience in Georgia that Libertarian Party candidates would need to gather "somewhere between 600,000 and 1,000,000 signatures" to run a full slate of fourteen candidates for U.S Representative—and that collecting that number of

---

[6] Plaintiffs assert that the Secretary of State's signature-validation process is error-prone, and, as evidence, Plaintiffs offer uncontested testimony that 2016 candidate Rocky De La Fuente's petition contained numerous signatures that were improperly rejected. Dkt. No. [97] ¶ 146. Defendant admits that "some signatures from De La Fuente's petition were improperly rejected." <u>Id.</u>

signatures is not "realistically achievable without an army of paid petition circulators." Dkt. No. [69-13] ¶¶ 21, 22.[7]

Second, Plaintiffs submit evidence regarding the difficulty, pace, and cost of petitioning. Don Webb, a paid petition circulator, testified that he gathers 30 to 40 raw signatures in an eight- or nine-hour day on a Saturday, and 15 to 25 raw signatures on other days—an average of five signatures per hour over the course of a week. Dkt. No. [69-23] ¶ 7. Volunteer signature-gatherers tend to be less effective and rarely are willing or able to work for more than a few hours. Id. ¶ 9; see also Dkt. No. [69-9] ¶ 9. As noted briefly above, Plaintiffs also offer testimony from a number of former independent and Libertarian candidates and experienced petition circulators who opine that it would be impossible for the Libertarian Party to qualify a full slate of candidates for the office of U.S. Representative without making extensive use of paid, professional petition

---

[7] Defendant objects to several declarations Plaintiffs have submitted in support of their claims as containing inadmissible opinion testimony from a lay witness. Defendant argues that this testimony is inadmissible under Federal Rule of Evidence 701. The Court has reviewed these objections and overrules them. Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." U.S. v. Toll, 804 F.3d 1344, 1355 (11th Cir. 2015) (citations omitted). The Court finds that the testimony at issue is fact testimony based on the witness's own personal experiences. See Toll, 804 F.3d at 1355 (quotation marks and citation omitted). Defendant's objections on this basis are overruled.

circulators. See Dkt. Nos. [69-9] ¶¶ 9–10; [69-10] ¶ 10; [69-13] ¶ 21; [69-16] ¶ 8;[8]
[69-23] ¶ 12.

Third, Plaintiffs provide evidence of the potential overall cost of collecting
signatures via paid petitioners. Hugh Esco, Georgia Green Party secretary and
former Georgia Green Party candidate, estimates that a single independent or
political-body candidate would need more than $75,000 to collect the requisite
number of signatures. Dkt. No. [69-9] ¶ 10. Wayne Parker, former Libertarian
Party candidate, estimates that one third-party candidate would need more than
$100,000 for petition circulators. Dkt. No. [69-19] ¶ 17. Plaintiffs note that
raising such sums is difficult in part because federal campaign finance laws limit
the amount that donors, including a state or national party, can contribute to a
candidate. Dkt. No. [97] ¶¶ 162, 171. The maximum amount that a state or
national party may contribute to one candidate for U.S. Representative is
$10,000 per election. Dkt. No. [134-1] at 19.

Finally, regarding the difficulty of collecting petition signatures, Plaintiffs
cite a lack of access to voters and public concern about disclosing confidential
information as barriers to circulating petitions. Dkt. No. [97] ¶¶ 173, 187. Petition

---

[8] Defendant objects to this paragraph of John Monds's declaration. Dkt.
No. [99] at 16. Defendant argues that Monds "does not claim any personal
knowledge of signature-gathering campaigns, and he is not competent to testify
about the feasibility of signature gathering campaigns under Georgia law." Dkt.
No. [99] at 16–17. As Plaintiff notes, however, there is evidence in the record that
Monds does possess personal knowledge of signature-gathering efforts in
Georgia. Defendant's objection is overruled.

