IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | **Plaintiffs' Brief in Response to the Court's March 29 Order** |
| Defendant. | |

The plaintiffs respectfully submit this brief, at the Court's direction, "proposing an appropriate remedy related to the First and Fourteenth Amendment claim and addressing [the plaintiffs'] claim that Georgia's 5% requirement violates the Equal Protection Clause because it was adopted with a discriminatory purpose." (ECF 159 at 47.)

## Remedy

The appropriate remedy for this Court's conclusion that Georgia's ballot-access restrictions for independent and third-party candidates for

United States Representative violate the First and Fourteenth Amendments to the United States Constitution is to permanently enjoin the Secretary of State from enforcing those restrictions against independent and third-party candidates. *See, e.g.*, *Graveline v. Benson*, 430 F. Supp. 3d 297, 318 (E.D. Mich. 2019), *aff'd* \_\_\_\_ F.3d _____, 2021 WL 1165186 (6th Cir. Mar. 29, 2021); *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016), *aff'd,* 674 F. App'x 974, 975 (11th Cir. 2017) (per curiam) (unpublished). As noted in the Court's order, those restrictions include the qualifying petition requirement set out in O.C.G.A. § 21-2-170(b); the qualifying fee set out in O.C.G.A. § 21-2-131(a) and O.C.G.A. § 21-2-132 (d); and the pauper's affidavit set out in O.C.G.A. § 21-2-132(g). (ECF 159 at 4.) The Court should make it clear that the permanent injunction extends to all of those provisions.

And because regulating access to the ballot is a quintessentially political task, the Court should also leave the job of re-writing those provisions to the Georgia General Assembly. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (a federal court should allow elected officials to remedy an unlawful election law "wherever practical"); *see, e.g.*, *Esshaki v. Whitmer*, 813 F. App'x 170, 172 (6th Cir. 2020) (reversing a mandatory

preliminary injunction because it re-wrote Michigan's ballot-access laws).

As a court of equity, however, this Court has discretion, if it so chooses, to fashion an interim remedy that would regulate ballot access for independent and third-party candidates for United States Representative until the Georgia General Assembly adopts a remedy that complies with the Constitution. *See Green Party of Ga.* 171 F. Supp. 3d at 1372. That discretion is broad but not unlimited. *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971). And the violation determines the scope of the Court's remedial power. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).

Here, there are good reasons for the Court to decline to enter an interim remedy. Most prominent among them is the fact that the Georgia General Assembly will meet again in a regular session (and possibly in one or more special sessions) before qualifying begins in the next elections for United States Representative. There is thus plenty of time for the General Assembly to act, and no immediate need for the Court to exercise its discretion.

Another reason not to enter an interim remedy is what happened after Judge Story entered an interim remedy in the *Green Party* case: nothing. The General Assembly declined to act. Judge Story's interim remedy removed all incentive for the General Assembly to act, and an interim remedy here would likely do the same.

A third reason not to enter an interim remedy is Senate Bill 202. Section 8 of that recently enacted omnibus voting law creates a new code section, O.C.G.A. § 21-2-36, which limits the authority of the Secretary of State to enter into any agreement, settlement, or order that "limits, alters, or interprets" state election law.[1] This provision expresses the General Assembly's desire to have a greater role in changes to election laws, and fashioning an interim remedy—particularly if the Secretary of State asks for one—would undermine that very-recently expressed state policy.

A fourth reason not to enter an interim remedy is that there is no evidence in the record to suggest that one is needed. Georgia's ballots are not at risk of overcrowding. With no interim remedy, the permanent

---

[1] The full text of Senate Bill 202 as passed is available at https://int.nyt.com/data/documenttools/georgia-sb-202/8f7976cadb0bcb56/full.pdf.

4

injunction described above would mean that a notice of candidacy, filed in March of an election year, is all that would be needed for an independent or third-party candidate for United States Representative to qualify for the general-election ballot. Of course, any such candidates would also have the burden of compliance with federal campaign-finance laws, which is no trifle.[2] Nothing in the record suggests that the filing deadline and the burden of compliance with campaign-finance laws would be insufficient on their own to keep Georgia's ballots to a reasonable length and free of frivolous candidacies. And if those measures prove to be inadequate in the future, the Court could always impose an interim remedy at that point.

If, however, the Court wishes to impose an interim remedy to regulate ballot access for independent and third-party candidates for United States Representative, the plaintiffs propose an injunction which requires the Secretary of State to qualify such candidates for the ballot if they, by the existing deadlines, *either* pay the qualifying fee set out in set out in O.C.G.A. § 21-2-131(a) and O.C.G.A. § 21-2-132(d) *or* submit a

---

[2] The Federal Election Commission's 199-page instruction manual, *Congressional Candidates and Committees* (2014), is available online at https://www.fec.gov/resources/cms-content/documents/candgui.pdf.

qualifying petition containing 500 signatures. The rationale for this proposal is as follows.

First, it is roughly commensurate with Judge Story's interim remedy in the *Green Party* case. Judge Story set the petition requirement at 7,500 signatures for a statewide candidate. Georgia has 14 congressional districts, and 7,500 divided by 14 is about 536 signatures. But no candidates have yet satisfied the 7,500-signature requirement, so a lower number is warranted. And a certain number, rather than any percentage, eliminates the need for the Secretary of State's office to perform any calculations once the General Assembly redraws Georgia's congressional districts later this year. According to testimony credited by the Court, gathering 500 signatures would require about 100 person-hours of work (ECF 159 at 25), which is substantial, and does not include the extra signatures that must be gathered in case some are rejected.

