IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al., | Case No. 1:17-cv-04660-LMM |
| Plaintiffs, | |
| vs. | **Plaintiffs' Response to the Court's August 23 Order** |
| **Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia, | |
| Defendant. | |

The plaintiffs respectfully submit this response to the Court's order of August 23, 2021 (ECF 165), proposing a court-ordered interim remedy for the Court's recent conclusion that Georgia's ballot-access restrictions for independent and third-party candidates violate the First and Fourteenth Amendments to the United States Constitution (ECF 159). As explained below, the plaintiffs object to the Court's proposed remedy because evidence in the record strongly suggests that it will not completely and with certitude cure the violation. The plaintiffs also

submit that the Court's proposed remedy, even if it did completely cure the violation, would need to address several additional items. The plaintiffs also maintain their prior positions on a remedy in this case. (ECF 160, 164.)

## I. The Court's proposed remedy would not cure the violation completely and with certitude.

It is well settled in the Eleventh Circuit that a court-ordered remedy must "completely" and "with certitude" cure the violation. *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987); *accord United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988); *Edge v. Sumter Cnty. Sch. Dist.*, 775 F.2d 1509, 1510 (11th Cir. 1983). The record strongly suggests that the Court's proposed remedy won't do that.

The Court proposes to require third-party and independent candidates to submit a nominating petition containing one percent of the voters registered to vote in the applicable district in the last election. (ECF 165 at 6.) That number, according to estimates provided by the Secretary of State, would be an average of 5,151 valid signatures per congressional district, or 72,114 for a full slate of 14 candidates. (ECF 154.) As justification for this number, the Court asserts that "several of

the serious candidates for office addressed in Plaintiffs' motion for Summary Judgment would have qualified." (ECF 165 at 6.) But that is not accurate.

Record evidence shows that, in the 78-year history of Georgia's five-percent petition requirement, only one third-party candidate for United States Representative has ever submitted more than 5,151 valid signatures. That candidate was Wayne Parker, who submitted 8,346 valid signatures in 2002. (ECF 159 at 17.) Approximately 20 other candidates have tried to gather enough signatures since then, and none have succeeded. Three independent candidates have gathered more than 5,151 raw signatures, but none met the threshold with *validated* signatures. In 2016, Hien Dai Nguyen submitted about 25,000 signatures, but the Secretary of State's office validated only 528 (two percent) of them. (*Id.* at 18-19.) Jeff Anderson and Eugene Moon gathered about 12,500 and 13,000 raw signatures, respectively, but they did not submit the signatures for validation. (*Id.* at 18.) Given the Secretary of State's consistently low validation rates, moreover, it is unlikely that either candidate would have met the threshold of 5,151 valid signatures. (*Id.* at 24, 31.)

The *Green Party* case and its aftermath also raise doubts about a one-percent petition. There, Judge Story found that Georgia's one-percent petition requirement for Presidential candidates, which at the time of the decision required 50,334 valid signatures, imposed a severe burden. *Green Party of Ga. v. Kemp*, 171 F. Supp. 3d 1340, 1357, 1365 (N.D. Ga. 2016). He lowered the requirement to 7,500 signatures, *id.* at 1374, a figure that in 2020 represented 0.12 percent of the voters registered in the previous election (ECF 97 ¶ 23). And yet no candidate has ever satisfied that lowered threshold. (ECF 139-2 ¶ 8.)

No statewide candidate in Georgia's history, moreover, has ever satisfied the remedy that the Court proposes here: a one-percent petition and filing fee. The Court is explicit in wanting to "bring the non-statewide office threshold in line with the statewide office threshold." (ECF 165 at 6.) That statewide office threshold, which applies only to non-presidential statewide candidates—has been in effect since 1986, and no candidate has *ever* satisfied it despite multiple attempts. (Ex. 1: Declaration of Richard Winger.) Millionaire Raymond O. Boyd attempted and failed to gain ballot access as an independent gubernatorial candidate in 2010. (Ex. 2: "Boyd quits Georgia governor's

4

race".) Businessperson John Dashler tried and failed to gain ballot access as an independent gubernatorial candidate in 2006. (Ex. 3: "Dalton's Dashler ends run for governor".) With more time and discovery, the plaintiffs might be able to identify other candidates who have tried and failed to meet the standard that the Court proposes here.

Lastly, a comparison to other states further raises questions about the Court's proposed remedy. According to data on which the Court relied, the number of signatures required for the Libertarian Party to run a full slate of congressional candidates in Georgia under the Court's proposal would be higher than all but three states (California, New York, and Illinois), all of which have substantially more representatives in Congress than Georgia does. (ECF 69-25 at 16-17.)

Under these circumstances, it does not appear with certitude that a one-percent petition requirement—particularly when coupled with the highest filing fee in the nation—would completely cure the violation. Indeed, the overwhelming balance of the evidence suggests otherwise.

If the Court still wishes to impose a percentage-based petition requirement, the plaintiffs suggest that .25 percent has some support in the record. That would be an average of 1,288 valid signatures per

congressional district and 18,032 valid signatures for a full slate of 14 congressional candidates. (ECF 154.) While still more than double the as-yet unmet percentage imposed by Judge Story and accepted without modification by the General Assembly, at that level, independent candidates Anderson and Moon would likely have qualified in 2010, and Billy McKinney and Maceo Dixon would have met that threshold in 1982. (ECF 159 at 18-20; ECF 97 ¶ 111.) Many other genuine candidates, however, would not have met even that threshold.

