[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13199

_____

MARTIN COWEN,
an individual,
ALLEN BUCKLEY,
an individual,
AARON GILMER,
an individual,
JOHN MONDS,
an individual,
LIBERTARIAN PARTY OF GEORGIA, INC.,
a Georgia nonprofit corporation,

Plaintiffs-Appellees-
Cross Appellants,

*versus*

2                    Opinion of the Court                    21-13199

SECRETARY OF STATE OF THE STATE OF GEORGIA,

Defendant-Appellant-
Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-04660-LMM

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and HULL, Circuit
Judges.

GRANT, Circuit Judge:

Georgia law places restrictions on which prospective
candidates for elective office can appear on the general election
ballot.  Over the past 50 years, courts have repeatedly rejected
constitutional challenges to these ballot-access laws: first the
Supreme Court, then our predecessor circuit, and then this Circuit,
twice.  See Jenness v. Fortson, 403 U.S. 431 (1971); McCrary v.
Poythress, 638 F.2d 1308 (5th Cir. 1981); Cartwright v. Barnes, 304
F.3d 1138 (11th Cir. 2002); Coffield v. Kemp, 599 F.3d 1276 (11th
Cir. 2010).  The challengers here—the Libertarian Party of Georgia,
prospective Libertarian candidates, and affiliated voters—ask us to
change course and hold that Georgia's ballot-access laws

unconstitutionally burden their First and Fourteenth Amendment rights and deny them equal protection. We decline to do so. Instead, we conclude that the district court incorrectly held that the laws violate their First and Fourteenth Amendment rights. And we agree with the district court's conclusion that Georgia's laws do not cause an equal protection violation. We therefore reverse in part, affirm in part, and vacate the district court's injunction.

## I.

The Libertarian Party, joined by voters and prospective candidates, brought suit against the Georgia Secretary of State to challenge the ballot-access requirements that prospective Libertarian candidates for the United States House of Representatives must satisfy. This case is now before us for the second time. *See Cowen v. Georgia Sec'y of State*, 960 F.3d 1339 (11th Cir. 2020). Our prior opinion provided an overview of Georgia's ballot-access system, so we elaborate only on those aspects that are necessary to our evaluation here. *See id.* at 1340–41.

To appear on the ballot for a non-statewide office, including the office of U.S. Representative, prospective candidates that do not belong to a "political party"—that is, third-party and independent candidates—must submit a nomination petition signed by a number of voters equal to 5% of the total number of registered voters eligible to vote in the last election for the office.

O.C.G.A. § 21-2-170(a)–(b).[1]  The petitions also must satisfy certain technical requirements.   Candidates have a 180-day period to collect signatures.  *Id.* § 21-2-170(e).  Each signer must declare that she is a registered voter of the electoral district qualified to vote in the next election for that office, sign her name, and include her residential address; signers are also encouraged to add their dates of birth for verification purposes.  *Id.* § 21-2-170(c).  Upon filing, the petition circulator must attach a notarized affidavit stating that, among other things, the signers were qualified to sign the petition, and then an official must verify the signatures.  *Id.* §§ 21-2-170(d), 21-2-171(a).  If a nomination petition is denied, that decision can be reviewed by a court through an application for a writ of mandamus.  *Id.* § 21-2-171(c).

In addition to the petition requirement, prospective candidates for non-statewide office must file a notice of candidacy and submit a qualifying fee.  *Id.* § 21-2-132(d).  For most offices, including U.S. Representative, the fee is 3% of the office's annual salary.  *Id.* § 21-2-131(a)(2).  A candidate who cannot afford the fee may file a pauper's affidavit instead, which requires an affirmation under oath of an inability to pay, a financial statement, and a signed petition.  *Id.* § 21-2-132(g)–(h).

---

[1] Under Georgia law, a "political party" is a political organization that at the preceding general election for governor or president nominated a candidate that received at least 20% of the total vote cast.  O.C.G.A. § 21-2-2(25).  Other political organizations are called "political bodies."  *Id.* § 21-2-2(23).

