IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Martin Cowen**, et al.,<br><br>    Plaintiffs,<br><br>  vs.<br><br>**Brad Raffensperger**, in his official capacity as Secretary of State of the State of Georgia,<br><br>    Defendant. | Case No. 1:17-cv-04660-LMM<br><br>**Plaintiffs' Response in Opposition to the Defendant's Third Motion for Summary Judgment** |

The plaintiffs respectfully submit this response in opposition to the Secretary of State's third motion for summary judgment. (ECF 209.) The Secretary seeks judgment as a matter of law on the plaintiffs' claim that Georgia's ballot-access restrictions are unconstitutional because they were adopted with a discriminatory purpose.

The Court should deny the Secretary's motion because the Secretary failed to include with his motion "a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried." N.D. Ga. R. 56.1(B)(1). That alone

precludes relief here because the Local Rules also provide that the Court "will not" consider any fact that is "set out only in the brief and not in the movant's statement of undisputed facts." *Id.*

But even if the Secretary had not completely disregarded the Local Rules, summary judgment would still be inappropriate here because there is a genuine dispute about whether Georgia's five-percent petition requirement was, in fact, enacted with a discriminatory purpose, and that fact is material to the outcome based on the applicable law.

This Court should therefore deny the Secretary's motion and set this case for trial.

## Background

The State of Georgia has an ugly history of racial discrimination against Black people in virtually all aspects of life. As the court observed in *Brooks v. State Board of Elections*: "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994); *see generally*

Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (2003).

In the late 1920s and 1930s, the Communist Party launched a campaign to combat racial discrimination against African Americans and to encourage interracial cooperation throughout the Jim Crow South. (Ex. 58: Communist Party policies on the "Negro Question.") The party established a weekly newspaper, *The Southern Worker*, and sent organizers across the region to spread its radical message of racial equality and solidarity among the working class. See *generally* Edward Hatfield, *Communists*, New Georgia Encyclopedia, https://www.georgiaencyclopedia.org/articles/history-archaeology/communists/.

In Georgia, the campaign generated a strong backlash against the party by state and local officials who sought to maintain the state's racial caste system. *Id.* Police conducted a series of "Red Raids" against suspected Communists, charging them with inciting an insurrection under a law originally designed to discourage slave rebellions that carried a possible death sentence. *Id.* The most famous of these involved Angelo Herndon, a young African-American communist organizer who

3

was arrested in July 1932 for distributing Communist literature advocating racial equality. Herndon was convicted and sentenced to 18-to-20 years in prison. After a series of appeals, the United States Supreme Court overturned his conviction in a 5-to-4 decision striking down Georgia's insurrection statute. *See Herndon v. Lowry*, 301 U.S. 242 (1937).

The backlash against the Communist Party also extended into the political arena. The Communist Party's presidential ticket—which included an African-American vice-presidential nominee, James W. Ford, and ran on a platform explicitly calling for racial equality and self-determination for the Black Belt—had appeared on Georgia's ballots in 1932. (Ex 59: 1932 Communist Party platform; Ex 60: 1932 news articles.) In 1935, a few months after a textile workers' strike prompted another round of Red Raids, the Georgia General Assembly passed a bill banning the Communist Party from state ballots that was vetoed by the Governor when it reached his desk. (Ex. 61: excerpts of 1935 Georgia House and Senate journals.)

In 1940, the Communist Party's presidential ticket once again included James Ford as the vice-presidential nominee, and the party's

4

platform once again called explicitly for racial equality. (Ex 62: 1940 Communist Party platform.) Notwithstanding state law, Georgia's Secretary of State, John B. Wilson, unilaterally barred the party from the state's ballots on the ground of public policy. (Ex. 63: 1940 news articles.) Shortly after the election, Secretary Wilson was reported to be seeking legislation to keep the Communist Party permanently off the ballot. (Ex. 64: 1941 news article.) He proposed a bill requiring all candidates for state and national office in Georgia to file with the secretary of state sufficient information to determine whether the party "is designed to overthrow our constitutional form of government." (*Id.*) Although the communist party would not be mentioned in the bill, Wilson said that "it and any other similar party would be the primary target." (*Id.*)

Although the General Assembly did not take up Wilson's proposal at its 1941 session, it did adopt a law imposing a five-percent petition requirement for candidates at its next regular session in 1943. Act of March 20, 1943, Ch. 415, 1943 Ga. Laws 292. The media reported that the petition requirement was designed to "sustain[] Secretary of State

John B. Wilson in refusing a Communist candidate for president a place on the Georgia ballot in the 1940 election." (Ex. 65: 1943 news articles.)

