Fulton County Superior Court
***EFILED***AC
Date: 8/18/2022 4:27 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

**Patty Durand,**

      Petitioner,

v.

**Brad Raffensperger**,
Secretary of State, State of Georgia

      Respondent.

Civil Action File

No. 2022CV365171

### Final Order

This case is before the Court on a petition for judicial review of the Secretary of State's decision concluding Petitioner Patty Durand is not qualified to be a candidate for the elected office of Public Service Commissioner - District 2. On July 26, 2022, this Court held a hearing on the matter. Upon consideration of the written submissions and argument of counsel, the record, the applicable law and pursuant to O.C.G.A. § 21-2-5(e), this Court hereby **REVERSES** the Secretary of State's decision for the reasons set forth hereinbelow:

1. **Background**

The Georgia Public Service Commission is a five-member body created by the Georgia Constitution. Ga. Const. Art. IV, § 1, Para. I. The jurisdiction, powers and duties of the Public Service Commission are prescribed by state law and they include broad



governmental authority to supervise and regulate common carriers, railroads and public utilities. O.C.G.A. § 46-2-1 *et seq*. The Commission regulates the rates Georgians may be charged by electric, natural gas and telephone companies, *inter alia. See* Id.

Georgia law provides members of the commission are to be elected statewide for six-year terms. O.C.G.A. § 46-2-1(a). Elections for commissioners are held on a partisan basis. (R. 499-507.) In 1998, the Georgia General Assembly added a requirement that commissioners must reside within specific districts and must have resided in that district "for at least 12 months prior to election thereto." O.C.G.A. § 46-2-1(b). Because they are elected statewide, and not by the voters in their district, commissioners represent the entire state. They do not focus on the specific interests of the voters in their district. (Testimony of Commissioner Echols, Tr. 30:4-12; Testimony of Commissioner Pridemore, Tr. 74:22-75:11.)

Public Service Commission elections are staggered-- and the District 2 "seat" is up for election in 2022. *See* O.C.G.A. § 46-2-1(d). The incumbent commissioner from District 2 is Tim Echols. (Testimony of Commissioner Echols, Tr. 27:22-28:1.) Commissioner Echols was first elected in 2010 and he was re-elected in 2016. (Id. 28:15-17.) Commissioner Echols is running for re-election as a Republican in 2022. (Id. 28:18-20.) Commissioner Echols launched his re-election campaign on or before November 6, 2021. (R. 287.)

Tricia Pridemore is the Chair of the Public Service Commission, a member of the Republican party and the incumbent commissioner from District 5. (Testimony of Commissioner Pridemore, Tr. 52:5-15.)

## 2. **Patty Durand's Candidacy for Public Service Commissioner – District 2**

Petitioner Patty Durand has been a Georgia resident for more than 26 years. (Testimony of Patty Durand, Tr. 99:23-25.) From January 2011 until February 2021, Ms. Durand was the Executive Director of the Smart Grid Consumer Collaborative, a non-profit organization working to promote the benefits of creating a next-generation energy infrastructure in the United States. (Id. 100:9-101:7.) As part of her work, Ms. Durand often interacted with commissioners and their staff. (Id. 101:8-25.) Ms. Durand is well known in the energy industry. (Id. 102:1-5.)

Ms. Durand had a contentious meeting with Commissioner Echols in February 2020 concerning Commissioner Echols' recent vote to raise utility rates. (Id. 102:6-106:21.) After researching Commissioner Echols' record, Ms. Durand decided to leave her employment at Smart Grid Consumer Collaborative in February 2021 and become a Democratic candidate for Public Service Commissioner - District 2. (Id. 100:7-8; Id. 106:23-107:5.)

Ms. Durand moved to Gwinnett County, which was in District 2, in June 2021. (Id. 109:9-12; R. 387.) Ms. Durand formally launched her campaign for Public Service Commissioner in July 2021. (Tr. 89:1-3; Id. 109:18-22; R. 331; R. 412.) Ms. Durand issued a media advisory announcing her candidacy and her candidacy was reported in media outlets throughout Georgia. (R. 412; Tr. 111:24-112:13.) Ms. Durand's candidacy was also reported in the Atlanta Journal Constitution's online political newsletter, "The Jolt." (Tr. 112:14-23.) Ms. Durand posted her candidacy on various social media platforms including *Twitter, LinkedIn, Facebook* and *Instagram*. (Id. 111:24-112:13.) Ms. Durand also engaged in other typical campaign activities: soliciting friends, neighbors, and colleagues for financial contributions; writing material regarding various aspects of Georgia's energy "situation" to be posted in blogs, newsletters and social media platforms, such material to be used to communicate her plans, should she be elected a commissioner; and sharing with her constituency her "energy-based" professional background. Ms. Durand also expressed her thoughts and plans in podcasts, promoting her experience, qualifications and vision for District 2's Public Service Commission seat-if elected.  In furtherance of her candidacy, Ms. Durand also hired campaign staff and attended Democratic party events. (Id. 109:23-111:23.)