circulators in Georgia may not lawfully solicit signatures on private property (i.e., places of public accommodation) without the permission of the property owner. Id. ¶ 173. Georgia law prohibits petition-circulators from canvassing for signatures within 150 feet of a polling place. Id. ¶ 180. Plaintiffs also noted that the nomination petition form requires a signer's birth year. Dkt. No. [134-1] at 21 n.7. Although a voter's date of birth and residential address are not required, providing that information increases the chance that county election officials will be able to identify the signature. Dkt. No. [97] ¶ 186. Plaintiffs have submitted testimony from former candidates indicating that potential signers frequently cited a reluctance to share such information as a reason for not signing a petition. See, e.g., Dkt. Nos. [69-7] ¶ 11; [69-11] ¶ 13; [69-12] ¶ 13.[9]

In sum, the record before the Court indicates that Georgia's ballot access laws, including the 5% petition signature requirement and the qualifying fee, place a severe burden on Plaintiffs' associational rights and right to vote. Even reasonably diligent political-body candidates who have expended considerable time and resources have failed to access Georgia's ballots. Plaintiffs have shown

---

[9] Defendant objects to paragraph 11 of Faye Coffield's Declaration, Dkt. No. [69-7] ¶ 11, and paragraph 13 of Aaron Gilmer's Declaration, Dkt. No. [69-11] ¶ 13. Dkt. No. [99] at 8, 12. Defendant argues that these paragraphs contain inadmissible hearsay. Dkt. No. [99] at 8, 12. However, as Plaintiffs argue, these assertions need not be admitted for the truth of the matter asserted—that is, it does not matter whether potential signers were telling the truth and actually were fearful of sharing this information or not. Dkt. No. [105-2] at 25. What is relevant is that some individuals provided this reason or excuse—true or not—for refusing to sign a petition.

that Georgia's laws relating to these congressional races have functionally frozen the status quo.

### ii. Prior Decisions on Georgia's Ballot-Access Scheme

Prior decisions have addressed and upheld Georgia's 5% signature petition requirement. This Court previously awarded summary judgment to Defendant by applying these decisions, particularly the Supreme Court's decision in <u>Jenness v. Fortson</u>. However, the Eleventh Circuit held that this judgment was in error. The Supreme Court's intervening decision in <u>Anderson</u> changed the test for a First and Fourteenth Amendment challenge in this context. For this reason, the Eleventh Circuit remanded so that the Court could apply the <u>Anderson</u> test. <u>Cowen</u>, 960 F.3d at 1347. Even so, the Eleventh Circuit observed that <u>Jenness</u> remains good law and emphasized that, on remand, Plaintiffs would have to distinguish <u>Jenness</u> "either because of different facts in the instant record, as compared to the record in <u>Jenness</u>; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law." <u>Id.</u> at 1346.

As is clear from the Court's holding that Georgia's ballot-access laws impose a severe burden on Plaintiffs' constitutional rights, the Court finds that Plaintiffs have satisfactorily distinguished <u>Jenness</u>. To make these distinctions clear, the Court briefly reviews <u>Jenness</u> and other relevant precedents to illustrate why this case demands a different outcome regarding the severity of the burden imposed upon Plaintiffs' rights.

In <u>Jenness</u>, a 1971 case, the Supreme Court addressed Georgia's 5%

petition requirement. 430 U.S. at 432. The plaintiffs there challenged provisions

of the Georgia Election Code requiring political body candidates to submit (1) a

nominating petition signed by at least 5% of the number of registered voters in

the last general election for the office in question; and (2) a filing fee equal to 5%

of the annual salary of the office sought. <u>Id.</u> The filing fee was not challenged on

appeal because the district court had granted the plaintiffs an injunction as to it.

<u>Id.</u> The appeal was instead taken from the Court's denial of an injunction related

to the signature requirement.

The Supreme Court upheld Georgia's 5% petition signature requirement

based on several factors tied to Georgia's election law scheme. The Court

remarked upon the "open quality of the Georgia system." <u>Id.</u> at 439. At that time,

there was "no limitation whatever . . . on the right of a voter to write in on the

ballot the name of the candidate of his choice and to have that write-in vote

counted." <u>Id.</u> at 434. Further, Georgia did "not require every candidate to be the

nominee of a political party, but fully recognize[d] independent candidacies"; did

not have an unreasonably early filing deadline; did not require small or new

parties to establish "elaborate primary election machinery"; and did not impose

"suffocating restrictions" on the circulation of nominating petitions. <u>Id.</u> at 438–