Judge Story's order does not offer a filing-fee alternative to a petition, but the qualifying fee for a presidential elector is only $1.50 and

was not at issue in the *Green Party* case.[3] Georgia's qualifying fee for candidates for United States Representative is $5,220. That fee is high enough on its own to deter frivolous candidacies. That fee is, in fact, the only barrier (other than the notice of candidacy and the burden of compliance with federal campaign-finance laws) for political-party candidates for United States Representative, and Georgia's primary ballots have not been overcrowded. (ECF 139-6.) As the Court recognized, most states do not require third-party candidates to submit both a filing fee and a petition (ECF 159 at 23), and that suggests that both barriers are not necessary to keep ballots to a reasonable length.

Second, the proposed numbers make sense within current campaign-finance limits. The filing fee is low enough that some candidates will likely be able to fund it themselves. For those who cannot, it is low enough that their political party, if they belong to one, can lawfully contribute almost enough money ($5,000 in the primary election cycle) to cover the fee. Or, if they do not belong to a political party, it is low enough that some candidates may be able to raise that

---

[3] Presidential electors are subject to the same three-percent-of-salary requirement that applies to most other candidates, but their salary is only $50. O.C.G.A. § 21-2-13.

much money. Likewise, the number of signatures is low enough that the cost of using paid petition circulators is attainable within campaign-finance limits. At around $2-$5 per signature, plus an allowance for extra signatures in case some are rejected, the cost of using paid circulators could reasonably be self-funded, party-funded, or donor-funded within existing campaign-finance limits. (ECF 69-13 at 6; ECF 69-23 at 2.)

Third, and finally, record evidence suggests that 500 signatures would be high enough to keep Georgia's ballots to a reasonable length. In 2020, eleven independent or third-party candidates timely submitted a notice of candidacy for any office and paid the required qualifying fee for the office they sought. (ECF 138-9.) But only three of those candidates submitted as many as 500 valid signatures, and one of those did so under unique circumstances. (ECF 159 at 20.) There is no evidence in the record to support a finding that any more than 500 signatures would be reasonably necessary to prevent Georgia's ballots from becoming overcrowded with frivolous candidacies. Should such evidence emerge in the future, the Court could always adjust the interim remedy.

There is one more aspect of an interim remedy that the plaintiffs believe the Court should consider. As the Court recognized in its order, the Secretary of State's signature-verification process yields validation rates that range between two and 40 percent, and, as a result, independent and third-party candidates must gather substantially more than the required number of valid signatures to be assured of ballot access. (ECF 159 at 24.) The low validation rate thus increases the burden on the constitutional rights of independent and third-party candidates, and this burden is by no means inevitable or necessary. If the Court chooses to order an interim remedy, it should therefore order the Secretary of State to take concrete steps to improve the signature-validation rate. The plaintiffs suggest that the Court order the Secretary to implement an online process similar to Arizona's, which allows voters to "sign" a candidate petition online using the voter's driver's license number or voter registration number and social security number.[4] This system, which is much like the voter-identification system that has replaced signature-verification for absentee ballots in Georgia as a result

---

[4] Arizona's system, known as "E-Qual," is accessible on the web: https://apps.azsos.gov/equal/ .

of Senate Bill 202, automatically verifies a voter's information without the need to scrutinize signatures. It is also similar to Georgia's online absentee-ballot application portal.  It is a more efficient and effective way for voters to show support for a candidate, and it would diminish the arbitrariness and discretion that has plagued Georgia's petition-verification process over the last 20 years. Any interim remedy that imposes a signature requirement should include a requirement to fix Georgia's utterly broken petition-verification process.

## Equal Protection Claim

The Court has directed the plaintiffs to "show cause why their remaining equal-protection claim should not be dismissed as moot," and to "address whether they are still requesting a trial as to that claim." (ECF 159 at 46.) To be clear, that "claim" refers to the plaintiffs' claim that Georgia's petition requirement for independent and third-party candidates violates the Equal Protection Clause of the Fourteenth Amendment because it was adopted with a discriminatory purpose. (ECF 1 ¶¶ 18-19.)

That claim is not yet moot by virtue of the Court's order granting summary judgment on the plaintiffs' First and Fourteenth Amendment

claim, but it could well become moot once the Court enters a remedy. That is because the discriminatory-purpose claim seeks essentially the same relief as the unjustified-burden claim—a permanent injunction. In fact, the relief sought on the unjustified-burden claim is arguably broader than the relief sought under the discriminatory-purpose claim because it incorporates all of Georgia's ballot-access restrictions on independent and third-party candidates for United States Representative—not just the petition requirement.

If the Court declines to enter a permanent injunction or enters an interim remedy that could be broadened by a finding of discriminatory purpose, then the plaintiffs' discriminatory-purpose claim would not be moot, and the plaintiffs would likely seek trial on that issue. But the interim remedy that the plaintiffs have proposed in this brief (if the Court wishes to impose one at all) would moot the discriminatory-purpose claim because it makes the petition requirement optional.

Respectfully submitted this 9th day of April, 2021.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **Plaintiffs' Brief in Response to the Court's March 29 Order** was prepared in 13-point Century Schoolbook in compliance with Local Rules 5.1(C) and 7.1(D).

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com