Finally, the Court's August 23 order suggests that a one-percent petition and high filing fee are "appropriate" to protect the State's interest in avoiding an overcrowded ballot. (ECF 165 at 4.) But the record doesn't support that assertion, either.

First, the record shows that the Libertarian Party has demonstrated substantial voter support in Georgia. (ECF 159 at 7-8.) Its candidates for other offices have received millions of votes. Ballot-access requirements that keep Libertarian candidates off of Georgia's ballots thus do not serve any legitimate interest in avoiding overcrowded ballots; they only protect the existing parties from legitimate

6

competition. Any remedy should account for the Libertarian Party's support at the ballot box.

Second, under current Georgia law, the only ballot-access requirements in *special elections* for United States Representative are a notice of candidacy and the qualifying fee. (ECF 97 ¶ 228.) No nomination petition is required. And ballots have not been crowded with independent and third-party candidates. In 2020, there was one independent candidate and one political-body candidate on the ballot in the special election in Georgia's Fifth Congressional District. In 2017, there were two independent candidates on the ballot in the special election in the Sixth Congressional District. (*Id.* ¶ 231.) In 2010, there was one independent candidate on the ballot in the special election in the Ninth Congressional District. In 2007, there was one political-body candidate on the ballot in the special election in the Tenth Congressional District. (*Id.* ¶ 233.)

There is also no petition required to appear on any primary ballot, and Georgia's primaries have not been overcrowded. Between 2010 and 2020, no primary election for United States Representative has ever had more than nine candidates, and most have three or fewer. (ECF 139-06.)

That does not add up to a "laundry list" ballot that justifies measures to keep ballot-length "manageable." *Lubin v. Panish*, 415 U.S. 709, 715 (1974) (suggesting that a ballot with "a dozen or more aspirants who are relatively unknown or have no prospects of success" might warrant restrictions).

The Secretary of State has admitted, moreover, that his office is unaware of any elections where voters have reported any significant confusion based on the number of candidates on the ballot. (ECF 97 ¶235.) The Court's proposed remedy thus imposes requirements that are substantially greater than necessary or appropriate, in a court-ordered plan, to protect the state's interest in preventing overcrowded ballots. The State itself has determined that only a filing fee is necessary to do that, and the record supports that judgment.

For these reasons, the Court's proposed remedy does not satisfy the standards required of a court-ordered remedial plan. The record suggests that a one-percent petition is too high and that keeping ballots to a manageable length does not require both a petition and a fee. The Court should therefore modify its proposed remedy accordingly.

## II. The Court's proposed remedy should address other items as well.

The Court's proposed remedy also raises several other issues that the Court should address if it chooses to proceed.

First, as the plaintiffs have already noted, a percentage petition is particularly problematic in a redistricting year. (ECF 160 at 6.) As of this filing, the Governor has not yet called a special session for redrawing districts to account for the 2020 Census, and that session appears unlikely to occur until November or December of this year. Once the districts are finished, the Secretary of State's office will have to re-assign registered voters to the new districts and, to determine the number of signatures required for a percentage petition, figure out how many voters were registered in the new districts as of the 2020 election. That process doesn't happen overnight. It is thus questionable, at best, that the Secretary of State's office will complete this task (among the many other tasks that result from redrawing districts) before the 180-day petitioning window opens on January 13, 2022. Under similar circumstances in the past, courts have prorated the number of signatures required to account for redistricting. (ECF 159 at 17.) As a result, if the Court chooses to impose a percentage petition, it should

9

make clear that the number of signatures will be automatically prorated based on the date on which the Secretary of State's office produces the required calculations and publishes them on its website.

Second, if the Court mandates a filing fee, it must also prescribe a ballot-access procedure for those unable to pay. The State's current procedure permits an impecunious candidate to file an affidavit of poverty accompanied by a wholly separate petition signed by one percent of the registered voters eligible to vote for the office in the last election. (ECF 96 ¶¶ 53-57.) That petition is due in early March of an election year, and the petitioning window for 2022 opens on September 8, 2021. (*Id.* ¶¶ 56-57.) Any requirement that a would-be candidate essentially gather two percent of registered voters in his or her district is far too high for the reasons discussed above, and the number of signatures required will not be known before the petitioning window opens. As a result, the Court should prorate the pauper's petition and/or require the Secretary of State to accept a single petition for both purposes that would be due at the time of the nominating petition.

Lastly, the Court should address the discriminatory nature of the filing fee. As the Court has recognized, qualifying fees for political-body

candidates are paid to the Secretary of State, who retains twenty-five percent and must send seventy-five percent to the political body. (ECF 159 at 5-6.) While the law requires the Secretary of State to distribute the funds to the political body "as soon as practicable," the Court found that the Secretary of State did not distribute the Libertarian Party's share of those funds paid in March 2018 until April 2019, thus depriving the Libertarian Party of the use of those funds during the election. (*Id.*) Any court-ordered remedy that requires a filing fee should therefore also require the Secretary of State to distribute that money to the applicable political body within 30 days of receipt, so that political bodies, like the Democratic Party and the Republican Party, can use those funds to promote their candidates during the election cycle.

Respectfully submitted this 2nd day of September, 2021.

**/s/ Bryan L. Sells**
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **Plaintiffs' Response to the Court's August 23 Order** was prepared in 13-point Century Schoolbook in compliance with Local Rules 5.1(C) and 7.1(D).


<u>**/s/ Bryan L. Sells**</u>
Attorney Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com