Ballot-access requirements differ for third-party candidates running for statewide office instead of non-statewide office. While candidates for statewide office must still file a notice of candidacy and pay the qualifying fee, they can avoid the petition requirement if they are nominated by a third-party "political body" that has met certain criteria. *Id.* §§ 21-2-132(d), 21-2-180. A political body can nominate statewide candidates to the ballot this way if it either (1) files a qualifying petition signed by a number of voters equal to 1% of the total number of registered voters eligible to vote in the preceding general election, or (2) at the preceding general election nominated a candidate for statewide office who received a number of votes equal to 1% of the total number of registered voters eligible to vote in that election. *Id.* § 21-2-180. Otherwise, a candidate for statewide office can earn a place on the ballot by submitting a nomination petition signed by a number of voters equal to 1% of the total number of registered voters eligible to vote in the last election for the office. *Id.* § 21-2-170(b).

The Libertarian Party now challenges this ballot-access system with two constitutional claims. *First*, it argues that the requirements for prospective Libertarian candidates for U.S. Representative cumulatively impose an unconstitutional burden on associational and voting rights protected by the First and Fourteenth Amendments. *Second*, it contends that Georgia law draws an unjustified classification between prospective Libertarian

candidates for statewide office and those for non-statewide office.[2] This case first came before us on the district court's grant of summary judgment to the Secretary on both claims. *See Cowen*, 960 F.3d at 1341. In our prior decision, we remanded for the district court to apply the correct legal test to the First and Fourteenth Amendment claim and to separately address the equal protection claim. *Id.* at 1347. On remand, the district court maintained its determination that the Libertarian Party showed no equal protection violation. But it shifted course and ruled for the Party on its First and Fourteenth Amendment claim.

To remedy that constitutional violation, the district court permanently enjoined the Secretary from enforcing the 5% signature requirement that applied to third-party and independent candidates for non-statewide office. In its place, the district court imposed a 1% requirement as an interim measure, which would persist until the state legislature enacted a permanent replacement. The Secretary and the Libertarian Party both appealed.

## II.

We review a district court's decision on cross-motions for summary judgment de novo. *Chavez v. Mercantil*

---

[2] The Libertarian Party moved for summary judgment on its classification theory underlying its equal protection claim, not its discriminatory purpose theory. The district court later found the discriminatory purpose theory moot in light of its conclusion on the First and Fourteenth Amendment claim. That theory is not at issue here.

*Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).  We view the facts "in the light most favorable to the non-moving party on each motion."  *Id.*

## III.

The Libertarian Party first claims that Georgia's ballot-access laws unconstitutionally burden two overlapping rights protected by the First and Fourteenth Amendments: "the right of individuals to associate for the advancement of political beliefs" and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quotation omitted).  As we explained in our prior decision, reviewing courts must analyze this claim under the framework the Supreme Court established in *Anderson v. Celebrezze*. *Cowen*, 960 F.3d at 1342.  The *Anderson* test requires the court to (1) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (2) "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule"; and (3) weigh those factors and "decide whether the challenged provision is unconstitutional."  *Id.* (quotations omitted).

*Anderson* postdated the Supreme Court's 1971 decision in *Jenness v. Fortson*, which held that Georgia's 5% signature requirement did not violate voters' and prospective candidates' First and Fourteenth Amendment rights.  *Jenness*, 403 U.S. at 439–40.  Because *Anderson* clarified that no "litmus-paper test"

exists to "separate valid from invalid restrictions" and that the analysis must be context-specific, we concluded that the holding in *Jenness* could not automatically control the Libertarian Party's claim here.   *Cowen*, 960 F.3d at 1342, 1345–46 (quotations omitted).

Still, *Jenness* could not be disregarded.  We instructed that the Libertarian Party would have to "satisfactorily distinguish its claims from those rejected in *Jenness*" to prevail on remand.  *Id.* at 1346.  Specifically, the Libertarian Party's task was to "demonstrate why a different result from *Jenness* is required in this case—either because of different facts in the instant record, as compared to the record in *Jenness*; changes in the relevant Georgia legal framework; or the evolution of the relevant federal law."  *Id.*

On remand, the Libertarian Party persuaded the district court that changed circumstances warranted a different result.  But we are unconvinced.    True, some changes to Georgia's ballot-access laws have occurred in the 50 years since *Jenness*.  And the evidentiary record detailing the practical difficulties of gathering petition signatures may be more robust here than it was in that case.  But to satisfactorily distinguish the claims, not just any difference from *Jenness* will do—the difference must be material enough to transform Georgia's ballot-access system from one that "in no way freezes the status quo" to one that does.  *Jenness*, 403 U.S. at 439.   The Libertarian Party has not identified such a difference.