A few weeks earlier, the Georgia Senate had adopted a resolution printing a recent speech from United States Senator Richard Russell in the journal of the State Senate. Russell, an ardent segregationist, gave the speech on the floor of the Senate in opposition to a bill that would have outlawed poll taxes in eight Southern states. He claimed that the Communist Party, which he accused of having fomented racial unrest in his state, was behind the bill. And he noted that the "only thing which has done more than the Communist party though the distribution of pamphlets to tear down good relations which men of good will in both races have painstakingly and earnestly created over a long period of years has been the proposal of measures such as the [anti-poll-tax bill] before the Senate at this time." (Ex. 66: excerpt from 1943 Georgia Senate journal.)

In October 1948, the Georgia General Assembly was called into a special session and temporarily suspended the petition requirement for presidential candidates so that the Dixiecrat candidate, Strom Thurmond, could appear on Georgia's ballot. Act of October 2, 1948, ch.

1, 1949 Ga. Laws 3. The act also expressly barred Communist Party candidates and retroactively changed the rules that applied to petitions for non-presidential offices that had already been submitted. *Id.* This had the effect of disqualifying Larkin Marshall, a prominent African-American newspaperman from Macon who had been nominated for United States Senator by the Progressive Party and who had earlier submitted a petition meeting the requirements then in force. (Ex. 67: 1948 news articles.)

The five-percent petition requirement remained substantively unchanged until 1986, when the General Assembly lowered the requirement to one percent—but only for statewide candidates. Act of April 3, 1986, ch. 284, 1986 Ga. Laws 890. Before the change, the General Assembly held a hearing on legislative proposals to ease ballot access for some third-party candidates. Richard Winger testified at the hearing and urged committee members to adopt a process that would allow third parties to qualify for all offices. One legislator on the committee responded, "I don't want some damned Libertarian running against me." (Ex. 68: 3d Winger decl.)

The five-percent petition requirement for non-statewide offices remained in place and has been substantively unchanged since 1986. And no third-party candidate for United States Representative has ever satisfied it.

**Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute about a material fact is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether to grant or deny summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Id.* at 249. In doing so, the court must view the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## Discussion

**I. The Court should deny the Secretary's motion because of his failure to provide a statement of undisputed material facts.**

Local Rule 56.1 provides as follows:

> A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The Court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

N.D. Ga. R. 56.1(B)(1). This rule requires a movant to file, along with every motion for summary judgment, a separate statement of undisputed material facts.

The Secretary failed to include a statement of undisputed material facts with his third motion for summary judgment. Instead, his brief

includes only a short background section that merely summarizes the procedural history of the case. The plaintiffs and the Court are left to guess at which facts, if any, the Secretary believes are material and undisputed here. The Local Rules make clear that under these circumstances, the Court "will not" consider facts set out only in a movant's brief, and so there are no "undisputed" facts for this Court to address. N.D. Ga. R. 56.1(B)(1).

This Court routinely denies motions for summary judgment that lack the required statement of undisputed material facts. *See, e.g., Hopkins v. DeVeaux*, 781 F. Supp. 2d 1283, 1296 (N.D. Ga. 2011) (denying a motion for summary judgment because the movant failed to include "any document that might even be remotely considered a statement of material facts"); *Amy v. Schloeder*, No. 1:15-cv-3857-LMM, 2017 WL 9882666, at *1 (N.D. Ga. Dec. 5, 2017) (denying a motion for summary judgment because the defendant "failed to include a separate statement of material facts in violation of Local Rule 56.1").

The Secretary has twice filed motions for summary judgment in this case that complied with the rules. (ECF 73 and ECF 135.) This time, however, his attorneys chose to ignore them. Under these circumstances,

10

the Court should deny the Secretary's motion for that reason alone and set this case for trial.