Ms. Durand set an initial campaign fundraising goal to raise $100,000 by the end of 2021. (Id. 113:19-115:4.) In January 2022, Ms. Durand filed a campaign finance report

4

evidencing she had raised in excess of $110,000 in campaign contributions. (Id. 118:25-119:3; R. 335.) That amount was more than other recent Democratic candidates for Public Service Commission had reported in their end-of-year disclosure reports. (Tr. 115:5-118:15.) Ms. Durand's fundraising total was reported in the media. (Id. 119:23-121:2.)  At that point, January 2022, Ms. Durand was Commissioner Echols' only challenger for the District 2 Public Service Commission seat. (Id. 121:10-15.)

### A. Patty Durand's Address is Removed from District 2

On January 26, 2022, Commissioner Pridemore sent to Commissioner Echols a text message containing a photo of a map she had drawn that reconfigured the commission's residency districts. (R. 424; Testimony of Commissioner Echols, Tr. 44:16-20.) Commissioner Pridemore's January 26, 2022 map retained Gwinnett County in District 2. (R. 424; Testimony of Commissioner Pridemore, Tr. 57:22-58:5.) Then, having just texted the map to Commissioner Echols, Commissioner Pridemore texted him again, communicating: "Don't forget to get her home address and send it to me please." (R. 422, 424.) Commissioner Pridemore was referring to Ms. Durand in that text. (Tr. 55:3-9.) Commissioner Pridemore requested Ms. Durand's home address for use in connection with her map-drawing. (Tr. 55:10-17.) Commissioner Echols then responded to the text with Ms. Durand's home address. (R. 422, 424.)

Commissioner Pridemore later revised her map with the help of Gina Wright, Executive Director of Georgia's Legislative and Congressional Reapportionment Office. (Tr. 72:19-23.) The resulting map, which became the basis for Senate Bill 472 ("SB 472"), removes Gwinnett County from District 2.

SB 472 removes the following counties from the 2012 District 2: Baldwin, Bibb, Bleckley, Gwinnett, Houston, Johnson, Jones, Laurens, Treutlen, Twiggs, and Wilkinson. (*Compare* R. 390 *with* R. 387.) The total population of those counties, according to 2020 Census data, is 1,444,834. (R. 392-95; R. 404-07.) The total population of Gwinnett County, according to 2020 Census data, is 957,062. (R. 392.) The new districts thus remove approximately 66 percent of the former District 2's population, including all of Gwinnett County—which alone comprised approximately 44 percent of the former District 2's population. (R. 407.) According to 2020 Census data, the total population deviation of the residency districts in SB 472 is 1.55 percent. (R. 391.)

Republican Senator John F. Kennedy introduced SB 472 in the Senate on February 7, 2022. (R. 270.) On February 16, 2022, the Senate Reapportionment and Redistricting Committee, chaired by Senator Kennedy, held a hearing on SB 472. (R. 138-58.) Commissioner Pridemore presented the bill to the committee. (R. 142.) Both Senator Kennedy and Commissioner Pridemore told the committee that the old districts had to

6

be redrawn as a result of population changes reflected in the 2020 Census. (R. 139-40, 142.) The committee recommended passage of the bill by a vote of 8 to 3. (R. 157.)

Eight days later, Senator Kennedy presented SB 472 on the floor of the Senate. (R. 163-67.) Senator Kennedy again communicated to his colleagues the changes were necessary due to population shifts. (R. 163-64, 168-69, 181-82.) After debate, the bill passed on a party-line vote. (R. 204-05.)

On March 2, 2022, the House Legislative and Congressional Reapportionment Committee held a hearing on SB 472. (R. 209-40.) Senator Kennedy, accompanied by Commissioner Pridemore, presented the bill. (R. 209-14.) Senator Kennedy and Commissioner Pridemore again communicated the newly drawn districts were legally necessary to address population changes. (R. 210, 213, 218-19, 220-21.)

Democratic Representative Kim Alexander attended the hearing. She offered a "substitute map" for the residency districts in SB 472. (R. 222; R. 396-97.) The substitute map removed the following counties from the 2012 District 2: Bleckley, Clarke, Emanuel, Greene, Hancock, Jefferson, Jenkins, Laurens, Oconee, Screven, and Treutlen. (R. 398.) The total population of those counties, according to 2020 Census data, is 327,897. (R. 408-11.) The GHDC alternative thus would have removed about 15 percent of the old

7

District 2's population. (R. 411.) According to 2020 Census data, the total population deviation of the residency districts in the substitute map is 1.26 percent. (R. 397.)

House Minority Leader James Beverly presented the substitute map to the committee. (R. 222-27.) Leader Beverly explained there was no legal need to redraw the residency districts, inasmuch as, the one-person-one-vote principle does not apply to residency districts, in accordance with the U.S. Supreme Court case, Dallas County, Ala. v. Reese, 421 U.S. 477, 480-81 (1975) (R. 224.) Leader Beverly also explained, even if the one-person-one-vote principle did apply, the existing districts were already within constitutional limits after the 2020 Census. (R. 224.) Beverly also presented data from the Legislative and Congressional Reapportionment Office showing the overall population deviations among the districts in the existing map were below the 10-percent threshold that the Supreme Court held to be presumptively constitutional in Gaffney v. Cummings, 412 U.S. 735 (1973). (R. 225; R. 389.) According to 2020 Census data, the total deviation of the residency districts in the 2012 map was 9.94%. (R. 389.)