39. The Supreme Court also observed that the "open quality of the Georgia

system [wa]s far from merely theoretical" given that a candidate for Governor

and a candidate for President had gained ballot designation by nominating

petitions in 1966 and 1968, respectively. Id. at 439. The Supreme Court thus concluded that Georgia's election laws "d[id] not operate to freeze the political status quo." Id. at 438.[10]

The Supreme Court's reliance on context-dependent factors makes Jenness distinguishable from the present case in several ways. First, the qualifying fee was not at issue in Jenness, but it is an important part of Plaintiffs' challenge here. Dkt. No. [134-1] at 44 (referring to O.C.G.A. § 21-2-132(d)). The Court must examine the "cumulative burdens" of the laws preventing Plaintiffs from accessing Georgia's ballot. Clingman v. Beaver, 544 U.S. 581, 607 (2005) (O'Connor, J., concurring); accord Williams, 393 U.S. at 34 (measuring the burden of Ohio's ballot-access laws "taken as a whole"). The qualifying fee increases the burden on Plaintiffs' constitutional rights, and so it is essential to the Court's analysis. See Cowen, 960 F.3d at 1348 (Jordan, J., concurring) ("So, whatever effect *Jenness* may have had on the plaintiffs' First and Fourteenth Amendment claims, it did not foreclose or control the plaintiffs' challenge to the qualifying fee.").

Second, Georgia law regarding write-in candidates has changed since Jenness with new restrictions adopted in 1978. Such candidates must now file and publish a notice of candidacy in advance of the election, O.C.G.A. § 21-2-

---

[10] The former Fifth Circuit followed Jenness by upholding Georgia's entire electoral statutory scheme before the Supreme Court changed the test in Anderson. McCrary v. Poythress, 638 F.2d 1308 (5th Cir. 1981)

133(a), and votes cast for someone who has not followed this process are not counted, Ga. Comp. R. & Regs. 183-1-15-.02(5).

Third, the record of historical ballot exclusion is stronger here than it was in Jenness. There, the Supreme Court held that Georgia's election system was "open" in part because the stipulated record contained evidence that two candidates—one for President and one for Governor—had gained ballot designation by petition. Jenness, 403 U.S. at 439. This finding influenced the Court's holding that "Georgia in no way freezes the status quo[.]" Id. In this case, by contrast, the record indicates that no political-body candidate for U.S. Representative has overcome Georgia's statutory petition threshold since it was established in 1943, though many candidates have tried. See Dkt. No. [97] ¶ 76. At least with respect to non-statewide office, the status quo is frozen.

And fourth, as previously discussed, the record in this case contains much evidence regarding the practical burdens of gathering petitions. Along with evidence of candidates attempting and failing to qualify despite collecting thousands of signatures, there is also evidence in the record illustrating the difficulty and cost of simply gathering the statutorily required number of signatures. See, e.g., Dkt. Nos. [69-9] ¶¶ 9–10; [69-10] ¶ 10; [69-13] ¶ 21; [69-16] ¶ 8; [69-23] ¶ 12. Moreover, Plaintiffs have produced evidence indicating that the Secretary of State's petition checking process yields signature-validation rates that, as a practical matter, require potential third-party and independent

candidates to gather signatures in excess of those required by O.C.G.A. § 21-2-170. Dkt. No. [97] ¶¶ 145–148.

In addition to "different facts in the instant record, as compared to the record in <u>Jenness</u>[] [and] changes in the relevant Georgia legal framework," <u>Cowen</u>, 960 F.3d at 1346, the Court notes a critical "evolution of the relevant federal law," <u>id.</u> Since <u>Jenness</u> was decided, federal campaign finance laws have become more stringent, so it has become more difficult for candidates to raise funding to gather petition signatures. More importantly, 12 years after <u>Jenness</u> was decided, the Supreme Court issued its decision in <u>Anderson v. Celebrezze</u>, which changed the rubric for analyzing ballot-access challenges like the one in this case.