Both the Libertarian Party and the district court heavily relied on the undisputed fact that "no political-body candidate for U.S. Representative has ever satisfied the requirements to appear on Georgia's general-election ballot" since the 5% signature requirement was first adopted, long before *Jenness*. But that frame of reference is too narrow. Focusing only on the success of political-body candidates for one particular non-statewide office is unwarranted when other candidates—including independent candidates and those running for other non-statewide offices—must meet the same 5% threshold. *See* O.C.G.A. § 21-2-170(a)–(b).

That limited focus is also inconsistent with the analysis applied by the Supreme Court. In *Jenness*, the challengers to Georgia's 5% signature requirement included one prospective candidate for governor and two for U.S. Representative. 403 U.S. at 432 n.3. When assessing the record of past petitioning efforts, however, the Supreme Court looked not only to a gubernatorial candidate who successfully petitioned onto the ballot, but also to a presidential candidate. *Id.* at 439. Each of those candidates was subject to the 5% signature requirement under the law as it existed at that time. *Id.* at 432, 438–39.

We thus broaden our own analysis to include other prospective candidates for non-statewide office. The parties agree that in 2020, an independent candidate for district attorney gathered enough signatures to exceed the 5% threshold. Although the absolute number of signatures required for district attorney

candidates and congressional candidates differs because of the varied sizes of the electoral districts, so did the absolute number of signatures required for the congressional and statewide candidates compared in *Jenness*. This local candidate's success shows that the 5% requirement still does not bar candidates from the ballot.

As the Supreme Court did in *Jenness*, we recognize that the 5% requirement appears to be somewhat higher than that in other states. *See id.* at 442. But it remains just as true that Georgia imposes "no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.*

In fact, Georgia's ballot-access laws were and are quite open in numerous respects. The *Jenness* Court explained that "no suffocating restrictions" existed—voters could sign petitions for multiple candidates; they could both sign a petition and vote in a party primary; they did not have to state that they intended to vote for a candidate in order to sign that candidate's petition; the pool of voters eligible to sign included those not registered in the preceding election; and petition signatures did not need to be notarized. *Id.* at 438–39. None of that has changed; nomination petitions can circulate just as freely today. *See Cartwright*, 304 F.3d at 1140–41. Candidates still have 180 days to collect signatures, and the filing deadline, which the Supreme Court stated was not "unreasonably early" in *Jenness*, is later now. *Jenness*, 403 U.S. at 433–34, 438; O.C.G.A. §§ 21-2-132(e), 21-2-170(e). The Georgia legislature has since added a requirement that write-in candidates

file a notice of candidacy, but that change has no effect on the burden of gaining ballot access by nomination petition. *See* O.C.G.A. § 21-2-133(a).

The Libertarian Party offers evidence to show that collecting petition signatures is costly and difficult. It is no surprise that parties must "undergo expense" to accumulate required petition signatures. *Am. Party of Texas v. White*, 415 U.S. 767, 793–94 (1974). But the Libertarian Party has not shown that the endeavor is significantly more challenging than it was 50 years ago.

The Party asserts that the Secretary's petition-validation process is so "error-prone" that prospective candidates must gather extra signatures to make up for those that are erroneously rejected. But it does not account for the availability of prompt judicial review of the decision to deny a nomination petition. *See* O.C.G.A. § 21-2-171(c). Nor does it contend that this judicial-review mechanism is inadequate to correct any erroneous petition denials. And most importantly, it provides no information about how validation rates have changed since *Jenness*.