II. **The Secretary of State is not entitled to judgment as a matter of law on the plaintiffs' claim of purposeful discrimination.**

The Secretary makes three arguments that he is entitled to judgment as a matter of law. First, he argues that the purpose behind the challenged statute is irrelevant because rational basis review under the *Anderson* test would apply anyway. (ECF 209-1 at 7-10.) Second, he argues that discriminatory purpose is relevant only if the statute is facially neutral—and he argues that this one is not. (*Id.* at 11-12.). And, finally, he argues that a discriminatory purpose does not trigger strict scrutiny here because (he assumes) the plaintiffs here allege only partisan discrimination. (*Id.* at 12-16.)

None of these arguments have any merit.

A. **Discriminatory purpose matters.**

The common thread in the Secretary's three arguments is that discriminatory purpose doesn't matter here because strict scrutiny wouldn't apply anyway. Without strict scrutiny, his argument goes, the

Eleventh Circuit's ruling in *Cowen II* is controlling. But the Secretary misunderstands the applicable law.

Ballot-access laws that were adopted or maintained for the purpose of discriminating against an identifiable political group are subject to strict scrutiny under the balancing test set forth in *Anderson v. Celebrezze*:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and determine the extent to which those interests necessitate the burdening of the plaintiffs' rights.

*Bergland v. Harris*, 767 F.2d 1551, 1553-54 (11th Cir. 1985) (paraphrasing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The Supreme Court's decision in *Anderson* distinguishes between burdens that restrict political participation equally and burdens that "discriminate[] against those candidates and … voters whose political preferences lie outside of the existing political parties." 460 U.S. at 794. When the law places discriminatory burdens on the rights of political parties, candidates, or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v.*

*Takushi*, 504 U.S. 428, 434 (1992) (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1982)). *See Anderson*, 460 U.S. at 794 n.16; *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring) (heightened scrutiny is often necessary to ensure that the state's asserted interests are "not merely a pretext for exclusionary or anticompetitive restrictions"). *See, e.g., Graveline v. Benson*, 992 F.3d 524, 535-39 (6th Cir. 2021) (concluding that a discriminatory ballot-access scheme warranted strict scrutiny); *Durand v. Raffensperger*, No. 2022CV365171, slip op. at 25 (Fulton Cnty. Super. Ct. Aug. 18, 2022) (attached as Ex. 69) (applying strict scrutiny where the challenged law was motivated by a desire to keep the plaintiff candidate off the ballot). *Cf. Larios v. Cox*, 300 F. Supp. 2d 1320, 1347-48 (N.D. Ga.) (three-judge district court), *aff'd*, 542 U.S. 947 (2004); *Cox v. Barber,* 275 Ga. 415, 418 (2002).

Ballot-access laws adopted or maintained for a discriminatory purpose also violate the First Amendment's prohibition on viewpoint discrimination. The Supreme Court has recognized a category of laws that, while facially content-neutral, will be considered to be content-based regulations of speech that are presumptively unconstitutional: laws that were adopted by the government "because of disagreement

13

with the message that [the speech] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Laws in this category, like those that are content-based on their face, must satisfy strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266 (11th Cir. 2007). And, in determining whether a challenged law falls into this category, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791; *accord DA Mortg. Inc.*, 486 F.3d at 1266.

Finally, ballot-access laws adopted or maintained with a racially discriminatory purpose are subject to strict scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985); *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1321-22 (11th Cir. 2021). A plaintiff must first show that the law "had a discriminatory purpose and effect." *Greater Birmingham Ministries*, 992 F.3d at 1321. Then, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

The upshot for this motion is that discriminatory purpose is a material fact under the applicable law. The Eleventh Circuit did not

address the issue, and the Secretary has not shown any undisputed material facts that entitle him to judgment as a matter of law. The Court should therefore deny his motion.

**B.     There are genuine factual disputes about the purposes of Georgia's petition requirement.**

The Secretary has not asserted the absence of a factual dispute about the purposes underlying the challenged statute. He has simply argued that purpose is "irrelevant." (ECF 209-1 at 6.) It is therefore not the plaintiffs' burden to show the existence of a genuine dispute about purpose. *See* Fed. R. Civ. P. 56(f) (a court may not grant summary judgment on grounds not raised by a party without first giving notice and an opportunity to respond). But even if it were, there is a genuine dispute here about that material fact. *See Rogers v. Lodge*, 458 U.S. 613, 622-23 (1982) (the issue of whether an election law was established or maintained for a discriminatory purpose is a question of fact subject to the clearly erroneous standard of review); *accord Brooks*, 158 F.3d at 1235-36.