Leader Beverly also explained that substantial reconfiguration of the districts was not necessary to achieve the goal of equalizing the population among the districts. (R. 226.) The substitute map had a lower population deviation than the districts in SB 472 and maintained the cores of the existing districts. (Id.) It left Gwinnett County in District 2.

8

(Id.; R. 396; R. 398.) The committee rejected the substitute map on a party-line vote and then recommended passage of SB 472 on a party-line vote. (R. 232-33; R. 238-39.)

On Friday, March 4, 2022, Representative Bonnie Rich presented SB 472 for consideration by her colleagues in the Georgia State House of Representatives. (R. 244-66.) In doing so, Representative Rich expressed to her colleagues the bill was necessary due to population shifts since the 2010 Census, as Senator Kennedy and Commissioner Pridemore had earlier communicated. (R. 245.) After debate, the bill passed on a party line vote. (R. 263-66.)

The Governor signed the bill on the same day—in the afternoon on the last business day before the beginning of Georgia's candidate qualification period, which was to commence on Monday, March 7, 2022. (R. 270.) O.C.G.A. § 21-2-153(c)(1)(A). At the time, Ms. Durand was still Commissioner Echols' only announced challenger. (Tr. 121:16-25.)

### B.  The Secretary of State Challenges Patty Durand's Qualifications

Patty Durand established residency in Rockdale County, Georgia, on March 4, 2022. (Tr. 88:17-25.) Rockdale County is in the *new* District 2. (R. 284.) Ms. Durand filed paperwork to qualify as a candidate for Public Service Commissioner - District 2 on March 10, 2022. (R. 434.)

9

Ms. Durand recruited another candidate, Russell Edwards, to enter the Democratic primary for District 2 Public Service Commissioner; Edwards was to be a "placeholder candidate," so Commissioner Echols would have an opponent, in the event Ms. Durand was disqualified as a candidate for the District 2 seat. When it appeared Ms. Durand's qualifications would not be challenged during the two-week challenge period set forth in O.C.G.A. § 21-2-5(b), on March 28, 2022, Edwards suspended his campaign and endorsed Ms. Durand. (Tr. 122:6-124:9.)

Seven weeks later, on April 28, 2022, the Secretary of State initiated the subject challenge to Ms. Durand's qualifications to be a candidate for District 2, based on the residency requirement set forth in O.C.G.A. § 46-2-1(b). The Secretary of State referred the challenge to an administrative law judge, as required by law, and requested an expedited hearing. (R. 2.)

Importantly, Ms. Durand did not dispute she has not lived within the area encompassed by the newly drawn District 2 for the requisite time period set forth in O.C.G.A. § 46-2-1(b). Rather, she contended *the **application of the residency requirement*** to her candidacy under the circumstances of this case ***unconstitutionally*** burdens her rights under the Equal Protection Clause and the First and Fourteenth Amendments to the

10

United States Constitution and the corresponding protections of the Georgia

Constitution.

On May 12, 2022, the administrative law judge held the hearing on this matter. (R. 564.)

The parties were represented by counsel. (Id.) Three witnesses testified at the hearing—

Patty Durand, Commission Chair Tricia Pridemore, and Commissioner Tim Echols. Ms.

Durand also subpoenaed Gina Wright to appear at the hearing to testify and produce

documents, however, she failed to appear. (Tr. 4:14-5:5.)  A number of exhibits were

admitted into the record and an audio recording was made of the proceedings. (R. 565

n.1.)

On May 18, 2022, the parties filed post-hearing briefs. (R. 564.) On May 20, 2022, the

administrative law judge issued her decision. (Id.) The administrative law judge

determined, *inter alia*, SB 472 removed 66 percent of the former District 2's population

and was drawn with the specific purpose of excluding Ms. Durand's address. (R. 569; R.

572.) However, the administrative law judge lacked the requisite authority to rule on the

merits of Ms. Durand's constitutional defenses, as she acknowledged. (R. 573 n.2.) She

then concluded Ms. Durand is not qualified to be a candidate for Public Service

Commissioner in District 2, in accordance with O.C.G.A. § 46-2-1(b). (R. 574.)

11

The Secretary of State issued his final decision in connection with this matter around 4:00 pm on the afternoon of May 23, 2022—the day before the primary election was to be held. The Secretary of State's decision rejects 10 findings of the administrative law judge, stating, "they are not supported by a preponderance of the evidence or misstate or mischaracterize the evidence." (Final Decision at 1-2.) The rejected findings are as follows:

> "25. Commissioner Pridemore asked for Respondent's home address for use in connection with her map-drawing. (Tr. at 1:13:06.)" (R. 568.)

> "27. Commissioner Pridemore, acting as the PSC's liaison to the General Assembly, thereafter revised her map with the assistance of Gina Wright, executive director of Georgia's Legislative and Congressional Reapportionment Office. (Tr. at 1:40:30.)" (R. 569.)