This change was not simply academic. The <u>Anderson</u> court rejected what it described as a "litmus-paper test" in favor of "an analytical process that parallels [a court's] work in ordinary litigation." <u>Anderson</u>, 460 U.S. at 789 (citing <u>Storer</u>, 415 U.S. at 730). By this, the Court meant that the extent of the infringement must be considered based upon the facts of a case, and the magnitude of infringement must be balanced against the state's interest. The Court put it this way in <u>Storer</u>, an earlier case upon which <u>Anderson</u> relied:

> [T]he rule fashioned by the Court to pass on the constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a "matter

of degree," . . . very much a matter of "consider[ing] the facts and circumstances behind the law, the interest which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." What the result of this process will be in any specific case may be very difficult to predict with great assurance.

Storer, 415 U.S. at 730 (quoting Williams, 415 U.S. at 730; Dunn v. Blumstein, 405 U.S. at 335).

This shift to a factual, context-based balancing approach reinforces the Court's decision to depart from Jenness for two reasons. First, the robust factual record showing the burden faced by aspiring candidates for office is key to the Court's analysis here. The Eleventh Circuit has explicitly held regarding Jenness and McCrary that "the two cases . . . do not foreclose the parties' right to present the evidence necessary to undertake the balancing approach outlined in Anderson . . . ." Bergland, 767 F.2d at 1554; accord Cowen, 960 F.3d at 1345. And second, the rubric of Anderson requires the Court to take a closer look at the State's stated interest—specifically, "the legitimacy and strength of each of those interests [and] the extent to which those interests make it necessary to burden the plaintiff's rights." Anderson, 460 U.S. at 789. This second distinction is discussed in more detail below.

Since Anderson, the Eleventh Circuit has issued decisions approving Georgia's 5% signature requirement. See Coffield v. Kemp, 599 F.3d 1276 (11th Cir. 2010); Cartwright v. Barnes, 304 F.3d 1138 (11th Cir. 2002). But each of those cases is distinguishable on grounds central to the Circuit's holdings.

33

Cartwright concerned primarily a challenge to the 5% requirement under the Qualifications Clause. 304 F.3d at 1139 ("The main issue in this case is whether this 5% signature requirement creates a new qualification for holding federal office in violation of the Qualifications Clause . . . ."). The court's discussion of the constitutional provisions at issue here was cursory. Id. ("We also conclude that this 5% signature requirement does not violate any other constitutional provision."). Further, the Cartwright plaintiffs "pointed to only two differences in the relevant context to distinguish their case from *Jenness*, both of which the panel rejected summarily as wholly without merit." Cowen, 960 F.3d at 1345 (citing Cartwright, 304 F.3d at 1141–42). And in fact, the court in Cartwright did not even quote Anderson directly, much less apply its three-part test to weigh the interests at stake.

Coffield is similarly distinguishable. In that case, the aspiring independent candidate failed to show that Georgia's 5% requirement severely burdened her. Coffield, 599 F.3d at 1277. The Eleventh Circuit rejected the candidate's challenge because, while she alleged that no independent candidate for the House of Representatives met Georgia's petition requirement since 1964, "she [did] not allege how many candidates have tried." Id. Thus, the Coffield plaintiff simply failed to carry her burden. See Cowen, 960 F.3d at 1345 ("[O]ur decision in Coffield appears to have rejected an attempt to distinguish *Jenness* . . . because the plaintiff's allegations were wholly insufficient to plausibly distinguish

34

*Jenness*."). And as in <u>Cartwright</u>, the Eleventh Circuit in <u>Coffield</u> did not balance the interests under the <u>Anderson</u> rubric.

A cursory reading of these Eleventh Circuit decisions suggests that the Circuit has approved Georgia's ballot-access scheme. A closer reading reveals that the plaintiffs in those cases simply failed to prove a constitutional infringement under the fact- and context-dependent rubric of <u>Anderson</u>. These failures decisively distinguish the prior cases from this one. The distinction is decisive because <u>Anderson</u> instructs courts to consider the cumulative burden upon plaintiffs' rights based on the context of each case. <u>Anderson</u>, 460 U.S. at 789 ("[A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. . . . The results of this evaluation will not be automatic; as we have recognized, there is 'no substitute for the hard judgments that must be made.'" (quoting <u>Storer</u>, 415 U.S. at 730)); <u>see also</u> <u>Bowe v. Bd. of Election Comm'rs</u>, 614 F.2d 1147, 1152–53 (7th Cir. 1980) ("[T]he Supreme Court has consistently taken an intensely practical and fact-oriented approach to deciding these election cases."); <u>Green Party of Ga.</u>, 171 F. Supp. 3d at 1363 (holding that Georgia's 1% petition-signature requirement for presidential candidates imposed a severe burden after the plaintiffs had a chance to fully develop an evidentiary record).