The Party's reliance on increased campaign-finance restrictions also falls short. While federal law now caps the amount that donors can contribute to petitioning efforts, the Party has not connected those contribution limits to any materially heightened burden. *See* 52 U.S.C. § 30116(a). For instance, it has made no showing that prospective candidates could not gain contributions from additional donors, or that the Party would donate more to its candidates if it were not barred from doing so. Asserting that some

12                    Opinion of the Court                    21-13199

new limit exists is not enough to show that it has caused a constitutional violation.

The main difference between this case and *Jenness* has nothing to do with the petition requirements—it is the challenge to the qualifying fee, which was not at issue there. *See Jenness*, 403 U.S. at 432. But we have long recognized qualifying fees as "reasonable, nondiscriminatory means of regulating ballot access" as long as "an alternative means of ballot access" exists. *Green v. Mortham*, 155 F.3d 1332, 1337 (11th Cir. 1998). Such an alternative means exists here: candidates for non-statewide office may qualify without paying the fee if they submit a pauper's affidavit and satisfy a 1% signature requirement. O.C.G.A. § 21-2-132(g)–(h). And this Circuit has upheld higher fees than Georgia's 3% fee. *See Green*, 155 F.3d at 1339 (7.5% and 6% fees); *Little v. Florida Dep't of State*, 19 F.3d 4, 5 (11th Cir. 1994) (4.5% fee). The Libertarian Party presents no evidence that the amount of the fee has precluded prospective candidates from accessing the ballot; to the contrary, it stipulated that several candidates who did not successfully amass the required petition signatures did pay the qualifying fee.

In sum, Georgia's ballot-access laws do not severely burden the Libertarian Party's First and Fourteenth Amendment rights. Under the *Anderson* framework, then, the laws need only be justified by "the State's important regulatory interests." *Anderson*, 460 U.S. at 788; *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992). That test is met here. It bears repeating that the interests the Secretary asserts—in "requiring some preliminary showing of a

significant modicum of support before printing the name of a political organization's candidate on the ballot," in maintaining the orderly administration of elections, and in "avoiding confusion, deception, and even frustration of the democratic process at the general election"—are compelling.[3] *Jenness*, 403 U.S. at 442; *see also Swanson v. Worley*, 490 F.3d 894, 903 (11th Cir. 2007); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193–94 (1986); *Libertarian Party of Florida v. Florida*, 710 F.2d 790, 792–93 (11th Cir. 1983). Georgia's ballot-access system is a "rational way" to meet those interests. *Swanson*, 490 F.3d at 903–04 (quotation omitted). No proof of "actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies" is required. *Munro*, 479 U.S. at 195; *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). We conclude that Georgia's ballot-access laws again survive challenge under the First and Fourteenth Amendments.

## IV.

We now turn to the claim that the disparate routes to the ballot provided for Libertarian candidates seeking non-statewide

---

[3] In an unpublished opinion, this Circuit summarily affirmed a district court decision holding Georgia's 1% signature requirement for presidential candidates unconstitutional under this framework. *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016), *aff'd*, 674 F. App'x 974 (11th Cir. 2017). That decision does not control this outcome. It is not binding, and because it involved presidential elections, the nature of both the asserted injury and the State's interests differs.

versus statewide office violate the Equal Protection Clause.  In our prior opinion, we explained the classification at issue.  *Cowen*, 960 F.3d at 1346–47.  If in the preceding general election any Libertarian candidate for statewide office received a number of votes equal to 1% of the total number of registered and eligible voters, Libertarian candidates for statewide office are "automatically entitled to ballot access," while Libertarian candidates for non-statewide office must petition.[4]  *Id.*; *see* O.C.G.A. §§ 21-2-170(b), 21-2-180.  We sent the case back to the district court with instructions to analyze whether this distinction between offices violates equal protection.  *Cowen*, 960 F.3d at 1347.