The parties dispute, as a matter of fact, whether Georgia's five-percent petition requirement was adopted or maintained for a

discriminatory purpose. The Secretary, relying solely on a 1948 attorney general opinion, asserts that the original purpose was entirely nondiscriminatory. (ECF 97 at 10-11.) The plaintiffs, on the other hand, rely on historical documents and an expert opinion to support their contention that the original purpose of the requirement was both racially and politically discriminatory and that—not surprisingly—it had the intended effect. (Pls. Stmt. Add'l Facts ¶¶1-2.)

The parties also likely dispute whether the five-percent petition requirement was maintained for a discriminatory purpose. The plaintiffs contend that it was, and they rely mostly on the testimony of a witness who was personally involved in the legislative process. (*Id.* ¶3.) The Secretary hasn't yet taken a position on the motivation behind the 1986 amendment that maintained the five-percent petition requirement for district offices, but the plaintiffs assume that he will not concede.

These disputes are genuine. Viewing the evidence in the light most favorable to the plaintiffs, as this Court must, a reasonable jury could find that Georgia's five-percent petition requirement was adopted or maintained for a discriminatory purpose. As a result, this dispute would

16

preclude summary judgment even if the Secretary had raised the argument in his motion.

C.   **The plaintiffs have standing to bring these claims.**

The Secretary argues in passing that he is entitled to judgment as a matter of law because the plaintiffs lack standing "to assert the rights of the Communist Party." (ECF 209-1 at 15.) But this argument incorrectly assumes that the plaintiffs are asserting the rights of the Communist Party. They are not.

To establish standing, a plaintiff must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The Secretary's brief is unclear about which of these three elements he believes the plaintiffs cannot satisfy.

The plaintiffs here are asserting their own rights. The Libertarian Party, along with the plaintiff candidates and supporters of the Libertarian Party, are themselves injured by the five-percent petition requirement because it prevents them from appearing on the ballot. That injury is traceable to the Secretary, who enforces the petition

17

requirement, and would likely be redressed by a favorable decision enjoining the Secretary from enforcing the statute.

These plaintiffs have standing to assert a claim that the five-percent petition requirement was unconstitutionally maintained with the purpose of discriminating against the Libertarian Party. Likewise, the Libertarian Party, which has Black members and strongly supports racial equality, and plaintiff John Monds, who is Black, have standing to assert a claim that the requirement is unconstitutional because it was adopted with the purpose of discriminating against Black people. (Ex. 70: 2d Cowen decl.) *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (an association has standing to assert the rights of its members).

These plaintiffs also have standing to assert a claim arising from the fact that the petition requirement was originally adopted for a politically discriminatory purpose. Under the *Anderson* test, the discrimination that matters is discrimination against "new or small political parties," 460 U.S. at 793, so it makes no difference to the injury that the General Assembly had a different small party in mind when it chose to discriminate. *See, e.g., Graveline*, 992 F.3d at 532, 535. Viewpoint discrimination, moreover, depends not on the identity of the

disfavored speaker but on the disfavored speech with which the government disagreed. *See Ward*, 491 U.S. at 791. Here, there is substantial overlap between the anti-racist views of the Communist Party and the Libertarian Party, and, more importantly, the Libertarian Party today and the Communist Party of yesterday appeal to "those voters whose political preferences lie outside the existing political parties." *Anderson*, 460 U.S. at 794. They offer "new programs and new ideas" and seek to "challenge[] the status quo." *Id.* And the government disagrees with their common message of change.

Under these circumstances, the plaintiffs have standing to raise their discriminatory-purpose claims.

## Conclusion

The Court should deny the Secretary's third motion for summary judgment and set this case for trial.

Respectfully submitted this 21st day of December, 2022.

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com

## Certificate of Compliance

I hereby certify that this document was prepared in 13-point Century Schoolbook in compliance with Local Rules 5.1(C) and 7.1(D).

**/s/ Bryan L. Sells**
Georgia Bar No. 635562
Attorney for the Plaintiffs
The Law Office of Bryan L. Sells, LLC
Post Office Box 5493
Atlanta, Georgia 31107-0493
Telephone: (404) 480-4212
Email: bryan@bryansellslaw.com