> "30. The new districts thus remove approximately 66 percent of the former District 2's population, including all of Gwinnett County—which alone comprised approximately 44 percent of the former District 2's population. (Ex. R-19.)" (R. 569.)

> "42. The alternative map removed the following counties from the 2012 PSC District 2: Bleckley, Clarke, Emanuel, Greene, Hancock, Jefferson, Jenkins, Laurens, Oconee, Screven, and Treutlen. (Ex. R-17: GHDC map overlay.) The total population of those counties, according to 2020 Census data, is 327,897. (Ex. R-15; Ex. R-20: demonstrative GHDC calculations.) The GHDC alternative thus would have removed approximately 15 percent of the old District 2's population. (Ex. R-20.) According to 2020 Census data, the total population deviation of the residency districts in the substitute map is 1.26 percent. (Ex. R-16.)" (R. 570-71.)

> "43. House Minority Leader James Beverly presented the alternative map to the committee. (Ex. R4 at 16:25-21:2.) She [sic] stated that there was no legal need to redraw the residency districts because the one-person-one-vote principle does not apply to residency districts. (Ex. R-4

at 18:3-16.) She [sic] additionally contended that, even if the one-person-one-vote principle did apply, the existing districts were already within constitutional limits after the 2020 Census. (*Id.* at 18:17-21.) Beverly also presented data from the Legislative and Congressional Reapportionment Office showing that the overall population deviations among the districts in the existing map were below 10 percent. (Ex. R-4 at 19:5-10; Ex. R-13: PSC 2012 with 2020 Census Data.)" (R. 571.)

"44. According to 2020 Census data, the total deviation of the residency districts in the 2012 map was 9.94%. (Ex. R13: PSC 2012 districts with 2020 data.) Leader Beverly also stated that population equalizing among the districts could be achieved without substantial reconfiguration of the districts. (Ex. R4 at 20:13-20.)" (R. 571.)

"45. The Democratic alternative map had a lower population deviation than the districts in SB 472. (Id.) It left Gwinnett County in District 2. (*Id.*; Ex. R-16; Ex. R-17.)" (R. 571.)

"51. At the time, Respondent remained Commissioner Echols' only announced challenger. (Tr. at 2:46:17.)" (R. 572.)

"52. Based on the testimony at the hearing and the exhibits, in particular the text exchange exhibit, the undersigned finds that, at the very least, the SB 472 redistricting map was drawn with Respondent's specific address in mind. (Ex. P-3, P-4)" (R. 572.)

"55. Respondent recruited another candidate, Russell Edwards, to enter the Democratic primary as a placeholder candidate so that Commissioner Echols would have at least a nominal opponent if she were disqualified. When it appeared that Respondent's qualifications would not be challenged, Edwards suspended his campaign and endorsed Respondent. (Tr. at 2:46:54.)" (R. 571.)

In his Final Decision, the Secretary of State concluded Ms. Durand is not qualified to be a

candidate for Public Service Commission – District 2. (Final Decision at 4.)

Ms. Durand timely filed the within appeal, seeking an emergency stay of the Secretary

of State's decision to disqualify her as a candidate for Public Service Commission –

District 2, pending the outcome of the appeal. The Court granted the emergency stay.

Ms. Durand received the most votes in the Democratic primary election and was

certified as the Democratic nominee for the Public Service Commission seat at issue.

The Court received additional submissions/briefing from counsel for both parties and

held a hearing on this matter on July 26, 2022.

### 3. Legal Standard

Ms. Durand seeks review of the Secretary's final decision under O.C.G.A. § 21-2-5(e):

> The review shall be conducted by the court without a jury and shall be
> confined to the record. The court shall not substitute its judgment for
> that of the Secretary of State as to the weight of the evidence on
> questions of fact. The court may affirm the decision or remand the case
> for further proceedings. The court may reverse or modify the decision if
> substantial rights of the appellant have been prejudiced because the
> findings, inferences, conclusions, or decisions of the Secretary of State
> are:
>
> (1) In violation of the Constitution or laws of this state;
>
> (2) In excess of the statutory authority of the Secretary of State;
>
> (3) Made upon unlawful procedures;
>
> (4) Affected by other error of law;
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial
> evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by an abuse of discretion or a
> clearly unwarranted exercise of discretion."

Id.

## 4. **Legal Conclusions**

Ms. Durand raises two issues in her Petition before this Court. First, Ms. Durand

contends **the application** of Georgia's durational residency requirement for Public

Service Commissioners to Ms. Durand's candidacy unconstitutionally burdened her

rights under the Equal Protection Clause and the First and Fourteenth Amendments to

the United States Constitution and the corresponding protections of the Georgia

Constitution.[1] (Pet. at 9.) Second, Ms. Durand contends the finding by the Secretary of

State rejecting 10 of the administrative law judge's findings because "they are not

supported by a preponderance of the evidence-- or misstate or mischaracterize the

evidence" is clearly erroneous, considering the reliable, probative, and substantial

evidence contained in the whole record. (Pet. at 10.)


In response to Ms. Durand's petition, the Secretary of State contends Ms. Durand's

constitutional defenses present a non-justiciable political question over which this Court

lacks jurisdiction. (Respondent's Br. 13-19.) He further argues the Georgia Supreme

Court's decision in Cox v. Barber, 275 Ga. 415 (2002) is controlling here and dispositive

---

[1] The Georgia Supreme Court has held that the protection of the equal protection clause in the 1983 Georgia Constitution, Ga Const. Art. 1, Sec. 1, Para. 2, is *at least* coextensive with the protection afforded by the Equal Protection Clause of the United States Constitution. *See* Grissom v. Gleason, 262 Ga. 374, 376 & n.1 (1992). Similarly, the Georgia Supreme Court has held that Georgia Constitution provides broader protection than the First Amendment to the United States Constitution. *See* State v. Miller, 260 Ga. 669, 671 (1990). Though this Order focuses largely on federal caselaw, the analysis would be the same under state law.

of Ms. Durand's constitutional claims. (Respondent's Br. 20-25.) Finally, the Secretary

of State argues his findings of fact are not clearly erroneous. (Id. at 25-27.)

### A.    This case is justiciable.

The Secretary of State argues this Court should adopt the reasoning of the U.S. Supreme

Court's recent partisan-gerrymandering decision in Rucho v. Common Cause, 139 S. Ct.

2484 (2019) and conclude that Ms. Durand's challenge to the residency requirement is

non-justiciable. (Respondent's Br. 13-19.) The Court is not persuaded for the reasons

set forth below.


First, Georgia courts routinely hear cases involving the application of various residency

requirements. See, e.g., Lilly v. Heard, 295 Ga. 399 (2014); Handel v. Powell, 284 Ga. 550

(2008). Indeed, the Georgia Supreme Court adjudicated a constitutional challenge to this

residency requirement in Cox, supra.


Second, the Secretary of State's argument is foreclosed by Williams v. Rhodes, 393 U.S.

23, 28 (1968), which held that constitutional challenges to state laws setting forth

candidate qualifications are justiciable. The Secretary of State's sole response to

Williams and other cases which have adjudicated constitutional challenges to candidate

qualifications is to attempt to distinguish them by offering that they involved "state

ballot access requirements." (Respondent's Br. 19.) However, that is a "distinction

16

without a difference" here, inasmuch as, ballot access requirements *are* qualifications. *See, e.g.,* Williams, 393 U.S. at 25 (noting the provisions at issue "make it virtually impossible for any party to *qualify* on the ballot except the Republican and Democratic Parties") (Emphasis supplied). Just as in Williams, this case matter concerns itself with whether Ms. Durand is qualified to appear on the ballot. *See* O.C.G.A. § 21-2-5.

Third, this is not a partisan gerrymandering case. In Rucho, the plaintiffs challenged the constitutionality of district boundaries based on a theory of partisan vote dilution. *See* Rucho, 139 S. Ct. at 2492 (describing the plaintiffs' claims). Ms. Durand does not. She does not seek to invalidate the district boundaries, which are set out in O.C.G.A. § 46-2-1(c). Rather, she challenges only the constitutionality of the durational residency requirement, set out in O.C.G.A. § 46-2-1(b), ***as it was applied in her case***. None of the claims or relief sought in Rucho overlap with Ms. Durand's claim or relief sought by Ms. Durand here. The Secretary of State contends this is "a textbook partisan gerrymandering [case]" because it involves an allegation Ms. Durand's address was drawn out of the district. (Respondent's Br. 19.) However, there was no such allegation in Rucho; this is a different kind of case altogether.

Fourth, and finally, Rucho does not apply to state proceedings. Its holding is expressly based on the limitations imposed by Article III of the United States Constitution on

*Federal* courts. 139 S. Ct. at 2493-94. Rucho also observes that partisan gerrymandering claims can still be brought in state courts. Id. at 2507-08. Notably, counsel for the Secretary of State took the position in a related federal-court challenge to Georgia's residency requirement that Ms. Durand's constitutional claims "may be raised in the Georgia Courts." (R. 492 n.10.) The Secretary of State cites to decisions of the Georgia Supreme Court confirming the *existence* of the political question doctrine under state law (Respondent's Br. 15), however, he offers no basis for concluding Rucho would apply here, despite its reliance on the limits of Federal courts. For the foregoing reasons, the Court concludes this matter is justiciable.

## B. Georgia's durational residency requirement was unconstitutionally applied here

To determine whether Georgia's durational residency requirement for Public Service Commissioners violates the Equal Protection Clause of the First and Fourteenth Amendments *as applied here*, this Court applies the balancing test set forth in Anderson v. Celebrezze:

> First, a court must evaluate the character and magnitude of the asserted injury to rights protected by the First and Fourteenth Amendments. Second, it must identify the interests advanced by the State as justifications for the burdens imposed by the rules. Third, it must evaluate the legitimacy and strength of each asserted state interest and

> determine the extent to which those interests necessitate the burdening
> of the plaintiffs' rights.

Bergland v. Harris, 767 F.2d 1551, 1553-54 (11th Cir. 1985) (paraphrasing Anderson, 460

U.S. 780, 789 (1983). The same test applies to both of Ms. Durand's constitutional

defenses. *See* Cowen v. Ga. Sec'y of State, 22 F. 4th 1227, 1231-35 (11th Cir. 2022).

Under the Anderson test, the level of scrutiny varies on a sliding scale with the character

and magnitude of the asserted injury. When, at the low end of the scale, the law

"imposes only 'reasonable, nondiscriminatory restrictions' upon the First and

Fourteenth Amendment rights of voters, 'the State's important regulatory interests are

generally sufficient to justify' the restrictions." Burdick v. Takushi, 504 U.S. 428, 434

(1992) (quoting Anderson, 460 U.S. at 788, 788-89 n.9); *accord* Cox v. Barber, 275 Ga.

415, 418 (2002) (applying the Anderson test). But when the law places discriminatory or

"severe" burdens on the rights of political parties, candidates, or voters, "the regulation

must be 'narrowly drawn to advance a state interest of compelling importance.'" Id. at

434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1982)). *See, e.g.,* Graveline v. Benson,

992 F.3d 524, 535-39 (6th Cir. 2021) (concluding that a discriminatory ballot-access

scheme warranted strict scrutiny).[2]

---

[2] In cases where the burden on the plaintiffs' rights is non-discriminatory but moderate, the Anderson test demands an intermediate level of scrutiny. *See, e.g.,* Cooper v. Raffensperger, 472 F. Supp. 3d 1282, 1291-92 (N.D. Ga. 2020) (Ross, J.). In this case, the choice between strict and intermediate scrutiny is immaterial because the Secretary has not attempted to satisfy heightened scrutiny.

The party asserting constitutional rights bears the burden of proof on the first step in the Anderson test, and the government bears the burden on the second and third. Fulani v. Krivanek, 973 F.2d 1539, 1544 (11th Cir. 1992); Bergland, 767 F.2d at 1554. In this analysis, "the burden is on the state to 'put forward' the 'precise interests … [that are] justifications for the burden imposed by its rules,'" and to "explain the relationship between these interests" and the challenged provisions. Fulani, 973 F.2d at 1544 (quoting Anderson, 460 U.S. at 789). "The State must introduce evidence to justify both the interests the State asserts and the burdens the State imposes on those seeking ballot access." Bergland, 767 F.2d at 1554.

### i. The Character and Magnitude of the Injury

As applied here, Georgia's durational residency requirement for Public Service Commissioners burdens two overlapping rights protected by the First and Fourteenth Amendments: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968). "Both of these rights, of course, rank among our most precious freedoms." Id.; accord Anderson, 460 U.S. at 787. The residency requirement also implicates the Equal Protection Clause because it creates a "geographic classification" between persons who can and cannot run for Public Service Commission based on the location and duration of their residence. Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 183-87 (1979); accord

20

Cowen, 22 F.4th at 1235. *See also* Dunn v. Blumstein, 405 U.S. 330, 334-35 (1972)

(striking down a durational residency requirement for voting as a violation of the Equal

Protection Clause).


The Georgia Supreme Court first applied the Anderson test to the residency

requirement twenty years ago in Cox v. Barber. 275 Ga. at 417-18. The court applied

only low-level scrutiny, finding the requirement to be both reasonable and

nondiscriminatory as applied there. Id. at 418. However, the court expressly noted that

the new districts for Public Services Commissioners, which had just been redrawn in

April 2002, did not result in "a substantial number of residents excluded from seeking

office." Id. The court also noted "there is no evidence in the record that the district lines

were redrawn to exclude Barber specifically from being a candidate." Id. However, the

facts here are different. SB 472 ***did*** exclude a substantial number of residents from

seeking office. In fact, it excluded 1,444,834 people-- or 66 percent of the total

population of the former District 2, from seeking office in District 2, on the eve of the

qualifying period. That represents a much higher share of the population than other

courts have found to constitute a severe restriction on the rights of voters and

candidates, and the last-minute timing of the change before qualifying began reduced

the pool of potential candidates for public office, arguably, to near zero.

For example, in Headlee v. Franklin County Board of Elections, 368 F. Supp. 999 (1973), the court examined a one-year durational residency requirement in a community where, by reason of an annexation close to the election, nearly one-half of the community's residents would be ineligible to hold office. The court applied strict scrutiny because the durational residency requirement, combined with the recent annexation, "obviously reduces the number of potential candidates for public office and unnecessarily restricts voter choice." Id. at 1003. SB 472 excluded a greater share of the population than did the annexation in Headlee, which was cited with approval by the Georgia Supreme Court in Cox.

SB 472 also excluded a greater share of the population than the one-year durational residency requirement for members of New Jersey's state legislature at issue in Robertson v. Bartels, 150 F. Supp. 2d 691, 694-96 (D.N.J. 2001). Soon after the 2001 round of redistricting, the court applied strict scrutiny because the shifting district lines limited the voters' choice of candidates, thereby affecting the right to vote. Ten years later, the same court reiterated that holding and applied heightened scrutiny, inasmuch as, newly drawn district lines moved about *one-third* of residents into new districts. *See* Robertson v. Bartels, 890 F. Supp. 2d 519, 530 (D.N.J. 2012). Here, the number (and percentage) of residents shifted out of District 2, as a result SB 472, is substantially greater when compared to scenarios in other such cases.

22

The limiting effect of SB 472 is exacerbated here, inasmuch as, it came on the eve of the qualifying period. Georgians who were moved into District 2 at the last minute had less than a week to explore the possibility of a campaign. Even if such individuals had decided to "jump into" the race, they would be commencing campaigns months behind the incumbent. Such was not the case in Cox, *supra* where the General Assembly altered the districts in early April as the qualifying period, at that time, was at the end of June. *See* 2001 Ga. Laws. 2d. Ex. Sess. 325 § 7.

The Secretary of State addresses the substance of the population shift by dismissing it as "completely irrelevant." (Respondent's Br. 5 n.3.) He points out that while SB 472 may have removed 66 percent of former District 2's population, it also added population to the district. Such was the case in Robertson, as well. Population added to a district at the last minute does not mitigate the candidate-limiting effect of removing a large portion of the former district's population. Notably, no persons who were added to District 2 on March 4, 2022 qualified to challenge the incumbent by the close of the qualifying period on March 11, 2022.

23

Given the extent and timing of the changes made to District 2, this Court finds SB 472, as applied here, constitutes a severe limitation on the number of viable candidates for the Public Service Commission seat such that "heightened scrutiny" is warranted.

There is also a second reason to apply heightened scrutiny here. For unlike the circumstances found in Cox, *supra*, the record here contains substantial evidence that District 2 was drawn to exclude Ms. Durand, specifically, as a candidate. To find that governmental action was motivated by discriminatory intent, the discriminatory motive need only be "a motivating factor," not the sole, dominant, or primary one. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977).

The record here establishes that Republican Commissioner Pridemore drew the map. Her drawing of the map did not begin until after Ms. Durand launched her candidacy, gained momentum and filed a strong campaign-finance report that received media attention. Ms. Durand was Commissioner Echols' only challenger. Commissioner Pridemore's initial draft of the map kept Ms. Durand's home county in Commissioner Echols' district, however, Pridemore then asked Commissioner Echols for Ms. Durand's address—which she admits she did for use in drawing the map—and later removed Ms. Durand's home county. Commissioner Pridemore and other proponents of the map gave pretextual justifications—suggesting repeatedly it was legally required due to

24

population changes, when it was not. The General Assembly rejected an alternative map

which complied with the redistricting guidelines and the stated goals of SB 472 and the

General Assembly passed the map strictly along partisan lines—even though members

of the Public Service Commission are elected statewide.

These facts strongly support an inference that SB 472's district lines were motivated, at

least in part, by a desire to draw Ms. Durand's address out of District 2, as the

administrative law judge so found. (R. 572.) Commissioner Pridemore did not deny she

purposefully drew Ms. Durand out of Commissioner Echols' district-- and that is the

most reasonable inference from her text exchange with Commissioner Echols. Under

these circumstances, the application of Georgia's durational residency requirement to

Ms. Durand's candidacy falls within the Supreme Court's disfavored category of

restrictions—those that impose an unequal or discriminatory burden on an identifiable

political group. Restrictions in that category must be subject to heightened scrutiny. *See,

e.g.*, Anderson, 460 U.S. at 793; Graveline, 992 F.3d at 536. *Cf.* Larios v. Cox, 300 F. Supp.

2d 1320, 1347-48 (N.D. Ga.) (three-judge district court), *aff'd* 542 U.S. 947 (2004).

Heightened scrutiny under the Anderson test is thus warranted here for both reasons

that the Georgia Supreme Court recognized in Cox. The presence of these additional

25

circumstances also sufficiently distinguishes this case from <u>Cox</u> to permit a different result.

### ii. Asserted State Interests and Narrow Tailoring

The Secretary of State argued only that applying the residency requirement here satisfies low-level scrutiny, as it did in <u>Cox</u>. Notably, he did not attempt to argue that its application would survive intermediate or strict scrutiny. The Court concludes that Georgia's durational residency requirement was unconstitutionally applied in this case.

### C. The Secretary of State's findings are clearly erroneous.

The Secretary of State's final decision rejects 10 of the administrative law judge's findings. Each of the rejected findings is supported with a citation to the record, yet the Secretary rejects them because "they are not supported by a preponderance of the evidence or misstate or mischaracterize the evidence." (Final Decision at 1-2.) That finding by the Secretary of State—that the administrative law judge's findings are unsound—is itself clearly erroneous and is hereby reversed.

Section 50-13-41(d)(2) of the Georgia Code provides:

> In reviewing initial decisions by the Office of State Administrative Hearings, the reviewing agency shall give due regard to the administrative law judge's opportunity to observe witnesses. If the reviewing agency rejects or modifies a proposed finding of fact or a proposed decision, it shall give reasons for doing so in writing in the form of findings of fact and conclusions of law.

O.C.G.A. § 50-13-41(d)(2). Here, the Secretary of State's final decision offers no citations to the record, no further explanation and nothing to support his conclusion that the

administrative law judge's findings are unsound. In his brief before this Court, the

Secretary of State defends only three of his rejections. (Respondent's Br. 25-27.)


First, the Secretary argues the administrative law judge's finding in paragraph 52 "is

contradicted by the undisputed testimony that Chairman Pridemore drew her proposed

map before even asking for Ms. Durand's address." (Respondent's Br. 26.) Paragraph 52

provides:

> 52. Based on the testimony at the hearing and the exhibits, in particular
> the text exchange exhibit, the undersigned finds that, at the very least,
> the SB 472 redistricting map was drawn with Respondent's specific
> address in mind. (Ex. P-3, P-4)

(R. 572.) Here are the relevant portions of the exhibits cited by the administrative law

judge:



(R. 422, 424.) Chairman Pridemore testified she drew *two* maps. (Tr. 72:8-73:21). She

drew one map, which appears in the text exchange above, before she obtained Ms.

Durand's address. (Tr. 72:8-13.) The other map, which she drew-- with assistance from

Gina Wright after obtaining Ms. Durand's address-- became SB 472. (Tr. 72:14-73:21.)

The administrative law judge's finding in paragraph 52 is thus not contradicted by

Chairman Pridemore's testimony about her first map.


Second, the Secretary of State argues the administrative law judge's finding in

paragraph 27 "misstates the record evidence that the Reapportionment Office drafted

the map that was the basis for S.B. 472, which was independent from Pridemore's hand-

drawn proposal." (Respondent's Br. 26.) Paragraph 27 provides:

> 27. Commissioner Pridemore, acting as the PSC's liaison to the General
> Assembly, thereafter, revised her map with the assistance of Gina
> Wright, executive director of Georgia's Legislative and Congressional
> Reapportionment Office. (Tr. at 1:40:30.)

(R. 569.) Chairman Pridemore's testimony cited by the administrative law judge as

support for paragraph 27 begins on page 72 of the written transcript:

> 19  Q    And you were working with a member of Gina
> 20  Wright's staff to make those changes, correct?
> 21  A    I was working with Gina Wright.
> 22  Q    Herself?
> 23  A    Yes.
> 24  Q    And the two of you were sitting at a
> 25  computer with mapping software on it?
>
> Page 73
>
> 1  A    Yes.
> 2  Q    And that would have been in the February 5th
> 3  or 6th time frame?
> 4  A    It would have been in a February date
> 5  between January 27th and February 7th.
> 6  Q    You said a January date?
> 7  A    So, if you look at the e-mails, you'll see
> 8  that January 27th was when the colored pencil map
> 9  was given to Gina, and on February 7th, Gina sent
> 10  to me the map that was used in the legislation.
> 11  So, it would have been sometime between January
> 12  27th and February 7th.

(Tr. 72:19-73:12.) The Secretary of State does not identify the portions of the record

that paragraph 27 allegedly misstates, however, Chairman Pridemore's testimony

reveals she collaborated with Gina Wright, Director of the Reapportionment Office, to

draw the map that became SB 472. The cited testimony thus supports the finding in

paragraph 27.

Third, and finally, the Secretary of State argues the administrative law judge's finding in

paragraph 30 that the "new districts remove approximately 66 percent of the former

District 2's population is misleading, inasmuch as, it disregards the comparative

population that was *added* to the district and, in any event, is irrelevant to the

determination of whether Ms. Durand is qualified to be a member of Public Service

Commission-- District 2." (Respondent's Br. 26.) Paragraph 30 provides:

> 30. The new districts thus remove approximately 66 percent of the
> former District 2's population, including all of Gwinnett County—which
> alone comprised approximately 44 percent of the former District 2's
> population. (Ex. R-19.)

(R. 569.) The Secretary of State does not explain how this fact is not relevant to Ms.

Durand's assertion the residency requirement is unconstitutional *as applied* in this case.

In view of Robertson and Headlee, discussed above, the percentage of the former

district's population that was shifted out is relevant to determining whether the

residency requirement operates as a significant limit on the pool of available candidates.

It has a direct bearing on her defense. The Secretary of State also cannot establish that

paragraph 30 misstates or mischaracterizes the record. The cited exhibit, which appears

at pages 404 through 407 of the administrative record, directly supports the finding. The

Secretary of State provides no basis for the Court to conclude that the numbers in

paragraph 30 are misleading.

30

The Court has reviewed the material cited by the administrative law judge in support of the rejected findings. Those citations show that each of the rejected findings has support in the record and does not misstate or mischaracterize the evidence. The Secretary of State's rejection of those findings is thus clearly erroneous, considering the reliable, probative and substantial evidence contained in the record.

For the reasons set forth above, this Court concludes the application of Georgia's durational residency requirement *as applied in this case* violates the United States Constitution and the Georgia Constitution. The Final Decision of the Secretary of State is hereby **REVERSED**.  Ms. Durand is qualified to be a candidate for Public Service Commissioner -- District 2.  Let it be **SO ORDERED**.

This _____ day of _____, 2022.

8-18-2022

Judge Melynee Leftridge
Superior Court of Fulton County
Atlanta Judicial Circuit

31