In this case, Plaintiffs have done what the plaintiffs in <u>Cartwright</u> and <u>Coffield</u> failed to do: they have developed a fulsome evidentiary record proving that Georgia's laws have excluded political-body candidates from ballots in races

for U.S. Representative. They have shown that Georgia's ballot-access laws "'freeze the status quo' by effectively barring all candidates other than those of the major parties . . . ." Libertarian Party of Fla., 710 F.2d at 793 (quoting Jenness, 403 U.S. at 439). For that reason, the Court finds that the laws impose a severe burden upon Plaintiffs' First and Fourteenth Amendment rights.

### 2.  Identifying and Evaluating the State's Interests

The next step of the Anderson test requires the Court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." 460 U.S. at 789. The State has advanced two interests: (1) ensuring that a candidate has substantial support before putting the candidate's name on ballots to screen out frivolous candidacies and avoid overcrowded ballots and (2) "a generalized interest in the orderly administration of elections." Dkt. No. [135-1] at 16–18; Dkt. No. [140] at 21–22.

The first of these interests has become well established in Supreme Court decisions since Jenness. See Jenness, 403 U.S. at 442 (acknowledging the "state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot"); Am. Party of Tex.v. White, 415 U.S. 767, 782 (1974) ("[W]e think that the State's admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support."); Anderson, 460 U.S. at 788 n.9 (discussing the "undoubted right to require candidates to make a preliminary showing of

substantial support in order to qualify for a place on the ballot"); <u>Munro v.</u> <u>Socialist Workers Party</u>, 479 U.S. 189, 193–94 (1986) (same).

As Plaintiffs point out, Defendant has invoked this interest in its briefing but has not offered substantial support for that interest. Dkt. No. [148] at 2 (citing <u>Fulani v. Krivanek</u>, 973 F.2d 1539, 1544 (11th Cir. 1992); <u>Bergland</u>, 767 F.2d at 1554). Of course, it goes without saying that a 5% petition signature requirement and registration fee screen out frivolous candidates because it is Plaintiffs' argument that even legitimate candidates are being screened out. But Defendant has offered little support for the reasonableness of those restrictions besides citation to precedent. <u>Cf.</u> <u>Fulani</u>, 973 at 1544 ("The state identifies interests that courts have found compelling in other cases, but fails to explain the relationship between these interests and the classification in question."). Even so, the Court finds that the State does have a legitimate interest in ensuring a significant modicum of support to screen out frivolous candidates and avoid ballot confusion.

The second of the State's claimed interests lacks the same grounding in prior precedent. Defendant cites several cases to support a generalized interest in election administration: <u>Jenness</u>, <u>Storer v. Brown</u>, and <u>Timmons</u>. Dkt. No. [140] at 22. The language Defendant cites from <u>Jenness</u> is a rephrasing of the State's first asserted interest. <u>See</u> <u>Jenness</u>, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's

candidate on the ballot—*the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election*.") (emphasis added to highlight Defendant's cited language). The citations from Storer and Timmons are truisms that do not outline specific interests, but rather elaborate on State's authority to regulate elections. Storer, 415 U.S. at 730 ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."); Timmons, 520 U.S. at 366 ("States also have a strong interest in the stability of their political systems."). These interests are now weighed.

### 3. **Weighing the Factors**

The third and final step of the Anderson test requires the Court to "determine the legitimacy and strength of [the State's] interests [and] consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id. The Eleventh Circuit has held that the legitimacy of ballot restrictions depends on the severity of the constitutional burdens imposed:

> [I]f the state election scheme imposes "severe burdens" on the plaintiffs' constitutional rights, it may survive only if it is "narrowly tailored and advance[s] a compelling state interest." [*Timmons*, 520 U.S. at 358]. But when a state's election law imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, "a State's important regulatory

> interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quotations omitted). In short, the level of scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights—"lesser burdens trigger less exacting review." *Id.*

Stein v. Ala. Sec'y of State, 774 F.2d 689, 694 (11th Cir. 2014). Because the Court holds that Georgia's laws impose a severe burden on Plaintiffs' constitutional rights, the Court must determine whether Georgia law is "narrowly tailored and advances a compelling state interest." Id. (citing Timmons, 520 U.S. at 358).

The Court agrees with Plaintiffs on this issue and holds that Defendant has not shown that Georgia's ballot-access requirements for non-statewide office are narrowly tailored to advance a compelling state interest. See Dkt. No. [134-1] at 48. While Georgia has an undeniable interest in regulating elections by bringing order to its ballots and screening out frivolous candidates, its chosen method of accomplishing that goal is overbroad. Georgia's 5% petition signature requirement for non-statewide candidates screens out legitimate candidates in addition to frivolous ones, and it does so without a reasonable justification. Georgia's own election scheme includes a more narrowly tailored means of screening out frivolous candidates—namely, the 1% petition signature requirement of O.C.G.A. § 21-2-180, which the State established in 1986. However, this 1% threshold only applies to statewide candidates, while candidates for non-statewide office must still clear the 5% hurdle established in 1943. Simply put, the State offers no justification for the higher threshold imposed on candidates for non-statewide office.

An unjustified distinction like this one was addressed and deemed unconstitutional by the Supreme Court in Socialist Workers Party. 440 U.S. 173. In that case, the Socialist Workers Party challenged a provision of Illinois law which required candidates for mayoral office in Chicago to obtain more signatures to access the ballot in their race than candidates for statewide office needed to access the ballot in statewide races. Id. at 177–78. This disparity arose from an Illinois law that required candidates for statewide office to obtain 25,000 signatures, while candidates for non-statewide office needed signatures from 5% of the number of persons who voted at the previous election in the relevant political subdivision. Id. at 176–77. This meant that statewide candidates needed 25,000 signatures, while candidates of "new political parties" running for mayor in Chicago needed 63,373 signatures. Id. at 177.

The Supreme Court held this scheme unconstitutional. It first described the rights at stake, which were the same as those at stake here: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Id. at 184 (quoting Williams v. Rhodes, 393 U.S. at 30). The Court held that when "such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest." Id. (citing Am. Party of Tex., 415 U.S. at 780–81). While Illinois, like Georgia, had "a legitimate interest in regulating the number of candidates on the ballot[,]" id. at 184–85, such that Illinois could "require a preliminary showing of a 'significant modicum

of support,'" id. at 185 (quoting Jenness, 403 U.S. at 442), the State failed to justify the disparity between signature requirements for statewide and non-statewide offices.

The Court held that the 5% rule, as applied in Chicago, was "not the least restrictive means of protecting the State's objectives." Id. at 186. The Court noted that Illinois's legislature "ha[d] determined that its interest in avoiding overloaded ballots in statewide elections [wa]s served by the 25,000-signature requirement." Id. But the State had advanced "no reason, much less a compelling one," why ballot access should be more burdensome for a Chicago mayoral candidate than for a candidate for statewide election. Id.

The State of Georgia has a similarly incongruous ballot-access scheme to the one struck down in Socialist Workers Party. The General Assembly has deemed a 1% petition signature requirement adequate to guard against ballot crowding and frivolous candidacies on a statewide basis. O.C.G.A. § 21-2-180. It is not immediately clear why candidates for non-statewide office must clear a proportionally higher hurdle, the 5% petition signature requirement. Defendant has not offered any explanation for this disparity. See Fulani, 973 F.2d at 1546 ("The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification here at issue."). Accordingly, the Court finds that Georgia's 5% petition signature requirement, combined with the qualifying fee, are not narrowly drawn to advanced the State's interests. Georgia's ballot-access scheme overburdens

Plaintiffs' rights to vote and to associate with their preferred political party, and so it violates the First and Fourteenth Amendments.

The Court would reach the same decision even under a more deferential standard of review. The Eleventh Circuit has held that, even when the burden on plaintiffs' rights is "significant," rather than "severe," a state defendant must still articulate its interests and "explain the relationship between these interests and the classification in question." Fulani, 973 F.3d at 1544. A state's means of achieving even legitimate goals may be struck down where "the state has failed to justify" the burden in question. Id. at 1547; see also New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1576 (11th Cir. 1991) (striking down a law that made it "moderately difficult" to access the ballot when the State failed to show that the less-than-severe burdens were necessary to advance Alabama's legitimate interests); Green Party of Ga., 171 F. Supp. 3d at 1367 (holding that, even under a deferential standard, "the State's regulatory interest [wa]s not sufficiently important to justify the restrictions on the First and Fourteenth Amendment rights of Plaintiffs"). Here, Defendant has failed to justify the requirement that congressional candidates must clear the 5% threshold when the General Assembly has determined that a 1% threshold is adequate on a statewide basis.

In reaching this decision, the Court agrees with the reasoning of another judge in this District in a similar case. See Green Party of Ga., 171 F. Supp. 3d at 1365. In Green Party of Georgia, the court found that Georgia's statewide 1% petition requirement violated plaintiffs' First and Fourteenth Amendment rights

with respect to a national presidential election. Id. at 1365–66. The plaintiffs'
interests were similar to those in this case, as was the State's interest. Id. at 1365.
The court found that the 1% requirement was "not narrowly tailored to advance
the State's interests." Id. This requirement translated to more than 50,000
signatures to access the general election ballot. Id. "But requiring a lower number
would ease the burden on voters' and political bodies' rights while still serving the
State's interest in avoiding voter confusion and a crowded ballot." Id. The
Eleventh Circuit succinctly affirmed this holding in an unpublished decision.
Green Party of Ga. v. Kemp, 674 F. App'x 974, 975 (11th Cir. 2017) (per curiam)
(unpublished) ("The judgment of the district court is affirmed based on the
district court's well-reasoned opinion.").

        In fact, the case now before the Court is a stronger case for Plaintiffs under
the Anderson framework. While the court in Green Party of Ga. looked at the
burden of the 1% requirement and the State's justification in isolation, the Court
here has the 1% requirement as a benchmark against which to consider the
challenged 5% requirement and qualifying fee. The Green Party of Ga. court held
that, even under a deferential standard of review, the State could not justify a 1%
threshold that required presidential candidates to gather 50,000 signatures.
Green Party of Ga., 171 F. Supp. 2d at 1366. Here, Defendant must justify a higher
proportional burden for non-statewide elections—a 5% signature requirement
that forces aspiring congressional candidates in Georgia's 14 congressional
districts to gather between 19,000 and 25,000 signatures. The candidates face

43

this burden despite the State's decision that a 1% threshold is adequate for candidates running on a statewide basis. Defendant has failed to justify this burden.

Accordingly, Plaintiffs' Second Motion for Summary Judgment, Dkt. No. [134], is **GRANTED** as to their First and Fourteenth Amendment claim. Defendant's Motion for Summary Judgment on that claim, Dkt. No. [135], is **DENIED**.

### B. Equal Protection Clause Challenge

Plaintiffs have also moved for summary judgment on a separate, narrow equal-protection challenge. They argue, under Socialist Workers Party and Norman v. Reed, 502 U.S. 279 (1992), that Georgia's election scheme unconstitutionally requires candidates for non-statewide office to obtain more petition signatures than candidates for statewide office. Dkt. No. [134-1] at 53–54. They point out that statewide Libertarian candidates do not need any petition signatures because they have already qualified under O.C.G.A. § 21-2-180, while non-statewide candidates must meet the 5% threshold and thus obtain between 19,777 and 26,539 signatures (for 2020).

Defendant argues that this claim fails as a matter of law, Dkt. No. [135-1] at 22–23, and the Court agrees. Plaintiffs misconstrue Georgia's ballot-access scheme. While it is true that Libertarian candidates for statewide office did not need to collect petition signatures, that is only so because the Libertarian Party has qualified to run statewide candidates under O.C.G.A. § 21-2-180 since 1988.

But that statute requires the political bodies to show the required modicum of support by obtaining votes from 1% of registered voters in the prior election. If a statewide candidate in 2020 sought ballot access through petition signatures, that candidate would need 51,686 signatures, a sum far above that required for any individual congressional district. That Georgia provides an alternative way to access the general-election ballot through votes obtained in the prior election does not mean that they have created a distinction that violates Plaintiffs' right to equal protection. See Jenness, 403 U.S. at 441–42.[11]

Accordingly, Plaintiffs' Motion for Summary Judgment, Dkt. No. [134], is **DENIED** as to their classification theory for their equal-protection claim. Defendant's Motion for Summary Judgment, Dkt. No. [135], is **GRANTED** as to that theory.

### C. Remedies and Remaining Claims

Although the Court is granting Plaintiffs' Motion for Summary Judgment as to its Fourteenth Amendment claims, the issue of what remedies are appropriate and whether there are other remining claims remains unclear.

As to the issues of remedies, Plaintiffs should submit a brief within 21 days of the date of this Order as to the remedies it is proposing. Defendant shall then

---

[11] To be clear, Plaintiffs argue that they are entitled to summary judgment because the state may not require a higher absolute number of signatures on a statewide basis than on a non-statewide or district-level basis. Dkt. No. [134-1] at 54. Plaintiffs do not argue in their summary judgment motion that Georgia has violated their equal-protection rights by establishing disparate percentage requirements.

have an opportunity to respond, and Plaintiffs can then reply. The Court will then provide further guidance to the parties.

In addition, a claim relating to Plaintiffs' theory that Georgia's 5% requirement violates the Equal Protection Clause still remains. Plaintiffs have not moved for summary judgment on that theory. Dkt. No. [134] at 2 n.1. Defendant does not address the claim in his summary-judgment brief. Dkt. No. [135-1]. Since the Court is granting Plaintiffs' Motion for Summary Judgment as to their First and Fourteenth Amendment claims, the Court is unclear as to whether Plaintiffs want to move forward with a trial as to this remaining claim when the summary judgment order may resolve any ongoing controversy in the case. To that end, Plaintiffs are **DIRECTED** to show cause why their remaining equal-protection claim should not be dismissed as moot in the same brief they are submitting as to remedies. Even if Plaintiffs do not agree that the claim is moot, they should address whether they are still requesting a trial as to that claim. Defendant can also respond to this issue in his response brief. Plaintiffs shall be entitled to reply.[12]

---

[12] Defendant has filed a motion to exclude the testimony of Plaintiffs' expert Darcy Richardson. Dkt. No. [137]. This testimony only pertains to Plaintiffs' theory that Georgia's 5% requirement violates the Equal Protection Clause because it was adopted with a discriminatory purpose. The Court will wait to rule on this motion until after it becomes clear whether this claim survives.

### V.   CONCLUSION

Based upon the foregoing, Plaintiffs' Second Motion for Summary Judgment [134] is **GRANTED in part** and **DENIED in part**. Defendant's Second Motion for Summary Judgment [135] is likewise **GRANTED in part** and **DENIED in part**.

Plaintiffs' Second Motion for Summary Judgment [134] is **GRANTED** as to their First and Fourteenth Amendment claim. Defendant's Motion for Summary Judgment [135] is **DENIED** as to that claim.

The Court **DIRECTS** Plaintiffs to submit within **21** days of the entry of this Order briefing proposing an appropriate remedy related to the First and Fourteenth Amendment claim and addressing their claim that Georgia's 5% requirement violates the Equal Protection Clause because it was adopted with a discriminatory purpose. Defendant and Plaintiffs shall then have the ordinary response and reply times.

Plaintiffs' Second Motion for Summary Judgment [134] is **DENIED** as to their equal-protection claim. Defendant's Second Motion for Summary Judgment [135] is **GRANTED** as to Plaintiffs' classification theory for that claim. Plaintiffs did not move for summary judgment on their discrimination theory for their equal-protection claim, and Defendant did not specifically address that claim in his briefing.

**IT IS SO ORDERED** this 29th day of March, 2021.

**Leigh Martin May**
**United States District Judge**