The district court responded on remand that the Libertarian Party had misconstrued Georgia's ballot-access system.  But in reaching this conclusion, the court itself seems to have misconstrued the Libertarian Party's claim, despite our earlier explanation.  The district court explained that Libertarian candidates for statewide office have not needed to submit nomination petitions because the Libertarian Party has consistently qualified to nominate its statewide candidates by convention alone, having passed the 1% vote threshold in statewide elections for decades.  It went on to acknowledge that Georgia law provides "an alternative way to access the

---

[4] The Libertarian Party does not argue that the disparity in signature percentage required for statewide and non-statewide candidates seeking to qualify by nomination petition violates equal protection or that we should consider any difference in qualifying fees.

general-election ballot through votes obtained in the prior election." It then summarily concluded that this extra qualification method was not "a distinction that violates Plaintiffs' right to equal protection."

That reasoning misses the point. The "alternative way" around qualifying by nomination petition is available to Libertarian candidates for statewide office, but not non-statewide office. Under Supreme Court precedent, that is a cognizable "geographic classification." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183–87 (1979). So as the Libertarian Party proposes, and because the start of the 180-day petitioning window is nearly upon us, we will conduct the necessary equal protection analysis ourselves based on the summary judgment record instead of remanding a second time to the district court. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (stating that we may "affirm the district court's judgment on any ground that appears in the record").

This Circuit considers equal protection challenges to ballot-access laws under the *Anderson* test. *Indep. Party of Florida v. Sec'y, Florida*, 967 F.3d 1277, 1283–84 (11th Cir. 2020); *Fulani v. Krivanek*, 973 F.2d 1539, 1543–44 (11th Cir. 1992). We assess "the character and magnitude of the asserted denial of equal treatment," "identify the precise interests put forward by the State to justify its rule," and "determine the legitimacy and strength of each interest." *Indep. Party*, 967 F.3d at 1284 (quotations omitted).

The asserted injury here is that Libertarian candidates for non-statewide office must petition for individual ballot access rather than benefitting from the Libertarian Party's qualification to nominate a slate of candidates at the statewide level. The magnitude of this inequality, however, is (at most) only as substantial as the severity of the burden of meeting the 5% signature requirement—the hurdle non-statewide candidates must overcome. And as we have already concluded, that burden is not severe. The disparity between candidates can thus be justified if the State puts forward an important regulatory interest. *See id.* at 1281.

The Secretary has explained the importance of "ensuring that candidates have a significant modicum of support among the electorate before placing them on the ballot." This is a compelling interest. *See, e.g., Swanson*, 490 F.3d at 903. The disparity between qualification methods serves that interest, the Secretary reasoned, because it keeps Libertarian candidates for non-statewide office from relying on the Party's support at the state level. Even though the Libertarian Party has consistently garnered support at that level, prospective Libertarian candidates for U.S. Representative may well lack a significant modicum of support within the congressional district they seek to represent.[5] Though

---

[5] We agree with the Secretary that the Supreme Court's decision in *Norman v. Reed*, 502 U.S. 279 (1992), does not undermine the State's interest in requiring voter support in specific electoral districts. That case held it unconstitutional for a State to require candidates running for office within a

we might be able to imagine more narrowly tailored alternatives to the disparity at issue, the *Anderson* test does not require perfect tailoring when the disparity is not severe. We conclude that the Secretary's stated interest sufficiently justifies this distinction.

## V.

For these reasons, we **REVERSE** the district court's grant of summary judgment to the Libertarian Party on its First and Fourteenth Amendment claim and its denial of summary judgment to the Secretary on that claim. We **AFFIRM** the district court's summary judgment ruling on the Libertarian Party's equal protection claim. We **VACATE** the district court's injunction and **REMAND** for further proceedings consistent with this opinion.

---

county that comprises multiple electoral districts to show support among citizens from an electoral district other than the one that would elect them, where that requirement resulted in county candidates having to gain more petition signatures than statewide candidates. *Id.* at 284, 292–93. The Court explained that because the State did not have a geographic distribution requirement for statewide candidates, it did not demonstrate a serious state interest in demanding that distribution for local candidates. *Id.* at 293–94. But that reasoning does not apply here, because prospective candidates at both the statewide and non-statewide levels must only show sufficient support among the electorate of the office they seek.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 05, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  21-13199-GG
Case Style:  Martin Cowen, et al v. Georgia Secretary of State
District Court Docket No:  1:17-cv-04660-LMM

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joseph Caruso, GG

at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion